No. CV-25-7977

# In the United States Court of Appeals for The Ninth Circuit

## PHILLIP POTTER,
*Plaintiff - Appellant,*

v.

KRIS MAYES, in her official capacity
as Arizona Attorney General;
PAMELA GATES, in her official administrative capacity
as Presiding Judge of the Maricopa County Superior Court,
*Defendants – Appellees.*

Appeal from the United States District Court
for the District of Arizona
Honorable Dominic W. Lanza
(2:25-cv-00663-PHX-DWL)

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
FOR INJUNCTIVE RELIEF PENDING APPEAL**

**RELIEF REQUESTED BY JANUARY 4, 2026**

Phillip Potter
2301 N. 66th Street
Scottsdale, AZ 85257
480-459-0310
phillip.t.potter@gmail.com
Pro Se Plaintiff - Appellant

## CIRCUIT RULE 27-3 CERTIFICATE

I, Phillip Potter, certify the following:

This appeal addresses a First Amendment facial challenge to Arizona Revised Statutes ("A.R.S.") § 12-3201. Appellant alleges all core court petitioning activities and all conduct incidental to petitioning which § 12-3201(E) prohibits or otherwise regulates are activities that the Petition Clause safeguards "in every application", while the § 12-3201(B) blanket restriction is not "narrowly tailored".

## 1. The Relief Requested in the Emergency Motion Accompanying This Certificate:

The relief requested in the emergency motion that accompanies this certificate is a FRAP 8(a)(2) injunction pending appeal to restrain and enjoin Arizona Attorney General Kris Mayes, in her official capacity, and Presiding Judge Pamela Gates, in her official administrative capacity,[1] from enforcing A.R.S. § 12-3201(B) ("A pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court") against Appellant during the pendency of the above-captioned appeal. Specifically, he asks the Court to issue an injunctive order which instructs Attorney General

---

[1] "Since [Plaintiff] sued [Presiding Judge Joseph Welty] in [his] administrative capacity as [Presiding Judge], we conclude that dismissal [for sovereign immunity] is not warranted". *Wolfe v. Strankman*, 392 F.3d 358, 365-66 (9th Cir. 2004). Per Fed. R. Civ. P. 25(d), Presiding Judge Pamela Gates was substituted as party when she assumed the Presiding Judge position in July.

i

Mayes, Presiding Judge Gates, all State officers, agents, employees, attorneys, and all other persons in active concert or participation with Attorney General Mayes or Presiding Judge Gates, are hereby restrained and enjoined from enforcing, attempting to enforce, threatening to enforce, or continuing to enforce A.R.S. § 12-3201 against Appellant in any manner, or otherwise taking any action against Appellant which has the effect of coercing Appellant's compliance with § 12-3201(B), pending the appeal's outcome.

In the _highly_ desirable alternative, the requested relief in the emergency motion that accompanies this certificate is a 28 U.S.C. § 1651 temporary restraining order (1) restraining the Attorney General's and Presiding Judge's enforcement of § 12-3201(B) in the same manner as described above, pending the outcome of Fed. R. Civ. P. 65 preliminary injunction proceedings conducted in the district court; and (2) remanding the case with instructions for the district court:

(a) to initiate preliminary injunction proceedings within fourteen days;

(b) to preliminarily review any issues pertinent to the constitutionality of A.R.S. § 12-3201(B) including "narrow tailoring", "content based" restrictions on petitioning, "prior restraint", and justifiable "government interests" as outlined in _Reed v. Town of Gilbert, Ariz._, 576 U.S. 155 (2015), provided that the state officers did not waive those defenses;[2] and

---

[2] As set forth more fully in the accompanying motion, Attorney General Mayes and

(c) to adopt the conjunctive legal standard made "explicit" in *BE & K Constr. Co. v. N.L.R.B.,* 536 U.S. 516 (2002) which properly defines the Petition Clause's scope,[3] and to incorporate the Arizona supreme court's interpretation of A.R.S. §§ 12-3201(E)(1)(a)-(f) language[4] as articulated in *Ariz. Republican Party v. Richer*, 257 Ariz., 210 (2024)[5], for the purposes of preliminarily (i) determining

---

Presiding Judge Gates did not argue in either of their Fed. R. Civ. P. 12(b)(6) motions (Doc. 38; Doc. 67) that Appellant failed to state a claim when challenging § 12-3201(B) or that the provision passes constitutional muster. *See Shay v. Apple Inc.*, 512 F. Supp. 3d 1066, 1071 (S.D. Cal. 2021) ("On a motion to dismiss, it is the defendant's burden to demonstrate that plaintiff has failed to state a claim.").

[3] To guarantee sufficient "breathing space for the [Petition Clause's] fruitful exercise", the Supreme Court "limited regulation to suits that were both objectively baseless *and* subjectively motivated by an unlawful purpose" in conjunctive fashion. *BE & K Constr. Co. v. N.L.R.B.,* 536 U.S. 516, 531 (2002) (emphasis original). The Ninth Circuit found "*BE & K* made this breathing room protection explicit". *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 932 (9th Cir. 2006). The Petition Clause's conjunctive "breathing space" standard mirrors the Speech Clause's conjunctive standard of falsity *and* actual malice that public officials must meet to sue for defamation, where liability does not attach unless "subjective" scienter (i.e., bad faith in the form of "guilty knowledge") is shown, not negligence (i.e., "erroneous statements honestly made"). *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 272-280, 285 (1964). Misapplying *Wolfe v. George*, 486 F.3d 1120 (9th Cir. 2007), the district court embraced the wrong legal standard – negligent "frivolous litigation" – as the sole legal basis to deny the TRO. *See U.S. v. Emmett*, 749 F.3d 817, 819 (9th Cir. 2014) ("It is an abuse of discretion to apply the wrong legal standard"). (Doc. 96).

[4] See *In re Kirkland,* 915 F.2d 1236, 1238 (9th Cir. 1990) ("When interpreting state law, a federal court is bound by the decision of the highest state court."),

[5] The key holding in *Richer*, as set forth more fully in the accompanying motion, is that, in Arizona, judicial considerations for the "subjective" bad faith motives or purposes behind bringing an action must be evaluated "separate" from, and are not "moored" to, consideration for the action's "objective" merits. Unlike California's vexatious litigant statute ("CVLS") (*see* Calif. Code Civ. P. §§ 391-391.8) and federal procedural rules, no A.R.S. § 12-3201(E)(1) provision "subsumes" a

whether "any" § 12-3201(E)(1)(a)-(f) definition of "vexatious conduct" reaches

constitutionally protected activities (i.e., core court "petitioning activities" or

_____

petition's baselessness when considering the petitioner's subjective motives or purposes. For instance, under Fed. R. Civ. P. 11(b)(1), "the 'improper purpose' inquiry subsumes the 'frivolousness inquiry' when applied to the filing of complaints. In other words, 'complaints are not filed for an improper purpose if they are non-frivolous.'" *CrossFit Inc. v. Martin*, No. 2:14-CV-02277-PHX-JJT, 2017 WL 4236968 (D. Ariz. Sept. 22, 2017) (quoting *Townsend v. Holman Consulting Corp.,* 929 F.2d 1358, 1362 (9th Cir. 1990). Federal rules can be, and are, interpreted to avoid reaching constitutionally protected petitioning. Similarly, "frivolous" litigation which is *also* subjectively motivated by an improper purpose is "the *sort* of frivolous litigation barred by the CVLS". *Sargent v. Cantil-Sakauye*, 812 F. App'x 682, 683 (9th Cir. 2020) (referencing *Wolfe v. George*, 486 F.3d 1120 (9th Cir. 2007)). Relying on "[a] long line of California decisions" per *Wolfe*, 487, F.3d, at 1125, the Ninth Circuit defers to California trial and lower appellate courts' interpretation of CVLS language because challengers in federal court have "not provide[d] convincing evidence that the California Supreme Court would" interpret the statute otherwise. *Sargent*, 812 F. App'x at 683. In contrast, Appellant did "provide convincing evidence that the" Arizona supreme court would find the "the sort of frivolous" petitioning written into Arizona's statute reaches constitutionally protected activities because that is precisely what the state's highest court did find. As set forth more fully in the accompanying motion, the Arizona supreme court cited the anti-surplusage canon to "extricate courts from the morass" of "attempting to discern the subjective motives" of petitioners "from the objective [merits] of litigation". *Richer* at ¶ 40. In Arizona, objective baselessness (i.e. frivolousness) and subjective motives (i.e., bad faith) are "separate" considerations where neither consideration subsumes, nor is "moored" to, the other. *Id*. Per *Richer*, no single § 12-3201(E)(1)(a)-(f) provision may be interpreted to meet the *BE & K* conjunctive standard. Further, Arizonans cannot be made subject to how California state judges may, or may not, interpret an Arizona statute, especially when the Arizona supreme court has ruled. The unpublished *Sargent* case "is not precedent except as provided by Ninth Circuit Rule 36-3" which states that unpublished cases are only "relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion." In other words, *Sargent* recognizes *Wolfe* stands as the "law of the case" and/or is preclusive when the CVLS is challenged. But Appellant does not challenge the CVLS. *Richer* binds the Ninth Circuit on A.R.S. § 12-3201(E) interpretation, not *Wolfe*.

iv

"conduct incidental to a petition") per *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931-32 (9th Cir. 2006) ("In determining whether the burdened conduct falls under the protection of the Petition Clause," courts must "give adequate 'breathing space' to the right to petition"), and (ii) considering the merits of the §§ 12-3201(E)(1)(a)-(f) overbreadth claim according to *Moody v. NetChoice, LLC,* 603 U.S. 707 (2024).

**2. Facts Showing the Existence and Nature of the Claimed Emergency:**

Appellant requests emergency injunctive relief on appeal from the district court's December 16th Order denying (Exh. 1, Doc. 96; Exh. 2, Doc. 47) Plaintiff's Motion for TRO and PI (Exh. 3, Doc. 94). For background, originating from state public records case CV2022-008626 brought to inspect documents implicating former State Representative Robert Meza's trading of his public office for private gain as reported by *The Arizona Republic* (Exh. 4, Doc. 14 at ¶¶ 14-18) and as confirmed by the Arizona Senate Ethics Committee Chair (Exh. 4, Doc. 14 at ¶ 25), a state court found Appellant statutorily vexatious for filing objectively baseless "court actions" in violation of A.R.S. § 12-3201(E)(1)(c). Critically, one of the statute's procedural defects is that this provision does not prohibit courts from reviewing or considering the speculative merits of parallel non-final actions, which is what trial and appellate courts did. With time, diligence, and further discovery, undisputed facts emerged showing Appellant never filed an objectively baseless petition, much less a petition that was both objectively baseless and

subjectively motivated by an improper purpose as per *BE & K.*  Rep. Meza and his associates made knowingly false statements and material omissions in public records litigation to conceal records and fraudulently secure judgments. (Exh. 4, Doc. 14 at ¶¶ 65, 66, 77, 78).  Other defendants in ongoing cases CV2021-005501 and CV2021-013201 subsequently requested and negotiated settlements rather than face eventual trial. (Exh. 5, Docs. 49).  *See Theme Promotions, Inc. v. News Am. Mktg. FSI,* 546 F.3d 991, 1008 (9th Cir. 2008) ("The fact that this ongoing litigation settled suggests that the original suit was not objectively baseless.").  That said, and to reiterate, Appellant does not challenge any state court judgment or seek relief from any judicial order.[6] (Exh. 6, Doc. 27).

Emergent facts and circumstances have arisen in three ongoing state cases (FC2020-090224, CV2021-005501, and CV2021-013210) determined meritorious as a function of state trial and appellate court proceedings (Exh. 4, Doc. 14 at ¶ 76), and the forementioned settlements.[7]  As the attached "Appellant's Affidavit"

---

[6] *See Noel v. Hall*, 341 F.3d 1148, 1157 (9th Cir. 2003) (The *Rooker-Feldman* doctrine does not apply to a facial challenge since such challenges are "not 'inextricably intertwined' with the judicial decision of the local court [and present] a general challenge to the constitutionality of" a statute seeking judicial review of legislative acts, not judicial review of judicial acts or of any state court decision.).
[7] Appellant learned during district court proceedings that Presiding Judge Joseph Welty had issued Administrative Order 2023-159 (Exh. 7, Doc. 67) which orders Appellant to comply with certain instructions apart from the separate judicial order finding him statutorily vexatious.  Arizona's constitution, pertinent statutes, and procedural rules establish that Presiding Judges hold an executive position with administrative authority only over court personnel, facilities, and resources.

explains, those cases have scheduled trial dates and rapidly approaching filing

deadlines.  Despite months of obfuscation regarding whether the Attorney General

is part of a "combination" of state officials "and private persons" statutorily

authorized to civilly and criminally prosecute conduct proscribed by § 12-

3201(B),[8] the state officers both acknowledged their non-judicial enforcement

---

Presiding Judges possess "no authority to compel persons outside the judiciary to" do, or to refrain from doing, anything.  *Maricopa County v. Dann,* 157 Ariz. 396, 400-01, 758 P.2d 1298, 1301 (1988).  A Presiding Judge's "'administrative authority' does not include 'authority over' private parties'". *Id.*  Presiding Judge Welty directed the administrative order's instructions toward Appellant, not court personnel.  Administrative Order 2023-159 demands compliance with the § 12-3201(B) provision before Appellant may exercise his First Amendment "right of access to the courts [which] is indeed but one aspect of the right of petition". *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Presiding Judge Welty "acted in the clear absence of all jurisdiction" when non-judicially compelling a private person outside the judiciary to take certain actions and to refrain from taking others.  *Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978).  To be clear, Presiding Judge Gates admitted Presiding Judge Joseph Welty was never judicially assigned to hear or decide any case involving Plaintiff, never entered the administrative order into any case docket, and made an administrative (i.e., non-judicial) decision when issuing Administrative Order 2023-159. (Exh. 8, Doc. 90; Exh. 9; Doc. 92).  The Presiding Judge's Fed. R. Civ. P. 12(b)(6) defense relies on absolute "[j]udicial immunity [which] only applies to judicial acts". *Forrester v. White,* 484 U.S. 219, 227 (1988).  "[A]bsolute judicial immunity does not apply to nonjudicial acts, i.e. the administrative, ... functions that judges may on occasion be assigned to perform." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1134 (9th Cir. 2001).  The Presiding Judge(s) did not, and cannot, establish justification for judicial immunity from facts in the record.  *Antoine v. Byers & Anderson*, 508 U.S. 429, 432 (1993) ("The proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity.").
[8] See *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 580 (1992) (Kennedy, A. concurring) (A legislature "has the power to ... articulate chains of causation that will give rise to a case or controversy").

connections to the challenged statute for the first time on November 28th but expressly refused to disavow enforcement, thus ensuring Appellant's standing from a pre-enforcement injury[9] and Article III jurisdiction. (Exh. 10, Doc. 93; Exh. 3, Doc. 94). The district court's December 16th denial of injunctive relief places Appellant in a perilous position requiring him to risk irreparable harm once more in the form of investigation, incarceration, loss of access to his six-year-old child, and other irreparable injuries (Exh. 4, Doc. 14 at ¶¶ 50-60) should he violate § 12-3201(B) by filing any "document without prior leave of the court" in meritorious cases where deadlines and requirements are imminent. (Appellant's Affidavit). Appellant endures pre-enforcement injuries and actual injuries which chill and punish his First Amendment rights to petition, including his right of access to the courts. These facts warrant emergency injunctive relief pending appeal since Appellant presents "a colorable First Amendment claim" when *Richer* is applied.[10]

---

[9] See *Isaacson v. Mayes*, 84 F.4th 1089, 1100 (9th Cir. 2023) ("The combination of these potential threats – from the county attorneys, [] and private parties – satisfies the third prong of *Driehaus*" to demonstrate standing); *Cal. Trucking Ass'n v. Bonta,* 996 F.3d 644, 653 (9th Cir. 2021) ("[T]he state's refusal to disavow enforcement ... is strong evidence that the state intends to enforce the law and that [plaintiffs] face a credible threat.").

[10] See *Fellowship of Christian Athletes v. San Jose Unified Sch. Bd. of Educ.,* 82 F.4th 664, 694-95 (9th Cir. 2023) (en banc) ("'Irreparable harm is relatively easy to establish in a First Amendment case' because the party seeking the injunction 'need only demonstrate the existence of a colorable First Amendment claim.'"); *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) ("[B]y establishing a likelihood that [the challenged statute]

### 3. Relief Is Required No Later Than: January 4, 2026

Appellant believes the Court can grant relief on the emergency motion with no additional briefing. But if the Court desires a response and a reply, Appellant recommends a briefing schedule whereby (1) Attorney General Mayes and Presiding Judge Gates provide responses to the emergency motion no later than December 29th; and (2) Plaintiff replies to each response two days later. This would give the Court at least four days to decide the emergency motion. As set forth more fully in the accompanying motion, Appellant (1) contends § 12-3201(B) is an unjustifiable, facially unconstitutional blanket restriction that fails for a lack of "narrowly tailoring" – a colorable claim neither state officer challenged on the merits; and (2) endorses the legal standard which provides the Petition Clause with *BE & K* and *Sosa* "breathing space", and brings color to his First Amendment claim that §§ 12-3201(E)(1)(a)-(f) overbroadly prohibit or otherwise regulate core petitioning and conduct incidental to a petition "in every application", as the *Richer* interpretation supports. This appeal asks the Court to resolve the purely legal issue of which legal standard properly defines the scope of the Petition Clause. Is it the standard which provides the First Amendment with "breathing space essential to its fruitful exercise" (i.e., suits that are "both objectively baseless

---

violates the U.S. Constitution, Plaintiff[] ha[s] also established that both the public interest and the balance of the equities favor [injunctive relief].").

and subjectively motivated by an unlawful purpose"), or is it a standard which provides no breathing space (i.e., "frivolous litigation")? The parties presented their arguments to the district court so a compressed schedule is reasonable.

**4. The Following Will Happen If Relief Is Not Granted Within The Requested Time:**

Absent relief granted within the requested time, Appellant faces civil and criminal prosecution, including indictment and incarceration, for exercising his First Amendment right to file court papers absent leave in meritorious cases – a right which he must exercise in less than twenty-one days. *See* Circuit Rule 27-3. The state officers admit being members of a "combination" of state officers and private persons authorized to prosecute Appellant, where certain members have repeatedly threatened to prosecute, continue to threaten to prosecute, and previously did (unsuccessfully) civilly prosecute him as part of the same legislatively defined chain of causation. (Exh. 4, Doc. 14 at ¶¶ 50-60, 83-98). Appellant faces a "bet the farm" decision antithetical to the First Amendment. *See Peace Ranch, LLC v. Bonta,* 93 F.4th 482, 487 (9th Cir. 2024). Prosecution is likely to occur absent relief within the requested time.

**5. Why the Motion Could Not Have Been Filed Earlier:**

Attorney General Mayes obfuscated her Fed. R. Civ. P. 12(b) defenses for months, declaring on June 3rd that she was "unlikely" to prosecute any § 12-

3201(B) violation and Appellant therefore did not suffer a pre-enforcement injury. (Exh. 11, Doc. 38; Exh. 12, Doc. 53). She finally declared her true position on November 28th after Appellant learned Presiding Judge Welty had issued an administrative (i.e., non-judicial) order heightening the enforcement threat. This resulted in the state officers finally acknowledging their connection to the statute's enforcement scheme while refusing to disavow enforcement. Appellant notified the district court of the officers' newfound positions via the denied motion. (Exh. 3, Doc. 94). As a pro se litigant, he educated himself and filed this motion shortly after the December 16th denial which, for the first time, emphatically foreclosed any possibility of interlocutory relief and effectively decided the merits on an erroneous legal standard. (Exh. 1, Doc. 96; Exh. 2, Doc. 47).

**6. Explain Whether the Relief Sought in the Motion Was First Sought in the District Court or Agency, and If Not, Why the Motion Should Not Be Remanded or Denied:**

Yes, Appellant sought that relief in the district court. (Exh. 3, Doc. 94).

**7. When and How the Movant Did or Will Give Notice to, and Serve the Motion on, Counsel for the Other Parties, and If Known – What the Other Parties' Positions Are on the Motion:**

In compliance with FRAP 8(a)(2) and Circuit Rule 27-3, Appellant filed a Notice of Appeal in the district court and sent a December 16th email to each

defendant party's counsel, collectively giving those parties advance notice of

Appellant's intent to file the emergency motion requesting an injunction pending

appeal. Appellees responded on December 18th, conveying opposition to the

emergency motion and proposed relief. Appellant will email a PDF copy of this

motion to each Defendant - Appellee counsel immediately after filing. *Plaintiff*

*has notified the Circuit staff via voicemail and email about the filing of this motion.*

### 8. Names, Telephone Numbers, E-mail Addresses, and Office Addresses of the Attorneys for All Parties:

> Phillip Potter
> 2301 N. 66th Street
> Scottsdale, AZ 85257
> 480-459-0310
> phillip.t.potter@gmail.com
> *Pro Se Plaintiff - Appellant*
>
> Hayleigh Crawford
> Joshua Katz
> Office of the Attorney General
> 2005 N. Central Avenue
> Phoenix, AZ 85004-1592
> 602-542-5025
> Hayleigh.Crawford@azag.gov
> Joshua.Katz@azag.gov
> *Attorneys for Defendant - Appellees Attorney General Kris Mayes*
>
> Kara Karlson
> Office of the Arizona Attorney General
> 2005 N. Central Avenue
> Phoenix, AZ 85004-1592
> 602-542-8323
> Kara.Karlson@azag.gov
> *Attorney for Defendant – Appellee Presiding Judge Pamela Gates*

Brett W. Johnson
Derek C. Flint
Charlene A. Warner
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
602-382-6000
bwjohnson@swlaw.com
dflint@swlaw.com
cwarner@swlaw.com
*Attorneys for Defendant Karrin Taylor Robson*

Timothy Nelson
24 West Camelback Road
Suite A#541
Phoenix, Arizona 85013
602-421-2681
Tim@nelsonlawsolutions.com
*Attorney for Defendant Robert Meza*

Trevor Cook
Jeffrey Silence
20235 N. Cave Creek Road
Suite 104 # 460
Phoenix, AZ 85024
602-932-8358
trevor@silencelaw.com
jeff@silencelaw.com
*Attorneys for Defendant Alane Ortega*

I declare under penalty of perjury that the foregoing is true as of this date, December 23, 2025.

By: /s/ Phillip Potter
Phillip Potter
Pro Se Plaintiff - Appellant

# TABLE OF CONTENTS

CIRCUIT RULE 27-3 CERTIFICATE ........................................................ i

TABLE OF AUTHORITIES .................................................... xvi

INTRODUCTION ....................................................................... 1

JURISDICTION ........................................................................... 2

ARGUMENT ................................................................................ 3

   I. The Court Should Grant Relief............................................... 4

      A. Factor One: Plaintiff Is Likely To Succeed On The Merits .......... 4

         1. A.R.S. § 12-3201(B) Is Not Narrowly Tailored ...................... 5

         2. A.R.S. § 12-3201(E) Violates The Overbreadth Doctrine ......... 7

            a. A.R.S. § 12-3201(E) Reaches Constitutionally
            Protected Activities ................................................ 7
              i. The U.S. Supreme Court Established The Petition
              Clause's Scope ......................................................... 8
              ii. The Arizona Supreme Court Determined
              A.R.S § 12-320 Reaches Constitutionally
              Protected Activities; *Richer* Is Binding ........................... 10

            b. A.R.S. § 12-3201(E) Lacks A Plainly Legitimate Sweep .... 13
              i. A.R.S. § 12-3201(E) Prohibits and Otherwise
               Regulates Constitutionally Protected Activities,
               Not *Unprotected* Activities ............................................ 13
              ii. Every Pro Se Litigant Has *Noerr-Pennington*
              Immunity ........................................................................ 14

            c. A.R.S. § 12-3201(E) Violates The Petition Clause
             At Least In A Substantial Number of Applications ............. 17

      B. Factor Two: Irreparable Injuries .................................... 17

C. Factors Three and Four: The Balance of Equities
  Tip Sharply In Plaintiff's Favor, While An Injunction
  Is In The Public's Interest ............................................................ 18

II. CONCLUSION ..................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                                     **Pages**

*360 Mortg. Grp., LLC v. Fortress Inv. Grp. LLC*,
   No. 19-CV-8760, 2020 WL 5259283 (S.D.N.Y. Sept. 3, 2020) ............. 15

*Arizona Attorneys for Crim. Just. v. Mayes*,
   127 F.4th 105 (9th Cir. 2025) ................................................. 7, 11

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ................................................. 18

*Ariz. Republican Party v. Richer*,
   257 Ariz., 210 (2024) ................................................. 1, 2, 5, 10-15

*Bantam Books, Inc.* v. *Sullivan*,
   372 U.S. 58 (1963) ................................................. 5

*B&G Foods N. Am., Inc. v. Embry*,
   29 F.4th 527 (9th Cir. 2022) ................................................. 15

*BE & K Constr. Co. v. N.L.R.B.*,
   536 U.S. 516 (2002) ................................................. 1, 2, 9, 12, 15

*Bill Johnson's Rests.*, *Inc. v. N.L.R.B.*,
   461 U.S. 731 (1983) ................................................. 5, 7, 8

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) ................................................. 7

*CrossFit Inc. v. Martin*,
   No. 2:14-CV-02277-PHX-JJT, 2017 WL 4236968
   (D. Ariz. Sept. 22, 2017) ................................................. 12

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
   82 F.4th 664 (9th Cir. 2023) (en banc) ................................................. 4, 18

*Fidelity Exploration and Prod. Co. v. U.S.*,
   506 F.3d 1182 (9th Cir.2007) ................................................. 8

*Givens v. Newsom*,
No. 20-15949, 2020 WL 7090826 (9th Cir. Dec. 4, 2020) ........................ 3

*Hudson v. Moore Business Forms, Inc.*,
836 F.2d 1156 (9th Cir.1987) ..................... 12

*In re Kirkland*,
915 F.2d 1236 (9th Cir. 1990) ..................... 13

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ..................... 19

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ..................... 7, 13, 14

*Moore v. Keegan Mgmt. Co.*,
78 F.3d 431 (9th Cir. 1996) ..................... 2

*Peace Ranch, LLC v. Bonta*,
93 F.4th 482 (9th Cir. 2024) ..................... 4

*Pro. Real Est. Investors., Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993) ..................... 12, 14

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) ..................... 6

*Religious Tech. Ctr., Church of Scientology Int'l, Inc. v. Scott*,
869 F.2d 1306 (9th Cir. 1989) ..................... 3

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) ..................... 19

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ..................... 18

*Saenz v. Roe*,
526 U.S. 489 (1999) ..................... 16

*Sosa v. DIRECTV, Inc.*,
  437 F.3d 923 (9th Cir. 2006) ........................................................ 2, 8, 9, 13-16

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001) ................................................................. 4

*Tucson v. City of Seattle*,
  91 F.4th 1318 (9th Cir. 2024) ................................................................. 17

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades
Council, AFL-CIO*,
  31 F.3d 800 (9th Cir. 1994) ................................................................. 10

*U.S. v. Cabaccang*,
  332 F.3d 622, 626 (9th Cir.2003) (en banc) ............................................. 11

*U.S. v. Hansen*,
  599 U.S. 762, 769 (2023) ................................................................. 7

*U.S. v. Johnson*,
  256 F.3d 895 (9th Cir.2001) ................................................................. 1

*U.S. v. Koziol*,
  993 F.3d 1160 (9th Cir. 2021) ................................................................. 2

*U.S. v. O'Brien*,
  391 U.S. 367 (1968) ................................................................. 6

*Where Do We Go Berkeley v. California Dep't. of Transportation*,
  32 F.4th 852 (9th Cir. 2022) ................................................................. 4

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ................................................................. 14, 15

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7, 20 (2008) ................................................................. 4, 18

*Wolfe v. George*,
  486 F.3d 1120 (9th Cir. 2007) ................................................................. 1, 5

**Statutes**

28 U.S.C. § 1292(a)(1) .................................................................... 2

42 U.S.C. § 1983 ............................................................................ 3

A.R.S. § 12-3201(B) ........................................................ 1, 4, 6, 16-18

A.R.S. § 12-3201(E) ......................................................... 1, 2, 5, 7-19

**Constitution**

U.S. Const., Amdt. 1 ............................................................... passim

**Other Authorities**

Antonin Scalia & Bryan A. Garner,
  *Reading Law: The Interpretation of Legal Texts* (2012) ........................... 9

Black's Law Dictionary (7th Ed., 1999) ...................................................... 11

Black's Law Dictionary (10th Ed., 2014) ...................................................... 2

Black's Law Dictionary (12th Ed., 2024) ...................................................... 12

# INTRODUCTION

As cited in the Circuit Rule 27-3 Certificate, *supra*, the district court issued an order denying Plaintiffs' motion for TRO and PI on December 16th. (Exh. 1, Doc. 96). Failing to even address arguments that § 12-3201(B) is not narrowly tailored (Exh. 4, Doc. 14 at ¶¶ 188-192; Exh. 3, Doc. 94; Exh. 13, Doc. 23), the district court erred when rejecting the "merits-based arguments set forth in Plaintiff's Second TRO/PI Motion" that § 12-3201(E) is overbroad because the court was "bound by" the "*Wolfe v. George*, 486 F.3d 1120 (9th Cir. 2007)" holding that "there is no constitutional right to file frivolous litigation ... This reasoning forecloses Plaintiff's overbreadth challenge". (Exh. 1, Doc. 96; Exh. 2, Doc. 47). That phrase from *Wolfe* (1) was read out of context and exclusively relates to the CVLS, making the phrase *dicta* at best;[11] and (2) is inapplicable to Arizona's vexatious litigant statute where *Ariz. Republican Party v. Richer*, 257 Ariz., 210 (2024) is binding. Consistent with *Richer* and *BE & K Constr. Co. v. N.L.R.B.,* 536 U.S. 516 (2002), the Ninth Circuit defines a "frivolous" petition as being "both baseless [i.e., meritless on the facts and law] and made without a

---

[11] *See U.S. v. Johnson,* 256 F.3d 895, 915 (9th Cir.2001) (en banc) ("Of course, not every statement of law in every opinion is binding on later panels. Where it is clear that a statement is made casually and without analysis, where the statement is uttered in passing without due consideration of the alternatives, or where it is merely a prelude to another legal issue that commands the panel's full attention, it may be appropriate to re-visit the issue in a later case.").

reasonable and competent inquiry". *Moore v. Keegan Mgmt. Co.,* 78 F.3d 431, 434 (9th Cir. 1996). A "frivolous" petition can be fairly characterized as an "objectively baseless" petition filed in negligent fashion. Negligence is not enough to forfeit Petition Clause protections. A litigant must file an objectively baseless petition *and* demonstrate scienter[12] to accomplish an improper purpose when filing that petition before statutory prohibitions or liability may attach. "[R]equiring both objective baselessness and an improper motive ... ensure[s] citizens may enjoy the right of access to the courts". *U.S. v. Koziol,* 993 F.3d 1160, 1171 (9th Cir. 2021). The Petition Clause protects core "petitioning activities" and "conduct incidental to a petition" unless the underlying petition is "*both* objectively baseless *and* subjectively motivated by an unlawful purpose" per *Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006) and *BE & K*, where *Richer* binds the Ninth Circuit to interpret § 12-3201(E) such that the definitions of "vexatious conduct" reach constitutionally protected activities. (Exh. 3, Doc. 94).

## JURISDICTION

The December 16th order foreclosed any possibility Plaintiff might secure future interlocutory relief based on a misreading of circuit precedent, making the district court order immediately appealable. 28 U.S.C. § 1292(a)(1). "A district

---

[12] "Scienter" refers to "[a] degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission". Black's Law Dictionary (10th Ed., 2014).

2

court's denial of a TRO 'effectively foreclose[s]' a party from 'pursuing further interlocutory relief' and permits appeal when it makes clear that any request for injunctive relief would be rejected." *Givens v. Newsom*, No. 20-15949, 2020 WL 7090826, *1 (9th Cir. Dec. 4, 2020) (quoting *Religious Tech. Ctr., Church of Scientology Int'l, Inc. v. Scott,* 869 F.2d 1306, 1308-09 (9th Cir. 1989) (allowing appeal from a TRO denial when the district court "emphatically" stated that circuit precedent "foreclosed any interlocutory relief".). The district court "emphatically" denied a TRO, made clear for the first time that its understanding of circuit precedent "foreclosed" any possibility of interlocutory relief, and applied a legal standard at direct odds with Supreme Court precedent when it "denied the [TRO] motion [and] failed to afford the relief requested." FRAP 8(a)(2)(A)(2).

## ARGUMENT

Good cause exists to grant the requested relief, and to do so on an emergency basis. Appellant must soon submit court filings to comply with trial schedules set in meritorious cases where filing deadlines and requirements are less than twenty-one days away. (Appellant's Affidavit). Under 42 U.S.C. § 1983, federal courts are permitted, and should be counted on, to enjoin state officers from penalizing conduct proscribed by an unconstitutional statute when a plaintiff expresses a plan to engage in such conduct, there exists a colorable First Amendment claim, and the plaintiff otherwise finds himself in a "bet the farm"

position absent injunctive relief. *Peace Ranch, LLC v. Bonta,* 93 F.4th 482, 487 (9th Cir. 2024). Plaintiff faces enforcement of § 12-3201(B), including criminal prosecution for engaging in constitutionally protected court petitioning activities.

## I. THE COURT SHOULD GRANT RELIEF

Courts apply the same approach to TRO requests as to PI motions. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "The Supreme Court has explained that plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *Where Do We Go Berkeley v. California Dep't. of Transportation,* 32 F.4th 852, 859 (9th Cir. 2022) (citing *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). Courts "evaluate 'these factors on a sliding scale, such 'that a stronger showing of one element may offset a weaker showing of another.' When the balance of equities 'tips sharply in the plaintiff's favor,' the plaintiff must raise only 'serious questions' on the merits – a lesser showing than likelihood of success." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,* 82 F.4th 664, 684 (9th Cir. 2023) (en banc).

### A. Factor One: Plaintiff Is Likely To Succeed On The Merits

Questions of Article III jurisdiction and standing have now been answered in

4

Plaintiff's favor. On the merits, state officers asked the district court (1) to treat *Wolfe*, not *Richer*, as binding on § 12-3201(E) interpretation, although *Wolfe* only relates to the CVLS and *Richer* expressly interpreted A.R.S. § 12-3201 language. California's statute and Arizona's statute indisputably contain no common language, structure, legislative history, or state constitutional underpinnings. The two statutes share a common label – "vexatious litigant statute". That is not enough to hold up the state officers' tentpole defense that § 12-3201(E) does not reach constitutionally protected activities. (Exh. 14, Doc. 37; Exh. 11, Doc. 38). When *Richer* is recognized as binding precedent, A.R.S. §§ 12-3201(E)(1)(a)-(f) reach constitutionally protected activities per *BE & K* and Plaintiff prevails on the overbreadth claim. (Exh. 3, Doc. 94). In addition, the officers presented no Fed. R. Civ. P. 12(b)(6) defense against the claim that § 12-3201(B) is not narrowly tailored, relying on obfuscation to uphold a Fed. R. Civ. P. 12(b)(1) jurisdictional standing defense before conceding Plaintiff has standing on November 28th.

### 1. A.R.S. § 12-3201(B) Is Not Narrowly Tailored

Per § 12-3201(B), litigants found vexatious "may not file a new [Ariz. R. Civ. P. 7] pleading, motion or other document without prior leave of the court" even in active "well-founded" suits. *See Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 742-43 (1983) ("well-founded lawsuits ... [may] not be enjoined"). The § 12-3201(B) blanket injunction serves (1) as a "prior restraint" on the

fundamental right to petition per *Bantam Books, Inc.* v. *Sullivan,* 372 U.S. 58, 70 (1963) ("Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."); and (2) as a "content based" regulation of a fundamental right per *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) ("[R]egulations [are] considered content based if they 'cannot be justified without reference to the content of the regulated speech' [or petitioning])."). Fundamental rights restrictions and regulations are "justified only if the government proves that they are narrowly tailored to serve compelling state interests". *Id* at 158. Defendants cannot overcome the accompanying rigors of "strict scrutiny", or even intermediate scrutiny, since § 12-3201(B) is not "narrowly tailored". *Id* at 158-162 ("[T]he First Amendment expressly targets the operation of the laws – i.e., the 'abridg[ement] of [court petitioning for redress]' – rather than merely the motives of those who enacted them. U.S. Const., Amdt. 1. 'The vice of content-based legislation ... is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes.' ... [I]t is the [State's] burden to demonstrate that the [statute's operation and enforcement] furthers a compelling governmental interest and is narrowly tailored to that end."). (Exh., 4, Doc. 14 at ¶¶ 188-192). They did not, and cannot, meet their "burden". *Id*; *see also U.S. v. O'Brien*, 391 U.S. 367, 377 (1968) ("We hold that a government regulation is sufficiently justified if it is within the constitutional

power of the Government; if it furthers a[] [compelling] or substantial

governmental interest; if the governmental interest is unrelated to the suppression

of free expression; and if the incidental restriction on alleged First Amendment

freedoms is no greater than is essential to the furtherance of that interest.").

### 2. A.R.S. § 12-3201(E) Violates the Overbreadth Doctrine

State laws which operate entirely, or substantially and unjustifiably, within

the First Amendment's scope may be challenged as overbroad. *Broadrick v.*

*Oklahoma,* 413 U.S. 601, 613 (1973). A statute which "lacks a plainly legitimate

sweep" is void. *Moody v. NetChoice, LLC,* 603 U.S. 707, 721 (2024). "[L]itigants

mounting a facial challenge to a statute normally 'must establish that *no set of*

*circumstances* exists under which the [statute] would be valid.'" *U.S. v.*

*Hansen,* 599 U.S. 762, 769 (2023) (emphasis original). Alternatively, First

Amendment facial challenges also may be successful if a plaintiff can show that "a

substantial number of [the law's] applications are unconstitutional, judged in

relation to the statute's plainly legitimate sweep." *Id*. "[I]n facial challenges under

... the First Amendment, like this one, courts set the bar lower out of respect for the

value of free expression." *Arizona Attorneys for Crim. Just. v. Mayes,* 127 F.4th

105, 107 (9th Cir. 2025).

### a. A.R.S. § 12-3201(E) Reaches Constitutionally Protected Activities

Attorney General Mayes contended "baseless litigation is not immunized by

the First Amendment right to petition" per "*Bill Johnson's Rests.*", and posited that

§ 12-3201(E) "does not encompass [i.e., reach] constitutionally protected speech or

activities" because "there is no constitutional right to file frivolous [i.e., objectively

baseless] litigation". (Exh. 11, Doc. 38; Exh. 13, Doc. 37). This attempt to

constrain the Petition Clause's scope to "[non]baseless litigation" or

"[non]frivolous litigation" is untenable since the Supreme Court <u>*directly*</u> and

unambiguously <u>*rejected*</u> the Attorney General's interpretation of the exact *Bill*

*Johnson's* phrase upon which her merits defense relied. (Exh. 3, Doc. 94; Exh. 4,

Doc. 14 at ¶¶ 114-187).

<u>i. The U.S. Supreme Court Established The Petition Clause's Scope</u>

All courts "must follow the Supreme Court precedent that directly controls."

*Fidelity Exploration and Prod. Co. v. U.S.*, 506 F.3d 1182, 1186 (9th Cir.2007).

And the Supreme Court held that when deciding whether "conduct falls under the

protection of the Petition Clause, we must give adequate 'breathing space' to the

right of petition". *Sosa.*, 437 F.3d at 932. Our nation's highest court explained "in

*Bill Johnson's* that [courts] could enjoin baseless retaliatory [i.e., baseless <u>*and*</u>

retaliatory] suits because they fell outside of the First Amendment and thus were

analogous to 'false statements.' We concluded that '[j]ust as false statements are

not immunized by the First Amendment right to freedom of speech, baseless

litigation is not immunized by the First Amendment right to petition.' While this

analogy is helpful, it does <u>not</u> suggest that the class of baseless litigation is *completely* unprotected: <u>*At most*</u>, it indicates such litigation should be unprotected 'just as' false statements are.  And while false statements may be unprotected for their own sake, '[t]he First Amendment <u>requires</u> that we protect some falsehood in order to protect *speech that matters.*'  ([N]oting the need to protect some falsehoods to ensure that 'the freedoms of speech and press [have] '<u>*breathing space*</u>' essential to their fruitful exercise'). ... It is at least consistent with these 'breathing space' principles that we have <u>never</u> held that the <u>entire</u> class of objectively baseless litigation may be enjoined *or <u>declared unlawful</u>* even though such suits may advance no First Amendment interests of their own.  Instead, in cases like *Bill Johnson's ...,* our holdings <u>limited regulation</u> to suits that were <u>both</u> objectively baseless *and* subjectively motivated by an unlawful purpose".  *BE & K,* 536 U.S. at 530-31 (Italics with underline emphasis added). (Exh. 3, Doc. 94).  The Ninth Circuit found "*BE & K* made this breathing room protection explicit" such that the scope of the Petition Clause protects and "immunizes" core court "petitioning activities" (i.e., filing Ariz. R. Civ. P. 7 "pleadings allowed" such as a "complaint", "answer", etc.) and all "conduct incidental to a petition" (i.e., motion practice, settlement communications, etc.) from statutory regulation "unless the underlying petition itself fell outside" the *BE & K* "both ... and" conjunctive[13]

---

[13] *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of*

parameters. *Sosa*, 437 F.3d at 932-938. Only when the "underlying petition f[alls]

outside" those parameters can a suit be treated as an actionable, non-immunized

"sham" per the "sham litigation exception". *Id*. (Exh. 3, Doc. 94; Exh. 4, Doc 14

at ¶¶ 113-187). The Ninth Circuit applies "a strict two-step analysis to assess

whether a single action constitutes sham petitioning. ... The two parts of the test

operate in succession: Only if the suit is found to be objectively baseless does the

court proceed to examine the litigant's subjective intent." *USS-POSCO Indus. v.*

*Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 810-

11 (9th Cir. 1994). Contrary to Appellees' contention, the Petition Clause's scope

captures all core court "petitioning activities" and all "conduct incidental",

including "baseless litigation" and "frivolous litigation", provided the "underlying"

suit is not a conjunctively demonstrated "sham". (Exh. 3, Doc. 94).

### ii. The Arizona Supreme Court Determined § 12-3201(E) Reaches Constitutionally Protected Activities; *Richer* Is Binding

The Arizona supreme court construed § 12-3201(E) language[14] and, as

_____

*Legal Texts* (2012) ("Under the conjunctive/disjunctive canon, *and* combines items
while *or* creates alternatives. Competent users of the language rarely hesitate over
their meaning.").

[14] For "this section: 1. 'Vexatious conduct' includes any of the following: (a)
Repeated filing of court actions solely or primarily for the purpose of harassment.
(b) Unreasonably expanding or delaying court proceedings. (c) Court actions
brought or defended without substantial justification. (d) Engaging in abuse of
discovery or conduct in discovery that has resulted in the imposition of sanctions
against the pro se litigant. (e) A pattern of making unreasonable, repetitive and

Plaintiff alleged (Exh. 4, Doc 14 at ¶¶ 121-194), found every § 12-3201(E)(1)(a)-

(f) "vexatious conduct" definition reaches constitutionally protected activities.[15]

(Exh. 4, Doc. 14, 128-131). Per *Richer*, § 12-3201(E)(1)(c) regulates civil actions

brought "without substantial justification" (i.e., "groundless"[16] petitions

negligently filed as judged against the standard of "what a reasonable attorney

would do")[17] while the other A.R.S. § 12-3201(E)(1) "subsections" evaluate

"*separate* bad faith" in the form of the § 12-3201(E)(1)(a) subjectively motivated

improper "purpose of harassment"[18] or any A.R.S. § 12-3201(E)(1)(b), (d), (e) or

---

excessive requests for information. (f) Repeated filing of documents or requests for
relief that have been the subject of previous rulings by the court in the same
litigation. 2. 'Without substantial justification' has the same meaning prescribed in
section 12-349. Per 'section 12-349[F]', 'without substantial justification' means
that the claim or defense is groundless and is not made in good faith."

[15] Courts "may assume without deciding that the [challenged] statute 'reaches
some [First Amendment] protected'" activities when deciding issues at the
dismissal or preliminary injunction stages. *Arizona Attorneys for Crim. Just.,* 127
F.4th at 110. In addition, a plaintiff can sufficiently allege a statute reaches
protected activities simply "from the text of [the law]". *Virginia v. Hicks,* 539 U.S.
113, 122 (2003). (Exh. 4, Doc. 14 at ¶¶ 121, n.28).

[16] "Groundless" and "baseless" are synonymous terms. Black's Law Dictionary
(7th Ed., 1999) ("Baseless" means "without legal or factual basis; groundless".).

[17] "Objectively baseless", "frivolous", and "without substantial justification" are
functionally equivalent terms.

[18] Per *Richer*, courts must consider the statutorily undefined § 12-3201(E)(1)(a)
term of "harassment" "separate" from the § 12-3201(E)(1)(c) objective merits.
"Harassment" in this context thus has its "ordinary, contemporary, common
meaning" of annoyance. *U.S. v. Cabaccang,* 332 F.3d 622, 626 (9th Cir.2003) (en
banc) ("When Congress does not define a term in a statute, we construe that term
'according to [its] ordinary, contemporary, common meaning"). This differs from
how "harassment' is interpreted under procedural rules where "harassment" is
treated as a legal term of art which inherently includes (i.e., "subsumes") a finding

(f) motivation[19] or purpose, which are not "moored" to the merits. *Id* at ¶¶ 35-44
(emphasis added). (Exh. 4, Doc. 14 at ¶¶ 128-131). The state's highest court
explained that to conclude otherwise would render § 12-3201(E)(1)(c)
"superfluous" in violation of the anti-surplusage canon. *Id* at ¶ 37. This construal
"extricates our courts from the morass of attempting to discern the subjective
motives of attorneys and parties in bringing a case and avoids conflating motive
and the objective reasonableness of litigation". *Id* at ¶ 40. *Richer* stands as
binding precedent on how the challenged statute must be interpreted and construed.

---

of no "legitimate purpose" for the underlying "complaint'. *Hudson v. Moore
Business Forms, Inc.,* 836 F.2d 1156, 1159 (9th Cir.1987) ("[B]ecause of the
objective standard applicable to Rule 11 analyses, a complaint that is found to be
well-grounded in fact and law cannot be sanctioned as harassing, regardless of the
attorney's subjective intent".); *CrossFit Inc. v. Martin,* No. 2:14-CV-02277-PHX-
JJT, 2017 WL 4236968 (D. Ariz. Sept. 22, 2017) ("[T]he 'improper purpose'
inquiry subsumes the 'frivolousness inquiry' when applied to the filing of
complaints. In other words, 'complaints are not filed for an improper purpose if
they are non-frivolous.'"); Black's Law Dictionary (12th Ed., 2024) ("Harassment"
means "[w]ords, conduct, or action . . . that, being directed at a specific person,
annoys, alarms, or causes substantial emotional distress to that person and serves
*no legitimate purpose*."). Per *Richer*, § 12-3201(E)(1)(a) "harassment" does not
"subsume" the merit's objective baselessness.

[19] No provision under §§ 12-3201(E)(1)(b) ("*Unreasonably* expanding or delaying
court proceedings"), (d) ("A pattern of making *unreasonable*, repetitive and
excessive requests for information"), or (e) ("A pattern of making *unreasonable*,
repetitive and excessive requests for information") presents a subjectively
motivated improper purpose since the negligence standard for determining what a
"reasonable" attorney or person would do is objective, not subjective. *See Pro.
Real Est. Investors., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61
(1993). (A "subjectively motivated" litigant has a "subjective intent" to achieve an
improper purpose.). A.R.S. §§ 12-3201(E)(1)(b), (d), and (e) all lack the
"subjectively motivated" element that *BE & K* requires.

*See In re Kirkland,* 915 F.2d 1236, 1238 (9th Cir. 1990) ("When interpreting state law, a federal court is bound by the decision of the highest state court.").  And *Richer* tells us that the challenged statute casts far too wide a net and reaches "protected petitioning activity or activity which must be protected to afford breathing space to the right of petition guaranteed by the First Amendment".  *Sosa*, 437 F.3d at 933.

### b. A.R.S. § 12-3201(E) Lacks A Plainly Legitimate Sweep

The "first step in the proper facial analysis is to assess the state law's scope. What activities, by what actors, do the laws prohibit or otherwise regulate?" *Moody*, 603 U.S. at 724.  A.R.S. § 12-3201 "actors" are civil "pro se litigant[s]". "[A]ctivities" that the challenged provisions "prohibit or otherwise regulate" are "any" activities defined as "vexatious conduct" per §§ 12-3201(E)(1)(a)-(f).

### i. A.R.S. § 12-3201(E) Prohibits and Otherwise Regulates
### Constitutionally Protected Activities, Not *Unprotected* Activities

Consistent with *Richer*, when deciding whether the Petition Clause protects activities related to court petitioning, "proof of a lawsuit's objective baselessness is the 'prerequisite': a court may not even consider the defendant's allegedly illegal objective unless it first determines that his lawsuit was objectively baseless." *White v. Lee*, 227 F.3d 1214, 1233 (9th Cir. 2000); *Pro. Real Est. Investors., Inc*, 508 U.S. at 60 ("Only if challenged litigation is objectively meritless may a court

examine the litigant's subjective motivation."). Each § 12-3201(E)(1) (a), (b), (d), (e), and (f) provision purports to present a motive or purpose for filing suit which *Richer* held is "separate' from, and not "moored" to, any § 12-3201(E)(1)(c) merits considerations. Again, courts "may not even" consider any filing motive or purpose unless the suit's merits are first found to be objectively absent. Defining various "separate" motives and purposes behind litigation, §§ 12-3201(E)(1)(a), (b), (d), (e), and (f) only regulate protected "conduct incidental to a petition" per *Sosa* since those provisions do not "subsume" the presence of a baseless petition. And § 12-3201(E)(1)(c) does not, and cannot, address anything beyond whether an objectively baseless "action" was filed. Per *Sosa* and *Richer*, each § 12-3201(E)(1)(a)-(f) provision reaches constitutionally protected activities, not *unprotected* activities. Put another way, "in every application", each of the *Moody* "activities ... that [§§ 12-3201(E)(1)(a)-(f)] prohibit or otherwise regulate" are *all* Sosa "activities which must be protected" under the Petition Clause. A.R.S. § 12-3201(E) "lacks a plainly legitimate sweep".

### ii. Every Pro Se Litigant Has *Noerr-Pennington* Immunity

"Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct. ... [The] doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the

rights protected by the Petition Clause." *Sosa*, 437 F.3d at 929-31; *White*, 227 F.3d at 1239 ("The *Noerr-Pennington* doctrine sharply limits [Government] officials' ability to treat [] state-court lawsuit[s] as a possible violation of [civil or criminal] law"). The U.S. Supreme "Court... extended *Noerr-Pennington* immunity to the use of 'the channels and procedures of state ... courts.'" *Sosa*, 437 F.3d at 929. For reasons stated, pro se litigants can defeat every A.R.S. § 12-3201(A) motion by asserting *Noerr-Pennington* immunity as an affirmative defense. (Exh. 4, Doc. 14 at ¶¶ 124-139). *See 360 Mortg. Grp., LLC v. Fortress Inv. Grp. LLC,* No. 19-CV-8760, 2020 WL 5259283, at *4 (S.D.N.Y. Sept. 3, 2020) ("The *Noerr-Pennington* doctrine is generally raised as an affirmative defense."). "To determine whether a [litig]ant's conduct, ..., is immunized under *Noerr-Pennington,* we apply a three-step analysis to determine: (1) 'whether the lawsuit imposes a burden on petitioning rights,' (2) 'whether the alleged activities constitute protected petitioning activity,' and (3) 'whether the statute[] at issue may be construed to [avoid] that burden.' If the answer at each step is 'yes,' then a defendant's conduct is immunized under *Noerr-Pennington*." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 536 (9th Cir. 2022). Meeting that first step, any § 12-3201(A) motion that might result in a "finding that a lawsuit was illegal 'is a burden'". *Sosa*, 436 F.3d at 930. The "focus at step two" is on whether any "alleged" A.R.S. § 12-3201(E)(1)(a)-(f) violation would qualify as "*protected* petitioning activity" not

subject to the "sham" litigation exception. *B&G Foods*, 29 F.4th at 536 (emphasis original); *Sosa*, 437 F.3d at 933. Per *Richer*, every alleged § 12-3201(E)(1)(c) violation may not take into consideration any "separate" subjective motives or improper purposes, while every alleged § 12-3201(E)(1)(a), (b), (d), (e) or (f) motive or purpose violation may not "subsume", or be "moored" to, consideration for the case's objective merits. This means all possible "alleged activities" that supposed violate the challenged statute would, in every instance, be "protected petitioning activities" in the form of core "petitioning activity" or "conduct incidental to a petition" per *BE & K* and *Sosa*. Moving to third step, the *Noerr-Pennington* doctrine immunizes every possible instance of § 12-3201(E)(1)(a)-(f) "vexatious conduct" because, per *Richer*, each provision can be, and has been, "construed to [avoid] that [First Amendment] burden". *B&G Foods*, 29 F.4th at 536. All three steps required to demonstrate *Noerr*-Pennington immunity are satisfied in every possible application. As a matter of constitutional law, every self-represented litigant who might be accused of engaging in "vexatious conduct" via a § 12-3201(A) motion is entitled to *Noerr-Pennington* immunity. A.R.S. § 12-3201 is "patently unconstitutional". *Saenz v. Roe,* 526 U.S. 489, 499 n.11 (1999) ("If a law has no other [demonstrable] purpose ... than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it is patently unconstitutional.").

### c. A.R.S. § 12-3201(E) Violates The Petition Clause At Least In A Substantial Number of Applications

Plaintiff also factually, not speculatively, demonstrated via court records that, in a conservative calculation, 85% of the statute's applications resulted in orders which violated the Petition Clause; a "substantial number" sufficient to find the law unconstitutional. (Exh. 15, Doc. 85). *See Tucson v. City of Seattle,* 91 F.4th 1318, 1328 (9th Cir. 2024) ("In determining whether an unconstitutional application is realistic, courts may consider whether that application has occurred in the past."). The number is not 100% because, in a handful of cases, judges incidentally found co-occurring §§ 12-3201(E)(1)(a) *and* (c) violations but declined to enter the requisite § 12-3201(B) blanket injunction. Orders compliant with the Petition Clause only resulted from trial judges who refused to enter, and therefore violated, the A.R.S. § 12-3201(B) mandate after encountering litigants who (unwittingly) failed to invoke the *Noerr-Pennington* doctrine as an affirmative defense. The state officers did not challenge these factual findings.

### B. Factor Two: Irreparable Injuries

"The loss of [and threats to] First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 19 (2020). "'Irreparable harm is relatively easy to establish in a First Amendment case' because the party seeking

the injunction 'need only demonstrate the existence of a colorable First Amendment claim.'" *Fellowship of Christian Athletes,* 82 F.4th at 694-95. Plaintiff presents a "colorable First Amendment claim" that the enforcement and operation of A.R.S. §§ 12-3201(B) and (E) impermissibly abridges, restricts, constrains, abridges, prohibits or otherwise regulates, and chills constitutionally protected activities causing Plaintiff to have a credible fear of future enforcement constituting imminent irreparable injuries and to have suffered other actual enforcement causing actual ongoing irreparable injuries. Factor Two is met.

C. Factors Three and Four: The Balance of Equities Tip Sharply In Plaintiff's Favor, While An Injunction Is In The Public's Interest

"Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors – the balance of equities and the public interest – 'merge.'" *Id* at 695. Both "the balance of equities" and "the public interest" independently favor granting injunctive relief. *Winter*, 555 U.S. at 20. Government defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio,* 695 F.3d 990, 1002 (9th Cir. 2012). "[B]y establishing a likelihood that [the challenged statute] violates the U.S. Constitution, Plaintiff[] ha[s] also established that both the public interest and the

balance of the equities favor [injunctive relief]." *Ariz. Dream Act Coal.*, 757 F.3d at 1069.  Factors Three and Four tip sharply in Plaintiff's favor.

## II. CONCLUSION

The Petition Clause protects core court "petitioning activities" and all "conduct incidental to a petition" unless the "underlying petition" is found to be "*both* objectively baseless *and* subjectively motivated by an unlawful purpose". The Ninth Circuit and Supreme Court are clear on this point of constitutional law. In binding fashion, Arizona's supreme court construed §§ 12-3201(E)(1)(a)-(f) to "avoid conflating [any subjective] motive and the objective reasonableness of litigation".  A.R.S. § 12-3201(E)(1)(c) thus addresses a petition's objective merits but does not consider any "separate" subjective motive or purpose behind the suit, while no § 12-3201(E)(1)(a), (b), (d), (e) or (f) motive or purpose provision may "subsume" consideration for the "threshold perquisite" of an underlying "objectively baseless" suit.  The statute "lacks a plainly legitimate sweep" as each § 12-3201(E) activity is constitutionally protected "in every application".  A.R.S. § 12-3201(B) also unconstitutionally imposes an unjustifiable "content based" "prior restriction" requiring the Government to review and approve every "pleading" before a litigant may exercise their fundamental rights in any ongoing or future suit.  Such injunctions violate the First Amendment as they are not "narrowly tailored".  "[N]o set of circumstances exists under which this law would be valid".

Plaintiff is "highly likely to succeed on the merits". He at least raises "serious questions" going to the merits of a "colorable First Amendment claim". The Court should grant Plaintiff's request for injunctive relief on an emergency basis.

Respectfully submitted this 24th day of December 2025.

/s/ Phillip Potter
Phillip Potter
Appellant – Plaintiff
Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that on December 24, 2025, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Ninth Circuit by using the circuit's CM/ECF and online emergency motion filing systems. Appellant sent opposing counsel PDF copies of the attached documents / filings via email.

/s/ Phillip Potter
Phillip Potter
Appellant – Plaintiff
Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing motion complies with the type-volume limitation of Fed. R. App. P. 27 because it contains 4,992 words and does not exceed 20 pages. This motion complies with the typeface and the type style requirements of Fed. R. App. P. 27 because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman typeface.

No. CV-25-7977

# In the United States Court of Appeals for The Ninth Circuit

### PHILLIP POTTER,
*Plaintiff - Appellant,*

v.

KRIS MAYES, in her official capacity
as Arizona Attorney General;
PAMELA GATES, in her official administrative capacity
as Presiding Judge of the Maricopa County Superior Court,
*Defendants – Appellees.*

Appeal from the United States District Court
for the District of Arizona
Honorable Dominic W. Lanza
(2:25-cv-00663-PHX-DWL)

**EXCERPTS OF RECORD**

Phillip Potter
2301 N. 66th Street
Scottsdale, AZ 85257
480-459-0310
phillip.t.potter@gmail.com
Pro Se Plaintiff - Appellant

# TABLE OF CONTENTS

| Exh. | Document Description | Doc. | Page |
|------|---------------------|------|------|
|  | Appellant's Affidavit (December 24) |  | ER-001 |
| 1 | Order Denying TRO and PI (December 16) | 96 | ER-006 |
| 2 | Order Denying TRO and PI (June 20) | 47 | ER-009 |
| 3 | Plaintiff's Motion for TRO and PI (December 12) | 94 | ER-027 |
| 4 | First Amended Complaint w/ Exhibits (May 12) | 14 | ER-074 |
| 5 | Plaintiff's Response to Attorney General Mayes' Fed. R. Civ. P. 12(b)(1) and (6) Motion (July 3) | 49 | ER-199 |
| 6 | Plaintiff's Response to Order to Show Cause (May 20) | 27 | ER-234 |
| 7 | Presiding Judge Gates' Fed. R. Civ. P. 12(b)(1) and (6) Motion, with Administrative Order 2023-159 (August 11) | 67 | ER-253 |
| 8 | Plaintiff's Motion to Take Judicial Notice Re: Presiding Judge Gates' Fed. R. Civ. P. 12(b)(1) and (6) Motion to Dismiss (November 9) | 90 | ER-271 |
| 9 | Plaintiff's Reply to Motion to Take Judicial Notice Re: Presiding Judge Gates' Fed. R. Civ. P. 12(b)(1) and (6) Motion to Dismiss (November 27) | 92 | ER-299 |
| 10 | Plaintiff's Notice Regarding State Officers' Express Refusal to Disavow Enforcement of A.R.S. § 12-3201 (December 1) | 93 | ER-309 |
| 11 | Attorney General Mayes' Fed. R. Civ. P. 12(b)(1) and (6) Motion to Dismiss (June 3) | 38 | ER-330 |

| 12 | Attorney General Mayes' Reply to Fed. R. Civ. P. 12(b)(1) and (6) Motion to Dismiss (July 18) | 53 | ER-350 |
|----|---|----|----|
| 13 | Plaintiff's Motion for TRO and PI (May 14) | 23 | ER-363 |
| 14 | Attorney General Mayes' Opposition to Plaintiff's TRO and PI (June 2) | 37 | ER-382 |
| 15 | Plaintiff's Second Motion to Take Judicial Notice (October 10) | 85 | ER-401 |

No. CV-25-7977

# In the United States Court of Appeals for The Ninth Circuit

### PHILLIP POTTER,
*Plaintiff - Appellant,*

v.

KRIS MAYES, in her official capacity
as Arizona Attorney General;
PAMELA GATES, in her official administrative capacity
as Presiding Judge of the Maricopa County Superior Court,
*Defendants – Appellees.*

Appeal from the United States District Court
for the District of Arizona
Honorable Dominic W. Lanza
(2:25-cv-00663-PHX-DWL)

**APPELLANT'S AFFIDAVIT**

Phillip Potter
2301 N. 66th Street
Scottsdale, AZ 85257
480-459-0310
phillip.t.potter@gmail.com
Pro Se Plaintiff - Appellant

I, Phillip Potter, hereby depose and state as follows:

1. I submit this affidavit pursuant to 28 U.S.C. § 1746 in support of Appellant's December 24, 2025 Emergency Motion Under Circuit Rule 27-3 for Injunctive Relief Pending Appeal.

2. The statements set forth in this affidavit (the "Affidavit") are based on my own personal knowledge and investigation unless stated otherwise. These statements are true to the best of my knowledge and belief as of the date I signed this Affidavit.

3. I am the Appellant in the above-captioned appeal.

4. In the afternoon of December 16, 2025, the Hon. Dominic Lanza denied my request for a temporary restraining order to enjoin Arizona Attorney General Kris Mayes, in her official capacity, and Presiding Judge Pamela Gates, in her official administrative capacity, from administratively, civilly or criminally enforcing conduct proscribed under A.R.S. § 12-3201(B); a statutorily mandated permanent blanket injunction requiring persons found "vexatious" per "any" A.R.S. § 12-3201(E)(1) infraction.

5. In a judgment finalized on appeal on February 1, 2024, the Hon. John Blanchard of the Maricopa County Superior Court adjudicated me on February 27, 2023 to have violated A.R.S. § 12-3201(E)(1)(c) ("Court actions brought or defended without substantial justification") in a public records case according to plain language.

6. Unknown to myself, or to anyone else that can be determined, until July 2025, Presiding Judge of the Maricopa County Superior Court Joseph Welty issued a November 2, 2023 Administrative Order 2023-159 instructing that I "may not file a new pleading, motion or other document without prior leave of the court." *See* A.R.S. § 12-3201(B). Specifically, Administrative Order 2023-159 states, "IT IS THEREFORE ORDERED as follows: 1. Mr. Potter may not file any new causes of action as a pro se litigant after the date of this order without leave of the Civil Presiding Judge or his/her designee. 2. Mr. Potter may not file any further pleading or motion in any of his current lawsuits as a pro se litigant without first seeking leave from the judicial officer assigned to that lawsuit. 3. Any motion for leave to file any lawsuit, pleading or motion shall be captioned 'Application Pursuant to Court Order Seeking Leave to File.' Mr. Potter must either cite this order in his application, or attach as an exhibit a copy of this order. 4. Any request for fee

1

waiver or deferral may only be granted by the Civil Presiding Judge or his/her designee."

7. Administrative Order 2023-159 contains no judicial case number and no "v." but has a captioned title which reads, "IN THE MATTER OF PROHIBITING PHILLIP POTTER FROM FILING ANY LAWSUIT IN MARICOPA COUNTY WITHOUT OBTAINING PRIOR PERMISSION FROM THE COURT".

8. Presiding Judge Welty was never assigned to any case to which I was party, never took evidence in any matter to which I was party, and she has no administrative authority as the Presiding Judge under the Arizona constitution to instruct anyone outside the judiciary to take action, or to retrain from acting.

9. Furthermore, as described in more detail in the Emergency Motion, none of the civil cases which Judge Blanchard referenced to find that I had filed objectively baseless court actions was final at the time. And I have since secured favorable settlements and emerged victorious on appeals so, as a matter of law, I filed no baseless actions.

10. Regardless, my former spouse is now engaged in legal maneuvers where she is trying to take custody of our six-year-old son on the premise that I was deemed "vexatious" in a case to which she was not party and this harms our child.

11. Based on Judge Blanchard's judgment, my former spouse even secured a card issued by the Arizona Secretary of State identifying her and my son as victims of A.R.S. § 13-3601 criminal domestic violence. But, again, she was not party to that case. And I was awarded attorney fees when she previously attempted to fabricate such allegations.

12. On November 28, 2025, after months of obfuscation, Arizona Attorney General Kris Mayes expressly refused to disavow civil or criminal enforcement of any violation of Administrative Order 2023-159 where the state's statutory scheme creates a legislatively enacted, unattenuated chain of statutes that permits the Attorney General to pursue civil and criminal penalties should I exercise my First Amendment right to file court pleadings and other papers in meritorious court cases, including cases that I have already won.

13. Likewise, Presiding Judge Pamela Gates refuses to rescind Administrative Order 2023-159 which continues to cause ongoing injuries including reputational harm and possible loss of access to my child, and makes me

susceptible to various civil and criminal penalties under Arizona's statutes.

14. I am being credibly threatened with civil and criminal penalties, including investigation, indictment, prosecution, and incarceration should I exercise my First Amendment right to petition and right of access to the court should I file court papers in meritorious court papers – even in cases that I have won but that still require all proceedings to come to a close.

15. State courts have set evidentiary hearing dates and briefing schedules with accompanying instructions to file various court papers in three cases: (1) FC2020-090224 where an evidentiary hearing is scheduled for February 10, 2026; (2) CV2021-005501 where trial is scheduled for March 6, 2026; and (3) the appeal of a child support issue in FC2020-090224 where the opening brief is due January 12, 2026.

16. I am required to imminently file multiple papers and documents including motions, responses, and evidence into the court's trial management system – none of which I can do without placing myself in jeopardy of violating Administrative Order 2023-159 and A.R.S. § 12-3201(B).

17. I am preparing multiple court papers and documents, including an amended pleading, in state court cases deemed meritorious.

18. I face a January 5, 2026 deadline for a required filing, and plan to file other papers and documents that same week. I do not plan on requesting leave of the court.

19. January 5th is less than twenty-one days and I face an emergency situation which warrants the Emergency Motion.

20. I received word of Judge Lanza's denial of request for a temporary restraining order in the evening of December 16, 2025, and immediately contacted the Attorney General and Presiding Judge in an attempt to secure an unopposed motion on appeal that would have spared judicial resources.

21. The state officers' counsel responded on December 18, 2025 that they would oppose an Emergency Motion and any requested relief.

22. I immediately began preparing for an appeal to the Ninth Circuit, educated myself on procedures, and began drafting the Emergency Motion right

away.

23. My older son was scheduled for surgery on December 22, 2025 and my younger son was scheduled for an unrelated healthcare follow-up the same day.

24. Despite those demands, as well as the demands of the holiday season, I was able to prepare this Emergency Motion less than one week after hearing from the Attorney General and the Presiding Judge.

25. I have done all that I can to expedite these appellate proceedings given the other demands on my time and resources at present.

26. To be clear, I do not challenge any judicial order in this federal case which brings a First Amendment facial challenge to A.R.S. § 12-3201(B) for overbreadth and vagueness. I am simply asking for a temporary restraining order so that I do not risk incarceration or other penalties during the early stages of this case for exercising my First Amendment rights.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on December 24, 2025.

Phillip Potter

ER-005

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Phillip Potter, | No. CV-25-00663-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Robert Meza, et al., | |
| Defendants. | |

*Pro se* Plaintiff initiated this action in February 2025. (Doc. 1.) As relevant here, Count One of Plaintiff's operative pleading raises a "First Amendment Facial Challenge" to A.R.S. § 12-3201, which is Arizona's vexatious litigant statute. (Doc. 14 ¶¶ 113-207.) Plaintiff previously filed a motion for a temporary restraining order and preliminary injunction that would bar Arizona Attorney General Kris Mayes ("AG Mayes") from enforcing § 12-3201 against him (Doc. 23) but the Court denied that motion in a June 20, 2025 order, concluding that (1) it was unlikely Plaintiff had standing to pursue a pre-enforcement challenge against AG Mayes; and (2) at any rate, Plaintiff was unlikely to succeed on the merits of his challenge (Doc. 47).

Now pending before the Court is Plaintiff's second motion for temporary restraining order and preliminary injunction ("Second TRO/PI Motion"). (Doc. 94.)[1] In that motion, "based on new and newly discovered jurisdictional facts," "Plaintiff moves the Court to

---

[1]     Also pending before the Court are several motions to dismiss, for judicial notice, for jurisdictional discovery, and to strike. (Docs. 38, 51, 52, 57, 58, 64, 67, 84, 85, 90.) The Court is aware of these motions and will rule on them in due course.

1    enjoin [AG] Mayes and [the Presiding Judge of the Maricopa County Superior Court] from

2    civilly, criminally or administratively enforcing A.R.S. § 12-3201 until the [present] case

3    is complete." (*Id.* at 1, 3-4.)  For the reasons that follow, the motion is denied.

## DISCUSSION

5        Plaintiff argues there are "new and newly discovered jurisdictional facts" that

6    warrant granting his request for injunctive relief.  (Doc. 94 at 1.)  Those purported new

7    facts are: (1) Administrative Order 2023-159, issued by the Presiding Judge, declaring

8    Plaintiff vexatious in all cases in Arizona (which was issued before Plaintiff filed his

9    operative pleading, but which Plaintiff claims not to have known about until recently) (*id.*

10   at 1-2); (2) "documents and admissions from [the Presiding Judge] . . . as part of an Ariz.

11   R. Sup. Ct. 123(f) public records request" (*id.* at 2-3); and (3) AG Mayes's and the

12   Presiding Judge's recent rejection of Plaintiff's request not to enforce A.R.S. § 12-3201

13   against him "until the [present] case is complete" (*id.* at 3).  According to Plaintiff, these

14   new facts create a "developed record . . . which show[s] no state officer is entitled to

15   sovereign immunity, and Plaintiff has standing to sue the state officers as *Ex parte Young*

16   'proper defendants.'"  (*Id.* at 3.)

17       The overarching problem with Plaintiff's motion is that the June 20, 2025 order

18   denied Plaintiff's initial motion for injunctive relief for two independent reasons: (1) failure

19   to establish a likelihood of standing; and (2) failure to establish a likelihood of success on

20   the merits.  The purported new facts referenced in Plaintiff's motion are only relevant, if

21   at all, to the first issue.  To the extent Plaintiff's motion also includes new or rehashed

22   arguments regarding the second issue, it is simply a motion for reconsideration.

23       Local Rule 7.2(g) governs motions for reconsideration.  Under LRCiv 7.2(g)(2),

24   "[a]bsent good cause shown, any motion for reconsideration shall be filed no later than

25   fourteen (14) days after the date of the filing of the Order that is the subject of the motion."

26   *Id.*  Thus, Plaintiff's request for reconsideration of the merits analysis in the June 20, 2025

27   order is untimely.  Furthermore, under LRCiv 7.2(g)(1), "[t]he Court will ordinarily deny

28   a motion for reconsideration of an Order absent a showing of manifest error or a showing

1    of new facts or legal authority that could not have been brought to its attention earlier with

2    reasonable diligence." *Id.* The merits-based arguments set forth in Plaintiff's Second

3    TRO/PI Motion (Doc. 94 at 7-15) are not based on new facts or new legal authorities and

4    do not, in any event, establish that the merits analysis in the June 20, 2025 order was

5    manifestly erroneous.

6           Accordingly,

7           **IT IS ORDERED** that Plaintiff's second motion for a temporary restraining order

8    and preliminary injunction (Doc. 94) is **denied**.

9           Dated this 16th day of December, 2025.

10

11

12                                            _____

13                                                 Dominic W. Lanza
                                             United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Phillip Potter, | No. CV-25-00663-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Robert Meza, et al., | |
| Defendants. | |

In February 2023, an Arizona trial court issued an order declaring Plaintiff a vexatious litigant pursuant to A.R.S. § 12-3201. (Doc. 37-2.) Under that order, Plaintiff "may not file any new pleading, motion or other document in this case or any other pending civil action without prior leave of the judge assigned to that case." (*Id.* at 5.) In February 2024, the Arizona Court of Appeals unanimously affirmed. *Potter v. Ariz. House of Reps.*, 2024 WL 368095, *7 (Ariz. Ct. App. 2024) ("The Superior Court Did Not Abuse Its Discretion When It Designated Potter a Vexatious Litigant Under A.R.S. § 12-3201."). In June 2024, the Arizona Supreme Court denied review. *Id.*

In February 2025, Plaintiff, who is proceeding *pro se*, initiated this action. (Doc. 1.) In Count One of his operative pleading, Plaintiff raises a "First Amendment Facial Challenge" to A.R.S. § 12-3201. (Doc. 14 ¶¶ 113-207.) As relevant here, Plaintiff names Arizona Attorney General Kris Mayes ("AG Mayes") as a defendant. (*Id.*)

Now pending before the Court is Plaintiff's motion for a temporary restraining order ("TRO") and preliminary injunction. (Doc. 23.) In that motion, Plaintiff renews his "First

Amendment facial challenge to Arizona's vexatious litigant statute" and seeks an order enjoining AG Mayes "from enforcing the Statute in any manner." (Doc. 23 at 1, 4.)[1] The motion is fully briefed (Docs. 37, 40) and the Court concludes that oral argument is unnecessary. For the reasons that follow, the motion is denied.

## DISCUSSION

### I. <u>Legal Standard</u>

Under Rule 65 of the Federal Rules of Civil Procedure, a party may seek injunctive relief if it believes it will suffer irreparable harm during the pendency of an action. There are two types of injunctions available under Rule 65: TROs and preliminary injunctions. Each type of request is governed by the same substantive standard. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). More specifically, each type of "injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (cleaned up). *See also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. However, "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are

---

[1]      Plaintiff also seeks injunctive relief against Joseph Welty, in his capacity as the Presiding Judge of the Maricopa County Superior Court (Doc. 23), but this order does not address that request because Judge Welty has not been served. (Doc. 29.) The Court notes that although Plaintiff recently filed a notice of service as to Judge Welty, the attached service declarations only relate to other defendants. (Docs. 39-1, 39-2.) To the extent Plaintiff believes he properly effected service on Judge Welty by sending certain documents to Judge Welty "via U.S. first class mail" (Doc. 39), Plaintiff is mistaken. At most, such a mailing may have started the process for obtaining a waiver of service under Rule 4(d).

ER-010

1  satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)

2  (cleaned up). *See also Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031

3  (9th Cir. 2024) ("Serious questions are issues that cannot be resolved one way or the other

4  at the hearing on the injunction because they require more deliberative investigation. Thus,

5  parties do not show serious questions when they raise a merely plausible claim, nor can a

6  district court forgo legal analysis just because it has not identified precedent that places the

7  question beyond debate. This 'less demanding' merits standard requires serious factual

8  questions that need to be resolved in the case.") (cleaned up). Additionally, "[w]here, as

9  here, the government opposes a preliminary injunction, the third and fourth factors merge

10 into one inquiry." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021).

11      Regardless of which standard applies, the movant "carries the burden of proof on

12 each element of either test." *Env't. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016,

13 1027 (E.D. Cal. 2000).

14 II.   <u>Analysis</u>

15      The analysis begins with the first *Winter* factor—whether Plaintiff has shown a

16 likelihood of success on the merits or at least serious questions going to the merits. *Roe v.*

17 *Critchfield*, 137 F.4th 912, 922 (9th Cir. 2025) ("Likelihood of success on the merits is the

18 most important *Winter* factor and is a threshold inquiry.") (cleaned up).

19      A.   **Standing**

20      One of AG Mayes's bases for opposing Plaintiff's motion is that he lacks standing.

21 (Doc. 37 at 6-10.) Although Plaintiff asserts in his reply that "[t]he Court would be wise

22 to reserve these jurisdictional challenges for dismissal proceedings" (Doc. 40 at 6), Plaintiff

23 overlooks that "[t]he first [*Winter*] factor incorporates an assessment of both the plaintiff's

24 standing and the merits of the underlying claim." *Arizona v. Mayorkas*, 584 F. Supp. 3d

25 783, 789 (D. Ariz. 2022). *See also LA Alliance for Human Rights v. Cnty. of Los Angeles*,

26 14 F.4th 947, 958 (9th Cir. 2021) (reversing preliminary injunction in part because

27 "Plaintiffs have not made the required 'clear showing' that any individual Plaintiff has

28 standing to bring the . . . claim"); *Mitchell v. City of Cincinnati*, 2022 WL 4546852, *4 (6th

1    Cir. 2022) ("[W]hether plaintiffs had standing . . . is a component of the likelihood of

2    success on the merits."); *Memphis A. Philip Randolph Institute v. Hargett*, 978 F.3d 378,

3    386 (6th Cir. 2020) ("[A] party who fails to show a substantial likelihood of standing is not

4    entitled to a preliminary injunction.") (cleaned up).

5        "[T]he irreducible constitutional minimum of standing contains three elements.

6    First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected

7    interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural

8    or hypothetical.  Second, there must be a causal connection between the injury and the

9    conduct complained of—the injury has to be fairly traceable to the challenged action of the

10   defendant, and not the result of the independent action of some third party not before the

11   court.  Third, it must be likely, as opposed to merely speculative, that the injury will be

12   redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

13   (1992) (cleaned up).

14       One of the alleged injuries identified in Plaintiff's motion is "the ongoing

15   deprivation of his First Amendment rights" caused by his inability to file court documents,

16   at least without leave of court.  (Doc. 23 at 13.)  However, AG Mayes has nothing to do

17   with this alleged injury—under the vexatious litigant statute, "the court" is tasked with

18   determining whether to allow a particular filing.  *See* A.R.S. § 12-3201(B) ("A pro se

19   litigant who is designated a vexatious litigant may not file a new pleading, motion or other

20   document without prior leave of the court.").  Thus, Plaintiff's first alleged injury is not

21   fairly traceable to AG Mayes.

22       The other alleged injury identified in Plaintiff's motion is a threat of criminal

23   prosecution.  Although Plaintiff's briefing on this point is not a model of clarity, Plaintiff

24   appears to advance two theories of why he now faces such a risk.  First, Plaintiff contends

25   that if he attempts to make future court filings without obtaining leave of court, he may be

26   charged with violating A.R.S. § 13-2810(A)(2), which makes it a misdemeanor to interfere

27   with judicial proceedings by knowingly "[d]isobey[ing] or resist[ing] the lawful order,

28   process or other mandate of a court."  (*See, e.g.*, Doc. 23 at 8 ["AG Mayes now threatens

- 4 -

Plaintiff with criminal and civil prosecution for § 13-2810(A)(2) Interfering With Judicial Proceedings . . . ."]; *id.* at 8 n.6 ["Filing motion papers absent leave of court allegedly 'disobeys or resists' an A.R.S. § 12-3201 order, in supposed violation of A.R.S. § 13-2810(A)(2)."]; *id.* at 12 ["[T]he State has unlawfully accepted that filing papers in well-founded lawsuits absent prior leave of the court constitutes conduct ripe for the Attorney General to civilly and criminally prosecute Plaintiff."].) Second, Plaintiff contends that his ex-wife recently enrolled in an address confidentiality program administered by the Arizona Secretary of State, the purpose of which is to protect victims of domestic violence, and cited Plaintiff's vexatious litigant order as her basis for enrolling in the program. According to Plaintiff, this development shows that he is now considered a "perpetrator" of domestic violence by the State of Arizona and faces prosecution under A.R.S. § 13-2921(A), which makes it a misdemeanor to engage in various forms of harassment. (*See, e.g.*, Doc. 23 at 8 ["AG Mayes now threatens Plaintiff with criminal and civil prosecution for . . . § 13-2921 Harassment violations . . . ."]; *id.* at 14 ["[T]he Secretary of State has now entered official records expressly asserting Plaintiff committed A.R.S. § 13-3601 Domestic Violence. The State of Arizona now considers Plaintiff's former spouse and young son to be victims of criminal domestic violence, with Plaintiff the perpetrator."].) In his reply, Plaintiff emphasizes that AG Mayes has publicly announced that "domestic violence prosecution is a priority." (Doc. 40 at 8.)

The type of claim that Plaintiff seeks to advance is known as a pre-enforcement challenge. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Such a claim arises "when the threatened enforcement of a law creates an Article III injury." *Id.* "When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Id.* *See also Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024) ("Pre-enforcement injury is a special subset of injury-in-fact. . . . [T]he injury is the anticipated enforcement of the challenged statute in the future. One need not violate a criminal law and risk prosecution in order to challenge the law's constitutionality. This principle applies equally in the civil context.").

1          An initial conceptual difficulty here is that the statute whose constitutionality

2   Plaintiff seeks to challenge—Arizona's vexatious litigant statute, codified at A.R.S. § 12-

3   3201—has already been enforced against Plaintiff, as evidenced by the entry of the

4   vexatious litigant order against him in February 2023. Plaintiff is thus left to argue that his

5   intent to commit future violations of that court order, which he effectively contends is

6   unconstitutional, exposes him to a threat of criminal prosecution under other statutes, such

7   as A.R.S. § 13-2810(A)(2) and A.R.S. § 13-2921(A), whose constitutionality he does not

8   independently challenge.

9          The parties have not cited, nor is the Court aware of, any authority that would permit

10  Plaintiff to invoke the pre-enforcement challenge framework under these unusual

11  circumstances. Nor is it obvious that Plaintiff may do so. After all, "[o]ne purpose of pre-

12  enforcement standing is to ensure that no law is practically unchallengeable." *Peace*

13  *Ranch*, 93 F.4th at 489. But this principle is not implicated here because Plaintiff already

14  had a full and fair opportunity to challenge the constitutionality of A.R.S. § 12-3201 during

15  the state-court litigation that led to the issuance (and affirmance) of the vexatious litigant

16  order against him. In a related vein, in a pre-enforcement challenge, "the injury is the

17  anticipated enforcement of the challenged statute *in the future*." *Id.* at 487 (emphasis

18  added). Thus, the Ninth Circuit has held (albeit without expressly referencing the pre-

19  enforcement challenge framework) that a plaintiff who is not currently the subject of a

20  state-court vexatious litigant order but reasonably fears the future issuance of such an order

21  may raise a prospective, facial challenge to the constitutionality of the state's vexatious

22  litigant statute. *Wolfe v. Strankman*, 392 F.3d 358, 363-64 (9th Cir. 2004) (concluding that

23  the plaintiff's request for "declaratory and injunctive relief against the threatened future

24  enforcement of the Vexatious Litigant Statute" was ripe because he had "previously

25  engaged in the sort of activity in which he now claims he will engage again if not prohibited

26  by the statute he seeks to challenge" and that the lawsuit was not barred by the *Rooker-*

27  *Feldman* doctrine because "since there was no vexatious litigant order entered against

28  Wolfe at the time he filed in district court, there was no state court judgment from which

1    he could have been seeking relief"). But that is not the situation here. Plaintiff does not

2    claim to fear the issuance of a future vexatious litigant order. Instead, he seeks to raise

3    what is effectively a collateral attack on an existing state-court judgment so that his planned

4    violation of that judgment cannot provide the foundation for a future criminal prosecution.[2]

5         During an earlier stage of this case, the Court issued an order to show cause ("OSC")

6    requiring Plaintiff to explain why such a request should not be dismissed for lack of

7    subject-matter jurisdiction under the *Rooker-Feldman* doctrine. (Doc. 26.) The order cited

8    various decisions in which courts concluded that federal lawsuits purporting to bring

9    constitutional challenges to state-court vexatious litigant orders were, in substance,

10    forbidden de facto appeals of state-court judgments and thus barred by *Rooker-Feldman*.

11    (*Id.* at 2-3.) Plaintiff then filed a response to the OSC, arguing that *Rooker-Feldman* is

12    inapplicable because he is suing an executive branch official and raising a facial challenge

13    to A.R.S. § 12-3201. (Doc. 27 at 2.) The Court, in turn, issued an order explaining that

14    although it was "not necessarily persuaded by Plaintiff's response to the OSC, . . . the

15    jurisdictional and other issues raised by Plaintiff's FAC and motion for TRO are better

16    resolved through the adversarial process." (Doc. 29 at 1-2.) The Court thus ordered AG

17    Mayes to file a response to the motion for TRO. (*Id.*) However, AG Mayes did not address

18    the *Rooker-Feldman* doctrine in her response brief. (Doc. 37.) Nor did AG Mayes raise

19    this doctrine in her recently filed motion to dismiss for lack of subject-matter jurisdiction.

20    (Doc. 38.)

21         Even assuming that *Rooker-Feldman* is inapplicable here,[3] the Court still harbors

---

[2]    As noted, A.R.S. § 13-2810(A)(2) makes it a misdemeanor to interfere with judicial proceedings by knowing "[d]isobey[ing] or resist[ing] the *lawful order*, process or other mandate of a court." *Id.* (emphasis added). Plaintiff's theory is that if he makes future court filings without leave of court, this will violate the vexatious litigant order that was issued against him in February 2023 and expose him to prosecution under § 13-2810(A). Plaintiff is thus effectively seeking a determination that the February 2023 vexatious litigant order is not a "lawful order," as required under § 13-2810(A). It is difficult to see how this does not qualify as a collateral attack on a prior state-court judgment.

[3]    The Court acknowledges that facial challenges ordinarily do not trigger *Rooker-Feldman* in the same manner as as-applied challenges. *See, e.g., Moore v. Urquhart*, 899 F.3d 1094, 1102 (9th Cir. 2018) ("The doctrine does not apply here because plaintiffs are not asking the district court to review and reject the judgment entered against them in state court. The state court judgment merely resolved the landlord's unlawful detainer action; it

1  concern that Plaintiff's challenge does not really qualify as a pre-enforcement challenge

2  and that Plaintiff lacks standing to raise a facial challenge to A.R.S. § 12-3201 in this

3  context. Assume, for example, that Plaintiff had never been deemed a vexatious litigant

4  by the Arizona courts, did not intend to engage in future conduct that placed him at risk of

5  being deemed a vexatious litigant, and simply wished to raise a facial challenge to

6  Arizona's vexatious litigant statute as a matter of principle. In that scenario, Plaintiff

7  would lack standing. *Bianchi v. Rylaarsdam*, 334 F.3d 895, 900 n.4 (9th Cir. 2003)

8  ("Although Facio claimed . . . that he was bringing a general constitutional challenge, . . .

9  if Mr. Facio is not able to set aside the state court judgment against him, he would lack

10  standing to assert his constitutional claim. This is so, because unless the state court

11  judgment is overturned, Facio's only interest in the state's procedures is prospective and

12  hypothetical in nature.") (cleaned up). Indeed, but-for the existing state-court judgment

13  against Plaintiff, there would be no foundation for Plaintiff's claimed fears of future

_____

14  did not resolve whether § 375 is facially constitutional, the challenge plaintiffs seek to

15  litigate here. Thus, rather than seek to overturn the state court judgment itself, plaintiffs
   have instead challenged the facial validity of the statute under which their state court
16  proceedings were conducted, an independent claim that encounters no *Rooker-Feldman*
   shoal. . . . [A] state-court decision is not reviewable by lower federal courts, but a statute
17  or rule governing the decision may be challenged in a federal action. Even if plaintiffs
   could have litigated their constitutional challenge in the unlawful detainer proceedings, as
18  the district court appeared to assume, that fact might be relevant to preclusion analysis, but
   it would not trigger application of the *Rooker-Feldman* doctrine.") (cleaned up); *Noel v.*
19  *Hall*, 341 F.3d 1148, 1157-58 & n.6 (9th Cir. 2003). Thus, courts outside the Ninth Circuit
   have concluded that *Rooker-Feldman* does not bar a facial challenge to a state vexatious
20  litigant statute. *See, e.g., Nunu v. Texas*, 2022 WL 820744, *2 (5th Cir. 2022) ("Paul also
   seeks a declaration that Texas' vexatious litigant statute is 'facially unconstitutional' and a
21  permanent injunction barring the law's enforcement. As the district court correctly
   recognized, the *Rooker-Feldman* doctrine bars collateral challenges to state judgments, but
22  does not bar facial challenges to the underlying rules of law on which those judgments are
   based. The district court nonetheless held that this qualification did not help Paul because
23  his allegations did not set forth a facial challenge, but rather stemmed 'from the
   vexatious litigant statute's application to him.' We disagree. Paul's complaint calls the
24  statute 'facially' unconstitutional at least five times, and requests prospective declaratory
   and injunctive relief against the law's enforcement. These claims are not barred by *Rooker-*
25  *Feldman*, and the district court should have recognized as much."); *Hall v. Callahan*, 727
   F.3d 450, 454-57 (6th Cir. 2013) (affirming the district court's conclusion "that the *Rooker-*
26  *Feldman* doctrine barred [the plaintiff's] as-applied constitutional challenge" to Ohio's
   vexatious litigant statute but considering, and rejecting, the plaintiff's facial challenge to
27  the statute on the merits); *Grundstein v. Ohio*, 2006 WL 3499990, *8 (N.D. Ohio 2006)
   ("While Mr. Grundstein's facial challenge to the vexatious litigant statute may arguably be
28  unaffected by the *Rooker-Feldman* doctrine, his claims regarding the application of this
   statute to him are barred.").

prosecution. For this reason, courts that have declined to apply *Rooker-Feldman* to facial challenges to vexatious litigant statutes have simply dismissed those challenges due to a different jurisdictional defect—a lack of standing to raise the facial challenge. *See, e.g.*, *Nunu v. Texas*, 2022 WL 820744, *2-3 (5th Cir. 2022) (although the district court should not have dismissed the plaintiff's facial challenges to Texas's vexatious litigant statute under *Rooker-Feldman*, those claims failed on the "alternate grounds" of "lack of standing" because there was no substantial likelihood that a future vexatious litigant order would be issued); *Jones v. Heuer*, 2024 WL 1664789, *9 (W.D. Tex. 2024) (although the plaintiff's request for "a declaratory judgment that the Texas vexatious litigant statute is unconstitutional on its face" was not precluded because "*Rooker-Feldman* . . . does not bar facial challenges," the request was still subject to dismissal for lack of jurisdiction because "[a]ll of Jones's allegations stem from the vexatious litigant statute's application to him"). *See also Mosby v. Ligon*, 418 F.3d 927, 932 (8th Cir. 2005) ("Mosby also asserts that *Rooker-Feldman* should not apply because she mounts only a 'facial' challenge to the administration of the Rules. We agree that the *Rooker-Feldman* doctrine does not bar the district court from exercising jurisdiction over general challenges to the constitutionality of a State's disciplinary rules and processes . . . [b]ut *Feldman* does not relieve Mosby of the requirement that she demonstrate Article III standing, and we conclude that Mosby does not have standing to bring what she describes as her facial challenge . . . ."); *Roshan v. Lawrence*, 689 F. Supp. 3d 697, 705-07 (N.D. Cal. 2023) (in lawsuit by disbarred attorney raising facial challenges to the California State Bar's rules and procedures, concluding that "to the extent that Roshan's facial constitutional claims seek to overturn Roshan's own prior disciplinary order, the Court is barred by *Rooker-Feldman* from hearing such claims" and to the extent the "facial challenges . . . are not barred by *Rooker-Feldman*," such as in relation to the plaintiff's request for "declaratory relief that the rules and procedures are unconstitutional," the plaintiff lacked standing because he was already subject to an existing disciplinary order and thus had only a hypothetical interest in how the State Bar's rules and procedures might be applied in a future case).

1    Nevertheless, even assuming Plaintiff may assert a constitutional challenge to

2    A.R.S. § 12-3201 under these unusual circumstances, Plaintiff would still need to establish

3    "a credible threat of enforcement" in order to possess standing. *Arizona v. Yellen*, 34 F.4th

4    841, 850 (9th Cir. 2022). The Ninth Circuit has "developed a framework to evaluate

5    whether a claimed threat of enforcement is genuine enough to confer standing. We

6    consider (1) whether the plaintiffs have articulated a concrete plan to violate the law in

7    question, (2) whether the prosecuting authorities have communicated a specific warning or

8    threat to initiate proceedings, and (3) the history of past prosecution or enforcement under

9    the challenged statute." *Id.* (cleaned up).

10    The first element is likely satisfied here based on Plaintiff's assertions in his motion

11    papers that he intends to make future court filings without seeking leave of court, which

12    would violate the February 2023 vexatious litigant order and thus also constitute

13    disobedience of a lawful court order, which A.R.S. § 13-2810(A)(2) proscribes. (Doc. 23

14    at 16 ["Plaintiff filed court papers in the past, and will continue to file court papers in the

15    future, as part of an ongoing family law case and in a civil suit now set for trial."]; Doc. 40

16    at 7-8.) Although AG Mayes correctly notes that Plaintiff's representations on this point

17    are somewhat vague and imprecise, it still seems clear that Plaintiff intends to disobey the

18    vexatious litigant order. *Yellen*, 34 F.4th at 850 ("A concrete plan need not be cast in stone

19    but must be more than a hypothetical intent to violate the law.") (cleaned up).

20    One way to establish the second element is to show that "the authorities in charge

21    of enforcing the challenged law have communicated a specific warning or threat to initiate

22    proceedings." *Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022) (cleaned up).

23    However, there is no suggestion—let alone evidence—that AG Mayes has ever threatened

24    to prosecute Plaintiff for violating A.R.S. § 13-2810(A)(2) or A.R.S. § 13-2921(A) or for

25    some other unspecified domestic violence offense. (*See also* Doc. 40 at 8-9 [Plaintiff's

26    reply brief, not identifying any specific threats toward him].)[4]

---

27    [4] Although Plaintiff previously asserted, in a different filing in this case, that AG
28    Mayes made a veiled threat of prosecution via email correspondence (Doc. 25 at 3-4),
Plaintiff does not raise this argument in his motion. At any rate, AG Mayes persuasively
explains in her response brief why the email correspondence cannot be reasonably

1    Even if there has been no direct warning or threat of prosecution, "the government's

2    failure to *disavow* enforcement of the law . . . weigh[s] in favor of standing." *Tingley*, 47

3    F.4th at 1068.  Plaintiff contends this principle is implicated here because AG Mayes

4    "acknowledges she could enforce the law" and "nowhere . . . disavow[s] enforcement of

5    A.R.S. § 12-3201 as Plaintiff describes and reasonably fears." (Doc. 40 at 8.)  On the one

6    hand, Plaintiff ignores that AG Mayes specifically disavowed, in her response brief, any

7    authority or intent to directly enforce A.R.S. § 12-3201 and any authority or intent to bring

8    an enforcement action based on the address confidentiality program.  (Doc. 37 at 6-7

9    ["[N]ot only is there no threat or warning, but also the vexatious litigant statute is, by its

10   terms, not a criminal statute. . . .  Plaintiff [also] attempts to ground his fear in his ex-wife's

11   participation in the address confidentiality program . . . [b]ut this, too, fails.  The Secretary

12   of State's acceptance of a vexatious litigant designation as evidence is not a threat or

13   warning of future enforcement because the Secretary of State has no criminal enforcement

14   powers, and can give no such warning."].)  On the other hand, it does not appear that AG

15   Mayes has specifically disavowed any intention to prosecute Plaintiff for violating A.R.S.

16   § 13-2810(A)(2), should he engage in future acts of disobeying court orders, or for

17   violating A.R.S. § 13-2921(A), should he engage in future acts of harassment.  Instead, AG

18   Mayes merely emphasizes the absence of prior prosecutions under those statutes where the

19   underlying conduct involved the violation of a vexatious litigant order.  (Doc. 37 at 7

20   ["Plaintiff has not pointed to a single such prosecution, directly or under A.R.S. § 13-

21   2810."].)  The problem with this approach is that the absence of past prosecutions is the

22   inquiry contemplated under the third element of the standing test and is not tantamount to

23   an affirmative disavowal of any intention to pursue a future prosecution for purposes of the

24   second element.  Furthermore, although AG Mayes emphasizes that county attorneys

25   (rather than the attorney general) have primary authority under Arizona law for bringing

26   criminal prosecutions under the statutes in question, her statements on that topic suggest,

27

28   construed as a threat of prosecution (Doc. 37 at 7 n.1) and Plaintiff does not dispute AG
     Mayes's arguments on this point in his reply.

if anything, that she has *not* definitively disavowed any intention to prosecute Plaintiff in the future under those statutes.  (Doc. 37 at 8-9, emphasis added ["[W]hile prosecution is unlikely, any such prosecution would be *more likely* to come from a county attorney than from AG Mayes."].)[5]  "That the . . . government has not disavowed enforcement . . . is evidence of an intent to enforce it."  *Yellen*, 34 F.4th at 850.

The third element, as noted, is "the history of past prosecution or enforcement under the challenged statute."  *Id.*  The parties disagree over whether such a track record exists here—AG Mayes contends that "Plaintiff has not pointed to a single such prosecution, directly or under A.R.S. § 13-2810" (Doc. 37 at 7), while Plaintiff contends that "the Attorney General has a history of civilly and criminally enforcing the domestic violence statute and all predicates including A.R.S. § 13-2810(A)(2).  Appeals records show seven cases where her office has brought such prosecutions in the past ten years.  Plaintiff has no way to know how many times enforcement was initiated but never reached appeal."  (Doc. 40 at 9.)

AG Mayes has the better of this argument.  Due to the unusual derivative nature of the pre-enforcement challenge that Plaintiff seeks to raise, it is irrelevant that AG Mayes may have, in general, pursued past prosecutions under A.R.S. § 13-2810(A)(2) or A.R.S. § 13-2921(A).  Instead, Plaintiff must go further and show that AG Mayes pursued those prosecutions in cases where the underlying conduct giving rise to the criminal charge was the unauthorized filing of court documents in violation of a vexatious litigant order.  Plaintiff has not come forward with evidence of any such past prosecutions, by AG Mayes or indeed by any Arizona prosecutor at any level.[6]

---

[5]    Additionally, the Ninth Circuit has rejected the argument that a state attorney general is not the proper defendant in pre-enforcement challenge to a criminal statute simply because other state law enforcement officials have primary (although not exclusive) enforcement authority related to that statute. *Matsumoto v. Labrador*, 122 F.4th 787, 798 (9th Cir. 2024) ("While Idaho downplays the extent of the attorney general's enforcement authority . . . it has never disavowed his authority. . . .  Challengers' standing is not short-circuited by the fact that there are multiple authorized enforcers of the statute."); *id.* at 802 ("Facing the threat of prosecution by an enforcer with statutory authority to bring suit, Challengers have satisfied both the traceability and redressability prongs of the standing requirement.").

[6]    Although Plaintiff contends that unspecified "Appeals records" support his claims

1    In light of these conclusions, the Court cannot say that Plaintiff has established a

2  likelihood of success with respect to his standing to pursue a pre-enforcement challenge.

3  The novelty of Plaintiff's theory alone creates significant doubt, Plaintiff's showing as to

4  the second element of the standing test is weak (even if it raises some questions), and

5  Plaintiff has not satisfied the third element of the standing test.  With that said, the failure

6  to establish the third element of the standing test "alone is not dispositive" when the other

7  two elements are satisfied.  *Libertarian Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867,

8  872 (9th Cir. 2013).

9    B.    **Merits**

10         1.    The Parties' Arguments

11    Plaintiff contends that *Ringgold-Lockhart v. County of Los Angeles*, 761 F.3d 1057

12  (9th Cir. 2014), sets forth the relevant standard for assessing the constitutionality of a

13  vexatious litigant order, imposing "certain procedural and substantive requirements," and

14  that A.R.S. § 12-3201 violates both sets of requirements.  (Doc. 23 at 2-3.)  More

15  specifically, as for procedural due process, Plaintiff contends that "the Statute contains no

16  hearing provision on a matter affecting First Amendment rights."  (*Id.* at 6.)  As for

17  substantive due process, Plaintiff contends that "any suit sparking a vexatious inquiry must

18  be objectively baseless, but the pro se litigant also must demonstrate a serial history of

19  bringing objectively baseless suits, provided those suits reached finality so judicial notice

20  could be properly taken. . . .  [I]f those conditions are all met, past and present baseless

21  litigation may then be reviewed for evidence of serial subjective 'improper motives' in the

22  form of either (1) an 'inordinate' amount of 'frivolous' lawsuits, or (2) a 'pattern of

23  harassment' involving common parties and claims.  Only then does the First Amendment

24  permit a pro se plaintiff to be deemed vexatious . . . ."  (*Id.* at 7, citations omitted).

25  According to Plaintiff, "[b]ecause no A.R.S. § 12-3201(E)(1)(a)-(f) provision meets the

26  U.S. Supreme Court's two-prong conditional requirement for enjoining a single suit, or

27  _____

regarding the third element, Plaintiff has not provided those records or identified them in a
28  manner that would enable the Court to independently locate and review them.

- 13 -

1   even approaches the Ninth Circuit's *Ringgold* Standard needed to abridge or burden the

2   fundamental right of access to the courts, the Statute violates substantive due process in

3   every application." (*Id.*)  Finally, Plaintiff contends that, for related reasons, A.R.S. § 12-

4   3201 also "violates the overbreadth doctrine" and is "unconstitutionally vague and

5   overbroad." (*Id.* at 10-12.)

6          In response, AG Mayes first argues that "A.R.S. § 12-3201 provides constitutionally

7   sufficient procedural due process" because "Arizona's courts of appeals interpret A.R.S.

8   § 12-3201 as requiring the procedural steps the Ninth Circuit has imposed on prefiling

9   requirements." (Doc. 37 at 10-11.)  AG Mayes also notes that "the only consequence of a

10  designation is a prefiling review requirement, not inability to file"; that the only conduct

11  thus prohibited by the statute—improper filings—is not protected by the First Amendment;

12  and that, at any rate, litigants have a procedural remedy (special action relief) should a trial

13  court erroneously decline to accept a particular filing.  (*Id.* at 11-12.)  Turning to

14  substantive due process, AG Mayes argues that Plaintiff misinterprets *Ringgold-Lockhart*

15  as requiring findings of both frivolousness and harassment, when in fact "*Ringgold-

16  Lockhart* is explicit that 'substantive findings of frivolousness or harassment' is

17  disjunctive." (*Id.* at 12.)  Finally, AG Mayes argues that A.R.S. § 12-3201 is not facially

18  overbroad because it only sweeps in "prohibited filings that are unprotected under the First

19  Amendment" and is not void for vagueness because "there is no real confusion as to the

20  core of what litigants may not do—they simply must avoid making improper filings.  That

21  is no new requirement.  It is required of them before a designation, and enforced

22  prospectively after." (*Id.* at 12-15.)

23         In reply, Plaintiff argues that under *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516

24  (2002), a lawsuit cannot be enjoined unless it is both objectively baseless and subjectively

25  motivated by an improper purpose.  (Doc. 40 at 1-3.)  Plaintiff contends that A.R.S. § 12-

26  3201 fails to satisfy this standard because no statutory provision "defines 'vexatious

27  conduct' in terms that meet the two-pronged standard for both (1) objective baselessness

28  and (2) a subjective improper purpose." (*Id.* at 3-4.)  Next, Plaintiff contends the statute is

1   overbroad because it requires a "permanent blanket injunction as the universal remedy for

2   any . . . infraction." (*Id.* at 4.) Finally, Plaintiff contends the statute is vague because

3   "objective standards appear nowhere in the statute." (*Id.* at 4-6.)

4               2.    Analysis

5           Plaintiff is unlikely to succeed on the merits of his challenge to A.R.S. § 12-3201.

6   In *Ringgold-Lockhart v. County of Los Angeles*, 761 F.3d 1057 (9th Cir. 2014), the Ninth

7   Circuit addressed "a federal court's authority to impose pre-filing restrictions against so-

8   called vexatious litigants." *Id.* at 1060. The Ninth Circuit held that, "[o]ut of regard for

9   the constitutional underpinnings of the right to court access, pre-filing orders should rarely

10  be filed, and only if courts comply with certain procedural and substantive requirements.

11  When district courts seek to impose pre-filing restrictions, they must: (1) give litigants

12  notice and an opportunity to oppose the order before it is entered; (2) compile an adequate

13  record for appellate review, including a listing of all the cases and motions that led the

14  district court to conclude that a vexatious litigant order was needed; (3) make substantive

15  findings of frivolousness or harassment; and (4) tailor the order narrowly so as to closely

16  fit the specific vice encountered." *Id.* at 1062 (cleaned up). "The first and second of these

17  requirements are procedural, while the latter two factors are substantive considerations that

18  help the district court define who is, in fact, a 'vexatious litigant' and construct a remedy

19  that will stop the litigant's abusive behavior while not unduly infringing the litigant's right

20  to access the courts." *Id.* (cleaned up).

21          One of Plaintiff's contentions is that A.R.S. § 12-3201 fails to comply with the first

22  procedural requirement under *Ringgold-Lockhart*—that is, the right to notice and an

23  opportunity to be heard in opposition—because "the Statute contains no hearing

24  provision." (Doc. 23 at 6.) But even assuming the requirements articulated in *Ringgold-*

25  *Lockhart* also apply to state vexatious litigant statutes,[7] Plaintiff ignores that the Arizona

26  _____

27  [7]      *But see Sargent v. Cantil-Sakauye*, 812 F. App'x 682, 683 (9th Cir. 2020) (rejecting
    First Amendment facial challenge to California's vexatious litigant statute, because that
28  challenge was foreclosed by existing Ninth Circuit law, and explaining that *Ringgold-*
    *Lockhart* was "not applicable" because it "addressed federal vexatious litigant rules and
    expressly did not consider the [California statute]").

courts have construed A.R.S. § 12-3201 as requiring notice and a hearing before a vexatious litigant order may be entered. *Madison v. Groseth*, 279 P.3d 633, 639 (Ariz. Ct. App. 2012) ("[T]he Ninth Circuit [has] set forth principles for courts to observe when ordering pre-filing restrictions . . . [including that] the litigant must be afforded notice and an opportunity to oppose the order. . . .  We agree adherence to these principles is appropriate to ensure that a litigant's access to courts is not inappropriately infringed upon, and we therefore adopt them.") (citation omitted).  Tellingly, Plaintiff received such a hearing before the entry of the vexatious litigant order against him. *Potter*, 2024 WL 368095 at *2 ("In February 2023, the court held an evidentiary hearing on the motion to designate Potter as a vexatious litigant.").

Another of Plaintiff's theories is that, as a matter of substantive due process as recognized in *Ringgold-Lockhart*, a vexatious litigant order can only issue upon findings that the litigant's claims were objectively baseless *and* that the litigant was motivated by an unlawful purpose—a standard that Plaintiff refers to as "two-pronged conditional requirement." (Doc. 23 at 1, 7.)  Operating from that premise, Plaintiff argues that A.R.S. § 12-3201 is invalid because it only requires a finding of objective baselessness or an improper purpose. (*Id.*)  This argument lacks merit because, as AG Mayes correctly notes, it rests on a misunderstanding of *Ringgold-Lockhart*. 761 F.3d at 1064 ("Before a district court issues a pre-filing injunction it is incumbent on the court to make substantive findings as to the frivolous *or* harassing nature of the litigant's actions.  To determine whether the litigation is frivolous, district courts must look at both the number and content of the filings as indicia of the frivolousness of the litigant's claims. . . . *As an alternative to frivolousness*, the district court may make an alternative finding that the litigant's filings show a pattern of harassment.") (cleaned up) (emphases added).

Plaintiff also contends that A.R.S. § 12-3201 facially "violates the overbreadth doctrine" because it "functions as a blanket injunction with no narrowly tailored solution to remedy any specific problem before the court." (Doc. 23 at 10-11.)  However, such "facial challenges [are] hard to win," as a law needs only a "plainly legitimate sweep" that

is not "substantially outweigh[ed]" by its unconstitutional applications.  *Moody v. NetChoice, LLC*, 603 U.S. 707, 723-24 (2024).  Thus, in *Wolfe v. George*, 486 F.3d 1120 (9th Cir. 2007), the Ninth Circuit rejected an overbreadth challenge to California's vexatious litigant statute, explaining that "[i]t is not overbroad, because there is no constitutional right to file frivolous litigation.  Just as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition.  Under the California statute, a vexatious litigant may file potentially meritorious claims not intended solely to harass or delay, so the courthouse doors are not closed to him." *Id.* at 1125 (cleaned up).  This reasoning forecloses Plaintiff's overbreadth challenge to Arizona's statute, which has the same relevant features as California's statute. *See also Sargent v. Cantil-Sakauye*, 812 F. App'x 682, 683 (9th Cir. 2020) ("Sargent's argument that the CVLS [California vexatious litigant statute] violates the First Amendment is foreclosed by [*Wolfe*], which rejected the same facial constitutional challenges to the CVLS raised by Sargent.  Sargent's argument that the CVLS impermissibly chills the First Amendment right to access the courts is meritless, given *Wolfe*'s holding that there is no constitutional right to file the sort of frivolous litigation barred by the CVLS.  Because *Wolfe* stated that it was addressing an '[o]verbreadth' challenge, which by definition is a facial challenge, Sargent's argument that *Wolfe* addressed only an as-applied challenge also fails.  We are therefore bound by the decision in *Wolfe*.") (citations omitted).  As AG Mayes correctly argues in a related filing: "With its two judicial screening steps, the vast majority of the law's applications will prevent filings not protected by the First Amendment because there is no constitutional right to file frivolous litigation.  Should the court mistakenly block a filing, the litigant may seek special action review.  Therefore, most of its applications are within the law's plainly legitimate sweep and are neither aimed at, nor encompass, protected activity." (Doc. 38 at 12, citations omitted.)

Plaintiff also contends that A.R.S. § 12-3201 is unconstitutionally vague because "objective standards appear nowhere in the statute."  (Doc. 23 at 11-12; Doc. 40 at 4-6.)

But this argument is once again foreclosed by *Wolfe*, which rejected a vagueness challenge to California's statute: "The California vexatious litigant statute is not unconstitutionally vague, because it gives fair notice to those who might violate the statute." *Wolfe*, 486 F.3d at 1125 (cleaned up). At any rate, Plaintiff's vagueness challenge falters on the principle that "[s]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Tucson v. City of Seattle*, 91 F.4th 1318, 1330 (9th Cir. 2024) (cleaned up).

  C.  **Summary As To The First *Winter* Factor**

It is unclear whether Plaintiff has standing to pursue the claim giving rise to his request for injunctive relief, both because A.R.S. § 12-3201 has already been enforced against him (which renders the very notion of a pre-enforcement challenge anomalous) and because it is questionable whether he can establish a credible threat of enforcement as to AG Mayes. And even if Plaintiff could somehow survive those jurisdictional hurdles, he has not shown a likelihood of success on the merits of his claim or even serious questions going to the merits of that claim. Given these conclusions, it is unnecessary to address the remaining *Winter* factors. *Roe*, 137 F.4th at 922 ("In the absence of serious questions going to the merits, the court need not consider the other factors.") (cleaned up).

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for a temporary restraining order and preliminary injunction (Doc. 23) is **denied**.

Dated this 20th day of June, 2025.

              Dominic W. Lanza
              United States District Judge

ER-026

1  Phillip Potter
2  2301 N. 66th Street
   Scottsdale, Arizona 85257
3  Phone: 480.459.0310
   E-Mail: phillip.t.potter@gmail.com
4  Plaintiff
   Pro Se
5

6          **IN THE UNITED STATES DISTRICT COURT**

7             **FOR THE DISTRICT OF ARIZONA**

8

9

10    Phillip Potter,                    No. 2:25-cv-00663-PHX-DWL

11                        Plaintiff,

12                                        **SECOND MOTION FOR NOTICED**
                                          **TEMPORARY RESTRAINING ORDER**
13    v.                                  **AND PRELIMINARY INJUNCTION**

14    Robert Meza, et al.,
                                          (Expedited Evidentiary Hearing Requested)
15                        Defendants.

16

17

18

19

20

21

22

23

24

25

26

Plaintiff asks the Court to issue a Temporary Restraining Order and schedule Preliminary Injunction proceedings based on new and newly discovered jurisdictional facts.  The record is sufficiently developed to grant those requests in this case of public concern involving a First Amendment facial challenge to A.R.S. § 12-3201. (Doc. 14 at 113-207).  Plaintiff sued Attorney General Kris Mayes, in her official capacity, and Presiding Judge Pamela Gates, in her official administrative capacity, (Doc. 14 at 110-111) seeking declaratory and injunctive relief to enjoin civil, criminal, and administrative enforcement of § 12-3201. (Doc. 14, pp. 70-71).  Attorney General Mayes moved for Fed. R. Civ. P. ("Rule") 12(b)(1) dismissal contending Plaintiff lacked standing (Doc. 38, pp. 5-9) and she had sovereign immunity (Doc. 38, pp. 10-11).  But she foreclosed the latter defense when admitting her office and "county attorneys" can prosecute Plaintiff. (Doc. 38, pp. 8-9; Doc. 49, pp. 8-9).  The Court still separately questioned whether Plaintiff met the "credible threat of enforcement" element to establish an imminent ("pre-enforcement") injury. (Doc. 47, pp. 10-13).  On November 28, 2025, for the first time, the Attorney General expressly refused to disavow civil or criminal enforcement of § 12-3201 against Plaintiff (Doc. 93, pp. 1-2, 5-6), thus conceding credible threat. (Doc. 93, pp. 2-5).  *Peace Ranch, LLC v. Bonta,* 93 F.4th 482, 490 (9th Cir. 2024) (The credible threat element "often rises or falls with the enforcing authority's willingness to disavow enforcement.").  Presiding Judge Gates, in her Rule 12(b)(1) motion, requested the Court judicially notice "Administrative Order 2023-159" (Doc. 67, p. 9, n.1), declared the Presiding Judge's "only action here was to review and approve the application to certify Plaintiff as a vexatious litigant" (Doc. 67, p. 3), and asked the Court to treat acts the Presiding Judge took in an administrative capacity as acts taken in a "judicial capacity" (Doc. 67, p. 9).  She posited the Court lacked jurisdiction due to sovereign immunity

because the Presiding Judge does not "enforce[] the law" (Doc. 67, p. 3-5).  However, the complaint does not reference Administrative Order 2023-159 or rely on that document as the basis for any claim. (Doc. 90, pp. 3-5).  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir.2018) (Extraneous documents may be made part of "the complaint [only] 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'").  Plaintiff did not even know that <u>*administrative*</u> order existed when filing suit. (Doc. 54, Affid.; Doc. 79, p. 1, 5-11).  Rather than support dismissal, the extraneous document provides an independent factual source of standing for an actual injury.  That document also confirms Presiding Judges can and do enforce § 12-3201 in an administrative (i.e., non-judicial) capacity.  *See* A.R.S. § 12-109(B)(1); Ariz. R. Sup. Ct. 123(b)(18)(A).  (Doc. 92, pp. 2-9).  Facing the prospect of jurisdictional discovery, Presiding Judge Gates altered her defense posture on October 23rd when declaring the "Motion to Dismiss does not cite to or rely on any extraneous documents or records" (Doc. 86, pp. 3-4), and expressly limiting herself to a "facial attack" on the complaint as written.  (Doc. 88, pp. 2-5).  *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ("A Rule 12(b)(1) jurisdictional attack may be facial or factual.").  Regardless, sovereign immunity does not apply to judges sued in their "administrative capacity".  *Wolfe v. Strankman*, 392 F.3d 358, 365-66 (9th Cir. 2004) ("Since [Plaintiff] sued [Judge Gates] in [her] administrative capacity as [Presiding Judge], we conclude that dismissal [for sovereign immunity] is not warranted".). (Doc. 49, pp. 4-5, 11; Doc 90, pp. 1-3).  Perhaps just as important, Plaintiff obtained documents and admissions from Presiding Judge Gates on October 21, 2025 as part of an Ariz. R. Sup. Ct. 123(f) public records request.  The Presiding Judge (1) could not produce copies of the supposed "application" from any source including the pertinent case's trial court judge, the Hon.

2

John Blanchard; (2) conceded a Presiding Judge's "'administrative authority' does not include 'authority over' private parties"; (3) stated "[t]he only communications [to or from Presiding Judge Welty[1]] are attorney and judicial work product emails between [Judge Gates] and Judge Welty or his staff when [Judge Gates] drafted the A.O. declaring Phillip Potter as a vexatious litigant"; and (4) admitted Presiding Judge Welty was never the assigned judge in the pertinent state case and never issued any judicial order entered into that case's docket. (Doc. 90, pp. 7-12). No record of the "application" exists. And the Presiding Judge's concessions and admissions cannot support the legal conclusion that Presiding Judge Welty acted "in a judicial capacity". With these facts in hand, Plaintiff asked defendants' counsels on November 24, 2025 "if your clients would agree not to [administratively, civilly or criminally] enforce A.R.S. § 12-3201 until the case is complete." On November 28th, attorney Joshua Katz responded: "I write to inform you that neither defendant agrees". (Doc. 93, pp. 1-2). The developed record now contains new and newly discovered jurisdictional facts which show no state officer is entitled to sovereign immunity, and Plaintiff has standing to sue the state officers as *Ex parte Young* "proper defendants". *See* attached Affidavit. The Court has Article III jurisdiction.[2]

Per Rule 65, Plaintiff moves the Court to enjoin Attorney General Mayes and

---

[1] The Hon. Pamela Gates replaced the Hon. Joseph Welty as Presiding Judge of the Maricopa County Superior Court in July 2025. (Doc. 77).

[2] The *Rooker-Feldman* doctrine is inapplicable here because a "facial challenge [i]s not 'inextricably intertwined' with the judicial decision of the local court [and presents] a general challenge to the constitutionality of" a statute seeking review of legislative acts, not judicial acts or any state court decision. *Noel v. Hall*, 341 F.3d 1148, 1157 (9th Cir. 2003); *Maldonado v. Harris*, 370 F.3d 945, 949-50 (9th Cir. 2004). (Doc. 27, pp. 1-6; Doc. 54, pp. 15-17; Doc. 55; pp. 3-5). In addition, no defendant, including the two state officer defendants, can benefit from claim preclusion, especially given the newly discovered Administrative Order 2023-159. *See Power Rd.-Williams Field LLC v. Gilbert*, 14 F. Supp. 3d 1304, 1309 (D. Ariz. 2014); *Lawrence T. v. Dep't. of Child Safety*, 438 P.3d 259, 262-64 (Ariz. Ct. App. 2019). (Doc. 55, pp. 5-11).

ER-030

Presiding Judge Gates from civilly, criminally or administratively enforcing A.R.S. § 12-3201 until the case is complete.  He asks the Court to issue a Temporary Restraining Order ("TRO") and to schedule Preliminary Injunction ("PI") proceedings as he meets TRO and PI requirements.  The developed record shows Plaintiff is likely to succeed on the merits or at least raises "serious questions".  He suffers irreparable injuries in the form of threatened and ongoing fundamental rights deprivations.  Both the balance of equities and the public interest strongly favor granting requested relief.  Plaintiff satisfied Rule 65 notice requirements by providing written notice of this Motion to Attorney General Mayes and Presiding Judge Gates on November 24, 2025.  No further notice should be required.  *See* Rule 65(b)(1)(A) and (B).  Plaintiff also requests the Court waive any security requirement.  *See* Rule 65(c).  This Motion is based on the following Memorandum in Support and all supporting written motions, court papers, documents and exhibits on the record, and other evidence and arguments which may be presented.

<div align="center">MEMORANDUM IN SUPPORT</div>

""The right of access to the courts is indeed but one aspect of the right of petition".  *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

I. CASE STATUS

Facts show Plaintiff never filed a baseless petition (Doc. 14 at 61-76, 242; Doc. 49, Affid.).  However, he faces administrative enforcement of § 12-3201, and credible threats of civil and criminal prosecution for constitutionally protected court petitioning.  Motion practice is now complete at the dismissal stage. (Doc. 38; Doc. 49; Doc. 53; Doc. 67; Doc. 79; Doc. 81).  Questions of jurisdiction and standing have been answered in Plaintiff's favor.  The Supreme Court expressly rejected the Attorney General's Rule 12(b)(6) defense that § 12-3201(E)(1) definitions of "vexatious conduct" do not reach

<div align="center">4</div>

constitutionally protected activities.  Tellingly, Presiding Judge Gates' Rule 12(b)(6) motion includes no argument that the Petition Clause permits A.R.S. § 12-3201.[3]

## II. LAW AND DISCUSSION

Courts apply the same approach to TRO requests as to PI motions.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "The Supreme Court has explained that plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *Where Do We Go Berkeley v. California Dep't. of Transportation,* 32 F.4th 852, 859 (9th Cir. 2022) (citing *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)).  Courts *"*evaluate 'these factors on a sliding scale, such 'that a stronger showing of one element may offset a weaker showing of another.' When the balance of equities 'tips sharply in the plaintiff's favor,' the plaintiff must raise only 'serious questions' on the merits – a lesser showing than likelihood of success." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,* 82 F.4th 664, 684 (9th Cir. 2023) (en banc).

---

[3] Presiding Judge Gates' Rule 12(b)(6) defense rests on absolute "judicial immunity". (Doc. 67, pp. 6-9).  This fails altogether since "[j]udicial immunity only applies to judicial acts".  *Forrester v. White,* 484 U.S. 219, 227 (1988).  "[A]bsolute judicial immunity does not apply to nonjudicial acts, i.e. the administrative, ... functions that judges may on occasion be assigned to perform." *Duvall v. County of Kitsap,* 260 F.3d 1124, 1134 (9th Cir. 2001).  The "'touchstone' for the [judicial immunity] doctrine's applicability has been 'performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." *Burns v. Reed,* 500 U.S. 478, 500 (1991).  But again, the Presiding Judge recently admitted Presiding Judge Welty "was never the assigned judge in that [CV2022-008626] case and never issued an order entered into that case's docket." (Doc. 92, pp. 2-4, n.3).  Indeed, Arizona's constitution, statutes, and court rules preclude Presiding Judges from resolving disputes between parties or adjudicating private rights via administrative proceedings or administrative orders since their "'administrative authority' does not include 'authority over' private parties'". (Doc. 90, pp. 1-8; Doc. 92, pp. 5-9).

A. Factor One: Plaintiff Is Likely To Succeed On The Merits

State laws which operate entirely, or substantially and unjustifiably, within the First Amendment's scope may be challenged as overbroad. *Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973). A statute which "lacks a plainly legitimate sweep" is void. *Moody v. NetChoice, LLC,* 603 U.S. 707, 721 (2024). "[L]itigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'" *U.S. v. Hansen,* 599 U.S. 762, 769 (2023) (emphasis original). Alternatively, First Amendment facial challenges also may be successful if a plaintiff can show that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id*; *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002) ("The overbreadth doctrine prohibits the Government from banning unprotected [expression] if a substantial amount of protected [expression] is prohibited or chilled in the process."). "[I]n facial challenges under ... the First Amendment, like this one, courts set the bar lower out of respect for the value of free expression." *Arizona Attorneys for Crim. Just. v. Mayes,* 127 F.4th 105, 107 (9th Cir. 2025). Statutes which abut against core court petitioning "expression" or reach protected petitioning-related conduct cannot suffer vagueness[4] and must be "narrowly tailored" to

---

[4] "As the overbreadth doctrine has developed, it has 'almost wholly merged' with the vagueness doctrine as applied to 'statutes covering [F]irst [A]mendment activities.'" *U.S. v. Sineneng-Smith,* 590 U.S. 371, 381 (2020) (Thomas, J. concurring). "When First Amendment freedoms are at stake, courts apply the vagueness analysis more strictly, requiring statutes to provide a greater degree of specificity and clarity than would be necessary under ordinary due process principles." *Cal. Teachers Ass'n v. State Bd. of Educ.,* 271 F.3d 1141, 1149-50 (9th Cir. 2001). "[A] law is void for vagueness if it 'lack[s] any ascertainable standard for inclusion and exclusion,' thereby authorizing or encouraging 'the authorities [to] arbitrarily prosecute" for ambiguously proscribed conduct. *Tucson v. City of Seattle,* 91 F.4th 1318, 1323 (9th Cir. 2024). Of note, "vagueness allegations must be taken as true for the purpose of determining standing." *Isaacson v. Mayes,* 84 F.4th 1089, 1099 (9th Cir. 2023). (Doc. 14 at 123, 195-207).

justifiably serve a "compelling" or "substantial" "government interest". *NAACP v. Button,* 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect. ... Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms."); *U.S. v. O'Brien*, 391 U.S. 367, 377 (1968) ("We hold that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers a[] [compelling] or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."); *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) ("[A] restriction on speech or expression must be 'narrowly tailored to serve a significant governmental interest.'").

### 1. A.R.S. § 12-3201(E) Reaches Constitutionally Protected Activities; *BE & K* (2002) Outlined The Petition Clause's Scope When Petitioning Courts For Redress

Attorney General Mayes contended "baseless litigation is not immunized by the First Amendment right to petition" per "*Bill Johnson's Rests.*, *Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983)". (Doc. 38, p. 1). From that truncated phrase, she posited § 12-3201(E) "does not encompass constitutionally protected speech or activities" because "there is no constitutional right to file frivolous (i.e., objectively baseless)[5] litigation". (Doc. 38, p. 12). This attempt to limit the Petition Clause's scope to "[non]baseless litigation" is untenable since the Supreme Court *directly* addressed and unambiguously *rejected* the Attorney General's interpretation of the exact *Bill Johnson's* phrase upon which her defense relied. *See Fidelity Exploration and Prod. Co. v. U.S.*, 506 F.3d 1182, 1186 (9th Cir.2007) ("[W]e must follow the Supreme Court precedent that directly controls.").

---

[5] *See Moore v. Keegan Mgmt. Co.,* 78 F.3d 431, 434 (9th Cir. 1996) (A complaint is "frivolous" if it "is both baseless and made without a reasonable and competent inquiry.").

### a. The U.S. Supreme Court Established The Petition Clause's Scope

When deciding whether "conduct falls under the protection of the Petition Clause, we must give adequate 'breathing space' to the right of petition".  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 932 (9th Cir. 2006).  The Supreme Court emphasized the importance of this "breathing space" principle when it explained "in *Bill Johnson's* that [courts] could enjoin baseless retaliatory [i.e., baseless *and* retaliatory] suits because they fell outside of the First Amendment and thus were analogous to 'false statements.'  We concluded that '[j]ust as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition.'  While this analogy is helpful, it does *not* suggest that the class of baseless litigation is *completely* unprotected: *At most*, it indicates such litigation should be unprotected 'just as' false statements are.  And while false statements may be unprotected for their own sake, '[t]he First Amendment *requires* that we protect some falsehood in order to protect *speech that matters.*'  ([N]oting the need to protect some falsehoods to ensure that 'the freedoms of speech and press [have] '*breathing space*' essential to their fruitful exercise'). ... It is at least consistent with these 'breathing space' principles that we have *never* held that the *entire* class of objectively baseless litigation may be enjoined *or declared unlawful* even though such suits may advance no First Amendment interests of their own.  Instead, in cases like *Bill Johnson's* ..., our holdings *limited regulation* to suits that were *both* objectively baseless *and* subjectively motivated by an unlawful purpose".  *BE & K Constr. Co. v. N.L.R.B.,* 536 U.S. 516, 530-31 (2002) (Italics with underline emphasis added). (Doc. 49, pp. 11-12).  The Ninth Circuit found "*BE & K* made this breathing room protection explicit" such that the scope of the Petition Clause reaches, protects, and "immunizes" core court "petitioning activities" (i.e., filing Ariz. R. Civ. P. 7

"pleadings allowed" such as a "complaint", "answer", etc.) and all "conduct incidental to a petition" (i.e., motion practice, settlement communications, etc.) from statutory regulation "unless the underlying petition itself fell outside" the *BE & K* "both ... and" conjunctive[6] parameters. *Sosa*, 437 F.3d at 932-938. Only when the "underlying petition f[alls] outside" those parameters can a suit be treated as an actionable, non-immunized "sham" pursuant to the "sham litigation exception". *Id*; *U.S. v. Koziol,* 993 F.3d 1160, 1171 (9th Cir. 2021) ("requiring both objective baselessness and an improper motive ... ensure[s] citizens may enjoy the right of access to the courts"). (Doc 14 at 113-187). The Ninth Circuit applies "a strict two-step analysis to assess whether a single action constitutes sham petitioning. ... The two parts of the test operate in succession: Only if the suit is found to be objectively baseless does the court proceed to examine the litigant's subjective intent." *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994). Contrary to the Attorney General's unsupported legal contention, the Petition Clause's reach captures all core court "petitioning activities" and all "conduct incidental", including "baseless litigation", provided the "underlying" suit is not a conjunctively demonstrated "sham".[7]

   b. The Arizona Supreme Court Determined § 12-3201 Reaches Constitutionally Protected Activities; That Construal Is Binding On Federal Courts

   The Arizona supreme court construed § 12-3201(E) language[8] and, as Plaintiff

_____

[6] *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives. Competent users of the language rarely hesitate over their meaning.").
[7] The *BE & K* conjunctive standard applies when adjudicating a "single action" and "*a small number of such suits*" while a long "series" of baseless suits alternatively infers the requisite subjectively motivated element. *Relevant Grp., LLC v. Nourmand,* 116 F.4th 917, 929 (9th Cir. 2024) (emphasis original). (Doc. 14 at 230, n.38; Doc 85, pp. 8-10).
[8] For "purposes of this section: 1. 'Vexatious conduct' includes any of the following: (a) Repeated filing of court actions solely or primarily for the purpose of harassment. (b)

ER-036

alleged (Doc 14 at 121-194), found every § 12-3201(E)(1)(a)-(f) "vexatious conduct"

definition reaches constitutionally protected activities which fall well within the *BE & K*

conjunctive boundaries.[9]  *Ariz. Republican Party v. Richer*, 257 Ariz., 210 (2024). (Doc.

14, 128-131).  Per *Richer*, § 12-3201(E)(1)(c) only regulates actions brought "without

substantial justification" ("groundless"[10] petitions negligently filed as judged against the

standard of "what a reasonable attorney would do")[11] while the other § 12-3201(E)(1)

"subsections" evaluate "*separate* bad faith"; i.e., the § 12-3201(E)(1)(a) subjectively

motivated improper "purpose of harassment"[12] and any § 12-3201(E)(1)(b), (d), (e) or (f)

---

Unreasonably expanding or delaying court proceedings. (c) Court actions brought or defended without substantial justification. (d) Engaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant. (e) A pattern of making unreasonable, repetitive and excessive requests for information. (f) Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation. 2. 'Without substantial justification' has the same meaning prescribed in section 12-349. Per 'section 12-349[F]', 'without substantial justification' means that the claim or defense is groundless and is not made in good faith."
[9] Courts "may assume without deciding that the [challenged] statute 'reaches some [First Amendment] protected'" activities when deciding issues at the dismissal or preliminary injunction stages. *Arizona Attorneys for Crim. Just.,* 127 F.4th at 110. In addition, a plaintiff can sufficiently allege a statute reaches protected activities simply "from the text of [the law]". *Virginia v. Hicks,* 539 U.S. 113, 122 (2003). (Doc. 14 at 121, n.28).
[10] "Groundless" and "baseless" are synonymous terms. *See* Black's Law Dictionary (7th Ed, 1999) ("Baseless" means "without legal or factual basis; groundless".).
[11] "Objectively baseless", "frivolous", and "without substantial justification" are functionally equivalent terms.
[12] Per *Richer*, courts must treat statutorily undefined § 12-3201(E)(1)(a) "harassment" as "separate" from the § 12-3201(E)(1)(c) merits. Thus, "harassment" in this context has its "ordinary, contemporary, common meaning" of annoyance. *United States v. Cabaccang,* 332 F.3d 622, 626 (9th Cir.2003) (en banc) ("When Congress does not define a term in a statute, we construe that term 'according to [its] ordinary, contemporary, common meaning"). This sharply contrasts with how courts must treat "harassment' under procedural rules, for instance, where "harassment" is read as a legal term of art which inherently includes (i.e., "subsumes") a finding of no "legitimate purpose" for the underlying "complaint'. *Hudson v. Moore Business Forms, Inc.,* 836 F.2d 1156, 1159 (9th Cir.1987) ("[B]ecause of the objective standard applicable to Rule 11 analyses, a

motivation[13] or purpose, which are not "moored" to the merits. *Id* at ¶¶ 35-44 (emphasis added). (Doc. 14, 128-131). Relying on the anti-surplusage canon, the state's highest court explained that to conclude otherwise would wrongly render § 12-3201(E)(1)(c) "superfluous". *Id* at ¶ 37. *See Am. Vantage Cos. v. Table Mountain Rancheria,* 292 F.3d 1091, 1098 (9th Cir.2002) ("legislative enactments should not be construed to render their provisions mere surplusage"). This construal "extricates our courts from the morass of attempting to discern the subjective motives of attorneys and parties in bringing a case and avoids conflating motive and the objective reasonableness of litigation". *Id* at ¶ 40.

"When interpreting state law, a federal court is bound by the decision of the highest state court." *In re Kirkland,* 915 F.2d 1236, 1238 (9th Cir. 1990). *Richer* is binding precedent when it comes to questions of how to construe the statute's language and whether the statute reaches constitutionally protected activities. Per *Richer* construal, the Arizona Legislature enacted a law which reaches "protected petitioning activity or

---

complaint that is found to be well-grounded in fact and law cannot be sanctioned as harassing, regardless of the attorney's subjective intent".); *CrossFit Inc. v. Martin*, No. 2:14-CV-02277-PHX-JJT, 2017 WL 4236968 (D. Ariz. Sept. 22, 2017) ("[T]he 'improper purpose' inquiry subsumes the 'frivolousness inquiry' when applied to the filing of complaints. In other words, 'complaints are not filed for an improper purpose if they are non-frivolous.'"); Black's Law Dictionary (12th ed. 2024) ("Harassment" means "[w]ords, conduct, or action . . . that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves *no legitimate purpose*."). In sum, the word "harassment" under Rule 11(b)(1) procedural authority has a different meaning from the word "harassment" under § 12-3201(E)(1)(a) statutory authority.

[13] No provision under §§ 12-3201(E)(1)(b) ("*Unreasonably* expanding or delaying court proceedings"), (d) ("A pattern of making *unreasonable*, repetitive and excessive requests for information"), or (e) ("A pattern of making *unreasonable*, repetitive and excessive requests for information") presents a subjectively motivated improper purpose since the negligence standard for determining what a "reasonable" attorney or person would do is objective, not subjective. *See Prof. Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60-61 (1993). (A "subjectively motivated" litigant has a "subjective intent" to achieve an improper purpose.). A.R.S. §§ 12-3201(E)(1)(b), (d), and (e), therefore, also lack the "subjectively motivated" element that *BE & K* requires.

11

activity which must be protected to afford breathing space to the right of petition

guaranteed by the First Amendment". *Sosa*, 437 F.3d at 933.

### 2. A.R.S. § 12-3201(E) Lacks A Plainly Legitimate Sweep; The Statute Violates The Petition Clause In Every Application

The "first step in the proper facial analysis is to assess the state law's scope.  What

activities, by what actors, do the laws prohibit or otherwise regulate?" *Moody*, 603 U.S.

at 724.  A.R.S. § 12-3201 "actors" are "pro se litigant[s]" involved in any "noncriminal

case".  The "activities" that the challenged provisions "prohibit or otherwise regulate" are

"any" activities defined as "vexatious conduct" per §§ 12-3201(E)(1)(a)-(f).

### a. A.R.S. § 12-3201(E) Exclusively Prohibits and Otherwise Regulates Constitutionally Protected Activities, But Does Not Reach *Unprotected* Activities

When deciding whether the First Amendment protects activities related to court

petitioning, "proof of a lawsuit's objective baselessness is the 'threshold prerequisite': a

court may not even consider the defendant's allegedly illegal objective unless it first

determines that his lawsuit was objectively baseless." *White v. Lee*, 227 F.3d 1214, 1233

(9th Cir. 2000).  Each § 12-3201(E)(1) (a), (b), (d), (e), and (f) provision purports to

present a motive or purpose for filing suit which *Richer* held is "separate' from, and not

"moored" to, any § 12-3201(E)(1)(c) merits considerations.  But again, courts "may not

even" consider any filing motive or purpose unless the suit's merits are first found to be

objectively absent.  Defining various "separate" motives and purposes behind litigation,

§§ 12-3201(E)(1)(a), (b), (d), (e), and (f) only regulate protected "conduct incidental" per

*Sosa* since those provisions do not "subsume" the presence of a baseless petition.  And

A.R.S. § 12-3201(E)(1)(c) addresses nothing beyond whether an objectively baseless

"action" was filed.  Per *Sosa* and *Richer*, each § 12-3201(E)(1)(a)-(f) provision only

ER-039

reaches constitutionally protected activities, not *unprotected* activities. In other words, "in every application", the *Moody* "activities ... that [§§ 12-3201(E)(1)(a)-(f)] prohibit or otherwise regulate" are *all* Sosa "activities which must be protected" under the Petition Clause's conjunctive scope. The statute thus "lacks a plainly legitimate sweep".

### b. Pro Se Litigants Have *Noerr-Pennington* Immunity In Every Application

"Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct. ... [The] doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause." *Sosa*, 437 F.3d at 929-31; *White*, 227 F.3d at 1239 ("The *Noerr-Pennington* doctrine sharply limits [Government] officials' ability to treat [] state-court lawsuit[s] as a possible violation of [civil or criminal] law"). The U.S. Supreme "Court... extended *Noerr-Pennington* immunity to the use of 'the channels and procedures of state ... courts.'" *Sosa*, 437 F.3d at 929. For reasons stated, pro se litigants can defeat every A.R.S. § 12-3201(A) motion by asserting *Noerr-Pennington* immunity as an affirmative defense. (Doc. 14 at 124-139). *See 360 Mortg. Grp., LLC v. Fortress Inv. Grp. LLC,* No. 19-CV-8760, 2020 WL 5259283, at *4 (S.D.N.Y. Sept. 3, 2020) ("The *Noerr-Pennington* doctrine is generally raised as an affirmative defense."). "To determine whether a [litig]ant's conduct, ..., is immunized under *Noerr-Pennington,* we apply a three-step analysis to determine: (1) 'whether the lawsuit imposes a burden on petitioning rights,' (2) 'whether the alleged activities constitute protected petitioning activity,' and (3) 'whether the statute[] at issue may be construed to [avoid] that burden.' If the answer at each step is 'yes,' then a defendant's conduct is immunized under *Noerr-Pennington*." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 536 (9th Cir. 2022). Meeting that first

ER-040

step, any § 12-3201(A) motion that might result in a "finding that a lawsuit was illegal 'is a burden'". *Sosa*, 436 F.3d at 930.  The "focus at step two" is on whether any "alleged" A.R.S. § 12-3201(E)(1)(a)-(f) violation would qualify as "*protected* petitioning activity" not subject to the "sham" litigation exception.  *B&G Foods*, 29 F.4th at 536 (emphasis original); *Sosa*, 437 F.3d at 933.  Per *Richer*, every alleged § 12-3201(E)(1)(c) violation could not take into consideration any "separate" subjective motives or improper purposes, while every other alleged § 12-3201(E)(1) violation would involve motives or purposes "[un]moored" to the case's objective merits, meaning all possible "alleged activities" would, in every instance, be "protected petitioning activities" in the form of core "petitioning activity" or "conduct incidental to a petition" per *BE & K* and *Sosa*.  Moving to third step, the *Noerr-Pennington* doctrine immunizes every instance of A.R.S. § 12-3201(E)(1)(a)-(f) "vexatious conduct" because, per *Richer*, each provision can be, and has been, "construed to [avoid] that [First Amendment] burden".  *B&G Foods*, 29 F.4th at 536.  All three steps required to demonstrate *Noerr*-Pennington immunity are satisfied in every possible application of the challenged statute.  As a matter of constitutional law, every self-represented litigant who could be accused of engaging in "vexatious conduct" through a § 12-3201(A) motion would be entitled to *Noerr-Pennington* immunity.  (Doc. 14 at 115-119).  A.R.S. § 12-3201 is "patently unconstitutional".  *See Saenz v. Roe,* 526 U.S. 489, 499 n.11 (1999) ("If a law has no other [demonstrable] purpose ... than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it is patently unconstitutional.").

   3. A.R.S. § 12-3201(E) Violates The Petition Clause At Least In A Substantial Number of Applications

   Plaintiff also factually demonstrated via court records that, in a conservative

calculation, 85% of the statute's applications resulted in orders which violated the Petition Cluse; a "substantial number" sufficient to find the law unconstitutional. (Doc 85, pp. 13-17). The number is not 100% because, in a handful of cases, judges found co-occurring §§ 12-3201(E)(1)(a) *and* (c) violations but declined to enter the requisite § 12-3201(B) blanket injunction. Orders compliant with the Petition Clause only resulted from judges who violated the § 12-3201(B) requirement after encountering litigants who (unwittingly) failed to invoke the *Noerr-Pennington* doctrine as an affirmative defense.

4. A.R.S. § 12-3201(B) Is A Content-Based, Permanent Blanket Prior Restriction

Per § 12-3201(B), litigants found vexatious "may n[ever] file a new [Ariz. R. Civ. P. 7] pleading, ... without prior leave of the court" even in active "well-founded" suits. *See Bill Johnson's Rests.*, 461 U.S. at 742-43 (1983) ("well-founded lawsuits ... [may] not be enjoined"). The § 12-3201(B) mandatory blanket injunction serves (1) as a "prior restraint" on the fundamental right to petition, *Bantam Books, Inc.* v. *Sullivan,* 372 U.S. 58, 70 (1963) ("Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."); and (2) as a "content based" regulation of a fundamental right, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) ("[R]egulations [are] considered content based if they 'cannot be justified without reference to the content of the regulated speech' [or petitioning]."). Restrictions and regulations on fundamental rights are "justified only if the government proves that they are narrowly tailored to serve compelling state interests". *Id* at 158. Defendants cannot overcome the rigors of "strict scrutiny", or even intermediate scrutiny, since a permanent blanket injunction could never be considered "narrowly tailored". *Id*. (Doc. 188-192).

B. Factor Two: Plaintiff Is Likely To Suffer, And Has Suffered, Irreparable Injuries

"The loss of [and threats to] First Amendment freedoms, for even minimal periods

of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 19 (2020). "'Irreparable harm is relatively easy to establish in a First Amendment case' because the party seeking the injunction 'need only demonstrate the existence of a colorable First Amendment claim.'" *Fellowship of Christian Athletes,* 82 F.4th at 694-95. Plaintiff presents a "colorable First Amendment claim" that the enforcement and operation of A.R.S. § 12-3201 abridges, impermissibly prohibits or otherwise regulates, and chills constitutionally protected activities in the form of core court petitioning and conduct incidental to a petition. Plaintiff is threatened with, and currently experiences, ongoing irreparable injuries. Factor Two is met.

    C. Factors Three and Four: The Balance of Equities Tip Sharply In Plaintiff's Favor, While An Injunction Is In The Public's Interest

    "Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors – the balance of equities and the public interest – 'merge.'" *Id* at 695. Both "the balance of equities" and "the public interest" independently favor granting injunctive relief. *Winter,* 555 U.S. at 20. Government defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio,* 695 F.3d 990, 1002 (9th Cir. 2012). "[B]y establishing a likelihood that [the challenged statute] violates the U.S. Constitution, Plaintiff[] ha[s] also established that both the public interest and the balance of the equities favor [injunctive relief]." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Factors Three and Four tip sharply in Plaintiff's favor.

III. CONCLUSION

    The Petition Clause protects core court "petitioning activities" and all "conduct

incidental to a petition" unless the "underlying petition" is found to be "*both* objectively baseless *and* subjectively motivated by an unlawful purpose".  The Ninth Circuit and Supreme Court are clear on this point of constitutional law.  In binding fashion, Arizona's supreme court construed §§ 12-3201(E)(1)(a)-(f) to "avoid conflating [the subjective] motive and the objective reasonableness of litigation".  A.R.S. § 12-3201(E)(1)(c) thus addresses a petition's objective merits but does not consider any "separate" subjective motive or purpose behind the suit, while no § 12-3201(E)(1)(a), (b), (d), (e) or (f) filing motive or purpose provision may "subsume" consideration for the "threshold perquisite" of an underlying "objectively baseless" suit.  Per these conditions, *Noerr-Pennington* immunity defeats all § 12-3201(A) motions "in every application".  The statute therefore "lacks a plainly legitimate sweep" as court records confirm.  A.R.S. § 12-3201(B) also unconstitutionally imposes an unjustifiable "content based" "prior restriction" where "any" § 12-3201(E) infraction results in a permanent blanket injunction mandating the Government review and approve every "pleading" before a litigant may exercise their fundamental right to petition in any ongoing or future suit.  Such injunctions violate the First Amendment as they are not "narrowly tailored" and can serve no justifiable "government interest".  "[N]o set of circumstances exists under which this law would be valid".  In sum, new and newly discovered jurisdictional facts show Plaintiff has standing and confirm neither Attorney General Mayes nor Presiding Judge Gates may benefit from sovereign immunity or judicial immunity.  The Court has Article III jurisdiction.  The Attorney General's and Presiding Judge's Rule 12(b)(6) defenses all fail as a matter of law.  Plaintiff is "highly likely to succeed on the merits", and he at least raises "serious questions" going to the merits of a "colorable First Amendment claim".  The Court should grant Plaintiff's request for a TRO and schedule PI proceedings.

17

DATED this 12th day of December 2025.

By: <u>//s//</u>
Phillip Potter
Plaintiff
Pro Se

18

<u>CERTIFICATE OF SERVICE</u>

Plaintiff hereby certifies that on December 12, 2025, he electronically delivered the attached documents via the PACER system to the District of Arizona Clerk's Office at:

401 W. Washington St.
Suite 130
SPC 1
Phoenix, AZ 85003
602-322-7200

Copies of the same documents were electronically transmitted this same day via the PACER CM/ECF system to all parties, including to:

Joshua Katz
Hayleigh Crawford
Office of the Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004-1592
602-542-5025
*Attorneys for Defendant Arizona Attorney General Kris Mayes*

Kara Karlson
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004-1592
(602) 542-8323
*Attorney for Defendant Presiding Judge Pamela Gates*

Brett W. Johnson
Derek C. Flint
Charlene A. Warner
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone: 602.382.6000
Facsimile: 602.382.6070
*Attorneys for Defendant Karrin Taylor Robson*

19

ER-046

1    Timothy Nelson
     24 West Camelback
2    Suite A#541
3    Phoenix, Arizona 85013
     Telephone: 602.421.2681
4    Facsimile: 602.456.9982
5    *Attorney for Defendant Robert Meza*

6    Trevor Cook
     Jeffrey Silence
7    20235 N. Cave Creek Rd.
8    Ste 104 # 460
     Phoenix, AZ 85024
9    Telephone: (602) 932-8358
10   *Attorneys for Defendant Alane Ortega*

11

12   By:  //s//
     Phillip Potter
13   Plaintiff
     Pro Se
14

15

16

17

18

19

20

21

22

23

24

25

26

Phillip Potter
2301 N. 66th Street
Scottsdale, Arizona 85257
Phone: 480.459.0310
E-Mail: phillip.t.potter@gmail.com
Plaintiff
Pro Se

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Phillip Potter,<br><br>                    Plaintiff,<br><br>v.<br><br>Robert Meza, et al.,<br><br>                    Defendants. | No. 2:25-cv-00663-PHX-DWL<br><br>**PLAINTIFF'S AFFIDAVIT IN SUPPORT OF SECOND MOTION FOR NOTICED TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

I, Phillip Potter, hereby depose and state as follows:

1. I submit this affidavit pursuant to 28 U.S.C. § 1746 in support of Plaintiff's December 12, 2025 Second Noticed for Noticed Temporary Restraining Order and Preliminary Injunction (Doc. 94). *See* Attachment 1.

2. The statements set forth in this affidavit (the "Affidavit") are based on my own personal knowledge and investigation unless stated otherwise. These statements are true to the best of my knowledge and belief as of the date I signed this Affidavit.

3. I am the Plaintiff in the above-captioned action.

4. Attorney General Kris Mayes, in her official capacity, and Presiding Judge Pamela Gates, in her official administrative capacity, separately filed Fed. R. Civ. P. 12(b)(1) and (6) motions (Doc. 38 and Doc. 67, respectively).

5. Presiding Judge Gates asked the Court to take judicial notice of "Administrative Order 2013-159" (Doc. 67, p. 9, n.1) which:

a. has a caption that contains no judicial case number and no "v." but reads, "IN THE MATTER OF PROHIBITING PHILLIP POTTER FROM FILING ANY LAWSUIT IN MARICOPA COUNTY WITHOUT OBTAINING PRIOR PERMISSION FROM THE COURT";

b. includes the phrase, "Judge Blanchard's referral is a result of his order designating Mr. Potter a vexatious litigant in the case of *Phillp Potter v. Arizona House of Representatives, et. al.,* CV2022-008626";

c. includes the phrase, "the Court (Presiding Judge Joseph Welty) finds that Mr. Potter has engaged in vexatious conduct by filing claims or requests for relief that have been subject to previous rulings in previous litigation; has unreasonably expanded court proceedings; and has brought court actions without 'substantial justification' as defined in A.R.S. § 12-349", roughly corresponding to A.R.S. §§ 12-3201(E)(1)(f), (b), and (c), respectively;

d. includes instructions to Plaintiff framed as an order aimed at Plaintiff, "IT IS THEREFORE ORDERED as follows: 1. Mr. Potter may not file any new causes of action as a pro se litigant after the date of this order without leave of the Civil Presiding Judge or his/her designee. 2. Mr. Potter may not file any further pleading or motion in any of his current lawsuits as a pro se litigant without first seeking leave from the judicial officer assigned to that lawsuit. 3. Any motion for

2

leave to file any lawsuit, pleading or motion shall be captioned 'Application Pursuant to Court Order Seeking Leave to File.' Mr. Potter must either cite this order in his application, or attach as an exhibit a copy of this order. 4. Any request for fee waiver or deferral may only be granted by the Civil Presiding Judge or his/her designee.";

    e. is electronically signed by "Honorable Joseph C. Welty, Presiding Judge" and "DATED this 2nd day of November, 2023"; and

    f.  indicates "COPIES" were sent to:

"Hon. Jeffrey Fine, Clerk of the Superior Court
 Hon. Danielle Viola, Civil Department Presiding Judge
 Hon. John Blanchard
 Raymond L. Billotte, Judicial Branch Administrator
 Luke Emerson, Civil Department Administrator
 Jessica Fotinos, Office of the Clerk of the Superior Court
 Phillip Potter
 Brett W. Johnson, Esq., Snell & Wilmer, L.L.P.
 Timothy A. Nelson, Esq., The Nelson Law Group, PLLC
 Kevin E. O'Malley, Esq., Gallagher & Kennedy, P.A.
 Hannah H. Porter, Esq., Gallagher & Kennedy, P.A."

    8. I never received, and never saw, Administrative Order 2023-159 before it was referenced in two motions to dismiss filed by other defendants in July 2025 (Doc. 51; Doc. 52; Doc. 54, Affid.).

    9. Attorney General Mayes gave no indication she was aware of Administrative Order 2023-159 in her June 3, 2025 motion to dismiss (Doc. 38).

    10. Administrative Order 2023-159 cites state cases CV2021-005501, CV2021-013210, CV2021-01789, and CV2022-014146 in that document's "Attachment A", but none of those cases had reached finality in February 2023.  All were active at the time.

    11.  I eventually secured favorable settlements in cases CV2021-005501, CV2021-

3

013210, and CV2021-017889 so, as a matter of law, those cases were not objectively baseless, and certainly not both objectively baseless and subjectively motivated by an unlawful purpose. *See USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994) ("Only if the suit is found to be objectively baseless does the court proceed to examine the litigant's subjective intent."); *Prof. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60 n.4 (1993) (Absent fraud, a "winning lawsuit is by definition a reasonable effort at petitioning for redress"). (Doc. 49, Affid.; Doc 14 at 76).

12. I truthfully represented facts and did not fraudulently obtain settlement in case CV2021-005501, CV2021-013210 or CV2021-017889.

13. On September 9, 2025, I filed an official request with Presiding Judge Pamela Gates, through attorney Kara Karlson, to make copies of public records in the judge's control and custody available for inspection pursuant to Ariz. R. Sup. Ct. 123(f).

14. Therein, I requested copies of documents as referenced in Plaintiff's December 11, 2025 Second Noticed Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 94, pp. 2-3).

15. On October 21, 2025, Ms. Karlson responded to that public records request and cited "attorney and judicial work product emails between [Judge Gates] and Judge Welty or his staff" to withhold production. *See* Attachment 2.

16. On October 27, 2025, I emailed Ms. Karlson: "Your client responded to my September 9, 2025 public records request on October 21, 2025 [].  Therein, the Hon. Pamela Gates, pointed to 'Administrative Order 2014-134'.  That administrative order describes a 'process'.  As a supplemental records request subject to the same considerations as the September 9th request, could you please have your client provide

ER-051

records documenting (1) the development and implementation of Administrative Order 2014-134; (2) communications any Presiding Judge made with trial court judges and/or staff regarding Administrative Order 2014-134; and (3) that Administrative Order 2014-134 was submitted to the Arizona Supreme Court for review and approval?"

17. Administrative Order 2014-134 describes a "process" to find litigants vexatious pursuant to A.R.S. § 12-3201 applicable only to the Maricopa County Superior Court. *See* <u>Attachment 2</u>.

18. It is my understanding that administrative orders which go to local court procedures require Arizona Supreme Court review and approval, but nothing indicates the state's highest court reviewed or approved Administrative Order 2014-134.

19. Ms. Karlson responded to my October 27, 2025 email on November 7, 2025, stating that the "supplemental" request "is still in process".

20. On December 1, 2025, I emailed Ms. Karlson as follows: "On November 7th you communicated that records disclosure was 'in process'. Could you please let me know if I will be receiving any additional responsive records as well as a privilege log?"

21. As of the date I signed this Affidavit, Ms. Karlson has not responded to my December 1, 2025 email, has not provided a "privilege log", and has not provided any other "in process" responsive documents.

22. Over the next two weeks and throughout January 2026 and February 2026, I will file multiple court papers in ongoing cases FC2020-090224, CV2021-005501, and CV2021-013210 in preparation for scheduled evidentiary hearings and oral arguments.

23. Each of those three court cases have been deemed well-founded lawsuits per trial courts, appellant courts, and defendants who sought settlement when presented with documents and other direct evidence supporting my claims.

ER-052

1    24. I will not seek prior leave of the court before filing papers.

2    25. Ms. Karlson's prolonged non-responsiveness to emails, along with Presiding

3  Judge Gates' reluctance to promptly provide easily accessible records and refusal to

4  provide a legally required privilege log, as well as the Attorney General's express refusal

5  to disavow enforcement of A.R.S. § 12-3201 collectively cause me to credibly fear

6  administrative, civil, and criminal enforcement of that statute for exercising my

7  fundamental right to petition the courts.

8

9

10    I declare under penalty of perjury that the foregoing is true and correct to the best

11  of my knowledge and belief.  Executed on December 12, 2025.

12

13

14    Phillip Potter

15

16

17

18

19

20

21

22

23

24

25

26

6

ER-053

 <span style="color:gray">Phil Potter &lt;phillip.t.potter@gmail.com&gt;</span>

---

## Case No. 2:25-cv-00663-PHX-DWL, Potter v. Meza, et al.

2 messages

---

**Phil Potter** &lt;phillip.t.potter@gmail.com&gt;                                    Mon, Nov 24, 2025 at 6:33 PM
To: "Crawford, Hayleigh" &lt;Hayleigh.Crawford@azag.gov&gt;, "Katz, Joshua" &lt;Joshua.Katz@azag.gov&gt;, "Karlson, Kara" &lt;Kara.Karlson@azag.gov&gt;

Ms. Crawford, Mr. Katz, and Ms. Karlson,
Please see the attached correspondence involving the above referenced case..
Regards,
Phillip Potter

---

 **TRO PI Letter _ Nov 24 2025.pdf**
317K

---

**Katz, Joshua** &lt;Joshua.Katz@azag.gov&gt;                                    Fri, Nov 28, 2025 at 4:05 PM
To: Phil Potter &lt;phillip.t.potter@gmail.com&gt;
Cc: "Crawford, Hayleigh" &lt;Hayleigh.Crawford@azag.gov&gt;, "Karlson, Kara" &lt;Kara.Karlson@azag.gov&gt;

Mr. Potter,

Thank you for providing this notice of your intent to file a motion.

I write to inform you that neither defendant agrees to the request on page 11 of your letter.

As you are of course aware, your request for preliminary relief was denied, and there are several motions to dismiss the case fully briefed and pending.  We will respond to any further motions in due course, as appropriate.

Sincerely,

**Joshua A. Katz (he/him)**

Assistant Attorney General

---


Arizona Attorney General Kris Mayes

Solicitor General's Office

2005 N. Central Ave., Phoenix, AZ 85004

Desk: (602) 542-8053

Joshua.Katz@azag.gov

ER-054

http://www.azag.gov

NOTICE: This email, including any attachments, may contain privileged or confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please notify the sender and destroy all copies of the original message. Thank you.

[Quoted text hidden]

November 24, 2025

VIA EMAIL

Hayleigh S. Crawford
Joshua A. Katz
Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004-1592
(602) 542-3333
Hayleigh.Crawford@azag.gov
Joshua.Katz@azag.gov

 Kara Karlson
Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004-1592
(602) 542-8323
Kara.Karlson@azag.gov

RE: Case No. 2:25-cv-00663-PHX-DWL, *Potter v. Meza*, et al.

Ms. Crawford, Mr. Katz, and Ms. Karlson,

I will soon move for a Temporary Restraining Order and Preliminary Injunction based in part on the recently discovered Administrative Order 2014-134 which bears markings of an unapproved local procedural rule used to deprive Arizonans of their fundamental rights. To avoid that motion, and consistent with Fed. R. Civ. P. 65, I write to ask if your clients would agree not to enforce A.R.S. § 12-3201 until the case is complete. For Attorney General Mayes, that would take the form of not civilly or criminally enforcing any perceived violation of § 12-3201(B), including any perceived violation of Administrative Order 2023-159. For Presiding Judge Gates, that would involve exercising her plenary administrative authority to rescind Administrative Order 2023-159 and remove my name from the state's online vexatious litigant list. I hope we can convey this limited agreement to the Court as means to conserve judicial resources.

<div align="center">COUNT ONE OVERVIEW</div>

Your state officer clients are named in their official capacities as *Ex Parte Young*, 209 U.S. 123 (1908) "proper defendants" in a First Amendment facial challenge to A.R.S. § 12-3201 for overbreadth. (Doc. 14 at 110-111, 113-207). "The Constitution gives significant protection from overbroad laws that chill [expression] within the First Amendment's vast and privileged sphere. Under this principle, [§ 12-3201] is unconstitutional on its face if it prohibits a substantial amount of protected expression." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002) (citing *Broadrick* v. *Oklahoma,* 413 U. S. 601, 612 (1973)). Petitioning the courts for redress,

<div align="center">1</div>

<div align="right">ER-056</div>

like engaging in political speech, is indeed an exercise in free expression as all First Amendment rights are "libert[ies] safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action [and may be exercised] without any prior restraint". *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 707, 714 (1931); *NAACP v. Button,* 371 U.S. 415, 428-29, 83 S.Ct. 328, 339, 9 L.Ed.2d 405 (1963) (the Speech and Petition Clauses provide "modes of expression ... protected by the First and Fourteenth Amendments which [states] may not prohibit"); *McDonald v. Smith,* 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985) ("The right to petition is cut from the same cloth as the other guarantees of that [First] Amendment, and is an assurance of a particular freedom of expression.").

Court petitioning is primarily regulated through judicially promulgated rules of procedure. The Supreme Court creates federal rules while district courts may adopt local rules not in conflict. *See* 28 U.S.C. §§ 2071 and 2072; Fed. R. Civ. P. 83(a). In Arizona, the state constitution and complementary statutes place the onus on the judiciary's highest echelon to promulgate rules that procedurally regulate court petitioning. *See* Ariz. Const. art. 6, § 5(5) ("The supreme court shall have: ... [p]ower to make rules relative to all procedural matters in any court"); A.R.S. § 12-109(A) ("The supreme court, by rules or administrative orders, shall regulate pleading, practice and procedure in judicial proceedings in all courts of this state"); R. Sup. Ct. Ariz. 28.1(c) ("Local rules and amendments must be consistent with rules of statewide application and must be approved by the Supreme Court"). Of course, procedural rules and statutes may not abridge or provide pretext to punish, prohibit, regulate or otherwise chill substantive petitioning rights, including the "right of access to courts [which] is indeed but one aspect of the right of petition". *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

That said, when it comes to making or enforcing statutes that reach court petitioning or related conduct, the U.S. Supreme Court has "limited regulation to suits that [a]re both objectively baseless *and* subjectively motivated by an unlawful purpose,". *BE & K Constr. Co. v. N.L.R.B.,* 536 U.S. 516, 530-31 (2002) (emphasis original). Akin to the legal standard requiring public figures to demonstrate *both* "falsity" *and* "actual malice" to bring defamation claims (*see New York Times Co.* v. *Sullivan,* 376 U. S. 254, 279-280, 285 (1964)), the *BE & K* "both ... and" conjunctive[1] legal standard serves a valuable constitutional function as it ensures sufficient "breathing space essential to [the Petition Clause's] fruitful exercise." *Id.* The Ninth Circuit observed "*BE & K* made this breathing room protection explicit" such that the Petition Clause "immune[izes]" all core "petitioning activities" (i.e., the filing of an Ariz. R. Civ. P. 7 "pleading allowed" such as a "complaint", "answer", "counterclaim", etc.) and all "conduct incidental to a petition" (i.e., settlement demand letters, motion filings, disclosure and discovery matters, etc.) which fall within those conjunctive boundaries.[2] *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 932-38

---

[1] *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives. Competent users of the language rarely hesitate over their meaning.").

[2] In a Fed. R. Civ. P. 12(b)(6) motion (Doc. 38), the Attorney General contended the applicable legal

(9th Cir. 2006). Put another way, the conjunctive standard determines whether, as a matter of constitutional law, court petitioning and related conduct enjoy "immunity" under the Petition Clause, or are an actionable, non-immunized "sham". *Id* at 938; *United States* v. *Koziol,* 993 F.3d 1160, 1171 (9th Cir. 2021) ("requiring both objective baselessness and an improper motive ... ensure[s] citizens may enjoy the right of access to the courts").[3] To be sure, the Ninth Circuit applies "a strict two-step analysis to assess whether a single action constitutes sham petitioning. ... The two parts of the test operate in succession: Only if the suit is found to be objectively baseless does the court proceed to examine the litigant's subjective intent." *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994). State laws which operate entirely or substantially within these conjunctive boundaries are overbroad and, thus, void unless precisely written and narrowly tailored to serve a sufficient government interest. *Button,* 371 U.S. at 438 ("Broad prophylactic rules in the area of free expression are suspect. ... Precision of regulation must be the touchstone in an area so closely

---

standard is "a pattern of harassment or frivolousness" to be read in the "disjunctive" per "*Ringgold*", and that "baseless litigation is not immunized by the First Amendment right to petition" per "*Bill Johnson's*". These are not the proper legal standards for two reasons. First, the Court explained that *Ringgold* is expressly not applicable to statutory authorities. (Doc. 47). Second, as I explained in my response (Doc. 49), the Supreme Court expressly held "in *Bill Johnson's* that [courts] could enjoin baseless retaliatory [i.e., baseless <u>and</u> retaliatory] suits because they fell outside of the First Amendment and thus were analogous to 'false statements.' We concluded that '[j]ust as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition.' While this analogy is helpful, it does <u>not</u> suggest that the class of baseless litigation is *completely* unprotected: <u>At most</u>, it indicates such litigation should be unprotected 'just as' false statements are. And while false statements may be unprotected for their own sake, '[t]he First Amendment <u>requires</u> that we protect some falsehood in order to protect *speech that matters.*' ([N]oting the need to protect some falsehoods to ensure that 'the freedoms of speech and press [receive] that 'breathing space' essential to their fruitful exercise'). ... It is at least consistent with these 'breathing space' principles that we have <u>never</u> held that the <u>entire</u> class of objectively baseless litigation <u>may be enjoined or declared unlawful</u> even though such suits may advance no First Amendment interests of their own. Instead, in cases like *Bill Johnson's* ..., our holdings <u>limited regulation</u> to suits that were <u>both</u> objectively baseless *and* subjectively motivated by an unlawful purpose." *BE & K*, 536 U.S. at 530-31, 122 S.Ct. 2390 (Italics with underline emphasis added).

[3] Courts honor the *BE & K* conjunctive standard even when deciding Fed. R. Civ. P. 11(c) motions that target "complaints", construing those motions to avoid implicating the right to petition. *See CrossFit Inc. v. Martin*, No. 2:14-CV-02277-PHX-JJT, 2017 WL 4236968 (D. Ariz. Sept. 22, 2017) ("the 'improper purpose' inquiry subsumes the 'frivolousness inquiry' when applied to the filing of complaints. In other words, 'complaints are not filed for an improper purpose if they are non-frivolous.'"); *Hudson v. Moore Business Forms, Inc.,* 836 F.2d 1156, 1159 (9th Cir.1987) ("because of the objective standard applicable to Rule 11 analyses, a complaint that is found to be well-grounded in fact and law cannot be sanctioned as harassing, regardless of the attorney's subjective intent"). Within the context of Fed. R. Civ. P. 11, courts interpret "harass" as a legal term of art to safeguard the First Amendment and to prevent civil defendants from feigning victimhood to avoid a plaintiff's "legitimate purpose" of holding defendants liable for their misdeeds. *See* Black's Law Dictionary (12th ed. 2024) ("Harassment" means "[w]ords, conduct, or action . . . that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose").

touching our most precious freedoms.").

## OVERBREADTH ANALYSIS

The overbreadth doctrine holds that a statute is overbroad if a plaintiff can show it "lacks a plainly legitimate sweep." *Moody v. NetChoice, LLC,* 603 U.S. 707, 721, 144 S. Ct. 2383, 2397, 219 L.Ed.2d 1075 (2024). This means "litigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'" *United States v. Hansen,* 599 U.S. 762, 769, 143 S.Ct. 1932, 216 L.Ed.2d 692 (2023) (emphasis original). However, when a facial suit is based on the First Amendment, the challenged law is alternatively void if the plaintiff can demonstrate "a substantial number of applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id*; *see also Ashcroft,* 535 U.S. at 255 ("The overbreadth doctrine prohibits the Government from banning unprotected [expression] if a substantial amount of protected [expression] is prohibited or chilled in the process."). "[I]n facial challenges under ... the First Amendment, like this one, courts set the bar lower out of respect for the value of free expression." *Arizona Attorneys for Crim. Just. v. Mayes,* 127 F.4th 105, 107 (9th Cir. 2025).

The "first step in the proper facial analysis is to assess the state law's scope. What activities, by what actors, do the laws prohibit or otherwise regulate?" *Moody*, 603 U.S. at 724, 144 S. Ct. 2383. A.R.S. § 12-3201 leaves little, if anything, to speculation on these subjects. The "actors" are "pro se litigant[s]" involved in any "noncriminal case". *See* § 12-3201(A). The "activities" that the "law[] prohibit[s] or otherwise regulate[s]" are those defined as "vexatious conduct" by "any" § 12-3201(E)(1)(a)-(f) provision.[4] *See United States v. Williams,* 553 U.S. 285, 292, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (courts generally analyze statutes on a provision-by-provision basis when adjudicating overbreadth). At this step, I needed only plead the statute "reaches some protected" First Amendment freedoms to proceed past the dismissal stage. *See Arizona Attorneys for Crim. Just. v. Mayes,* 127 F.4th 105, 110 (9th Cir. 2025) (courts considering a First Amendment facial challenge "may assume without deciding that the statute 'reaches some protected [expression]'"). I accomplished that minimal task when pointing to statutory text (i.e., "court actions", "pleading", "motion", etc.) defining prohibited and regulated activities under § 12-3201(E)(1)(a)-(f) (Doc. 14 at 121) and mandating a permanent blanket injunction for "any" violation per § 12-3201(B) (Doc. 14 at 188-192), while also articulating the proper conjunctive legal standard for determining whether the Petition Clause protects those activities. (Doc. 14 at 125). *See Virginia v. Hicks,* 539 U.S. 113, 122, 123 S.Ct. 2191, 156

---

[4] "For the purposes of this section: 1. "Vexatious conduct" includes any of the following: (a) Repeated filing of court actions solely or primarily for the purpose of harassment. (b) Unreasonably expanding or delaying court proceedings. (c) Court actions brought or defended without substantial justification. (d) Engaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant. (e) A pattern of making unreasonable, repetitive and excessive requests for information. (f) Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation." (Doc. 14 at 121).

L.Ed.2d 148 (2003) (a plaintiff can plead and prove a law is unconstitutional "from the text of [the law]").  There can be no reasonable doubt that § 12-3201 "reaches some protected" conduct.

My next burden was to plead the statute is unconstitutional in every application or, alternatively, in a substantial number of applications.  The operative complaint (Doc. 14) and notice of relevant court records (Doc. 85) show I overcame this burden on the well-pled facts and the applicable law.  Fortunately, the Arizona supreme court settled this legal framework per *Ariz. Republican Party v. Richer*, 257 Ariz., 210 (2024). (Doc. 14, 128-131).  Analyzing the plainly legitimate (i.e., demonstrably lawful) sweep of § 12-3201(E) expressly calls to A.R.S. § 12-349 where *Richer* found § 12-3201(E)(1)(c) language addresses no more than "groundless" (i.e., baseless)[5] suits brought or defended "without substantial justification" (i.e., in negligent fashion judged against "what a reasonable attorney would do")[6] while the other provisions provide independent mechanisms to evaluate "*separate* bad faith" in the form of the § 12-3201(E)(1)(a)[7] subjectively motivated[8] purpose of harassment, or any § 12-3201(E)(1)(b), (d), or (e) objectively motivated[9]

---

[5] *See* Black's Law Dictionary (7th Ed, 1999) ("baseless" means "without legal or factual basis; groundless").

[6] *See* A.R.S. § 12-3201(E)(2) ("'Without substantial justification' has the same meaning prescribed in section 12-349"); A.R.S. § 12-349 ("For the purposes of this section, 'without substantial justification' means that the claim or defense is groundless and is not made in good faith").  The term "without substantial justification" is functionally equivalent to the term "objectively baseless".

[7] In addition to the overbreadth claim, I included a claim that § 12-3201(E)(1)(a) and (c) provisions are impermissibly vague for, among other things, not identifying the number of "court actions" required before certain conduct becomes actionable. (Doc. 14 at 199, 201).  "[F]acial vagueness challenges are appropriate if the statute clearly implicates [First Amendment] rights ... When First Amendment freedoms are at stake, courts apply the vagueness analysis more strictly, requiring statutes to provide a greater degree of specificity and clarity than would be necessary under ordinary due process principles." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149-50 (9th Cir. 2001).  "'The terms of a law cannot require wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.'  As for the arbitrary enforcement theory of unconstitutional vagueness, a law is void for vagueness if it 'lack[s] any ascertainable standard for inclusion and exclusion,' thereby authorizing or encouraging 'the authorities [to] arbitrarily prosecute one class of persons instead of another.'" *Tucson v. City of Seattle,* 91 F.4th 1318, 132-3- (9th Cir. 2024) (internal citations omitted).

[8] A.R.S. § 12-3201(E)(1)(a) ("Repeated filing of court actions solely or primarily for the purpose of harassment") presents the lone specific type of possible *subjectively* motivated improper purpose (i.e.., subjective bad faith) "separate" from a suit's objective merits.  *Richer* established "harassment" in this context reflects ordinary language generally indicating annoyance rather than a legal term of art which inherently considers the "legitimate purpose" of bringing a meritorious lawsuit.  *See United States v. Cabaccang,* 332 F.3d 622, 626 (9th Cir.2003) ("When Congress does not define a term in a statute, we construe that term 'according to [its] ordinary, contemporary, common meaning[].'"); *see also* Black's Law Dictionary (12th ed. 2024) ("Harassment" means "[w]ords, conduct, or action . . . that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose").  At bottom, *Richer* held § 12-3201(E)(1)(a) does not include consideration for the presence of an objectively baseless suit as the First Amendment requires.  *See USS-POSCO*, 31 F.3d at 811 ("Only if the suit is found to be objectively baseless does the court proceed to examine the litigant's subjective intent.").

[9] A.R.S. §§ 12-3201(E)(1)(b) ("*Unreasonably* expanding or delaying court proceedings"), (d) ("A pattern of making *unreasonable*, repetitive and excessive requests for information"), and (e) ("A pattern of

improper purpose.[10]  *Richer*, 257 Ariz. at 222-23, ¶¶ 37-44 (emphasis added).  To construe those provisions otherwise would wrongly render A.R.S. § 12-3201(E)(1)(c) "superfluous".[11]  *Id* at ¶ 37.  This construal "extricates [Arizona] courts from the morass of attempting to discern the subjective motives of attorneys and parties in bringing a case and avoids conflating motive and the objective reasonableness of litigation".  *Id* at ¶ 40.  In the end, *Richer* ensured no § 12-3201(E)(1)(a)-(f) provision can be construed to regulate suits that are *both* objectively baseless *and* subjectively motivated by an unlawful (i.e., improper) purpose.  Critically, *Richer* binds the parties and the Court on this statutory construal.  *See Commissioner v. Estate of Bosch,* 387 U.S. 456, 465 (1967) ("state law as announced by the highest court of the State is to be followed [in federal courts since] [t]he state's highest court is the best authority on its own law").  Therefore, as a matter of settled law, the challenged statute prohibits or regulates core "petitioning" and "conduct incidental" considered together to be "protected petitioning activity or ['incidental'] activity which must be protected to afford breathing space to the right of petition guaranteed by the First Amendment".  *Sosa*, 437 F.3d at 933.  Put another way, *all Moody* "activities ... [that §§ 12-3201(E)(1)(a)-(f) provisions] prohibit or otherwise regulate" are *all Sosa* "activit[ies] which

---

making *unreasonable*, repetitive and excessive requests for information") each present an *objectively* motivated improper purpose (i.e., objective bad faith), not a *subjectively* motivated improper purpose (i.e., subjective bad faith) since the legal standard for determining what a "reasonable" attorney or person would do is objective, not subjective.  A "subjectively motivated" litigant must be proven to have "subjective intent" to achieve an improper purpose.  *See Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60-61 (1993).  But an "objectively motivated" litigant has negligently acted in a way that no reasonable attorney would have acted although the associated conduct lacks the requisite *mens rea* element to rise to the level of subjective intent to do a wrong.

[10] A.R.S. §§ 12-3201(b) ("Unreasonably expanding or delaying court proceedings"), (d) ("Engaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant"), (e) ("A pattern of making unreasonable, repetitive and excessive requests for information"), and (f) ("Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation") reference "conduct incidental to a petition" (i.e., motion practice, settlement communications, etc.) which is protected under the Petition Clause "unless the underlying petition itself fell outside" those protections.  *Sosa*, 437 F.3d at 936.  These four subsections thus require an objectively baseless "court action" (i.e., lawsuit) before any associated conduct could fall outside the Petition Clause's protections.  Accordingly, like § 12-3201(E)(1)(a), none of the § 12-3201(b) and (d)-(f) subsections can be read to include the requisite "objectively baseless" element because to do so would render § 12-3201(E)(1)(c) "superfluous" per *Richer,* 257 Ariz. at ¶ 37.  *See USS-POSCO*, 31 F.3d at 811 ("Only if the suit is found to be objectively baseless does the court proceed to examine the litigant's subjective intent.").  Rather than actionable "vexatious conduct", these subsections reach, and wrongly prohibit, constitutionally protected *Sosa* "conduct incidental to a petition".

[11] "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).  Should a statute's language be reasonably susceptible to differing interpretations, courts turn to canons of "statutory construction" to determine legislative intent, including the "anti-surplusage" canon which holds "that legislative enactments should not be construed to render their provisions mere surplusage."  *Am. Vantage Cos. v. Table Mountain Rancheria,* 292 F.3d 1091, 1098 (9th Cir.2002); *see also Boise Cascade Corp. v. EPA,* 942 F.2d 1427, 1432 (9th Cir.1991) (Courts "must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.").

must be protected" under the Petition Clause. As I sufficiently pled, A.R.S. §§ 12-3201(E)(1)(a)-(f) all reach constitutionally protected activities and are ultimately void for violating the Petition Clause "in every application". Per *Hansen*, I carried my burden at the dismissal stage (and beyond) to demonstrate "that *no set of circumstances* exists under which [any § 12-3201(E)(1)(a)-(f) provision] would be valid'" as a matter of law.

Should there be any imaginable constitutional application of the challenged statute, I also factually demonstrated via court records that the statute was unconstitutional in "a substantial number of applications" (85% of cases) where only a small number of "applications" (15% of cases) involved *incidental* co-occurring violations of *both* a § 12-3201(E)(1)(c) court action "without substantial justification" (i.e., objectively baseless) *and* a § 12-3201(E)(1)(a) court action filed for "purpose of harassment" (i.e., subjectively motivated by an improper purpose). (Doc. 85). Although the statute does not contemplate self-represented litigants to be found vexatious for co-occurring violations, even my generous reading of court records show past applications are unconstitutional in a vast majority of instances even when incidental co-occurring violations are included in the analysis. *See Tucson v. City of Seattle,* 91 F.4th 1318, 1328 (9th Cir. 2024) ("In determining whether an unconstitutional application is realistic, courts may consider whether that application has occurred in the past."). In other words, although the statute only proscribes the disjunctive prosecution of objectively baseless "court actions" *or* "filing of court actions" subjectively motivated by improper harassment purposes *or* court filings objectively motivated by improper purposes, a small number of pro se litigants filed objectively baseless suits *and* did so for subjectively motivated improper purposes of "conflated" harassment as *Richer*, 257 Ariz. at ¶ 40 put it.

Beyond factually evaluating past applications for overbreadth, courts are also instructed to consider hypothetical applications which are "realistic, not fanciful". *Hansen*, 599 U.S. at 770, 143 S.Ct. 1932. Under that requirement, I pled that pro se litigants can defeat all future applications of § 12-3201 by asserting *Noerr-Pennington* immunity as an affirmative defense. (Doc. 14 at 124-139). *See 360 Mortg. Grp., LLC v. Fortress Inv. Grp. LLC,* No. 19-CV-8760, 2020 WL 5259283, at *4 (S.D.N.Y. Sept. 3, 2020) ("The *Noerr-Pennington* doctrine is generally raised as an affirmative defense"). "Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability[12] for their petitioning conduct. ... [The] doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause." *Sosa*, 437 F.3d at 929-31; *see also White v. Lee*, 227 F.3d 1214, 1239 (9th Cir. 2000) ("The *Noerr-Pennington* doctrine sharply limit[s] [government] officials' ability to treat [] state-court lawsuit[s] as a possible violation of law"). "To determine whether a [litig]ant's conduct, ..., is immunized under *Noerr-Pennington,* we apply a three-step analysis to determine: (1) 'whether

---

[12] "Liability" means "[t]he quality, state, or condition of being bound or obliged by law or justice to do, pay, or make good something; legal responsibility to another or to society". Black's Law Dictionary (11th Ed., 2019).

the lawsuit imposes a burden on petitioning rights,' (2) 'whether the alleged activities constitute protected petitioning activity,' and (3) 'whether the statute[] at issue may be construed to [avoid] that burden.' If the answer at each step is 'yes,' then a defendant's conduct is immunized under *Noerr-Pennington*." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 536 (9th Cir. 2022). As to that first step, any § 12-3201(A) motion requesting a § 12-3201(B) "pre-clearance requirement imposes a substantial burden on the free-access guarantee". *Ringgold-Lockhart v. County of Los Angeles*, 761 F.3d 1057, 1061-62 (9th Cir. 2014). The "focus at step two" is on whether disputed activities qualify as "*protected* petitioning activity". *B&G Foods*, 29 F.4th at 536 (emphasis original). Here, those activities are "vexatious conduct" as defined in §§ 12-3201(E)(1)(a)-(f) which, again, are constitutionally "protected" as core "petitioning activity" or as "conduct incidental to a petition" which are not subject to the "sham exception". *Sosa*, 437 F.3d at 933. Moving to third step, the *Noerr-Pennington* doctrine immunizes all instances of "vexatious conduct" as a matter of constitutional law because, per *Richer*, each § 12-3201(E)(1)(a)-(f) provision can be, and definitively has been, "construed to [avoid] that [First Amendment] burden". *B&G Foods*, 29 F.4th at 536. Because every pro se litigant accused in any and every § 12-3201(A) motion of engaging in "any" § 12-3201(E) "vexatious conduct" can successfully assert *Noerr-Pennington* immunity, A.R.S. § 12-3201 is "patently unconstitutional" in every application and, most certainly, in at least substantial number of applications. *See Saenz v. Roe,* 526 U.S. 489, 499 n.11, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) ("If a law has no other [demonstrable] purpose ... than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it is patently unconstitutional.").

At the pleading stage, I have demonstrated (1) standing to sue Attorney General Mayes[13] and Presiding Judge Gates[14]; and (2) the statute reaches constitutionally protected activities and is

---

[13] The Attorney General initially attacked "redressability" in her Fed. R. Civ. P. 12(b)(1) motion positing that "an order enjoining AG Mayes from enforcing A.R.S. § 12-3201 would have no practical effect because courts could still impose prefiling requirements on vexatious litigants. As discussed, while prosecution is unlikely, any such prosecution would be more likely to come from a county attorney than from AG Mayes." (Doc. 38). This position acknowledged at least a "scintilla" of enforcement connection to the statute, undercutting any possible sovereign immunity defense. (Doc. 49). The Attorney General has since reframed her redressability defense to argue § 12-3201 "contains no enforcement provision relevant to AG Mayes" and therefore no "credible threat of enforcement" exists to invoke standing. (Doc. 69). But she expressly does not "disavow" enforcement of that statute, or any provision of that statute, which she previously admitted both she and "county attorneys" could enforce, although county attorneys "would be more likely" to enforce. The Attorney General's defenses show she has no sovereign immunity and Plaintiff has standing to bring suit against her to enjoin civil and/or criminal enforcement of the challenged statute. *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154-55 (9th Cir. 2000) (When the case "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing".).

[14] Administrative Order 2023-159 was discovered during this litigation. (Doc. 72). Maintaining that patently unconstitutional administrative order causes me ongoing actual injuries, is traceable to the Presiding Judge, is redressable by a favorable ruling, "exceed[s] the bounds of reasonable governmental action and violate[s] [my] First Amendment rights." *White*, 227 F.3d at 1231. Presiding Judge Gates' Fed. R. 12(b)(1) reliance on "judicial immunity" (Doc. 67) therefore fails since, per the Ninth Circuit, "absolute judicial immunity does not apply to nonjudicial acts, i.e. the administrative, legislative, and

unconstitutional in every application. Should there be a scenario where a constitutional application exists, I also sufficiently pled the statute is unconstitutional in a substantial number of applications. And "[i]f the challenger demonstrates that the statute 'prohibits a substantial amount of protected [First Amendment expression]' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Hansen,* 599 U.S. at 770, 143 S.Ct. 1932. In sum, the statute is facially invalid for being unconstitutional in every application or at least in a substantial number of applications demonstrated via the statute's text, existing records of past applications, and all realistic scenarios of future applications. *See Hicks,* 539 U.S. at 122, 123 S.Ct. 2191) (plaintiff can plead a law is substantially unconstitutional "from actual fact").

The burden has now shifted to your "government" clients to show <u>on the proofs</u> that the statute can be "fairly" construed to avoid First Amendment safeguards, or that the statute is "narrowly" tailored to serve a sufficient (i.e., "significant" or "compelling"] "government interest" based on the proper level of scrutiny due. *Reno v. American Civil Liberties Union,* 521 U.S. 844, 884 (1997) ("The Government has the burden of proving that a construction narrowing the statute to constitutionally permissible applications is 'fairly possible.'"); *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816-17 (2000) ("When the Government restricts [protected expression], the Government bears the burden of proving the constitutionality of its actions. … If a statute regulates [expression] based on its content, it must be narrowly tailored to promote a compelling Government interest. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. ... The Government has not met that burden here."); *McCullen v. Coakley,* 573 U.S. 464, 495, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014) ("To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's [significant] interests, not simply that the chosen route is easier.); *see also Porter v. Martinez,* 68 F.4th 429, 438 (9th Cir. 2023) ("In 'quintessential public forums' such as [courts][15], streets, parks, and other 'places which by long tradition ... have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed.' 'The government bears the burden of justifying the regulation of expressive activity in a public forum.'"). Neither Presiding Judge Gates nor Attorney General Mayes will be able to carry the government's burden to demonstrate narrow tailoring, significant or compelling government interests, or least

---

executive functions that judges may on occasion be assigned to perform." *Duvall v. County of Kitsap,* 260 F.3d 1124, 1134 (9th Cir. 2001); *see also Glazer v. State,* 237 Ariz. 160, 164 ¶ 10, 347 P.3d 1141, 1145 (2015) (For state officials in Arizona, "the rule is liability and immunity is the exception."). Presiding Judge Gates' immunity defense raises a factual dispute not amenable to dismissal at the pleading stage. *See Arizona v. Mayorkas,* 600 F. Supp. 3d 994, 1004, n.2 (D. Ariz. 2022) ("'[W]here the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits,' in which case 'the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial.'").
[15] A "court is a public forum". *Universal Entertainment Corp. v. Aruze Gaming America, Inc.* (D. Nevada January 17, 2023).

restrictive alternative. *See Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n*, 160 Ariz. 350, 357, 773 P.2d 455, 463 (1989) ("[G]overnmental convenience [including purported administrative efficiency] and certainty cannot prevail over constitutionally guaranteed rights."). I have raised significant questions going to this First Amendment overbreadth claim, and I am confident I will eventually prevail on the merits.

TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION

"The Supreme Court has explained that plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *Where Do We Go Berkeley v. California Dep't of Transportation,* 32 F.4th 852, 859 (9th Cir. 2022) (citing *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). Factors three and four "merge when [as here] the Government is the opposing party". *Nken v. Holder,* 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). Further, the Ninth Circuit employs a "sliding scale" approach to the four *Winter* factors, under which a strong showing on the balance of hardships may compensate for a lesser showing of likelihood of success. *See Where Do We Go Berkeley,* 32 F.4th at 859. That said, in cases arising under the First Amendment, showing a "likelihood of success on the merits" generally results in a finding that the three remaining *Winter* factors are satisfied as well. *See Am. Beverage Ass'n v. City & Cnty. of San Francisco,* 916 F.3d 749, 757-58 (9th Cir. 2019). Where a plaintiff has made "a colorable First Amendment claim, they have demonstrated that they likely will suffer irreparable harm". *Id.* at 758. In addition, a finding that a plaintiff has raised a "serious" First Amendment question compels a finding that the balance of hardships tips sharply in their favor. *Id.* Finally, there is a "significant public interest in upholding First Amendment principles," and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (internal quotation marks and citations omitted); *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) ("by establishing a likelihood that [the challenged statute] violates the U.S. Constitution, Plaintiff[] ha[s] also established that both the public interest and the balance of the equities favor [injunctive relief]").

On the merits, and as explained above, the U.S. Supreme Court's holding in "*BE & K* made ... explicit" that the Petition Clause safeguards "protected petitioning activities" (i.e., all core "petitioning" and all "conduct incidental to a petition") unless the underlying "suit[] [is] both objectively baseless *and* subjectively motivated by an unlawful purpose", in conjunctive fashion. In *Richer*, the Arizona supreme court relied on the "anti-surplusage canon" when construing statutory language to find no § 12-3201(E)(1)(a)-(f) provision meets that conjunctive legal standard. Instead, § 12-3201(E)(1)(c) proscribes objectively baseless "court actions" but does not include any "separate bad faith" subjectively improper purposes such as § 12-3201(E)(1)(a) "harassment". And § 12-3201(E)(1)(a) "harassment" does not include or subsume the element of § 12-3201(E)(1)(c) objectively baseless "court actions" because to do so would render that latter provision "superfluous". For that same reason, §§ 12-3201(E)(1)(b), (d), (e), and (f) do not

include or subsume objectively baseless "court actions".  Based on the *Richer* binding precedent, the challenged statute reaches, abridges, punishes, prohibits, otherwise regulates, and chills "protected petitioning activities" "in every application".  Given the statute prohibits and regulates conduct entirely within the Petition Clause's broad protections, pro se litigants can claim *Noerr-Pennington* immunity to defeat each and every A.R.S. § 12-3201(A) motion.  *See Sosa*, 437 F.3d at 929 (The Supreme "Court... extended *Noerr-Pennington* immunity to the use of 'the channels and procedures of state ... courts.'").  Your clients have not argued to save, and cannot save, the statute on the basis that it is narrowly tailored, meets a significant or compelling government interest, or is the least restrictive option available.  Indeed, the § 12-3201(B) mandatory blanket injunction functions as an indiscriminate "prior restraint" on a First Amendment right of expression.  *See Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963) ("Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.").  In sum, each *Winter* factor favors a temporary restraining order and preliminary injunction on the current record.

CONCLUSION

Please let me know before close of business on **November 28, 2025** if either, or both, of your clients will agree to not administratively, civilly, or criminally enforce A.R.S § 12-3201.  Again, I would like to convey to the Court that, until the case is decided, Presiding Judge Gates has agreed to exercise her administrative authority and rescind Administrative Order 2023-159 while Attorney General Mayes has agreed to exercise her prosecutorial authority and not civilly or criminally prosecute, or aid in any such prosecution, of any perceived § 12-3201 violation.  Beyond that, my hope is that your clients will recognize the challenged statute violates the First Amendment, abandon any defense of A.R.S. § 12-3201, and use this case to re-affirm their Ariz. Const. art. 6, § 27 and A.R.S. § 38-231 oaths of office to "support the Constitution of the United States".  *See* U.S. Const. Amend. I (there shall be "no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances"); U.S. Const. amend. XIV ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States); *see also* Ariz. Const. art. 2, § 5 ("The right of petition, ..., shall never be abridged").  Feel free to contact me with any questions.


Regards,

Phillip Potter
2301 N. 66th Street
Scottsdale, AZ 85257
480-459-0310
phillip.t.potter@gmail.com

 Gmail

Phil Potter <phillip.t.potter@gmail.com>

## PRR Response

6 messages

**Karlson, Kara** <Kara.Karlson@azag.gov>                     Tue, Oct 21, 2025 at 3:05 PM
To: Phil Potter <phillip.t.potter@gmail.com>

Mr. Potter:

Judge Gates' public records response is as follows:

1. The Presiding Judge created, or relied on, to "designate" any authority to the Hon. John

Blanchard to "designate a pro se litigant a vexatious litigant". *See* A.R.S. § 12-3201(A).

Pursuant to Administrative Order 2014-124 (see attached, it is the Presiding Judge that has the authority
to designate a litigant as "vexatious" across the board in the Superior Court. However, a judge in an
individual case can issue a minute entry declaring the litigant vexatious in their specific case, and
requiring the litigant to seek permission from the judge before filing any further pleadings in the case.
The judge then forwards the minute entry to the Presiding Judge for consideration to designate the litigant
vexatious across the board.) (Also, see attached minute entry from Judge Blanchard.)

2. Contain, or reference, an "application" from the Hon. John Blanchard to the Presiding

Judge to certify Phillip Potter as a vexatious litigant through case CV2022-008626.

See attached minute entry.

3. Contain communications the Hon. Joseph Welty made with any other person regarding

the previously referenced "application".

The only communications are attorney and judicial work product emails between me and Judge Welty or
his staff when I drafted the A.O. declaring Phillip Potter as a vexatious litigant. (Protected by Supreme
Court Rule 123(d)(4) and (e)(9).

4. Reference, or contain communications the Hon. Joseph Welty and/or the Hon. Pamela

Welty made with any other person regarding, Administrative Order 2023-159.

Same answer as to number 3 above.

ER-067

--

## Kara Karlson

Senior Litigation Counsel

State Government Division-Elections



Arizona Attorney General Kris Mayes

15 S 15<sup>th</sup> Ave

Phoenix, AZ 85007

Desk: 602-542-8118

Kara.Karlson@azag.gov

http://www.azag.gov

CONFIDENTIALITY NOTICE:  This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**2 attachments**

 **Admin Order 2014-134 Vexatious Litigants.pdf**
14K

 **Potter vexatious minute entry.pdf**
210K

**Phil Potter** <phillip.t.potter@gmail.com>                     Mon, Oct 27, 2025 at 8:36 AM
To: "Karlson, Kara" <Kara.Karlson@azag.gov>

Ms. Karlson,
First, for purposes of clarity, are you saying that records (emails, written correspondence, etc.) documenting the "application" consist solely of the attached Minute Entry?  It would seem that if a trial court judge "forwards" a Minute Entry to a Presiding Judge, then there would be an email string or some other record of that correspondence.

Second, Judge Gates says she "drafted the A.O."  But she cites "judicial work product" to withhold documents without explanation, detail or affidavit.  My understanding is that judicial work product refers to a deliberative privilege, which is a qualified privilege that can be overcome under certain circumstances, many of which, if not all, are present here.  As with every public records request, any denial must identify every withheld document and provide specificity justifying each record withheld.  In the federal context, I'm told this takes the form of a "Vaughn Index" with affidavits and document-by-document particularized explanations as to why an exemption or privilege applies.  Here in Arizona, the state supreme court in *Fann v. Kemp* (2022) described that index as a "privilege log" which must be provided "when a party claims a privilege or work-product protection and withholds information or documents" as part of a public records request.  That court went on to write that state officials "must identify in a privilege log the information or document(s)

being withheld and describe the nature of the item 'in a manner that - without revealing information that is itself privileged or protected - will enable other parties to assess the claim.'"  I asked the Presiding Judge(s) to prepare an index of all withheld records in my September 9, 2025 request.  Please let me know if the Presiding Judge(s) will be providing that privilege log for all "emails between [Judge Gates] and Judge Welty or his staff" and for all other responsive documents.

Finally, can you confirm that Judge Welty searched for responsive documents, and concurs with Judge Gates' October 21, 2025 response?

Thanks for your help with this.
Regards,
Phillip Potter

[Quoted text hidden]

---

**Phil Potter** <phillip.t.potter@gmail.com>                                           Mon, Nov 3, 2025 at 11:27 AM
To: "Karlson, Kara" <Kara.Karlson@azag.gov>

Ms. Karlson,
Ariz. R. Sup. Ct. 123(f)(4)(B) states "(i) .. If access to any record is denied for any reason, the custodian shall explore in good faith with the applicant alternatives to allow access to the requested records, including redaction of confidential information; and (ii) If unsuccessful, the custodian shall meet with the judge having immediate, supervisory responsibility for the daily operations of the respective court, to determine if an alternative means of access to the records may be provided for the applicant.  Thereafter, as soon as practicable, the judge shall inform the applicant if the denial is affirmed.  Reviews of the foregoing denial and all other denials shall be conducted in accordance with the provisions of paragraph (f)(5)".  Ariz. R. Sup. Ct. 123 (f)(5), in turn, holds that "(A) Any applicant who is denied access to or copies of any record, bulk data, or compiled data pursuant to this rule, shall be entitled to an administrative review of that decision by the presiding judge.  The request for review must be filed in writing with the custodian who denied the request within 10 business days of a denial made under paragraph (f)(4) above. The custodian shall forward the request for review, a statement of the reason for denial, and all relevant documentation to the presiding judge or a designee within 5 business days of receipt of the request for review.  The presiding judge or designee shall issue a decision as soon as practicable considering the nature of the request and the needs of the applicant, but not more than 10 business days from the date the written request for review was received."

Is it safe to assume from the lack of response that Judge Gates, as the records custodian, has denied my request for responsive documents and a privilege log, and that no additional responsive records are forthcoming?  If so, please accept this email as notice that I'd like an administrative review of that denial which I believe would need to be conducted by the Arizona Supreme Court Chief Justice under these circumstances which also involve a matter of significant public concern regarding the state legislature and a gubernatorial candidate.
Regards,
Phillip Potter

[Quoted text hidden]

---

**Karlson, Kara** <Kara.Karlson@azag.gov>                                              Fri, Nov 7, 2025 at 11:09 AM
To: Phil Potter <phillip.t.potter@gmail.com>

Mr. Potter:

Your public records request has not been denied.  The first one was fulfilled with the responsive documents you

ER-069

received. The supplement that you sent me is still in process.

As to your motion for judicial notice, due to the fact that there a number of new allegations that go well outside the complaint, there are a number of legal conclusions that are the province of the court rather than the parties, among other reasons, we cannot stipulate to the motion.

Thank you,

--

## Kara Karlson

Senior Litigation Counsel

State Government Division-Elections



| | Arizona Attorney General Kris Mayes |
|---|---|
| | 15 S 15th Ave |
| | Phoenix, AZ 85007 |
| | Desk: 602-542-8118 |
| | Kara.Karlson@azag.gov |
| | http://www.azag.gov |

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

[Quoted text hidden]

---

**Phil Potter** <phillip.t.potter@gmail.com>                    Fri, Nov 7, 2025 at 12:03 PM
To: "Karlson, Kara" <Kara.Karlson@azag.gov>

Ms. Karlson,
Your client admits responsive documents exist but were withheld for express reasons of "judicial work product". Again, the Presiding Judge provided no privilege log despite a requirement to do so per well-established precedent. Hence, my records request was not "fulfilled" and an administrative review is needed. Once more, it would be much easier on all involved to simply produce the privilege log as the law requires. In addition, stipulations do not go to "allegations", by definition. That said, you're welcome to identify which controlling facts and which applicable law your client will stipulate to so that we can conserve judicial resources for those non-issues, and ask the Court to decide any residual issues where a legitimate dispute exists. Thank you.
Regards,
Phillip Potter

[Quoted text hidden]

---

**Phil Potter** <phillip.t.potter@gmail.com>                                    Mon, Dec 1, 2025 at 3:52 PM
To: "Karlson, Kara" <Kara.Karlson@azag.gov>

Ms. Karlson,
On November 7th you communicated that records disclosure was "in process".  Could you please let me know if I will
be receiving any additional responsive records as well as a privilege log?
Regards,
Phillip Potter
[Quoted text hidden]

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA**

| | | |
|---|---|---|
| IN THE MATTER OF VEXATIOUS | ) | ADMINISTRATIVE ORDER |
| LITIGANT REQUESTS | ) | NO. 2014-134 |
| | ) | |
| _____ | ) | |

WHEREAS, the Legislature passed and the Governor signed House Bill 2021, which allows a presiding judge to designate a pro se litigant as a vexatious litigant and place limitations on the filing of new actions, pleadings, and motions,

**IT IS ORDERED** adopting the following process, effective January 1, 2015, for requests to designate a litigant as vexatious:

1. If the request to declare a litigant vexatious is specific to the case in which the request was filed, such as the litigant is repeatedly filing motions in a specific case to harass another party in the case, the judge assigned to that case shall retain the request, hold any hearing necessary, and issue a ruling on the vexatious litigant request relating to that case.

2. If the request to declare a litigant vexatious is filed in multiple cases, the motion shall be handled by the judge assigned to the case with the lowest case number.  The judge shall hold any hearing necessary.  If the judge believes it may be appropriate to declare the litigant vexatious for future cases, the judge may issue a minute entry which provides the facts as found by the judge and refer it to the Presiding Judge for consideration of whether to issue a vexatious litigant administrative order.

3. If the request to declare the litigant vexatious is not related to a specific case but is simply filed as a standalone request, the clerk will assign it a case number and the presiding judge will assign it to a judge for consideration. The judge shall hold any hearing necessary.  If the judge believes it may be appropriate to declare the litigant vexatious for future cases, the judge may issue a minute entry which provides the facts as found by the judge and refer it to the Presiding Judge for consideration of whether to issue a vexatious litigant administrative order.

4. If a judge has a case in which he or she believes the litigant should be declared vexatious for future cases, the judge may provide notice to the litigant via minute entry of the possibility of a vexatious litigant order, provide the litigant an opportunity to respond, hold any hearing deemed necessary by the judge, then issue a minute entry which provides the facts as found by the

judge and may refer it to the Presiding Judge for consideration of whether to issue a vexatious litigant administrative order.

Dated this 19th day of November, 2014.

/s/ Norman J. Davis

_____
Norman J. Davis
Presiding Judge

Original:     Clerk of the Superior Court

Copies:       Superior Court Judges and Commissioners
              Hon. Michael K. Jeanes, Clerk of the Superior Court
              Raymond L. Billotte, Judicial Branch Administrator

1

Phillip Potter
2301 N. 66th Street

2

Scottsdale, Arizona 85257

3

Phone: 480.459.0310
E-Mail: phillip.t.potter@gmail.com

4

Plaintiff
Pro Se

5

6

7

## IN THE UNITED STATES DISTRICT COURT

8

## FOR THE DISTRICT OF ARIZONA

9

10

11

Phillip Potter,

No. 2:25-cv-00663-PHX-DWL

Plaintiff,

12

v.

13

**FIRST AMENDED COMPLAINT**

14

Robert Meza, in his private
capacity; Karrin Taylor Robson, in

(Jury Trial Demanded)

15

her private capacity; Alane
Ortega; Kris Mayes, in her official

16

capacity as Arizona Attorney
General; Joseph Welty, in his

17

official administrative capacity as
Presiding Judge of the Maricopa

18

County Superior Court; and Does
1-60, inclusive,

19

20

Defendants.

21

22

    This action presents a (1) First Amendment facial challenge to A.R.S. § 12-3201;

23

(2) a 42 U.S.C. § 1983 claim arising from the deprivation of constitutional rights under

24

color of law; and (3) related intentional torts where a state legislator caught trading his

25

public office for private gain, and his associates, are liable for acts committed to conceal

26

their unlawful routing of state-administered federal funds to the legislator via nonprofits.

BACKGROUND

<u>Robert Meza Traded His Public Office for Private Gain</u>

1.      State Representative Robert Meza devised a fraudulent scheme (the "Scheme") where, under color of office[1], he corruptly secured public funds for six Medicaid-approved nonprofit behavioral health services organizations (collectively, the "Nonprofits"; individually, "NP1", "NP2", "NP3", "NP3", "NP4", "NP5", and "NP6"). The Nonprofits' complicit executives covertly paid him to perform those official acts.

2.      With intent to defraud, and through the artifice of a benevolent legislator voluntarily supporting constituents,[2] Meza solicited and secured public funds from state officials with authority to allocate those funds.  Officials that Meza defrauded include the Governor, state legislators, leaders of state agencies, and A.R.S. § 36-2906.01(A) Arizona Health Care Cost Containment System ("AHCCCS") "system contractor" executives.  His willful omission of material facts regarding his private pay arrangements effectuated the Scheme, and deceived officials into authorizing funds that went to the Nonprofits.

3.      The Scheme violated state statutes, federal codes, and government contracts proscribing bribes, kickbacks, and frauds, including Medicaid fraud.[3]

---

[1]      "No distinction exists between acts under color of office and those by virtue of office; both are 'official' acts".  *McDonald v. Thomas,* 198 Ariz. 590, ¶¶ 24-35, 12 P.3d 1194 (App.2000) "[A]n official act is 'any act done by [an] officer in his official capacity, under color and by virtue of his office.' ... . This, of course, is broad enough to cover any action taken by the [elected official] in performing the duties of his office. ... [This broad definition] creates a record the public may inspect to determine what has been done and to be informed of the contents of the official record.  ... [This] prevent[s] [government] activity from slipping below public scrutiny".  *Id.*

[2]      Arizona legislators who actively support their constituents perform "official acts" in the form of "political acts" which enjoy no immunity or privilege.  *See Fann v. Kemp in and for the County of Maricopa,* 515 P. 3d 1275 (2022).

[3]      Pursuant to 42 CFR 455.2, Medicaid Fraud is defined as "an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or some other person.  It includes any act that

2

4.    In return for increased organizational revenues, and in pursuit of enhanced compensation derived from those revenues, the Nonprofits' complicit executives (1) knowingly received and deposited corruptly obtained public funds into the Nonprofits' corporate bank accounts; (2) actively concealed the true nature of those funds to evade internal controls and external regulations; and (3) ensured Meza received a monthly payment for sham consulting services which had no value beyond his elected office.

5.    Meza and the Nonprofits' complicit executives knowingly and willfully participated in the Scheme and acted in concert under agreement.  The primary objects of that agreement were (1) to fraudulently obtain and distribute public funds for mutual personal benefit; and (2) to maintain secrecy and prevent investigations into the Scheme.

6.    On information and belief, and evidence obtained, each Nonprofit paid Meza paid $1,000 - $3,000 per month.  Meza personally received more than $1,000,000 in total spread across 250-300 payments unlawfully sourced from public funds while the Scheme was fully operational from 2014 - 2021.

7.    To conceal the true nature of this financial activity, the complicit executives authorized and instructed Meza's payments to be made through Ameliorate, LLC.

8.    Robert Meza is, and has always been, the sole member of Ameliorate, LLC ("Ameliorate") per Arizona Corporation Commission records.

9.    From 2014 - 2021, Ameliorate possessed no external marks of a legitimate consulting business such as a website, marketing materials, social media presence, dedicated phone number, business email address, business liability insurance, or client contracts detailing statements-of-work or articulating industry accepted deliverables.

---

constitutes fraud under applicable State or Federal law." *See e.g.*, 18 U.S.C. § 371; 18 U.S.C. § 1347; 31 U.S.C. § 3729, *et seq.*; 42 U.S.C. § 1320a-7b(b).

3

10.     During that time period, Ameliorate functioned in truth as a corporate vehicle to unlawfully process corruptly obtained public funds as part of the Scheme.

11.     As part of the Scheme's primary revenue source, Meza solicited and secured state-administered Medicaid funds from A.R.S. § 36-2906.01(A) AHCCCS "system contractors" including Mercy Care which receives more than $4B annually to administer Medicaid health insurance plans in Maricopa County, and serves as an insurance payor.

12.     Mercy Care C-suite executive "TG" knowingly and willfully participated in the Scheme, as he was fully aware that a portion of the public funds that he authorized to benefit the Nonprofits would be passed on to Meza.  Specifically, TG facilitated state-administered Medicaid funds to be selectively provided to the Nonprofits disguised as periodic corporate grants, annual corporate event sponsorships, and ongoing enhanced rate services contracts.[4]  Other nonprofits did not receive the same considerations or benefits.

13.     The Scheme also maintained a secondary revenue source derived from corruptly obtained private funds.  The Nonprofits held fundraising events where, again through the artifice of a benevolent legislator supporting constituents, Meza operated

---

[4]     Per A.R.S. § 13-2311 Fraudulent Schemes and Practices, "[n]otwithstanding any provision of the law to the contrary, in any matter related to the business conducted by any department or agency of this state or any political subdivision thereof, any person who, pursuant to a scheme or artifice to defraud or deceive, knowingly falsifies, conceals or covers up a material fact by any trick, scheme or device or makes or uses any false writing or document knowing such writing or document contains any false, fictitious or fraudulent statement or entry is guilty of a class 5 felony."  "Scheme or artifice to defraud means to form a plan, device or trick to perpetrate a fraud upon another. ... A fraudulent representation may be effected by deceitful statements, half-truths or the concealment of any material fact as well as by affirmative statement or acts."  *State v. Bridgeforth*, 156 Ariz. 60, 63, 750 P.2d 3, 6 (1988).  "[I]ntent to defraud is found where the defendant intends to cause a pecuniary loss or gain."  *State v. Thompson,* 194 Ariz. 295, ¶ 13, 981 P.2d 595, 598 (App. 1999).  "The intent to defraud can [also] be established by proving the defendant devised the fraudulent scheme or willfully participated in it with knowledge of its fraudulent nature".  *Bridgeforth*.

4

under color of office to solicit and secure corporate sponsorships from unwary registered

lobbyists and corporate executives seeking his political favor.  Per the Scheme, Meza

willfully withheld the material facts of his private pay from unwary private funders.[5, 6, 7]

Plaintiff Forced The Scheme To Be Revealed

14.    The Scheme first came to limited public awareness on August 23, 2021

when NP1's CEO met with Arizona House of Representatives (the "House") members

and disclosed that he had been covertly paying Meza since 2015 (*see* Exhibit A).

15.    The NP1 CEO disclosed because (1) Defendant Alane Ortega, who is the

daughter-in-law of NP1's founder, made him aware within the prior two weeks that

Plaintiff was on the cusp of filing a civil suit that would expose the Scheme; (2) the House

had received $45M in federal "P90" covid relief funds which, if the House had dispersed

those funds to any of the Nonprofits, would have exposed knowledgeable persons to state

and/or federal criminal charges; and (3) actual disclosure is a defense to fraud.

---

[5]    A.R.S. § 13-2310 Fraudulent Schemes and Artifices is violated whenever someone "knowingly, pursuant to a scheme or artifice to defraud, obtained any benefit by means of false pretenses, representations, promises or material omissions".  "The word benefit means anything of value or advantage, present or prospective." *Bridgeforth*.

[6]    Meza routinely presented himself under color of office before and during events to further the artifice of a benevolent legislator voluntarily supporting his constituents.  For example, Meza appeared with the NP2 CEO on an April 12, 2016 podcast to promote an upcoming NP2 event that a sponsor "underwrote for $25,000".  Presenting himself as "Senator Robert Meza", but omitting the material fact of his private pay, he stated "for me politically ... it affects us at the city, state, and national level ... as a policy maker I know that I have to be strategically involved in the whole process and I'm glad I'm involved right now with this [Sojourner] team ... I will help with whatever they need".  *See* https://inspiredmedia360tv.com/ Podcast Episode 60; Exhibit B.

[7]    Meza also unlawfully routed election campaign funds to his private benefit via NP3 which received at least $9,100 originating from Meza's campaign accounts ($1,000 on May 22, 2015; $100 on January 22, 2016; $1,000 on April 22, 2016; $2,500 on December 20, 2017; $1,000 on October 28, 2018; $2,500 on February 1, 2019; and $1,000 on September 24, 2020).  Meza disguised the transactions as election campaign contributions to a 501(c)(3) to be comingled with other corruptly obtained funds, and used to pay Meza.

16.    Immediately thereafter, "at the advice of House counsel", the House's Minority Leader dedicated "hundreds of staff hours" to identifying the Nonprofits paying Meza, and prevented those organizations from receiving House-administered P90 funds to be allocated as part of that year's state "budget negotiations".

17.    An honest legislative staff member contacted *The Arizona Republic* about the NP1 CEO's disclosure.  This sparked a media investigation published November 8, 2021 containing the above quoted facts.  *See* https://tinyurl.com/2s3wedcf.

18.    That article reported (1) NP1 "had been barred from seeking any funds from the House"; (2) NP1 "canceled" Meza's sham consulting contract; (3) Meza stated "[h]is job was to ... 'explore mergers and acquisitions'"; (4) Meza otherwise "declined to answer any questions about the work [he was] contracted to do"; (5) Gov. Ducey reported that he "didn't know [NP1] had hired" Meza or that Meza had "financial connections to NP1" but he did have "frequent[] discussions" with Meza about funding NP1 as a "lawmaker[]"; (6) three of the four legislators quoted were unaware that NP1 was paying Meza; and (7) Meza stated that his conduct was lawful because he "showed it on [his] financials", meaning his annual A.R.S. § 18-444 Financial Disclosure Statements.

19.    Meza's 2014 - 2021 Financial Disclosure Statements show that he wrote the words "consultant" or "strategic marketing" on those forms, with no further description.

20.    A Financial Disclosure Statement is a public record, and no public record can ever provide constructive notice of material facts.  Actual notice is required, or else material facts are considered omitted.[8]

---

[8]    *See Field v. Mans,* 516 U.S. 59, 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (Fraud exists even if the truth could be learned from public records); *Baker ex rel. Hall Brake Supply, Inc. v. Stewart Title & Trust of Phoenix, Inc.*, 197 Ariz. 535, 540, ¶ 23, 5 P.3d 249, 254 (App. 2000) ("The existence of public records is no defense to fraud.").

21.    On information and belief, and evidence obtained, the Nonprofits' complicit executives stopped paying Meza when the *Republic* article was published due to fear of criminal investigation.

22.    Before November 2021, the Scheme nearly came to light on three other occasions but was actively concealed pursuant to the Scheme agreement's second object.

a.    First, in December 2016, an unwary NP2 Board member discovered that the NP2 CEO was covertly paying Meza.

b.    NP2's Board members resigned en masse while the Board Chair initiated an internal investigation.

c.    Seeking to discredit, and attempting to intimidate and create a financial crisis for, the NP2 Chief Development Officer ("CDO") and CEO, Meza arranged for a NP2 staff Director ("TD") knowledgeable of the Scheme to anonymously email the Board Chair in January 2017, and falsely accuse them of breaching federal contract terms unrelated to the Scheme (misusing restricted funds as operating expenses).

d.    The NP2 Board Chair terminated the CDO and CEO in April 2017, in part because the paid arrangement with Meza was "not an appropriate relationship ... and [he had] asked [the CDO] to terminate" the sham contract.  In turn, the two executives filed suit for breach of employment contract on June 15, 2017 (case no. CV2017-008728).

e.    That case progressed through discovery.  The Board Chair admitted in a September 14, 2017 deposition that NP2 breached the CDO's employment contract, leading to an October 27, 2017 Motion for Summary Judgment (*see* Exhibit C).

f.    After maneuvers to cause delay, and after NP3 had "acquired" NP2 (as described below), the NP2 defendants manufactured facts to fabricate a Conversion counterclaim civilly accusing those plaintiffs of stealing donated furniture.

g.     The counterclaim was filed for the unlawful purpose of driving up plaintiffs' attorney fees and costs, and intimidating the former executives into fearing criminal prosecution.  As a result, the CDO and CEO were intimidated and eventually induced into dismissing their otherwise victorious claim on April 11, 2019.

h.     To limit public scrutiny and conceal the Scheme, Meza arranged for NP3 to "acquire" NP2 in July 2017.

i.     Meza served as a NP3 Board member at time while the NP3 CEO briefly suspended Meza's NP3 payments and spearheaded the acquisition.  Post-acquisition, the NP3 CEO selected, and still maintains, an NP2 Board of Directors consisting of himself and three NP3 executives knowledgeable of the Scheme.  The "acquisition" was, in truth, a corruptly designed and executed "mop-up operation".

j.     Second, in mid-2015, Meza recruited and cultivated a seventh nonprofit ("NP7") to participate in the Scheme, but he first needed NP7 to generate public funds sufficient to pay him through Ameliorate on a recurring basis.

k.     Prior to 2015, NP7 functioned as a modest grant-making operation whose unpaid leaders routinely lobbied the Arizona Legislature for financial allocations and discretionary funding to support research into treatment for the mentally ill.  But NP7 never brought in more than $87,632 in revenue and distributed those funds as grants.[9]

l.     To generate sufficient annual revenue, Meza approached TG in mid-2015 seeking to have Mercy Care provide that funding.  Together, the two men developed a plan to convert NP7 from a grant-making organization to a Medicaid-funded nonprofit behavioral health services organization, and open a clinic soon known as "Epicenter".

---

[9]    See NP7 IRS Form 990s at
https://projects.propublica.org/nonprofits/organizations/861030444.

m.      To effectuate that plan and to conceal its true purpose being to further the Scheme, TG (1) became the NP7 Board Chair; (2) authorized Mercy Care to provide enhanced rate clinical services contract for Epicenter; (3) authorized Mercy Care to provide corporate grants sufficient to launch Epicenter; and (4) helped Meza solicit and secure complementary public and private funding throughout the community.[10]

n.      Epicenter failed from the outset as NP7's IRS Form 990 shows the nonprofit suffered a net loss of $298,065 to operate the clinic in its first year.

o.      Yet, TG deceptively praised Epicenter in the May 2018 *Psychiatric Services* article and in other public venues knowing the clinic was not financially viable.

p.      On the cusp of NP7's collapse, and as means to conceal the Scheme, Meza again approached the other Nonprofits to "acquire" an asset that failed by his hand.

q.      In March 2018, NP4, where Meza had inserted TD into a C-suite executive position after she left NP2, agreed to acquire Epicenter upon TG's approval as NP7 Board Chair (*see* Exhibit D).  TD promoted and led the "acquisition" process.

r.      To effectuate the acquisition, in his Mercy Care role, TG had Mercy Care "forg[i]ve contract advances to Epicenter totaling $947,453"[11], effectively putting TG on both sides of the negotiating table and gifting almost $1M in Medicaid funds to corruptly complete this second "mop-up operation".

---

[10]      See article published in the May 2018 edition of *Psychiatric Services* at https://psychiatryonline.org/doi/10.1176/appi.ps.201700516.  Therein, as the only article co-author knowledgeable of the Scheme, TG noted that Epicenter funding came from various private and public sources including Mercy Care and the Arizona Attorney General's Office.  Mercy Care provided "monthly block payments of more than $100,000 to reimburse services provided to individuals covered by Medicaid" and provided enhanced rate clinical services contracts paying at "135% of standard Medicaid rate".

[11]      See NP7 2018 IRS Form 990 Schedule O, p. 26 located online at https://projects.propublica.org/nonprofits/organizations/861030444/201902409349300810/full

9

s.      Third, beginning in September 2019, an unwary NP6 Board member became concerned with the CEO's "specific and heightened focus on government and politics" involving Meza, and expressed those concerns in letters to the seven-member NP6 Board sent on January 29, 2020 and February 27, 2020 (*see* Exhibit E).

t.      With an unsatisfactory response from the Board (which included three members knowledgeable of the Scheme), the concerned Board member quit, instructed NP6 to "vacate[] Televerde's premises by end of day February 28, 2020", and permanently withdrew $125K in recurring annual corporate support.

u.      On May 20, 2020, NP6's Board Chair wrote an "official warning" to the CEO noting, "[u]pon attending [NP6's] Mother's Day event, we learned that it was opened by Robert Mesa (sic).  ... We have repeatedly discussed Robert's involvement in [NP6] and its events and have expressed the Board's preference not to have relationship (sic) front and center.  In addition, we learned that you committed us to real estate in PHX in an office with Robert Mesa (sic). ... Finally, the Board had previously learned of a contract to pay Robert Mesa (sic) $1000 per month.  Firstly, while I have not seen the contract, you have told me it is with Robert's company and that many politicians perform services for non-profits for hire including Robert.  You had been paying Robert directly (not his company) for a portion of this contract.  When the Board discovered this and became uncomfortable for the reasons you previously stated above of not wanting to be seen politically connected to Robert, you took it upon yourself to change the check-writing to Leslie (an employee of Robert's) and current recipient of the $1000 from [NP6's] account.  Again, we only uncovered this on the Mother's Day call where Leslie stated that she was on the call 'to learn about [NP6] so when she is on the phone with constituents she can better represent us.'".  The NP6 CEO was caught actively concealing

Meza's payments from unwary Board members, and she was forced to release Meza.

v.    As he admitted in the *Arizona Republic* article, Meza soon thereafter asked NP1's CEO to "acquire" NP6.  He made this request so that the NP6 CEO could be in a position to reinstate Meza's pay.

w.    NP1's CEO agreed to acquire NP6 and reached terms with the compromised NP6 Board in May 2021 (*see* Exhibit F).  But NP1 did not finalize the acquisition when Ortega made the NP1 CEO aware of current litigation in CV2021-005501 and pending litigation in CV2021-013210.

x.    Meza was unable to complete this third "mop up operation".  The NP1 CEO instead terminated Meza's sham consulting contract and disclosed Meza's paid arrangement to House members, triggering the November 2021 *Arizona Republic* article.

y.    The other Nonprofits' complicit senior executives quickly released Meza from the sham consulting contracts, further confirming the covert nature of the Scheme, and that Ameliorate and the Nonprofits did not conduct legitimate business.

23.    In April 2022, the Arizona House and Arizona Senate initiated independent ethics investigations into Meza's involvement with the Nonprofits.

24.    The Arizona House Ethics Committees acknowledged on May 2, 2022 that Meza was under federal investigation and therefore tabled the complaint.

25.    The Chair of the Arizona Senate Ethics Committee stated during a May 6, 2022 ethics committee meeting, and after reviewing evidence, that there was "good cause" to believe Meza's conduct in public office was "criminal".  But the Senate likewise tabled the complaint for the same reasons as the House.

26.    Facing scandals, ethics investigations, and criminal investigations, and no longer able to supplement his legislator's $24,000 salary with income derived from the

11

Scheme, Meza ran for Justice of the Peace but lost that August 2022 primary election.

27.    Meza registered his name with the Arizona Secretary of State as a Lobbyist in February 2023. He also registered Ameliorate as a Lobbyist firm in May 2023.[12]

28.    Ameliorate is, and always has been, a corporate vehicle that Meza used to generate private payment in return for influencing legislation and procuring public funds from elected officials, state agencies, and AHCCCS contractors.

TD Explained The Scheme To Plaintiff

29.    Plaintiff learned of the Scheme through TD.

30.    Between January - April 2018, TD gradually described to Plaintiff how she became involved in the Scheme, shared texts and voicemails between her and Meza referencing the Scheme, discussed the Scheme's details with her parents in Plaintiff's presence, and explained that Meza's growing pressure to maintain, grow, and secrete the Scheme had put Meza and TD in open conflict within the NP4 workplace.[13]

31.    In January 2018, TD admitted facilitating the Scheme to Plaintiff through

---

[12]    Records on file with the Arizona Secretary of State show Meza registered as a lobbyist employee (EMP ID 703900) working for a lobbying firm (LOB ID 3614168). LOB ID 3614168 corresponds to LOB NAME "Ameliorate, LLC" which lists "Robert Meza" as the only "Active Employee" with no "Inactive Employees" listed in records. Among the companies that used Meza's/Ameliorate's lobbying services, "Deloitte Consulting, LLP" identified LOB ID 3614168 "Ameliorate, LLC" as an "LFC", meaning a Lobbyist for Compensation, with a "STARTED" date of "7/18/2023" and a "TERMINATED" DATE of "1/31/2024". Pursuant to A.R.S. § 41-1233(2), "[n]o person shall: ... Lobby the legislature for compensation within one year after the person ceases to be a member of the senate or house of representatives.". Meza "ceased to be a member of the" House in January 2023, six months prior to the July 18, 2023 "STARTED" date lobbying on behalf of Deloitte Consulting.

[13]    TD expressed her belief to Plaintiff in February 2018 that Meza was under a financial strain to act so aggressively. Per Maricopa County Recorder's Office records, Meza was enduring an IRS audit or investigation related to a "Small Business" at that time. The IRS placed four federal tax liens on his personal residence, totaling $55,923.31; the last of which was recorded April 14, 2018 (Recorder No. 20180290161).

12

various professional roles that Meza secured for her as a financial benefit, including as a NP2 staff Director and a NP4 C-suite executive; career advancements that required her to ensure Meza's private payments would continue and remain concealed.

32.    That same month, TD admitted to Plaintiff that she sent the anonymous email to the NP2 Board Chair in January 2017 at Meza's instruction.

33.    One February 2018 evening, Plaintiff and TD found themselves at the Arcadia OHSO Distillery and Brewery Restaurant discussing her conflict with Meza when she invited TG to join them via text and call.  TG arrived with his partner after their dinner out and the parties discussed Meza over drinks.  During that time, TG stated (1) "Meza always comes to me for money and I always find ways to get it to him", referring to Meza's solicitation of Mercy Care administered funds to benefit the Nonprofits; (2) "Meza convinces politicians to send money" to the Nonprofits "but doesn't tell them the money ends up back in his pocket", referring to how Meza effectuated the Scheme through unwary government officials while withholding the material facts of his private pay; and (3) "Meza is going to end up in prison ...  I just hope I don't end up in there with him", admitting his knowledge of the Scheme and that his participation was unlawful.

34.    The conflict between Meza and TD grew through March 2018 when the CEO of NP4 officially announced her retirement.  TD claimed Meza had arranged for her to become the CEO successor as one benefit of her Scheme participation.  Realizing their relationship had soured, Meza blocked TD's promotion and demanded NP4 open the position for national recruitment when, in truth, Meza had recruited a local nonprofit executive willing to assume the position and continue paying him.

35.    On or about April 9, 2018, TD learned journalist "DP" had published an online article connecting Meza with several nonprofits, and suggesting he was corrupt.

13

36.     Intending to frighten Meza and increase her chances of becoming NP4's CEO, TD purchased a Cricket burner phone on or about April 13, 2018 and used the phone to contact DP (*see* <u>Exhibit G</u>). She offered to share damaging information on Meza.

37.     TD stated her goal was to cause DP to further probe Meza's involvement with nonprofits and publish articles that would cause him to fear criminal investigation in the hopes Meza would disengage from NP4, allowing her to become CEO.

38.     On April 15, 2018, Plaintiff instead encouraged TD to retain an attorney for the purpose of formally contacting Meza and instructing him to cease his open conflict with TD or otherwise face a workplace harassment suit.

39.     TD asked Plaintiff to participate in an April 19, 2018 call with her preferred attorney (*see* <u>Exhibit H</u>).

40.     During and after that call, TD revealed that she launched Evidence Based Medical Consulting, LLC ("EBMC") in April 2016 as her personal corporate vehicle to receive additional financial benefits derivative of the Scheme, where each of EBMC's four clients (which included NP3 and NP7) was, in truth, an individual or entity seeking Meza's legislative favor.  Meza sourced every client.  EBMC had no website, marketing materials, social media presence, dedicated phone number, business email address, business liability insurance, or client contracts detailing statements-of-work or articulating industry accepted deliverables, yet the company generated $147,125 in its first year.

41.     Plaintiff attempted to end his relationship with TD in late April 2018, but he agreed to continue when TD promised she would remove herself from the Scheme, disengage from all Nonprofits, cease contact with Meza, and find legitimate employment.

42.     In April 2018, TD assured Plaintiff that she was withdrawing from the Scheme and secured employment in June 2018 with AHCCCS contractor Equality Health.

14

43.    Plaintiff and TD married in October 2018.

TD Continued to Participate in the Scheme During The Marriage

44.    Based on a societal need, significant market potential, TD's graduate training, Plaintiff's experience providing psychological assessments in volume, his background in launching technology-enabled startups, and a shared desire to run a family business, Plaintiff developed and launched a startup concept ("FountainSyde") to provide rapid and scalable Autism testing and diagnostic services.

45.    By October 2019, FountainSyde, LLC was launched and operational as a corporate entity after Plaintiff had (1) created trademarked materials and developed trade secrets; (2) established corporate branding and marketing materials; (3) met with pediatricians and licensed therapists to generate a patient referral pipeline; (4) developed, tested, and launched FountainSyde's corporate website with automated scheduling, provider referral, patient intake processes, and secure health records; (5) established pricing schedules; (6) produced corporate contracts and user agreements; (7) opened a corporate bank account; (8) secured a dedicated phone line and office space at three locations; (9) generated pitch decks; and (10) secured clients.

46.    However, TD had secretly continued to serve as an NP6 Board member, to associate with Scheme participants, and to further the Scheme.  For instance, Plaintiff learned TD facilitated a November 2019 $10,000 Equality Health sponsorship for an NP6 fundraising event.  She knew a portion of those funds would be passed on to Meza.

47.     In late November 2019, TD asked Plaintiff to meet with a capital investor ("CE") that she claimed to have met earlier that same month.

48.    Also in November 2019, a professional colleague ("GB") contacted Plaintiff and asked if he would be willing to help scale an educational technology startup built

ER-088

around K-12 teacher professional development.  Plaintiff agreed to consider it, conducted basic market analysis, kept the concept as a potential side project, and only made TD aware of the opportunity.

49.     Plaintiff met with CE on December 2, 2019 and pitched FountainSyde as an angel investment opportunity, but TD conveyed later that same month that CE decided to pass on the investment.

50.     On January 9, 2020, Plaintiff had become increasingly concerned with TD's questionable behavior and deceptions.  He sought to end the brief marriage amicably.

51.     TD left Plaintiff's residence calm that evening but returned two hours later agitated and threatening to lodge false domestic violence allegations.  Plaintiff immediately called Scottsdale Police.  Officers (1) arrived within ten minutes; (2) inspected the residence; (3) interviewed Plaintiff and TD; (4) determined "no crime" occurred; and (5) encouraged TD to stay the night with her parents in Chandler, AZ.

52.     TD and her mother returned unannounced the next morning with TD declaring that she spoke with Scottsdale Police and could return because Plaintiff's residence was also her residence.  Plaintiff never told TD she could not return. Regardless, TD and her mother proceeded to harass and antagonize Plaintiff until he finally called police again for assistance in the evening of January 13, 2020.

53.     A Scottsdale Police officer arrived and agreed to speak with TD and her mother to keep the peace, but TD and her mother quickly made false allegations that Plaintiff had planted video devices and was recording for some malicious purpose.  The seasoned officer challenged TD to point out the devices causing both women to recant. The officer instructed TD and her mother to stop making false criminal accusations.

54.     TD's mother vacated the residence that night and TD followed suit the next

morning.  But on January 16, 2020, TD appeared unannounced at a public plaza located at 68th Street and Thomas Road where Plaintiff already had been for an hour, and after he had already hailed a Lyft rideshare to take him to central Scottsdale.  The parties did not interact between 2:18 p.m. when TD arrived and 2:20 p.m. when Plaintiff left via Lyft.

55.     On January 24, 2020, Plaintiff reached a verbal settlement agreement with TD's first attorney to expedite the dissolution (case no. FC2020-090224), but the attorney failed to finalize the agreement with signature and stopped responding to email.

56.     On the evening of January 28, 2020, Scottsdale Police came to Plaintiff's residence, notified him that TD had secured an *ex parte* A.R.S. § 13-3602 order of protection, took Plaintiff's infant son, and explained that Plaintiff would have to challenge the order in court or else be labeled an A.R.S. § 13-3601 Domestic Violence perpetrator.

57.     Each allegation of assault and stalking described in the A.R.S. § 13-3602 petition (case no. FC2020-050752) was entirely fabricated.

58.     Plaintiff initiated his own investigation, hired counsel, and discovered:

a.     On January 9, 2020, TD's mother and father were present in front of Plaintiff's house when TD threatened to lodge false domestic violence allegations, and they called Scottsdale Police falsely accusing Plaintiff of assaulting TD in the hopes that police would arrive and arrest Plaintiff.  Scottsdale Police had dispatched a unit for that purpose.  But those officers had not yet arrived when Plaintiff made his call to the same department.  The police dispatcher dispatched a second unit, notified both units that Plaintiff was on the phone with her, and there was no assault occurring at the residence.

b.     On January 10, 2020, TD made another call to Scottsdale Police falsely accusing Plaintiff of criminally threatening her but, upon questioning and a review of text messages, that officer explained to TD that Plaintiff's conduct was "not threatening

17

in any way" per the resulting Field Incident Report.

       c.     TD fired her first attorney and hired her second attorney ("MC") on January 27, 2020. MC instructed TD to file the A.R.S. § 13-3602 petition outside of the existing family law case, knowing TD had avowed three times in FC2020-090224 filings that no domestic violence occurred in the relationship.

       d.     During FC2020-050752 discovery, MC initially conveyed that, *inter alia*, (1) TD's friend ("SN") would corroborate TD's assault allegations based on conversations the two women had during a noon lunch meeting that took place December 11, 2020 at Ocotillo Coffee Shop; (2) SN would corroborate the stalking allegation based on being present at the public plaza on January 16, 2020; and (3) the NP6 CEO would also corroborate the same stalking allegation based on a phone conversation that same day; and (4) TD now lived temporarily with NP6's CEO.

       e.     Plaintiff learned the Ocotillo Coffee Shop had gone out of business six months prior and since reopened as a speakeasy bar that did not open until 4:00pm.

       f.     Plaintiff compiled emails, texts, voicemails, store receipts, Lyft field receipts and corporate records, and witness statements confirming his physical location continuously from 6:36am through 3:15pm on January 16, 2020. The evidence proved he was at the public plaza for more than an hour prior to TD's arrival, he had hailed a Lyft prior to her unannounced arrival, and he did not interact with Plaintiff while waiting for the Lyft to pick him up less than two minutes after TD's arrival.

       g.     Realizing Plaintiff intended to depose SN, TD's story changed again with MC reporting that CE was now the friend present at the public plaza on January 16, 2020, and that CE would testify as a witness to stalking, not the NP6 CEO.

       h.     Finally, Plaintiff compiled texts, email messages, witness statements,

18

and video showing he was more than twelve miles away at a practice facility with his older son's club baseball team when he allegedly assaulted his infant son.

i.    The clearly fabricated allegations, constantly changing stories, and the NP6 CEO's involvement made Plaintiff realize TD's malicious conduct and factual misrepresentations did not just serve the unlawful purposes of attempting to gain an advantage in dissolution proceedings and harass Plaintiff, but also served the unlawful purpose of attempting to intimidate him and obstruct investigations into the Scheme.

j.    From March 2 - 6, 2020, Plaintiff's attorney contacted MC via phone calls and emails conveying evidence that proved TD's allegations were entirely fabricated and explaining to MC that his professional obligations required him to ensure the order of protection was withdrawn and not presented at the upcoming hearing to quash.

k.    MC offered to dismiss the order of protection attached to the child if Plaintiff would admit to stalking TD; malicious terms intended to intimidate Plaintiff and exploit his distress at being unjustly separated from, and not allowed to see, his young son for more than two months.  Plaintiff declined.

l.    At the April 4, 2020 hearing to quash, TD reiterated the false allegations and testified to knowingly false facts on direct examination.  Plaintiff's attorney eviscerated TD on cross-examination.

m.    On April 7, 2020, that court quashed the order of protection and awarded Plaintiff his attorney's fees and costs on May 21, 2020.

n.    TD substituted counsel again and retained Ortega on April 20, 2020.

59.    Facing an otherwise expiring claim, Plaintiff filed suit (case no. CV2021-005501) on April 5, 2021 alleging Malicious Prosecution (i.e., Wrongful Institution of Civil Proceedings and associated counts) of the order of protection.  Ortega also

19

represents TD in that civil suit which survived dismissal attempts and is set for trial.

60. Plaintiff continued to investigate events and conduct discovery in the FC2020-090224 dissolution proceedings. He learned:

a. An anonymous defamatory letter was sent via U.S. mail to GB postmarked March 9, 2020 falsely accusing Plaintiff of criminal conduct, stating that he was under criminal investigation by the Arizona Attorney General and the IRS, and advising that GB should not do business with Plaintiff (*see* Exhibit I). Plaintiff committed no crimes, and was not under investigation. The letter, not discovered until September 2020, was another malicious attempt to intimidate Plaintiff and to damage him personally and professionally with factual misrepresentations to further the Scheme, and using methods highly similar to those TD and Meza jointly used to damage and intimidate the terminated NP2 CDO in 2017.

b. During a November 5, 2020 deposition, TD provided knowingly false testimony, including factual misrepresentations that, *inter alia*, (1) she had not spoken with Meza since June 2018, although documents later obtained prove she and Meza were jointly involved in NP6 Board meetings and projects, and, on information and belief, Meza's personal phone records show TD and Meza spoke often beginning January 10th or 11th of 2020; (2) she did "not remember" purchasing or using the Cricket burner phone containing texts to DP; (3) Meza did not refer her to Ortega, although Meza inadvertently shared with a journalist in May 2022 that he "helped" TD to secure Ortega as counsel and "helped" Ortega with litigation thereafter; and (4) she had no personal or professional relationship with CE, but facts contained in the below paragraph refute that testimony.

c. CE was not a capital investor that TD met in November 2019. In June 2021, Plaintiff learned CE was the former CEO of Industrial Solutions Network, a

1    physical therapist health insurance network specializing in workers compensation

2    practice.  And she paid Meza for sham consulting services in 2013 and 2014 as part of the

3    Scheme while Meza served as a State Senator with the statutory ability to influence

4    reimbursement rates for workers compensation claims.  CE sold Industrial Solutions

5    Network for $7.6M in 2015.  Critically, in June 2021, CE publicly announced that she had

6    launched Axis for Autism, LLC, a behavioral health startup to provide rapid and scalable

7    Autism testing and diagnostic services – a functional copy of FountainSyde.  CE even

8    admitted in media interviews that she pursued the business concept after a meeting with

9    two psychologists.  Plaintiff and TD are those psychologists.  CE had no background in

10    behavioral health or in technology-enabled startups, and only could have progressed to

11    that point with TD's involvement and based on Plaintiff's work.[14]

12            d.    Per documents responsive to Plaintiff's May 2022 A.R.S. § 39-121,

13    *et seq*. public records request of Governor Doug Ducey: (1) Meza corresponded with the

14    Governor's Director of Scheduling from his rmeza@azleg.gov government email account

---

[14]    After learning of Axis for Autism, LLC, and of CE's true relationship with Meza and TD, Plaintiff filed case no. CV2021-013210 on August 23, 2021, the same day the NP1 CEO disclosed Meza's pay to the House.  He filed suit after notifying Ortega of his desire to amend CV2021-005501, or else file a second suit and move to consolidate.  Plaintiff filed CV2021-013210 as a separate suit only because Ortega objected to consolidation on the basis that the two suits presented distinct claims.  Per Restatement (Second) of Judgments § 26(1)(a), which Arizona follows, "Comment a provides: '[a] main purpose of the general rule [against splitting claims] is to protect the defendant from being harassed by repetitive actions based on the same claim.  The rule is thus not applicable where the defendant consents, in express words or otherwise, to the splitting of the claim.  [Defendant's] argument in [the first action] that the [Plaintiff's] claims were distinct from [the second action's] claims is the functional equivalent of consent to splitting the [plaintiff's] claims from the [first action's] proceedings." *Shoemake, et al. v. Estancia De Prescott*, Nos. 1 CA-CV 14-0162, 1 CA-CV 14-0527 (Consolidated), ¶47 (Ariz. Ct. App. 2016) (mem. decision).  Hence, as a matter of law, TD and Ortega forfeited any subsequent right to allege CV2021-013210 was filed for harassment purposes.  CV2021-005501 has progressed through discovery and is now set for trial.

21

between March 6 - 15, 2018 regarding Gov. Ducey's appearance at the March 16, 2018 NP4 fundraiser.  That email string included correspondence sent through Meza's legislative aide at tkrepitch@azleg.gov email account, and included other members of the Governor's Office.  On March 15, 2018 Meza emailed the Director of Scheduling from his government account, "I am writing to double verify the details of the luncheon tomorrow.  Please let me know if you have any questions.  We would like the governor to arrive at 11:45.  After the luncheon ends at 1:00, there will be a fifteen minute meeting with the governor and [the CEO of NP5], a nonprofit that has been around for about 40 years.  Their demographic is foster youth in the behavioral health and medical health arenas.  They are helping children, as well as their foster parents.  They will be getting national recognition in the coming months, so we want the governor to hear about what they are doing. ... I will make sure that the meeting lasts only 15 minutes, to respect the governor's time."; (2) Meza directed government personnel to his (602) 421-1702 personal cell phone to conduct business; and (3) Meza invited eleven sitting Arizona Senators and House members to attend the NP4 fundraising event.  See Exhibit J.

   e. Per records responsive to Plaintiff's May 2022 A.R.S. § 39-121, *et seq*. request of the Department of Corrections, Rehabilitation, and Reentry, (1) starting no later than March 2018, NP6 pursued a "Behavioral Health Program" initiative to "build [the NP6] Behavioral Center" and secure an "AHCCCS contract" as a joint initiative with NP4; and (2) NP6 internal messages from "3-11-20" listed Meza as the person already "Responsible for Outreach" to certain corporate sponsors for an NP6 fundraising event, where NP6 documents showed (a) Meza as the person responsible for contacting AHCCCS "system contractors" Mercy Care, AZ Complete Health, United Health Care, and Blue Cross and Blue Shield of Arizona for sponsorships; (b) Meza secured a $5,000

sponsorship from AHCCCS contractor Equality Health; and (c) Meza was specifically assigned to approach private corporate sponsors including the Arizona "Cardinals and Michael Bidwill", "APS/Pinnacle West", the "National Bank of Arizona", and "HBI", International which agreed to be the event's $15,000 "Title Sponsor" (*see* <u>Exhibit K</u>).

Plaintiff Brought Public Records Case CV2022-014146

61.     Pursuant to A.R.S. § 39-121, *et seq*., Plaintiff also requested the A.R.S. § 39-121.01(A) Director of AHCCCS and A.R.S. § 36-2906.01(A) system contractor Mercy Care provide documents regarding TG's involvement with the Nonprofits and Meza.[15]

62.     The AHCCCS Director pointed Plaintiff to the agencies' website which documented its contracts with Mercy Care, but provided no other records for inspection. The Director refused to direct Mercy Care turn over responsive records in its actual possession.  And Mercy Care refused to provide any documents.  Plaintiff filed suit (case no. CV2022-014146) seeking to compel records production.

63.     On December 8, 2022, those defendants jointly moved for summary judgment based on sworn affidavits declaring that Mercy Care and TG only allocated Mercy Care "profits" to the Nonprofits, and therefore the requested documents did not constitute public records since those "profits" belonged "exclusively to Mercy Care".

64.     That court conducted a March 17, 2023 oral argument wherein those defendants relied on the affidavit.  The court granted dismissal.  Plaintiff appealed.

65.     During appellate proceedings, Plaintiff discovered AHCCCS and Mercy Care participate in a profit-sharing agreement among thousands of pages of documents under (1) state contract YH19-001R (pp. 234-235) which describes "MCO [Mercy Care]

---

[15]     The Arizona Supreme Court confirmed that state contractors which perform government functions generate documents subject to Arizona's public records law. *See Fann v. Kemp in and for the County of Maricopa*, 515 P. 3d 1275 (2022).

Share" and the "State Share" of profits; and (2) ACOM 311 which also details the profit-sharing agreement ("AHCCCS shall recoup/reimburse a percentage of the Contractor's profit or loss").[16] Mercy Care's FY 2022 Audited Financial Statement also described the profit-sharing agreement ("Certain provisions of the AHCCCS ... contracts include a risk band whereby Mercy Care and the AHCCCS programs share in the profits and losses of the contract ... Mercy Care has recorded an estimate of the reconciliation revenue, or contra-revenue, within other revenue in the accompanying statements of activities and changes in net assets, based on the AHCCCS ... lines of business").[17] The referenced *Psychiatric Services* article also confirms Mercy Care did not just allocate "profits" to Nonprofits but also provided "block grants" and "135%" enhanced rate services contracts.

66.    On October 6, 2024, Plaintiff notified those defendants, through their counsels, that he had discovered the factual misrepresentations and requested they acknowledge the profit-sharing agreement to the court. On October 8, 2024, AHCCCS Director Carmen Heredia and Mercy Care, at TG's instruction, declined to acknowledge the profit-sharing agreement to the trial court or appellate court.

Plaintiff Brought Public Records Case CV2022-008626

67.    Plaintiff requested A.R.S. § 39-121.01(A)(1) House member Meza, the A.R.S. § 39-121.01(A)(2) House, and Robson provide documents regarding Meza's solicitation of Robson to host fundraising events for NP5 and NP6 – actions which Meza described as supporting "constituents" in a January 7, 2022 CV2021-013210 court filing – and seeking documents solely in Robson's actual possession after Meza reported that he

---

[16]    See p. 1 of ACOM 311 online at
https://www.azahcccs.gov/shared/Downloads/ACOM/PolicyFiles/300/311new/311.pdf.
[17]    See p. 8 of Mercy Care Financial Statement online at
https://www.azahcccs.gov/Resources/Downloads/ContractorAudits/2022/MercyCare0622
_FS_AUDIT_FINAL.pdf.

did not actually possess documents relating to that "constituent" support.

68.     Faced with inadequate and delayed records production, Plaintiff brought suit to inspect records per A.R.S. § 39-121, *et seq.*.

69.     The House partially complied and produced records held on its government email server, which largely duplicated Gov. Ducey's disclosure.  Unique documents produced included (1) emails State Senator Lisa Otondo sent from her legislator email account lotondo@azleg.gov to "all House and Senate members" on January 11, 2018 asking legislators to "[p]lease join me and Sen. Robert Meza as we host the Board members of [NP4] for lunch on Tuesday January 16 at 11:30am – 1:00pm in Senate Dem. Caucus Rm. 2. ... Please RSVP to my assistant, Barb Wellman."; and (2) a January 10, 2017 email string Meza sent from his rmeza@azleg.gov email account to U.S. Senator Sinema's District Director requesting the Senator support NP2's $5,297,489 application for U.S. Dept. of Health and Human Services grant #HHS-2016-ACF-OHS-HP-118 (*see* Exhibit L).  Those emails did not disclose that NP2 and NP4 were paying Meza.

70.     But the House argued it was under no statutory obligation to search beyond its email servers for public records involving an A.R.S. § 39-121.01(A)(1) Officer. Plaintiff could locate no other A.R.S. § 39-121.01(A)(2) Public Body that had ever taken such a position which also appeared contrary to precedent and statutory language.

71.     Meza eventually produced two documents after the Governor's and the House's production demonstrated that, in emails sent from his legislator email address, Meza directed state officials to his personal cell phone to conduct business.  Those two un-dated documents were signed "Arizona State Senator Robert Meza", written on "Arizona State Senate" letterhead referencing "ROBERT MEZA, ARIZONA STATE SENATE, DISTRICT 30", and sent to U.S. Senator Sinema and U.S. Congressman

25

Stanton to their government staff at their staff's federal government email addresses. Under the artifice of a benevolent legislator, and under color of office, those two letters invited Senator Sinema and Congressman Stanton to be honored guests at a 2019 NP4 event. The letters also pointed to Meza's involvement with NP4, to public policy matters ("advocating for behavioral health issues"), to Governor Ducey's 2018 NP4 event appearance, to Meza's role organizing NP4 events, and to the "400 attendees" who regularly attended those events. See Exhibit M.[18]  Meza did not disclose his private pay.

72.    On September 15, 2022, Meza signed an affidavit that he never produced or maintained public records on his personal phone (602-421-1702) or via his personal email address (mezand86@gmail.com).

a.    But on information and belief, and evidence obtained, Meza routinely solicited and secured funds from registered lobbyists and corporate executives on behalf of the Nonprofits via his personal email and his personal phone's text messaging features and loaded "apps". For example, on or about February 5, 2020, Meza sent texts to Arizona Cardinals corporate officials, under color of office, asking to meet in his

---

[18]    Senator Sinema and Congressman Stanton were unaware of Meza's private payments, meaning they were defrauded by omission into appearing. Their appearance, in turn, boosted NP4 sponsorships and ticket sales. See State v. Henry, 205 Ariz. 229, ¶17, 68 P.3d 455 (App. 2003) ("The definition of 'fraud' must be broad enough to cover all of the varieties made possible by boundless human ingenuity"). Unwary corporate sponsors were also defrauded by omission, as were persons who purchased individual even tickets. Event tickets cost $150, and sponsorships cost between $5,000 and $25,000 (see Exhibit N). As part of the Scheme, Meza facilitated at least ten Nonprofit fundraising events by soliciting and securing event sponsorships which benefitted (1) NP2 in October 2016; (2) NP3 in Spring 2015, 2016, and 2017; (3) NP4 in March 2016, 2017, 2018, and 2019; (4) NP5 in February 2020; and (5) NP6 in May 2021. On the basis that each event attracted 400 guests at $150 per ticket, and presumably 10% of those guests were aware of Meza's private payments, more than 3,500 members of the local philanthropic community were defrauded out of $525,000. Unwary corporate sponsors additionally were defrauded out of tens of thousands, if not hundreds of thousands, of dollars.

government office for the purpose of soliciting NP5 sponsorship funds. Corporate representative Michael Bankston met Meza in Meza's office, conveyed that the team would sponsor the February 23, 2020 NP5 event, and attended that event not knowing Meza was receiving private pay due to Meza's material omissions (*see* Exhibit O).

　　　b.　　Likewise, on or about October 1, 2016, Meza sent texts to corporate lobbyists under color of office for the purpose of soliciting NP2 sponsorship funds. As a result, State Farm lobbyist Gus Miranda went to Meza's office, agreed to sponsor the NP2 fundraiser, and secured $2,500 for NP2 on October 4, 2016 not knowing Meza was receiving private pay due to material omissions: "Sen. Meza did not mention receiving any type of payment or compensation from [NP2] to me" (*see* Exhibit P).

　　73.　　Robson, who was brought to suit through principles of joinder, refused to turn over documents in her actual possession but later produced seventeen (17) pages of records when confronted with Arizona appellate rulings determining private persons in actual possession of public records must produce those documents. *Fann*.

　　74.　　Per documents Robson produced on September 9, 2022, (1) Meza sent Robson a March 10, 2020 email noting her involvement in NP5 and NP6 events served the purposes of "branding [her] name quickly in the community" to bolster her campaign to become Governor; (2) Robson hosted a February 23, 2020 fundraiser for NP5 at her personal residence, and co-hosted a May 28, 2021 fundraiser for NP6 at another person's residence; (3) sponsorships for those two events ranged from $5,000 to $25,000; and (4) NP5's Chief Administrative Officer sent Robson a $5,000 invoice from her NP5 corporate email account with "Representative Robert Meza" cc'ed on that invoice, along with an email thanking her for "support of our 2020 Tournament of Hearts"; but (5) Robson

withheld records documenting her responses to Meza's communications.[19]  *See* <u>Exhibit Q</u>.

75.    Meza and Robson became aware by December 1, 2022 that Plaintiff had obtained public records from cooperative state agencies factually supporting the existence of additional public records in their actual possessions and implicating the Scheme.

TORTIOUS ACTS

<u>Meza and Robson Jointly Committed Tortious Acts</u>

76.    Seeking to shut down further records production out of concern that Plaintiff would obtain other incriminating documents, the House, along with Meza and Robson jointly moved for that court to find Plaintiff vexatious pursuant to A.R.S. § 12-3201(A) on December 12, 2022.  In support, those defendants pointed to active litigation in FC2020-090224, CV2021-017889[20], CV2021-005501, CV2021-013210, and CV2022-014146.

77.    On January 27, 2023, NP6's CEO produced an affidavit admitting that she paid Meza "for his service as a fundraiser".[21]

---

[19]    A legislator's public records include "all ... documentary materials ... *made or received*" pursuant to A.R.S. § 41-151(2).

[20]    CV2021-017889 was a personal injury case at which time that defendant had admitted 100% fault and the only determination remaining was damages calculation. Plaintiff won that case, which was clear when the A.R.S. § 12-3201(A) motion was filed.

[21]    The NP6 CEO's admission that she paid Meza for his "services as a fundraiser", coupled with documents showing that CEO assigned Meza specific AHCCCS "systems contractors" and corporate sponsors to solicit funds for events demonstrate an agreement. Evidence shows Meza approached those assigned funders under color of office continuing to work through the artifice of a benevolent legislator supporting his constituents.  Again, constituent support is an "official act" that legislators perform.  *See Fann*.  Accordingly, under a "meeting of the minds" agreement between Meza and the NPC CEO, the NP6 CEO paid Meza in return for performing "official acts"; a proscribed *quid pro quo* agreement.  *See United States v. Householder, et a*l., No. 1:20-cr-00077, pp. 13-20 (2nd Cir., May 6, 2025) (*per curiam*) (To violate "Hobbs Act extortion ([]28 U.S.C. § 1951) and honest services fraud ([] 28 U.S.C. §§ 1343, 1346) ... the Supreme Court has told us that extortion under color of official right requires that a public official 'receive[] a payment in return for his agreement to perform specific official acts.' ... In other words, the Court has required the government to show a *quid pro quo* agreement: that the official

28

78.     That affidavit directly contradicted Meza's January 7, 2022 CV2021-013210 court filing where, in his private capacity, he avowed the Nonprofits were "constituents" that he supported as a legislator but they only paid him "for advice".

79.     Regardless, on February 27, 2023, the CV2022-008626 court issued an order (the "Order") finding Plaintiff statutorily vexatious per A.R.S. § 12-3201, enjoining him from filing court papers "in this case or any other pending civil action without prior leave of the judge assigned to that case", and subjecting him to an A.R.S. § 12-3201(B) blanket injunction ("A pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court.").

80.     Meza, Robson, and the House knew when they filed the A.R.S. § 12-3201(A) motion that A.R.S. § 12-3201 was patently unconstitutional in every application but used the statute for the unlawful purposes of intimidating Plaintiff and retaliating against him for exercising his rights under the Petition Clause and the Speech Clause.

81.     Meza and Robson used A.R.S. § 12-3201 for the additional unlawful

---

received a payment (the quid) and in return agreed to take official action (the quo). The Court's *quid pro quo* requirement also applies to honest services fraud. ... And bribery has long proscribed an official from receiving something of value 'in return for' official action. 18 U.S.C. § 201(b)(2). ... [S]ince an agreement can be informal, unwritten, or implied, the government can prove the existence of the *quid pro quo* with circumstantial evidence. Otherwise, anyone could frustrate the law by 'knowing winks and nods.' ... Thus, a jury can infer an agreement from what the participants 'say, mean and do.' ... In sum, Hobbs Act extortion and honest services fraud require the government to show a *quid pro quo* – that is, the official received money in exchange for a promise to take specific official action.") (Internal citations omitted). The factual elements are sufficient to establish Meza violated 28 U.S.C. §§ 201(b)(2), 1951, and 1346. It is of no moment whether the Nonprofits' funders knew that a portion of the funds they provided would be returned to Meza through Ameliorate. Funders with knowledge of the Scheme were complicit while those without knowledge would have been defrauded. If more specificity is required regarding Meza's performance of official acts, Governor Ducey expressly confirmed that Meza often approached him as a "lawmaker" seeking specific allocations and discretionary funds, such as P90 funds, made available to legislators.

purpose of concealing criminal conduct and obstructing investigations into the Scheme.

82.     Meza and Robson jointly and continuously prosecuted the A.R.S. § 12-3201(A) motion over months of trial and appellate proceedings where the December 12, 2022 motion was initially granted, the resulting injunctive Order was then stayed on appeal over defendants' objections, and the motion and Order were subsequently argued through appeal until defendants jointly filed their Answering Brief on October 10, 2023.

Ortega Committed Tortious Acts In Concert With Meza

83.     On August 25, 2021, and with full knowledge of the Scheme and of the NP1 CEO's disclosure to the House two days prior (which Meza attended), Ortega and Meza's counsel (and Meza himself, on information and belief) conferred via phone and email. During that communication, and in a series of communications dating back to April 2020, Ortega and Meza agreed (1) to intimidate Plaintiff, and (2) to pre-emptively discredit and damage him via factual misrepresentations presented in court filings; both in attempt to prevent criminal investigations into Meza and TD, and both serving as an extension of the Scheme agreement's second object.  These efforts included the concerted use of, and the overt acts of filing, A.R.S. § 12-3201(A) motions across suits.

84.     Ortega thereafter filed two unsuccessful A.R.S. § 12-3201(A) motions in CV2021-013210 on November 17, 2021 and June 23, 2022, while repeatedly referring to those motions in CV2021-005501 proceedings.  Meza then persuaded the CV2022-008626 defendants to jointly file their December 12, 2022 A.R.S. § 12-3201(A) motion.

85.     In parallel, upon learning on October 2, 2021 that TD was under FBI and DHS investigation, and in another attempt to intimidate Plaintiff and to unlawfully learn details about the federal investigations, Ortega demanded in an October 6, 2021 FC2020-090224 court filing that Plaintiff "disclose all communications with FBI Agent France and

Homeland Security" or face a contempt petition seeking his incarceration.[22]

86.    As time progressed, the Court of Appeals granted Plaintiff a new trial on remand and separately granted him special action relief assigning a new judge to the FC2020-090224 case.  Appellate instructions issued August 23, 2023 required discovery be re-opened, including for documents production and the right to depose TD on financial matters and on the "anonymous" attacks launched against Plaintiff's business interests.

87.    As she had done from the outset, Ortega continued to withhold statutorily mandated and appellate ordered financial records production.  On court order, she produced partial documents in rolling fashion between July 31, 2024 and April 10, 2025, but with blanket redactions for the unlawful purpose of concealing financial information that the Arizona Child Support Guidelines and court orders required her to provide, but that implicated TD's and Meza's Scheme participation.

88.    Producing documents behind schedule and facing an August 19, 2024 deposition, Ortega requested a protective order on August 14, 2024.  She asked that court to order "all financial information disseminated in this matter be limited to use in this family Court matter and not to be disseminated to third parties for any reason without order of the Court allowing such over threat of sanctions and finding of contempt."

89.    Government investigators were the "third parties" that concerned Ortega,

---

[22]    *See U.S. v. Liew,* 856 F.3d 585 (9th Cir. 2017) (Civil litigation becomes a criminal matter when defense tactics go beyond "a general, legal denial of guilt" and conceal prior criminal conduct);  *U.S. v. Volpendesto,* 746 F.3d 273, 286 (7th Cir. 2014) (Efforts to obtain investigative information from sources other than the investigative agency are "not efforts merely in service of curiosity, but out of desire to influence what evidence" might come before a court knowing "information collected during the investigation would, in turn, be presented to the" proceeding, and thus merit obstruction charges); *General Dynamics Corp. v. Selby Mfg. Co.*, 481 F.2d 1204, 1213 (8th Cir. 1973) (There is no "legal right to the fruits of the FBI's investigative endeavors … 'civil discovery is not intended to be a 'back door' method of accomplishing criminal discovery").

and she attempted to intimidate Plaintiff with threats of sanctions and findings of contempt should Plaintiff share any "financial information" that might evidence financial crimes although that same evidence was statutorily required to calculate child support.

90.     During the August 19, 2024 FC2020-090224 deposition, (1) Ortega improperly lodged 188 objections, the vast majority of which were talking objections and disguised instructions directing TD to evade response (e.g., "don't answer if you don't want to"); (2) she unlawfully instructed TD not to answer relevant questions going to financial matters, to EBMC's revenue, and to TD's professional history; and (3) when Plaintiff questioned TD regarding her knowledge of anonymously sent messages, Ortega unlawfully instructed TD to walk out of the deposition.  Those acts were all taken to obstruct investigations and conceal information implicating TD and Meza in the Scheme.

91.     But that court instructed TD to answer those questions at an April 14, 2025 evidentiary hearing, to which TD falsely stated she never bought or used the Cricket burner phone, *inter alia*.  Federal authorities took physical possession of that phone and, on information and belief, have confirmed that it belonged to, and was used by, TD.

92.     In preparation for inevitable documents production and deposition appearance, Ortega also instructed TD to present the A.R.S. § 12-3201 Order from CV2022-008626 to the Arizona Secretary of State on or about April 10, 2024 seeking to have the State identify Plaintiff as an A.R.S. § 13-3601 Domestic Violence perpetrator per A.R.S. § 41-161, *et seq.*[23]  The Secretary of State Office's personnel did just that.

---

[23]     A.R.S. § 41-161, *et seq*. governs the Arizona Address Confidentiality Program where A.R.S. § 41-161(5) verified victims of A.R.S. § 13-3601 criminal domestic violence can keep an address confidential upon relocation.  See A.R.S. § 41-161(2); A.R.S. § 41-162.  TD declared to an A.R.S. § 41-163(B) "application assistant" and made an A.R.S. § 41-161(C)(11) sworn statement submitted "under penalty of perjury" that Plaintiff had been convicted of committing A.R.S. § 13-3601 domestic violence.

93.     Ortega instructed TD to take those actions for the improper purposes of bolstering ongoing efforts to delay, block, and/or limit financial documents production which might prove financial crimes.

94.     To serve that unlawful purpose, on May 10, 2024, Ortega entered A.R.S. § 41-163(D) "address confidentiality program authorization cards" as exhibits attached to motions in the ongoing FC2020-090224 discovery dispute.

95.     TD confirmed during the forementioned August 19, 2024 deposition that she pursued the A.R.S. § 41-161, *et seq*. action based solely on a mention of "harassment" in the A.R.S. § 12-3201 Order – an order to which she was not party – and where the supposed harassment occurred only via court filings in meritorious litigation.

96.     Following his former attorney's prescient warnings, Plaintiff has only had very brief, publicly monitored physical or electronic contact with TD since January 2020, by design.  Ortega therefore had no factual or legal basis to instruct TD to accuse Plaintiff of being an A.R.S. § 13-3601 perpetrator via the A.R.S. § 41-161, *et seq*. action.

97.     The Arizona Secretary of State now holds official records identifying Plaintiff as an A.R.S. § 13-3601 Domestic Violence perpetrator, although Plaintiff has never committed an act of domestic violence.

98.     Despite the A.R.S. § 12-3201 Order, including the A.R.S. § 12-3201(B) blanket provision, Plaintiff plans to file court papers absent leave of the court in ongoing FC2020-090224 and CV2021-005501 litigation, and in this suit.  For doing so, he is being threatened with, and reasonably fears, administrative, civil, and/or criminal enforcement of A.R.S. § 12-3201, including where filing court papers in well-founded lawsuits is being unlawfully postured as violations of A.R.S. § 13-2810(A)(2) Interfering With Judicial Proceedings and/or A.R.S. § 13-2921 Harassment, which enforcement authorities in turn

can then cite as predicates to prosecute A.R.S. §§ 13-3601 and 13-3602.[24]

## PARTIES, JURISDICTION, AND VENUE

99.     Plaintiff Phillip Potter resides in Scottsdale, Arizona.

---

[24]     Should there be a question of whether the pleading meets the Fed. R. Civ. P. Rule 9 requirement for "particularity" of facts documenting the alleged underlying criminal fraud which motivated Meza's, Robson's, and Ortega's conduct, Plaintiff asks the Court to either (1) permit Plaintiff to conduct limited discovery to extract facts under the exclusive control of corporate entities, and amend the complaint; or (2) consider the facts and "circumstances constituting fraud" sufficient to apprise defendants of the "the time, place and nature of the alleged fraudulent activities" under either one of two "relaxed" fraud standards that the Ninth Circuit recognizes. *CMB Infrastructure Grp. IX, LP v. Cobra Energy Inv. Fin., Inc.,* 572 F. Supp. 3d 950, 969-70 (D. Nev. 2021) (citing *Wool v. Tandem Computers Inc.,* 818 F.2d 1433, 1439-40 (9th Cir. 1987)). Rule 9(b) "may be relaxed" in one of two situations, both applicable here. First, the Rule "may be relaxed as to matters within the opposing party's knowledge [especially in cases involving] corporate fraud, [where] plaintiffs will not have personal knowledge of all of the underlying facts [and may not be able to] attribute particular fraudulent conduct to each defendant." *Id.* This standard only requires plaintiffs to plead "facts on which the belief is founded and include the misrepresentations themselves with particularity and, *where possible,* the roles of the individual defendants in the misrepresentations." *Id.* The fraud alleged here involves corporate fraud conducted via Ameliorate and the Nonprofits, meaning the "relaxed" corporate-fraud standard applies. Second, Rule 9(b) is "relaxed" in "fraud by omission claims, which do not require the same level of specificity required by a normal fraud by misrepresentation claim". *See Washington v. Baenziger*, 673 F. Supp. 1478, 1482 (N.D.Cal. 1987) ("Where the fraud consists of omissions on the part of the defendants, the plaintiff may find alternative ways to plead the particular circumstances of the fraud. [F]or example, a plaintiff cannot plead either the specific time of the omission or the place, as he is not alleging an act, but a failure to act."); *see also MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1096 (N.D. Cal. 2014) ("Because the plaintiffs are alleging a failure to act instead of an affirmative act, the Plaintiffs cannot point out the specific moment when the Defendant failed to act."). Meza and the Nonprofits' complicit executives relied extensively on material omissions of Meza's private pay when soliciting public funds from elected officials and state agencies, and when soliciting supplemental private funds from lobbyists and corporate officials. Accordingly, the "relaxed" fraud-by-omission standard also applies. Should greater particularity be deemed necessary, easily discoverable facts under the control of Ameliorate, LLC include (1) corporate bank accounts through which funds were transferred and deposited; (2) exact dates and amounts of financial transactions; (3) the terms of written contracts and oral agreements which governed those transactions; and (4) communications that resulted in the transactions.

100.    Defendant Robert Meza resides in Phoenix, Arizona. He is a former State Senator and State House member who held legislative office from January 2003 through January 2023. He is sued in his private capacity.

101.    Defendant Karrin Taylor Robson resides in Phoenix, Arizona. She is a former Arizona Board of Regents member who held that position between June 2017 and February 2022, and was a candidate in the August 2022 primary election campaign to become the Governor of Arizona. She is sued in her private capacity.

102.    Defendant Alane Ortega resides in Phoenix, Arizona. She is TD's attorney in FC2020-090224 and CV2021-005501, and has an extensive disciplinary record. For instance, on April 14, 2021, the Discipline Probable Cause Committee of the Supreme Court of Arizona found that "in several cases and in several forums", Ms. Orega "violated the following Rules of the Supreme Court of Arizona: Rule 42, Ariz. R. Sup. Ct., ERs, 1.2, 1.3, 3.1, 3.2, 3.4(c), and 8.4(d)", including in case cv-15-00357 before the U.S. District Court for the District of Arizona where, on December 5, 2016, the Hon. John J. Tuchi issued an order admonishing her for knowingly "furthering a [client's] falsehood".

103.    Defendant Kris Mayes is the Arizona Attorney General. She is sued in her official capacity. As the state's chief legal officer, Attorney General Mayes ("AG Mayes") is charged by Ariz. Const. art., 5 § 9, A.R.S. § 41-192, A.R.S. § 41-193, and other authorities with guaranteeing that state laws are uniformly and adequately enforced. For instance, A.R.S. § 41-193(A)(2) provides that AG Mayes may "prosecute and defend any proceeding in a state court other than the supreme court in which this state or an officer of this state is a party or has an interest". And A.R.S. § 41-193(A)(5) grants her the authority to "if deemed necessary, assist the county attorney of any county in the discharge of the county attorney's duties", providing AG Mayes the power to deputize

35

herself with county prosecutor criminal enforcement authorities.  She has the authority to

prosecute A.R.S. § 13-2810(A)(2) which makes it criminal to "disobey[] a lawful court

order", including any A.R.S. § 12-3201 order (if "lawful"), and to prosecute A.R.S. § 13-

2810(A)(2) violations as an A.R.S. § 13-3601 predicate.  Likewise, Ariz. Const. art., 2 §

2.1 and A.R.S. § 13-4433(D) provide AG Mayes with civil enforcement powers over

A.R.S. § 12-3201(B) violations as A.R.S. § 13-2810(A)(2) predicates for an A.R.S. § 13-

3602(A) civil protective order.  A.R.S. § 13-2810 directly connects the Attorney General's

civil and criminal enforcement powers with every state court order, and with every

statutory basis underlying every order, including A.R.S. § 12-3201 orders, sufficient to

invoke Article III jurisdiction.  *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376

F.3d 908, 919 (9th Cir. 2004) ("[A] mere scintilla of enforcement" connection is sufficient

to invoke article III jurisdiction under *Ex parte Young*).

104.    Defendant Joseph Welty is the Presiding Judge of the Maricopa County

Superior Court.  He is sued in his official *administrative* capacity only.  "Enjoining a

statewide official under *Young* ... is appropriate when there is a realistic possibility the

official will take legal or *administrative* actions against the plaintiff's interests."  *Doe v.

DeWine,* 910 F.3d 842, 848-49 (6th Cir. 2018) (emphasis added) citing *Ex parte Young,*

209 U.S. 123 (1908).  The Presiding Judge's connection to the administrative enforcement

of A.R.S. § 12-3201 is grounded in Ariz. Const. art. 6 § 11 ("Presiding judges shall

exercise administrative supervision over the superior court and judges thereof in their

counties") and in A.R.S. § 12-3201(A) ("[T]he presiding judge of the superior court ...

may designate a pro se litigant a vexatious litigant").  Judge Welty "may designate a pro

se litigant a vexatious litigant" at any time without warning or recourse by issuing an

unappealable administrative order adding Plaintiff to Arizona's "Vexatious Litigant

List".[25] *See Madison v. Groseth,* 230 Ariz. 8, 13, ¶ 16 n.8 (App. 2012) (Noting Arizona appellate courts does not have appellate jurisdiction over administrative orders). Presiding Judge Welty has a sufficient connection to the administrative enforcement of A.R.S. § 12-3201 to invoke Article III jurisdiction.

105.    Doe Defendants 1 through 60, inclusive, are persons sued herein under fictitious names as their true names, capacities, and sources of liability are presently unknown.  Plaintiff will amend this complaint to designate the true names, capacities, and sources of liability of these parties when the same have been ascertained.  Plaintiff is informed and believes, and on that basis alleges, that Doe Defendants 1 through 60 were agents or alter egos of Defendants, or are otherwise responsible for any acts alleged. Plaintiff is informed and believes, and on that basis alleges, that the actions of Does 1 through 60, as alleged herein, were duly ratified by named Defendants, with each Doe acting in concert per agreement or acting as the Defendant's agent, alter ego, or facilitator.

106.    The Court has jurisdiction (1) under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, thus raising federal questions; (2) to decide declaratory and injunctive relief as authorized by 28 U.S.C. §§ 2201 and 2202; and (3) under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws and statutes of the State of Arizona, of fundamental rights secured by the United States Constitution.  For the above reasons, the Court also has jurisdiction over state claims factually intertwined with federal claims.

107.    A case and a controversy exist between the parties on federal claims authorized under 42 U.S.C. § 1983 (Meza, Robson), on factually intertwined state claims (Meza, Robson, Ortega), and on federal claims for prospective relief (Mayes, Welty)

---

[25]        See https://tinyurl.com/2x4unmjx.

authorized under 28 U.S.C. §§ 2201 and 2202 based on a First Amendment facial challenge to A.R.S. § 12-3201[26] to invoke U.S. Const. art. III, § 2 jurisdiction.

108.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to Plaintiff's claims occurred in this district.

## STANDING

109.     "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013).

110.     AG Mayes threatens to cause Plaintiff to suffer First, Fifth, and Fourteenth Amendment fundamental rights deprivations, creating "concrete, particularized, and ... imminent" injuries, by definition.  *Nebraska Press Ass'n*; *Melendres*.  "[T]he 'fairly traceable' and 'redressability' components for standing overlap and are 'two facets of a single causation requirement.'"  *Washington Env't Council v. Bellon,* 732 F.3d 1131, 1146 (9th Cir. 2013). "Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last [or first] link in the chain".  *Mendia v. Garcia,* 768 F.3d 1009, 1012 (9th Cir. 2014).  "What matters is not the 'length of the chain of causation, but rather the plausibility of the links that comprise the chain.'"  *Nat'l. Audubon Soc'y., Inc. v. Davis,* 307 F.3d 835, 849 (9th Cir.2002).  As a demonstration of traceability and redressability, if the Court enjoins AG Mayes from civilly and criminally enforcing Plaintiff's non-adherence to A.R.S. § 12-3201(B) as any

---

[26]     A "plaintiffs' facial challenge [i]s not 'inextricably intertwined' with the judicial decision of the local court [if] it [i]s a general challenge to the constitutionality of" a statute.  *Noel v. Hall*, 341 F.3d 1148, 1157 (9th Cir. 2003).  Therefore, this facial challenge to A.R.S. § 12-3201 is not subject to the *Rooker-Feldman* doctrine. *Id.*

form of A.R.S. §§ 13-3601 or 13-3602 predicate then Plaintiff will not suffer additional

irreparable injuries from indictment, prosecution, and incarceration, or separation from his

son.  Plaintiff has standing to bring suit for prospective relief against AG Mayes.

111.    Presiding Judge Welty threatens to cause Plaintiff to suffer additional First

and Fourteenth Amendment fundamental rights deprivations under the Petition Clause –

"imminent" irreparable injuries, by definition.  As a demonstration of traceability and

redressability, if the Court enjoins Presiding Judge Welty from administratively enforcing

A.R.S. § 12-3201(A), then Plaintiff will not suffer further denial of access to the courts by

being placed on the Vexatious Litigant List.  Plaintiff has standing to bring suit for

prospective relief against Presiding Judge Welty.

112.    Defendants Meza, Robson, and Ortega have intentionally and directly

caused irreparable and compensable injuries which are "concrete, particularized, and

actual ...; fairly traceable to the challenged action[s]; and redressable by a favorable

ruling."  Plaintiff has standing to bring suit for damages, including compensable and

punitive damages, against Defendants Meza, Robson, and Ortega.

## COUNT ONE
### DECLARATORY AND INJUNCTIVE RELIEF
### FIRST AMENDMENT FACIAL CHALLENGE TO A.R.S. § 12-3201
### VIOLATION OF U.S. CONST. AMENDS. I (PETITION CLAUSE) AND XIV
### [Mayes and Welty]

113.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully

set forth herein.

114.    The First Amendment is applicable to states via the Fourteenth Amendment.

115.    Whether due to the significant costs of litigation or other factors, pro se

litigants account for a large and growing percentage of Arizona court actions where "as

many as 70% or more of all litigants in the Family Court proceedings are self-represented,

39

the highest number among all departments in the [Maricopa County Superior] Court".[27]

116.    The Arizona Legislature passed A.R.S. § 12-3201 in 2014 purportedly to provide a statutory authority that codified and complemented courts' inherent authority to manage their dockets in the government interest of judicial efficiency.

117.    A February 10, 2025 "A.R.S. § 12-3201" keyword search shows pro se litigants have challenged an A.R.S. § 12-3201 designation in thirty-three (33) appeals.

118.    There is no telling how many A.R.S. § 12-3201 injunctions were never appealed or, worse yet, how many times attorneys threatened pro se litigants with a vexatious litigant injunction to unjustly prevent the prosecution of civil actions.

119.    Appellate courts have affirmed A.R.S. § 12-3201 plain language permits trial courts to permanently enjoin a pro se litigant from ever filing court papers of any type based solely on instances of sanctionable conduct within non-final lawsuits, even when the litigant presents as the _**defendant**_ party.  *See Gainey Ranch Community Assoc, v. Kraft*, No. 1 CA-CV 18-0179, ¶¶ 32, 34 (Ariz. Ct. App. 2019) (mem. decision) ("[Defendant] Kraft also challenges the superior court's ruling designating him a vexatious litigant, arguing that the court failed to specify any filing made for purposes of harassment or without substantial justification. ... [The Court of Appeals affirmed because] Kraft's filings repeatedly 'rehash[ed]' issues that had already been addressed"); *Parsons v. Harris*, No. 1 CA-CV 24-0324, ¶¶ 3, 9 (Ariz. Ct. App. Dec. 10, 2024) (mem. decision) ("Parsons sued Harris for defamation.  Harris filed six motions in the ten-month period after he was served with the defamation complaint.  None of these motions had merit, ... We affirm the court's designation of [Defendant] Harris as a vexatious litigant.").

---

[27]    See https://superiorcourt.maricopa.gov/posts/press-releases/2023/informal-trial-format-assists-self-represented-litigants-in-family-cases/.

120.    There is no record showing that the facial constitutionality of A.R.S. § 12-3201 (the "Statute") has ever been challenged in state court or federal court.

121.    Plaintiff presents a First Amendment facial challenge to A.R.S. § 12-3201, which went into effect January 1, 2015, and reads in full:

> A. In a noncriminal case, at the request of a party or on the court's own motion, the presiding judge of the superior court or a judge designated by the presiding judge of the superior court may designate a pro se litigant a vexatious litigant.
> B. A pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court.
> C. A pro se litigant is a vexatious litigant if the court finds the pro se litigant engaged in vexatious conduct.
> D. The requesting party may make an amended request at any time if the court either:
> 1. Determined that the party is not a vexatious litigant and the requesting party has new information or evidence that is relevant to the determination, even if there is not a pending case in the court.
> 2. Did not rule on the original request during the pendency of the action, even if there is not a pending case in the court.
> E. For the purposes of this section:
> 1. "Vexatious conduct" includes any of the following:
> (a) Repeated filing of court actions solely or primarily for the purpose of harassment.
> (b) Unreasonably expanding or delaying court proceedings.
> (c) Court actions brought or defended without substantial justification.
> (d) Engaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant.
> (e) A pattern of making unreasonable, repetitive and excessive requests for information.
> (f) Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation.
> 2. "Without substantial justification" has the same meaning

1    prescribed in section 12-349.[28]

2

3    122.    The Statute's language is lifted almost verbatim from the state's sanctions

4    statute, A.R.S. § 12-349, which reads in pertinent part:

5        [I]n any civil action commenced or appealed in a court of
         record in this state, the court shall assess reasonable attorney
6        fees, ..., if the attorney or party does any of the following:
         1. Brings or defends a claim without substantial justification.
7        2. Brings or defends a claim solely or primarily for delay or
         harassment.
8        3. Unreasonably expands or delays the proceeding.
         4. Engages in abuse of discovery.
9

10

11    123.    The Statute violates due process, and the vagueness and overbreadth

12    doctrines. *Grayned v. Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222,

13    227 (1972) ("[W]e insist that laws give the person of ordinary intelligence a reasonable

14    opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may

15    trap the innocent by not providing fair warning.  Second, if arbitrary and discriminatory

16    enforcement is to be prevented, laws must provide explicit standards for those who apply

17    them.  A vague law impermissibly delegates basic policy matters to policemen, judges,

18    and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of

19    arbitrary and discriminatory application.  Third, but related, where a vague statute 'abut[s]

20    upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the

21    exercise of [those] freedoms.'  Uncertain meanings inevitably lead citizens to 'steer far

22    wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly

23    marked.'"); *Moody v. NetChoice, LLC,* 144 S. Ct. 2383, 2397 (2024) (A state law is

24    overbroad if it "lacks a plainly legitimate sweep. ... [W]hen a facial suit is based on the

25

26    _____

[28]    Per "section 12-349[F]", "'without substantial justification' means that the claim or
defense is groundless and is not made in good faith".

42

First Amendment, ... [the law is also void if] 'a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'").

### THE STATUTE VIOLATES THE OVERBREADTH DOCTRINE

A.R.S. § 12-3201 Lacks A Plainly Legitimate Sweep Per *Noerr-Pennington*

124.    Any state statute which purports to carve out a path to enjoin litigation implicates the First Amendment right of access to courts.[29]  *Ringgold-Lockhart v. County of Los Angeles,* 761 F.3d 1057, 1061-62 (9th Cir. 2014) (Vexatious litigant injunctions implicate rights protected by the Petition Clause since such injunctions' "pre-clearance requirement imposes a substantial burden on the free-access guarantee" under the First Amendment); *see Delew v. Wagner,* 143 F.3d 1219, 1222 (9th Cir. 1998) ("[T]he right of access to the courts is a fundamental right protected by the Constitution.").

125.    Speaking to overbreadth, the U.S. Supreme Court established the "plainly legitimate sweep" for any statute that makes litigation subject to injunction.  Specifically, the litigation in question must be *both* objectively baseless *and* motivated by an improper purpose.  *Bill Johnson's Rests., Inc. v. N.L.R.B.,* 461 U.S. 731, 743-44 (1983) ("[A]n 'improperly motivated' lawsuit may not be enjoined ... unless such litigation is '[objectively] baseless.'"); *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-62, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (The Petition Clause guarantees litigation "may not be enjoined" unless the suit is *both* "objectively baseless" *and* filed for an "improper, malicious purpose"); *BE & K Constr. Co. v. N.L.R.B.,* 536 U.S. 516, 531, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) (Litigation may be enjoined only if "both

---

[29]    Arizona courts and the Ninth Circuit treat vexatious litigant pre-filing restrictions as a species of injunction.  *Moy v. United States,* 906 F.2d 467, 470 (9th Cir. 1990); *Madison,* 230 Ariz. 8, 279 P.3d at 638-39.

objectively baseless *and* subjectively motivated by an unlawful purpose" (emphasis original); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006) (To forfeit the Petition Clause's broad protections, "*both* objective baselessness and an improper motive" must be demonstrated) (emphasis original).

126.    Defining "plainly legitimate sweep" on the U.S. Supreme Court's "objective baselessness and improper motive" standard echoes in "the *Noerr-Pennington* doctrine [which] stands for a generic rule of statutory construction, applicable to *any* statutory interpretation that could implicate the rights protected by the Petition Clause. ... [W]e must give adequate 'breathing space' to the right of petition.  ... [U]nder the breathing space principle, ... [only] 'sham litigation' [characterized by *both*] objective baselessness *and* an improper motive" must be demonstrated before becoming actionable in any form, *Id* at 931-32 (emphasis added), including via statutory injunction.

127.    At minimum, this standard – the "*Noerr-Pennington* standard" – establishes what constitutes the Statute's "plainly legitimate sweep" for enjoining a lawsuit.

128.    Pursuant to A.R.S. § 12-3201(C) and (E)(1), a "vexatious litigant" is a self-represented litigant who has engaged in "any" A.R.S. § 12-3201(E)(1)(a)-(f) "vexatious conduct".  For the Statute to possess any plainly legitimate sweep, at least one of the A.R.S. § 12-3201(E)(1)(a)-(f) provisions must meet the *Noerr-Pennington* standard and only enjoin litigation that can be properly characterized as demonstrating *both* objective baselessness *and* an improper motive.  None of those six provisions meet that standard.

129.    The Arizona Supreme Court dispositively made that determination when recently interpreting the common language between A.R.S. §§ 12-3201 and 12-349 through the lens of the Petition Claus.  *See Ariz. Republican Party v. Richer,* 257 Ariz., 210, 222, ¶ 44 (2024) (Penalizing those who bring suits "grounded in fact and law ...

inflict[s] real damage to our republic by slamming the courthouse door on citizens ...

legitimately seeking to vindicate rights").[30]

130.    That court found A.R.S. § 12-3201(E)(1)(c) language referring to "without

substantial justification" (i.e., "groundless and not made in good faith") does not mean

"groundless and made in bad faith". *Id* at 221, ¶¶ 34-37. And "bad faith" is what

characterizes litigation motivated by an "'improper purpose". *Id*. Consequently, A.R.S. §

12-3201(E)(1)(c) does not reach any improper purpose motivation as the *Noerr-*

*Pennington* standard requires. Further, language in each A.R.S. § 12-3201(E)(1)(a), (b),

and (d) "subsection provides a separate bad faith" consideration only, *Id* at ¶ 37, meaning

each of those three provisions lacks an objectively baseless consideration. *Id*.

131.    In the end, the Arizona Supreme Court determined no A.R.S. § 12-

3201(E)(1)(a)-(d) "subsection" can be read to codify the federal injunctive standard for

*both* objective baselessness *and* an improper motive.[31]

132.    The Statute thus "lacks a plainly legitimate sweep" pursuant to the *Noerr-*

*Pennington* standard, meaning it is overbroad.

133.    That said, enjoining a single *lawsuit* is fundamentally different from

enjoining a *litigant* from forever filing *any* lawsuit absent leave of the court. The latter

implicates far greater threats to the Petition Clause. Thus, a heightened standard beyond

---

[30]    *See Bragdon v. Abbott,* 524 U.S. 624, 645, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)
(When "judicial interpretations have settled the meaning of an existing statutory
provision, repetition of the same language" is presumed to incorporate that same
interpretation).

[31]    A.R.S. §§ 12-3201(E)(1)(e) ("A pattern of making unreasonable, repetitive and
excessive requests for information") and (f) ("Repeated filing of documents or requests
for relief that have been the subject of previous rulings by the court in the same
litigation") include neither a "baseless litigation" nor an "improper motive" component on
their face and thus fail the *Noerr-Pennington* standard.

*Noerr-Pennington* is required to guarantee procedural and substantive due process. The Ninth Circuit established that heightened standard in *Ringgold,* 761 F.3d at 1061-62 ("Out of regard for the constitutional underpinnings of the right to court access ... [vexatious litigant injunctions must] comply with certain procedural and substantive requirements").

134.    Built on the same line of precedent as *Noerr-Pennington*, *Ringgold* determined that courts may find a litigant vexatious and issue a narrowly tailored injunction only if there are heightened procedural and "substantive findings as to the frivolous or harassing nature of the litigant's actions." *Ringgold,* 761 F.3d at 1064.

135.    Like *Noerr-Pennington*, the improper purpose "frivolous or harassing" consideration does not come into play unless the current litigation is first determined to be "objectively baseless", meaning the complaint does not arguably contain "any genuine issue of material fact or law". *See Pro. Real Est. Invs.*, 113 S.Ct. at 61.

136.    If that threshold criterion is met, heightened procedural requirements beyond *Noerr-Pennington* trigger and court records must be reviewed for the presence of numerous objectively baseless lawsuits, all of which have reached finality through the exhaustion of appeal. *See In re Powell,* 851 F.2d 427, 432 (D.C. Cir. 1988) ("[T]he district court should be careful not to review pending cases … complaints that predated the [motion for an] injunction were still pending at the time the injunction was imposed and, as such, could not have been reviewed" for being a past baseless suit).[32]

137.    To establish that serial objectively baseless litigation is of a "harassing nature", every suit in a long series of suits must found to be both objectively baseless and filed for an improper purpose, thus demonstrating a heightened "pattern of harassment" affecting common defendants on common claims. *Ringgold,* 761 F.3d at 1060-64.

---

[32]    The Ninth Circuit recognizes *Powell* as binding authority. See *Ringgold*.

138.    In the highly unusual alternative, serial objectively baseless litigation of a "frivolous ... nature" exists when records review demonstrates an "inordinate" number of finalized frivolous[33] suits.  *Id; see Molski v. Evergreen Dynasty Corp.,* 500 F.3d 1047 (9th Cir. 2007) (Affirming a vexatious injunction when court records revealed *Molski* had filed "hundreds" of "frivolous" suits against small business owners alleging impossible facts that he suffered the same exact injuries at the same exact time but at different geographic locations, indicating an intent to coerce defendants into unjust monetary settlements).

139.    No A.R.S. § 12-3201(E)(1)(a)-(f) provision meets the Ninth Circuit's heightened standard for vexatious litigant injunctions – the "*Ringgold* Standard" – requiring *both* serial objectively baseless litigation *and* an improper purpose in the form of either an "inordinate" number of "frivolous" suits or a demonstrated "pattern of harassment" involving common defendants and claims.

Every A.R.S. § 12-3201(E)(1) Provision Lacks A Plainly Legitimate Sweep Per *Ringgold*

140.    A.R.S. § 12-3201(E)(1)(a) defines "vexatious conduct" as "[r]epeated filing of court actions solely or primarily for the purpose of harassment".

141.    This provision only considers the "separate bad faith" improper purpose motive of harassment, *see Richer* at ¶ 37, and therefore does not first detect the presence of serial objectively baseless litigation – a threshold requirement per *Ringgold*.

142.    Plain language permitting the improper purpose of "harassment" to form the entire basis for a vexatious litigant injunction also makes A.R.S. § 12-3201(E)(1)(a) overly broad since *Ringgold* requires a heightened "pattern of harassment" demonstration.

143.    Inclusion of the phrase "or primarily" confirms A.R.S. § 12-3201(E)(1)(a) is

---

[33]    "Baseless" litigation becomes "frivolous" litigation in the absence of a "reasonable inquiry" which includes fabricating facts to bring suit. *See Moore v. Keegan Mgmt. Co. (In re Keegan Mgmt. Co., Sec. Litig.),* 78 F.3d 431, 434 (9th Cir. 1996).

overbroad since "or" presents a disjunctive standard used to express an alternative or to give a choice, and the dictionary defines "primarily" as "for the most part".[34]  A court action filed "primarily for the purpose of harassment" concedes the complaint contains at least one claim which presents a "genuine issue of material fact or law", meaning the action is not objectively "baseless", and thus can neither be enjoined nor considered in the requisite historical review for finalized serial objectively baseless litigation.  *Id.*

144.    In sum, A.R.S. § 12-3201(E)(1)(a) overbroadly permits sanctionable conduct solely in the form of non-patterned "harassment" to serve as the entire basis for a statutory vexatious litigant injunction.

145.    A.R.S. § 12-3201(E)(1)(a) lacks a plainly legitimate sweep per the *Ringgold* Standard.

146.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

147.    A.R.S. § 12-3201(E)(1)(a) therefore is overbroad.

148.    A.R.S. § 12-3201(E)(1)(b) defines "vexatious conduct" as "[u]nreasonably expand[ing] or delay[ing] court proceedings".

149.    Like A.R.S. § 12-3201(E)(1)(a), A.R.S. § 12-3201(E)(1)(b) does not first determine whether the litigation in question is objectively baseless or whether there is a history of serial objectively baseless litigation, as it must per the *Ringgold* Standard.

150.    *Ringgold* also tells us that litigation "expansion" or "delay" is not a permitted improper purpose consideration for vexatious litigant injunctions; only "a pattern of harassment" or an "inordinate" number of "frivolous" lawsuits are permitted.

---

[34]    See https://www.merriam-webster.com/dictionary/primarily.

151.    The term "court proceedings" also solidifies that this particular provision casts an overbroad net since "court proceedings are not separate actions. ... [T]hey are distinct stages in the processing of the same 'action'".  *Sw. Airlines Co. v. Ariz. Dep't of Revenue,* 197 Ariz. 475, 477, ¶ 7, 4 P.3d 1018, 1020 (App.2000).

152.    The First and Fourteenth Amendments do not permit a pro se litigant to be found vexatious for unreasonably expanding or delaying "distinct stages in the processing of" a single lawsuit if that lawsuit itself is not objectively baseless and if there is not also a history of serial objectively baseless litigation.  *Ringgold.*

153.    A.R.S. § 12-3201(E)(1)(b) lacks a plainly legitimate sweep per *Ringgold.*

154.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

155.    A.R.S. § 12-3201(E)(1)(b) therefore is overbroad.

156.    A.R.S. § 12-3201(E)(1)(c) defines "vexatious conduct" as "[c]ourt actions brought or defended without substantial justification" where, per A.R.S. § 12-3201(E)(2), "without substantial justification means that the claim or defense is groundless and is not made in good faith" based on cross-referencing "section 12-349".

157.    As an initial matter, A.R.S. § 12-3201(E)(1)(c) and "section 12-349" are incompatible because A.R.S. § 12-3201(E)(1)(c) applies to "court actions" (i.e., lawsuits) while "section 12-349" expressly applies to "claim[s] or defense[s]".  "Lawsuits", not any individual "claim or defense", are the only constitutional unit of analysis that can be used to evaluate for the presence of serial objectively baseless litigation.  *Ringgold.*

158.    The Arizona Legislature enacted an overbroad (and vague) statute when conflating and cross-referencing "court actions" with "claim[s] or defense[s]".

49

159.    Further, A.R.S. § 12-3201(E)(1)(c) "or defended" language and the section 12-349 "or defense" language both present an "or" disjunctive standard, which overbroadly allows a self-represented _defendant_ to be deemed a vexatious litigant; a circumstance which common sense and the Ninth Circuit preclude given that the purpose of a vexatious litigant injunction is to protect "defendant[s] or the court" from a self-represented _plaintiff_.  *Ringgold,* 761 F.3d at 1064.

160.    Moving on, the Arizona Supreme Court dispositively opined that "without substantial justification" does _not_ include any "improper purpose" consideration for the presence of "bad faith", *Richer* at ¶¶ 37-40, and therefore violates the *Ringgold* Standard.

161.    A.R.S. § 12-3201(E)(1)(c) lacks a plainly legitimate sweep per *Ringgold*.

162.    If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

163.    A.R.S. § 12-3201(E)(1)(c) therefore is overbroad.

164.    A.R.S. § 12-3201(E)(1)(d) defines "vexatious" conduct as "[e]ngaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant".

165.    Whether a plaintiff is engaging in, or has ever engaged in, sanctionable discovery conduct provides no information as to the whether the underlying lawsuit is objectively baseless or whether there is a history of serial objectively baseless litigation. The provision, therefore, cannot meet the *Ringgold* Standard.

166.    It should also be presumed that a litigant who reached the discovery phase presented a "well-founded lawsuit", and the First Amendment does not permit well-founded lawsuits to be enjoined for any reason.  *Bill Johnson's Rests.*.

167.   A.R.S. § 12-3201(E)(1)(d) also cannot be interpreted to demonstrate any form of harassment since to do so would render A.R.S. § 12-3201(E)(1)(a) superfluous.

168.   A.R.S. § 12-3201(E)(1)(d) lacks a plainly legitimate sweep per *Ringgold*.

169.   If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

170.   A.R.S. § 12-3201(E)(1)(d) therefore is overbroad.

171.   A.R.S. § 12-3201(E)(1)(e) defines vexatious conduct as "[a] pattern of making unreasonable, repetitive and excessive requests for information."

172.   Whether a litigant makes "excessive requests for information" provides no information as to the whether the underlying lawsuit is objectively baseless or whether there is a history of serial objectively baseless litigation.  The provision, therefore, cannot meet basic *Ringgold* requirements.

173.   A.R.S. § 12-3201(E)(1)(e) also cannot be interpreted to demonstrate any form of harassment since to do so would render A.R.S. § 12-3201(E)(1)(a) superfluous.

174.   Further, "[r]equests for information" from government officials, especially information about "cronyism and conflicts of interest" or any form of public corruption represents the epitome of the fundamental right to petition the government, as well as the fundamental right of free speech in the form of political speech.  *See Dombey v. Phx. Newspapers, Inc.,* 150 Ariz. 476, 481, 724 P.2d 562, 567 (1986) (The Arizona Supreme Court determined Arizonans' fundamental rights include the right to inquire about "the quality of the conduct of [] government, including charges of cronyism and conflicts of interest involving governmental programs [which] is at the very core of 'public concern' and is protected by the [F]irst [A]mendment.").  Consequently, statutory injunctions

cannot ever be applied to legitimate exercises of the First Amendment. *See LaFaro v. Cahill,* 203 Ariz. 482, 485, ¶ 16, 56 P.3d 56, 59 (App. 2002).

175.    Also, seeking government "information" contained in public records, including for evidentiary purposes, is a legitimate and incentivized use of the Arizona public records law and therefore cannot ever be considered to have been done for any improper purpose. *Bolm v. Custodian of Records of Tucson Police Dep't.,* 193 Ariz. 35, ¶ 11, 969 P.2d 200, 204 (App.1998) ("that litigation was pending ... when [the requesting party] made his public records request does not affect the [Public Body's] obligation to comply with the Public Records Law"); *Phoenix Newspapers, Inc. v. Keegan,* 201 Ariz. 344, 351 ¶ 33, 35 P.3d 105, 112 (App. 2001) ("The core purpose of the public records law is to allow the public access to official records and other government information so that the public may monitor the performance of government officials."); A.R.S. § 39-121.02(D) (Public records are provided free of charge when the records are sought "as evidence or as research for evidence in an action in any judicial or quasi-judicial body").

176.    In that same vein, public records litigation vindicates a public right, not a private right, and therefore is not appropriate for inclusion in the requisite record review of court records to identify the presence of serially baseless litigation or for a *Ringgold* "pattern of harassment". *Powell*, 851 F.2d at 433 (public records litigation "preclude[s] consideration of the interests of the requester"); *Bolm,* 193 Ariz. 35 at ¶ 10 ("A person's right to public records ... is not conditioned on his or her showing, or a court finding, that the documents are relevant to anything").

177.    The First and Fourteenth Amendments do not permit a pro se litigant to be found vexatious for "requesting information".

178.    A.R.S. § 12-3201(E)(1)(e) lacks a plainly legitimate sweep per *Ringgold*.

179.   If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

180.   A.R.S. § 12-3201(E)(1)(e) therefore is overbroad.

181.   A.R.S. § 12-3201(E)(1)(f) defines "vexatious conduct" as "[r]epeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation".

182.   The "same litigation" language expressly, and overbroadly, permits courts to find litigants vexatious based on sanctionable conduct that occurs within a single suit; a circumstance which *Ringgold* prohibits.

183.   The provision does not require, as it must, that the underlying lawsuit be objectively baseless, or there to be a history of serial objectively baseless litigation, before the litigant is found vexatious and all litigation is forever enjoined.

184.   A.R.S. § 12-3201(E)(1)(f) also cannot be interpreted to demonstrate any form of harassment since to do so would render A.R.S. § 12-3201(E)(1)(a) superfluous.

185.   A.R.S. § 12-3201(E)(1)(f) lacks a plainly legitimate sweep per *Ringgold*.

186.   If the provision has any plainly legitimate sweep, then "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

187.   A.R.S. § 12-3201(E)(1)(f) therefore is overbroad.

A.R.S. § 12-3201(B) Is Overly Broad Per *Ringgold*

188.   Per A.R.S. § 12-3201(B), "[a] pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court"; the epitome of an overbroad injunction designed to prevent a pro se litigant from

ever filing any motion paper or complaint in any case without leave of the court.

189.    The Ninth Circuit established long ago that a vexations litigant injunction is unconstitutionally "overbroad [if] it is designed to prevent [a plaintiff] from filing any complaint in any case without leave of court". *Moy,* 906 F.2d at 471.

190.    An A.R.S. § 12-3201(B) injunction also serves as an unconstitutional complaint "screening" in every instance and thus sweeps overbroadly per the Ninth Circuit. *See Ringgold*, 761 F.3d at 1066 (An injunctive "order is too broad [if] it provides that the court 'will approve all filings'. ... [T]he district court added a screening criteria that is not narrowly tailored to the problem before it, and is in fact unworkable. ... [C]ourts cannot properly say whether a suit is 'meritorious' from pleadings alone.").

191.    A.R.S. § 12-3201(B) also unconstitutionally enjoins all future litigation in permanent, blanket fashion. *See Id* at 1067 ("In light of the constitutional concerns such pre-filing orders implicate, ... there [must be a] []sufficiently close fit between the terms of the injunction and the problem it purports to address").

192.    A.R.S. § 12-3201(B) therefore is overly broad.

A.R.S. § 12-3201 VIOLATES PROCEDURAL DUE PROCESS

193.    As a matter of U.S. Const. amend. XIV procedural due process, a pro se litigant facing a possible vexatious injunction must be afforded a fair opportunity to be heard during an evidentiary hearing in opposition to any vexatious litigant motion. *Ringgold,* 761 F.3d at 1062-63.  But the Statute contains no hearing provision on a matter affecting First Amendment rights, and thus is unconstitutional in every application

194.    Procedural due process requires fair notice and "the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 339-343 (1976).  When "the private interest that will be affected by the official action"

54

arises from the First Amendment and there is "the risk of an erroneous [permanent] deprivation of such interest", *Id*, due process demands a hearing. But the Statute has no provision requiring a hearing be conducted in opposition to an A.R.S. § 12-3201(A) motion, as it must per logic and the Ninth Circuit. *See Ringgold,* 761 F.3d at 1062-63. Accordingly, the Statute violates procedural due process in every application.

## THE STATUTE VIOLATES THE VAGUENESS DOCTRINE

195.    A.R.S. § 12-3201 is overly vague as it does not sufficiently "provide explicit standards for those who apply them ..., abut[s] upon sensitive areas of basic First Amendment freedoms,' [and] 'operates to inhibit the exercise of [those] freedoms.'"

196.    The Statute relies on imprecise language which does not provide "explicit standards" and invites "arbitrary and discriminatory enforcement".

197.    A.R.S. §§ 12-3201(E)(1)(a), (e), and (f) reference terms "repeated"[35] and "repetitive" but do not define "explicit standards" with objective precision to determine how many times specific conduct must recur before conduct becomes prohibited as "repeated" or "repetitive", and thus subject to enforcement.

198.    A.R.S. § 12-3201(E)(1)(e) also relies on the subjective term, "excessive", which means "exceeding what is usual, proper, necessary or normal".[36] This term does not provide "explicit standards" with objective precision and no self-represented litigant can be expected to discern at what point his conduct would be considered "excessive" and subject to penalty, especially the drastic penalty of the loss of access to the courts.

199.    A.R.S. §§ 12-3201(E)(1)(a) and (c) reference "court actions" (in the plural), but do not provide "explicit standards" with objective precision as to how many "court

---

[35]    "Repeated" means "renewed or recurring again and again". See https://www.merriam-webster.com/dictionary/repeated.
[36]    See https://www.merriam-webster.com/dictionary/excessive.

actions" are required before a litigant's conduct is prohibited and subject to enforcement.

200.    A.R.S. § 12-3201(E)(1)(c) relies on the term "without substantial justification" which "is judged on an objective standard of what a professional, competent attorney would do in similar circumstances." *Richer*, 547 P.3d 356, ¶ 40.  That standard does not to "give the [self-represented] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" since "ordinary" persons do not possess the "intelligence" of, or the acquired knowledge gained by, the average attorney to let them know "what a professional, competent attorney would do".

201.    A.R.S. § 12-3201(E)(1)(a), (c), (e), and (f) do not provide "explicit standards for those who enforce them" and do not "give the [self-represented] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly".  Therefore, each of those provisions is overly vague.

202.    This case also illuminates a fatal vagueness flaw across several Arizona statutes.  Specifically, "harassment" is not clearly defined, and often not defined at all.

203.    Neither A.R.S. § 12-3201(E)(1)(a) nor the provision that inspired it, A.R.S. § 12-349(A)(2), defines "harassment" which, in a legal context, should mean "[w]ords, conduct, or action . . . that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose."  Black's Law Dictionary (12th ed. 2024).  The phrase, "and serves no legitimate purpose", functions as a crucial saving clause that prohibits litigants from strategically professing "alarm[]" or "distress" to avoid being held culpable or liable in court for their misconduct, because holding people legally accountable serves a "legitimate purpose" (vindicating legal rights) regardless of how a person emotionally responds to being brought to suit.

56

204. But in everyday context, "harass" means "to annoy persistently"[37] regardless of whether that serves a "legitimate purpose" such as vindicating one's legal rights.

205. For comparison purposes, Arizona's other statute which addresses injunctions proscribing harassment defines A.R.S. § 12-1809(T)(1)(a) "harassment" as a "[a] series of acts over any period of time that is directed at a specific person and that would cause a reasonable person to be seriously alarmed, annoyed or harassed and the conduct in fact seriously alarms, annoys or harasses the person and serves no legitimate purpose." The "and serves no legitimate purpose" saving clause is present. *See LaFaro*.

206. But because A.R.S. § 12-3201(E)(1)(a) does not define harassment, persons of ordinary intelligence do not have a reasonable opportunity to know what is prohibited in judicial proceedings. The provision invites arbitrary and discriminatory enforcement, and abuts against First Amendment freedoms implicating the Petition Clause, thus forcing Arizonans to "steer far wider of the unlawful zone" out of fear of rights deprivations.

207. A.R.S. §§ 12-3201(E)(1)(a), (c), (e), and (f) are overly vague.

## COUNT TWO
### DECLARATORY AND INJUNCTIVE RELIEF
### FIRST AMENDMENT FACIAL CHALLENGE TO A.R.S. § 13-2921
### VIOLATION OF U.S. CONST. AMENDS. I (PETITION CLAUSE) AND XIV
### [Mayes]

208. Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

209. Pursuant to A.R.S. § 13-2921(A)(1), "[a] person commits harassment if the person knowingly and repeatedly commits an act or acts that harass another person or the person knowingly commits any one of the following acts in a manner that harasses: ... Contacts or causes a communication with another person by verbal, electronic,

---

[37] See https://www.merriam-webster.com/dictionary/harass.

57

mechanical, telegraphic, telephonic or written means."

210.    Per A.R.S. § 13-2921(E), "'harass' means conduct that is directed at a specific person and that would cause a reasonable person to be seriously alarmed, annoyed, humiliated or mentally distressed and the conduct in fact seriously alarms, annoys, humiliates or mentally distresses the person."  The provision, however, does not contain an "and serves no legitimate purpose" saving clause.  Accordingly, any repeating conduct that results in a reasonable person's "distress[]", regardless of whether that conduct serves a legitimate purpose, is a criminal violation under Arizona statute.

211.    The Arizona Secretary of State has accepted that a pro se litigant who files court papers that result in the opposing party experiencing (or at least expressing) emotional distress, has violated A.R.S. §§ 13-2921 and 13-3601.  The breadth of A.R.S. § 13-2921 Harassment is staggering both in sheer numbers and in societal consequences.

212.    Reasonable persons experience distress when brought to suit.  In Arizona, tens of thousands of new suits are filed each year, and it is reasonable to believe defendants experience distress as a result.  Thus, the "number" of A.R.S. § 13-2921 violations committed when a plaintiff exercises his right to petition Arizona courts for redress of grievances and the opposing party experiences distress is "substantial".

213.    The *Noerr-Pennington* doctrine requires government to give adequate "breathing space" to the right of petition.  Under the breathing space principle, only "sham litigation" characterized by both objective baselessness and an improper motive is subject to penalty, especially a criminal penalty.  But Arizona officials read A.R.S. § 13-2921 to invoke criminal penalties for petitioning the judicial branch on the basis that the opposing party voices distress, regardless of whether the petitioning serves a "legitimate purpose".

214.    Accordingly, A.R.S. § 13-2921 is an overbroad statute in violation of the

First Amendment where "a substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep."

## COUNT THREE
## DEPRIVATION OF CONSTITUTIONAL RIGHTS UNDER COLOR OF LAW
## FIRST AMENDMENT RETALIATION
## 42 U.S.C. § 1983
## VIOLATION OF U.S. CONST. AMENDS. I AND XIV
## [Meza and Robson]

215.    Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

216.    "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, ... secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress".  42 U.S. Code § 1983.  "A plaintiff may bring a Section 1983 claim alleging that public officials, acting in their official capacity, took action with the intent to retaliate against, obstruct, or chill the plaintiff's First Amendment rights."  *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

217.    Meza operated under color of law as an Ariz. Const. art. 4 House member and an A.R.S. § 39-121.01(A)(1) Officer when filing and prosecuting the A.R.S. § 12-3201(A) motion through appeal, knowing the Statute was patently unconstitutional, causing Plaintiff to be subjected to the deprivation of his First Amendment right of access to the courts.  Meza's intentional acts caused irreparable and compensable injuries, making him liable for compensable and punitive damages for acting with malicious intent to retaliate, against, obstruct, and chill Plaintiff's rights under the Petition Clause.

218.   With the same intent and result, Robson also operated under color of law as a willful participant in joint activity with Meza and the House when filing and prosecuting the A.R.S. § 12-3201(A) motion through appeal.  "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color of law' for purposes of the statute.  To act 'under color' of law does not require that the accused be an officer of the State.  It is enough that he is a willful participant in joint activity with the State or its agents,".  *United States* v. *Price,* 383 U. S. 787, 794 (1966); *United Steelworkers of America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1540 (9th Cir.1989) ("Private parties act under color of state law if they willfully participate in joint action with state officials to deprive others of constitutional rights").  For the same reasons as Meza, Robson is liable for compensable and punitive damages.

219.   "Under the First Amendment to the United States Constitution, a citizen has the right to be free from governmental action taken to retaliate against the citizen's exercise of First Amendment rights or to deter the citizen from exercising those rights in the future." *Sloman v. Tadlock,* 21 F.3d 1462, 1469-70 (9th Cir. 1994); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions").

220.   "To bring a First Amendment retaliation claim, the plaintiff must allege that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct – i.e., that there was a nexus between the defendant's actions and an intent to chill [First Amendment rights]." *Ariz. Students' Ass'n.*, 824 F.3d at 867.

221.   Pursuant to *Noerr-Pennington* and the *Ringgold* Standard, Plaintiff engaged

in constitutionally protected activity under the Petition Clause when he petitioned the government for redress of grievances, including when he sought to inspect public records containing government information of public concern.

222.    Meza's and Robson's actions would chill a person of ordinary firmness from continuing to engage in such First Amendment protected activity.  To be sure, facing a chamber of the State Legislature, a sitting House member, and a viable candidate for Governor acting in concert to jointly launch targeted attacks on one's right to petition – and then seeing those government officials coordinate with their associates to threaten incarceration and separation from one's child based on those attacks – would chill a person of ordinary firmness from continuing to engage in that protected activity.

223.    Plaintiff's exercise of his First Amendment petition rights, and his associated speech rights, were substantial motivating factors in the defendants' conduct, which was intended to chill Plaintiff's rights.  There was a clear nexus between Meza's and Robson's actions in filing and prosecuting the A.R.S. § 12-3201(A) motion, and in their intent to chill Plaintiff's First Amendment rights.  Indeed, Plaintiff's exercise of his fundamental rights uncovered evidence of Meza's pervasive misconduct and brought Plaintiff to the cusp of additional documents production demonstrating Meza's and Robson's concerted involvement with the Scheme.  To avoid that outcome, and to thwart efforts to collect evidence in any other action, Meza and Robson jointly moved to deny Plaintiff access to the courts.  Meza and Robson had no reason to file and prosecute the A.R.S. § 12-3201(A) motion other than to chill Plaintiff's First Amendment rights given that Meza's factual misrepresentations on affidavit had already induced the trial court to grant summary judgment in defendants' favor.

224.    Plaintiff became subject to adverse action when Meza and Robson jointly

61

filed and prosecuted an A.R.S. § 12-3201(A) motion for the improper purposes of unlawfully shutting down public records production to which Plaintiff had a statutory right to inspect, intimidating Plaintiff as a crime witness, obstructing state and federal criminal investigations into the Scheme, and falsely labeling Plaintiff vexatious in attempt to chill his First Amendment rights and deny him access to courts. Defendants' acts had the intended effects, subjected Plaintiff to a blanket injunction, and threatened him with civil and criminal penalties, including incarceration and loss of access to his son, should he not submit to the retaliation and abandon his fundamental right to petition.

225. The adverse action against Plaintiff would not have been taken absent the retaliatory motive.

226. Meza's and Robson's conduct violated clearly established statutory and constitutional rights of which a reasonable person would have known. Plaintiff's statutory right to inspect public records was clearly established at the time of the conduct at issue, as were his constitutional rights under the First Amendment's Petition Clause and Speech Clause, including that the fundamental right to petition was procedurally and substantively protected in the face of vexatious accusations far beyond the Statute's woefully overbroad provisions pursuant to well-established U.S. Supreme Court and Ninth Circuit precedent.

227. Meza's actions and Robson's actions "exceeded the bounds of reasonable governmental action and violated [Plaintiff's] First Amendment rights." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000).

228. Every reasonable official, and their agents or joint operators, would have understood that what he or she was doing to violate Plaintiff's constitutional rights.

229. First Amendment retaliation, especially on matters of considerable public concern, are prohibited under the utmost of circumstances.

230.    Meza's and Robson's joint A.R.S. § 12-3201(A) motion and prosecution, including their efforts to uphold the resulting Order on appeal, were not legitimate petitioning activity immunized by the Petition Clause or the *Noerr-Pennington* doctrine. Those concerted actions constitute "sham litigation" predicated on a litigant's "fraud ... misrepresentation, or other misconduct", including criminal misconduct.[38]  *See Pro. Real Est. Invs.*, 113 S.Ct. at 1928 n. 6 (quotation marks omitted).  "The line is crossed when [the litigant's] purpose is not to win a favorable judgment ... but to harass him, and deter others, by the process itself – regardless of outcome – of litigating". *Id* at 1935-36. Again, there was no "favorable judgment" to win in a public records lawsuit after the trial court denied additional records production, but Meza and Robson proceeded with efforts to forever deny and deprive Plaintiff of his fundamental right of access to courts.

231.    Meza's misconduct and malicious intent is further evident in other court filings where he provided knowing misrepresentations for the unlawful purpose of attempting to conceal the Scheme.  Again, he falsely avowed to one court that Nonprofits' executives only paid him for his "advice", although Plaintiff secured an affidavit from NP6's CEO in another court that she paid him for his "services as a fundraiser".  Meza also submitted an affidavit swearing he did not produce or maintain public records on his

---

[38]     The Ninth Circuit has adopted this consideration as stand-alone evidence of "sham litigation".  *See Relevant Grp., LLC v. Nourmand,* 116 F.4th 917, 928 (9th Cir. 2024) ("Our court has identified three circumstances in which the sham litigation exception might apply: first, where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful; second, where the conduct involves a series of lawsuits 'brought pursuant to a policy of starting legal proceedings without regard to the merits' and for an unlawful purpose; and third, if the allegedly unlawful conduct 'consists of making intentional misrepresentations to the court, litigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.'") (Internal citations omitted).  This "second" consideration tracks with the *Ringgold* "inordinate" number of "frivolous" lawsuits consideration.

personal cell phone or personal email account, but evidence demonstrated that he did.

232.    "In the adjudicatory sphere, ..., information supplied by the parties is relied on as accurate for decision making and dispute resolving.  The supplying of fraudulent information thus threatens the fair and impartial functioning of these agencies and does not deserve [*Noerr-Pennington*] immunity".  *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1260-61 (9th Cir. 1982). "There is no first amendment protection for furnishing with predatory intent false information to an ... adjudicatory body." *Id.*

233.    Meza's improper and malicious litigation tactics included numerous "intentional misrepresentations to, the court[s] and deprive[d] the litigation of its legitimacy.'" *Relevant Grp.,* 116 F.4th at 928.

234.    Plaintiff seeks compensatory damages due to fundamental rights deprivations, reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses with damages to be jointly and severally assessed against Meza and Robson for their concerted actions.

235.    "A jury [is] permitted to assess punitive damages in an action under Section 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30 (1983).  "Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266–67 (1981).

236.    Meza and Robson were motivated by evil motives and evil intent, and demonstrated reckless or callous indifference to Plaintiff's federally protected First

Amendment rights under the Petition Clause and the Speech Clause. Those defendants should be punished for their intentional and malicious actions, and to deter them and others from similar extreme conduct.

237. Plaintiff seeks punitive damages jointly and severally assessed against Meza and Robson.

**COUNT FOUR**
**ABUSE OF PROCESS**
**[Meza, Robson, and Ortega]**

238. Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

239. Arizona recognizes a common law claim for Abuse of Process. *Goldman v. Sahl,* 248 Ariz. 512 (App. 2020). "[T]he elements of abuse of process are (1) a willful act in the use of [a] judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings." *Id at* ¶ 58. "One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." *Id* at ¶ 59.

MEZA AND ROBSON

240. The proper purpose of a vexatious litigant injunction is to protect courts and defendants from enduring a series of "objectively baseless lawsuits" which also demonstrate "a pattern of harassment" on common claims and defendants. *Ringgold*.

241. Robert Meza, in his official capacity, and Karrin Taylor Robson were not party to any other lawsuit involving Plaintiff beyond CV2022-008626. Therefore, by definition, they could not have endured any effects of a series of baseless lawsuits. And neither Meza nor Robson could have suffered directly from a "pattern of harassment" since one lawsuit cannot establish a pattern.

65

242.    Further, Plaintiff never filed an objectively baseless lawsuit per *Pro. Real Est. Invs.*.  Several CV2021-013210 claims were "returned to" or abated for litigation in CV2021-005501 which is now set for trial.  Therefore, the CV2021-013210 complaint was not "objectively baseless" as it contained "genuine issues of material fact and law". *Id*.  Further, previously concealed, but now discovered, facts show no CV2021-013210 claim, much less the entire suit, was objectively baseless.  Further still, in non-final parallel litigation, Mercy Care and the AHCCCS Director knowingly misrepresented and actively concealed facts of their profit-sharing agreement to evade public records disclosure in CV2022-014146, so that suit was not "objectively baseless" and could not contribute to any calculation of an "inordinate" number of frivolous lawsuits. *Ringgold*.

243.    Meza and Robson each engaged in a willful act in the use of a judicial process when jointly bringing the A.R.S. § 12-3201(A) motion in CV2022-008626 and prosecuting the motion and resulting Order through appeal.

244.    Meza and Robson acted in concert, and jointly filed and prosecuted the A.R.S. § 12-3201(A) motion for the "ulterior purposes" of (1) retaliating against Plaintiff for exercising his First Amendment rights under the Petition Clause; (2) intimidating Plaintiff as a crime witness; and (3) obstructing criminal investigations into the Scheme.  None of those purposes are proper in the regular conduct of judicial proceedings.  But those ulterior purposes were Meza's and Robson's primary motive.

245.    Plaintiff seeks compensatory damages due to fundamental rights deprivations, reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses with those damages jointly and severally assessed against Robson and Meza.  Meza is liable in his private capacity for acts taken in his official capacity but which served his private interest. *See Goldman,* 248 Ariz. at 519,

¶ 58 ("There is no requirement that [a defendant] be a party to the proceedings.").

246.    Meza and Robson both acted out of malice. Their concerted conduct was guided by evil minds.

247.    Meza's and Robson's wrongful conduct was motivated by ill will with intentions to serve their own interests.

248.    Meza and Robson acted in concert with evil minds to commit intentional acts that injured Plaintiff and, thus, are jointly and severally liable for punitive damages.

ORTEGA

249.    Again, "[t]here is no requirement that [a defendant] be a party to the proceedings." *Goldman*.  Ortega can be held liable for her actions and for working in concert with Meza to further the Scheme.

250.    Ortega engaged in "(1) a willful act in the use of [a] judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings." *Id*.

251.    The proper purpose of "discovery is to assist the search for truth by providing the parties with all the evidence possible so that the crucial facts may be presented at trial and a just decision made.'" *Wells v. Fell,* 231 Ariz. 525, 528 ¶ 13 (2013).  "[D]iscovery, is not a game." *Id*.

252.    The only proper purpose of A.R.S. § 41-161, *et seq*. is to keep addresses confidential when genuine A.R.S. § 13-3601 victims move from one location to another.

253.    Polluting proceedings with false information, evading discovery via unlawful and improper means, and intimidating crime victims with threats of incarceration are never proper purposes for judicial proceedings, including discovery proceedings.

254.    Ortega engaged in willful acts in the use of judicial processes when (1) filing A.R.S. § 12-3201(A) motions in CV2021-005501 and CV2021-013210 per

agreement with Meza; (2) remaining silent during a FC2020-090224 November 2020 deposition knowing her client was presenting false testimony while having a duty, but refusing, to display candor[39] in an ongoing case; (3) demanding Plaintiff turn over communications he made to federal investigators and threatening him with incarceration in motion papers if he did not comply; (4) entering A.R.S. § 41-163(D) "address confidentiality program authorization cards" as exhibits in motion papers seeking to evade ordered and relevant discovery; (5) instructing TD not to answer deposition questions required on appellate remand, special action instructions, and court order; (6) instructing TD to walk out when asked relevant questions later permitted at trial; and (7) moving the FC2020-090224 court to issue a blanket order prohibiting Plaintiff from exercising his First Amendment rights under the Speech Clause and Petition Clause to speak with government officials.

255.    Ortega engaged in those willful acts for the ulterior purposes of (1) threatening Plaintiff's First Amendment rights under the Petition Clause; (2) intimidating Plaintiff as a crime witness; and (3) obstructing criminal investigations into the Scheme. None of those purposes were proper in the regular conduct of those judicial proceedings. But those ulterior purposes were Ortega's primary motive.

256.    Plaintiff seeks compensatory damages due to reputational harm, loss of

---

[39]    Ortega willfully remained silent in FC2020-090224, and therefore actively concealed the Scheme, knowing TD was presenting false testimony at a November 2020 deposition, and she willfully failed to correct the record despite maintaining an ongoing professional duty to do so. *See* Ariz. R. Sup. Ct. 42 ER 3.3; *see also U.S. v. LaPage*, 231 F3d 488, 492 (9th Cir. 2000) ("[N]o lawyer, whether prosecutor or defense counsel, civil or criminal, may knowingly present lies to a [court] and then sit idly by while opposing counsel [or party] struggles to contain this pollution"); *Wells Fargo Bank v. Arizona Laborers, Teamsters*, 201 Ariz. 474, 485, 38, ¶¶ 87-98, P.3d (2002) (Silence and other forms of material omissions constitute "active concealment", and therefore constitute fraud, when there is a duty to speak the truth).

income and wages, loss of business assets, emotional distress and fear, and pecuniary losses.

257. Ortega acted out of malice. Her conduct was guided by an evil mind.

258. Ortega's wrongful conduct was motivated by ill will with intentions to serve her own interests and interests of other persons, including Meza.

259. Ortega committed intentional and malicious acts that injured Plaintiff and, therefore, is liable for punitive damages.

<div align="center">

**COUNT FIVE**
**AIDING AND ABETTING ABUSE OF PROCESS**
**[Meza, Robson, and Ortega]**

</div>

260. Plaintiff incorporates the allegations in all preceding paragraphs as if fully set forth herein.

261. The elements of Aiding and Abetting are (1) a primary tort or violation; (2) knowledge or general awareness of the primary tort or violation; and (3) substantial assistance or encouragement of the primary tort. *Wells Fargo*, 201 Ariz. 474 at ¶ 51.

262. Meza, Robson, and Ortega each committed the primary tort of Abuse of Process.

263. Meza, Robson, and Ortega each had knowledge and general awareness of the other's tortious acts as they jointly engaged in that tortious activity in planned and coordinated fashion.

264. Meza and Robson each substantially assisted and encouraged each other to commit their primary torts, as evidenced by their joint conduct in CV2022-008626.

265. Meza and Ortega each substantially assisted and encouraged one another to commit their primary torts as evidenced by (1) Meza's and Ortega's August 2021 communications on the specific topic of filing A.R.S. § 12-3201(A) motions; (2) Ortega's

<div align="center">

69

</div>

two unsuccessful A.R.S. § 12-3201(A) motions filed in CV2021-013210; and (3) Meza's May 2022 inadvertent public admission that he was "helping" Ortega in litigation, including assisting her in her attempts to commit the torts and further the Scheme.

266.    Meza, Robson, and Ortega are liable for compensatory damages for causing Plaintiff's fundamental rights deprivations, reputational harm, loss of income and wages, loss of business assets, emotional distress and fear, and pecuniary losses.

267.    Meza, Robson, and Ortega each acted out of malice.  Their conduct was guided by evil minds.

268.    Meza's, Robson's, and Ortega's wrongful actions were motivated by ill will with intentions to serve their own interests.

269.    Meza, Robson, and Ortega acted in concert to commit intentional acts that injured Plaintiff and, therefore, are jointly and severally liable for punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court provide the following relief:

A. A judgment for declaratory relief that:

    1. A.R.S. § 12-3201 is unconstitutional pursuant to the overbreadth and vagueness doctrines, and void *en toto*; and

    2. A.R.S. § 13-2921 is unconstitutional pursuant to the vagueness doctrine; and

    3. A.R.S. § 39-121, *et seq*. public records requests vindicate public rights, not private rights, implicating First Amendment protections to such an extent that the U.S. Constitution prohibits such public records litigation from being included in any consideration, or in any court records review process, for the purposes of determining a vexatious litigant injunction.

B. A judgment for preliminary and permanent injunctive relief:

    1. Enjoining Defendant Mayes from enforcing A.R.S. § 12-3201 injunctive orders, including as any type of A.R.S. §§ 13-2810, 13-2921, 13-3601, and/or 13-3602 predicate.

C. A judgment for preliminary and permanent injunctive relief:

    1. Permanently enjoining Defendant Welty from enforcing A.R.S. § 12-3201, which also precludes issuing any administrative entering Plaintiff's name onto any vexatious litigant list or register.

D. A judgment for compensatory damages against Defendants Meza, Robson, and Ortega.

E. A judgment for punitive damages against Defendants Meza, Robson, and Ortega.

F. A judgment for taxable costs and expenses to the extent permitted by law.

F. Such other relief as may appear just and appropriate.

DATED this 12th day of May 2025.

By: _____
Phillip Potter
Plaintiff
Pro Se

VERIFICATION

I, Phillip Potter, state and swear under penalty of perjury, as follows: I have read this Complaint, and to the best of my knowledge, information and belief, the contents of this document and the statements made therein are true and correct.

_____
Date

_____
Phillip Potter

71

1    Phillip Potter
     2301 N. 66th Street
2    Scottsdale, Arizona 85257
     Phone: 480.459.0310
3    E-Mail: phillip.t.potter@gmail.com
4    Plaintiff
     Pro Se
5

6

7               **IN THE UNITED STATES DISTRICT COURT**

8                  **FOR THE DISTRICT OF ARIZONA**

9

10

11   Phillip Potter,                    No. 2:25-cv-00663-PHX-DWL
                           Plaintiff,
12
     v.
13
                                        **EXHIBITS ATTACHED TO**
14   Robert Meza, in his private        **FIRST AMENDED COMPLAINT**
     capacity; Karrin Taylor Robson, in
15   her private capacity; Alane
     Ortega; Kris Mayes, in her official
16   capacity as Arizona Attorney
     General; Joseph Welty, in his
17   official administrative capacity as
     Presiding Judge of the Maricopa
18   County Superior Court; and Does
     1-60, inclusive,
19
                           Defendants.
20

21

22

23

24

25

26

ER-145

1    <u>Exhibit A</u>

2

3    **Ashley McIver**

4    **Subject:**              P90 Committee Meeting - Senate Majority Caucus Room
     **Location:**             Teams Link below: In-Person Senator Majority Caucus Room

5    **Start:**                Mon 8/23/2021 8:30 AM
     **End:**                  Mon 8/23/2021 9:45 AM
6    **Show Time As:**         Tentative

7    **Recurrence:**           (none)

8    **Meeting Status:**       Not yet responded

     **Organizer:**            Rebecca Rios
9    **Required Attendees:**   Lela Alston; Paulino Valerio; Rebecca Rios; Reginald Bolding; Mitzi Epstein; Robert Meza;
                               Rhonda Barnes; Jeff Winkler; Brenden Foland; Sean Laux; Victoria Steele; Stephanie Stahl
10                             Hamilton; david.adame@cplc.org
     **Optional Attendees:**   Cindy Narvaez; Nikki Finch; Kathy Dominguez; Timothy Wilson; Andrea Martinez; Mary
11                             Peralta; Carmen Velarde; Dora Ramirez; Victoria Steele
                               LELA ALSTON; Paula Peyerl

12
     The meeting will take place in-person in the Senate Majority Caucus Room and via Teams for those who will join virtually
13   (link below).

14   List of participants
     In-Person:
     Sen. Rios
15   Sen. Steele
     Rep. Bolding
16   Rep. Epstein
     Rep. Meza
17   Virtual:
     Sen. Steele
18   Sen. Alston
     Rep. Stahl Hamilton
19   Guest:
     David Adame, Chicanos por la Causa
20   Staff:
     Jeff Winkler
     Rhonda Barnes
21   Paulino Valerio
     Brenden Foland
22   Sean Laux

     Andrea Martinez
23   on behalf of Senator Rebecca Rios
     602-926-3073
24

25

26

1  Exhibit B

2

3  # How To Solve America's Deadly

4  # Domestic Violence Problem And Why

5  # The Solution Might Be Found In Phoenix

6

7  ⬤ IM360 STAFF

8

   CAREY PENA REPORTS    PODCASTS

9

10  ## Listen to this Podcast Episode

11

12  

13

14  "It's a public health epidemic because it is linked to child welfare.  Millions of dollars are lost to this issue.  We

15  haven't uncovered the real impact, the trauma to men, women, children, and pets."

16  Dr. Maria Garay-Serratos is the CEO of Sojourner Center, a domestic violence shelter in Phoenix, Arizona that is
   breaking new ground both in principal and in practice.

17  The programs that Sojourner points to as successful will be discussed at the Symposium titled "A World Free From
   Domestic: Moving the Conversation".  It takes place April 14th.

18

19  "We have the Huffington Post, Forbes, Arizona Republic, Univision all talking about the issue.  Getting it to the
   global level takes away the stigma and gets people talking," says Arizona State Senator Robert Meza, who is one of

20  the featured speakers.

21

22

23

24

25

26








Exhibit C

BURCH & CRACCHIOLO, P.A.
702 E. OSBORN ROAD, SUITE 200
PHOENIX, AZ 85014
TELEPHONE 602.274.7611

Jake D. Curtis, SBA #019726
jcurtis@bcattorneys.com
Sarah N. O'Keefe, SBA #030131
sokeefe@bcattorneys.com

Jose Garay, #SBC200494
jgaray@garaylaw.com
(Pro Hac Vice Application Pending)

Attorneys for Plaintiffs

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| MARIA ELENA GARAY-SERRATOS, a married woman, ROBERT KNECHTEL, a married man, TERI HAUSER, an unmarried woman, <br><br> Plaintiffs, <br><br> v. <br><br> DAVID and STEFANIE FRANKE, husband and wife, MICHAEL and LISA KRILEY, husband and wife, DAVID and DAWN RAMIREZ, husband and wife, PATRICK and LAURA RAMIREZ, husband and wife, JEANETTE EVERETTE, an unmarried woman, TERE AND FREDERICK CAMARENA, husband and wife, JEFF and JANE DOE TREMBATH, husband and wife, STANLIE JAMES, an unmarried woman, SOJOURNER CENTER, an Arizona non-profit corporation, <br><br> Defendants. | Case No. CV2017-008728 <br><br> **PLAINTIFF TERI HAUSER'S SUPPLEMENTAL FACTS IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> (Assigned to the Honorable Daniel Kiley) |

Plaintiff Teri Hauser hereby provides supplemental facts in support of her motion for partial summary judgment.

any of the categories of for-cause termination listed in the Employment Agreement, and specifically Section 6.3(d) respecting the misappropriate of funds or property.

**D. Teri Was Not Given an Opportunity to Cure the Alleged Violation of Company Policy.**

Sojourner also claims Teri violated various company policies and procedures. Sojourner misleadingly quotes Section 6.3(b) to imply that any violation of Sojourner policy justifies for-cause termination. This section explicitly requires that Teri be provided an opportunity to cure any alleged violation at least ten days prior to termination. Sojourner has not identified any company policy of which she was made aware and given the opportunity to cure prior to her termination. In the absence of such evidence, no reasonable fact-finder could conclude Teri violated Section 6.3(d).

The only specific violation of company policy alleged by to have been breached by Teri is that former CEO and plaintiff Maria Garay-Serratos entered into an agreement with state legislator Robert Meza to provide consulting services. Mr. Franke admitted at his deposition that Ms. Garay-Serratos was given an opportunity to cure this alleged violation of Sojourner policy and that she did so:

> Q. Okay. I guess I was asking so when you -- when you realized that there was this consulting contract with Senator Meza's --
> A. Oh, probably --
> Q. You got to wait. She can't take everything down twice.
> A. I'm sorry.
> Q. I guess what actions did the board take once they learned about this?
> A. Indicated to Maria that it was not an appropriate relationship, and we wanted to terminate the relationship and asked her to terminate the contract.
> Q. Okay. And what did she say in response to that?
> A. She was disappointed but understood, and we eventually, I think late January 2017, terminated the contract.
> Q. Okay. So it sounds like she was given an opportunity to cure this violation of company policy and that she did so. Do you agree with that?
> A. Yes.

PRSOF at ¶ 44.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Dave Franke
September 14, 2017

Page 36

1    give me the -- explain to me the details of the

2    improper use of donor funds.

3         A.  Charitable executives are held to a standard

4    of care around donor funds that is outlined and

5    identified both at a federal level, and Arizona has

6    adopted it at the state level, the UPMIFA Act at the

7    federal level, and I think Arizona is something like

8    the charitable -- Management of Charitable Funds Act

9    that's along the lines of UPMIFA.  It indicates that if

10   you've been given a restricted gift that that gift has

11   to be used for the stated purposes, and we uncovered

12   incidents where that was not the case, not followed.

13        Q.  Okay.  And when -- when was this non-permitted

14   use of restricted funds identified?

15        A.  In January.

16        Q.  Okay.  And how was it uncovered?

17        A.  Through an anonymous letter from a Sojourner

18   employee in a --

19        Q.  Go ahead.

20        A.  -- e-mail to the board.

21        Q.  Okay.  And then did somebody on the board do

22   an investigation?

23        A.  Yes.

24        Q.  Who was that?

25        A.  Myself.

BARTELT | NIX
602-254-4111

ER-151

Dave Franke
September 14, 2017

Page 84

1  documentation about that?

2       A.  Or the financial department.

3       Q.  Okay.  It's something we can figure out one

4  way or another for sure.  Right?

5       A.  If they have the records.

6       Q.  Okay.  So now let's go to page 5, Section 6.3,

7  definition of for-cause termination.  Okay.  So, again,

8  tell me just generally the reasons why Teri was

9  terminated for cause.

10      A.  Specifically her in particular as a

11  fundraising professional, the donor funds, BRAIN, and

12  training kitchen, misuse of restricted funds.

13      Q.  Anything else for her?

14      A.  Collectively a part of the cultural issues

15  described previously.

16      Q.  Okay.  So I guess what role would she have in

17  the use of the restricted funds?

18      A.  She's the primary donor relations person,

19  professional, and would know that those funds should be

20  kept restricted.

21      Q.  I mean, is there some evidence that she

22  initiated the use of those restricted funds for general

23  operating purposes?

24      A.  No.  But, you know, didn't stop or make us

25  aware of it, make the board aware of that.

BARTELT | NIX
602-254-4111

78

Exhibit D

| 990 Schedule O, Supplemental Information | |
|---|---|
| Return Reference | Explanation |
| FORM 990, PART VIII | LINE 7A-7D  A LOSS TOTALING 235,972 WAS INCURRED DUE TO THE SALE OF IMHR EPICENTER'S ASSET S TO AN UNRELATED ARIZONA NONPROFIT ORGANIZATION  LINE 11A  MERCY MARICOPA INTEGRATED CARE FORGAVE CONTRACT ADVANCES TO IMHR EPICENTER TOTALING 947,453 |

| 990 Schedule O, Supplemental Information | |
|---|---|
| Return Reference | Explanation |
| FORM 990, PART IX, LINE 11G | CONSULTING 0 23,107 1,000 CONSULTING - EPICENTER 175,947 1,792 0 OTHER - EPICENTER 223 3,666 0 TOTAL 176,170 28,565 1,000 |

| efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | | DLN: 93493240008109 |
|---|---|---|---|

**SCHEDULE R (Form 990)**

Department of the Treasury
Internal Revenue Service

**Related Organizations and Unrelated Partnerships**

► Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or 37.
► Attach to Form 990.
► Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No 1545-0047

**2018**

Open to Public Inspection

Name of the organization
INSTITUTE FOR MENTAL HEALTH RESEARCH

Employer identification number
86-1030444

**Part I**  Identification of Disregarded Entities  Complete if the organization answered "Yes" on Form 990, Part IV, line 33.

| (a) Name, address, and EIN (if applicable) of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| (1) IMHR EPICENTER 1415 N 1ST STREET PHOENIX, AZ 85004 81-1966321 | HEALTH | AZ | 1,262,393 | 128,799 | IMHR |



To: +1 (602) 622-6635                                                   Details

Yes! She is trying to find an instructor but we agreed on terms

For PSA
                                                      3/29/18, 8:30:37 PM

Btw: acquisition is good to go. Epicenter's board approved it last night.
Got the go ahead for due diligence this evening

They are exclusive to PSA

**Resilient Health Arizona**
September 14, 2018 · ⊘                                              ···

PSA Behavioral Health Agency is excited to announce the acquisition of the Epicenter clinic from the Institute for Mental Health Research! (IMHR)

This exciting move will help PSA continue to grow and expand the presence of its outpatient services in the valley

Read more about PSA here: http://qoo.ly/r2uaa

79

<u>Exhibit E</u>

Televerde

General 888-925-7526   **Global Headquarters**
Sales 888-787-2829   4636 E. University Drive, Suite 150
info@televerde.com   Phoenix, AZ USA 85034
@televerde   televerde.com

January 29, 2020

Arouet Board Members

To Whom it May Concern,

As we move into 2020 we will be expanding the Televerde operation into other states. In preparation for that we need to determine how Arouet supports that expansion and ensure that the business plan is aligned with Televerde and can be executed effectively.

As the CEO of Televerde, I am concerned about the current management of Arouet, the current brand of the nonprofit and where its focus is to raise monies. As the major main contributor to the operational expenses I want to ensure that 2020 is a growth year for the organization both in fund raising and in driving programs that truly benefit the ladies of Televerde as they reenter society.

To that end I have no confidence in Alison Rapping as CEO and would request that we replace her as soon as possible.

I would like to recommend that we look at Michelle Cirocco to replace Alison as CEO. Michelle has the requisite business skills, the position in the market to attract speaking and interview opportunities and she truly represents the model.

Much of the work Michelle has been doing on behalf of Televerde should really have been undertaken by Arouet as a spokesperson for the program, working with companies to provide more opportunities for the ladies to gain skills (outside of the Televerde model) and someone that will ensure the brand of Arouet is elevated effectively to solicit funding and programs.

I would appreciate your prompt attention and response to my request and recommendation.

Regards,

Morag Lucey
Chief Executive Officer
Televerde

Generating Demand. Accelerating Sales.

80

ER-154

1

2

3

**Televerde**

Global Headquarters
4636 E. University Drive, Suite 150
Phoenix, AZ USA 85034
televerde.com

4

5

February 27, 2020

6

Dear Arouet Board Members:

7

I am writing to this Board to clarify Televerde's position with respect to recent events related to its relationship with the Arouet Foundation and more specifically, to dispel any inaccurate information that has been circulating in both internal and external communications between Televerde and Arouet.

8

9

The fundamental basis of the cessation of the Televerde and Arouet Foundation relationship is Televerde's disapproval of the unsatisfactory performance of Arouet CEO, Alison Rapping, a position that has been communicated to the Arouet Board of Directors on numerous occasions. In early November of 2019, Vince Barsolo, founding Board member of the Arouet Foundation and former Televerde COO, communicated to Lynne Oldham, Chairwoman of the Arouet Board of Directors, Televerde's concerns with Arouet's CEO.  On November 7, 2019, Michelle Cirocco, Televerde Chief Social Responsibility Officer and Arouet Board member, was informed via text message by Lynne that "We [Alison and Lynne] had a discussion on Saturday.  She [Alison] has a plan she is executing on to make changes. We need to watch and listen to see improvement.  I have it all written up."

10

11

12

13

Our concerns with the CEO have centered around the questionable business decisions being made by Arouet. as well as Alison's specific and heightened focus on government and politics. As you can appreciate, with Televerde's customer base and our partner relationships with the DOC and other government entities, we cannot be associated with any political platform.

14

On the business side, we had an increasing number of concerns.  One of the main issues was that the Arouet programming was erratic. There had been no graduation from the mentoring program since August 2019, the Televerde Scholarship fund had only provided funding for two ladies in the last two years,  and the ladies were being pulled away from their work to do mandatory Arouet training which negatively impacted their ability to deliver for the customers they supported.  Televerde's new COO, Toby Parish, specifically asked for all Arouet programming to be carried out after business hours.  However just this week we learned that once again our ladies were being told they had to do the training during work hours, often at overtime rates.

15

16

17

18

Another example of poor business judgement by Arouet was the recent decision to fly an Arouet employee from Phoenix to Rockville to raise $1100 from the Televerde ladies in the Rockville center, without Televerde management approval.  The monies raised by this effort would be negated by the expenses incurred in travel and travel related expenses. What is even more astounding is that the Televerde ladies in Rockville do not receive any benefits from Arouet, as we elected not to expand the Arouet program into Indiana until we resolved the issues with the programming and focus of Arouet to ensure alignment with Televerde's goals. Alison was aware of Televerde's position with respect to Indiana expansion, and still deemed it appropriate to approve this trip, again, without Televerde's knowledge or approval.

19

20

21

22

General 888-925-7526
Sales 888-787-2829
info@televerde.com
televerde.com

23

24

Generating Demand. Accelerating Sales.

25

26

As I stated at the beginning of my letter, our issues with the performance of Arouet's CEO and its changed direction could and should have been discussed in a professional and reasonable manner, to avoid the current state of misinformation and falsities that have resulted from this week's severance between the two organizations. The following is a timeline of events that illustrates the chaotic and unprofessional manner in which the situation has unfolded and led up to this week's announcement of the shift in the Arouet and Televerde relationship:

On January 29- Televerde sent a letter addressed to the Arouet Board of Directors via email to the attention of Lynne Oldham, expressing Televerde's continued concerns about the performance of Arouet's CEO and the change in direction of Arouet's mission.

On February 3- I met with Lynne at Televerde's offices to discuss the future of Arouet, its partnership with Televerde and my dissatisfaction with Alison's performance of her duties as CEO.

On February 7- I received a text message from Lynne informing me that the discussion regarding Alison's unsatisfactory performance "came out of the blue" and that the Arouet Board would be taking Televerde's concerns under consideration. Furthermore, I was told that Arouet would formally respond in writing within two weeks.

On February 18- When I had not received a written response as expected from Arouet, I once again reached out to Lynne via email. I informed her that we had not heard back from Arouet, and that until such time as we received a response, and/or request for a meeting to further discuss, that we would be withholding any funding to Arouet. I confirmed Televerde's commitment to provide office space and utilities in the interim period until a clear path forward was established.

On February 23- I received a response from Lynne addressed to me, the Televerde Operating Committee and the Televerde Board of Directors informing us that Arouet had decided to sever ties with Televerde, would be ceasing all programming for the Televerde workforce by February 28, and that it intended to vacate Televerde's premises by Mach 6.

On February 24- I responded to Arouet's position letter, acknowledging and accepting Arouet's decision to part ways, and requested that no contact be made with the Televerde workforce using their Televerde emails. Concurrently, we sent out a communication to the Televerde corporate and engagement center workers informing them of Televerde and Arouet's amicable parting.

On February 25, Tami Martinez, on behalf of Arouet, sent an email to Televerde employees on their Televerde emails, despite my specific request not to use Televerde email addresses, informing them that this decision "caught [Arouet] off guard" and that programming for Televerde women would continue (despite the counter-indication in the letter from Arouet dated February 23). I once again asked Lynne to not contact our employees using Televerde emails and her response on the same day via email was that "our donors and program participants are proprietary to Arouet, regardless of their professional affiliation."

Generating Demand. Accelerating Sales.

1

2

3

4

5

As noted in the above timeline of events, what began as a business discussion regarding performance of a CEO with fiduciary duties to its Board of Directors, has escalated into a series of mistruths and miscommunications amongst two organizations that have partnered over the years to provide services to the most disempowered members of our community. I would not only like to set the record straight, but also want to cease all the negative communications and rumors.

It is for this reason, that I believe it is in the best interest of both Televerde and Arouet, that Arouet vacates Televerde's premises by end of day on Friday, February 28, the same day Arouet's letter purports to cease providing programming to the Televerde ladies. Furthermore, I bring to the attention of this Board, that Televerde will be reclaiming any and all funds in the Televerde Scholarship fund, to be used at Televerde's sole discretion for programs of its choosing. Lastly, I request that Arouet's website be updated to remove all Televerde references, and its office location and contact information be appropriately updated in a timely manner.

We wish you continued success in all your future endeavors.

Sincerely,

Morag Lucey
CEO, Televerde

Generating Demand. Accelerating Sales.

1

2

3      May 20, 2020

4
       Alison Rapping
5      CEO Arouet Foundation
       Phoenix, AZ
6      Delivered via email to: arapping@arouet.org

7      Dear Alison:

8      This letter should serve as an official warning to you. Your performance has not met the expectations
       the Board has for your position.

9      There have been several events that have precipitated this document, but this is not the first time that
       we have discussed some of these items.  Multiple Board recall past conversations and interactions on
10     these topics which I will reference below.

11     Upon attending Arouet's Mother's Day event, we learned that it was opened by Robert Mesa.  We
       believe that this was an unfortunate start to an important event for us because it made it feel too
12     political.  We have repeatedly discussed Robert's involvement in Arouet and its events and have
       expressed the Board's preference not to have relationship front and center.

13
       In addition, we learned that you committed us to real estate in PHX in an office with Robert Mesa.  This
14     surprised me given our previous very vigorous dialogue about this office and co-locating with Robert.
       In addition, Tim Vatuone recalls a similar conversation with you on or about March 5 when he had a
15     one-on-one with you where he also discussed the excessive uber spending.  The issue here is not only
       co-location but also financial commitment to additional monthly monies in a time when we do not need
       to spend it.
16
       Finally, the Board had previously learned of a contract to pay Robert Mesa $1000 per month.  Firstly,
17     while I have not seen the contract, you have told me that it is with Robert's company and that many
       politicians perform services for non-profits for hire including Robert.  You had been paying Robert
18     directly (not his company) for a portion of this contract.  When the Board discovered this and became
       uncomfortable for the reasons previously stated above of not wanting to be seen as politically
19     connected to Robert, you took it upon yourself to change the check-writing to Leslie (an employee of
       Robert's) and current recipient of the $1000 per month from Arouet's account.  Again, we only
20     uncovered this on the Mother's Day call where Leslie stated that she was on the call "to learn about
       Arouet so when she is on the phone with constituents she can better represent us".  I understand from
21     our conversation last week that the contract ends in June.  You are to provide me with a copy of the
       contract by Wednesday, May 20 so we can confirm.  The billing will be changed back to Robert's
22     company for the balance of the contract.
       This is the final time you will be warned about these issues. Failure to take care of these problems
23     immediately can result in discipline, up to and including, termination of employment. First, you are to
       immediately inform the landlord that we will not be moving into the real estate in Phoenix with Robert.
24     Any future real estate transaction that we collectively decide on with have a proper lease and be co-

25

26

84

1

2

3    signed by a Board member.  For additional clarity, we do not expect that we need to enter into another
     real estate transaction until potentially sometime in the fall due to COVID.  Also, effective immediately,
     you will no longer be able to obligate Arouet Foundation to contracts and financial expenses without a
4    counter signature by a Board member. In addition, you must strictly abide by the Arouet Foundatiuon
     Expense Policy. Finally, any and all contracting with Robert Mesa for services, etc. must be discussed
5    and approved by the Board.

6    We value you as CEO of Arouet and hope that you take the necessary steps to improve your
     performance. The Board feels that financial stewardship including revenue generation and expense
7    management IS the critical part of your role and we expect you to carry it out with your utmost care.

8    Please contact me if you have any questions about this matter. An e-mail can be sent to
     lynne.oldham@yahoo.com.

9    Sincerely,

10

11   Lynne Oldham

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

85

1    <u>Exhibit F</u>

2

3

4    **To:**    Lynne Oldham[Lynne Oldham]; Tim Vatuone[Tim Vatuone]; Chevera Trillo[Chevera Trillo]; Dana
     saylor[Dana saylor]; Chevera Trillo[Chevera Trillo]; Alison Rapping[Alison Rapping]
     **From:**    Colleen Schwab
5    **Sent:**    Tue 5/11/2021 11:45:19 AM
     **Subject:**    Re: Arouet unsecure
     image001.png
6
     Exciting! Sounds wonderful and looking forward to hearing more.
7
     Colleen Schwab
8    SVP, Marketing & Communications
     Greater Phoenix Economic Council
     m: 602-359-1176
9

10   **From:** Lynne Oldham <lynne.oldham@zoom.us>
     **Sent:** Monday, May 10, 2021 7:03:55 PM
     **To:** Tim Vatuone <tim@vatuoneconsulting.com>; Chevera Trillo <░░Redacted░░>; Colleen Schwab
11   <cschwab@gpec.org>; Dana saylor <░░Redacted░░>; Chevera Trillo <ctrillo@azdes.gov>; Alison
     Rapping <arapping@arouetempowers.org>
     **Subject:** Fwd: Arouet unsecure
12
     Good news!  Allison, let's talk tomorrow.
13
     Sent from my iPhone
14
     Begin forwarded message:
15

16       **From:** Maria Spelleri <Maria.Spelleri@cplc.org>
     **Date:** May 10, 2021 at 9:42:01 PM EDT
     **To:** Lynne Oldham <lynne.oldham@zoom.us>, David Adame <david.adame@cplc.org>
17   **Cc:** Andres Contreras <Andres.Contreras@cplc.org>, Alison Rapping
         <arapping@arouetempowers.org>, "Janis C. Gallego" <Janis.Gallego@cplc.org>
18   **Subject: RE: Arouet unsecure**

19
         Hello Lynne,
20
         I'm the General Counsel of CPLC.  We are so excited about the merger with
21       Arouet.  Our CPLC Board of Directors approved the merger at our Board
         meeting on April 28, 2021.  So now it's just about executing on the merger
22       plan in a way that preserves all the hard work Arouet has taken to date.  I'd
         like to touch base with Allison this week (tomorrow if possible given
23       schedules) to catch up on all Arouet's activities.  Allison, and my Associate
         Counsel, Janis Gallego, and our respective teams have done much, if not all,
24       the heavy lifting on this.  I believe we just need to obtain one or two

25

26

86

ER-160

1

2

3      required approvals (i.e. from a bank with regards to a PPP loan) to
       consummate the merger.

4      What we would be happy to do is work with Allison on laying out the next
       steps in detail for you and the Arouet Board.  We can structure the
5      consummation of the transaction in a way that CPLC can take much of the
       load from the Arouet Board.  I just want to make sure we address all issues
6      that Allison can help us identify.  I hope to have that to you shortly, and no
       later than this week.  In the meantime, if you have any questions, please do
7      not hesitate to contact me at ▮Redacted▮

8      Best regards,

9      Maria Spelleri

10
       **Maria Morales Spelleri**
11     EXECUTIVE VICE PRESIDENT & GENERAL COUNSEL
       LEGAL | COMPLIANCE | INTERNAL AUDIT | RISK MANAGEMENT | HUMAN RESOURCES
12

13     Chicanos Por La Causa, Inc.
       1112 E. Buckeye Rd., Phoenix Az 85034
14     (602) 257-6719
       Maria.Spelleri@cplc.org
15        website | facebook

       Confidentiality Disclosure: All of the sender's e-mails and any files transmitted therewith are
16     confidential and are intended solely for the use of the individual or entity to whom they are addressed.
       Such communications may contain material protected by the attorney-client privilege. If you are not the
17     intended recipient or the person responsible for delivering an e-mail to the intended recipient, be
       advised that you have received such e-mail in error and that any use, dissemination, forwarding, printing
       or copying of such e-mail is strictly prohibited. If you have received an e-mail in error, please
18     immediately notify our office by telephone.

19
       **From:** Lynne Oldham <lynne.oldham@zoom.us>
20     **Sent:** Sunday, May 9, 2021 9:27 PM
       **To:** David Adame <david.adame@cplc.org>
21     **Cc:** Andres Contreras <Andres.Contreras@cplc.org>; Alison Rapping <arapping@arouetempowers.org>;
       Maria Spelleri <Maria.Spelleri@cplc.org>
22     **Subject:** Re: Arouet

23     Thank you David. I am traveling tomorrow arriving on the east coast after 4pm PT.

24

25

26

1

2          Sent from my iPhone

3

4          On May 9, 2021, at 7:15 PM, David Adame <david.adame@cplc.org> wrote:

5              Lynne

6          Thank you I will connect with you tomorrow.   I will be discussing with our General
           Counsel next steps

7

8          David Adame
           PRESIDENT & CEO

9



10

11         1112 E. Buckeye Rd. | Phoenix, AZ 85034
           W (602) 257-0700 | david.adame@cplc.org

12         website | facebook

13

14         On May 9, 2021, at 7:02 PM, Lynne Oldham
           <lynne.oldham@zoom.us> wrote:

15
              Good morning David

16         I meant to write this email Tuesday morning after our board meeting
           but it's been quite a week. We met on Monday nights as a board for

17         Arouet and discussed where we are with respect to CPLC. As you can
           imagine, we are all anxious to understand next steps.  Since our MOU

18         expires at the end of the month, we'd like to get more concrete
           quickly. We are in a position where we're going to need to add more

19         board members if this does not work out. We can't afford to put our
           mission and fundraising at risk due to the months we've invested in

20         these discussions. Please help me put my board at ease about this
           transaction. As always, thank you.

21
              Lynne

22         917-692-1995
           Sent from my iPhone

23

24

25

26

1   <u>Exhibit G</u>



89

<u>Exhibit H</u>

To:  Tasneem Doctor                                                          Details

Think you should schedule an hour with an attorney early this week too. Black gives a free consultation.

iMessage with (602) 525-4087

Ok. I will                                                                 4/15/18, 6:54:49 PM

**M** Gmail                                         Phil Potter <phillip.t.potter@gmail.com>

**Re: Initial telephonic consultation with attorney Phil Flemming at 2:00 p.m. today**
4 messages

**Polly Carpenter <GPC@robainalaw.com>**                        Thu, Apr 19, 2018 at 12:29 PM
To: "Phillip.t.potter@gmail.com" <Phillip.t.potter@gmail.com>

Hi Mr. Potter:

It was a pleasure speaking with you.  Per our conversation, please complete the attached consultation forms and return them to me, via fax or email, along with any additional documents you want Mr. Flemming to review during your telephonic consultation.  It is my understanding that you will also forward these consultation forms to Ms. Doctor for her completion as well.  As we discussed, the consultation fee is $280 per hour and will include all time spent reviewing your documents and consulting with you over the phone.  We will call you 5-10 minutes before your scheduled consultation time so that we can take down your credit card information.  Initially, you will be charged for the first hour; anytime spent after the first hour will be pro-rated and charged after the consultation is finished. We accept Visa, MasterCard, Discover and American Express for credit card payments.

Thank you,

Polly

**POLLY CARPENTER**
**Legal Assistant**

Robaina & Kresin PLLC

5343 North 16<sup>th</sup> Street, Suite 200
Phoenix, Arizona 85016-3231
602-682-6450 (voice); 602-682-6455 (fax)
gpc@robainalaw.com

_____

2 attachments

📄 **IEC form $280-new address.pdf**
96K

📄 **Client Information Form-new address.pdf**
163K

**Phil Potter <phillip.t.potter@gmail.com>**                       Thu, Apr 19, 2018 at 12:51 PM
To: "ebmedical77@gmail.com" <ebmedical77@gmail.com>

[Quoted text hidden]

2 attachments

90

1    Exhibit I

2

3    Date: March 7, 2020

4

5    Dear Sir:

6    I am sending this letter to you as a courtesy to inform you that a
     contract employee of yours is running a non-profit corporation in
7    Arizona that is a scam.  He is currently under investigation with the
     Arizona Attorney General's Office and the IRS Criminal Investigation
8    Division for stealing veteran funds from his phony non-profit.  I am
     enclosing several shell corporations that Potter has been using to
9    move funds around without paying income taxes.

10   Furthermore, he used the scam and funneled monies to his mother and
     wife even though they make no contribution to the non-profit.
11   Phoenix, who has made donations to his "veteran" non-profit, forced
     him out of the office space he was provided free of charge as a non-
12   profit.  Unfortunately, he is using the good name of the University of
     Alabama to further his criminal activity.

13
     If you are giving Potter university taxpayer funds, you will be
14   supporting a scam artist.  Potter is also embroiled in a domestic
     lawsuit in Arizona for physically abusing his third wife and there 6-
15   month-old child.  The restraining orders can be found in the Justice
     Court of Maricopa County, Arizona.
16

17   Regards,
     A Concerned Citizen

18

19

20

21

22

23

24

25

26

91

Exhibit J

**From:** Cassandra Wicklund [mailto:cwicklund@az.gov]

**To:** Robert Meza <rmeza@azleg.gov>; Grant Packwood <grant.packwood@azpsa.org>

**CC:** Samantha Orth <sorth@az.gov>; Brendon Cross <bcross@az.gov>; Christina Corieri <ccorieri@az.gov>; Yasmin Ramos <yramos@az.gov>; TKrepitch@azleg.gov

**Subject:** PLZ RESPOND: 3-16 Gov Ducey - People Service Action (PSA) Behavioral Health Luncheon & Private Meeting w/ Open Hearts CEO DETAILS

Sen. Meza & Mr. Packwood -

Checking back on the below email since this event is Friday this week.

See below.

Thank you,

————————————

**Cassie Wicklund**

On Tue, Mar 6, 2018 at 11:40 AM, Cassandra Wicklund <cwicklund@az.gov> wrote:

Sen. Meza & Grant -

Thanks for your time over the phone today. I have added some notes below and highlighted in green information I will still need to received at least two days before the event.

I will check on the private meeting with Open Hearts CEO and whether or not Mrs. Ducey will be able to attend.

As far as seating at Gov Ducey's table, Senior Policy Advisor Christina Corieri will attend the event with Gov Ducey. May she also sit at Governor's table? Should Angela attend, she will also sit there.

I have CC'd Samantha Orth (who will arrive at 10:45 AM on day of event in advance of Governor) and Brendon Cross (who prepares the Governor's remarks).

Thanks for all of your help!

--

**Staffer:** Samantha Orth, (623) 696-6672

**Event POC:** AZ State Senator Robert Meza, (602) 421-1702 // Grant Packwood, (PSA, Development) (602) 617-3881, grant.packwood@azpsa.org

**Event Name:** People Service Action (PSA) Behavioral Health Luncheon & Private Meeting w/ Open Hearts CEO

**Attire:** Business

---

**Date:** Friday, March 16th, 2018

**Location:** Arizona Biltmore, Gold Room (for luncheon) & Wright Room (for private mtg) - 2400 E Missouri Ave, Phoenix, AZ 85016

**Arrival:** 11:45 AM / **Speak @** TBD PM / **Depart:** 1:15 PM

**Expected Attendance:** 220

**VIP's:** VIP's/attendees list via email

**From:** Tom Krepitch <TKrepitch@azleg.gov>
**Sent:** 3/12/2018 2:43:37 PM
**To:** ccorieri@az.gov
**Subject:** FW: PLZ RESPOND: 3-16 Gov Ducey - People Service Action (PSA) Behavioral Health Luncheon & Private Meeting w/ Open Hearts CEO DETAILS

Hi, Christina.

The list for the Wright Room meeting will be Governor Ducey, Senator Meza, Argie Gomez, Sharon Harper, Mi-Ai Parrish and Susie Stevens.

Sincerely,
Tom

TOM KREPITCH
ASSISTANT TO SENATOR ROBERT MEZA, LD30
1700 W WASHINGTON ST, PHOENIX AZ 85007
602 926 3425 TKREPITCH@AZLEG.GOV

---

**From:** Tom Krepitch <TKrepitch@azleg.gov>
**Sent:** 3/12/2018 11:07:29 AM
**To:** Cassandra Wicklund; Grant Packwood
**Cc:** Robert Meza; Samantha Orth; Brendon Cross; ccorieri@az.gov; Yasmin Ramos
**Subject:** RE: PLZ RESPOND: 3-16 Gov Ducey - People Service Action (PSA) Behavioral Health Luncheon & Private Meeting w/ Open Hearts CEO DETAILS

Hi, everyone. Here a few notes from my conversation with Senator Meza.

- After the luncheon, a small group will meet for a quick 15 minute meeting. Senator Meza will walk the Governor to the Wright Room. The private meeting will be an opportunity for Governor Ducey, Senator Meza, Sharon Harper, and Mi-Ai Parrish to meet briefly with Argie Gomez, the CEO of Open Hearts and discuss what her organization is doing to improve behavioral health of foster youth. Open Hearts will be providing medical and behavioral health care to children in zip code 85015, which has the state's greatest number of youth in foster care. The organization will be receiving national recognition soon for their critical work in this area.

- The governor will be speaking at approximately 12:40 PM.

- All of the seats at the Governor's table are full, but Ms Corieri will be seated at a premium table adjacent to the Governor's.

Sincerely,
Tom Krepitch

TOM KREPITCH
ASSISTANT TO SENATOR ROBERT MEZA, LD30
1700 W WASHINGTON ST, PHOENIX AZ 85007
602 926 3425 TKREPITCH@AZLEG.GOV

**From:** Cassandra Wicklund [mailto:cwicklund@az.gov]
**Sent:** Monday, March 12, 2018 10:11 AM
**To:** Grant Packwood <grant.packwood@azpsa.org>
**Cc:** Robert Meza <rmeza@azleg.gov>; Samantha Orth <sorth@az.gov>; Brendon Cross <bcross@az.gov>; ccorieri@az.gov; Yasmin Ramos <yramos@az.gov>; Tom Krepitch <TKrepitch@azleg.gov>
**Subject:** Re: PLZ RESPOND: 3-16 Gov Ducey - People Service Action (PSA) Behavioral Health Luncheon & Private Meeting w/ Open Hearts CEO DETAILS

Thank you!

---

**From:** Grant Packwood <grant.packwood@azpsa.org>
**Sent:** 3/12/2018 9:37:15 AM
**To:** Cassandra Wicklund; Robert Meza
**Cc:** Samantha Orth; Brendon Cross; Christina Corieri; Yasmin Ramos; TKrepitch@azleg.gov
**Subject:** RE: PLZ RESPOND: 3-16 Gov Ducey - People Service Action (PSA) Behavioral Health Luncheon & Private Meeting w/ Open Hearts CEO DETAILS

**Attachments:** PSAOCT17Corp_LR.pdf , 2018_PSA_Luncheon_Agenda.pdf , List_of_VIPs.pdf

Good morning Cassie,

I have attached the run of show and the corporate packet that has bios for all honorees to this email. The Emily Jenkins being honored is the President and CEO of the Arizona Council of Human Service Providers.

As for a list of VIPs, we are finalizing a full list as final confirmations and table rosters are submitted by the sponsors. I have attached the confirmed VIPs that I do have to this email. Please advise if you would like additional categories beyond what we have listed. As we finalize the full seating I will send the full list of attendees as well.

On the subject of the Governor's table I just want to confirm that Mrs. Ducey is not able to attend (from a previous email) and that only Christina Corieri will be needing a seat?

I have spoken with Senator Meza regarding your other questions and he says that he will give you a call sometime today to discuss.

If you require any additional information or clarification please feel free to reach out.

Thank you,

Grant A. Packwood
Development Manager
PSA Behavioral Health Agency
c480-521-7965 | o602-995-1767
Grant.Packwood@AZPSA.org

93

| | |
|---|---|
| **From:** | Grant Packwood <grant.packwood@azpsa.org> |
| **Sent:** | 3/12/2018 9:37:15 AM |
| **To:** | Cassandra Wicklund; Robert Meza |
| **Cc:** | Samantha Orth; Brendon Cross; Christina Corieri; Yasmin Ramos; TKrepitch@azleg.gov |
| **Subject:** | RE: PLZ RESPOND: 3-16 Gov Ducey - People Service Action (PSA) Behavioral Health Luncheon & Private Meeting w/ Open Hearts CEO DETAILS |

**Attachments:** PSAOCT17Corp_1R.pdf ; 2018 PSA Luncheon Agenda.pdf ; List_of_VIPs.pdf

Good morning Cassie,

I have attached the run of show and the corporate packet that has bios for all honorees to this email. The Emily Jenkins being honored is the President and CEO of the Arizona Council of Human Service Providers.

As for a list of VIPs, we are finalizing a full list as final confirmations and table rosters are submitted by the sponsors. I have attached the confirmed VIPs that I do have to this email. Please advise if you would like additional categories beyond what we have listed. As we finalize the full seating I will send the full list of attendees as well.

On the subject of the Governor's table I just want to confirm that Mrs. Ducey is not able to attend (from a previous email) and that only Christina Corieri will be needing a seat?

I have spoken with Senator Meza regarding your other questions and he says that he will give you a call sometime today to discuss.

If you require any additional information or clarification please feel free to reach out.

Thank you,

Grant A. Packwood
Development Manager
PSA Behavioral Health Agency
o480-521-7965 | o602-995-1767
Grant.Packwood@AZPSA.org

**From:** Cassandra Wicklund [mailto:cwicklund@az.gov]
**Sent:** Monday, March 12, 2018 8:50 AM
**To:** Robert Meza <rmeza@azleg.gov>; Grant Packwood <grant.packwood@azpsa.org>
**Cc:** Samantha Orth <sorth@az.gov>; Brendon Cross <bcross@az.gov>; Christina Corieri <ccorieri@az.gov>; Yasmin Ramos <yramos@az.gov>; TKrepitch@azleg.gov
**Subject:** PLZ RESPOND: 3-16 Gov Ducey - People Service Action (PSA) Behavioral Health Luncheon & Private Meeting w/ Open Hearts CEO DETAILS

Sen. Meza & Mr. Packwood -

Checking back on the below email since this event is Friday this week.

See below.

Thank you,

————————————

**Cassie Wicklund**

On Tue, Mar 6, 2018 at 11:40 AM, Cassandra Wicklund <cwicklund@az.gov> wrote:

Sen. Meza & Grant -

Thanks for your time over the phone today. I have added some notes below and highlighted in green information I will still need to received at least two days before the event.

I will check on the private meeting with Open Hearts CEO and whether or not Mrs. Ducey will be able to attend.

As far as seating at Gov Ducey's table, Senior Policy Advisor Christina Corieri will attend the event with Gov Ducey. May she also sit at Governor's table? Should Angela attend, she will also sit there.

I have CC'd Samantha Orth (who will arrive at 10:45 AM on day of event in advance of Governor) and Brendon Cross (who prepares the Governor's remarks).

Thanks for all of your help!

--

**Staffer:** Samantha Orth (623) 696-6672

**Event POC:** AZ State Senator Robert Meza, (602) 421-1702 // Grant Packwood, (PSA, Development) (602) 617-3881, grant.packwood@azpsa.org

**Event Name:** People Service Action (PSA) Behavioral Health Luncheon & Private Meeting w/ Open Hearts CEO

**Attire:** Business

94

**Date:** Friday, March 16th, 2018

**Location:** Arizona Biltmore, Gold Room (for luncheon) & Wright Room (for private mtg) - 2400 E Missouri Ave, Phoenix, AZ 85016

**Arrival:** 11:45 AM / Speak @ TBD PM / Depart: 1:15 PM

**Expected Attendance:** 220

**VIP's:** VIP's/attendees list via email

**Staging:** Stage with podium and microphone attached

**Press:** Open to press

**Gov @ table:**

- Ballroom-style with round tables
  - 12 top roundtables
  - Gov seated at: Table #4 (Head table)
  - Other's seated with Gov: Christina Corieri, , Angela Ducey?, Sharon Harper, Mi-Ai Parrish, Sara Marriott (CEO, PSA Behavioral Health), President Steve Yarbrough, Rep. TJ Shope, Jessica Pacheco, Jeff Guldner (Executive VP of Public Policy, APS), Josh Nisbet (Client Relationship Exec., Deloitte), Chad Guzman (Gov't Affairs Rep, APS & PSA Board Member)

**Other Notes:** 5 awards will be presented throughout the luncheon to 5 "Champions" of behavioral health. Each "Champion" will speak during the luncheon, with Gov Ducey speaking last.

- Emily Jenkins, American writer of children's picture books - **Is this the correct Emily Jenkins? I found a bio online:**
- Tad Gary, COO of Mercy Maricopa Integrated Care
- Councilman Daniel Valenzuela, Phoenix (running for Mayor of PHX)
- Sara Marriott, CEO of PSA Behavioral Health
- Gov Doug Ducey

**People Service Action (PSA) Behavioral Health Luncheon & Private Meeting w/ Open Hearts CEO TIMELINE**
**11:45 AM** – Governor arrives, greeted by AZ Sen. Robert Meza & Grant Packwood (Development, PSA Behavioral Health)
**TIMELINE MINUTE-BY-MINUTE TBD** – will be sent
***AWAITING APPROVAL TO CONFIRM: 1:00 PM - 1:15 PM** – Private meeting after luncheon from *1:00 PM - 1:15 PM* at Arizona Biltmore, Wright Room with: Argie Gomez (CEO, Open Hearts), AZ Sen. Robert Meza, Sharon Harper, Doug Yonko (10 mins)
**1:15 PM** – Departure

———————————

**Cassie Wicklund**

*Director of Scheduling*

Office of the Arizona Governor Doug Ducey

1700 W Washington St

Phoenix, AZ 85007

O: (602) 542-1369

C: (602)

E: cwicklund@az.gov

ER-169

1

2

3    **Ashley McIver**

4    **From:**        Cassandra Wicklund <cwicklund@az.gov>
     **Sent:**        Thursday, March 15, 2018 9:25 AM
     **To:**          Robert Meza
5    **Subject:**     Re: PLZ RESPOND: 3-16 Gov Ducey - People Service Action (PSA) Behavioral Health
                      Luncheon & Private Meeting w/ Open Hearts CEO DETAILS

6

7    Sen. Meza -

8    Thank you! This is all confirmed - I sincerely appreciate all of your help.

9    Best,
     Cassie

10

11   — — — — — — —

12   **Cassie Wicklund**

13   *Director of Scheduling*

14   Office of the Arizona Governor Doug Ducey

15   1700 W Washington St

16   Phoenix, AZ 85007

17   O: (602) 542-1369

18   C:

19   E: cwicklund@az.gov

20

21   **NOTE: If you are emailing in regards to a scheduling request for Governor Ducey or First Lady Angela Ducey, please
     visit www.azgovernor.gov/engage, and fill out the appropriate form.

22

23   On Thu, Mar 15, 2018 at 8:41 AM, Robert Meza <rmeza@azleg.gov> wrote:

24     Cassie,

25
       I am writing to double verify the details for the luncheon tomorrow.  Please let me know if you have any questions.
26

1   We would like the governor to arrive at 11:45. After the luncheon ends at 1:00, there will be a fifteen minute meeting
    with the governor and Argie Gomez, the CEO of Open Hearts, a nonprofit that has been around for about 40
2   years. Their demographic is foster youth in the behavioral health and medical health arenas. They are helping
    children, as well as their foster parents. They will be getting national recognition in the coming months, so we want the
3   governor to hear about what they are doing. Also in the meeting will be Sharon Harper, Mi-Ai Parrish, Susie Stevens,
    Barb Meaney, Christina Corieri, Steve Trussell, and myself.

4

5   Immediately after the luncheon, I will walk Governor Ducey and his security staff to the Wright Room, which is very
    close to the room where the luncheon will be. I will make sure that the meeting lasts only 15 minutes, to respect the
6   governor's time.

7

8   Sincerely,

9   Senator Robert Meza

10

11  **From:** Cassandra Wicklund [mailto:cwicklund@az.gov]
    **Sent:** Monday, March 12, 2018 11:09 AM
    **To:** Tom Krepitch <TKrepitch@azleg.gov>
12  **Cc:** Grant Packwood <grant.packwood@azpsa.org>; Robert Meza <rmeza@azleg.gov>; Samantha Orth <sorth@az.gov>;
    Brendon Cross <bcross@az.gov>; ccorieri@az.gov; Yasmin Ramos <yramos@az.gov>
13  **Subject:** Re: PLZ RESPOND: 3-16 Gov Ducey - People Service Action (PSA) Behavioral Health Luncheon & Private
    Meeting w/ Open Hearts CEO DETAILS

14

15  Thank you, Tom!

16

17

18  — — — — — — —

19  **Cassie Wicklund**

20  *Director of Scheduling*

21  Office of the Arizona Governor Doug Ducey

22  1700 W Washington St

23  Phoenix, AZ 85007

24  O: (602) 542-1369

25  C:

26

## PSA
*People / Service / Action*

# Tentative 2018 PSA Luncheon Agenda:

### Friday March 16th

- **11:15am: People Arrive**
- **11:45am: Doors Open**
- **12:00pm: Program Begins**
  - o **MC welcomes crowd**
  - o **MC brings up Tasneem and Meza**
  - o **Tasneem introduces the PSA Board and the Planning Committee.**
- **12:05pm:**
  - o **Meza introduces corporate sponsors**
    1. **APS, Blue Cross Blue Shield, Mercy Maricopa Integrated Care, and Mercy Care Plan**
    2. **Special shoutout for Awards and Flowers sponsors of I-Tether, Triadvocates, and Gretchen**
  - o **MC introduces elected officials.**

- o **MC honorary chair Sue Glawe.**
- **12:20pm**
  - o **MC introduces PSA Video + Testimonial.**
- **12:25pm:**
  - o **MC introduces the honorees:**
    1. **Emily Jenkins**
       - Video shown.
       - Emily speaks.
    2. **Tad Gary**
       - Video shown.
       - Tad speaks.
    3. **Councilman Daniel Valenzuela**
       - Video shown.
       - Councilman speaks.
    4. **Sara Marriott**
       - Video shown.
       - Sara speaks.
    5. **Governor Ducey**
       - Video shown.
       - Governor speaks.
- **1:10pm:**
  - o **MC thanks sponsors and closes the event.**

**Confirmed Elected Officials:**

1. Governor Ducey
2. Senator Brophy-McGee
3. Senator Lisa Otondo
4. Senator Sean Bowie
5. Senator Nancy Barto
6. Senator Karen Fann
7. Senator Catherine Miranda
8. Representative Heather Carter
9. Representative Diego Espinoza
10. Representative Macario Saldate
11. Representative TJ Shope
12. Phoenix City Councilman Danny Valenzuela

98

1

2

**Ashley McIver**

3

| From: | Lisa Otondo |
| Sent: | Thursday, January 11, 2018 4:43 PM |
| To: | .ALLHMEMS; ALLSMEMS |
| Cc: | .All House Secretaries; ALLSSECS |
| Subject: | CORRECTION: LUNCH INVITE - PLEASE RSVP |

4

5

6

Members,

7

Please note the CORRECT DATE FOR THE LUNCH IS JAN. 23RD at 11:30. I apologize for the confusion.

8

Thanks for your interest and RSVP's.

9

Lisa

10

11

Senator Lisa Otondo
Legislative District 4
602-926-3002

12

lotondo@azleg.gov
Transportation & Technology Committee, Ranking Member
Natural Resources, Energy & Water Committee

13

14

15

**From:** Lisa Otondo
**Sent:** Thursday, January 11, 2018 4:09 PM
**To:** .ALLSMEMS <ALLSMEMS@azleg.gov>; .ALLHMEMS <ALLHMEMS@azleg.gov>

16

**Cc:** .ALLSSECS <ALLSSECS@azleg.gov>; .All House Secretaries <AllHouseSecretaries@azleg.gov>; Barbara Wellman
<bwellman@azleg.gov>

17

**Subject:** LUNCH INVITE - PLEASE RSVP

18

Members,

19

Please join me and Sen. Robert Meza as we host the Board members on the PSA (People

20

Service Action) Behavioral Health Agency for lunch on Tuesday January 16 at 11:30 AM – 1:00
PM in Senate Dem. Caucus Rm. 2.

21

PSA Behavioral Health Agency does some incredible work and is responsible for the "Art

22

Awakenings" – a new and creative way in working with those with psychiatric disabilities. Come and
meet the  PSA Health Bd. Members, and learn about their work on mental and behavioral health

23

issues affecting our state.

Please RSVP to my assistant, Barb Wellman

24

25

26

99

1    <u>Exhibit K</u>

2

3

4    # VIP Event Update

5

6    Ongoing:
     Weekly call time to introduce Arouet and the event to
     potential attendees and sponsors

7    Meeting with sponsors and influencers

8    Updates:
     Received Funds: $2,500

9    Received Confirmation for Title Sponsor: HBI, $15,000
     Verbal Confirmations from:

10   AZ Blue Cross and Blue Shield, and Equality Health (Levels
     TBD)

11   Interest From:
     SRP, APS, Arizona Complete Health, Fire Fighters, CMS,
     AT&T

12

13



14

15   # Event Fundraising Update

16

17   Total Paid: $25,000
     Total Outstanding (invoiced): $13,000

18   • HBI: $5,000
     • Old Republic: $3,000

19   • I-Tether: $2,500
     • Chuck Levinus: $2,500

20   **TOTAL RAISED: $38,000**

21   Potential Additional: $12,500
     • AZ Complete Health: $2,500

22   • APS: $5,000
     • Equality Health: $5,000
     **CURRENT POTENTIAL TOTAL: $49,500**

23

24

25

26



| | | | |
|---|---|---|---|
| | | | written 2/10/20 asking for e... our application. They were ...<br><br>We asked for, and received t... application for April 3 (Aliso... presentation) this would put... not 11, however good timing... about this I wan to share wit... potential after Catalyst. |
| 6.  Rockville fundraiser(S) | Brandy Smith – Fundraiser was in February 2020 | | Rockville is interested in hos... fundraisers for Arouet (curre...<br><br>Think for now everything in ... EXCEPT, Rockville women ar... services upon release, so thi... back" once this levels out (fo... |
| 7.  Arizona Community Foundation | Dana Campbell Saylor and Alison Rapping will be lead contacts | | https://www.azfoundation... Alison met with Kim Covingt... need to be explored.  Dana t... supporter of what Arouet do...<br><br>Alison to ask Dana to set up... and maybe Steve, once we g... |
| 8.  Thunderbirds Charities | Will apply in September, 2020 | | Alison and Danielle working ... 2020 round |
| 9.  APS/ Pinnacle West | RM LB AR GP | | Inviting to come and small s... |
| 10.  Cardinals and Michael Bidwill | Robert Mesa/Grant Packwood | | Invited to come and small sp... also be writing a small ($300... Cardinals Foundation) |
| 11.  Phoenix Suns/Phoenix Mercury | Alison Rapping to reach out to Sara Krannenbuhl (current Valley Leadership Board chair). | | Phoenix Mercury could be a ... women supporting women. ... representatives from both S... Spring event. |
| 12.  Kemper and Ethel Marley Foundation | Dana ? | | I |
| 13.  Shamrock/McClellan family | Dana? | | |
| 14. Job placement fee-for-service | Tami Martinez | | Tami has done a GREAT job i... placement center and is crea... partnerships.<br><br>Iconic, BBB and others have ... meeting, this is moving full s... provide full report at BOD m... members have recommenda... have them!) We also can inv... the Spring Event so showcas... interested in investing with ... |
| 15.  Wells Fargo | Alison Rapping | Lisa Price | Workforce development / fi... etc.<br>NOTE: funded in 2019; think... |

101

ER-175

| | | | |
|---|---|---|---|
| | | | 2020<br>IN PROGRESS: Writing our 2<br>$20,000 may still get $10,00 |
| **16. W.K. Kellogg Foundation** | Alison Rapping | | https://www.wkkf.org/<br><br>Lynne and Alison to deter<br>forward! |
| **17. PNC Bank** | Alison Rapping | | Seek general ops funds unles<br>restrictions.<br>Alison is setting up a meetin<br>community affairs person. |
| **18. Nina Mason Pulliam Trust** | Alison Rapping talking to Gene D'Adamo | | https://www.ninapulliamt<br><br>Alison is inviting Gene D'Ada<br>Fundraiser. |
| **19. Freeport McMoRan** | Dana Campbell Saylor will be lead contact and Alison Rapping works with Dana to secure meeting. | $25,000 is target goal.<br>Tracy Bame and Angie Harmon are key contacts. | Turned down in 2019; althou<br>opportunity to reapply<br>Alison has relationships ther<br>see what may be possible fo |
| **20. National Bank of Arizona** | Alison Rapping and Dana Campbell Saylor | Deborah Batemen | We are doing a StoryTellers<br>of 2-25<br>WENT WELL! Deborah Ston<br>the Spring Event, and she di<br>sponsorship for Arouet. |
| **21. Salesforce.com corporate support (Trailblazers)** | Contact? | | |
| **22. Wendy Bruder (MUFG)** | Lynne Oldham | | |
| **23. Melanie Walton** | Need to determine contact, Walmart IS getting into second chance hiring! | | |
| **24. Walmart Foundation** | Need to determine contact, Walmart IS getting into second chance hiring! (Alison) | Just supported the #secondchance employer campaign | Focusing on addressing a Gr<br>https://gcgh.grandchallen |
| **25. GPL and Neil Giuliano** | Alison Rapping (engage Colleen) | Have requested an opportunity to conduct a StoryTellers to the GPL Business and Justice Subcommittee. | We have sent a letter to Nei<br>need to follow up. |
| **26. Carstens Family Fund – Deb Carstens** | Alison Rapping – Carol Poore or other Arouet board members could make the introduction. | Invite Deb to a presentation or have lunch. | Dana would be the best pers |
| **27. BHHS Legacy Foundation** | Alison Rapping | Setting up a meeting with Mary Thompson | https://bhhslegacy.org/<br><br>Alison setting up a lunch wit |
| **28. SPRING INFLUENCER EVENT** | Grant Packwood, Robert Mesa, Alison Rapping BOD | Board Members to each invite 2-3 C-Suite Level guests.<br>Currently in process for | Good event to invite<br>or Advisory Board m<br>members to recomm<br>invite. Goal 20-35 ke |

ER-176

| | | asks: APS, United HealthCare, Robson Homes, Old Republic Title, Think we should ask Pulse Secure, Mercy Care, Suns, Coyotes, Trial Lawyers Association, National Bank of Arizona (full list in development will send with BOD with this update.) | leaders and influenc cocktail party.<br><br>This event could hav populate the Power Board. |
| 29. **Women of the KNOW Tribe** | Alison Rapping | | KNOW has already expresse us, and a meetings are being members.<br><br>Setting up lunches/coffees n |
| 30. **Kevin Hickman Motor Cycle Club** | Brandy Smith | Kevin is a TV employee | Organizing a motorcycle eve influencer event, so there w Fundraisers that weekend.<br>on May 16th at Harley Davisc |
| 31. **Perryville Prison Fundraisers** | Back in business; they explained that they were hesitant to do fundraisers for us because we were so closely aligned with Televerde; but now they are open to it. We will have one this year. | | |
| 32. BOARD MEMBER IDEAS!! | | | |

103

ER-177

*Arouet*
Foundation

**Board of Director Meeting Minutes**

| | |
|---|---|
| **Meeting Date:** | December 4, 2018 |
| **Location:** | Televerde Corporate Headquarters |
| **Scheduled call to order:** | Lynne Oldham |
| **Prepared by:** | Alison Rapping |

<u>**ATTENDING:**</u>

| Member | December 2017 | April 2018 | May/June 2018 | September 2018 | December 2018 |
|---|---|---|---|---|---|
| Lynne Oldham, President | X | X | X | X | X |
| Vince Barsolo, Treasurer | X | E | X | X | X |
| Jim Hooker | X | X | E | E | E |
| Chevera Trillo | NA | NA | NA | X | X |
| Colleen Schwab | X | X | E | X | X |
| Dana Campbell Saylor | X | X | X | X P | X |
| Tasneem Doctor | X | X | X | X P | X |
| **Staff/Guests** | | | | | |
| Alison Rapping | X | X | X | X | X |
| Brandy Smith | NA | NA | NA | X | X |
| Tami Martinez | X | X | X | X | X |
| Chuck Schultz | NA | NA | NA | NA | X |

<u>**PROCEEDINGS:**</u>

1. <u>Welcome and Chair Remarks (Lynne Oldham) @ 5:07pm</u>
   >>APPLAUD THE TEAM AT AROUET FOR A GREAT YEAR IN 2018
   A. Board Meeting Plan
      A.       Governance
         a. Building a Board
         b. Culture
      B.       Fundraising
         a. Task force

   B. January "Mini" Strategy Planning Session
      Propose a 3-hour meeting, 3p-6p (1st week of February)

      ACTION: Book a date – DATE SELECTED 02/03/19 3PM to 6PM
      Wednesday February 6, 2019!

Board Meeting Minutes 06/27/2018                                           Page 1

ER-178

*Arouet*
Foundation

C.  Board Meetings 2019
　　　　Propose: 1ˢᵗ Wednesday of month – Feb (strategy planning), March, May, August,
　　　　October & December with special meetings called as need.

　　　　　　ACTION:  Book all dates and confirm all Board members can attend.

D.  Board of Directors Update/Discussion
　　　A.　　Present a new board Member – Michelle Cirocco, Chief of Corporate
　　　　　　Responsibility (Globally)
　　　　　　　　>>Living example of transition success
　　　　　　　　Motion to Approve by Tasneem Doctor
　　　　　　　　Second by Colleen Schwab
　　　　　　　　All In favor, no-opposed, motion unanimously passes.

2.  Review September 2018 Board Meeting Minutes (Alison Rapping)
　　　　　　Motion to Approve by Dana Saylor
　　　　　　Second by Lynne Oldham
　　　　　　All In favor, no-opposed, motion unanimously passes

3.  Behavioral Health Program Update (Tasneem Doctor & Chuck Schultz)
　　　A.　Steps/Costs to build Arouet Behavioral Center
　　　　　　　>>Alison reviewed the importance of these benefits for the women transitioning
　　　　　　　　>>License is received from state of AZ; ACHHHS certification is secured.
　　　　Need to build relationships with the health plans.
　　　　　　　>>Building several partnerships besides PSA to better serve the needs of the
　　　　women

　　　　　　ACTIONS:
　　　　　　1) Need a Revenue Cycle Mgmt (RCM) & Electronic Health Record (HER)
　　　　　　Plans by yearend (6-8 weeks implementation).  Create a timeline for
　　　　　　implementation and ROI
　　　　　　2) Obtain contract with a healthcare provider (Mercy Care)
　　　　　　3) BCBS has a grant for Substance Use, Mobilize

4.  Key Updates (Alison Rapping, Tami Martinez & Brandy Smith)
　　　A.　　Name change for Arouet
　　　　　　　>>Include in 2019 Strategy Plan
　　　B.　　Volunteers for 2019
　　　　　　　>>Approval from Lynn to send out memo to TV Corp of the
　　　　　　　opportunities  with Arouet
　　　　　　　>>Seeking volunteer who is knowledgeable with Salesforce
　　　C.　　3 Year Transition Model Updates
　　　　　　　>>Greater understanding of the program by the women inside PV

Board Meeting Minutes 06/27/2018　　　　　　　　　　　　　　　　　　　Page 2

ER-179

*Arouet*
Foundation

**Arouet Foundation**
**Board of Directors Meeting**
**Agenda**
**September 19, 2018**
**5:00 PM – 7:00 PM**

I.  **Welcome & Chair's Remarks**                                    **Lynne Oldham**

    a.  Board of Directors Nomination Status

II. **Discussion of Board Governance Process, Nominations and Vote**   **Lynne Oldham**

III. **Key Updates and Developments**                                **Alison Rapping**

    1.  Website Redesign                                          **Tami Martinez**
    2.  Job Placement Program
    3.  3 Year Transition Model Updates (TOPS, Mentorship, Leadership Program Launch)
    4.  New Partnerships and Collaborations
    5.  Golf Tournament
    6.  LISC Financial Opportunity Center Grant
    7.  SNAP CAN Grant
    8.  Annual Campaign Launch Plan

IV. **Behavioral Health Program Update**                             **T. Doctor/A. Rapping**

    a.  **Update on Program Design and Status to-date**

    b.  Process to date and plan moving forward

        1.  Curriculum Design for 3 week program/outline and detail to be shared with the board

        2.  GOAL:  To launch with at least 6 women by end of 2018/beginning 2019

        3.  We have secured License and AHCCCS credentials

        4.  Need to finalize MOU with PSA and present to the health plans

        5.  Marketing/Outreach – Televerde and Perryville

        6.  Hire Lead Therapist and Case Manager

106

ER-180

*Aranet*
Foundation

**Board of Director Meeting Minutes**

**Meeting Date:**          June 27, 2018
**Location:**              Televerde Corporate Headquarters
**Scheduled call to order:** Lynne Oldham
**Prepared by:**           Alison Rapping

**ATTENDING:**

| Member | December 2017 | April 2018 | May/June 2018 | September 2018 | November 2018 | December 2018 |
|--------|--------------|-----------|---------------|----------------|---------------|---------------|
| Lynne Oldham, President | X | X | X | | | |
| Vince Barsolo, Treasurer | X | E | X | | | |
| Jim Hooker | X | X | E | | | |
| Colleen Schwab | X | X | E | | | |
| Dana Campbell Saylor | X | X | X | | | |
| Tasneem Doctor | X | X | X | | | |
| **Staff/Guests** | | | | | | |
| Alison Rapping | X | X | X | | | |
| Kristin Romaine | E | X | E | | | |
| Tami Martinez | X | X | X | | | |

**PROCEEDINGS:**

1. Welcome and Chair Remarks
   a. Call to order by: Lynne Oldham
      i. Briefing of ███████████████

2. 2018 Programming – A. Rapping
   a. 3-Year Transition Model
      i. Review Updated Program Model & Design
      ii. Educational Program with Maricopa County
         1. Recap of scholarships through TENS
            a. ███████████████
            b. 
      iii.        Status of Dates / Highlights

3. Behavioral Health / Job Training License & Contract – T. Doctor / A. Rapping
   a. Recommendation for Structuring Program – Board Vote

Board Meeting Minutes 06/27/2018                                    Page 1

ER-181

*Arouet*
Foundation

    b.  Process to date and plan moving forward
           i. Licensing
          ii. Contract with PSA –
               1.  Onsite Specialist at TV would require individual meeting deductible with Cigna
          iii.       Curriculum Development
          iv.       Marketing / Outreach
          v. Space and build Out
          vi.       Pilot Program, 5-10 women; Goal = Fall 2018

          vii.       All services provided through PSA
               1.  Complete medical assessment
          viii.     Provide upon release for 30-days (Intensive outpatient)
               1.  Housing
               2.  Food
               3.  Family Counseling
               4.  Health
          ix.       ACHCCS enrolled allows for full benefits
          x. Recommenationd to provide financial literacy to the ladies inside
          xi.       Implementing a job training program on customer service/inside sales with the
               help of Lauren Bailey

  4.   ANNOUNCEMENT OF CHANGE IN AROUET STAFF
      a.  MaryNicole moved
      b.  Brandy Smith
      c.  Kat – New intern

  5.   3-YEAR TRANSITION MODEL
      a.  1-YEAR = TOPs ENHANCED
      b.  2-YEAR = MENTORSHIP & INTEGRATION; SOPHISTICATED WORKSHOPS & TAILORED TO THE WOMEN
          i. Homebuying 101 should be more like preparing for an apartment (Rental) or put in 3rd
            year
          ii. Graduation in July – wish for Vince and Lynne to attend
          iii.     Recommendation by Vince about root/cause of getting in relationship too early
               1.  Need help from Dana for an expert speaker
      c.  3-YEAR = LEADERSHIP & IMPACT
          i. Plan a 2nd year program at corporate
          ii. Recommend an elevated relationship workshop
          iii.     Recommend a group for abusive relationship
          iv.     ACHCCS can still be billed if none program attendees (uninsured vs
            underinsured)
          v. External mentors with "Girls in tech"
      d.  SOCIAL ACTIVITY

Board Meeting Minutes 06/27/2018                          Page 2

1    <u>Exhibit L</u>

2

3    **Ashley McIver**

4    | **From:** | Davidson, Michelle <Michelle.Davidson@mail.house.gov> |
     | **Sent:** | Tuesday, January 10, 2017 6:13 PM |
5    | **To:** | Robert Meza |
     | **Cc:** | Coldwell, Michelle |
     | **Subject:** | Re: Early Head Start Draft Memo |
6

7    Thanks Robert! Copying Michelle Coldwell, who coordinates grant support for our office. She will be in touch to get
     what we need and take care of this!

8    Michelle Davidson
     District Director
9    Congresswoman Kyrsten Sinema (AZ-09)
     602.956.2285
10   michelle.davidson@mail.house.gov

11

     Sent from my iPhone

12   On Jan 10, 2017, at 4:29 PM, Robert Meza <rmeza@azleg.gov> wrote:

13       Good afternoon Michelle,

14       As per our conversation from Saturday's meeting here is all of the information regarding Sojourner's
         application for the Head Start program. Please reach out to either myself or my assistant Grant at
15       gpackwood@azleg.gov or 602-926-3425.

16       Thank you so much and I look forward to talking soon.

17       Best regards,

18       Senator Robert Meza
         Legislative District 30

19       **From:** mgaray@sojournercenter.org [mailto:mgaray@sojournercenter.org]
         **Sent:** Tuesday, January 10, 2017 4:21 PM
20       **To:** Robert Meza <mailto:rmeza@azleg.gov>
         **Cc:** thauser@sojournercenter.org
21       **Subject:** FW: Early Head Start Draft Memo

22       Here you go...

23       *María E. Garay-Serratos, MSW, Ph.D.*
         Chief Executive Officer
24       *Office:* (602) 296-3336
         *Cell:*
25       *Fax:* (602)244-8006
         *Email:* mgaray@sojournercenter.org
26       **www.sojournercenter.org**

ER-183

Follow us on Facebook, Twitter, and Pinterest!
Support Sojourner Center at Fry's Food Stores and through Amazon!
<image003.png>
<image002.jpg>

*A world free from domestic violence*

From: Maria Garay
Sent: Sunday, January 8, 2017 6:17 PM
To:
Cc: Teri Hauser <thauser@sojournercenter.org>
Subject: Early Head Start Draft Memo

Hi Robert,

Here is the draft memo you requested. Teri and I worked on it. We want to make sure you have it for tomorrow. It contains key information and leave it up to you and Sinema to cut and shorten.

Thank you for your support with this significant opportunity. We will see you tomorrow at 9 am in your office.

Have a good evening,


*Maria E. Garay-Serratos, MSW, Ph.D.*
Chief Executive Officer
*Office*: (602) 296-3336
*Cell*:
*Fax*: (602)244-8006
*Email*: mgaray@sojournercenter.org
www.sojournercenter.org
Follow us on Facebook, Twitter, and Pinterest!
Support Sojourner Center at Fry's Food Stores and through Amazon!
<image001.png>
<image002.jpg>

*A world free from domestic violence*

<Sojourner Center Early Head Start App DRFT MEMO 2017.docx>

January 9, 2017

**To:**     U.S. Department of Health and Human Services, Administration on Children and
Families—Office of Head Start.

**From:**

**Re:     Sojourner Center Application for Solicitation #** HHS-2016-ACF-OHS-HP-118, **Grant
Program** Early Head Start (EHS) Expansion and Early Head Start-Child Care
Partnership Grants and **Project Title** Early Head Start for Children Exposed to Domestic
Violence and Other High-Risk Factors

I am contacting you to recommend that you give serious consideration to awarding Sojourner
Center the Early Head Start (EHS) Expansion and Early Head Start-Child Care Partnership Grant
because it proposes to serve a high risk cohort in the 0-3 population (exposure to domestic
violence puts infants and toddlers at great risk) with an innovative integrated and comprehensive
blended center-based/home-based Early Head Start (EHS) program within a specific geographic
service area in Phoenix, Arizona.

Sojourner Center is the largest domestic violence and supportive services agency in Arizona, and
one of the largest in the country serving some of the highest risk zip codes. They are applying for
the first time to provide early head start services (request amount: $5,297,489-$1,113,671 per
year x 4 years, plus $842,805 start-up funds). The announcement will be made in February 2017.

Sojourner Center reaches thousands of individuals each year with prevention and intervention
activities. Their vision is a world free from domestic violence, and by providing high-quality
services for all age ranges, with specific focus on the 0 – 3 population, this can become a reality.

Sojourner Center is intent on counteracting the effects of domestic violence among the 0-3.
Within the domestic violence field, children are often silent victims, hidden in the shadows.
Nationally, it is estimated that over 15.5 million children are exposed to domestic violence each
year. In Phoenix alone, 30,000 children will be exposed to domestic violence this year.

The program will both expand the availability of EHS in Phoenix, and offer early childhood care
tailored specifically for infants and toddlers who have been exposed to domestic violence or are
identified as vulnerable due to other high-risk indicators.

Page | 1

111

1    Sojourner Center's EHS program aims to deliver integrated, comprehensive and coordinated
services for these children to counteract what may otherwise become irreparable damage to their

2    development. By providing early childhood care, connecting families to direct and community-
based services, and helping infants and toddlers heal from the trauma of domestic violence and

3    other high-risk indicators, Sojourner Center's EHS program in conjunction with their behavioral
health program will meet the needs of low-income families who are working, in school or in

4    training programs, and prepare their infants and toddlers for transition to preschool.

5    They are committed to partnering with existing EHS and Head Start programs in the region, as
well as social service agencies, child care facilities, educational institutions, and other service

6    providers that reach our target population, to ensure maximizing resources as a community and
providing high-quality services. This commitment extends to their internal monitoring and

7    evaluation, including research and dissemination through the Sojourner Center Institute.

8    Thank you for your consideration.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26    Page | 2

Exhibit M

**ROBERT MEZA**
**ARIZONA STATE SENATE**
1700 WEST WASHINGTON, SUITE 311
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-3425
rmeza@azleg.gov

DISTRICT 30



**COMMITTEES:**
COMMERCE AND PUBLIC
SAFETY
GOVERNMENT
SENATE ETHICS

Dear Michelle Davidson:

I am writing to inform you that U.S. Senator Kyrsten Sinema has been selected to be PSA Behavioral Health Agency's Gold Medal of Service inaugural recipient. This new award was created specifically to honor those Arizonans who have shown tremendous dedication to serving our state and advocating for behavioral health issues on the national level. We would be honored if Senator Sinema could attend the People Service Action Champions Luncheon in 2019 for the presentation of this award, as well as a VIP Reception before the event with our Platinum Sponsors.

For the past four years, I have helped PSA Behavioral Health Agency organize their annual People Service Action Champions Luncheon. With more than 400 attendees from across Arizona's healthcare spectrum, it is the event of the year for many of us who have worked alongside this incredible organization. In fact, in the Champions Luncheon was recognized by the Arizona Capitol Times as the Best Special Event of the 2017 and has garnered nominations since its inception. Past honorees have included Governor Doug Ducey, State Senator Heather Carter, State Senator Brophy McGee, and CEOs of many major healthcare organizations in our state who have shown steadfast dedication to improving the behavioral health community in Arizona.

PSA Behavioral Health offers comprehensive services for youth and adults in Arizona including their Early Psychosis Intervention Center in downtown Phoenix as well as their Art Awakenings program which is accredited through the Commission on Accreditation of Rehabilitation Facilities and serves to support empowerment and recovery through artistic expression. The Art Awakenings program operates studios and galleries throughout the state where art therapy groups focus on visual art as well as poetry, music, storytelling and drama. This is an organization that is close to my heart and I am thrilled that they have chosen you as the recipient of this new award.

The People Service Action Champions Luncheon serves as not only an amazing chance for us to recognize leaders like Senator Sinema, but also gives us the opportunity to showcase our vision of promoting hope, recovery, diversity, and wellness. The event is currently scheduled for April 26th, however it is still early enough that we would be happy to work with your office to schedule a time that works for the Senator. I certainly the Senator is able to join us for this event and look forward to hearing from you soon.

Sincerely,

Arizona State Senator Robert Meza                    Honorary Chair Mi-Ai Parrish

113

ER-187

**ROBERT MEZA**
ARIZONA STATE SENATE
1700 WEST WASHINGTON, SUITE 311
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-3425
rmeza@azleg.gov

DISTRICT 30

**COMMITTEES:**
COMMERCE AND PUBLIC
SAFETY
GOVERNMENT
SENATE ETHICS

Dear Congressman Stanton:

I am writing to inform you that you have been selected to be an honoree at PSA Behavioral annual Champions Luncheon. Your dedication to the City of Phoenix and to our state as a whole, as well as your constant support for behavioral health initiatives is worthy of recognition and we would be honored if you would be able to join us for this event.

For the past four years, I have helped PSA Behavioral Health Agency organize their annual People Service Action Champions Luncheon. With more than 400 attendees from across Arizona's healthcare spectrum, it is the event of the year for many of us who have worked alongside this incredible organization. In fact, in the Champions Luncheon was recognized by the Arizona Capitol Times as the Best Special Event of the 2017 and has garnered nominations since its inception. Past honorees have included Governor Doug Ducey, State Senator Heather Carter, State Senator Brophy McGee, and CEOs of many major healthcare organizations in our state who have shown steadfast dedication to improving the behavioral health community in Arizona.

PSA Behavioral Health offers comprehensive services for youth and adults in Arizona including their Early Psychosis Intervention Center in downtown Phoenix as well as their Art Awakenings program which is accredited through the Commission on Accreditation of Rehabilitation Facilities and serves to support empowerment and recovery through artistic expression. The Art Awakenings program operates studios and galleries throughout the state where art therapy groups focus on visual art as well as poetry, music, storytelling and drama. This is an organization that is close to my heart and I am thrilled that they have chosen you as an honoree this year.

The People Service Action Champions Luncheon serves as not only an amazing chance for us to recognize leaders like yourself, but also gives us the opportunity to showcase our vision of promoting hope, recovery, diversity, and wellness. The event is currently scheduled for April 26th, 2019. I certainly hope you are able to join us for this event and look forward to hearing from you soon.

Sincerely,

Arizona State Senator Robert Meza

Honorary Chair Mi-Ai Parrish

114

1  <u>Exhibit N</u>

2

3

4  

5

6

7

8

9

10

11

12

13

14

15

16

17

18  

19

20

21

22

23

24

25

26

115

ER-190



## *People Service Action Champions Luncheon*

# 2018 PSA BEHAVIORAL HEALTH AGENCY



**FRIDAY, MARCH 16, 2018  |  11:30AM – 1:00PM**
**EMCEE  |  TOM SIMPLOT**

**ARIZONA BILTMORE RESORT  |  GOLD ROOM**
2400 EAST MISSOURI AVENUE  |  PHOENIX

HONORARY CHAIR: SUE GLAWE

## *Sponsorship Levels*

**PLATINUM SPONSOR $25,000**
- Premier seating
- Listed as a PLATINUM Sponsor on PSA Behavioral Health Agency's and Art Awakening's websites and program
- One table of ten (10) at luncheon (we ask that one seat is reserved for PSA Representative)
- Exhibit booth set up at prominent location during event
- Recognition as Presenting Sponsor in all Press releases, websites, and print media
- Logo acknowledgement on all print materials, event signage and websites
- Sponsor's giveaways to increase brand recognition
- Links from ArtAwakenings.org and AZPSA.org to your business website

3

**GOLD SPONSOR $15,000**
- Premium seating
- Listed as a GOLD sponsor on PSA Behavioral Health Agency's and Art Awakening's websites and program
- One table of ten (10) at luncheon (we ask that one seat is reserved for PSA Representative)
- Recognition as Presenting Sponsor in all Press releases website and print media
- Logo acknowledgement on all print materials, event signage and websites
- Sponsor's giveaways to increase brand recognition
- Mid Size PSA Art Awakenings Original Painting

**SILVER SPONSOR $10,000**
- Listed as a SILVER Sponsor on PSA Behavioral Health Agency's and Art Awakening's websites and program
- One table of ten(10) at luncheon (we ask that one seat is reserved for a PSA Representative)
- Recognition as a SILVER Sponsor in all press releases, websites, and print media
- Logo acknowledgement on all print materials, event signage and websites
- PSA Momento

**BRONZE SPONSOR $5,000**
- Listed as BRONZE Sponsor on PSA Behavioral Health Agency's and Art Awakening's websites and program
- Recognition as Bronze sponsor in all press releases, website, and print media
- Logo acknowledgement on all print materials, event signage and websites
- One table of ten (10) at luncheon (we ask that one seat is reserved for PSA Representative)

117

ER-191

Exhibit O



ER-192

1    <u>Exhibit P</u>

2

3

4    **From: Gus Miranda [mailto:gus.miranda.ca0j@statefarm.com]**
     Sent: Tuesday, October 4, 2016 11:01 AM
5    To: Melissa DiCesare <mdicesare@sojournercenter.org>; Teri Hauser <thauser@sojournercenter.org>
     Cc: Sherry A McFadden <sherry.a.mcfadden.cy56@statefarm.com>; Kim McLain <kim.mclain.p79w@statefarm.com>;
6    rmeza@azleg.gov
     Subject: Sojourner Center Luncheon Attendance

7    Terri and Melissa, thank you once again for the tour yesterday. I wanted to inform you that we will have two
     representatives from State Farm in attendance at the luncheon. Kim McLain, Philanthropy Analyst, and Sherry
     McFadden, Director of our Customer Care Center/Service Division. Sherry will also be attending on behalf of
8    the Charter Property Casualty Underwriter (CPCU) Society. CPCU is an insurance designation. CPCU
     graduates have chapters in each city. Phoenix has a chapter, and one of the events they hold is a Dress for
9    Success fundraiser to benefit several nonprofits in the valley. I informed Sherry about the Sojourner Center,
     and about our conversation yesterday with regard to workforce readiness, and the need for business attire.
     Sherry believes that the CPCU chapter here could be of some assistance.

10   Senator Meza, while we were unable to allocate funds for a table at the luncheon, we were able to allocate
     funds for a direct grant through our Women's Networking (WNET) Employee Resource Group (ERG) WNET
11   has designated a grant in the amount of $2,500. We will be in touch with Sojourner Center during the first
     quarter of 2017 to present that check. Thank you for bringing this organization's needs to our attention.

12   We look forward to a rewarding relationship with the Sojourner Center.

13

14

15   Phil Potter <phillip.t.potter@gmail.com>                                    Thu, Sep 8, 7:31 AM    ☆    ↩    ⋮
     to Gus, Kim, Sherry ▾
16
     Mr. Miranda,
17   Could you please provide some details of the in person conversation?  For instance, where was the meeting held and did Sen. Meza make you aware that he was
     receiving private payments from Sojourner?
     Regards,
18   Phillip

     ⋯
19

20   **Gus Miranda** <gus.miranda.ca0j@statefarm.com>                           Thu, Sep 8, 8:08 AM    ☆    ↩    ⋮
     to me ▾
21
     Mr. Potter, Sen. Meza did not mention receiving any type of payment or compensation from Sojourner Center to me.  In my prior capacity working with our
     philanthropy team I had many, many conversations with community leaders and elected officials with regard the possibility of funding the non-profits they were
22   either involved with or had a passion for. So, please forgive me if I cannot remember the particulars of my conversation with Sen. Meza. My explanations of our
     funding requirements tend to be boiler plate in nature.  Unfortunately, I do not remember the event or activity where our conversation took place.

23   ⋯

24

25

26

                                                                   119

1  Exhibit Q

2  **Karrin Taylor Robson**

3  **From:**      Robert Meza <mezand86@gmail.com>
   **Sent:**      Tuesday, March 10, 2020 10:18 AM
4  **To:**        Karrin Taylor
   **Subject:**   Suggestions of branding your name quickly in the community....

5

6  1. Arouet----Arouet is hosting a private party with the most effective and impactful people in Arizona and DC. The
   private gathering is concerning women and recidivism in Arizona and across the country. Initially they were going to ask
7  Greg Stanton to host. Since I set on the committee I suggested that you host the event......your thoughts? Actually I
   have the final say who will host it. The committee left it up to me.... Carey Pena will be a part of this.

8  2. Tennis Tournament- next years tournament will be Tennis on steroids. There will be approximately 600 to 1,000 in
   attendance.  My suggestions to the group call it First Serve the Karrin Taylor Robson and Ed Robson Tennis Classic. I
9  talked to Bethany she is interested in playing.

10 3. Volleyball Tournament- First week in November....to be held at ASU. Proceeds to go to Resilent Health. High School
   kids and parents will be participating. The Firefighters and Police will be honored. There will be pro players coming in
11 from LA for the exhibition. Its a whose who event.

12 All three events will be live on Facebook. There will be many PSA's and news stories about the events....

13 Please keep me posted if you are interested....

14 Robert Meza

15
                                        Records Request
16                                      1.b.
17

18

19

20

21

22

23

24

25

26

120

1

2

**Karrin Taylor Robson**

3

| | |
|---|---|
| **From:** | Jaye Williams <jwilliams@openheartsaz.org> |
| **Sent:** | Tuesday, January 28, 2020 11:23 AM |
| **To:** | ejr@robsoncommunities.com |
| **Cc:** | Karrin Taylor |
| **Subject:** | Open Hearts Tennis Tournament Invoice |
| **Attachments:** | Robson Invoice.pdf |

Hello Ed,

On behalf of Open Hearts, I would first and foremost like to thank you for your support of our 2020 Tournament of Hearts. We are very appreciative of your generosity in allowing us to utilize your beautiful backyard and tennis court for the event. We are all incredibly excited and know it will be a wonderful event.

I have also attached the sponsorship invoice to this email for your review.

Thank you again for your partnership and support! Please let me know if you have any questions!

**Jaye Williams, MBA** Chief Administrative Officer
O:602-285-5550 ext. 353 | C: 480-259-7295 | openheartsaz.org

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed or sent to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited

AVISO de CONFIDENCIALIDAD: El contenido de este mensaje de correo electrónico y los datos adjuntos están dirigidos exclusivamente al destinatario y puede contener información  confidencial o privilegiada ye puede estar protegida legalmente de la divulgación. Si usted no es el destinatario de este mensaje o de su agente, o si este mensaje ha sido dirigido o enviado por error, por favor respuesta avisando  inmediatamente por correo electrónico, y luego borrar este mensaje y los adjuntos. Si no eres el destinatario , le informamos que cualquier uso, divulgación, copia o almacenamiento de este mensaje o sus anexos está estrictamente prohibida.

15

16

17

18

19

20

21

22

23

24                                             1

25

26

121

1
2
3
4

**openhearts**
family wellness

# INVOICE

5
6
7
8

| DATE | 1/28/2019 |
|------|-----------|
| INVOICE # | 012819 |
| TERMS | Due on receipt |

9
10
11
12

| BILL TO |
|---------|
| Ed Robson |

| CC: |
|-----|
| Representative Robert Meza |

13
14
15

| DESCRIPTION | COUNT | RATE | AMOUNT |
|-------------|-------|------|--------|
| 2020 Tournament Sponsorship | 1 | $5,000 | $5,000 |
| | | | |
| | | TOTAL | $5,000 |

16
17
18
19

Please make payment to:

Open Hearts
Attn: Jaye Williams
4414 N 19th Ave
Phoenix, AZ 85015

20

# Thank You!

21
22
23
24

4414 N. 19th Ave. Phoenix, AZ 85015 | openheartsaz.org

Open Hearts is a qualified charitable organization under section 501(c) (3) of the Internal Revenue Code, and under the State of Arizona's
Working Poor Tax Credit Program (86-0291956). We declare that no goods or services were provided in exchange for this contribution.
Your gift is tax deductible to the full extent permitted by law.

25
26

122

1

2      **Vicki Vesey**

3      **From:**          Leslie Banks <lesliealison16@gmail.com>
       **Sent:**          Monday, January 13, 2020 12:59 PM
4      **To:**            Vicki Vesey
       **Cc:**            Robert Meza
5      **Subject:**       Open Hearts Tournament of Hearts

6      Hi Vicki,

7      I'm emailing to give Karrin updated information about the Open Hearts Tournament of
       Hearts.

8      Karrin,

9      Rep. Robert Meza and I want to thank you for sponsoring this wonderful event. Open
       Hearts Family Wellness is an amazing non-profit health organization. It provides
10     integrated mental health and wellness services to vulnerable communities throughout the
       Phoenix metropolitan area. If you would like to browse the website please click on this
11     link: openheartsaz.org.

12     We want to remind you about the Open Hearts Honorees Celebration this Thursday at
       5:30pm. It will be at Paradise Valley Country Club. Please wear dinner cocktail attire and
13     arrive at 5:20pm.

14     For the February 22 event. Your sponsorship of $5,000 provides you with 10 tickets (or
       however many because you are hosting). We would like to have the names of your guests
15     by February 5th. Here is the flyer with all the relevant information. You can forward it to
       your guests.

16

17

18

19

20

21

22

23

24                                                    1

25

26

1

2

3    **Vicki Vesey**

4    | | |
     |---|---|
     | **From:** | Robert Meza <mezand86@gmail.com> |
     | **Sent:** | Thursday, September 12, 2019 2:36 PM |
     | **To:** | Karrin Taylor; Vicki Vesey |
     | **Subject:** | Corporate Packet for Open Hearts Tennis Tournament |
     | **Attachments:** | 17_X11_ Tennis Sponsorship FINAL 9.6.19.pdf |

5

6    | | |
     |---|---|
     | **Follow Up Flag:** | Follow up |
     | **Flag Status:** | Flagged |

7

8    Karrin and Vicki,

9    Attached is the corporate packet for the tennis tournament.

10   Please place in your calendar....it will be a fun one....

11

12   Robert Meza

13

14

15

16

17

18

19

20

21

22

23

24                                            1

25   ─────────────────────────────────────

26

1  Phillip Potter
   2301 N. 66th Street
2  Scottsdale, Arizona 85257
3  Phone: 480.459.0310
   E-Mail: phillip.t.potter@gmail.com
4  Plaintiff
   Pro Se
5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9                 FOR THE DISTRICT OF ARIZONA

10

11

12     Phillip Potter,                    No. 2:25-cv-00663-PHX-DWL

13                        Plaintiff,

14     v.                                 **RESPONSE TO ARIZONA
                                          ATTORNEY GENERAL'S
15                                        MOTION TO DISMISS
       Robert Meza, et al.,               FIRST AMENDED COMPLAINT**
16
                        Defendants.       (Oral Argument Requested)
17

18

19

20

21

22

23

24

25

26

"[T]he right[] ... to petition for a redress of grievances [is] among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers of America v. Illinois State Bar Ass'n.,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). And "[t]he right of access to the courts is indeed but one aspect of the right of petition". *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Yet, Plaintiff is subject to an A.R.S. § 12-3201(B) blanket injunction permanently enjoining him from filing court papers absent leave of the court in two suits separately judged to be "well-founded" – patent Petition Clause violations. *See Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 742-43 (1983) ("[W]ell-founded lawsuits ... may not be enjoined"); *Ringgold-Lockhart v. County of Los Angeles,* 761 F.3d 1057, 1062 (9th Cir. 2014) ("[P]re-filing restrictions, [] must: ... [be] tailor[ed] narrowly so as 'to closely fit the specific vice encountered'"); First Amended Complaint (Doc. 14, "FAC" at 59, 60, 79, 98). Critically, by operation of § 12-3201, Plaintiff is now being threatened with civil and criminal enforcement of two "unconstitutional act[s] of the state legislature [and has] go[ne] into a Federal court [], in a case involving a violation of the Federal Constitution, and [seeks to] obtain[] a judicial investigation of the problem[s], and pending its solution [to] obtain freedom from suits, civil or criminal, by a temporary injunction, and, if the question[s] be finally decided favorably to the contention of the [plaintiff], a permanent injunction restraining all such actions or proceedings." *Ex parte Young,* 209 U.S. 123, 149 (1908). The instant motion to dismiss (Doc. 38, "MTD") should be denied in full.

**I. There Is No Basis For Rule 12(b)(1) Dismissal**

A. Standing

1. Legal Standard

"Article III standing ... 'requires a plaintiff to have [1] suffered an injury-in-fact,

[2] caused by the defendant's conduct, that [3] can be redressed by a favorable result.'"
*Planned Parenthood Great Nw. v. Labrador*, 122 F.4th 825, 835 (9th Cir. 2024). "For pre-enforcement plaintiffs, the injury is the anticipated enforcement of the challenged statute in the future." *Peace Ranch, LLC v. Bonta,* 93 F.4th 482, 486-87 (9th Cir. 2024). Such an injury exists "if: '(1) [the plaintiff] ha[s] alleged 'an intention to engage in a course of conduct arguably affected with a constitutional interest;' (2) but the conduct is 'proscribed by a statute;' and (3) 'there exists a credible threat of prosecution'". *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014).

### 2. There Exists a Credible Threat of Prosecution

The Attorney General ("AG Mayes") concedes the first two *Driehaus* factors but contends Plaintiff falls short on the third. She reasons no credible threat exists because "the Secretary of State has no criminal enforcement powers" despite labeling Plaintiff an A.R.S. § 13-3601 perpetrator due to §§ 13-2921 and 12-3201 violations. (MTD, pp. 6-7).

### a. Legal Standard

The third *Driehaus* factor "is a 'quite forgiving' requirement that sets up only a 'low threshold'". *Antonyuk v. Chiumento*, 89 F.4th 271, 334 (2d Cir. 2023); *Isaacson v. Mayes*, 84 F.4th 1089, 1100 (9th Cir. 2023) ("Our cases have taken a broad view of this factor"). The "low threshold" is crossed when the threat from statutorily authorized enforcers is not "imaginary or wholly speculative". *Driehaus,* 573 U.S. at 160.[1]

---

[1] The Attorney General cites *Libertarian Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867 (9th Cir. 2013) as the pre-enforcement injury legal standard (MTD, pp. 6-9). *Bowen* traces back to *Thomas v. Anchorage Equal Rts. Comm'n,* 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) on injury "ripeness". "Though our circuit 'has toggled between' the *Thomas* and *Driehaus* formulations, we have 'adopt[ed] the Supreme Court's framework' in *Driehaus*". *Planned Parenthood Great Nw.*, 122 F.4th at 836. Likewise, *Driehaus* provides a superior framework to resolve this pre-enforcement injury dispute for the same reason as *Planned Parenthood* – the alleged credible threat is not "contingent upon the

### b. The Credible Threat Element Is Met

A credible threat is demonstrated when (1) the plaintiff has endured "past enforcement against the same conduct" including via judicial proceedings, *Id*; (2) "a challenged 'provision on its face proscribes' the conduct in which a plaintiff wishes to engage, and the state 'has not disavowed any intention of invoking the ... provision'", *U.S.* v. *Sup. Ct. of N.M.,* 839 F.3d 888, 901 (10th Cir. 2016); (3) any of the state's "enforcement authorities [, including private parties,] have communicated a specific warning or threat", *Tingley v. Ferguson,* 47 F.4th 1055, 1067 (9th Cir. 2022); or (4) sufficient "other circumstances" exist in First Amendment cases. *Id* at 1068; *see also LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154-55 (9th Cir. 2000) (When the threat "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing").

Each criterion is met here. *First*, Plaintiff was previously judged to have violated § 12-3201. (FAC at 79). *Second*, he pleads § 12-3201(B), "on its face" proscribes filing court papers absent leave of court and, in a statutorily defined chain of causation, that AG Mayes can "invoke the provision" to prosecute per §§ 13-2921, 13-2810(A)(2), 13-3601, and/or 13-3602 (*see* Count One, FAC at 113-207; Count Two, FAC at 208-214). Saying she "is unlikely" to prosecute (MTD, p. 9) does not disavow the prosecution that Plaintiff "reasonably fears". (FAC at 92, 98). *Peace Ranch,* 93 F.4th at 490 (A credible threat determination "often rises or falls with the enforcing authority's willingness to disavow enforcement."). Also, AG Mayes cannot speak for all state officers and "private parties" who possess statutory authority to prosecute Plaintiff, although every potential enforcer must disavow before it can be said that "the state/government" disavows.[2] *See Planned*

---

[future] occurrence of unforeseeable events". *Thomas,* 220 F.3d at 1141. Here, Plaintiff has already been declared to have violated §§ 12-3201 and 13-2921. (FAC at 79, 92-97).
[2] Defendant Alane Ortega, as the legal agent of Plaintiff's ex-wife, would need to disavow

ER-202

*Parenthood Great Nw.*, 122 F.4th at 838 (Standing confers when "county prosecutors d[o] not submit such declarations" disavowing enforcement); *Isaacson*, 84 F.4th at 1100-01 ("The combination of these potential threats – from the county attorneys, [] and private parties – satisfies the third prong of *Driehaus*"); *Tingley,* 47 F.4th at 1068 ("We have, however, interpreted *the government's* failure to disavow enforcement of the law as weighing in favor of standing."); *Cal. Trucking Ass'n v. Bonta,* 996 F.3d 644, 653 (9th Cir. 2021) ("Here, *the state*'s refusal to disavow enforcement ... is strong evidence that *the state* intends to enforce the law and that [plaintiffs] face a credible threat.").  AG Mayes offers no evidence of comprehensive disavowal; hence, "the state/government" has not overcome the presumption of enforcement.[3]  *Third*, Plaintiff pleads a credible threat based on "a specific warning or threat" from his ex-spouse and the Secretary of State (the "Secretary") who, as an executive officer with state constitutional authority to speak for the state, is not "some third party". (MTD, p. 6, 8; FAC at 92-95).  *See* Ariz. Const. art. 5, § 1 ("The executive department shall consist of the ..., secretary of state, attorney general, ... "); A.R.S. § 41-121(A)(9) ("The Secretary of State shall: ... [p]erform other duties imposed on the secretary of state by law"); A.R.S. § 41-162(A) ("[T]he secretary of state shall establish the address confidentiality program to allow persons who have been subjected to domestic violence offenses, ... to keep their residence addresses confidential".).  Pursuant to A.R.S. § 41-161, *et seq.*, the Secretary has found that Plaintiff violated § 13-3601 based on conduct expressly traced to the Count One and Count Two challenged statutes.  *See* A.R.S. §§ 41-161(5) and 41-163.  Further, the

---

enforcement under A.R.S. § 13-3602(A).  This private party has shown a strong intent to prosecute Plaintiff, even if she must fabricate facts.  (FAC at 56-60, 83-98, 102).

[3] "Courts have not placed the burden on the plaintiff to show an intent by *the government* to enforce the law against it but rather presumed such intent in the absence of a disavowal by *the government*."  *Antonyuk*, 89 F.4th at 334 (emphasis added).

Attorney General admits the Secretary has administrative enforcement powers (MTD, p. 3), including to find Plaintiff has, or has not, engaged in criminal conduct. *See* A.R.S. § 41-164(D) ("If the secretary of state determines that there is one or more grounds for canceling certification of a program participant ..., the secretary of state shall send notice of cancellation"). Actions taken by the ex-wife and Secretary, coupled with AG Mayes' refusal to disavow future state prosecution, constitute a specific warning or threat. *See Planned Parenthood Great Nw.*, 122 F.4th at 838 ("[T]argeting' of the plaintiff and the Attorney General's failure to disavow enforcement [a]re 'enough to substantiate the threat and satisfy the final *Driehaus* prong.'"). <u>Fourth</u>, at minimum, these events meet the "other circumstances" test in a First Amendment case. (FAC at 113-214).

### 3. Traceability And Redressability Are Met for Counts One and Two

AG Mayes concedes § 13-2921 is a criminal statute subject to her enforcement. But she contends the "vexatious litigant statute is, by its terms, not a criminal statute", and from this she argues that "any injury would not be fairly traceable to AG Mayes ... because county attorneys carry out the vast majority of criminal prosecutions in Arizona, [thus] enjoining AG Mayes would not 'likely' redress any injury." (MTD, pp. 7-10).

#### a. Legal Standard

The traceability "and 'redressability' components for standing overlap and are 'two facets of a single causation requirement.'" *Washington Env't Council v. Bellon,* 732 F.3d 1131, 1146 (9th Cir. 2013). A plaintiff satisfies traceability when the alleged "chain of causation" connecting the defendant's alleged unlawful acts to the plaintiff's imminent injuries goes beyond the "hypothetical or tenuous." *Nat'l Audubon Soc'y, Inc. v. Davis,* 307 F.3d 835, 849 (9th Cir.2002). "What matters is not the 'length of the chain of causation, but rather the plausibility of the links that comprise the chain.'" *Id.* On the

other hand, to demonstrate redressability, a plaintiff "need[s] only show a substantial likelihood that the relief sought would redress the injury." *M.S. v. Brown,* 902 F.3d 1076, 1083 (9th Cir. 2018). This burden is "relatively modest." *Bennett v. Spear,* 520 U.S. 154, 171, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). "Partial amelioration of [any] harm" will suffice. *Matsumoto v. Labrador*, 122 F.4th 787, 802 (9th Cir. 2024).

### b. Traceability Is Met

Defeating any possible "hypothetical or tenuous" defense, a legislature "has the power to ... articulate chains of causation that will give rise to a case or controversy". *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 580, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (Kennedy, A. concurring). Arizona legislators enacted an unattenuated statutory chain of causation whereby, once deemed "vexatious", by "operation" of A.R.S. § 12-3201 a litigant who files court papers absent leave of the court violates § 12-3201(B) and becomes subject to (1) civil and criminal "enforcement" per §§ 13-2810(A)(2), 13-2921, 13-3601, and 13-3602; and (2) administrative "enforcement" per §§ 12-3201(A) and 41-161, *et seq.. See Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) ("[A] realistic danger of sustaining a direct injury [can be shown] as a result of the statute's operation *or* enforcement") (emphasis added). (FAC at 56-60, 76-98, 102-104, 110). Proving both "facets" of causation, if § 12-3201 does not operate for lack of constitutionality, then AG Mayes cannot enforce §§ 13-2810(A)(2), 13-2921, 13-3601, or 13-3602, and the Secretary cannot enforce § 41-161 *et seq..* As AG Mayes notes (MTD, pp. 8-9), "there's no requirement that the defendant's conduct comprise the last [or first] link in the chain". *Mendia v. Garcia,* 768 F.3d 1009, 1012 (9th Cir. 2014). Dancing around the traceability issue, she eventually resorts to the bald assertion that Plaintiff pleads an "an indirect chain of statutes". (MTD, p. 8.) The Attorney General

gives no explanation how a legislatively defined, unattenuated chain of statutes causing injuries could be considered "indirect". That said, the actual question is whether the chain of causation is "plausible". *See Nat'l Audubon Soc'y.,* 307 F.3d at 849. The alleged chain is not only plausible, but it forced AG Mayes to declare "county attorneys" are "more likely" to prosecute Plaintiff – a meritless defense since "standing is not short-circuited by the fact that there are multiple authorized enforcers of the statute[s]". *Matsumoto*, 122 F.4th at 802. Traceability is met for Counts One and Two.

### c. Redressability Is Met

When AG Mayes says her office's "prosecution is unlikely", she tacitly admits she can prosecute for conduct proscribed by A.R.S. § 12-3201(B) as § 13-2810(A)(2) and/or § 13-2921 violations which are §§ 13-3601/3602 predicates. The frequency with which she might "carry out" those feared prosecutions relative to "county attorneys" has no bearing on the redressability analysis.[4] The question is not who speculatively is more "likely" to prosecute, but whether enjoining AG Mayes from enforcing either of the disputed Count One or Count Two statutes is "likely" to redress any imminent injury. Enjoining AG Mayes from enforcing A.R.S. § 12-3201(B) violations as any § 13-3601 predicate makes it more likely that Plaintiff will not suffer injuries such as incarceration or loss of access to his young son. Redressability is met for Count One and Count Two.

### B. Sovereign Immunity

AG Mayes claims sovereign immunity on the supposed basis that she "lacks a sufficiently direct connection to the vexatious litigant statute's enforcement scheme [and]

---

[4] The Attorney General's argument is better understood as an observation that Plaintiff might obtain fuller relief by including county attorneys as "proper defendants" under *Ex parte Young*. She argues, in essence, that Plaintiff should amend his complaint to add county attorneys as defendants. But adding defendants would not warrant her dismissal. *See e.g., Isaacson* and its defendants list which includes AG Mayes and county attorneys.

has no role in ... enforcing [§ 12-3201]" (MTD, pp. 10-11).  She has a role in the scheme.

### 1. Legal Standard

"[S]overeign immunity limits the grant of [federal] judicial authority".  *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984).  "[A]n exception [exists] under *Ex parte Young* that allows 'actions for prospective declaratory or injunctive relief against state officers in their official capacities for their alleged violations of federal law,'".  *Matsumoto*, 122 F.4th at 802.  An attorney general is a "proper defendant" in pre-enforcement challenges if she has "some connection", *Id*, to the administrative, civil, or criminal enforcement of challenged statutes.  *See Doe v. DeWine*, 910 F.3d 842, 848-49 (6th Cir. 2018) (citing *Ex Parte Young*).  "[S]ome connection" presents "a low bar. ... [A] mere scintilla of enforcement" connection is sufficient.  *Matsumoto*, 122 F.4th at 802-04.

### 2. There Is No Sovereign Immunity

AG Mayes has far more than a "scintilla" of connection to the disputed statutes' collective "enforcement scheme".  Arizona's constitution and pertinent statutes (FAC at 95, 102-104, 121) give her the authority to "deputize" herself (1) to criminally prosecute Plaintiff for conduct deemed unlawful, including any perceived resistance to the § 12-3201(B) injunction[5] or § 13-2921 violation; and (2) to civilly prosecute him for that same conduct pursuant to §§ 13-3602 and 13-4433(D). (FAC at 103, 110.).  *See Planned Parenthood of Idaho, Inc. v. Wasden,* 376 F.3d 908, 919-20 (9th Cir. 2004).  There can be no genuine dispute that the Arizona "attorney general has the authority, at the attorney general's sole discretion, to prosecute a person for a criminal violation of this section'".  *Matsumoto*, 122 F.4th at 802.  "This statutorily [and constitutionally] defined

---

[5] *See* A.R.S. § 13-2810(A)(2) ("A person commits interfering with judicial proceedings if such person knowingly: ... [d]isobeys or resists the lawful order, process or other mandate of a court").  (FAC at 103).

enforcement role satisfies the plain meaning of *Ex parte Young*'s 'some connection' standard,". *Id*. And because there is no requirement that she be the "primary authority to enforce", *Id* at 802-04, her immunity defense failed when she admitted county attorneys can *also* prosecute Plaintiff. Her "role" in the § 12-3201 "enforcement scheme" defeats sovereign immunity regardless of whether her conduct serves as the first *Mendia* "link".

## II. There Is No Basis For Rule 12(b)(6) Dismissal

### A. Legal Standard

A Rule 12(b)(6) motion should be denied if a plaintiff alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Courts are "to take as true all material allegations in the complaint and construe the complaint in favor of the plaintiff." *Arizona v. Yellen,* 34 F.4th 841, 849 (9th Cir. 2022). Furthermore, a "pro se litigant must be given leave to amend his or her complaint, and some notice of its deficiencies" before dismissal may be granted. *Cato v. United States*, 70 F.3d 1103, 1106 (9th Cir. 1995).

### B. Plaintiff Sufficiently Pleads Counts One and Two

AG Mayes declares bottom-line positions that A.R.S. § 12-3201 "does not facially violate the First Amendment" and § 13-2921 is not "void for vagueness". (MTD, pp. 11, 16.). To arrive at those far-reaching conclusions, she improperly asks the Court to decide disputes of applicable law, statutory interpretation, and constitutional interpretation in her favor at the pleading stage. *See Lynch v. Rank,* 604 F. Supp. 30, 39 (N.D. Cal.), *aff'd,* 747 F.2d 528 (9th Cir. 1984) (Disputes of statutory interpretation and applicable canons of statutory construction are not proper subjects for Rule 12(b)(6) motions on the pleadings); *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2398-99 (2024) (District courts "must" develop a sufficient factual record on First Amendment overbreadth claims).

### 1. Count One

#### a. A.R.S. § 12-3201 Facially Violates the Petition Clause

Facial challenges for overbreadth require courts to develop a full factual record to establish a disputed statute's "plainly legitimate sweep", and if any such sweep exists, to determine whether "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id*. (FAC at 123.). "The first step in the proper facial analysis is to assess the state laws' scope. What activities, by what actors, do the laws prohibit or otherwise regulate? ... The next order of business is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest. ... [District] courts *must* explore the law's full range of applications – the constitutionally impermissible and permissible both – and compare the two sets. ... [Otherwise,] the record is underdeveloped". *Id* (emphasis added).

As to that first step, the parties agree the scope of A.R.S. § 12-3201 primarily prohibits pro se litigants from filing suits that are *either* objectively baseless *or* filed for an improper purpose, in "disjunctive" fashion. (MTD, p. 14; FAC at 125-138).

Now the Court "must" tend to the "next order of business [which] is to decide which of the laws' applications violate the First Amendment". *Id*. This Circuit outlined the "scope of the Petition Clause" and its specific "right of access to the courts" in *Sosa v. DIRECTV, Inc*., 437 F.3d 923 (9th Cir. 2006). Accordingly, the First Amendment is violated where § 12-3201's "applications" of "vexatious" petitioning, as defined by § 12-3201(E)(1)(a)-(f), do not also constitute "sham" petitioning as defined by "*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ['*PRE II*'] ... *PRE II* recognized the applicability of the first aspect of the breathing space principle when it defined the *Noerr-Pennington*

doctrine's 'sham litigation' exception as requiring *both* objective baselessness and an improper motive." *Sosa*, 437 F.3d at 930-31. For ultimate Petition Clause clarity, in _conjunctive_ fashion, "[t]he two parts of the [*PRE II*] test operate in succession: Only if the suit is found to be objectively baseless does the court proceed to examine the litigant's subjective intent." *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994). The *PRE II* "definition _over-protects_ baseless petitions so as to ensure citizens may enjoy _the right of access to the courts without fear of prosecution_." *Sosa*, 437 F.3d at 934 (emphasis added).

In *Sosa*, the Ninth Circuit formally (1) granted *Noerr-Pennington* immunity to all petitioning subject only to "the sham litigation exception", *Id* at 938; and (2) established that "[t]he *Noerr-Pennington* doctrine stands for a generic rule of statutory construction, applicable to _any_ statutory interpretation that could implicate the rights protected by the Petition Clause." *Id* at 931 (emphasis added). Consequently, "in this Circuit, there is a three-step test to determine whether conduct that allegedly violates a statute is immunized from liability [and culpability]. Under the test, the court asks: '(1) whether the lawsuit imposes a burden on petitioning rights,' '(2) _whether the alleged activities constitute protected petitioning activity,' in other words, 'neither the Petition Clause nor the Noerr-Pennington doctrine protects sham petitions,_' and '(3) whether the statute at issue may be construed to [avoid] that burden. If the answer at each step is 'yes,' then a defendant's conduct is immunized under *Noerr-Pennington.*'" *Pyankovska v. Abid*, 65 F.4th 1067, 1077 (9th Cir. 2023) (emphasis added). This "test" recognizes that the bright line scope of the Petition Clause's right of free access to the courts covers _all_ "petitioning activity" _not_ subject to the sham litigation exception, and sets conditions for the *Moody* analysis.

Recognizing her dilemma, AG Mayes simply rejects *Sosa* with no justification

beyond a truncated and misread passage from *Bill Johnson's Rests*. – "baseless litigation is not immunized by the First Amendment right to petition" (MTD, p. 1). Clarifying that exact passage, the Supreme Court expressly held "in *Bill Johnson's* that [an adjudicative body] could enjoin baseless retaliatory [i.e., baseless *and* retaliatory] suits because they fell outside of the First Amendment and thus were analogous to 'false statements.' We concluded that '[j]ust as false statements are not immunized by the First Amendment right to freedom of speech, *baseless litigation is not immunized by the First Amendment right to petition*.' While this analogy is helpful, it does *not* suggest that the class of baseless litigation is *completely* unprotected: *At most*, it indicates such litigation should be unprotected 'just as' false statements are. And while false statements may be unprotected for their own sake, '[t]he First Amendment *requires* that we protect some falsehood in order to protect *speech that matters.*' ([N]oting the need to protect some falsehoods to ensure that 'the freedoms of speech and press [receive] that 'breathing space' essential to their fruitful exercise'). ... It is at least consistent with these 'breathing space' principles that we have *never* held that the *entire* class of objectively baseless litigation *may be enjoined or declared unlawful* even though such suits may advance no First Amendment interests of their own. Instead, in cases like *Bill Johnson's* and [*PRE II*]*, our holdings *limited regulation* to suits that were *both* objectively baseless *and* subjectively motivated by an unlawful purpose." *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 530-31, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) (Italics with underline emphasis added). At bottom, the Supreme Court addressed, and dispensed with, AG Mayes' attempt to redefine the sham litigation exception with a "disjunctive" standard.

The Attorney General also fails to explain what legal principle could ever permit A.R.S. § 12-3201 to evade "[t]he *Noerr-Pennington* doctrine [which is] applicable to *any*

statutory interpretation that could implicate the rights protected by the Petition Clause." *Sosa*, 437 F.3d at 931-32 (emphasis added). Again, in this Circuit, the Petition Clause "over-protects" all petitioning activities except "sham litigation". *Id* at 934. *Ringgold* did not abrogate *Sosa*. (MTD, pp. 13-14). To the contrary, when properly read, *Ringgold* aligns with *Sosa* and the *Noerr-Pennington* doctrine such that § 12-3201 violates the First Amendment in every application because "[n]o A.R.S. § 12-3201(E)(1)(a)-(f) provision meets the Ninth Circuit's heightened standard for vexatious litigant injunctions ... requiring *both* serial objectively baseless litigation *and* an improper purpose in the form of either an 'inordinate' number of 'frivolous' suits or a demonstrated 'pattern of harassment' involving common defendants and claims." (FAC at 139-187). In sum, AG Mayes' arguments are fatally flawed because (1) the Supreme Court and this Circuit foreclosed her interpretation of the *Bill Johnson's Rests*. phrase upon which she relies; and (2) *Ringgold* must be read to be consistent with *Sosa*, the Petition Clause's right of access to the courts, and the *Noerr-Pennington* doctrine's sham litigation exception.[6]

---

[6] "[W]e identified three circumstances in which the sham litigation exception might apply: first, where the lawsuit is objectively baseless *and* the defendant's motive in bringing it was unlawful; second, where the conduct involves a series of lawsuits 'brought pursuant to a policy of starting legal proceedings without regard to the merits' *and* for an unlawful purpose; and third, if the allegedly unlawful conduct 'consists of making intentional misrepresentations to the court, litigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.'" *Sosa,* 437 F.3d at 938 (emphasis added). *Ringgold* held litigants cannot be designated vexatious, and their lawsuits enjoined, unless they (1) engage in "a pattern of harassment" against common defendants through baseless lawsuits, or (2) file a "series" of "frivolous" suits where the number of baseless lawsuits is so "inordinate" that a court can only infer an improper purpose. (FAC at 136-138.). Regarding this first "*Ringgold* Standard", "[t]o establish that serial objectively baseless litigation is of a 'harassing nature', every suit in a long series of suits must found to be both objectively baseless and filed for an improper purpose, thus demonstrating a heightened "pattern of harassment" affecting common defendants. *Ringgold*, 761 F.3d at 1060-64." (FAC at 137). The "alternative" second "*Ringgold* Standard" holds that "[i]n the highly unusual alternative,

The overbreadth dispute boils down to what legal standard defines the right of access to the courts. AG Mayes asks the Court to adopt a disjunctive standard that the Supreme Court rejected and contradicts *Sosa*. Plaintiff asks the Court to accept the conjunctive standard that the Supreme Court affirmed, and this Circuit adopted in *Sosa*. *Fidelity Exploration and Prod. Co. v. U.S.,* 506 F.3d 1182, 1186 (9th Cir.2007) (Courts "must follow the Supreme Court precedent that directly controls"); *Human Life of Wash., Inc. v. Brumsickle,* 624 F.3d 990, 1016 (9th Cir.2010) ("[W]e are bound to follow circuit precedent"). He alleges "the improper purpose 'frivolous or harassing' consideration does not come into play unless the current litigation is first determined to be 'objectively baseless'", (FAC at 135), and that the legal definition of "harassment" only implicates suits filed for "no legitimate purpose" (i.e., objectively baseless suits). (FAC at 203). He will argue in post-pleading proceedings that *Sosa* applies, and *Ringgold* supports *Sosa*. AG Mayes must somehow (1) square her contrary position with *PRE II*, *BE & K Constr., Sosa*, and *Ringgold*; and (2) overcome *Noerr-Pennington*, the Petition Clause, and the Supremacy Clause ("This Constitution, and the Laws of the United States ..., shall be the supreme Law of the Land") – quite a tall task since each precludes state legislators from enacting laws that abridge petitioning rights or in any way threaten access to the courts.

### b. A.R.S. § 12-3201(E) Facially Violates the Vagueness Doctrine

Again, vexatious designations are permitted in the face of an "inordinate number" of "frivolous" suits indicating a "series" because such petitioning conduct also inherently demonstrates an improper purpose. (FAC at 138, n. 38.). In civil tort cases, this test has

---

serial objectively baseless litigation of a 'frivolous ... nature' exists when records review demonstrates an 'inordinate' number of finalized frivolous suits" which can only infer an improper purpose. (FAC at 138, n. 38). When read properly, the two *Ringgold* tests for vexatious litigation (FAC at 124-139, 213, 221, 230-233) align with the first two *Noerr-Pennington* tests for the "sham litigation" exception. *Sosa,* 437 F.3d at 938; Affidavit

"relied on a fact pattern that involved twenty-nine lawsuits.  Perhaps due to the rarity of that number, its infrequent application in our case law is a feature rather than a bug." *Relevant Grp., LLC v. Nourmand,* 116 F.4th 917, 931 (9th Cir. 2024).  In the vexatious context, mere "litigiousness alone is not enough".  *Ringgold,* 761 F.3d at 1064.  To pass that "inordinate" threshold and affirm an actionable frivolous "series", "thirty-five actions" have been needed.  *Id.*  This "alternative" test is quantitative but § 12-3201 lacks any such objective standard, making the provision facially vague. (FAC at 195-207).  AG Mayes' defense is that the need for objectivity is a "quibble". (MTD, p. 16.). But "[w]hen First Amendment freedoms are at stake, courts apply the vagueness analysis more strictly, requiring statutes to provide a greater degree of specificity and clarity than would be necessary under ordinary due process principles." *Cal. Teachers Ass'n v. State Bd. of Educ.,* 271 F.3d 1141, 1150 (9th Cir. 2001).  This dispute requires further adjudication.

### c. A.R.S. § 12-3201(B) Facially Violates the Overbreadth Doctrine

A.R.S. § 12-3201(B) mandates a permanent blanket injunction for "any" § 12-3201(E)(1)(a)-(f) infraction.  But even if any § 12-3201(E) provision could be construed to be constitutional, the resulting statutory injunction would be unconstitutional since any such provision has been deemed "overbroad [if] it is designed to prevent [a plaintiff] from filing any complaint in any case without leave of court".  *Moy v. U.S.*, 906 F.2d 467, 471 (9th Cir. 1990). (FAC at 188-192).  Facing this decided issue of law, AG Mayes points to rules of special action and asks the Court to rely on Arizona's appellate judges to fix trial errors. (MTD, p. 12).  She misses the obvious legal fallacy – every judge would use the statute's "disjunctive" plain language to render unconstitutional decisions.

### d. A.R.S. § 12-3201 Is Facially Vague for Lack of a Hearing Requirement

The Attorney General argues that a civil statute admittedly implicating the Petition

Clause, but lacking any hearing language, somehow provides adequate procedural due process. (MTD, pp. 14-15.). Again, she is free to argue in post-pleading proceedings what canons of statutory construction permit such a conclusion, but her defense is not grounds for dismissal at the pleading stage. The Court must analyze the statute for vagueness to determine whether the state's judiciary can fill such a large legislative gap. (FAC at 193).

### 2. Count Two

The current iteration of A.R.S. § 13-2921 "was not enacted without controversy". *McCormack v. Hiedeman,* 694 F.3d 1022 (9th Cir.2012). The Court should take judicial notice[7] that (1) the Arizona Legislature revised that statute during the 2022 legislative session, eliminated intent as an element while maintaining the A.R.S. § 13-2921(E) "harassment" definition which has no "saving clause" (FAC at 202-214), and on the day Democrat Senator Martin Quezada voted against the 2022 revision, he explained on the chamber floor that § 13-2921 "violates the First Amendment"[8]; and (2) Republican Senator Alexander Kolodin sponsored significant revisions in the 2025 session because the statute "violates the First Amendment".[9] Like Plaintiff, those two attorney legislators from both sides of the political aisle consider the current version of A.R.S. § 13-2921 Harassment to be facially unconstitutional. Accordingly, Plaintiff sufficiently alleges state judges and prosecutors have been forced to engage in "arbitrary and discriminatory enforcement" of this challenged statute which "abuts against First Amendment freedoms". (FAC at 123, 202-214). A.R.S. § 13-2921 is facially vague on the pleadings.

### CONCLUSION

The Petition Clause safeguards free "access to the courts". Giving life to that

---

[7] *See Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir. 2001).
[8] *See* https://apps.azleg.gov/BillStatus/BillOverview/77621.
[9] *See* https://apps.azleg.gov/BillStatus/BillOverview/81701?SessionId=129.

ER-215

"precious" right, the Ninth Circuit immunizes all petitioning activities pursuant to the *Noerr-Pennington* doctrine, subject only to the "sham litigation exception". *See Sosa*. Yet, A.R.S. § 12-3201 permits litigation to be enjoined in blanket fashion, and litigants to be deemed "vexatious", based on petitioning that AG Mayes acknowledges does not meet this Circuit's settled definition of "sham litigation". In other words, § 12-3201 punishes a heavy volume of petitioning activity which warrants First Amendment protection. By operation of that statute, AG Mayes belongs to a combination of state officer and private party enforcers who threaten Plaintiff with civil and criminal prosecution for A.R.S. § 12-3201(B) violations as § 13-3601 Domestic Violence predicates, including § 13-2921 Harassment which is also void for vagueness. Pre-enforcement injuries are traceable to the Attorney General's alleged misconduct through an unattenuated, legislatively defined chain of causation. And because Plaintiff seeks redressable relief, he has standing. AG Mayes also tacitly admits her *Ex Parte Young* connection to enforcement of the disputed statutes, making her a "proper defendant" and giving the Court Article III jurisdiction. Plaintiff pleads sufficient facts to bring plausible First Amendment facial challenges to § 12-3201 in Count One and to § 13-2921 in Count Two. Count One's overbreadth claim turns largely on which legal standard applies to the *Moody* analysis. Under the Ninth Circuit's ubiquitous embrace of the *Noerr-Pennington* doctrine's conjunctive "sham litigation exception" standard, the vexatious litigant statute has no "plainly legitimate sweep". Thus, it is unconstitutional in every application. In opposition, AG Mayes takes the position that the Court should apply a disjunctive standard which the Supreme Court expressly rejected, that misreads *Ringgold*, and that conflicts with *Noerr-Pennington* and *Sosa*. The parties have genuine disputes of fact and law requiring adjudication on a fully developed record. There is no basis for Rule 12(b)(1) or (6) dismissal.

1          DATED this 3rd day of July 2025.

2
                              By:  //s//
3                                  Phillip Potter
                                   Plaintiff
4                                  Pro Se

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

18

1   Phillip Potter
2   2301 N. 66th Street
    Scottsdale, Arizona 85257
3   Phone: 480.459.0310
    E-Mail: phillip.t.potter@gmail.com
4   Plaintiff
    Pro Se
5

6           IN THE UNITED STATES DISTRICT COURT

7               FOR THE DISTRICT OF ARIZONA

8

9

10  Phillip Potter,                    No. 2:25-cv-00663-PHX-DWL

11                     Plaintiff,

12  v.                                 **PLAINTIFF'S AFFIDAVIT IN
                                       SUPPORT OF RESPONSE TO
13  Robert Meza, et al.,               ARIZONA ATTORNEY GENERAL'S
                                       MOTION TO DISMISS
14                                     FIRST AMENDED COMPLAINT**

15                     Defendants.

16

17

18

19

20          I, Phillip Potter, hereby depose and state as follows:

21

22          1. I submit this affidavit pursuant to 28 U.S.C. § 1746 in support of Plaintiff's July

23  3, 2025 Response to a motion to dismiss (Doc. 38) the above-captioned lawsuit.

24          2. The statements set forth in this affidavit are based on my own personal

25  knowledge and investigation unless stated otherwise.  These statements are true to the

26  best of my knowledge and belief as of the date I sign this affidavit.

3. I am the Plaintiff in the above-captioned action.

4. Attorney General Kris Mayes is a defendant in the above-captioned action. She filed a June 3, 2025 motion to dismiss (Doc. 38) per Fed. R. Civ. P. 12(b)(1) and (6).

5. Therein, on pages 1-2, Attorney General Mayes referred to state court case no. CV2021-013210 as the "other 'litigation activity,' which 'paint[ed] a troubling picture'" for the state trial court judge who cited that case as grounds to find Plaintiff vexatious in "*Potter v. Ariz. House of Reps.*, No. [CV]2022-008626".

6. Attached to this Affidavit as Exhibit A is a true and correct copy of three documents recently entered in The Superior Court of the State of Arizona In and For The County of Maricopa case no. CV2021-013210 *Potter v. Doctor*, et al.: (1) a June 12, 2025 Notice of Settlement jointly submitted by plaintiff Phillip Potter and defendants Michael Clancy and Hildebrand Law, P.C. through their counsel Benjamin Hodgson; (2) a June 12, 2025 Stipulation for Dismissal With Prejudice jointly submitted by plaintiff Phillip Potter and defendants Michael Clancy and Hildebrand Law, P.C. through their counsel Benjamin Hodgson; and (3) a June 16, 2025 Order of Dismissal With Prejudice signed by the Hon. Randall Warner.

7. Case no. CV2021-013210 was active when Plaintiff was found statutorily vexatious in case no. CV2022-008626, and is still active and ongoing today.

8. As disclosure and discovery continued to progress in CV2021-013210 and CV2021-005501, and defendants Michael Clancy and Hildebrand Law, P.C. gained greater awareness of Plaintiff's evidence of his former spouse's and Robert Meza's coordinated conduct as alleged in the above-captioned suit, Mr. Clancy and Hildebrand Law, P.C. asked to settle. The parties reached settlement.

9. "The fact that this ongoing litigation settled suggests that the original suit was

2

not objectively baseless." *Theme Promotions, Inc. v. News Am. Mktg. FSI,* 546 F.3d 991, 1008 (9th Cir. 2008).

10. Case no CV2021-005501 has survived motions to dismiss and is set for trial beginning September 22, 2025. That case also is not objectively baseless.

11. Plaintiff provides these facts, not to prove that case no. CV2022-008626 was decided in error, but to submit additional, newly established evidence supporting Plaintiff's First Amendment facial overbreadth challenge to A.R.S. § 12-3201; specifically, that the challenged statute's sweep violates the Petition Clause.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on July 3, 2025.

Phillip Potter

3

ER-220

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# Exhibit A

Clerk of the Superior Court
*** Electronically Filed ***
L. Sanchez, Deputy
6/12/2025 12:56:07 PM
Filing ID 20014530

Elizabeth S. Fitch, (#010442)
Benjamin L. Hodgson, (#018402)
**RIGHI FITCH LAW GROUP, P.L.L.C.**
2999 N. 44th Street, Suite 215
Phoenix, AZ 85018
Telephone:  (602) 385-6776
Facsimile:  (602) 385-6777
beth@righilaw.com
benjamin@righilaw.com
*Attorneys for Defendants Michael Clancy
and Hildebrand Law, PC*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| PHILLIP POTTER, an individual, | Case No.: CV2021-013210 |
| Plaintiff, | **NOTICE OF SETTLEMENT** |
| v. | |
| TASNEEM DOCTOR, an individual; | *(Assigned to the Hon. Randall Warner)* |
| ABDULLA DOCTOR, a married man; | |
| BRENDA DOCTOR, a married woman; | |
| CHRISTINE EHRICH, an individual; | |
| MICHAEL CLANCY, a married man; | |
| HILDEBRAND LAW, P.C., an | |
| Arizona professional corporation; | |
| ALIFIA KARACHIWALA, a married | |
| woman; ALANE ORTEGA, a married | |
| woman; ROBERT MEZA, a married man; | |
| TONY NAVARRETE, an individual; | |
| DANA CAMBPELL SAYLOR, a married | |
| woman; LORRIE HENDERSON, an | |
| individual; JEWISH FAMILY AND | |
| CHILDREN'S SERVICES, INC.; an | |
| Arizona nonprofit corporation; SHAWN | |
| EMMONS, an individual; PSA | |
| BEHAVIORAL HELTH AGENCY, an | |
| Arizona nonprofit corporation; TAD GARY, | |
| an individual; HUGH LYTLE, a married | |
| man; EQUALITY HEALTH, LLC; an | |
| Arizona limited liability company; BLUE | |
| CROSS AND BLUE SHIELD OF | |
| ARIZONA, INC., an Arizona nonprofit | |
| corporation; JEFF GUILDNER, a married | |

- 1 -

ER-222

1  man; DON BRANDT, a married man;
   ARIZONA PUBLIC SERVICE
2  COMPANY, an Arizona corporation;
   PINNACLE WEST CAPITAL
3  CORPORATION, an Arizona corporation;
   JOHN/JANE DOES A-J; and COMPANIES
4  1-10,

                    Defendants.

6         **NOTICE IS HEREBY GIVEN** that Plaintiff Phillip Potter, Defendants Michael

7  Clancy and Hildebrand Law, P.C. in the above-captioned matter have reached a

8  settlement and will submit to the Court a Stipulation for Dismissal with Prejudice.

10        **RESPECTFULLY SUBMITTED** this 11th day of June, 2025.

12                              **RIGHI FITCH LAW GROUP, P.L.L.C.**

14                              By: */s/ Benjamin L. Hodgson*
15                                  Elizabeth S. Fitch
                                    Benjamin L. Hodgson
16                                  2999 N. 44th Street, Suite 215
                                    Phoenix, AZ 85018
17                                  *Attorneys for Defendants Michael Clancy*
                                    *and Hildebrand Law, PC*

18                              **PHILLIP POTTER**

20                              By: _____
                                    Phillip Potter
21                                  2301 N. 66th Street
                                    Scottsdale, AZ 85257
22                                  *Plaintiff Pro Per*

                                    - 2 -                                        ER-223

1    **ORIGINAL** of the foregoing e-filed
2    With AZ Turbo Court this 11ᵗʰ day of June, 2025,
     with:
3
4    Clerk of the Court
     Maricopa County Superior Court
5

6    **COPY** of the foregoing emailed
7    this 11ᵗʰ day of June, 2025, to:

8    Phillip Potter
     phillip.t.potter@gmail.com
9    2301 N. 66ᵗʰ Street
10   Scottsdale, AZ 85257
     *Plaintiff Pro Per*
11
     Alane M. Ortega
12   ORTEGA & ORTEGA, P.L.L.C.
13   7227 N. 16ᵗʰ Street, Suite 245
     Phoenix, AZ 85020
14   alane@ortegalawyers.com
15   *Attorney for Defendants Tanseem Doctor,*
     *Abdulla Doctor, Brenda Doctor,*
16   *and Alane M. Ortega*

17   Jill M. Covington
18   Gabriel T. O'Quin
     **SLATTERY PETERSEN LLC**
19   340 East Palm Lane, Suite 250
     Phoenix, Arizona 85004
20   jcovington@slatterypetersen.com
21   goquin@slatterypetersen.com
     *Attorneys for Defendant Mercy Care and Tad Gary*
22
23   Tim Nelson
     **THE NELSON LAW GROUP PLLC**
24   21 West Coolidge Street
     Phoenix, AZ 85013
25   Tim@NelsonLawSolutions.com
     *Attorney for Robert Meza*
26

- 3 -

1  Keith Beauchamp
   Marki Stewart
2  **COPPERSMITH BROCKELMAN PLC**
   2800 N. Central Ave., Suite 1900
3  Phoenix, AZ 85004
   kbeauchamp@cblawyers.com
4  mstewart@cblawyers.com
   *Attorneys for Blue Cross Blue Shield of Arizona*
5

6  By: */s/ Koni Andrews*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

- 4 -

ER-225

Clerk of the Superior Court
*** Electronically Filed ***
L. Martinez, Deputy
6/12/2025 1:16:46 PM
Filing ID 20014795

1  Elizabeth S. Fitch, (#010442)
   Benjamin L. Hodgson, (#018402)
2  **RIGHI FITCH LAW GROUP, P.L.L.C.**
   2999 N. 44th Street, Suite 215
3  Phoenix, AZ 85018
   Telephone:   (602) 385-6776
4  Facsimile:   (602) 385-6777
   beth@righilaw.com
5  benjamin@righilaw.com
   *Attorneys for Defendants Michael Clancy*
6  *and Hildebrand Law, PC*

7              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

8                  **IN AND FOR THE COUNTY OF MARICOPA**

9  PHILLIP POTTER, an individual,              Case No.: CV2021-013210

10            Plaintiff,                        **STIPULATION FOR DISMISSAL
                                                WITH PREJUDICE**
11 v.

12 TASNEEM DOCTOR, an individual;              *(Assigned to the Hon. Randall Warner)*

13 ABDULLA DOCTOR, a married man;
   BRENDA DOCTOR, a married woman;
14 CHRISTINE EHRICH, an individual;
   MICHAEL CLANCY, a married man;
15 HILDEBRAND LAW, P.C., an
   Arizona professional corporation;
16 ALIFIA KARACHIWALA, a married
17 woman; ALANE ORTEGA, a married
   woman; ROBERT MEZA, a married man;
18 TONY NAVARRETE, an individual;
19 DANA CAMBPELL SAYLOR, a married
   woman; LORRIE HENDERSON, an
20 individual; JEWISH FAMILY AND
   CHILDREN'S SERVICES, INC.; an
21 Arizona nonprofit corporation; SHAWN
22 EMMONS, an individual; PSA
   BEHAVIORAL HELTH AGENCY, an
23 Arizona nonprofit corporation; TAD GARY,
   an individual; HUGH LYTLE, a married
24 man; EQUALITY HEALTH, LLC; an
   Arizona limited liability company; BLUE
25 CROSS AND BLUE SHIELD OF
   ARIZONA, INC., an Arizona nonprofit
26 corporation; JEFF GUILDNER, a married

ER-226

man; DON BRANDT, a married man;
ARIZONA PUBLIC SERVICE
COMPANY, an Arizona corporation;
PINNACLE WEST CAPITAL
CORPORATION, an Arizona corporation;
JOHN/JANE DOES A-J; and COMPANIES
1-10,

                    Defendants.

      PLAINTIFF Phillip Potter, as an individual, and Defendants Michael Clancy and Hildebrand Law, P.C. by and through undersigned counsel, hereby stipulate that the forgoing claim be dismissed with prejudice as to Defendants Michael Clancy and Hildebrand Law, P.C. only, each party to bear its own attorneys' fees and other expenses.

      **RESPECTFULLY SUBMITTED** this 11ᵗʰ day of June, 2025.

          **RIGHI FITCH LAW GROUP, P.L.L.C.**

      By: */s/ Benjamin L. Hodgson*
          Elizabeth S. Fitch
          Benjamin L. Hodgson
          2999 N. 44ᵗʰ Street, Suite 215
          Phoenix, AZ 85018
          *Attorneys for Defendants Michael Clancy*
          *and Hildebrand Law, PC*

      **PLAINTIFF PRO PER**

      By: _____
          Phillip Potter
          2301 N. 66ᵗʰ Street
          Scottsdale, AZ 85257
          *Plaintiff Pro Per*

ER-227

**ORIGINAL** of the foregoing e-filed
this 11th day of June, 2025, with:

Clerk of the Court
Maricopa County Superior Court

**COPY** of the foregoing emailed
this 11th day of June, 2025, to:

Phillip Potter
phillip.t.potter@gmail.com
2301 N. 66th Street
Scottsdale, AZ 85257
*Plaintiff Pro Per*

Alane M. Ortega
ORTEGA & ORTEGA, PLLC
7227 North 16th Street, Suite 245
Phoenix, AZ 85020
Arobylaw.efile@gmail.com
alane@ortegalawyers.com
*Attorney for Defendants Tanseem Doctor,*
*Abdulla Doctor, Brenda Doctor,*
*and Alane M. Ortega*

Jill M. Covington
Gabriel T. O'Quin
**SLATTERY PETERSEN LLC**
340 East Palm Lane, Suite 250
Phoenix, Arizona 85004
jcovington@slatterypetersen.com
goquin@slatterypetersen.com
*Attorneys for Defendant Mercy Care and Tad Gary*

Tim Nelson
**THE NELSON LAW GROUP PLLC**
21 West Coolidge Street
Phoenix, AZ 85013
Tim@NelsonLawSolutions.com
*Attorney for Robert Meza*

Keith Beauchamp
Marki Stewart

ER-228

1

**COPPERSMITH BROCKELMAN PLC**
2800 N. Central Ave., Suite 1900

2

Phoenix, AZ 85004
kbeauchamp@cblawyers.com

3

mstewart@cblawyers.com
*Attorneys for Blue Cross Blue Shield of Arizona*

4

5

By: */s/ Koni Andrews*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ER-229

Granted as Submitted

***See eSignature page***

Clerk of the Superior Court
*** Electronically Filed ***
A. Larimer, Deputy
6/16/2025 8:00:00 AM
Filing ID 20023771

Elizabeth S. Fitch, (#010442)
Benjamin L. Hodgson, (#018402)
**RIGHI FITCH LAW GROUP, P.L.L.C.**
2999 N. 44th Street, Suite 215
Phoenix, AZ 85018
Telephone:    (602) 385-6776
Facsimile:    (602) 385-6777
beth@righilaw.com
benjamin@righilaw.com
*Attorneys for Defendants Michael Clancy*
*and Hildebrand Law, PC*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| PHILLIP POTTER, an individual, | Case No.: CV2021-013210 |
| Plaintiff, | **ORDER FOR DISMISSAL WITH PREJUDICE** |
| v. | |
| TASNEEM DOCTOR, an individual; ABDULLA DOCTOR, a married man; BRENDA DOCTOR, a married woman; CHRISTINE EHRICH, an individual; MICHAEL CLANCY, a married man; HILDEBRAND LAW, P.C., an Arizona professional corporation; ALIFIA KARACHIWALA, a married woman; ALANE ORTEGA, a married woman; ROBERT MEZA, a married man; TONY NAVARRETE, an individual; DANA CAMBPELL SAYLOR, a married woman; LORRIE HENDERSON, an individual; JEWISH FAMILY AND CHILDREN'S SERVICES, INC.; an Arizona nonprofit corporation; SHAWN EMMONS, an individual; PSA BEHAVIORAL HELTH AGENCY, an Arizona nonprofit corporation; TAD GARY, an individual; HUGH LYTLE, a married man; EQUALITY HEALTH, LLC; an Arizona limited liability company; BLUE CROSS AND BLUE SHIELD OF ARIZONA, INC., an Arizona nonprofit corporation; JEFF GUILDNER, a married | |

- 1 -

ER-230

1   man; DON BRANDT, a married man;
    ARIZONA PUBLIC SERVICE
2   COMPANY, an Arizona corporation;
    PINNACLE WEST CAPITAL
3   CORPORATION, an Arizona corporation;
    JOHN/JANE DOES A-J; and COMPANIES
4   1-10,
                    Defendants.
5

6        Notice of Settlement and Stipulation for Dismissal with Prejudice having been

7   received in the above-captioned matter,

8        **IT IS HEREBY ORDERED** that the case is dismissed with prejudice, Plaintiff

9   Phillip Potter, as an individual, and Defendants Michael Clancy and Hildebrand Law, P.C.

10  to bear their own attorneys' fees and costs.

11

12       **[END OF ORDER—SIGNATURE AT TOP OF FIRST PAGE]**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

- 2 -

ER-231

# eSignature Page 1 of 1

Filing ID: 20023771    Case Number: CV2021-013210
Original Filing ID: 20014795

Granted as Submitted



/S/ Randall Warner Date: 6/13/2025

Judicial Officer of Superior Court

ER-232

**ENDORSEMENT PAGE**

CASE NUMBER: CV2021-013210

E-FILING ID #: 20023771

SIGNATURE DATE: 6/13/2025

FILED DATE: 6/16/2025 8:00:00 AM

ALANE ORTEGA

TIMOTHY A NELSON

ANDREW J ALVARADO

PHILLIP POTTER
2301 N 66TH ST SCOTTSDALE AZ 85257

BENJAMIN L HODGSON

DOCKET CV TX

DANIEL D MAYNARD

EMILE J HARMON

JEFFREY H WOLF

JILL M COVINGTON

JOSEPH N ROTH

MARK J DEPASQUALE

MARKI STEWART

ER-233

1  Phillip Potter
2  2301 N. 66th Street
   Scottsdale, Arizona 85257
3  Phone: 480.459.0310
   E-Mail: phillip.t.potter@gmail.com
4  Plaintiff
5  Pro Se

6        **IN THE UNITED STATES DISTRICT COURT**

7            **FOR THE DISTRICT OF ARIZONA**

8

9

10   Phillip Potter,                          No. 2:25-cv-00663-PHX-DWL

11                    Plaintiff,

12   v.                                       **PLAINTIFF'S RESPONSE TO THE
                                              ORDER TO SHOW CAUSE WHY THE
13   Robert Meza, et al.,                     CAUSE SHOULD NOT BE DISMISSED**

14                                            (Oral Argument Requested)
                     Defendants.
15                                            (Expedited Consideration Requested)

16

17

18

19

20

21

22

23

24

25

26

ER-234

The Hon. Dominic W. Lanza instructed "that Plaintiff must show cause, within seven days of the issuance of this order, why this action should not be dismissed for lack of subject-matter jurisdiction." (Doc. 26.). Plaintiff shows herein that the action should not be dismissed as the Court does have U.S. Const. Art. III subject matter jurisdiction. No federal claim, and no requested relief, asks or requires the Court to review, rely on, enjoin, or revise any state court order, judgment, or judicial function.

THE COURT HAS SUBJECT MATTER JURISDICTION

U.S. Const. "Art. III, ... limits the jurisdiction of federal courts to 'Cases' and 'Controversies,'". *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559 (1992). Within those constitutional "limits", a federal court's "'obligation' to hear and decide a case is 'virtually unflagging.'" *Sprint Communic'ns, Inc. v. Jacobs,* 571 U.S. 69, 134 S.Ct. 584, 591, 187 L.Ed.2d 505 (2013) (quoting *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). On-point Ninth Circuit precedent and U.S. Supreme Court precedent confirm that an original "controversy" exists between Plaintiff and each defendant party where neither the *Rooker-Feldman* doctrine nor the *Younger* abstention doctrine apply.

I. Legal Standards

A. *Rooker-Feldman*

The *Rooker-Feldman* doctrine "recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments". *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 644 n.3 (2002). The U.S. Supreme Court has repeatedly emphasized that *Rooker-Feldman* is a "narrow doctrine". "Neither *Rooker* nor *Feldman* elaborated a rationale for a wide-reaching bar on the jurisdiction of lower federal courts, and our cases

since *Feldman* have tended to emphasize the narrowness of the *Rooker-Feldman* rule. ... *Rooker-Feldman,* we explained, is a narrow doctrine, confined to 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.' ...  The doctrine applies only in 'limited circumstances,'." *Lance v. Dennis*, 546 U.S. 459, 464-66 (2006) (quoting *Exxon Mobil Corp.* v. *Saudi Basic Industries Corp.,* 544 U.S. 280, 292 (2005)).  Those "limited circumstances" occur when (1) a federal plaintiff seeks appellate review of a state judicial act or judgment; or (2) a plaintiff's federal case is "inextricably intertwined" with a state court judgment. *Id*.

Speaking to the first of those two "circumstances", *Rooker-Feldman* is strictly limited to federal cases requesting or requiring appellate review of judicial acts done, and/or orders or judgments rendered, in state courts. *Id*.  On the other hand, federal claims seeking relief from actions committed by, or threatened by, state officers acting in their administrative, legislative, or executive capacity are <u>not</u> subject to the doctrine.  *Id* at 464 ("*Rooker-Feldman* 'has no application to judicial review of executive action,'").  Going to the second of those "circumstances", a federal case is "inextricably intertwined ... if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 25 (1987).  Of note, the Ninth Circuit has held that a "facial [constitutional] challenge [i]s not 'inextricably intertwined' with the judicial decision of the local court [since such claims present] a general challenge to the constitutionality of" a state statute.  *Noel v. Hall*, 341 F.3d 1148, 1157 (9th Cir. 2003); *Bianchi v. Rylaarsdam*, 334 F.3d 895, 898 (9th Cir. 2003) ("A general constitutional challenge [] is <u>not</u> 'inextricably intertwined' with the state court decision" because it asks a federal court to review state legislative acts, not judicial acts) (emphasis added).

B. *Younger*

"*Younger* abstention remains an extraordinary and narrow exception to the general rule [of Article III jurisdiction]". *Cook v. Harding,* 879 F.3d 1035, 1038 (9th Cir. 2018) (quoting *Nationwide Biweekly Admin., Inc. v. Owen,* 873 F.3d 716, 727 (9th Cir. 2017)). "Specifically, *Younger* abstention is appropriate when: (1) there is 'an ongoing state judicial proceeding'; (2) the proceeding 'implicate[s] important state interests'; (3) there is 'an adequate opportunity in the state proceedings to raise constitutional challenges'; and (4) the requested relief 'seek[s] to enjoin' or has the practical effect of enjoining the ongoing state judicial proceeding." *Arevalo v. Hennessy,* 882 F.3d 763, 765 (9th Cir. 2018) (quoting *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund,* 754 F.3d 754, 758 (9th Cir. 2014)). Every *Arevalo* condition must be met to invoke *Younger* abstention. *Id.*

## II. No Claim Is Subject to *Rooker-Feldman* or *Younger*

As a preliminary matter, the Court expressed no concerns for the state claims (Counts Four and Five) provided Plaintiff could demonstrate the Court's subject matter jurisdiction over federal Counts One, Two, and/or Three. (Doc. 26.).

### A. The Court Has Subject Matter Jurisdiction Over Count One

Count One brings a First Amendment facial challenge to Arizona's mistitled vexatious litigant statute, A.R.S. § 12-3201 (the "Statute"). (Doc. 14 at 113-217.). Kris Mayes, in her official executive capacity as Arizona Attorney General, and the Hon. Joseph Welty, in his official *administrative* capacity as Presiding Judge of the Maricopa County Superior Court, are named as defendants.[1] (Doc. 14 at 103-104.). Plaintiff

---

[1] Judge Welty did not preside over any state case, decide any dispute, engage in any judicial act, issue any order, or render any judgment. He is listed as a defendant because A.R.S. § 12-3201(A) grants county Presiding Judges certain administrative authorities which permit them to issue unappealable administrative orders, including orders entering names onto a Vexatious Litigant List; an outcome Plaintiff seeks to avoid given the

ER-237

reasonably fears defendants' administrative and executive (including civil and criminal) enforcement of A.R.S. § 12-3201 which would cause irreparable injuries.  These facts give him standing to bring suit (Doc. 14 at 110-111.) and seek prospective relief enjoining administrative and executive enforcement of the allegedly unconstitutional Statute, and of a reliant order.[2]  *See Ex parte Young,* 209 U.S. 123 (1908) (Persons threatened with a state officer's enforcement "of an unconstitutional act of the state legislature [may] ... go[] into a Federal court [], in a case involving a violation of the Federal Constitution, and obtain[] a judicial investigation of the problem, and pending its solution obtain freedom from suits, civil or criminal, by a temporary injunction"); *Verizon,* 535 U.S. at 645 ("[A] court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' ... 'The prayer for injunctive relief – that state officials be restrained from enforcing an order in contravention of controlling federal law – clearly satisfies our 'straightforward inquiry.'"). With tensions now rising, the Attorney General recently threatened Plaintiff with "consequences" (Doc. 24, p.3.) should he disobey the A.R.S. § 12-3201(B) blanket provision ("A pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court") based on a stated intent to file motion papers absent leave of court in litigation deemed meritorious in state trial and appellate courts (Doc. 14 at 98.).  An *Ex parte Young* "controversy" exists between Plaintiff and state officers who threaten to act in an official non-judicial capacity. This is an "original" case.   The Court has Article III subject matter jurisdiction.

---

irreparable injuries that would result. (Doc. 14 at 104, 111.).

[2] For purposes of clarity, and as described in greater detail later in this document, Plaintiff does *not* seek to enjoin any state officer acting in their *judicial* capacity, and he does *not* seek any form of appellate review of any state judicial action, order, or judgment.

1    1. Count One Is Not Subject to *Rooker-Feldman*

2        "[U]nder *Rooker-Feldman*, 'we must pay close attention to the *relief* sought by the

3    federal-court plaintiff.'" *Bianchi*, 334 F.3d at 900 (emphasis original).  In Count One

4    (Doc. 14 at 113-207.), Plaintiff seeks relief in the form of (1) a declaration that A.R.S. §

5    12-3201 is unconstitutional under the First Amendment pursuant to the vagueness and

6    overbreadth doctrines; and (2) preliminary and permanent injunctions prohibiting

7    defendants from administratively, civilly, or criminally enforcing any A.R.S. § 12-3201

8    provision or reliant order. (Doc. 14, pp. 70-71.).  Critically, Plaintiff does *not* ask the

9    Court to restrain any Arizona judge or court staff member from *judicially enforcing*

10   A.R.S. § 12-3201, or any state court order or judgment.  To be clear, state courts are free

11   to adjudicate cases without interference, and judges are free to sanction Plaintiff or even

12   find him in contempt for filing motion papers without prior leave.  Plaintiff positioned the

13   federal claims and defendant roster to ensure this case has no impact on state judgments

14   and orders, or on the state court's judicial machinery.

15       a. First Amendment Facial Challenges Are Not Subject to *Rooker-Feldman*

16       While *Rooker-Feldman* prohibits "as-applied [constitutional] challenge[s]" that

17   harken back to "the judicial decision of the local court", the doctrine does not apply to

18   "facial challenges" to the "general" constitutionality of a statute.  *Noel*, 341 F.3d at 1157-

19   65; *Bianchi*, 334 F.3d at 898 ("A general constitutional challenge [] is not 'inextricably

20   intertwined' with the state court decision").  Indeed, federal courts routinely exercise

21   jurisdiction to adjudicate challenges to the constitutionality of state statutes.  *See e.g.,*

22   *Matsumoto v. Labrador*, 122 F.4th 787, 802 (9th Cir. 2024).  In sum, because Plaintiff

23   mounts a First Amendment facial challenge – a "general challenge" – to A.R.S. § 12-

24   3201, the question of whether this Court has Article III jurisdiction is dispositively

25

26

answered in the affirmative pursuant to Ninth Circuit hornbook law.  The Court need read no further to rule that Plaintiff has "show[n] cause, ...why this action should not be dismissed for lack of subject-matter jurisdiction."

### i. Defendants Mayes and Welty Are Proper Defendants

"*Ex parte Young* [] allows 'actions for prospective declaratory or injunctive relief against state officers in their official [non-judicial] capacities for their alleged violations of federal law,' provided that the officer has 'some connection with the enforcement of the act'".  *Matsumoto*, 122 F.4th at 802.  "[A] mere scintilla of enforcement" connection satisfies *Ex parte Young* and confers standing.  *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004).  The "connection" requirement presents "a low bar", *Matsumoto*, which can be cleared simply by demonstrating the potential for redressable relief.  *Mecinas v. Hobbs,* 30 F.4th 890, 903-04 (9th Cir. 2022) ("The question of whether there is the requisite 'connection' between the sued official and the challenged law implicates an analysis that is 'closely related – indeed overlapping' – with ... redressability").  Put another way, *Matsumoto* and *Mecinas* collectively explain that a state officer acting in an official non-judicial capacity is "a proper defendant" for a facial challenge if enjoining the officer's enforcement of the disputed statute provides even "[p]artial amelioration of a harm".  *Matsumoto*, 122 F.4th at 799.

Enjoining Defendant Mayes from civilly and criminally enforcing the Statute's A.R.S. § 12-3201(B) blanket provision certainly would at least partially ameliorate harms threatened in the form of irreparable injuries including unjust incarceration and unlawful family separation. (Doc. 14 at 103, 110.)  In similar fashion, enjoining Defendant Welty from administratively enforcing the Statute per A.R.S. § 12-3201(A) would partially ameliorate the threat to Plaintiff of being placed on Arizona's Vexatious Litigation List,

and of causing additional fundamental rights deprivations. (Doc. 14 at 104, 111.).  *See Doe v. DeWine,* 910 F.3d 842, 848-49 (6th Cir. 2018) ("Enjoining a statewide official under *Young* ... is appropriate when there is a realistic possibility the official will take legal or *administrative* actions against the plaintiff's interests.") (Emphasis added).  Defendants Mayes and Welty are Count One "proper defendants", and Plaintiff has Article III standing to challenge the Statute's constitutionality.  *Lujan,* 504 U.S. at 560-62.  All Article III jurisdictional requirements are met.  Again, there are no grounds to dismiss.

<u>ii. Plaintiff Detailed His State Case For Inclusion In The Tally That First Amendment Overbreadth Challenges Require, Not To Review Or Revise Any Judgment</u>

Plaintiff's First Amendment facial challenge alleges A.R.S. § 12-3201 violates the vagueness and overbreadth doctrines. (Doc. 14 at 123-207.).  Such challenges lead to an exercise in statutory interpretation to decide whether the Statute (1) does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly [and] 'abut[s] upon sensitive areas of basic First Amendment freedoms,'" as means to adjudicate vagueness; or (2) "lacks a plainly legitimate sweep" as means to adjudicate overbreadth. (Doc. 14 at 123.).  But overbreadth also presents what is, in essence, a judicial math problem that requires fact-finding and fact presentation to solve.  If facts cause the Court to determine the Statute possesses a "plainly legitimate sweep", then the Court must decide if "a substantial *number* of [the Statute's] applications are unconstitutional, judged in relation to the [S]tatute's plainly legitimate sweep." *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397-98 (2024) (emphasis added).  "In First Amendment cases, [], this Court has lowered that very high bar [to finding a statute unconstitutional]. ... [W]e have substituted a less demanding though still rigorous standard.  ... [A] law with 'a plainly legitimate sweep' may be struck down in its entirety.

But that is so only if the law's unconstitutional applications substantially outweigh its constitutional ones. ... The first step in the proper facial analysis is to assess the state law's scope. What activities, by what actors, do the laws prohibit or otherwise regulate? ... The next order of business is to decide which of the law's applications violate the First Amendment, and to measure them against the rest. ... To decide the facial challenges here, the courts below must explore the law's full range of applications – the constitutionally impermissible and permissible both – and compare the two sets." *Id*.

The particulars of Plaintiff's state case speak to the Statute's "legitimate sweep" and, if any such "sweep" exists, demonstrate that "the law's full range of applications" produce results incompatible with U.S. Supreme Court precedent, the *Noerr-Pennington* doctrine, and the Ninth Circuit's "*Ringgold* Standard". (Doc. 14 at 133-139.). Those First Amendment authorities harmoniously hold that (1) "well-founded lawsuits ... may not be enjoined", *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 742-43 (1983); (2) litigation may not be enjoined unless it is "both objectively baseless *and* subjectively motivated by an unlawful purpose", *BE & K Constr. Co. v. N.L.R.B.,* 536 U.S. 516, 531, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) (emphasis original); and (3) a litigant may not be denied free access to the courts without a substantive demonstration that he has brought serial objectively baseless litigation and did so for serial improper purposes. *Ringgold-Lockhart v. County of Los Angeles*, 761 F.3d 1057, 1061-64 (9th Cir. 2014). Despite these ironclad Petition Clause protections, Plaintiff is statutorily prohibited from filing pleadings or motion papers absent leave of the court in any suit despite two lawsuits being deemed "well-founded" in trial and appellate courts, meaning those cases are not "objectively baseless". (Doc. 14 at 76-79, 188-191.).

In an entirely separate action, the Arizona State Supreme Court established that the

A.R.S. § 12-3201(E)(1)(c) provision which Plaintiff allegedly violated does not reach to issues of subjective motive, including bad faith motive. (Doc. 14 at 129-131.). Plaintiff's state judgment highlights the inherent friction between the Petition Clause and the Arizona Statute. But Plaintiff does <u>*not*</u> ask or require the Court to conduct any form of appellate review of that judgment. His point in detailing his state case goes to nothing more than facilitating the Court's eventual factual and legal determination as to whether the Statute "lacks a plainly legitimate sweep" and, if the Statute has a "plainly legitimate sweep", whether a "substantial number" of its "applications" are unconstitutional. *Moody*.

### 2. Count One Is Not Subject To *Younger*

While the Court appears to focus on the *Rooker-Feldman* doctrine, it included a citation pointing to *Younger* abstention. (Doc. 26.). That citation reads, "Macleod's claim involves an order uniquely in furtherance of the state courts' ability to perform their judicial functions, and it is thus barred by the *Younger* abstention doctrine."[3] (Doc. 26 at p. 3.). *See Macleod v. Bexley*, 730 F. App'x 845, 848 (11th Cir. 2018). The best Plaintiff can translate Eleventh Circuit language, the Macleod reference most closely aligns with *Arevalo* Factor Four ("the requested relief 'seek[s] to enjoin' or has the practical effect of enjoining the ongoing state judicial proceeding") or perhaps Factor Two (an ongoing proceeding "implicate[s] important state interests"). *Arevalo*, 882 F.3d at 765. Plaintiff's case is easily distinguished from *Macleod*.[4] But, in the end, the *Younger* abstention

---

[3] The "order uniquely in furtherance of the state courts' ability to perform their judicial functions" language traces to *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989) where that language refers to "civil contempt order[s]", orders "require[ing] the posting of bond pending appeal", and the like.

[4] Macleod "sued the Chief Deputy Clerk of the Circuit Court of Flagler County, Florida" in his official judicial capacity, and filed a 42 U.S.C. § 1983 claim seeking relief in the form of compensable damages for not entering a complaint into local court records. The

doctrine does not apply here because none of the four *Arevalo* factors apply.

a. *Arevalo* Factor Four Does Not Apply

In its "Do Not Publish" decision, the Eleventh Circuit noted judicial officers and staff "have absolute immunity from actions for damages arising from acts they are specifically required to do under court order or at a judge's direction." *Macleod*, 730 F. App'x at 848. Further, the U.S. Constitution prohibits federal courts from enjoining state court judges or staff from performing their judicial functions. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021) ("[A]n injunction against a state court or its machinery would be a violation of the whole scheme of our Government"). The Eleventh Circuit reached the substance of its *Macleod* decision based on *Rooker-Feldman* but continued with *dicta* citing *Younger* and noting Macleod's requested relief "involve[d] an order uniquely in furtherance of the state courts' ability to perform their judicial functions". In Ninth Circuit terms, and per *Arevalo* Factor Four, Macleod's "requested relief 's[ought] to enjoin' or ha[d] the practical effect of enjoining" judicial functions.

In stark contrast to *Macleod*, Plaintiff's claims and requested relief do not "'seek to enjoin' or have the practical effect of enjoining" any state judicial act or function because Plaintiff (1) does not bring to suit any state officer acting in an official judicial capacity; (2) does not seek to enjoin the performance of any judicial act, function, or proceeding, meaning the suit cannot impact the state's judicial "machinery"; and (3) intentionally positioned the case so that all state orders and judgments remain intact, meaning he continues to be subject to judicial enforcement of those orders and judgments. *Arevalo* Factor Four does not trigger. The *Younger* abstention doctrine does not apply.

---

underlying claim essentially threatened a court clerk with monetary penalties for adhering to a judicial ministerial order. Macleod did not mount a "general challenge" to the statute.

### b. *Arevalo* Factor Two Does Not Apply

Plaintiff's claims cannot be read to reach *Arevalo* Factor Two which requires there to be an ongoing proceeding that "implicate[s] important state interests". The Statute's constitutionality has never been challenged in a state or federal court in any fashion, much less challenged against the *Noerr-Pennington* doctrine or the *Ringgold* Standard. (Doc. 14 at 120.). So, while the Arizona Legislature might purport that the Statute "implicates important state interests", no court has ever confirmed that to be true. As Plaintiff points out and factually alleges, the Statute is really nothing more than an enhanced sanctions statute, misleadingly titled as a vexatious litigant statute, that provides unconstitutional statutory relief in the form of an unlawful blanket injunctive provision. (Doc. 14 at 121-122, 188-191.). Until the Statute survives First Amendment scrutiny under the crucible of an adversarial process, it cannot be considered legislation that genuinely "implicates important state interests".[5] To be sure, the U.S. Supreme Court has held "the State's interest [is] 'in protecting the health and well-being of its citizens'" via "fact-finding" and the prosecution of "well-founded lawsuits". *Bill Johnson's Rests.,* 461 U.S. at 742-43.

---

[5] Applicable to *Macleod*, the constitutionality of Florida's vexatious litigant statute, "section 68.093, Florida Statutes", could be considered a statute that "implicates state's interests" because it has been tested and endured judicial scrutiny, albeit only under Fla. Const. Art. I, § 21 ("The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay"). *See Smith v. Fisher*, 965 So. 2d 205, 208 (Fla. 4th DCA 2007); *Brown v. Miami-Dade Cnty.*, 319 So. 3d 81, 83 (Fla. 3d DCA 2021). Plaintiff could locate no Eleventh Circuit precedent adjudicating the general constitutionality of "section 68.093, Florida Statutes". That search leads him to conclude the Eleventh Circuit has not developed jurisprudence in this First Amendment arena nearly to the extent of the Ninth Circuit, which culminated with the *Ringgold* Standard guaranteeing procedural and substantive due process when confronted with vexatious litigant determinations. It appears the Eleventh Circuit instead leans heavily on broad residual authorities emanating from the All Writs Act, 28 U.S.C. § 1651, and on judicial discretion to fashion narrowly tailored injunctions to achieve the ends of judicial economy and administration. *See Miller v. Donald,* 541 F.3d 1091, 1096 (11th Cir. 2008).

But the State has absolutely no interest in upholding unconstitutional legislation. *Id*. In sum, *Younger* does not apply because *Arevalo* Factor Two does not apply.

### c. *Arevalo* Factor One Does Not Apply

Per *Arevalo* Factor One, *Younger* requires there to be "an ongoing state judicial proceeding" as a threshold consideration. "For *Younger* purposes, the State's trial-and-appeals process" must not have concluded. *New Orleans Public Service*, 491 U.S. at 369; *DeVries v. State*, 219 Ariz. 314, 198 P.3d 580, ¶14 (App.2008) (The term "proceeding" refers to "every step from the beginning of an action until ... entry of a final judgment that is not subject to further appeal."). CV2022-008626 has reached finality in the state court and is not subject to further appeal. (Doc. 26.). As such, there is no "ongoing" judicial proceeding as *Younger* would define it, meaning *Arevalo* Factor One does not trigger and abstention cannot apply.

### D. *Arevalo* Factor Three Does Not Apply

Finally, Plaintiff also does not have "an adequate opportunity in the state proceedings to raise constitutional challenges" per *Arevalo* Factor Three. Apart from CV2022-008626 reaching conclusion, that public records case sought to vindicate a statutory public right to inspect documents akin to a writ of mandamus. Thus, those proceedings did not, and do not, provide a proper venue or "an adequate opportunity ... to raise constitutional challenges". *See Lujan,* 504 U.S. at 576-578 (Discussing "public rights" vindication versus "individual rights" vindication). *Arevalo* Factor One does not apply. Therefore, *Younger* does not apply.[6]

---

[6] The order to show cause also cites *Bashkin v. Hickman*, 411 F. App'x 998, 999 (9th Cir. 2011) and *Kleidman v. Administrative Presiding Justice Elwood Lui*, 2025 WL 1117432, *3 (C.D. Cal. 2025). Unsuccessful due to the *Rooker-Feldman* doctrine, *Bashkin* and *Kleidman* were initiated in California district courts, much like the majority of pertinent Ninth Circuit precedent culminating with *Ringgold*. California enacted its vexatious

**B. The Court Has Subject Matter Jurisdiction Over Count Two**

Count Two presents a First Amendment facial challenge to A.R.S. § 13-2921 (Doc. 14 at 202-214.), where Plaintiff's requested relief seeks to enjoin the Attorney General's civil and criminal enforcement of that statute. (Doc. 14, p.70-71.).  He asks the Court to enjoin Defendant Mayes from subjecting him to indictment, incarceration, and separation from his young son for mischaracterizing the filing of papers in two well-founded lawsuits as criminal harassment given that such conduct is constitutionally protected under the Petition Clause, the *Noerr-Pennington* doctrine, and the *Ringgold* Standard.  As it stands, the State of Arizona has unlawfully declared that Plaintiff's protected petitioning violates A.R.S. § 13-2921 as an A.R.S. § 13-3601 predicate, while Defendant Mayes threatens "consequences" (Doc. 14 at 92-97, 211.) based on a statutory "chain of causation" which also traces to the Statute. (Doc. 14 at 97-98.).  *See Lujan,* 504 U.S. at 580 (Kennedy, A. concurring) (A state legislature "has the power to ... articulate chains of causation that will give rise to a case or controversy").  Plaintiff generally challenges A.R.S. § 13-2921 as overbroad and alleges that he reasonably fears imminent enforcement of that unlawful statute.  "When contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'

---

litigant statute in 1963.  In the five decades between legislative enactment and *Ringgold*, Californians exhaustively litigated general challenges and as-applied challenges in state and federal courts, culminating in facial constitutional challenges ultimately decided in *Wolfe v. George,* 486 F.3d 1120 (9th Cir. 2007); *see also Shalant v. Girardi,* 51 Cal.4th 1164 (2011).  Absent Ninth Circuit en banc consideration or U.S. Supreme Court review, California's statute must stand.  But none of the other eight states (Arizona, Florida, Hawaii, Iowa, New Hampshire, Nevada, Ohio, and Texas) which enacted a vexatious litigant statute have seen their statute exhaustively adjudicated.  The Court should note Arizona's Statute was the most recently enacted in 2015 and it bears no resemblance whatsoever to California's statute.  *See* Cal. Code Civ. Proc. §§ 391.1 - 391.8.

When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Babbitt* v. *Farm Workers,* 442 U. S. 289, 298-99 (1979).  The Court has original jurisdiction over Count Two.

### 1. Count Two Is Not Subject to *Rooker-Feldman*

The order to show cause does not appear to suggest Count Two is subject to *Rooker-Feldman*.  That said, Count Two is not subject to the *Rooker-Feldman* doctrine for the same reasons that Count One is not subject to the doctrine.

### 2. Count Two Is Not Subject To *Younger*

The order to show cause does not appear to suggest Count Two is subject to *Younger*.  That said, Count Two is not subject to the *Younger* abstention doctrine for the same reasons that Count One is not subject to the doctrine.

### C. The Court Has Subject Matter Jurisdiction Over Count Three

Count Three brings a 42 U.S.C. § 1983 First Amendment Retaliation claim against Defendants Robert Meza and Karrin Taylor Robson. (Doc. 14 at 67-82, 215-237.).

### 1. Count Three Is Not Subject to *Rooker-Feldman*

This species of claim is somewhat unique among § 1983 claims in that (1) it is agnostic as to the method of retaliation; and (2) the injury suffered is the "chill".   At this stage, that "chill" only requires a factual pleading that "the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity".  Plaintiff has done that. (Doc. 14 at 219-224.).  Critically, the "chill" injury suffered here is entirely separate from any injuries that resulted from the CV2022-008626 trial court's order or judgment, or from the appellate court's affirmation.  *Rooker-Feldman* applies

when the federal plaintiff "complain[s] of an injury caused by the state-court judgment and seek[s] review and rejection of that judgment." *Saudi Basic*, 544 U.S. at 291. Plaintiff's injury was not "caused by the state-court judgment", but by Defendant Meza's and Defendant Robson's retaliation when faced with a public records request and their realization that Plaintiff had independently confirmed both the existence of additional public records and Meza's repeated misrepresentations in court.[7] (Doc. 14 at 67-75, 223-224, 230-233). The two Defendants' joint A.R.S. § 12-3210(A) motion and their persistence in prosecuting the sham motion, *not* the trial court's ultimate judgment, caused Plaintiff's "chill" injury.[8] Indeed, Plaintiff would have suffered the same injury had the trial court denied the motion or had the appellate court upheld its initial stay. (Doc. 14 at 82.). Consequently, Count Three does not require the Court to review or revise any order or judgment, meaning (1) this case does not present a *de facto* appellate review of any judicial determination; and (2) the federal claim is not "inextricably intertwined" with any state court order or judgment. *Lance*, 546 U.S. at 464-66.

---

[7] The Count Three defendants filed and prosecuted a retaliatory A.R.S. § 12-3210(A) motion. Court filings depended on knowingly false factual representations and material omissions as means to conceal Meza's criminal fraud and Robson's involvement. (Doc. 14 at 230-233.). "[E]xtrinsic fraud is 'not an error by [a] court,' but instead is 'a wrongful act committed by the party or parties who engaged in the fraud'". *Benavidez v. Cnty. of San Diego,* 993 F.3d 1134, 1143 (9th Cir. 2021). *Rooker-Feldman* could never apply under such circumstances. *Id*.

[8] Plaintiff he has pleaded sufficient facts, and could plead additional facts should the Court deem it necessary, to invoke the "third exception" to the *Noerr-Pennington* doctrine and classify defendants' motion practice as actionable "sham litigation". *See Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 928 (9th Cir. 2024). Meza's and Robson's filings were a sham predicated on "fraud ... misrepresentation, or other misconduct", including Meza's criminal misconduct. *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-62, 113 S.Ct. 1928 n.6, 123 L.Ed.2d 611 (1993). "The line is crossed when [the litigant's] purpose is not to win a favorable judgment ... but to harass [an opponent], and deter others, by the process itself – regardless of outcome – of litigating". *Id* at 1935-36. (Doc. 14 at 223-230.).

Faced with Count Three, Defendants Meza and Robson are likely to argue that Plaintiff did not "engage[] in constitutionally protected activity" as the Statute defines such "activity". *See Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). Plaintiff sufficiently pleaded that he "engaged in constitutionally protected activity" as the *Noerr-Pennington* doctrine and the *Ringgold* Standard define such "activity". (Doc. 14 at 174-177, 221.). Defendants' circular logic would be tethered to the Statute while Plaintiff's linear logic would be grounded in U.S. Supreme Court and Ninth Circuit precedent. The Court will be asked to decide what legal standard – the Statute, *Noerr-Pennington*, or *Ringgold* – must be used to determine whether Plaintiff engaged in "constitutionally protected activity". Regardless of the ultimate outcome, the need to adjudicate that "controversy" ensures the Court has jurisdiction.

At bottom, "*Noel* provided the following 'general formulation' of the *Rooker-Feldman* doctrine: 'If a ... plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court ... *Rooker-Feldman* bars subject matter jurisdiction in federal district court. If ... [a] plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction.'" *Benavidez,* 993 F.3d at 1141 quoting *Noel*, 341 F.3d at 1164. In simple terms, a district court lacks jurisdiction if "the federal plaintiff [is] seeking to set aside a state judgment," whereas that same district court has jurisdiction if the federal plaintiff "present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party". *Noel*, 341 F.3d at 1164. Because the 42 U.S.C. § 1983 First Amendment Retaliation claim does not rely on "the state-court judgment" and does not "seek[] review and rejection of that judgment", Count Three is not subject to the *Rooker-Feldman* doctrine. The Court has Article III subject matter jurisdiction over an original case.

### 2. Count Three Is Not Subject To *Younger*

Count Three is not subject to the *Younger* abstention doctrine for the same reasons that Counts One and Two are not subject to the doctrine.

### SUMMARY

Plaintiff's federal claims do not ask, and do not require, the Court to conduct an express or *de facto* appellate review of any state court order or judgment. Defendants Mayes and Welty, in their official <u>*non-judicial*</u> capacities, are proper defendants for Counts One and Two which mount First Amendment facial challenges to A.R.S. §§ 12-3201 and 13-2921, respectively. Plaintiff seeks (1) a declaration that the statutes are unconstitutional pursuant to the vagueness and/or overbreadth doctrines; and (2) injunctive relief preliminarily and permanently enjoining administrative, civil, and criminal enforcement – <u>*not*</u> judicial enforcement – of unlawful statutes and an unlawful reliant order. Neither the *Rooker-Feldman* doctrine nor the *Younger* abstention doctrine apply. *See Bianchi*, 334 F.3d at 898 ("A general constitutional challenge [] is not 'inextricably intertwined' with the state court decision"). Count Three brings Defendants Meza and Robson to suit with a 42 U.S.C. § 1983 First Amendment Retaliation claim. Plaintiff's "chill" injuries are independent of any injuries arising from state court orders or judgments. Neither defendant is entitled to civil immunity. Plaintiff seeks relief in the form of compensatory and punitive damages.

### CONCLUSION

Article III subject matter jurisdiction is demonstrated on all Counts. Given the threatened deprivation of liberty interests and fundamental rights, Plaintiff respectfully requests the Court soon schedule proceedings to hear Plaintiff's Motion for Temporary Restraining Order and Motion for Preliminary Injunction (Doc. 23.).

ER-251

1

DATED this 20th day of May 2025.

2

3                                     By: _//s//_

                                               Phillip Potter

4                                                Plaintiff

                                             Pro Se

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

18

1    KRISTIN K. MAYES
     Attorney General
2    Firm State Bar No. 14000

3    Kara Karlson, Bar No. 029407
     Senior Litigation Counsel
4    2005 North Central Avenue
     Phoenix, AZ  85004-1592
5    Telephone (602) 542-8323
     Facsimile (602) 542-4385
6    Kara.Karlson@azag.gov
     adminlaw@azag.gov
7

8    *Attorney for Defendant Presiding Judge of*
9    *Maricopa County Joseph Welty*

10                **IN THE UNITED STATES DISTRICT COURT**

11                   **FOR THE DISTRICT OF ARIZONA**

12

13   Philip Potter, individually and on behalf of all
     others similarly situated              Case No. 2:25-CV-00663-PHX-DWL
14

15                        Plaintiff,         **JUDGE JOSEPH WELTY'S**
                                             **MOTION TO DISMISS**
16   v.                                      **PLAINTIFFS' FIRST AMENDED**
                                             **COMPLAINT**
17   Robert Meza, et al,

18                        Defendants.

19

20         Judge Joseph Welty ("Judicial Defendant"), presiding judicial officer in the

21   Maricopa County Superior Court for the state of Arizona, moves to dismiss this case

22   pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  This Court lacks

23   subject matter jurisdiction to hear this matter because there is no case or controversy

24   between Plaintiff and the Judicial Defendant and Plaintiff's claims are barred by

25   Eleventh Amendment immunity.  Alternatively, Plaintiff cannot state a claim for which

26   relief can be granted because the Judicial Defendant is absolutely immune from liability

27   for actions taken in his judicial capacity, and therefore Plaintiff cannot state a claim for

28   which relief can be granted.  For these reasons, Plaintiff's Complaint against the Judicial

1    Defendant should be dismissed, and because these defects are not curable, he should not
2    be granted leave to amend it.

3                                    **BACKGROUND**

4          Since the Judicial Defendant was never served, he was not included in much of
5    the background that was provided in Attorney General Mayes' Motion to Dismiss.  (Doc.
6    38 at 1-3.)  The allegations in the First Amended Complaint ("Complaint") applicable to
7    the Judicial Defendant are as follows:

8    •   That the Judicial Defendant is the Presiding Judge of the Maricopa County
9        Superior Court, who is authorized by Arizona law to issue orders requiring
10       vexatious litigants to pre-file documents for review before they may be filed by a
11       person who is represented by counsel (Compl. ¶ 104); and

12   •   That the Judicial Defendant's compliance with the procedures provided under
13       Arizona law—which balances the constitutional rights of individual litigants and
14       the burden on access to justice for other litigants, the court, and access to
15       justice—violates Plaintiffs' rights.  (Compl. ¶¶ 113-257).

16   The Judicial Defendant was not served, but is in receipt of the lawsuit, and files this
17   Motion to Dismiss to avoid delaying the proceedings or increasing the cost of litigation
18   on the parties.

19                                 **LEGAL ARGUMENT**

20         The Plaintiff fails to state a claim that this Court is enable to entertain, and
21   alternatively, fails to state a claim for which relief can be granted pursuant to Fed. R.
22   Civ. P. 12(b)(1) and 12(b)(6).  If this Court determines that it lacks jurisdiction to hear
23   the claim, under Fed. R. Civ. P. 12(b)(1), then it should not reach the arguments under
24   Fed. R. Civ. P. 12(b)(6).  *Arizonans for Off. English v. Arizona*, 520 U.S. 43, 73 (1997)
25   (explaining that jurisdiction must be determined first, and finding that it is ultra vires for
26   a court to reach the merits if it lacks jurisdiction).  The authority to declare a litigant a
27   vexatious litigant derives from the long historical precedent that courts have the inherent

28

ER-254

1    authority to control their own dockets. *Harris v. Mangum*, 863 F.3d 1133, 1143 (9th Cir.

2    2017) (explaining the All Writs Act is the basis for the court's authority to "enter pre-

3    filing orders against vexatious litigants.") (quoting *Molski v. Evergreen Dynasty Corp.*,

4    500 F.3d 1047, 1057 (9th Cir. 2007)). This inherent authority is important not just to

5    protect judicial resources, but to protect the rights of other litigants. "Flagrant abuse of

6    the judicial process cannot be tolerated because it enables one person to preempt the use

7    of judicial time that properly could be used to consider the meritorious claims of other

8    litigants." *De Long v. Hennessey*, 912 F.3d 1144, 1148 (9th Cir. 1990). Arizona, like

9    jurisdictions around the country, have a process delineated by statute and multiple safety

10   valves to protect the rights of everyone before the Court, including vexatious litigants.

11   **I.  This Court Lacks Subject Matter Jurisdiction to Hear this Matter.**

12   The U.S. Constitution provides for federal jurisdiction only when there is an

13   actual "case" or "controversy" to adjudicate. U.S. Const. Art. III. "Standing is 'built on

14   a single basic idea—the idea of separation of powers.'" *FDA v. All. for Hippocratic

15   Med.*, 602 U.S. 367, 378 (2024) (quoting *United States v. Texas*, 559 U.S. 670, 675

16   (2023)). At the pleading stage, the plaintiff must clearly "allege facts demonstrating"

17   each element of standing. *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

18   **A.  There is No Case or Controversy Between Plaintiff and the Judge.**

19   There is no case or controversy between Plaintiff and the Judicial Defendant.

20   "Judges exist to resolve controversies about a law's meaning or its conformance to the

21   Federal and State Constitutions, not to wage battle as contestants in the parties'

22   litigation." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 40 (2021). The Judicial

23   Defendant's only action here was to review and approve the application to certify

24   Plaintiff as a vexatious litigant, as allowed by Arizona law. The Judicial Defendant had

25   no part in drafting the law that the Plaintiff believes violates his rights, nor enforces the

26   law that the Plaintiff believes violates his rights. Rather, the Judicial Defendant

27   performed a quintessential judicial function—making a ruling based on the record before

28

ER-255

him—in his role as a judicial officer. Both the federal and state constitutions respect and must "remain faithful to this tripartite structure" that precludes the existence of a case or controversy here. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016); *see also* Ariz. Const. art. III (providing express separation of powers "into three separate departments, the Legislative, the Executive, and the Judicial."). There cannot be a case or controversy between the judge overseeing the court's business and a litigant before that court.

Plaintiff also appears to attempt to invoke the standing of others by seeking to "permanently enjoin[] Defendant Welty from enforcing A.R.S. § 12-3201." (Compl. ¶ C.) To the extent this request for relief can be read to prevent the Judicial Defendant from entering vexatious litigant orders against others, this Plaintiff does not have standing to raise those claims. Standing prevents federal courts from becoming nothing more than "a vehicle for the vindication of the value interests of concerned bystanders." *United States v. Students Challenging Reg. Agency Proc.*, 412 U.S. 669, 687 (1973). Plaintiff cannot demonstrate the requisite personal injury to assert the rights of others, here.

Plaintiff lacks standing to bring this claim against the Judicial Defendant, and this Court should dismiss the Complaint with prejudice as to the Judicial Defendant.

### B. Plaintiff's Claims are Barred by the Eleventh Amendment.

Plaintiff's claims are also barred by the Eleventh Amendment, based on principles of co-equal sovereigns between the federal government and the states. While the precise language of the Eleventh Amendment only refers to foreign citizens and citizens from other states, federal courts have long "understood the Eleventh Amendment to confirm the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant." *Va. Off. For Protection & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011). In other words, there is a strong presumption that states and their officers are immune from suit in federal court. Sovereign immunity may

be overcome if it is waived by the State, or if it is abrogated by appropriate congressional action. *Id.*

A narrow exception to sovereign immunity permits suits in federal court against state officials who are acting in their official capacity when the plaintiff seeks injunctive relief to prevent the enforcement of state laws that conflict with federal law. The *Ex Parte Young* exception does not apply here, because the Judicial Defendant does not enforce the law. 209 U.S. 123 (1908). Instead, he is a neutral arbiter. "Usually, [state court judges] do not enforce state laws as executive officials might; instead, they work to resolve disputes between parties." *Whole Woman's Health*, 595 U.S. at 39. Even in explaining the exemption to 11th Amendment immunity more than a century ago, *Ex Parte Young* did not countenance an injunction against a state court or its machinery. 209 U.S. at 163.

In short, Plaintiff has not overcome the high bar for Eleventh Amendment immunity, and cannot overcome that bar as to the Judicial Defendant. This Court does not have jurisdiction, and should dismiss the Complaint with prejudice as to the Judicial Defendant.

**C. No Amendment to the Complaint Can Vest Jurisdiction in this Court Against the Judicial Defendant.**

While Rule 15 of the Federal Rules of Civil Procedure generally apply a liberal amendment standard, no amendment can save the claim against the Judicial Defendant. "When justice requires, a district court should 'freely give leave' to amend a complaint." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 871 (9th Cir. 2016) (citing Fed. R. Civ. P. 15(a)(2)). However, leave to amend should not be granted when "it is clear that the complaint could not be saved by any amendment." *Id.* (citing *Thinket Ink Info. Res., Inc. v. Sun Microsys., Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004)).

Plaintiff cannot amend his Complaint in any way that provide this Court with jurisdiction over the Judicial Defendant. As a matter of law, there can be no case or controversy between Plaintiff and the Judicial Defendant because they are not adverse

ER-257

1    parties.  In our system of governance, judges are—and must remain—neutral arbiters,

2    applying the facts that they are presented by the adverse parties present before them to

3    the law as it exists.  *Whole Woman's Health*, 595 U.S. at 39.  No amendment can change

4    the relationship of Plaintiff to the Judicial Defendant in this case.

5        Additionally, Plaintiff cannot amend his Complaint to overcome Eleventh

6    Amendment immunity against the Judicial Defendant.  Eleventh Amendment immunity

7    may present a bar to amending a complaint when the amendment "would fail as a matter

8    of law on a motion for summary judgment."  *Yakama Indian Nation v State of Wash.*

9    *Dep't of Revenue*, 176 F.3d 1241, 1246 (9th Cir. 1999).  Here, as a matter of law, the

10    Eleventh Amendment bars Plaintiff's claims against the Judicial Defendant.  *Whole*

11    *Woman's Health*, 595 U.S. at 39-40.  Plaintiff can allege no facts that alters this legal

12    principle.

13        For these reasons, the Judicial Defendant should be dismissed from the

14    Complaint, and the Court should not grant the Plaintiff leave to amend claims against the

15    Judicial Defendant.

16    **II. The Complaint Fails to State a Claim for Which Relief May Be Granted.**

17        Alternatively, if the Court decides it has jurisdiction under the Federal Rules of

18    Civil Procedure 12(b)(1), Plaintiff's claim against the Judicial Defendant should be

19    dismissed pursuant to the Federal Rules of Civil Procedure 12(b)(6).  *Moore v. Maricopa*

20    *Cty. Sheriff's Off.*, 657 F.3d 890, 895 (9th Cir. 2011) (explaining a district court "must

21    first determine whether it has jurisdiction before it can decide whether a complaint states

22    a claim.").

23        To survive a motion to dismiss under the Federal Rules of Civil Procedure

24    12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state

25    a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

26    (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has

27    facial plausibility when the plaintiff pleads factual content that allows the court to draw

28

ER-258

the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This Complaint does not meet the pleading threshold.

Plaintiff cannot state a claim for which relief can be granted because the Judicial Defendant has judicial immunity. The foundational case on the exemption to sovereign immunity, *Ex Parte Young*, 209 U.S. 123 (1908), allows federal courts to enjoin state officers who *enforce* the law under certain circumstances. However, the Judicial Defendant does not enforce the law, he applies it. More than a century ago, *Ex Parte Young* explained that "an injunction against a state court would be a violation of the whole scheme of our government." *Id.* at 163. More recently, the Supreme Court re-affirmed the principles in *Ex Parte Young*, specifically as it applies to state court judges and clerks who might be required to hear cases under Texas' anti-abortion statute, and decided that "state-court judges are not proper defendants." *Whole Woman's Health*, 595 U.S. at 41.

Plaintiff seeks declaratory and injunctive relief against the Judicial Defendant as to Count One only. (Doc. 14.) The Judicial Defendant is absolutely immune from suit for the acts he takes in his judicial capacity. *See Stump v. Sparkman*, 435 U.S. 349, 355-60 (1978). This includes immunity from injunctive relief. *Mullis v. U.S. Bankr. Ct. for D. of Nev.*, 828 F.2d 1385, 1394 (9th Cir. 1987) ("We hold that when a person . . . can successfully assert judicial or quasi-judicial immunity from damages, that immunity also will be declaratory and injunctive relief."). Judicial immunity serves numerous important functions, including "protecting the finality of judgments," "discouraging inappropriate collateral attacks," and "protect[ing] judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants." *Forrester v. White*, 484 U.S. 219, 225 (1988).

Judicial immunity from 42 U.S.C. § 1983 claims against state judicial officers is guaranteed by law. Congress amended 42 U.S.C. § 1983 to clarify judicial immunity precludes injunctive relief against state judicial officers as well. *Moore v. Urquhart*, 899

ER-259

1    F.3d 1094, 1104 (9th Cir. 2018) ("Section 1983 (as amended by the [Federal Courts
2    Improvement Act of 1996 'FCIA'] therefore provides judicial officers immunity from
3    injunctive relief even when the common law would not.").  "The text of the FCIA bars
4    injunctive relief against 'a judicial offer' for acts or omissions taken in the officer's
5    'judicial capacity.'"  *Id.* at 1104.

6    　　　Plaintiff attempts to avoid judicial immunity by claiming that the Judicial
7    Defendant's action here was "administrative," but that mischaracterizes the nature of the
8    Complaint.  The Judicial Defendant is a party to this action solely because of he entered
9    an order determining the rights of parties as presiding judge in Maricopa County
10   according to Arizona law.  A.R.S. § 12-3201(A) ("[T]he presiding judge of the superior
11   court . . . may designate a pro se litigant a vexatious litigant.").  Entering an order
12   relating to parties before the court is a judicial act.  *See* BLACK'S LAW DICTIONARY
13   (12th ed. 2024) (defining judicial act as "[a]n act involving the exercise of judicial
14   power.  Also termed *act of court*.").  A judge acts in his or her judicial capacity—and is
15   protected by judicial immunity—when he or she takes an action that is normal judicial
16   function, in the judge's chambers, based on a controversy centered around a case before
17   the court, and the events "arose directly and immediately out of a confrontation with the
18   judge in his or her official capacity."  *Lund v. Cowan*, 5 F.4th 964, 971 (9th Cir. 2021)
19   (citing *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1133 (9th Cir. 2001)).

20   　　　Judicial immunity attaches to and protects judicial functions when they are
21   exercised by a judicial officer.  *Forrester*, 484 U.S. at 227.  As the Supreme Court
22   explained, judicial immunity is broad in scope:

23   　　　　[T]he scope of the judge's jurisdiction must be construed broadly
24   　　　　where the issue is the immunity of the judge.  A judge will not be
     　　　　deprived of immunity because the action he took was in error, was
25   　　　　done maliciously, or was in excess of his authority; rather, he will be
26   　　　　subject to liability only when he has acted in the "clear absence of all
     　　　　jurisdiction."

27   *Stump*, 435 U.S. at 356-57.

28

ER-260

1    The Judicial Defendant was acting in his judicial capacity when he entered the

2    order declaring Plaintiff a vexatious litigant.  He reviewed the record after reviewing the

3    other matters in which Plaintiff had been involved, and made a judicial determination.[1]

4    This is a quintessential judicial function, and as such, the Judicial Defendant is entitled

5    to judicial immunity.

6    Finally, Plaintiff identifies no actions by the Judicial Defendant in the nearly

7    twenty pages dedicated to Count One.  Instead, those paragraphs are dedicated to

8    arguments challenging Arizona's vexatious litigant statute.  (Compl. ¶¶ 113-207.)  Of

9    course, the Judicial Defendant played no role in creating or enforcing the law that

10   Plaintiff challenges.  He only applied that law to the facts that were presented to him and

11   issued the order declaring Plaintiff a vexatious litigant.   The Complaint makes no

12   allegations that the Judicial Defendant did anything improper.  Accordingly, Plaintiff

13   does not state a claim for which relief can be granted.

## CONCLUSION

15   For the foregoing reasons, this Complaint should be dismissed as to the Judicial

16   Defendant pursuant to Federal Rules of Civil Procedure 12(b)(1), or alternatively

17   12(b)(6), without leave to amend.

18   Respectfully submitted this 11th day of August, 2025.

20   Kristin K. Mayes
     Attorney General

22    /s/ Kara Karlson
     Kara Karlson
23   Senior Litigation Counsel
     *Attorney for Defendant Judge Joseph Welty*

---

[1]   *See*  Admin.  Order  2023-159  (Nov.  2,  2023)  *available  at*
https://www.azcourts.gov/Vexatious-Litigants/List-of-Vexatious-Litigants/Maricopa.
This court can take judicial notice of this order, Fed. R. Evid. 201, and not transform this
Motion to Dismiss to one for summary judgment.

ER-261

**CERTIFICATE OF CONFERRAL**

In accordance with the Court's April 24, 2025 Order (DE 13) and LR Civ. 12.1(c), the undersigned counsel notified Plaintiff of the defects that the Judicial Defendant was asserting via email on August 5, 2025, and requesting an agreeable time to discuss.  On August 11, 2025, undersigned counsel discussed the defects in the Amended Complaint with the Plaintiff.  The parties to the meet and confer could not reach an agreement as to amendment.


*/s/ Kara Karlson*
Kara Karlson
Senior Litigation Counsel
*Attorney for Defendant Judge Joseph Welty*

ER-262

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 11th day of August, 2025 I filed the forgoing document electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means.


 */s/Monica Quinonez*

ER-263

**SUPERIOR COURT OF ARIZONA**
**MARICOPA COUNTY**

| | |
|---|---|
| IN THE MATTER OF PROHIBITING PHILLIP POTTER FROM FILING ANY LAWSUIT IN MARICOPA COUNTY WITHOUT OBTAINING PRIOR PERMISSION FROM THE COURT | ) ) ) ) ) ) ADMINISTRATIVE ORDER No. 2023- 159 |

      This matter was referred by the Honorable John Blanchard to consider issuing an administrative order declaring Phillip Potter a vexatious litigant. Upon review of other matters filed in this Court, and considering all the matters presented, the Court makes the following findings and orders.

      Pursuant to A.R.S. § 12-3201, the Presiding Judge of the Superior Court may designate a pro se litigant who engages in vexatious conduct as a vexatious litigant. In addition, courts "possess inherent authority to curtail a vexatious litigant's ability to initiate additional lawsuits." *Madison v. Groseth,* 230 Ariz. 8, 15, 279 P.3d 633, 639 (App. 2012). The filing excesses of vexatious litigants interfere with the orderly administration of justice by diverting judicial resources from those cases filed by litigants willing to follow court rules and those meritorious cases that deserve prompt judicial attention. *See Acker v. CSO Chevira,* 188 Ariz. 252, 934 P.2d 816 (App. 1997). A.R.S. § 12-3201(E) defines vexatious conduct to include repeated filing of court actions solely or primarily for the purpose of harassment, filing claims unreasonably expanding or delaying court proceedings, bringing court actions without substantial justification, and filing claims or requests for relief that have been the subject of previous rulings by a court in the same litigation.

      Judge Blanchard's referral is a result of his order designating Mr. Potter a vexatious litigant in the case of *Phillp Potter v. Arizona House of Representatives, et. al.,* CV2022-008626. Judge Blanchard noted that beginning in 2021, Mr. Potter filed numerous lawsuits against various individuals and organizations alleging conspiracies between his ex-wife, his ex-in-laws, and various government actors and other parties. The allegations contain both frivolous and bizarre claims against the various defendants. In addition to the lawsuit before Judge Blanchard, the following list, attached as Attachment "A", sets forth other vexatious conduct by Mr. Potter in various other causes of action in this Court.

As Judge Blanchard has noted, the cases filed by the plaintiff allege causes of action that are unsupported by facts as alleged, argue legal positions that are not founded in the law or reasonable interpretations of the law, re-argue the same positions repeatedly with no regard for rulings of the Court, and promote abuse of process. Many allegations appear to be made solely for the purposes of harassing defendants.

For the reasons set forth above and incorporating the findings of fact and conclusions of law of Judge Blanchard, the Court finds that Mr. Potter has engaged in vexatious conduct by filing claims or requests for relief that have been subject to previous rulings in previous litigation; has unreasonably expanded court proceedings; and has brought court actions without "substantial justification" as defined in A.R.S. §12-349.

The Court may issue an order limiting such a litigant's ability to file future lawsuits, motions, and requests for relief to the extent necessary to curtail the improper conduct. The Court finds the orders set out below to be the least restrictive orders that will adequately address Mr. Potter's established pattern of abuse.

**IT IS THEREFORE ORDERED** as follows:

1. Mr. Potter may not file any new causes of action as a pro se litigant after the date of this order without leave of the Civil Presiding Judge or his/her designee.

2. Mr. Potter may not file any further pleading or motion in any of his current lawsuits as a pro se litigant without first seeking leave from the judicial officer assigned to that lawsuit.

3. Any motion for leave to file any lawsuit, pleading or motion shall be captioned "Application Pursuant to Court Order Seeking Leave to File." Mr. Potter must either cite this order in his application, or attach as an exhibit a copy of this order.

4. Any request for fee waiver or deferral may only be granted by the Civil Presiding Judge or his/her designee.

If approval for filing a new action by Mr. Potter is granted, the Clerk of Court may accept subsequent filings in that cause number from Mr. Potter. This Administrative Order does not preclude Mr. Potter from filing a Notice of Appeal or a Notice of Cross-Appeal in accordance with Arizona Rules of Civil Appellate Procedure Rule 8(a) and (b).

Dated this 2nd day of November, 2023.


/S/ Joseph C. Welty
Honorable Joseph C. Welty
Presiding Judge

Original:     Clerk of the Superior Court

Copies:       Hon. Jeffrey Fine, Clerk of the Superior Court
              Hon. Danielle Viola, Civil Department Presiding Judge
              Hon. John Blanchard
              Raymond L. Billotte, Judicial Branch Administrator
              Luke Emerson, Civil Department Administrator
              Jessica Fotinos, Office of the Clerk of the Superior Court
              Phillip Potter
              Brett W. Johnson, Esq., Snell & Wilmer, L.L.P.
              Timothy A. Nelson, Esq., The Nelson Law Group, PLLC
              Kevin E. O'Malley, Esq., Gallagher & Kennedy, P.A.
              Hannah H. Porter, Esq., Gallagher & Kennedy, P.A.

ATTACHMENT "A"

**Case Number:** CV2021-005501

**Date Filed:** April 5, 2021

**Pleading Filed:** Complaint

**Listed Defendants:**
Tasneem Doctor; Abdulla Doctor; Brend Doctor; Christine Erchich; Michael Clancy; Hildebrandt Law, P.C.; John / Jane Does A- J; Companies

**Overview:**
Plaintiff files a 48-page lawsuit against his ex-wife and ex-in-laws but focuses most of the complaint on scandalous and irrelevant accusations as well as extensive details about alleged abuse and grotesque cult involvement by some of the defendants. The Court strikes 53 of these paragraphs in a minute entry dated August 23, 2021.

**Case Number:** CV2021- 005501
**Date Filed:** July 30, 2021
**Pleading Filed:** Response to Defendant Tasneem Doctor's Motion to Strike
**Overview:**
In opposing a motion to strike much of his Complaint, Plaintiff frivolously requests sanctions.

**Case Number:** CV2021-005501, CV2021-013210
**Date Filed:** October 11, 2021
**Pleading Filed:** Motion to Consolidate per Ariz. R. Civ. P. Rule 42(a)
**Overview:**
Plaintiff attempts to consolidate CV2021- 005501 and CV2021- 013210, which involve completely different factual and legal issues. The Motion is denied in a Minute Entry dated November 22, 2021.

**Case Number:** CV2021-005501
**Date Filed:** January 26, 2022
**Pleading Filed:** Motion for Leave to Amend Complaint
**Listed Defendants:**

Tasneem Doctor; Abdulla Doctor; Brenda Doctor; Christine Ehrich; Michael Clancy; Hildebrandt Law, P.C.; Robert Meza; Alison Rapping; Lorrie Henderson; Jewish Family and Children's Services, Inc.; Shawn Emmons; PSA Behavioral Health Agency; Tad Gary; Mercy Care; Blue Cross and Blue Shield of Arizona, Inc.; Jeff Guldner; Don Brandt; Arizona Public Service Company; Pinnacle West Capital Corporation; Alane Ortega; John / Jane Does A-J; Companies 1-10 Saylor; Lorrie Henderson; Jewish Family and Children's Services, Inc.; Shawn Emmons; PSA Behavioral Health Agency; Tad Gary; Mercy Care; Blue Cross and Blue Shield of Arizona, Inc.; Jeff Guldner; Don Brandt; Arizona Public Service Company; Pinnacle West Capital Corporation; John / Jane Does A-J; Companies 1-10

**Overview:**
To get around the court's order striking irrelevant allegations against Defendant Meza and the denial of consolidation with CV2021-013210, Plaintiff changes the entire scope of his Complaint to include 479 paragraphs of allegations, 10 separate counts, and 14 additional defendants. This amended complaint essentially duplicates the issues raised in CV2021- 013210. This motion is denied in a Minute Entry dated March 29, 2022.

**Case Number:** CV2021-013210
**Date Filed:** October 15, 2021
**Pleading Filed:** Motion to Disqualify Counsel and to Compel Document Production and Testimony per Crime-Fraud Exception.

**Overview:**
Plaintiff alleges that counsel for his ex-wife committed criminal acts and requests disqualification and disclosure of privileged communications from every defendant's attorney. Plaintiff also requests sanctions. In denying Plaintiff's motion in a ruling dated January 19, 2022, the Court notes this as a "particularly abusive pleading."

**Case Number:** CV2021-013210
**Date Filed:** February 4, 2022
**Pleading Filed:** Motion to Alter Judgment

**Overview:**
Plaintiff seeks to overturn a ruling granting attorney's fees and costs to certain defendants.

**Case Number:** CV2021-013210
**Date Filed:** February 5, 2022
**Pleading Filed:** Motion to Alter Judgment
**Listed Defendants:**

**Overview:**
Plaintiff seeks to overturn the Court's January 19, 2022 ruling alleging frivolous due process violations that "render void any rulings already entered." The procedurally improper Motion is Denied in a Minute Entry dated May 16, 2022.

**Case Number:** CV2021-013210
**Date Filed:** February 7, 2022
**Pleading Filed:** Motion for Change of Judge for Cause

**Overview:**
Plaintiff asks for the judge to be removed for cause, and his rulings and orders vacated, due to "bias, prejudice, or interest." The motion is denied in a Minute Entry dated February 18, 2022.

**Case Number:** CV2021-013210
**Date Filed:** March 4, 2022
**Pleading Filed:** Response to Motion for Entry of Rule 54(b) Judgment

**Overview:**
Plaintiff frivolously attempts to avoid judgment by re-alleging the connection between CV2021-013210 and CV-2021-005501, attaching a 63-page, 283-paragraph Proposed Amended Complaint re- alleging the same claims.

**Case Number:** CV2021-013210
**Date Filed:** May 31, 2022
**Pleading Filed:** Motion for Relief from Judgment and Orders
**Overview:**
Plaintiff again attempts to circumvent the Court's rulings by alleging new evidence, mistake, and matters of statewide importance regarding Representative Meza. Plaintiff attaches his Proposed Amended Complaint. This motion is denied in a Minute Entry dated June 28, 2022.

**Case Number:** CV2021-013210
**Date Filed:** June 2, 2022
**Pleading Filed:** Supplement to Motion for Relief from Judgment and Orders

**Overview:**
Plaintiff provides additional irrelevant facts, alleging these new facts directly implicate many of the dismissed defendants.

**Case Number:** CV2021-013210
**Date Filed:** June 23, 2022
**Pleading Filed:** Motion to Take Judicial Notice of Facts
**Overview:**
Plaintiff requests judicial notice of unrelated and irrelevant facts regarding Representative Meza, who had already been dismissed. This motion is denied in a Minute Entry dated July 7, 2022.

---

**Case Number:** CV2021-017889
**Date Filed:** November 18, 2021
**Pleading:** Complaint
**Listed Defendants:** Courtney Hornback, John / Jane Does A- J, and ABC Companies 1- 10.

**Overview:**
Plaintiff files a lawsuit devoid of specific facts against an individual who allegedly hit his car at a red light.

---

**Case Number:** CV2022-014146
**Date Filed:** November 18, 2021
**Pleading:** Verified Complaint for Statutory Special Actions
**Listed Defendants:** Jami Snyder (Arizona Health Care Cost Containment System Director) and Mercy Care

**Overview:**
Plaintiff files a public records lawsuit against a private nonprofit, Mercy Care, to obtain documents allegedly in Mercy Care's possession regarding fundraising activities by Representative Meza. Mercy Care and Representative Meza were also named defendants in CV2021- 013210 and implicated in CV2021-005501.

---

**Case Number:** CV2022-014146
**Date Filed:** October 25, 2022
**Pleading:** Application for Order to Show Cause

**Overview:**
Plaintiff requests the court to enter an Order to Show Cause requiring Mercy Care to show cause why the relief in his Complaint should not be granted.

---

1   Phillip Potter
    2301 N. 66th Street
2   Scottsdale, Arizona 85257
3   Phone: 480.459.0310
    E-Mail: phillip.t.potter@gmail.com
4   Plaintiff
    Pro Se
5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                         FOR THE DISTRICT OF ARIZONA

9

10

11      Phillip Potter,                    No. 2:25-cv-00663-PHX-DWL

12                        Plaintiff,

13      v.                                 MOTION TO TAKE
                                           JUDICIAL NOTICE RE:
14      Robert Meza, et al.,               PRESIDING JUDGE GATES'
                                           MOTION TO DISMISS
15
                          Defendants.
16

17

18

19          This case involves a First Amendment facial challenge to A.R.S. § 12-3201 for

20   overbreadth wherein the Hon. Joseph Welty, in his official _administrative_ capacity as

21   Presiding Judge of the Maricopa County Superior Court, is identified as "a proper

22   defendant" per *Ex Parte Young*, 209 U.S. 123 (1908). (Doc. 14).  The Hon. Pamela

23   Gates, who replaced Judge Welty as Presiding Judge (Doc. 77), hinges combined Fed. R.

24   Civ. P. 12(b)(1) and (6) motion defenses on sovereign immunity and judicial immunity.

25   (Doc. 67; Doc. 81).  But the Ninth Circuit held that "a state official in his or her official

26   capacity, when sued for injunctive relief, [is] a person under § 1983, because 'official-

capacity actions for prospective relief are not treated as actions against the State.' ... [W]hether judges are proper defendants in a § 1983 action depends on whether they are acting as adjudicators or as 'administrators, enforcers, or advocates.' ... Section 1983 only contemplates judicial immunity from suit for injunctive relief for acts taken in a judicial capacity. ... Since [Plaintiff] sued [Judge Welty] in [his] administrative capacity as [Presiding Judge of the Maricopa County Superior Court], we conclude that dismissal is not warranted on the basis of judicial immunity [or sovereign immunity]". *Wolfe v. Strankman,* 392 F.3d 358, 365-66 (9th Cir. 2004). Presiding Judge Welty asked the Court to treat the acts he expressly took in an administrative capacity as acts taken in a "judicial capacity" because he "was acting in his judicial capacity when he entered the [administrative] order declaring Plaintiff a vexatious litigant" (Doc. 67, p. 9). On reply, Presiding Judge Gates asserted that issuing the "Administrative Order [wa]s 'a general function normally performed by a judge'" in Arizona and "is therefore entitled to judicial immunity". (Doc. 81, p. 5). Facts and the law say otherwise on these defenses. "[T]he 'touchstone' for the [judicial immunity] doctrine's applicability has been 'performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights.'" *Burns v. Reed,* 500 U.S. 478, 500 (1991) (Scalia, J., concurring in judgment in part and dissenting in part). Entitlement to judicial immunity thus requires, at a minimum, that a judge demonstrate she was assigned to, and therefore was "presiding over", a case in which the plaintiff was party. *Duvall v. County of Kitsap,* 260 F.3d 1124, 1134 (9th Cir. 2001). This is because "absolute judicial immunity does not apply to non-judicial acts, i.e. the administrative, legislative, and executive functions that judges may on occasion be assigned to perform." *Id.* And the indisputable facts here show Presiding Judge Welty never presided over any case involving Plaintiff and never judicially decided

any dispute involving Plaintiff because, by law, he had no jurisdiction while operating in an administrative capacity.  Judicially noticeable facts described herein, together with well-pled facts described in the operative complaint, defeat the Presiding Judge's sovereign immunity and judicial immunity defenses.  Per Fed. R. Evid. ("Rule") 201, Plaintiff asks the Court to take judicial notice as follows.

I. Legal Standard

"The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Lee v. City of L.A.,* 250 F.3d 668, 689 (9th Cir. 2001); Rule 201(b).  When a party adequately requests notice and the Court receives sufficient information, judicial notice is mandatory.  Rule 201(c)(2).  "The court may take judicial notice at any stage of the proceeding."  Rule 201(d).

II. The Court Should Take Judicial Notice

To evaluate jurisdictional standing and the sufficiency of a complaint courts look to "the complaint itself and its attached exhibits, documents incorporated by reference, and matters properly subject to judicial notice".  *In re NVIDIA Corp. Sec. Litig.,* 768 F.3d 1046, 1051 (9th Cir. 2014).  Whether through the complaint, incorporation-by-reference or judicial notice at the dismissal stage, "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question."  *Burns*, 500 U.S. at 486.  In an apparent attempt to carry this burden, the Presiding Judge asked the Court to "take judicial notice" of "Administrative Order 2023-159" in a combined Fed. R. Civ. 12(b)(1) and (6) dismissal motion (Doc. 67, p. 9, n. 1) and referenced that "Administrative Order" document on reply (Doc. 81, pp. 5-6), *yet failed to identify any*

*specific undisputed fact(s) that the Court could glean from that document*.  Seeming to recognize this procedural deficiency, Presiding Judge Gates modified her defense when faced with the prospect of limited jurisdictional discovery, asserting she had not mounted a "factual attack" on jurisdiction because the "Motion to Dismiss does not cite to or rely on any extraneous documents or records." (Doc. 86, pp. 3-4).  *See Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir. 2004) ("A Rule 12(b)(1) jurisdictional attack may be facial or factual.  In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.  By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.").  Accordingly, the Court would be wise to deny the defendant's patently deficient request to take judicial notice of any fact contained in Administrative Order 2023-159 since (1) Presiding Judge Gates admittedly "does not rely on any extraneous documents"; and (2) Plaintiff never referenced that administrative order in his complaint[1], that document does not form the basis for any claim, and no part of the complaint relies on it.  *See Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 998 (9th Cir.2018) (per the "incorporation-by-reference doctrine", documents may be incorporated "into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'");  *Lee*, 250 F.3d at 688 ("documents ... not physically attached to the complaint, ... may be considered if ... 'the plaintiff's complaint necessarily relies' on them").  Regardless, out of an abundance of caution, Plaintiff presents undisputed facts for judicial notice to demonstrate the defendant has no claim to judicial immunity for acts taken in an

---

[1] The existence of Administrative Order 2023-159 was only revealed through the course of this litigation, and affects no claim. (Doc. 88, pp. 4, 6, 9-10).

administrative capacity.  Plaintiff files the instant motion based on the premise that, although Presiding Judge Gates should not be considered to have done so, a movant can convert a "motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, [meaning] the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Meyer*, 373 F.3d at 1039.

A. The Court Should Take Judicial Notice of Undisputed Facts Contained in A.R.S. § 12-109(B)(1), Ariz. R. Sup. Ct. 92, an Arizona Supreme Court December 13, 2024 News Release, and the CV2022-008626 Case Record

When deciding motions to dismiss, federal courts may take "judicial notice of ... statutes, ... not included in the plaintiff's complaint." *Navajo Nation v. Dep't of the Interior,* 876 F.3d 1144, 1153 n.3 (9th Cir. 2017).  Courts may also take judicial notice of materials available on government websites. *Gustavson v. Wrigley Sales Co.*, 961 F. Supp. 2d 1100, 1113 n.1 (N.D. Cal. 2013).  Finally, district courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue". *Rancheria Citizens Council v. Borneo,* 971 F.2d 244, 248 (9th Cir. 1992).

1. The Undisputed Facts Are Relevant

Presiding Judge Welty initially asserted, and Presiding Judge Gates continues to maintain, that the Presiding Judge "is a party to this action solely because of [sic] he entered an [administrative] order determining the rights of parties as presiding judge in Maricopa County". (Doc. 67, p. 8).  But undisputed facts show Presiding Judge Welty never presided over case CV2022-008626, while the attached statute and procedural rule demonstrates, and the attached press release confirms, that Presiding Judges in Arizona

have no authority to issue administrative orders which affect "the rights of parties". To be sure, the state supreme court has established that an administrative "matter [i]s *not* a civil [judicial] proceeding [for a host of substantive and procedural reasons]. ... In civil and criminal matters, [for example,] we have long adhered to the notion that a party may disqualify one judge and have the case transferred to another judge. There is no procedure for change of judge in an administrative proceeding before the [P]residing [J]udge. As we view the situation, such a procedure is not necessary because the [P]residing [J]udge has *no authority* to compel persons outside the judiciary to" do anything as a function of the Arizona constitution, including its separation of powers and due process provisions. *Maricopa County v. Dann,* 157 Ariz. 396, 400-01, 758 P.2d 1298, 1301 (1988) (emphasis added). *Dann* is critical precedent given that federal judicial immunity decisions involving a state judge are in part a function of that state's constitution, statutes, and procedural rules. *See Forrester v. White,* 484 U.S. 219, 230 (1988) ("Under Virginia law, only that State's judges could promulgate and enforce a Bar Code, but we nonetheless concluded that neither function was judicial in nature."). Because, as the Arizona supreme court explained in *Dann*, Presiding Judges have no subject matter jurisdiction to hear legal disputes and no personal jurisdiction over private individuals, the Presiding Judges enjoy no judicial immunity, but can be brought to suit per 42 U.S.C. § 1983 for reasons that one Presiding Judge "acted in the clear absence of all jurisdiction" when issuing the administrative order while another continues to do so when maintaining that order. *Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978).

2. Exhibits

a. Exhibit 1: A.R.S. § 12-109

Plaintiff asks the Court to take judicial notice of A.R.S. § 12-109(B)(1) plain

language which holds that "administrative orders shall not do any of the following: 1. Abridge, enlarge or modify substantive rights of a litigant." The language can be found in A.R.S. § 12-109 (*see* Exhibit 1), which the Court can also review on the Arizona Legislature's website accessible online at https://www.azleg.gov/ars/12/00109.htm.

<u>b. Exhibit 2: Rules of the Supreme Court of Arizona Rule 92</u>

Plaintiff asks the Court to take judicial notice of the entirety of plain language contained in the Rules of the Supreme Court of Arizona Rule 92 which articulates a Presiding Judge's authority which goes no farther than, for instance, "general supervision over all court personnel". The Court is asked to judicially notice the undisputed fact that nowhere in this rule does it suggest, or can it be read to indicate, that Presiding Judges may decide the rights of parties through administrative proceedings. The rules language can be found in R. Sup. Ct. Ariz. 92 (*see* Exhibit 2), which the Court can also review on the Westlaw website accessible online at https://govt.westlaw.com/azrules/Document/NEE2A4F70717A11DAA16E8D4AC7636430?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc.Default), which links from the Arizona supreme court's rules website accessible online at https://www.azcourts.gov/rules.

<u>c. Exhibit 3: December 13, 2024 Arizona Supreme Court News Release</u>

Plaintiff asks the Court to take judicial notice of the undisputed factual statements contained in the December 13, 2024 News Release issued by the Arizona supreme court which states, in pertinent part, that "Presiding Judges in Arizona serve as the chief *executive* officer of the county courts, having *administrative* authority over the courts, judicial officers, and court employees in their county." (Emphasis added). The Court should judicially notice that this "administrative authority" does not include "authority

7

over" private parties as per *Dann*.  This language can be found in the News Release (*see* Exhibit 3) which the Court can also review on the Arizona supreme court's website accessible online at https://www.azcourts.gov/Portals/0/201/News%20Release%20-%20Judge%20Pamela%20Gates%20Appointed%20Presiding%20Judge%20for%20Maricopa%20County.pdf.

### d. Exhibit 4: Official Case Record for CV2022-008626

Plaintiff asks the Court to take judicial notice of the contents of the CV2022-008626 case record, and specifically the undisputed facts that Judge Welty was never the assigned judge in that case and never issued an order entered into that case's docket.  A copy of the civil case record is attached (*see* Exhibit 4) which the Court can review on the Maricopa County Superior Court's website accessible online at https://www.superiorcourt.maricopa.gov/docket/CivilCourtCases/caseSearch.asp.

### 3. Summary

Issuing and/or maintaining an administrative order, especially an administrative order affecting substantive rights, is not a "normal judicial function" because as the attached documents and forementioned undisputed facts contained therein demonstrate, (1) only Presiding Judges acting in an administrative capacity are permitted to issue administrative orders under the state's constitution, statutes, and procedural rules; (2) the state legislature through A.R.S. § 12-109 expressly prohibits administrative orders which affect a litigant's substantive rights; and (3) the Arizona supreme court has articulated through press releases and binding caselaw that Presiding Judges acting in their administrative capacity only have "authority over the courts, judicial officers, and court employees in their county", not jurisdictional authority to hear and decide disputes between private parties, to conduct judicial proceedings, or to issue orders granting any

ER-278

form of relief or compelling private party action.

B. The Court Should Take Judicial Notice Of Plaintiff's Public Records Request and Presiding Judge Gates' Response

"Under Fed. R. Evid. 201, a court may take judicial notice of 'matters of public record.'" *Lee*, 250 F.3d at 689. Written correspondence between private parties and Arizona public officials, including court officials, are matters of public record. *See* Ariz. R. Sup. Ct. 123(b)(18) ("'Record' means all existing documents, papers, letters, maps, books, tapes, photographs, films, sound recordings or other materials, regardless of physical form or characteristics, *made or received* pursuant to law or in connection with the transaction of any official business by the court, and preserved or appropriate for preservation by the court as evidence of the organization, functions, policies, decision, procedures, operations or other governmental activities.").

1. The Undisputed Facts Are Relevant

Apparently seeking to carry the burden to demonstrate immunity, Presiding Judge Welty factually posited that his "only action here was to review and approve the application to certify Plaintiff as a vexatious litigant." (Doc. 67, p. 3). Because § 12-3201 references no such "application" (Doc. 14 at 121), the Presiding Judge did not provide evidence of that application, and no application is docketed in the CV2022-008626 case record (*see* Exhibit 4), Plaintiff submitted a public records request to inspect that "application" document, which only could have been submitted to the Presiding Judge by the Hon. John Blanchard – the assigned trial judge.

2. Exhibits

a. Exhibit 5: Plaintiff's Public Records Request

Plaintiff asks the Court to judicially notice Plaintiff's September 9, 2025 public

records request sent via email to Presiding Judge Gates through Kara Karlson, the attorney of record for the Presiding Judge(s).  This request includes the undisputed fact that Plaintiff asked Presiding Juge Gates to provide "copies of all records maintained in any storage medium (e.g., email, text message, voicemail, physical papers, digital files, etc.) which: ... 2. Contain, or reference, an 'application' from the Hon. John Blanchard to the Presiding Judge to certify Phillip Potter as a vexatious litigant through case CV2022-008626. [and] 3. Contain communications the Hon. Joseph Welty made with any other person regarding the previously referenced 'application'."  A copy of this public record request is attached (*see* Exhibit 5).

### b. Exhibit 6: Presiding Judge Gates' Response

Plaintiff asks the Court to judicially notice the contents of Presiding Judge Gates' October 12, 2025 response to the forementioned public records request sent via email to Plaintiff.  The contents include undisputed facts that (1) the response to public records request "2" was "see attached Minute Entry" where the "attached Minute Entry" contains no reference to an "application"; (2) the response to public records request "3" was "The only communications are attorney and judicial work product emails between me [Judge Gates] and Judge Welty or his staff when I [Judge Gates] drafted the A.O. declaring Phillip Potter as a vexatious litigant. (Protected by Supreme Court Rule 123(d)(4) and (e)(9)"; and (3) there exists no document evidencing communication of an "application" originating from Judge Blanchard and being sent to Presiding Judge Welty.  A copy of those responses is attached (*see* Exhibit 6).

### 3. Summary

Presiding Judge Welty posited in the dismissal motion that he "review[ed] and approve[d] [an] application to certify Plaintiff as a vexatious litigant."  But Presiding

Judge Gates could not produce documentation of the "application" while the plain language of A.R.S. § 12-3201 contains no reference to such an "application". Judicial notice indicates that Ms. Karlson's factual statements made in a written motion, and in pursuit of judicial immunity, have no evidentiary support.

CONCLUSION

Government officials are "absolutely immune ... for conduct within [their] exclusive sphere of constitutional authority". *Trump v. United States,* 144 S. Ct. 2312, 2319 (2024). Accordingly, the nation's chief executive enjoys absolute immunity for executive acts. *Id.* State and federal legislators also enjoy absolute immunity for acts taken in their "legislative sphere" but "not ... beyond". *Gravel* v. *United States,* 408 U. S. 606, 624-25 (1972); *Bogan v. Scott-Harris*, 523 U.S. 44 (1998) ("It is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities"). Likewise, state and federal judges entitled to absolutely immunity from civil suits for acts taken "in a judicial capacity" but not for acts taken pursuant to "the administrative, ... functions that judges may on occasion be assigned by law to perform." *Forrester*, 484 U.S. at 227. When, as here, there is a dispute about whether a government official has acted under their "exclusive sphere of constitutional authority" as per *Trump*, courts must first factually "examine the nature of the functions with which a particular official" engaged so as to determine how to properly classify those functions before deciding absolute immunity since "the [Supreme] Court has been careful not to extend the scope of the [absolute judicial immunity] protection further than its purposes require." *Forrester*, 484, U.S. at 224. Undisputed facts Plaintiff presents in the instant motion confirm Presiding Judge Gates cannot meet her burden to demonstrate immunity on the complaint, via the incorporation of any document by

11

reference, or through the Presiding Judges' deficient request for judicial notice offered in

their dismissal motion.

DATED this 9th day of November 2025.

By:  //s//
Phillip Potter
Plaintiff
Pro Se

ER-282

**12-109.** Rules and administrative orders of pleading, practice and procedure; adoption; prohibitions; electronic signatures; distribution

A. The supreme court, by rules or administrative orders, shall regulate pleading, practice and procedure in judicial proceedings in all courts of this state to simplify pleading, practice and procedure and promote speedy determination of litigation on its merits.

B. The rules and administrative orders shall not do any of the following:

1. Abridge, enlarge or modify substantive rights of a litigant.

2. Abridge, enlarge or modify statutory, contractual or common law real property rights or questions of substantive law.

C. The court may allow documents that require a sworn written declaration, verification, certificate, statement, oath or affidavit to be signed with an electronic signature.

D. The supreme court shall print and distribute the rules and administrative orders to all members of the state bar and to all other persons who apply.

E. The rules shall not become effective until sixty days after distribution.

**THOMSON REUTERS**
**WESTLAW**   Arizona Court Rules

Home | Table of Contents

*Rule 92. Presiding Judge; Associate Presiding Judge*

Arizona Revised Statutes Annotated

Rules of the Supreme Court of Arizona

---

Arizona Revised Statutes Annotated
    Rules of the Supreme Court of Arizona (Refs & Annos)
      VIII. Superior Court Administration

---

A.R.S. Sup.Ct.Rules, Rule 92

Rule 92. Presiding Judge; Associate Presiding Judge

Currentness

**(a) Powers and Duties of Presiding Judge.** The presiding judge in each county, in addition to exercising general administrative supervision over the court and the judges thereof, shall:

(1) Make regular and special assignments of all judges, except as otherwise provided by A.R.S. Section 8-202(B), and, unless otherwise directed by the Chief Justice, assign judges within the county to other counties;

(2) Exercise general supervision over all court personnel;

(3) Prescribe the powers and duties of the clerk of the court, in addition to those prescribed by law and the Supreme Court;

(4) Appoint with the approval of the Supreme Court an associate presiding judge to serve as acting presiding judge during the presiding judge's absence or unavailability;

(5) Determine the need for and approve (i) the allocation of space and furnishings in the court building; (ii) the construction of new court buildings, courtrooms and related physical facilities; and (iii) the modification of existing court buildings, courtrooms and related physical facilities;

(6) Identify and develop programs that provide alternative methods for the resolution of civil disputes to which actions may be referred pursuant to the authority conferred by Rule 16(i) of the Arizona Rules of Civil Procedure, and promulgate such local rules as a majority of the judges of the county may approve establishing and governing such alternative dispute resolution programs.

In order to facilitate the business of the court the presiding judge or associate presiding judge may delegate the duties prescribed in these rules to other judges.

**(b) Associate Presiding Judge.** The associate presiding judge shall serve at the pleasure of the presiding judge and shall exercise and discharge all powers and duties of the presiding judge, except the associate presiding judge may not appoint court commissioners or appoint judges permanently to special assignments.

**(c) Assignment of Cases.** In counties with more than one judge, the presiding judge may, upon the presiding judge's motion or upon the motion of any party, assign a case permanently to one judge for all purposes.

**Credits**
Added Oct. 10, 2000, effective Dec. 1, 2000. Amended Aug. 31, 2017, effective July 1, 2018.
    <Formerly Part VII. Redesignated as Part VIII January 15, 2003, effective July 1, 2003.>
    <The heading was changed from "Court Commissioners" to "Superior Court Administration" by order dated Oct. 10, 2000, effective Dec. 1, 2000.>

17A Pt. 2 A. R. S. Sup. Ct. Rules, Rule 92, AZ ST S CT Rule 92
State Court Rules and the Code of Judicial Administration are current with amendments received and effective through October 15, 2025. Some rules may be more current, see credits for details.

---

**END OF DOCUMENT**

# NEWS RELEASE

Arizona Supreme Court
Administrative Office of the Courts



Contact:  Alberto Rodriguez
Phone:  602-452-3656
Mobile:  602-448-8412
Email:  arodriguez@courts.az.gov

Dec. 13, 2024

### Judge Pamela S. Gates Appointed Presiding Judge for Maricopa County

PHOENIX – The Arizona Supreme Court has appointed Hon. Pamela S. Gates as Presiding Judge for the Superior Court in Maricopa County, effective July 1, 2025. Gates is the Associate Presiding Judge for the court, and has served as Presiding Civil Judge, Associate Criminal Presiding Judge, and Associate Presiding Judge for the downtown family court.

Prior to her appointment to the bench in 2009, Judge Gates was a partner at Bryan Cave. Her private practice included handling complex civil litigation matters with a concentration in environmental litigation.

In accepting the appointment, Judge Pamela Gates said, "I am honored by the Supreme Court's decision to appoint me as the Presiding Judge of the Superior Court in Maricopa County. I look forward to continuing our commitment to providing the community a court system that ensures fairness and access to justice for all. Together with my colleagues, we will work to ensure that the court system remains a steadfast guardian of the Rule of Law and a vital resource for those who seek justice."

Presiding Judges in Arizona serve as the chief executive officer of the county courts, having administrative authority over the courts, judicial officers, and court employees in their county. The Presiding Judge oversees case assignments, court calendars, financial management, and helps set the court's strategic agenda. They also monitor the performance of the courts to ensure that cases are processed in a timely manner. Judge Gates will receive no additional compensation for her duties and responsibilities as Presiding Judge.

Judge Gates graduated cum laude from Drake University with a B.S. Political Science and History and earned her J.D. with distinction from the University of Iowa College of Law.

###

*Learn more about Arizona's judicial branch by visiting azcourts.gov. Follow us on X, formerly Twitter: @AZCourts and on Facebook: @ArizonaSupremeCourt.*

## Case Information

| | | | |
|---|---|---|---|
| **Case Number:** | CV2022-008626 | **Judge:** | Ponce, Adele |
| **File Date:** | 7/8/2022 | **Location:** | Downtown |
| **Case Type:** | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Phillip Potter | Plaintiff | Male | Pro Per |
| Arizona House Of Representatives | Defendant | | KEVIN O'MALLEY |
| Robert Meza | Defendant | Male | Timothy Nelson |
| Karrin Taylor Robson | Defendant | Female | Derek Flint |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 12/19/2024 | ORD - Order | 12/19/2024 | |
| **NOTE:** | SUPPLEMENTAL JUDGMENT FOR ATTORNEYS' FEES AND COSTS ORDERED BY THE ARIZONA COURT OF APPEALS | | |
| 11/22/2024 | NOL - Notice of Lodging | 11/25/2024 | |
| **NOTE:** | NOTICE OF LODGING PROPOSED FORM OF SUPPLEMENTAL JUDGMENT FOR ATTORNEYS' FEES AND COSTS ORDERED BY THE ARIZONA COURT OF APPEALS | | |
| 10/21/2024 | LET - Letter | 10/23/2024 | |
| **NOTE:** | COURT OF APPEALS | | |
| 10/21/2024 | MAN - Order Of Mandate | 10/23/2024 | |
| **NOTE:** | COURT OF APPEALS | | |
| 4/10/2024 | ALT - Appeals Letter Of Transmittal | 4/12/2024 | |
| 2/21/2024 | NOT - Notice | 2/23/2024 | |
| **NOTE:** | Notice of Court of Appeals Decision Affirming Final Judgment | | |
| 2/15/2024 | SOC - Statement Of Costs | 2/16/2024 | |
| **NOTE:** | APPELLEE ROBERT MEZA'S STATEMENT OF ATTORNEYS' FEES AND COSTS | | |
| 11/15/2023 | AIX - Appeals Index | 11/20/2023 | |
| **NOTE:** | AMENDED | | |
| 11/15/2023 | REC - Receipt | 11/20/2023 | |
| **NOTE:** | C2C TRANSMISSION | | |
| 10/31/2023 | MEM - Memorandum | 11/3/2023 | |
| 10/3/2023 | NOT - Notice | 10/3/2023 | |
| **NOTE:** | Defendant's Notice of Ordering 2/23/2023 Hearing Transcript | | |
| 10/3/2023 | CAO - Court Of Appeals Order | 10/6/2023 | |
| 9/26/2023 | NOT - Notice | 9/29/2023 | Plaintiff(1) |
| **NOTE:** | Notice of Intention Not to Concur | | |
| 9/19/2023 | NOT - Notice | 9/22/2023 | |
| **NOTE:** | Defendants' Designation of Additional Transcript as Part of Record on Appeal | | |
| 9/12/2023 | 023 - ME: Order Entered By Court | 9/12/2023 | |
| 9/11/2023 | RTM - Returned Mail or Returned/ReMailed Mail | 9/13/2023 | |
| 9/4/2023 | MOT - Motion | 9/6/2023 | Plaintiff(1) |
| **NOTE:** | MOTION TO STAY ENFORCEMENT OF INJUNCTION | | |
| 8/29/2023 | RTM - Returned Mail or Returned/ReMailed Mail | 8/31/2023 | |
| 8/21/2023 | CAR - Court Of Appeals Receipt | 8/27/2023 | |
| 8/21/2023 | AIX - Appeals Index | 8/27/2023 | |
| 8/8/2023 | ANA - Amended Notice Of Appeal | 8/9/2023 | Plaintiff(1) |
| **NOTE:** | Amended Notice of Appeal | | |
| 8/7/2023 | RNM - Returned Mail | 8/11/2023 | |
| 7/18/2023 | RNM - Returned Mail | 7/24/2023 | |
| 7/13/2023 | REC - Receipt | 7/20/2023 | |
| **NOTE:** | C2C TRANSMISSION / | | |
| 7/13/2023 | AIX - Appeals Index | 7/20/2023 | |
| **NOTE:** | ELECTRONIC INDEX OF RECORD | | |
| 7/11/2023 | JUD - Judgment | 7/11/2023 | |
| **NOTE:** | FINAL JUDGMENT | | |
| 7/5/2023 | REL - Reply | 7/5/2023 | |
| **NOTE:** | DEFENDANTS' REPLY IN SUPPORT OF NOTICE OF LODGING PROPOSED FORM OF FINAL JUDGMENT | | |

| Date | Entry | Date | Party |
|---|---|---|---|
| 6/28/2023 | NOT - Notice | 7/13/2023 | |
| NOTE: | C2C TRANSMISSION RECEIPT | | |
| 6/28/2023 | NOT - Notice | 7/13/2023 | |
| NOTE: | ELECTRONIC INDEX OF RECORD | | |
| 6/27/2023 | OBJ - Objection/Opposition | 6/28/2023 | Plaintiff(1) |
| NOTE: | Response in Opposition to Proposed Final Order | | |
| 6/23/2023 | ANA - Amended Notice Of Appeal | 6/23/2023 | Plaintiff(1) |
| NOTE: | Amended Notice of Appeal | | |
| 6/15/2023 | NOT - Notice | 6/15/2023 | |
| NOTE: | DEFENDANTS' NOTICE OF LODGING PROPOSED FORM OF FINAL JUDGMENT | | |
| 6/12/2023 | 023 - ME: Order Entered By Court | 6/12/2023 | |
| 6/8/2023 | CAO - Court Of Appeals Order | 6/12/2023 | |
| NOTE: | COURT OF APPEALS ORDER CONTINUING STAY | | |
| 6/7/2023 | 023 - ME: Order Entered By Court | 6/7/2023 | |
| 6/6/2023 | 019 - ME: Ruling | 6/6/2023 | |
| 5/31/2023 | CAR - Court Of Appeals Receipt | 6/1/2023 | |
| 5/30/2023 | RNM - Returned Mail | 5/31/2023 | |
| 5/25/2023 | ALT - Appeals Letter Of Transmittal | 5/26/2023 | |
| 5/25/2023 | CAO - Court Of Appeals Order | 5/26/2023 | |
| NOTE: | Declining Special Action Jurisdiction | | |
| 5/24/2023 | MOT - Motion | 5/24/2023 | Plaintiff(1) |
| NOTE: | Motion for Signed Judgment Pursuant to Court of Appeals Order | | |
| 5/24/2023 | NOT - Notice | 5/25/2023 | |
| NOTE: | Joint Notice of Outstanding Issues | | |
| 5/18/2023 | CAO - Court Of Appeals Order | 5/19/2023 | |
| NOTE: | Order Staying Appeal | | |
| 5/11/2023 | ALT - Appeals Letter Of Transmittal | 5/12/2023 | |
| 5/11/2023 | CAO - Court Of Appeals Order | 5/12/2023 | |
| NOTE: | Dismissing Appeal | | |
| 4/21/2023 | CAR - Court Of Appeals Receipt | 4/24/2023 | |
| NOTE: | C2C TRANSMISSION RECEIPT | | |
| 4/21/2023 | AIX - Appeals Index | 4/24/2023 | |
| NOTE: | ELECTRONIC INDEX OF RECORD | | |
| 4/19/2023 | NOT - Notice | 4/20/2023 | |
| NOTE: | APPELLATE CLERK NOTICE | | |
| 4/6/2023 | NOT - Notice | 4/10/2023 | |
| NOTE: | NOTICE OF FILING NOTICE OF APPEAL | | |
| 4/4/2023 | CAO - Court Of Appeals Order | 4/5/2023 | |
| NOTE: | ORDER RE: AMENDED NOTICE OF APPEAL / NEW APPEAL | | |
| 3/28/2023 | MAN - Order Of Mandate | 4/9/2023 | |
| 3/28/2023 | MAN - Order Of Mandate | 3/29/2023 | |
| 3/28/2023 | CAR - Court Of Appeals Receipt | 3/29/2023 | |
| NOTE: | C2C TRANSMISSION RECEIPT | | |
| 3/28/2023 | AIX - Appeals Index | 3/29/2023 | |
| NOTE: | AMENDED ELECTRONIC INDEX OF RECORD | | |
| 3/17/2023 | ANA - Amended Notice Of Appeal | 3/21/2023 | Plaintiff(1) |
| NOTE: | AMENDED NOTICE OF APPEAL | | |
| 3/13/2023 | 025 - ME: Case Status Minute Entry | 3/13/2023 | |
| 3/8/2023 | CAR - Court Of Appeals Receipt | 3/9/2023 | |
| NOTE: | C2C TRANSMISSION RECEIPT | | |
| 3/8/2023 | AIX - Appeals Index | 3/9/2023 | |
| NOTE: | ELECTRONIC INDEX OF RECORD | | |
| 3/3/2023 | NOT - Notice | 3/6/2023 | |
| NOTE: | APPELLATE CLERK NOTICE | | |
| 3/1/2023 | 023 - ME: Order Entered By Court | 3/1/2023 | |
| 2/27/2023 | EXW - Exhibits Work Sheet | 3/1/2023 | |
| 2/27/2023 | 020 - ME: Matter Under Advisement | 2/27/2023 | |
| 2/27/2023 | 926 - ME: Under Advisement Ruling | 2/27/2023 | |
| 2/23/2023 | LOW - List Of Witnesses/Exhibit/Evidence | 2/27/2023 | Plaintiff(1) |
| NOTE: | Notice of Exhibits | | |
| 2/22/2023 | 023 - ME: Order Entered By Court | 2/22/2023 | |
| 2/21/2023 | NOF - Notice Of Filing | 2/24/2023 | |
| NOTE: | Notice of Filing Exhibits for Evidentiary Hearing | | |
| 2/16/2023 | MTD - Motion To Dismiss | 2/21/2023 | Plaintiff(1) |
| NOTE: | | | |
| MOTION TO DISMISS DEFENDANTS' REQUEST FOR INJUNCTIVE RELIEF PER A.R.S. § 12-751 AND A.R.S. § 12-1802(4) | | | |
| 2/14/2023 | REL - Reply | 2/15/2023 | Plaintiff(1) |
| NOTE: | Reply to Motion for Clarification | | |
| 2/13/2023 | MOT - Motion | 2/14/2023 | Plaintiff(1) |
| NOTE: | Motion for Clarification | | |
| 2/13/2023 | RES - Response | 2/15/2023 | |
| NOTE: | Defendants' Response to Plaintiff's Motion for Clarification | | |
| 2/7/2023 | 056 - ME: Hearing Set | 2/7/2023 | |

ER-287

| Date | Entry | Date2 | Party |
|---|---|---|---|
| 2/2/2023 | MOT - Motion | 2/4/2023 | Plaintiff(1) |
| NOTE: | Motion for Signed Judgment | | |
| 2/2/2023 | NAP - Notice Of Appeal | 2/4/2023 | Plaintiff(1) |
| NOTE: | Notice of Appeal | | |
| 2/2/2023 | 019 - ME: Ruling | 2/2/2023 | |
| 2/2/2023 | 023 - ME: Order Entered By Court | 2/2/2023 | |
| 2/1/2023 | CAO - Court Of Appeals Order | 2/2/2023 | |
| 2/1/2023 | REL - Reply | 2/4/2023 | Plaintiff(1) |
| NOTE: | Reply to Motion for Reconsideration | | |
| 1/31/2023 | NOT - Notice | 2/2/2023 | Plaintiff(1) |
| NOTE: | Notice | | |
| 1/31/2023 | CAO - Court Of Appeals Order | 2/1/2023 | |
| NOTE: | ORDER | | |
| 1/30/2023 | MOT - Motion | 2/1/2023 | Plaintiff(1) |
| NOTE: | Motion for TRO and for Order Setting Hearing on Preliminary Injunction | | |
| 1/27/2023 | ALT - Appeals Letter Of Transmittal | 1/30/2023 | |
| 1/27/2023 | CAO - Court Of Appeals Order | 1/30/2023 | |
| NOTE: | DIV 1 TRANSFER ORDER | | |
| 1/27/2023 | RES - Response | 1/31/2023 | |
| NOTE: | DEFENDANT ROBERT MEZA'S RESPONSE TO MOTION FOR RECONSIDERATION | | |
| 1/27/2023 | RES - Response | 1/31/2023 | |
| NOTE: | Defendant Arizona House of Representatives' Response to Request for Reconsideration | | |
| 1/24/2023 | CAR - Court Of Appeals Receipt | 1/25/2023 | |
| 1/24/2023 | AIX - Appeals Index | 1/25/2023 | |
| NOTE: | ELECTRONIC INDEX OF RECORD-AMENDED | | |
| 1/17/2023 | REL - Reply | 1/20/2023 | |
| NOTE: | DEFENDANT ROBERT MEZA'S REPLY IN SUPPORT OF APPLICATION FOR ATTORNEYS' FEES | | |
| 1/17/2023 | REL - Reply | 1/20/2023 | |
| NOTE: | | | |

DEFENDANT ARIZONA HOUSE OF REPRESENTATIVES' REPLY IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AS SANCTIONS
1/17/2023    REL - Reply    1/20/2023
NOTE:

DEFENDANT KARRIN TAYLOR ROBSON'S REPLY IN SUPPORT OF RULE 11 MOTION AND MOTION FOR ATTORNEYS' FEES AND EXPENSES UNDER A.R.S. §§ 12-349–50 AND SUPPLEMENTAL APPLICATION FOR ATTORNEYS' FEES
1/17/2023    REL - Reply    1/20/2023
NOTE:    REPLY IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DESIGNATE PLAINTIFF AS VEXATIOUS LITIGANT
1/13/2023    RES - Response    1/18/2023
NOTE:    Defendant Karrin Taylor Robson's Response to Plaintiff's Motion for Reconsideration
1/11/2023    906 - ME: Response/Reply Times Set    1/11/2023
1/2/2023    RES - Response    1/3/2023    Plaintiff(1)
NOTE:

Plaintiff's Combined Response to Defendants' Joint Motion to Designate Plaintiff a Vexatious Litigant and Defendant Karrin Taylor Robson's Motion for Rule 11 Sanctions
1/2/2023    RES - Response    1/3/2023    Plaintiff(1)
NOTE:    Plaintiff's Combined Response to Defendants' Applications for Attorney Fees and Costs
12/30/2022    906 - ME: Response/Reply Times Set    12/30/2022
12/23/2022    NAP - Notice Of Appeal    12/27/2022    Plaintiff(1)
NOTE:    Notice of Appeal
12/13/2022    MOT - Motion    12/14/2022
NOTE:

DEFENDANT KARRIN TAYLOR ROBSON'S MOTION FOR ATTORNEY'S FEES AND EXPENSES UNDER A.R.S. §§ 12-349–50
12/13/2022    AAF - Application For Attorney Fees    12/15/2022
NOTE:

DEFENDANT ROBERT MEZA'S MOTION FOR ATTORNEYS' FEES AS SANCTIONS AND DECLARATION IN SUPPORT THEREOF
12/13/2022    AAF - Application For Attorney Fees    12/15/2022
NOTE:    Defendant Arizona House of Representatives' Motion for Attorneys' Fees as Sanctions
12/12/2022    MOT - Motion    12/13/2022
NOTE:    Defendants' Joint Motion to Designate Plaintiff as Vexatious Litigant
12/12/2022    MOT - Motion    12/13/2022
NOTE:    Defendant Karrin Taylor Robson's Rule 11 Motion for Sanctions
12/5/2022    MOT - Motion    12/5/2022    Plaintiff(1)
NOTE:    Motion for Reconsideration
11/23/2022    005 - ME: Hearing    11/23/2022
11/22/2022    PSC - Petition For Order To Show Cause    11/22/2022    Plaintiff(1)
NOTE:    Second Supplement to Second Application for Order to Show Cause
10/28/2022    094 - ME: Oral Argument Set    10/28/2022
10/28/2022    NOT - Notice    11/2/2022
NOTE:    DEFENDANT KARRIN TAYLOR ROBSON'S LAW FIRM SNELL & WILMER L.L.P.'S NOTICE OF CHANGE OF ADDRESS
10/14/2022    RES - Response    10/18/2022
NOTE:

KARRIN TAYLOR ROBSON'S RESPONSE IN OPPOSITION TO PLAINTIFF'S SECOND APPLICATION FOR ORDER TO SHOW CAUSE

ER-288

| 10/11/2022 | OBJ - Objection/Opposition | 10/13/2022 | |
|---|---|---|---|
| **NOTE:** | DEFENDANT ARIZONA HOUSE OF REPRESENTATIVES' OPPOSITION TO PLAINTIFF'S SECOND APPLICATION FOR ORDER TO SHOW CAUSE | | |
| 10/11/2022 | OBJ - Objection/Opposition | 10/14/2022 | |
| **NOTE:** | DEFENDANT ROBERT MEZA'S OPPOSITION TO PLAINTIFF'S SECOND APPLICATION FOR ORDER TO SHOW CAUSE | | |
| 10/5/2022 | NOT - Notice | 10/8/2022 | Plaintiff(1) |
| **NOTE:** | Supplement to Second Application FOR ORDER TO Show Cause | | |
| 9/30/2022 | REL - Reply | 10/5/2022 | |
| **NOTE:** | DEFENDANT ARIZONA HOUSE OF REPRESENTATIVES' REPLY IN SUPPORT OF MOTION TO DISMISS | | |
| 9/28/2022 | PSC - Petition For Order To Show Cause | 9/30/2022 | Plaintiff(1) |
| **NOTE:** | Second Application for Order to Show Cause | | |
| 9/28/2022 | REL - Reply | 10/1/2022 | |
| **NOTE:** | Defendant Karrin Taylor Robson's Reply IN SUPPORT of Motion to Dismiss | | |
| 9/26/2022 | REL - Reply | 9/28/2022 | |
| **NOTE:** | DEFENDANT ROBERT MEZA'S REPLY IN SUPPORT OF MOTION TO DISMISS | | |
| 9/25/2022 | REL - Reply | 9/26/2022 | Plaintiff(1) |
| **NOTE:** | REPLY TO DEFENDANT HOUSE OF REPRESENTATIVES' OBJECTION TO IN CAMERA INSPECTION OF DISPUTED RECORDS | | |
| 9/25/2022 | REL - Reply | 9/27/2022 | Plaintiff(1) |
| **NOTE:** | REPLY TO DEFENDANT MEZA'S OBJECTION TO IN CAMERA INSPECTION OF DISPUTED RECORDS | | |
| 9/25/2022 | REL - Reply | 9/27/2022 | Plaintiff(1) |
| **NOTE:** | REPLY TO DEFENDANT ROBSON'S OBJECTION TO IN CAMERA INSPECTION OF DISPUTED RECORDS | | |
| 9/23/2022 | RES - Response | 9/24/2022 | Plaintiff(1) |
| **NOTE:** | Response to Defendant House of Representatives' Motion to Dismiss | | |
| 9/21/2022 | RES - Response | 9/23/2022 | Plaintiff(1) |
| **NOTE:** | Response to Defendant Robson's Motion to Dismiss | | |
| 9/20/2022 | OBJ - Objection/Opposition | 9/23/2022 | |
| **NOTE:** | Opposition to Motion for In Camera REVIEW | | |
| 9/20/2022 | RES - Response | 9/23/2022 | |
| **NOTE:** | | | |
| 9/20/2022 | RES - Response | 9/23/2022 | |
| DEFENDANT ARIZONA HOUSE OF REPRESENTATIVES' RESPONSE TO MOTION FOR IN CAMERA INSPECTION OF DISPUTED RECORDS | | | |
| **NOTE:** | KARRIN TAYLOR ROBSON'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR IN CAMERA REVIEW | | |
| 9/19/2022 | RES - Response | 9/22/2022 | Plaintiff(1) |
| **NOTE:** | Response to Defendant Meza's Motion to Dismiss | | |
| 9/15/2022 | MTD - Motion To Dismiss | 9/19/2022 | |
| **NOTE:** | Defendant Arizona House of Representatives' Motion to Dismiss | | |
| 9/15/2022 | MTD - Motion To Dismiss | 9/19/2022 | |
| **NOTE:** | DEFENDANT KARRIN TAYLOR ROBSON'S MOTION TO DISMISS | | |
| 9/15/2022 | MTD - Motion To Dismiss | 9/19/2022 | |
| **NOTE:** | DEFENDANT ROBERT MEZA'S MOTION TO DISMISS PURSUANT TO ARIZ. R. CIV. P. 12(B)(1) and (6) | | |
| 9/15/2022 | CER - Certificate | 9/19/2022 | |
| **NOTE:** | Good Faith Consultation Certificate | | |
| 8/31/2022 | MOT - Motion | 9/3/2022 | Plaintiff(1) |
| **NOTE:** | MOTION FOR IN CAMERA INSPECTION OF DISPUTED RECORDS | | |
| 8/10/2022 | 005 - ME: Hearing | 8/10/2022 | |
| 8/5/2022 | CAN - Credit Memo Appearance Fee Paid | 8/8/2022 | |
| **NOTE:** | Credit Memo/Appearance Fee Paid | | |
| 8/2/2022 | WSS - Waiver Of Service Of Summons | 8/5/2022 | |
| **NOTE:** | DEFENDANT ROBERT MEZA'S WAIVER OF SERVICE OF PROCESS PURSUANT TO ARIZ. R. CIV. P 4(f)(1) | | |
| 8/2/2022 | NOT - Notice | 8/5/2022 | |
| **NOTE:** | Joint Notice Re Outstanding Motions | | |
| 7/29/2022 | NAR - Notice Of Appearance | 8/1/2022 | |
| **NOTE:** | Notice of Appearance of Timothy A Nelson | | |
| 7/25/2022 | CAN - Credit Memo Appearance Fee Paid | 7/27/2022 | |
| **NOTE:** | Credit Memo/Appearance Fee Paid | | |
| 7/22/2022 | OSC - Order To Show Cause | 7/27/2022 | |
| 7/19/2022 | 066 - ME: Case Reassigned | 7/19/2022 | |
| 7/19/2022 | 001 - ME: Disqualification | 7/19/2022 | |
| 7/15/2022 | WSS - Waiver Of Service Of Summons | 7/20/2022 | |
| **NOTE:** | Waiver of Service on Defendant Karrin Taylor Robson | | |
| 7/15/2022 | NJR - Notice of change of Judge for right | 7/20/2022 | |
| **NOTE:** | Notice of Change of Judge | | |
| 7/15/2022 | NAR - Notice Of Appearance | 7/21/2022 | |
| **NOTE:** | NOTICE OF APPEARANCE | | |
| 7/15/2022 | WSS - Waiver Of Service Of Summons | 7/21/2022 | |
| **NOTE:** | WAIVER OF SERVICE ON DEFENDANT ARIZONA HOUSE OF REPRESENTATIVES | | |
| 7/11/2022 | OSC - Order To Show Cause | 7/14/2022 | |
| 7/8/2022 | COM - Complaint | 7/8/2022 | Plaintiff(1) |
| 7/8/2022 | CSH - Coversheet | 7/8/2022 | Plaintiff(1) |
| 7/8/2022 | APL - Application | 7/8/2022 | Plaintiff(1) |
| **NOTE:** | FOR ORDER TO SHOW CAUSE | | |

## Case Calendar

| Date | Time | Event |
|------|------|-------|
| 7/18/2022 | 9:30 | Order To Show Cause |
| 8/4/2022 | 10:30 | Order To Show Cause |
| 11/16/2022 | 11:00 | Oral Argument |
| 2/23/2023 | 10:30 | Evidentiary Hearing |

## Judgments

| Date | (F)or / (A)gainst | Amount | Frequency | Type | Status |
|------|-------------------|--------|-----------|------|--------|
| 7/11/2023 | **F:** Robert Meza<br>**A:** Phillip Potter | $583.62 | One Time | Costs | |
| 7/11/2023 | **F:** Robert Meza<br>**A:** Phillip Potter | $10,000.00 | One Time | Attorney Fee | |
| 7/11/2023 | **F:** Arizona House Of Representatives<br>**A:** Phillip Potter | $326.62 | One Time | Costs | |
| 7/11/2023 | **F:** Arizona House Of Representatives<br>**A:** Phillip Potter | $10,000.00 | One Time | Attorney Fee | |
| 7/11/2023 | **F:** Karrin Taylor Robson<br>**A:** Phillip Potter | $583.62 | One Time | Costs | |
| 7/11/2023 | **F:** Karrin Taylor Robson<br>**A:** Phillip Potter | $11,000.00 | One Time | Attorney Fee | |

VIA E-MAIL ONLY

September 9, 2025

Kara Karlson
Senior Litigation Counsel
State Government Division - Elections
Office of the Arizona Attorney General
15 South 15th Avenue
Phoenix, AZ 85007

Re: Public Records Request

Ms. Karlson,

I am contacting you to request your client(s), the Presiding Judge(s) of the Maricopa County Superior Court (the Hon. Joseph Welty and the Hon. Pamela Gates), make records available for inspection pursuant to Ariz. R. Sup. Ct. 123 and A.R.S. § 39-121, *et seq.*. Specifically, I ask for copies of all records maintained in any storage medium (e.g., email, text message, voicemail, physical papers, digital files, etc.) which:

1. The Presiding Judge created, or relied on, to "designate" any authority to the Hon. John Blanchard to "designate a pro se litigant a vexatious litigant". *See* A.R.S. § 12-3201(A).
2. Contain, or reference, an "application" from the Hon. John Blanchard to the Presiding Judge to certify Phillip Potter as a vexatious litigant through case CV2022-008626.
3. Contain communications the Hon. Joseph Welty made with any other person regarding the previously referenced "application".
4. Reference, or contain communications the Hon. Joseph Welty and/or the Hon. Pamela Welty made with any other person regarding, Administrative Order 2023-159.

This request is not made for any commercial use. Please let me know if there will be any production costs prior to actual production.

The requested records are in your clients' actual and constructive possession as the Presiding Judge[s] of the Maricopa County Superior Court, and should be readily available with minimal efforts through a search of government e-mail servers, personal devices, and digital files.

I ask that your client furnish an index of records or categories of records that are being withheld, if any, and the reasons those records or categories of records are being withheld, if any.

If possible, please provide digital copies of the requested records to phillip.t.potter@gmail.com. Your client is welcome to provide a rolling response to expedite production and preserve resources. If you have any questions, or if I can clarify any matter, you are welcome to contact

me via the forementioned email address or via phone at 480-459-0310.  I thought it best to route this request through you given current litigation.  Thank you for your help with this.

Regards,
Phillip Potter

 Gmail

Phil Potter <phillip.t.potter@gmail.com>

---

## PRR Response

---

**Karlson, Kara** <Kara.Karlson@azag.gov>                    Tue, Oct 21, 2025 at 3:05 PM
To: Phil Potter <phillip.t.potter@gmail.com>

Mr. Potter:

Judge Gates' public records response is as follows:

1. The Presiding Judge created, or relied on, to "designate" any authority to the Hon. John

Blanchard to "designate a pro se litigant a vexatious litigant". *See* A.R.S. § 12-3201(A).

<span style="color:red">Pursuant to Administrative Order 2014-124 (see attached, it is the Presiding Judge that has the authority to designate a litigant as "vexatious" across the board in the Superior Court. However, a judge in an individual case can issue a minute entry declaring the litigant vexatious in their specific case, and requiring the litigant to seek permission from the judge before filing any further pleadings in the case. The judge then forwards the minute entry to the Presiding Judge for consideration to designate the litigant vexatious across the board.) (Also, see attached minute entry from Judge Blanchard.)</span>

2. Contain, or reference, an "application" from the Hon. John Blanchard to the Presiding

Judge to certify Phillip Potter as a vexatious litigant through case CV2022-008626.

<span style="color:red">See attached minute entry.</span>

3. Contain communications the Hon. Joseph Welty made with any other person regarding

the previously referenced "application".

<span style="color:red">The only communications are attorney and judicial work product emails between me and Judge Welty or his staff when I drafted the A.O. declaring Phillip Potter as a vexatious litigant. (Protected by Supreme Court Rule 123(d)(4) and (e)(9).</span>

4. Reference, or contain communications the Hon. Joseph Welty and/or the Hon. Pamela

Welty made with any other person regarding, Administrative Order 2023-159.

<span style="color:red">Same answer as to number 3 above.</span>

ER-293

--

## Kara Karlson

Senior Litigation Counsel

State Government Division-Elections



Arizona Attorney General Kris Mayes

15 S 15th Ave

Phoenix, AZ 85007

Desk: 602-542-8118

Kara.Karlson@azag.gov

http://www.azag.gov

CONFIDENTIALITY NOTICE:  This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

**2 attachments**

 **Admin Order 2014-134 Vexatious Litigants.pdf**
14K

 **Potter vexatious minute entry.pdf**
210K

Clerk of the Superior Court
*** Electronically Filed ***
02/27/2023 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-008626                                    02/24/2023

                                          CLERK OF THE COURT
HONORABLE JOHN L. BLANCHARD            Y. Rodriguez/S. Brown
                                               Deputy

PHILLIP POTTER                        PHILLIP POTTER
                                      2301 N 66TH ST
                                      SCOTTSDALE AZ  85257

v.

ARIZONA HOUSE OF REPRESENTATIVES, et    KEVIN E O'MALLEY
al.

                                      DEREK FLINT
                                      TIMOTHY A NELSON
                                      JUDGE BLANCHARD
                                      JUDGE WELTY

MINUTE ENTRY

        The Court has reviewed and fully considered *Defendants' Joint Motion To Designate Plaintiff As Vexatious Litigant*, filed December 12, 2022, as well as Plaintiff's Response, and Defendants' Reply.  The Court also carefully reviewed the parties' filings and the Court's minute entries and orders in this matter, together with the pleadings, minute entries, and orders in the several other litigation matters cited by Defendants and Plaintiff.  The Court held an evidentiary hearing on the Joint Motion on February 23, 2023.  At the hearing, the Court took judicial notice of the litigation matters referenced by Defendants and admitted into evidence (and reviewed) Plaintiff's nine exhibits.  For the Reasons set forth below the Motion is granted.

Docket Code 926                     Form V000A                        Page 1

ER-295

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-008626                                          02/24/2023

**Factual Background**

      Plaintiff's complaint in this matter is a public records lawsuit under A.R.S. § 39-121 *et seq.*  Plaintiff has alleged that Defendants are, among other things, withholding public records that would demonstrate a conspiracy of public corruption.  Plaintiff's pursuit of these records is tied to his suspicion of a conspiracy involving these Defendants and several other parties that are/were parties in several other actions he has initiated.

      His initial lawsuit was filed in 2001 against his ex-wife, her family members, and individuals related to their divorce proceedings (CV2021-005501).  Each of Plaintiff's lawsuits suggests a conspiracy among his ex-wife, several government actors, and other parties.  At the evidentiary hearing, Plaintiff alleged that he discovered that his ex-wife was involved in these corrupt activities during their marriage.  He testified that he believes the public records he is seeking here will expose that public corruption conspiracy and allow him to revive and pursue claims against his ex-wife, her family, and others.    Stated differently, this current action is a necessary step towards his ongoing campaign against his ex-wife and others.

      The Joint Motion (at pages 3-12) summarizes in detail the litigation activity of Plaintiff.  At the evidentiary hearing, Defendants discussed the pleadings and events in CV2021-005501, CV2021-013201, CA-CV 22-0441 (appeal from CV2021-013210), and CV2022-014146.  A review of the orders in those matters paints a troubling picture.  All these cases revolve around Plaintiff's public corruption allegations dating back to his ex-wife and the divorce proceedings.  The summary of Plaintiff's claims includes many examples of frivolous motions, disregarding court orders, re-hashed positions that were rejected by the courts, and plain attempts to harass parties and/or unnecessarily expand litigation matters.  For example, the Court in CV2021-013210 (against his wife and 21 other defendants) concluded that Plaintiff's action, "clearly arising out of a family court matter run amok – constitutes a transparent effort to harass any person or entity even remotely associated with his estranged wife and her family."  The Court ordered that the defendants need not respond to Plaintiff's filings unless directed to do so by the Court.  The Court sanctioned Plaintiff.  The Court has granted motions to strike his pleadings, finding they contained gratuitously inflammatory and irrelevant allegations against parties.  Plaintiff has repeated these stricken allegations in subsequent filings.

      While the core public corruption allegations remain throughout, Plaintiff's various lawsuits have added new parties over time as he has expanded his efforts to pursue his conspiracy theories. He has sued his ex-wife, her family, family-law attorneys, medical providers, Arizona Public Service, insurance companies, a member of the Arizona House of Representatives, the Arizona House of Representatives, and several others.  He has stated in open court his intention to revive his claims against at least some of these parties if he is successful in obtaining the public records he believes are being withheld.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-008626                                              02/24/2023

     This Court granted each Defendant their separate Motions to Dismiss on November 16, 2022.  Plaintiff has indicated that he intends to appeal.

     The Court is mindful that requiring court approval for any filing will place a burden on Plaintiff to demonstrate a factual and legal basis for future filings. But that is what is needed in this case.

## Analysis

     Arizona law provides for designation of a party as a vexatious litigant. The applicable statute states:

**12-3201. Vexatious litigants; designation; definitions**

A. In a noncriminal case, at the request of a party or on the court's own motion, the presiding judge of the superior court or a judge designated by the presiding judge of the superior court may designate a pro se litigant a vexatious litigant.

B. A pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court.

C. A pro se litigant is a vexatious litigant if the court finds the pro se litigant engaged in vexatious conduct.

D. The requesting party may make an amended request at any time if the court either:

1. Determined that the party is not a vexatious litigant and the requesting party has new information or evidence that is relevant to the determination, even if there is not a pending case in the court.

2. Did not rule on the original request during the pendency of the action, even if there is not a pending case in the court.

E. For the purposes of this section:

1. "Vexatious conduct" includes any of the following:

(a) Repeated filing of court actions solely or primarily for the purpose of harassment.

(b) Unreasonably expanding or delaying court proceedings.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2022-008626                                      02/24/2023

(c) Court actions brought or defended without substantial justification.

(d) Engaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant.

(e) A pattern of making unreasonable, repetitive and excessive requests for information.

(f) Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation.

2. "Without substantial justification" has the same meaning prescribed in section 12-349.

The cases filed by Plaintiff allege causes of action that are unsupported by facts as alleged, argue legal positions that are not founded in the law or reasonable interpretations of the law, re-argue the same positions repeatedly with no regard for rulings of the Court, and promote abuse of process. The common thread to Plaintiff's litigation tactics in his cases is the common link of some connection or another to his attenuated and contentious divorce case.

Based upon the Court's review of the arguments made by the parties in this motion and the relevant case law cited by the Defendant,

**THE COURT FINDS** that Plaintiff Phillip Potter has engaged in vexatious conduct per Arizona Revised Statutes § 12-3201 by: repeated filing of court actions without substantial justification; and repeatedly filing documents or requests for relief that have been the subject of previous rulings by the court in similar litigation.

**IT IS ORDERED** that Plaintiff Phillip Potter may not file any new pleading, motion or other document in this case or any other pending civil action without prior leave of the judge assigned to that case.

**IT IS FURTHER ORDERED** that any request to file any new pleading, motion or other document in this case or any other pending civil action shall attach a copy of this order with the request.

**IT IS ORDERED** referring this matter to the Honorable Joseph Welty, Presiding Judge, Maricopa County Superior Court to consider issuing an administrative order designating Phillip Potter as a vexatious litigant.

1   Phillip Potter
2   2301 N. 66th Street
    Scottsdale, Arizona 85257
3   Phone: 480.459.0310
    E-Mail: phillip.t.potter@gmail.com
4   Plaintiff
    Pro Se
5

6

7                **IN THE UNITED STATES DISTRICT COURT**

8                **FOR THE DISTRICT OF ARIZONA**

9

10

11       Phillip Potter,                        No. 2:25-cv-00663-PHX-DWL

12                          Plaintiff,

13       v.                                      **REPLY TO MOTION TO TAKE
                                                 JUDICIAL NOTICE RE:
14       Robert Meza, et al.,                    PRESIDING JUDGE GATES'
                                                 MOTION TO DISMISS**
15
                            Defendants.
16

17

18

19         In her Response (Doc. 91), Presiding Judge Pamela Gates (1) concedes "this Court

20   may take judicial notice of [facts contained in] Exhibits 3 [] and 4 []"; (2) "does not

21   dispute that Exhibits 5 [] and 6 [] are the Plaintiff's public records request and response

22   regarding this case," but wrongly posits that facts contained in those public records "do

23   not meet the standard ... of which this Court may take judicial notice"; and (3) recognizes

24   "[t]his Court may consider any legal authorities it considers germane to this case –

25   including A.R.S. § 12-109 [Exhibit 1] and Rule 92 of the Rules of the Arizona Supreme

26   Court [Exhibit 2] – without taking judicial notice" but offers that these "authorities" do

not contain "a legislative fact".

<div align="center">REBUTTAL</div>

I. The Court Should Fully Grant Plaintiff's Motion To Take Judicial Notice

    A. The Parties Agree On Notice Of Facts Contained in Exhibit 3 and Exhibit 4

       The instant motion's Exhibit 3 presented a December 13, 2024 Arizona Supreme Court News Release containing the conceded fact that, in reference to a Presiding Judge's administrative authority, "this 'administrative authority' does not include 'authority over' private parties". (Doc. 90, pp. 7-8). Exhibit 4 presented the CV2022-008626 judicial case record containing the conceded "undisputed facts that Judge Welty was never the assigned judge in that case and never issued an order entered into that case's docket." (Doc. 90, p. 8). Notice of all conceded facts is a "must" per Fed. R. Evid. 201(c)(2).

    B. As Requested, The Court Should Notice Facts Contained in Exhibit 5 and Exhibit 6

       The instant motion's Exhibit 5 contains undisputed facts accurately sourced from a public records request Plaintiff made on September 9, 2025. Therein, Plaintiff "asked Presiding Juge Gates to provide 'copies of all records maintained in any storage medium (e.g., email, text message, voicemail, physical papers, digital files, etc.) which: ... 2. Contain, or reference, an 'application'[1] from the Hon. John Blanchard to the Presiding Judge to certify Phillip Potter as a vexatious litigant through case CV2022-008626. [and] 3. Contain communications the Hon. Joseph Welty made with any other person regarding the previously referenced 'application'." (Doc. 90, p. 10). Exhibit 6 contains the President Judge's October 12, 2025 response which includes "undisputed facts that (1) the response to public records request '2' was 'see attached Minute Entry' where the

---

[1] For context, Presiding Judge Welty declared in a combined Fed. R. Civ. P. 12(b)(1) and (6) motion that "[t]he Judicial Defendant's only action here was to review and approve the application to certify Plaintiff as a vexatious litigant". (Doc. 67, p. 3).

<div align="center">2</div>

'attached Minute Entry' contains no reference to an 'application'; (2) the response to public records request '3' was 'The only communications are attorney and judicial work product emails between me [Judge Gates] and Judge Welty or his staff when I [Judge Gates] drafted the A.O. declaring Phillip Potter as a vexatious litigant. (Protected by Supreme Court Rule 123(d)(4) and (e)(9))'; and (3) there exists no document evidencing communication of an 'application' originating from Judge Blanchard and being sent to Presiding Judge Welty." (Doc. 90, p. 10).

Presiding Judge Gates asks the Court to deny Plaintiff's request to take judicial notice of these facts, arguing Exhibit 5 and Exhibit 6 "do not meet the standard for documents of which this Court may take judicial notice" because "these documents do not provide additional facts necessary for this Court's jurisdictional inquiry, which must exist when a plaintiff files his complaint." (Doc. 91, p. 3). This argument fails for at least four reasons. *First*, courts take judicial notice of "facts" not "documents". Here, the facts contained in the provided Exhibits "are not subject to reasonable dispute because [they] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Since Plaintiff requested notice and "supplied" the Court "with the necessary information", the Court "must take judicial notice". Fed. R. Evid. 201(c)(2). *Second*, "[t]he court may take judicial notice at any stage of the proceeding" so there are no timing deficiencies. Fed. R. Evid. 201(d). *Third*, the proper question before the Court is whether these facts are relevant to the "jurisdictional inquiry", not whether the facts are "necessary for this Court's jurisdictional inquiry". The provided facts are relevant. Indeed, Presiding Judge Gates does not even challenge the evidence on relevance. *Fourth*, the noticeable facts Plaintiff provided the Court did "exist" when Plaintiff "file[d] the complaint" (Doc. 1) on

February 27, 2025. Specifically, those noticeable facts include the newly discovered fact that "there exists no document evidencing communication of an 'application' originating from Judge Blanchard and being sent to Presiding Judge Welty" although the Presiding Judges painted the picture that direct evidence of an "application" existed. *See* Doc. 67, p. 3 ("The Judicial Defendant's only action here was to review and approve the application to certify Plaintiff as a vexatious litigant".). The "application" purportedly "review[ed] and approve[d]" only could have been sent to Presiding Judge Welty prior to November 2, 2023 per the date on Administrative Order 2023-159 (Doc. 67, p. 9, n.1), but Presiding Judge Gates' October 12, 2025 response provides the negative fact that no documentary evidence exists. This is not a circumstance where a fact "did not exist" before February 27, 2025. The "application" apparently never existed.[2] To decide the Fed. R. Civ. P. 12(b)(1) "jurisdictional inquiry", the Court should take judicial notice of these newly discovered, undisputed, relevant, and sufficiently provided facts, including the fact that "there exists no document evidencing communication of an 'application' originating from Judge Blanchard and being sent to Presiding Judge Welty".[3]

---

[2] Every "written motion, or paper" presented to a court must contain "factual contentions [which] have evidentiary support" or be "withdrawn or appropriately corrected" should counsel learn through "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that the "factual contentions [made do] not have evidentiary support". Fed. R. Civ. P. 11(b)(3) and (c). Now that a reasonable inquiry has been conducted, it can accurately be said that no evidence of the "application" exists, and that Plaintiff discovered this fact on October 12, 2025. Presiding Judge Gates' counsel should immediately withdraw or correct the factual contention that Presiding Judge Welty reviewed and approved the forementioned application.

[3] The Court would be wise to consider *sua sponte* issuing an Order to Show Cause instructing Presiding Judge Gates' counsel, Kara Karlson, to explain why the Court should not sanction counsel for failing to withdraw or appropriately correct the written motion's factual contention that Presiding Judge Welty "review[] and approve[d]" an "application" in case CV2022-008626 before issuing *Administrative* Order 2023-159 when (1) Presiding Judge Gates now concedes "Judge Welty was never the assigned judge in that [CV2022-

C. As Requested, The Court Should Notice Facts Contained in Exhibit 1 and Exhibit 2

The instant motion's Exhibit 1 presented A.R.S. § 12-109, including the "plain language" of A.R.S. § 12-109(B)(1) which holds that "administrative orders shall not do any of the following: 1. Abridge, enlarge or modify substantive rights of a litigant." (Doc. 90, pp. 6-7). Exhibit 2 presented the "plain language contained in the Rules of the Supreme Court of Arizona Rule 92 which articulates a Presiding Judge's authority which goes no farther than, for instance, 'general supervision over all court personnel'." (Doc. 90, p. 7). Plaintiff also asked the Court "to judicially notice the undisputed fact that nowhere in this rule does it suggest, or can it be read to indicate, that Presiding Judges may decide the rights of parties through administrative proceedings." (Doc. 90, p. 7).

Presiding Judge Gates admits "there is nothing preventing this Court from considering A.R.S. § 12-109 (Doc. 90-1) or Rule 92 of the Arizona Supreme Court (Doc. 90-2), [but] the Court is not required to do so by judicial notice" because the Exhibits provided do not contain "adjudicative fact[s]". (Doc. 91, p. 3). The defendant does not dispute relevance of the statute's language or the rule's language, or that the Court can "consider[]" that language. She instead posits that the facts contained therein are "legislative" rather than "adjudicative". But she is wrong on that point because this is the

_____

008626] case and never issued an order entered into that case's docket"; (2) it is apparent, and now has been admitted, that the CV2022-008626 judicial case record "contains no reference to an 'application'"; (3) the Presiding Judges can produce "no document evidencing communication of an 'application' originating from [CV2022-008626 trial court] Judge Blanchard and being sent to Presiding Judge Welty"; (4) R. Sup. Ct. Ariz. 123(b)(18)(B) and (d) collectively define judicial "case records", require judicial all case records to be entered into the case docket, and require those records be available to the public; (5) R. Sup. Ct. Ariz. 123(18)(B)(1)-(3) specifically defines "Case Record" as "any record ... order ... or register of actions" either "in connection with a judicial proceeding" or "related to a judicial proceeding"; and (6) R. Sup. Ct. Ariz. 123(18)(A) defines "Administrative Record" in pertinent part as "any non-adjudicatory record".

5

ER-303

uncommon claim between a private party and a state official in their official administrative capacity where the state official's jurisdictional defenses and merit defenses hinge on judicial immunity. Absolute judicial immunity defenses, including sovereign immunity claimed as a function of judicial immunity, can only be decided after applying a federal common law doctrine to proven material facts understood within the legal framework of a particular state's jurisdictional scheme. *See e.g., Stump v. Sparkman*, 435 U.S. 349 (1978); *Forrester v. White*, 484 U.S. 219 (1988).

The factual "'touchstone' for the [common law judicial immunity] doctrine's applicability has been 'performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." *Burns v. Reed,* 500 U.S. 478, 500 (1991) (Scalia, J., concurring in judgment in part and dissenting in part). At every stage of litigation, "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Id* at 486. Seeking to carry that burden, the Presiding Judges promoted their omnibus judicial immunity defense by attaching Administrative Order 2023-159 as an exhibit to their combined Fed. R. Civ. P. 12(b)(1) and (6) dismissal motion, and by asking the Court to judicially notice unspecific facts in that document. (Doc. 67, p. 9, n.1). Contradicting this defense when challenged, Presiding Judge Gates then declared the "Motion to Dismiss does not cite to or rely on any extraneous documents or records" (Doc. 86, pp. 3-4), undermining what otherwise appeared to be a factual defense to jurisdictional standing. (Doc. 88, pp. 1-3). As such, the Court could, and should, consider the Presiding Judge's judicial immunity defense withdrawn insofar as it is based on any "documents or records". (Doc. 90, pp. 3-5).

Regardless, separate from that extraneous document, Presiding Judge Welty also made factual statements that (1) "[t]he Judicial Defendant's only action here was to

review and approve the application to certify Plaintiff as a vexatious litigant" (Doc. 67, p. 3); and (2) "[t]he Judicial Defendant is a party to this action solely because of [sic] he entered an order determining the rights of parties as presiding judge in Maricopa County" (Doc. 67, p. 8).  But, once again, Plaintiff's First Amendment facial challenge does not rely on this administrative order (Doc. 90, pp. 3-5) and there exists no documentary evidence that this "application" ever existed which, in and of itself, at least creates a factual dispute that violates the "prohibition against resolving factual disputes at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 (9th Cir. 2018).  In addition, the statement that Presiding Judge Welty "entered an [administrative] order determining the rights of parties" is factually and legally incompatible with (1) A.R.S. § 12-109(B)(1) which holds that, in Arizona, "administrative orders shall not ... abridge, enlarge or modify substantive rights"; (2) R. Sup. Ct. Ariz. 92 which makes clear that, in Arizona, a Presiding Judge's authority goes no farther than "general supervision over all court personnel"; (3) Presiding Judge Gates' concession "that Judge Welty was never the assigned judge"; and (4) Presiding Judge Gates' concession that a Presiding Judge's "'administrative authority' does not include 'authority over' private parties".  As a function of Arizona substantive and procedural law, Administrative Order 2023-159, like all administrative orders, was issued by a Presiding Judge acting in an administrative capacity under their administrative authority which does not reach litigants and cannot affect litigants' substantive rights.  *See Maricopa County v. Dann,* 157 Ariz. 396, 400-01, 758 P.2d 1298, 1301 (1988) (A "[P]residing [J]udge has no authority to compel persons outside the judiciary to" do anything as a function of Arizona's constitution, statutes, and procedural rules).  Thus, the administrative order Presiding Judge Gates referenced is not, and could never be, a judicial order "determining the rights of parties" to litigation (Doc.

67, p. 8) or "resolving disputes between parties, or of authoritatively adjudicating private

rights." *Burns,* 500 U.S. at 500. Applying the common law judicial immunity doctrine to

this mix of facts and state law can only lead to the conclusion that issuing an

administrative order is a non-judicial "administrative function" where the Ninth Circuit

dispositively established that "absolute judicial immunity does not apply to nonjudicial

acts, i.e. the administrative, … functions that judges may on occasion be assigned to

perform." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1134 (9th Cir. 2001).

At bottom, the operative facts of a facial challenge where judicial immunity is

raised as a common law defense revolve around state constitutional, statutory, and

procedural rule language, thus making that language an adjudicative fact. *See Ellis v.

Weasler Eng'g Inc.,* 258 F.3d 326, 334 n.11 (5th Cir. 2001) (An adjudicative fact is an

"controlling or operative fact, ... a fact that concerns the parties to a judicial ... proceeding

and that helps the court ... determine how the law applies to those parties."); *see also* Fed.

R. Evid. 201 Notes of Advisory Committee ("Adjudicative facts are simply the facts of

the particular case. ... Stated in other terms, the adjudicative facts are those to which the

law is applied in the process of adjudication."). Accordingly, the provided statute and

rule contain adjudicative facts necessary to decide the First Amendment facial challenge.

Per Fed. R. Evid. 201(c)(2), the Court should and "must" take judicial notice of the plain

language contained in A.R.S. § 12-109 and Ariz. R. Sup. Ct. Rule 92[4] to adjudicate the

---

[4] "No rule deals with judicial notice of 'legislative' facts [which] are those [facts] which
have relevance to legal reasoning and the lawmaking process, whether in the formulation
of a legal principle or ruling by a judge or court or in the enactment of a legislative body.
... [And] [i]n determining the content or applicability of a rule of domestic law, the judge
is unrestricted in his investigation and conclusion." Fed. R. Evid. 201 Notes of Advisory
Committee. Presiding Judge Gates implicitly acknowledges on Response that the Court
will reach the same conclusion regardless of whether it decides to take judicial notice of
the provided facts contained in the identified statute and identified rule, or decides to

Fed. R. Civ. P. 12(b)(1) and (6) dismissal motion.[5]

## II. The Motion Is Not a Surreply; There Can Be No Waiver

Presiding Judge Gates declared that "Plaintiff's Motion is a surreply in disguise" and the "Court should find that Plaintiff waived the argument" that Administrative Order 2023-159 is "no[t] part of the complaint". (Doc. 91, pp. 4-5). The instant motion is not a "surreply" for the simple reason that the motion raises no new arguments. Plaintiff merely outlined why the undisputed facts associated with his request for judicial notice are relevant at this stage, as all rules of evidence require. Furthermore, in the form of Administrative Order 2023-159, Presiding Judges Welty and Gates succumbed to the "alluring temptation to pile on numerous documents to their motion[] to dismiss to undermine the complaint, and hopefully dismiss the case at an early stage." *Khoja*, 899 F.3d at 998. Although those defendants retreated somewhat from their original position, such "unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Id*. Regardless, "[o]n a motion to dismiss, it is the defendant's burden to demonstrate that plaintiff has failed to state a claim." *Shay v. Apple Inc.*, 512 F. Supp. 3d 1066, 1071 (S.D. Cal. 2021). Defendants must do more than "provide summary

---

exercise "unrestricted" authority to review that statute and that rule.
[5] Noticeable facts contained in Exhibit 1 and Exhibit 2 confirm the Presiding Judges' judicial immunity defense has no legal basis or factual support. That defense does nothing more than improperly raise questionable "factual disputes" at the pleading stage. *Khoja*, 899 F.3d at 1000. Any legitimate factual dispute going to jurisdictional standing must be resolved on the merits at the summary judgment stage or at trial. *Arizona v. Mayorkas,* 600 F. Supp. 3d 994, 1004, n.2 (D. Ariz. 2022) ("'[W]here the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits,' in which case 'the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial.'").

ER-307

arguments and analyses seeking dismissal". *Id.* Absent more, a court must conclude that the dismissal movants "fail to meet [their] burden under Rule 12(b)(6) to prove that no claim has been presented". *Id.* Here, the Presiding Judges provided insufficient "summary arguments and analyses" in their combined Fed. R. Civ. P. 12(b)(1) and (6) motion, attempted to wrongly introduce an extraneous document, and made factual contentions that later turned out to have no evidentiary support. Presiding Judge Gates should instruct her counsel to withdraw those unsupported factual contentions to conserve judicial resources. Plaintiff waived nothing in this First Amendment case of significant public concern.

## CONCLUSION

The Court should take judicial notice of all facts requested and grant Plaintiff's motion in full.

DATED this 27th day of November 2025.

By: //s//
Phillip Potter
Plaintiff
Pro Se

1   Phillip Potter
2   2301 N. 66th Street
    Scottsdale, Arizona 85257
3   Phone: 480.459.0310
    E-Mail: phillip.t.potter@gmail.com
4   Plaintiff
    Pro Se
5

6

7              **IN THE UNITED STATES DISTRICT COURT**

8              **FOR THE DISTRICT OF ARIZONA**

9

10

11   Phillip Potter,                          No. 2:25-cv-00663-PHX-DWL

12                    Plaintiff,

13   v.                                        **NOTICE RE:**
                                               **ATTORNEY GENERAL MAYES'**
14   Robert Meza, et al.,                      **AND PRESIDING JUDGE GATES'**
                                               **EXPRESS REFUSAL TO DISAVOW**
15                    Defendants.              **ENFORCEMENT OF A.R.S. § 12-3201**

16

17

18

19        Plaintiff herein provides Notice to the Court that state officer defendants Attorney

20   General Kris Mayes, in her official capacity, and Presiding Judge Pamela Gates, in her

21   official administrative capacity, have expressly refused to disavow enforcement of A.R.S.

22   § 12-3201 going to the Count One First Amendment facial challenge for overbreadth and

23   vagueness. (Doc. 14 at 113-207).  On November 24, 2025, Plaintiff wrote the counsels

24   for Attorney General Mayes and Presiding Judge Gates asking "if your clients would

25   agree not to enforce A.R.S. § 12-3201 until the case is complete.  For Attorney General

26   Mayes, that would take the form of not civilly or criminally enforcing any perceived

violation of § 12-3201(B), including any perceived violation of Administrative Order 2023-159.[1]  For Presiding Judge Gates, that would involve exercising her plenary administrative authority to rescind Administrative Order 2023-159 and remove my name from the state's online vexatious litigant list."  On November 28, 2025, attorney Joshua Katz responded: "I write to inform you that neither defendant agrees".  *See* Exhibit A.  This express refusal to disavow administrative, civil, and criminal enforcement of § 12-3201 confirms (1) Plaintiff has demonstrated jurisdictional standing to bring a First Amendment challenge against the state officers; and (2) the state officers are sufficiently connected to the statute's enforcement scheme that sovereign immunity does not apply.

I. Plaintiff Has Jurisdictional Standing To Sue Attorney General Mayes

Plaintiff filed suit seeking declaratory relief and prospective injunctive relief to prevent the Attorney General from civilly or criminally enforcing any perceived violation of A.R.S. § 12-3201(B), including as an A.R.S. § 13-3601 predicate. (Doc. 14, pp. 70-71).  "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Attorney General Mayes' Fed. R. Civ. P. 12(b)(1) jurisdictional defenses attacked imminent injury, traceability, and redressability (Doc. 38, pp. 6-11).

---

[1] Plaintiff's complaint does not cite, nor do any of his claims rely on, Administrative Order 2023-159.  Plaintiff did not even know administrative order existed when filing suit (Doc. 54, Affid.; Doc. 79, p. 1, 5-11) although Presiding Judge Gates referenced it in her Fed. R. Civ. P. 12(b)(1) and (6) dismissal motion. (Doc. 67).  When challenged, Presiding Judge Gates declared her "Motion to Dismiss does not cite to or rely on any extraneous documents or records" (Doc. 86, pp. 3-4), undermining what otherwise appeared to be a factual defense to standing. (Doc. 88, pp. 1-3).  The Court should therefore consider the Presiding Judge's judicial immunity defense abandoned or withdrawn insofar as it is based "on any extraneous documents or records". (Doc. 90, pp. 3-5; Doc. 92, pp. 5-10).

ER-310

Regarding causation (i.e., traceability and redressability), the Attorney General posited that "[w]hile [civil and/or criminal] prosecution is unlikely, any such prosecution would be more likely to come from a county attorney than from AG Mayes. ... [Plaintiff's] requested relief here would not 'likely' redress his problem because enjoining AG Mayes would not prevent a county attorney from prosecuting him, nor the courts from enforcing their injunctions." (Doc. 38, p. 9-10).  But the Ninth Circuit has made clear that "'[r]edressability is satisfied so long as the requested remedy would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'  Partial amelioration of a harm also suffices for redressability.  In discussing injury, the Supreme Court highlighted that a plaintiff need only show redress of 'an injury,' not 'every injury.'  [Attorney General Mayes] offers a variation on [her] standing argument that redressability fails because county prosecutors would retain authority to bring prosecutions even if the attorney general were enjoined from enforcement of [§ 12-3201, including as a § 13-3601 predicate].  Where a state statute [such as § 13-3601] specifically grants enforcement powers to multiple government authorities, an injunction against the exercise of those powers by any one of those authorities suffices to establish redressability." *Matsumoto v. Labrador*, 122 F.4th 787, 798-99 (9th Cir. 2024).  Plaintiff also demonstrates traceability where enjoining the Attorney General's enforcement of § 12-3201 disrupts the "unattenuated statutory chain of causation whereby, once deemed 'vexatious', by 'operation' of A.R.S. § 12-3201 a litigant who files court papers absent leave of the court violates § 12-3201(B) and becomes subject to [] civil and criminal 'enforcement' per §§ 13-2810(A)(2), 13-2921, 13-3601, and 13-3602".  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 580, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (Kennedy, A. concurring) (A State Legislature "has the

power to ... articulate chains of causation that will give rise to a case or controversy"). (Doc. 49, pp. 5-7).  Causation is shown.

Regarding imminent injury, "[t]o establish a pre-enforcement injury-in-fact, [a plaintiff] must satisfy the requirements listed in *Susan B. Anthony List v. Driehaus,* 573 U.S. 149 (2014)."  *Peace Ranch, LLC v. Bonta,* 93 F.4th 482, 487 (9th Cir. 2024). "Under *Driehaus,* a plaintiff demonstrates injury-in-fact by showing '[1] an intention to engage in a course of conduct arguably affected with a constitutional interest, but [2] proscribed by a statute, and [3] there exists a credible threat of prosecution thereunder.'" *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador,*122 F.4th 825, 836 (9th Cir. 2024) (alterations in original) (quoting *Driehaus,* 573 U.S. at 159).  The Court found Plaintiff met the first two *Driehaus* prongs. (Doc. 47).  Attorney General Mayes took issue with the third prong which "is a 'quite forgiving' requirement that sets up only a 'low threshold'".  *Antonyuk v. Chiumento*, 89 F.4th 271, 334 (2d Cir. 2023).  That "low threshold" is crossed when the threat from statutorily authorized enforcers is not "imaginary or wholly speculative".  *Driehaus,* 573 U.S. at 160; *see also Isaacson v. Mayes*, 84 F.4th 1089, 1101 (9th Cir. 2023) ("The combination of these potential threats – from the county attorneys, [] and private parties – satisfies the" credible threat prong). Attorney General Mayes argued Plaintiff does not face a "credible fear of prosecution" because he has not "demonstrated any instance where a person was prosecuted" for conduct proscribed under § 12-3201(B). (Doc. 38, pp. 6-7).  But that burden is not Plaintiff's to carry.  Instead, to prevail on a credible threat defense, the Attorney General must overcome a presumption of enforcement by factually demonstrating the challenged statute (1) has been "commonly and notoriously violated"; and (2) has fallen into "desuetude".  *S.F. Cnty. Democratic Cent. Comm. v. Eu,* 826 F.2d 814, 822 & n. 15 (9th

4

Cir.1987) (quoting *Poe v. Ullman,* 367 U.S. 497, 502, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961)).  When, as here, the state officer cannot factually overcome the presumption of enforcement, the third *Driehaus* prong "rises or falls with the enforcing authority's willingness to disavow enforcement." *Peace Ranch,* 93 F.4th at 490.  Faced with this dilemma, the Attorney General implicitly abandoned "credible threat" as a defense declaring she "is not arguing that Plaintiff lacks pre-enforcement standing because the law is old, unenforced, and 'has fallen into desuetude.'" (Doc. 69, p. 11).  Via this Notice's contents, Attorney General Mayes expressly refuses to disavow enforcement. And "the state's refusal to disavow enforcement ... is strong evidence that the state intends to enforce the law and that [Plaintiff] face[s] a credible threat." *California Trucking Ass'n v. Bonta,* 996 F.3d 644, 653 (9th Cir. 2021).  Notice confirms Plaintiff has demonstrated standing to bring Count One against the Attorney General.  *See also LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154-55 (9th Cir. 2000) (When the case "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing".).

## II. Attorney General Mayes Has No Sovereign Immunity

In her dismissal motion, the Attorney General contended she "lacks a sufficiently direct connection to the vexatious litigant statute's enforcement scheme" because her connection was not "fairly direct" (Doc. 38, pp. 10-11).  She then "maintained that she was entitled to sovereign immunity because she lacked 'some' 'fairly direct' 'connection' to the challenged statute's enforcement scheme." (Doc. 69, p. 3).  But, as Plaintiff argued in his dismissal Response, the "some connection" standard established in *Ex parte Young* "presents "a low bar. ... [A] mere scintilla of enforcement" connection is sufficient. *Matsumoto*, 122 F.4th at 802-04." (Doc. 49, p. 8).  He also pointed out that "Arizona's constitution and pertinent statutes ([Doc 14] at 95, 102-104, 121) give [Attorney General

Mayes] the authority to 'deputize' herself (1) to criminally prosecute Plaintiff for conduct deemed unlawful, including any perceived resistance to the § 12-3201(B) injunction[2] or § 13-2921 violation; and (2) to civilly prosecute him for that same conduct pursuant to §§ 13-3602 and 13-4433(D). ([Doc. 14] at 103, 110.). *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919-20 (9th Cir. 2004). There can be no genuine dispute that the Arizona 'attorney general has the authority, at the attorney general's sole discretion, to prosecute a person for a criminal violation of this section'. *Matsumoto*, 122 F.4th at 802. This statutorily [and constitutionally] defined enforcement role satisfies the plain meaning of *Ex parte Young*'s 'some connection' standard,". *Id*. And because there is no requirement that she be the 'primary authority to enforce', *Id* at 802-04, her [sovereign] immunity defense failed when she admitted county attorneys can also prosecute Plaintiff." (Doc. 49, pp. 8-9). In sum, the Attorney General's refusal to disavow enforcement shows she can enforce the statute and, therefore, has a sufficient "connection" to the statute's enforcement scheme. There is no sovereign immunity.

III. Plaintiff Has Standing To Sue The Presiding Judge Who Has No Sovereign Immunity

Plaintiff brought to suit the Presiding Judge of the Maricopa County Superior Court in an official *administrative* capacity seeking declaratory relief and prospective injunctive relief to prevent the Presiding Judge from administratively enforcing A.R.S. § 12-3201, including by exercising plenary administrative authority to place Plaintiff on the state's online vexatious litigant list. (Doc. 14 at 70-71) In a combined Fed. R. Civ. P. 12(b)(1) and (6) motion, Presiding Judge Gates relied entirely on absolute "judicial immunity" to challenge jurisdictional standing (Doc. 67, pp. 3-4) and to assert sovereign

---

[2] See A.R.S. § 13-2810(A)(2) ("A person commits interfering with judicial proceedings if such person knowingly: ... [d]isobeys or resists the lawful order, process or other mandate of a court"). (FAC at 103).

ER-314

immunity. (Doc. 67, pp. 4-5).  But Ninth Circuit precedent holds that "[s]ince [Plaintiff] sued [Judge Gates] in [her] administrative capacity as [Presiding Judge of the Maricopa County Superior Court], we conclude that dismissal [for sovereign immunity] is not warranted on the basis of judicial immunity".  *Wolfe v. Strankman*, 392 F.3d 358, 365-66 (9th Cir. 2004).  Simply put, the Presiding Judge cannot defeat jurisdictional standing or assert sovereign immunity on judicial immunity grounds when sued in an administrative capacity.  *See Duvall v. County of Kitsap*, 260 F.3d 1124, 1134 (9th Cir. 2001) ("[A]bsolute judicial immunity does not apply to nonjudicial acts, i.e. the administrative, … functions that judges may on occasion be assigned to perform."); *Forrester v. White*, 484 U.S. 219, 228, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) ("Administrative decisions, even though they may be essential to the very functioning of the courts, have not [] been regarded as judicial acts.").  Likewise, suits against judges acting in an <u>*administrative*</u> capacity are permitted per the plain language of 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... , subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's <u>*judicial capacity*</u>, injunctive relief shall not be granted ...").  Presiding Judge Gates cannot assert judicial immunity or claim she does not administratively enforce § 12-3201 when this Notice shows she acknowledges her administrative enforcement authority but expressly refuses to disavow administrative enforcement against Plaintiff.[3]

---

[3] The Court should also note that, among other things, Presiding Judge Gates very recently

CONCLUSION

This Notice confirms (1) Plaintiff has demonstrated standing against both state officer defendants; (2) neither state officer defendant can claim sovereign immunity; and (3) Presiding Judge Gates has no grounds to challenge jurisdictional standing or to assert sovereign immunity on the basis of absolute judicial immunity.  *See Burns*, 500 U.S. at 486 ("[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question.").  With the Court having Article III jurisdiction involving the state officers, the Court also has supplemental jurisdiction over state claims involving Defendant Alane Ortega (*see* Doc. 52; Doc. 54; Doc. 56).  Defendants Robert Meza and Karrin Taylor Robson did not challenge jurisdiction (*see* Doc. 51; Doc. 55).  There also is no claim preclusion (Doc. 55, p. 5-11), especially given Administrative Order 2023-159 which serves as newly discovered factual grounds for a 42 U.S.C. § 1983 damages claim against multiple defendants.  And the *Rooker-Feldman* doctrine is inapplicable to a First Amendment facial challenge. (Doc. 55, pp. 3-5).  In sum, the Court has Article III jurisdiction and should move the case to discovery.

DATED this 1st day of December 2025.

By: <u>//s//</u>
Phillip Potter
Plaintiff
Pro Se

---

admitted that no Presiding Judge ever acted in a judicial capacity in this cases' subject matter.  For instance, Presiding Judge Gates conceded the Presiding Judge of the Maricopa County Superior Court "was never the assigned judge in that case and never issued an order entered into that case's docket." (Doc. 92, pp. 2-4, n.3).  *See Burns v. Reed,* 500 U.S. 478, 500 (1991) (The factual "'touchstone' for the [common law judicial immunity] doctrine's applicability has been 'performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights.").

 Gmail

Phil Potter <phillip.t.potter@gmail.com>

## Case No. 2:25-cv-00663-PHX-DWL, Potter v. Meza, et al.
2 messages

**Phil Potter** <phillip.t.potter@gmail.com>                          Mon, Nov 24, 2025 at 6:33 PM
To: "Crawford, Hayleigh" <Hayleigh.Crawford@azag.gov>, "Katz, Joshua" <Joshua.Katz@azag.gov>, "Karlson, Kara" <Kara.Karlson@azag.gov>

Ms. Crawford, Mr. Katz, and Ms. Karlson,
Please see the attached correspondence involving the above referenced case..
Regards,
Phillip Potter

 **TRO PI Letter _ Nov 24 2025.pdf**
317K

**Katz, Joshua** <Joshua.Katz@azag.gov>                          Fri, Nov 28, 2025 at 4:05 PM
To: Phil Potter <phillip.t.potter@gmail.com>
Cc: "Crawford, Hayleigh" <Hayleigh.Crawford@azag.gov>, "Karlson, Kara" <Kara.Karlson@azag.gov>

Mr. Potter,

Thank you for providing this notice of your intent to file a motion.

I write to inform you that neither defendant agrees to the request on page 11 of your letter.

As you are of course aware, your request for preliminary relief was denied, and there are several motions to dismiss the case fully briefed and pending.  We will respond to any further motions in due course, as appropriate.

Sincerely,

**Joshua A. Katz (he/him)**

Assistant Attorney General



Arizona Attorney General Kris Mayes

Solicitor General's Office

2005 N. Central Ave., Phoenix, AZ 85004

Desk: (602) 542-8053

Joshua.Katz@azag.gov

http://www.azag.gov

NOTICE: This email, including any attachments, may contain privileged or confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please notify the sender and destroy all copies of the original message. Thank you.

[Quoted text hidden]

November 24, 2025

VIA EMAIL

Hayleigh S. Crawford
Joshua A. Katz
Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004-1592
(602) 542-3333
Hayleigh.Crawford@azag.gov
Joshua.Katz@azag.gov

 Kara Karlson
Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004-1592
(602) 542-8323
Kara.Karlson@azag.gov

RE: Case No. 2:25-cv-00663-PHX-DWL, *Potter v. Meza*, et al.

Ms. Crawford, Mr. Katz, and Ms. Karlson,

I will soon move for a Temporary Restraining Order and Preliminary Injunction based in part on the recently discovered Administrative Order 2014-134 which bears markings of an unapproved local procedural rule used to deprive Arizonans of their fundamental rights.  To avoid that motion, and consistent with Fed. R. Civ. P. 65, I write to ask if your clients would agree not to enforce A.R.S. § 12-3201 until the case is complete.  For Attorney General Mayes, that would take the form of not civilly or criminally enforcing any perceived violation of § 12-3201(B), including any perceived violation of Administrative Order 2023-159.  For Presiding Judge Gates, that would involve exercising her plenary administrative authority to rescind Administrative Order 2023-159 and remove my name from the state's online vexatious litigant list.  I hope we can convey this limited agreement to the Court as means to conserve judicial resources.

<div align="center">COUNT ONE OVERVIEW</div>

Your state officer clients are named in their official capacities as *Ex Parte Young*, 209 U.S. 123 (1908) "proper defendants" in a First Amendment facial challenge to A.R.S. § 12-3201 for overbreadth.  (Doc. 14 at 110-111, 113-207).  "The Constitution gives significant protection from overbroad laws that chill [expression] within the First Amendment's vast and privileged sphere. Under this principle, [§ 12-3201] is unconstitutional on its face if it prohibits a substantial amount of protected expression."  *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002) (citing *Broadrick* v. *Oklahoma*, 413 U. S. 601, 612 (1973)).  Petitioning the courts for redress,

<div align="right">ER-319</div>

like engaging in political speech, is indeed an exercise in free expression as all First Amendment rights are "libert[ies] safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action [and may be exercised] without any prior restraint". *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 707, 714 (1931); *NAACP v. Button,* 371 U.S. 415, 428-29, 83 S.Ct. 328, 339, 9 L.Ed.2d 405 (1963) (the Speech and Petition Clauses provide "modes of expression ... protected by the First and Fourteenth Amendments which [states] may not prohibit"); *McDonald v. Smith,* 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985) ("The right to petition is cut from the same cloth as the other guarantees of that [First] Amendment, and is an assurance of a particular freedom of expression.").

Court petitioning is primarily regulated through judicially promulgated rules of procedure. The Supreme Court creates federal rules while district courts may adopt local rules not in conflict. *See* 28 U.S.C. §§ 2071 and 2072; Fed. R. Civ. P. 83(a). In Arizona, the state constitution and complementary statutes place the onus on the judiciary's highest echelon to promulgate rules that procedurally regulate court petitioning. *See* Ariz. Const. art. 6, § 5(5) ("The supreme court shall have: ... [p]ower to make rules relative to all procedural matters in any court"); A.R.S. § 12-109(A) ("The supreme court, by rules or administrative orders, shall regulate pleading, practice and procedure in judicial proceedings in all courts of this state"); R. Sup. Ct. Ariz. 28.1(c) ("Local rules and amendments must be consistent with rules of statewide application and must be approved by the Supreme Court"). Of course, procedural rules and statutes may not abridge or provide pretext to punish, prohibit, regulate or otherwise chill substantive petitioning rights, including the "right of access to courts [which] is indeed but one aspect of the right of petition". *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

That said, when it comes to making or enforcing statutes that reach court petitioning or related conduct, the U.S. Supreme Court has "limited regulation to suits that [a]re both objectively baseless *and* subjectively motivated by an unlawful purpose,". *BE & K Constr. Co. v. N.L.R.B.,* 536 U.S. 516, 530-31 (2002) (emphasis original). Akin to the legal standard requiring public figures to demonstrate *both* "falsity" *and* "actual malice" to bring defamation claims (*see New York Times Co.* v. *Sullivan,* 376 U. S. 254, 279-280, 285 (1964)), the *BE & K* "both ... and" conjunctive[1] legal standard serves a valuable constitutional function as it ensures sufficient "breathing space essential to [the Petition Clause's] fruitful exercise." *Id.* The Ninth Circuit observed "*BE & K* made this breathing room protection explicit" such that the Petition Clause "immune[izes]" all core "petitioning activities" (i.e., the filing of an Ariz. R. Civ. P. 7 "pleading allowed" such as a "complaint", "answer", "counterclaim", etc.) and all "conduct incidental to a petition" (i.e., settlement demand letters, motion filings, disclosure and discovery matters, etc.) which fall within those conjunctive boundaries.[2] *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 932-38

---

[1] *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives. Competent users of the language rarely hesitate over their meaning.").

[2] In a Fed. R. Civ. P. 12(b)(6) motion (Doc. 38), the Attorney General contended the applicable legal

(9th Cir. 2006). Put another way, the conjunctive standard determines whether, as a matter of constitutional law, court petitioning and related conduct enjoy "immunity" under the Petition Clause, or are an actionable, non-immunized "sham". *Id* at 938; *United States* v. *Koziol,* 993 F.3d 1160, 1171 (9th Cir. 2021) ("requiring both objective baselessness and an improper motive ... ensure[s] citizens may enjoy the right of access to the courts").[3] To be sure, the Ninth Circuit applies "a strict two-step analysis to assess whether a single action constitutes sham petitioning. ... The two parts of the test operate in succession: Only if the suit is found to be objectively baseless does the court proceed to examine the litigant's subjective intent." *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO,* 31 F.3d 800, 810-11 (9th Cir. 1994). State laws which operate entirely or substantially within these conjunctive boundaries are overbroad and, thus, void unless precisely written and narrowly tailored to serve a sufficient government interest. *Button,* 371 U.S. at 438 ("Broad prophylactic rules in the area of free expression are suspect. ... Precision of regulation must be the touchstone in an area so closely

---

standard is "a pattern of harassment or frivolousness" to be read in the "disjunctive" per "*Ringgold*", and that "baseless litigation is not immunized by the First Amendment right to petition" per "*Bill Johnson's*". These are not the proper legal standards for two reasons. First, the Court explained that *Ringgold* is expressly not applicable to statutory authorities. (Doc. 47). Second, as I explained in my response (Doc. 49), the Supreme Court expressly held "in *Bill Johnson's* that [courts] could enjoin baseless retaliatory [i.e., baseless *and* retaliatory] suits because they fell outside of the First Amendment and thus were analogous to 'false statements.' We concluded that '[j]ust as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition.' While this analogy is helpful, it does *not* suggest that the class of baseless litigation is *completely* unprotected: *At most*, it indicates such litigation should be unprotected 'just as' false statements are. And while false statements may be unprotected for their own sake, '[t]he First Amendment *requires* that we protect some falsehood in order to protect *speech that matters.*' ([N]oting the need to protect some falsehoods to ensure that 'the freedoms of speech and press [receive] that 'breathing space' essential to their fruitful exercise'). ... It is at least consistent with these 'breathing space' principles that we have *never* held that the *entire* class of objectively baseless litigation *may be enjoined or declared unlawful* even though such suits may advance no First Amendment interests of their own. Instead, in cases like *Bill Johnson's ...,* our holdings *limited regulation* to suits that were *both* objectively baseless *and* subjectively motivated by an unlawful purpose." *BE & K,* 536 U.S. at 530-31, 122 S.Ct. 2390 (Italics with underline emphasis added).

[3] Courts honor the *BE & K* conjunctive standard even when deciding Fed. R. Civ. P. 11(c) motions that target "complaints", construing those motions to avoid implicating the right to petition. *See CrossFit Inc. v. Martin,* No. 2:14-CV-02277-PHX-JJT, 2017 WL 4236968 (D. Ariz. Sept. 22, 2017) ("the 'improper purpose' inquiry subsumes the 'frivolousness inquiry' when applied to the filing of complaints. In other words, 'complaints are not filed for an improper purpose if they are non-frivolous.'"); *Hudson v. Moore Business Forms, Inc.,* 836 F.2d 1156, 1159 (9th Cir.1987) ("because of the objective standard applicable to Rule 11 analyses, a complaint that is found to be well-grounded in fact and law cannot be sanctioned as harassing, regardless of the attorney's subjective intent"). Within the context of Fed. R. Civ. P. 11, courts interpret "harass" as a legal term of art to safeguard the First Amendment and to prevent civil defendants from feigning victimhood to avoid a plaintiff's "legitimate purpose" of holding defendants liable for their misdeeds. *See* Black's Law Dictionary (12th ed. 2024) ("Harassment" means "[w]ords, conduct, or action . . . that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose").

3

touching our most precious freedoms.").

## OVERBREADTH ANALYSIS

The overbreadth doctrine holds that a statute is overbroad if a plaintiff can show it "lacks a plainly legitimate sweep." *Moody v. NetChoice, LLC,* 603 U.S. 707, 721, 144 S. Ct. 2383, 2397, 219 L.Ed.2d 1075 (2024). This means "litigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'" *United States v. Hansen,* 599 U.S. 762, 769, 143 S.Ct. 1932, 216 L.Ed.2d 692 (2023) (emphasis original). However, when a facial suit is based on the First Amendment, the challenged law is alternatively void if the plaintiff can demonstrate "a substantial number of applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id*; *see also Ashcroft,* 535 U.S. at 255 ("The overbreadth doctrine prohibits the Government from banning unprotected [expression] if a substantial amount of protected [expression] is prohibited or chilled in the process."). "[I]n facial challenges under ... the First Amendment, like this one, courts set the bar lower out of respect for the value of free expression." *Arizona Attorneys for Crim. Just. v. Mayes,* 127 F.4th 105, 107 (9th Cir. 2025).

The "first step in the proper facial analysis is to assess the state law's scope. What activities, by what actors, do the laws prohibit or otherwise regulate?" *Moody*, 603 U.S. at 724, 144 S. Ct. 2383. A.R.S. § 12-3201 leaves little, if anything, to speculation on these subjects. The "actors" are "pro se litigant[s]" involved in any "noncriminal case". *See* § 12-3201(A). The "activities" that the "law[] prohibit[s] or otherwise regulate[s]" are those defined as "vexatious conduct" by "any" § 12-3201(E)(1)(a)-(f) provision.[4] *See United States v. Williams,* 553 U.S. 285, 292, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (courts generally analyze statutes on a provision-by-provision basis when adjudicating overbreadth). At this step, I needed only plead the statute "reaches some protected" First Amendment freedoms to proceed past the dismissal stage. *See Arizona Attorneys for Crim. Just. v. Mayes,* 127 F.4th 105, 110 (9th Cir. 2025) (courts considering a First Amendment facial challenge "may assume without deciding that the statute 'reaches some protected [expression]'"). I accomplished that minimal task when pointing to statutory text (i.e., "court actions", "pleading", "motion", etc.) defining prohibited and regulated activities under § 12-3201(E)(1)(a)-(f) (Doc. 14 at 121) and mandating a permanent blanket injunction for "any" violation per § 12-3201(B) (Doc. 14 at 188-192), while also articulating the proper conjunctive legal standard for determining whether the Petition Clause protects those activities. (Doc. 14 at 125). *See Virginia v. Hicks,* 539 U.S. 113, 122, 123 S.Ct. 2191, 156

---

[4] "For the purposes of this section: 1. "Vexatious conduct" includes any of the following: (a) Repeated filing of court actions solely or primarily for the purpose of harassment. (b) Unreasonably expanding or delaying court proceedings. (c) Court actions brought or defended without substantial justification. (d) Engaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant. (e) A pattern of making unreasonable, repetitive and excessive requests for information. (f) Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation." (Doc. 14 at 121).

L.Ed.2d 148 (2003) (a plaintiff can plead and prove a law is unconstitutional "from the text of [the law]").  There can be no reasonable doubt that § 12-3201 "reaches some protected" conduct.

My next burden was to plead the statute is unconstitutional in every application or, alternatively, in a substantial number of applications.  The operative complaint (Doc. 14) and notice of relevant court records (Doc. 85) show I overcame this burden on the well-pled facts and the applicable law.  Fortunately, the Arizona supreme court settled this legal framework per *Ariz. Republican Party v. Richer*, 257 Ariz., 210 (2024).  (Doc. 14, 128-131).  Analyzing the *plainly legitimate* (i.e., demonstrably lawful) sweep of § 12-3201(E) expressly calls to A.R.S. § 12-349 where *Richer* found § 12-3201(E)(1)(c) language addresses no more than "groundless" (i.e., baseless)[5] suits brought or defended "without substantial justification" (i.e., in negligent fashion judged against "what a reasonable attorney would do")[6] while the other provisions provide independent mechanisms to evaluate "*separate* bad faith" in the form of the § 12-3201(E)(1)(a)[7] subjectively motivated[8] purpose of harassment, or any § 12-3201(E)(1)(b), (d), or (e) objectively motivated[9]

---

[5] *See* Black's Law Dictionary (7th Ed, 1999) ("baseless" means "without legal or factual basis; groundless").

[6] *See* A.R.S. § 12-3201(E)(2) ("'Without substantial justification' has the same meaning prescribed in section 12-349"); A.R.S. § 12-349 ("For the purposes of this section, 'without substantial justification' means that the claim or defense is groundless and is not made in good faith").  The term "without substantial justification" is functionally equivalent to the term "objectively baseless".

[7] In addition to the overbreadth claim, I included a claim that § 12-3201(E)(1)(a) and (c) provisions are impermissibly vague for, among other things, not identifying the number of "court actions" required before certain conduct becomes actionable. (Doc. 14 at 199, 201).  "[F]acial vagueness challenges are appropriate if the statute clearly implicates [First Amendment] rights ... When First Amendment freedoms are at stake, courts apply the vagueness analysis more strictly, requiring statutes to provide a greater degree of specificity and clarity than would be necessary under ordinary due process principles." *Cal. Teachers Ass'n v. State Bd. of Educ.,* 271 F.3d 1141, 1149-50 (9th Cir. 2001).  "'The terms of a law cannot require wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.'  As for the arbitrary enforcement theory of unconstitutional vagueness, a law is void for vagueness if it 'lack[s] any ascertainable standard for inclusion and exclusion,' thereby authorizing or encouraging 'the authorities [to] arbitrarily prosecute one class of persons instead of another.'" *Tucson v. City of Seattle,* 91 F.4th 1318, 132-3- (9th Cir. 2024) (internal citations omitted).

[8] A.R.S. § 12-3201(E)(1)(a) ("Repeated filing of court actions solely or primarily for the purpose of harassment") presents the lone specific type of possible *subjectively* motivated improper purpose (i.e.., subjective bad faith) "separate" from a suit's objective merits.  *Richer* established "harassment" in this context reflects ordinary language generally indicating annoyance rather than a legal term of art which inherently considers the "legitimate purpose" of bringing a meritorious lawsuit.  *See United States v. Cabaccang,* 332 F.3d 622, 626 (9th Cir.2003) ("When Congress does not define a term in a statute, we construe that term 'according to [its] ordinary, contemporary, common meaning[].'"); *see also* Black's Law Dictionary (12th ed. 2024) ("Harassment" means "[w]ords, conduct, or action . . . that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose").  At bottom, *Richer* held § 12-3201(E)(1)(a) does not include consideration for the presence of an objectively baseless suit as the First Amendment requires.  *See USS-POSCO,* 31 F.3d at 811 ("Only if the suit is found to be objectively baseless does the court proceed to examine the litigant's subjective intent.").

[9] A.R.S. §§ 12-3201(E)(1)(b) ("*Unreasonably* expanding or delaying court proceedings"), (d) ("A pattern of making *unreasonable*, repetitive and excessive requests for information"), and (e) ("A pattern of

improper purpose.[10]  *Richer*, 257 Ariz. at 222-23, ¶¶ 37-44 (emphasis added).  To construe those provisions otherwise would wrongly render A.R.S. § 12-3201(E)(1)(c) "superfluous".[11]  *Id* at ¶ 37.  This construal "extricates [Arizona] courts from the morass of attempting to discern the subjective motives of attorneys and parties in bringing a case and avoids conflating motive and the objective reasonableness of litigation".  *Id* at ¶ 40.  In the end, *Richer* ensured no § 12-3201(E)(1)(a)-(f) provision can be construed to regulate suits that are *both* objectively baseless *and* subjectively motivated by an unlawful (i.e., improper) purpose.  Critically, *Richer* binds the parties and the Court on this statutory construal.  *See Commissioner v. Estate of Bosch,* 387 U.S. 456, 465 (1967) ("state law as announced by the highest court of the State is to be followed [in federal courts since] [t]he state's highest court is the best authority on its own law").  Therefore, as a matter of settled law, the challenged statute prohibits or regulates core "petitioning" and "conduct incidental" considered together to be "protected petitioning activity or ['incidental'] activity which must be protected to afford breathing space to the right of petition guaranteed by the First Amendment".  *Sosa*, 437 F.3d at 933.  Put another way, *all Moody* "activities ... [that §§ 12-3201(E)(1)(a)-(f) provisions] prohibit or otherwise regulate" are *all Sosa* "activit[ies] which

_____

making *unreasonable*, repetitive and excessive requests for information") each present an *objectively* motivated improper purpose (i.e., objective bad faith), not a *subjectively* motivated improper purpose (i.e., subjective bad faith) since the legal standard for determining what a "reasonable" attorney or person would do is objective, not subjective.  A "subjectively motivated" litigant must be proven to have "subjective intent" to achieve an improper purpose.  *See Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60-61 (1993).  But an "objectively motivated" litigant has negligently acted in a way that no reasonable attorney would have acted although the associated conduct lacks the requisite *mens rea* element to rise to the level of subjective intent to do a wrong.

[10] A.R.S. §§ 12-3201(b) ("Unreasonably expanding or delaying court proceedings"), (d) ("Engaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant"), (e) ("A pattern of making unreasonable, repetitive and excessive requests for information"), and (f) ("Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation") reference "conduct incidental to a petition" (i.e., motion practice, settlement communications, etc.) which is protected under the Petition Clause "unless the underlying petition itself fell outside" those protections.  *Sosa*, 437 F.3d at 936.  These four subsections thus require an objectively baseless "court action" (i.e., lawsuit) before any associated conduct could fall outside the Petition Clause's protections.  Accordingly, like § 12-3201(E)(1)(a), none of the § 12-3201(b) and (d)-(f) subsections can be read to include the requisite "objectively baseless" element because to do so would render § 12-3201(E)(1)(c) "superfluous" per *Richer,* 257 Ariz. at ¶ 37.  *See USS-POSCO*, 31 F.3d at 811 ("Only if the suit is found to be objectively baseless does the court proceed to examine the litigant's subjective intent.").  Rather than actionable "vexatious conduct", these subsections reach, and wrongly prohibit, constitutionally protected *Sosa* "conduct incidental to a petition".

[11] "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).  Should a statute's language be reasonably susceptible to differing interpretations, courts turn to canons of "statutory construction" to determine legislative intent, including the "anti-surplusage" canon which holds "that legislative enactments should not be construed to render their provisions mere surplusage."  *Am. Vantage Cos. v. Table Mountain Rancheria,* 292 F.3d 1091, 1098 (9th Cir.2002); *see also Boise Cascade Corp. v. EPA,* 942 F.2d 1427, 1432 (9th Cir.1991) (Courts "must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.").

must be protected" under the Petition Clause.  As I sufficiently pled, A.R.S. §§ 12-3201(E)(1)(a)-(f) all reach constitutionally protected activities and are ultimately void for violating the Petition Clause "in every application".  Per *Hansen*, I carried my burden at the dismissal stage (and beyond) to demonstrate "that *no set of circumstances* exists under which [any § 12-3201(E)(1)(a)-(f) provision] would be valid'" as a matter of law.

Should there be any imaginable constitutional application of the challenged statute, I also factually demonstrated via court records that the statute was unconstitutional in "a substantial number of applications" (85% of cases) where only a small number of "applications" (15% of cases) involved *incidental* co-occurring violations of *both* a § 12-3201(E)(1)(c) court action "without substantial justification" (i.e., objectively baseless) *and* a § 12-3201(E)(1)(a) court action filed for "purpose of harassment" (i.e., subjectively motivated by an improper purpose). (Doc. 85).  Although the statute does not contemplate self-represented litigants to be found vexatious for co-occurring violations, even my generous reading of court records show past applications are unconstitutional in a vast majority of instances even when incidental co-occurring violations are included in the analysis.  *See Tucson v. City of Seattle,* 91 F.4th 1318, 1328 (9th Cir. 2024) ("In determining whether an unconstitutional application is realistic, courts may consider whether that application has occurred in the past.").  In other words, although the statute only proscribes the disjunctive prosecution of objectively baseless "court actions" *or* "filing of court actions" subjectively motivated by improper harassment purposes *or* court filings objectively motivated by improper purposes, a small number of pro se litigants filed objectively baseless suits *and* did so for subjectively motivated improper purposes of "conflated" harassment as *Richer*, 257 Ariz. at ¶ 40 put it.

Beyond factually evaluating past applications for overbreadth, courts are also instructed to consider hypothetical applications which are "realistic, not fanciful".  *Hansen,* 599 U.S. at 770, 143 S.Ct. 1932.  Under that requirement, I pled that pro se litigants can defeat all future applications of § 12-3201 by asserting *Noerr-Pennington* immunity as an affirmative defense. (Doc. 14 at 124-139).  *See 360 Mortg. Grp., LLC v. Fortress Inv. Grp. LLC,* No. 19-CV-8760, 2020 WL 5259283, at *4 (S.D.N.Y. Sept. 3, 2020) ("The *Noerr-Pennington* doctrine is generally raised as an affirmative defense").  "Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability[12] for their petitioning conduct. ... [The] doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause."  *Sosa,* 437 F.3d at 929-31; *see also White v. Lee*, 227 F.3d 1214, 1239 (9th Cir. 2000) ("The *Noerr-Pennington* doctrine sharply limit[s] [government] officials' ability to treat [] state-court lawsuit[s] as a possible violation of law").  "To determine whether a [litig]ant's conduct, ..., is immunized under *Noerr-Pennington,* we apply a three-step analysis to determine: (1) 'whether

---

[12] "Liability" means "[t]he quality, state, or condition of being bound or obliged by law or justice to do, pay, or make good something; legal responsibility to another or to society".  Black's Law Dictionary (11th Ed., 2019).

the lawsuit imposes a burden on petitioning rights,' (2) 'whether the alleged activities constitute protected petitioning activity,' and (3) 'whether the statute[] at issue may be construed to [avoid] that burden.' If the answer at each step is 'yes,' then a defendant's conduct is immunized under *Noerr-Pennington*." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 536 (9th Cir. 2022). As to that first step, any § 12-3201(A) motion requesting a § 12-3201(B) "pre-clearance requirement imposes a substantial burden on the free-access guarantee". *Ringgold-Lockhart v. County of Los Angeles*, 761 F.3d 1057, 1061-62 (9th Cir. 2014). The "focus at step two" is on whether disputed activities qualify as "*protected* petitioning activity". *B&G Foods*, 29 F.4th at 536 (emphasis original). Here, those activities are "vexatious conduct" as defined in §§ 12-3201(E)(1)(a)-(f) which, again, are constitutionally "protected" as core "petitioning activity" or as "conduct incidental to a petition" which are not subject to the "sham exception". *Sosa*, 437 F.3d at 933. Moving to third step, the *Noerr-Pennington* doctrine immunizes all instances of "vexatious conduct" as a matter of constitutional law because, per *Richer*, each § 12-3201(E)(1)(a)-(f) provision can be, and definitively has been, "construed to [avoid] that [First Amendment] burden". *B&G Foods*, 29 F.4th at 536. Because every pro se litigant accused in any and every § 12-3201(A) motion of engaging in "any" § 12-3201(E) "vexatious conduct" can successfully assert *Noerr-Pennington* immunity, A.R.S. § 12-3201 is "patently unconstitutional" in every application and, most certainly, in at least substantial number of applications. *See Saenz v. Roe*, 526 U.S. 489, 499 n.11, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) ("If a law has no other [demonstrable] purpose ... than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it is patently unconstitutional.").

At the pleading stage, I have demonstrated (1) standing to sue Attorney General Mayes[13] and Presiding Judge Gates[14]; and (2) the statute reaches constitutionally protected activities and is

---

[13] The Attorney General initially attacked "redressability" in her Fed. R. Civ. P. 12(b)(1) motion positing that "an order enjoining AG Mayes from enforcing A.R.S. § 12-3201 would have no practical effect because courts could still impose prefiling requirements on vexatious litigants. As discussed, while prosecution is unlikely, any such prosecution would be more likely to come from a county attorney than from AG Mayes." (Doc. 38). This position acknowledged at least a "scintilla" of enforcement connection to the statute, undercutting any possible sovereign immunity defense. (Doc. 49). The Attorney General has since reframed her redressability defense to argue § 12-3201 "contains no enforcement provision relevant to AG Mayes" and therefore no "credible threat of enforcement" exists to invoke standing. (Doc. 69). But she expressly does not "disavow" enforcement of that statute, or any provision of that statute, which she previously admitted both she and "county attorneys" could enforce, although county attorneys "would be more likely" to enforce. The Attorney General's defenses show she has no sovereign immunity and Plaintiff has standing to bring suit against her to enjoin civil and/or criminal enforcement of the challenged statute. *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154-55 (9th Cir. 2000) (When the case "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing".).

[14] Administrative Order 2023-159 was discovered during this litigation. (Doc. 72). Maintaining that patently unconstitutional administrative order causes me ongoing actual injuries, is traceable to the Presiding Judge, is redressable by a favorable ruling, "exceed[s] the bounds of reasonable governmental action and violate[s] [my] First Amendment rights." *White*, 227 F.3d at 1231. Presiding Judge Gates' Fed. R. 12(b)(1) reliance on "judicial immunity" (Doc. 67) therefore fails since, per the Ninth Circuit, "absolute judicial immunity does not apply to nonjudicial acts, i.e. the administrative, legislative, and

unconstitutional in every application. Should there be a scenario where a constitutional application exists, I also sufficiently pled the statute is unconstitutional in a substantial number of applications. And "[i]f the challenger demonstrates that the statute 'prohibits a substantial amount of protected [First Amendment expression]' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Hansen,* 599 U.S. at 770, 143 S.Ct. 1932. In sum, the statute is facially invalid for being unconstitutional in every application or at least in a substantial number of applications demonstrated via the statute's text, existing records of past applications, and all realistic scenarios of future applications. *See Hicks,* 539 U.S. at 122, 123 S.Ct. 2191) (plaintiff can plead a law is substantially unconstitutional "from actual fact").

The burden has now shifted to your "government" clients to show <u>on the proofs</u> that the statute can be "fairly" construed to avoid First Amendment safeguards, or that the statute is "narrowly" tailored to serve a sufficient (i.e., "significant" or "compelling"] "government interest" based on the proper level of scrutiny due. *Reno v. American Civil Liberties Union,* 521 U.S. 844, 884 (1997) ("The Government has the burden of proving that a construction narrowing the statute to constitutionally permissible applications is 'fairly possible.'"); *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816-17 (2000) ("When the Government restricts [protected expression], the Government bears the burden of proving the constitutionality of its actions. … If a statute regulates [expression] based on its content, it must be narrowly tailored to promote a compelling Government interest. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. ... The Government has not met that burden here."); *McCullen v. Coakley,* 573 U.S. 464, 495, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014) ("To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's [significant] interests, not simply that the chosen route is easier.); *see also Porter v. Martinez,* 68 F.4th 429, 438 (9th Cir. 2023) ("In 'quintessential public forums' such as [courts][15], streets, parks, and other 'places which by long tradition ... have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed.' 'The government bears the burden of justifying the regulation of expressive activity in a public forum.'"). Neither Presiding Judge Gates nor Attorney General Mayes will be able to carry the government's burden to demonstrate narrow tailoring, significant or compelling government interests, or least

---

executive functions that judges may on occasion be assigned to perform." *Duvall v. County of Kitsap,* 260 F.3d 1124, 1134 (9th Cir. 2001); *see also Glazer v. State,* 237 Ariz. 160, 164 ¶ 10, 347 P.3d 1141, 1145 (2015) (For state officials in Arizona, "the rule is liability and immunity is the exception."). Presiding Judge Gates' immunity defense raises a factual dispute not amenable to dismissal at the pleading stage. *See Arizona v. Mayorkas,* 600 F. Supp. 3d 994, 1004, n.2 (D. Ariz. 2022) ("'[W]here the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits,' in which case 'the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial.'").
[15] A "court is a public forum". *Universal Entertainment Corp. v. Aruze Gaming America, Inc.* (D. Nevada January 17, 2023).

restrictive alternative. *See Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n*, 160 Ariz. 350, 357, 773 P.2d 455, 463 (1989) ("[G]overnmental convenience [including purported administrative efficiency] and certainty cannot prevail over constitutionally guaranteed rights."). I have raised significant questions going to this First Amendment overbreadth claim, and I am confident I will eventually prevail on the merits.

TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION

"The Supreme Court has explained that plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *Where Do We Go Berkeley v. California Dep't of Transportation*, 32 F.4th 852, 859 (9th Cir. 2022) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Factors three and four "merge when [as here] the Government is the opposing party". *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). Further, the Ninth Circuit employs a "sliding scale" approach to the four *Winter* factors, under which a strong showing on the balance of hardships may compensate for a lesser showing of likelihood of success. *See Where Do We Go Berkeley*, 32 F.4th at 859. That said, in cases arising under the First Amendment, showing a "likelihood of success on the merits" generally results in a finding that the three remaining *Winter* factors are satisfied as well. *See Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 757-58 (9th Cir. 2019). Where a plaintiff has made "a colorable First Amendment claim, they have demonstrated that they likely will suffer irreparable harm". *Id.* at 758. In addition, a finding that a plaintiff has raised a "serious" First Amendment question compels a finding that the balance of hardships tips sharply in their favor. *Id.* Finally, there is a "significant public interest in upholding First Amendment principles," and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (internal quotation marks and citations omitted); *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) ("by establishing a likelihood that [the challenged statute] violates the U.S. Constitution, Plaintiff[] ha[s] also established that both the public interest and the balance of the equities favor [injunctive relief]").

On the merits, and as explained above, the U.S. Supreme Court's holding in "*BE & K* made ... explicit" that the Petition Clause safeguards "protected petitioning activities" (i.e., all core "petitioning" and all "conduct incidental to a petition") unless the underlying "suit[] [is] both objectively baseless *and* subjectively motivated by an unlawful purpose", in conjunctive fashion. In *Richer*, the Arizona supreme court relied on the "anti-surplusage canon" when construing statutory language to find no § 12-3201(E)(1)(a)-(f) provision meets that conjunctive legal standard. Instead, § 12-3201(E)(1)(c) proscribes objectively baseless "court actions" but does not include any "separate bad faith" subjectively improper purposes such as § 12-3201(E)(1)(a) "harassment". And § 12-3201(E)(1)(a) "harassment" does not include or subsume the element of § 12-3201(E)(1)(c) objectively baseless "court actions" because to do so would render that latter provision "superfluous". For that same reason, §§ 12-3201(E)(1)(b), (d), (e), and (f) do not

10

include or subsume objectively baseless "court actions". Based on the *Richer* binding precedent, the challenged statute reaches, abridges, punishes, prohibits, otherwise regulates, and chills "protected petitioning activities" "in every application". Given the statute prohibits and regulates conduct entirely within the Petition Clause's broad protections, pro se litigants can claim *Noerr-Pennington* immunity to defeat each and every A.R.S. § 12-3201(A) motion. *See Sosa*, 437 F.3d at 929 (The Supreme "Court... extended *Noerr-Pennington* immunity to the use of 'the channels and procedures of state ... courts.'"). Your clients have not argued to save, and cannot save, the statute on the basis that it is narrowly tailored, meets a significant or compelling government interest, or is the least restrictive option available. Indeed, the § 12-3201(B) mandatory blanket injunction functions as an indiscriminate "prior restraint" on a First Amendment right of expression. *See Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963) ("Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."). In sum, each *Winter* factor favors a temporary restraining order and preliminary injunction on the current record.

CONCLUSION

Please let me know before close of business on **November 28, 2025** if either, or both, of your clients will agree to not administratively, civilly, or criminally enforce A.R.S § 12-3201. Again, I would like to convey to the Court that, until the case is decided, Presiding Judge Gates has agreed to exercise her administrative authority and rescind Administrative Order 2023-159 while Attorney General Mayes has agreed to exercise her prosecutorial authority and not civilly or criminally prosecute, or aid in any such prosecution, of any perceived § 12-3201 violation. Beyond that, my hope is that your clients will recognize the challenged statute violates the First Amendment, abandon any defense of A.R.S. § 12-3201, and use this case to re-affirm their Ariz. Const. art. 6, § 27 and A.R.S. § 38-231 oaths of office to "support the Constitution of the United States". *See* U.S. Const. Amend. I (there shall be "no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances"); U.S. Const. amend. XIV ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States"); *see also* Ariz. Const. art. 2, § 5 ("The right of petition, ..., shall never be abridged"). Feel free to contact me with any questions.


Regards,

Phillip Potter
2301 N. 66th Street
Scottsdale, AZ 85257
480-459-0310
phillip.t.potter@gmail.com

1    **KRISTIN K. MAYES**
2    **Attorney General**
     (Firm State Bar No. 14000)

3

4    Hayleigh S. Crawford (Bar No. 032326)
     Joshua A. Katz (Bar No. 039449)
5    Office of the Arizona Attorney General
     2005 N. Central Avenue
6    Phoenix, AZ 85004-1592
     (602) 542-3333
7    Hayleigh.Crawford@azag.gov
     Joshua.Katz@azag.gov
8    ACL@azag.gov

9

10    *Attorneys for Defendant Arizona Attorney*
     *General Kristin K. Mayes*

11

12             **UNITED STATES DISTRICT COURT**

13                 **DISTRICT OF ARIZONA**

| | |
|---|---|
| 14   Philip Potter, | No.CV25-00663-PHX-DWL |
| 15   individually and on behalf of all others similarly situated | |
| 16 | |
| 17             Plaintiffs, | **ARIZONA ATTORNEY GENERAL'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |
| 18   v. | |
| 19   Robert Meza, et al., | |
| 20 | |
| 21           Defendants. | |
| 22 | |

23

24

25

26

27

28

Pursuant to Federal Rule of Civil Procedure 12(b), Defendant Arizona Attorney General Kristin K. Mayes ("AG Mayes") moves to dismiss the First Amended Complaint.

## INTRODUCTION

Plaintiff is subject to an order pre-screening his future filings in pending civil actions. The order does not deprive Plaintiff of the right to file legitimate, non-frivolous papers. It only prevents him from 1) filing papers without leave of court in pending cases, and 2) filing improper papers at all in those cases. The question presented is whether the Constitution protects Plaintiff from such an order. It does not.

As the Supreme Court has held, there is no constitutional right to make improper filings. *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983) ("[B]aseless litigation is not immunized by the First Amendment right to petition."). Plaintiff's related challenge to the statutory definition of "harass" both misstates the statute and grossly expands the void for vagueness doctrine, and so fails as well. In any event, AG Mayes is the wrong party against whom to seek relief. For both these reasons, AG Mayes respectfully requests the Court dismiss the case.

## BACKGROUND

**I.    Plaintiff sues in state court following a public records request and is designated vexatious.**

This is Plaintiff's second trip to the District of Arizona following a public records request and resulting state litigation. *See* First Amended Complaint (FAC), Dkt. 14, ¶ 67. Plaintiff sought documents from the Arizona House of Representatives, Representative Robert Meza, and a private citizen. *Id.*; *Potter v. Ariz. House of Reps.*, No. 23-0213, 2024 WL 368095, at *1 ¶ 4 (Ariz. App. Feb. 1, 2024). Dissatisfied with their responses, he filed a special action under A.R.S. § 39-121.02. FAC ¶ 68; *Potter*, 2024 WL 368095, at *1 ¶ 6. On motion, the superior court dismissed the case. *Potter*, 2024 WL 368095, at *2 ¶¶ 9–10; Docket Sheet, *Potter v. Ariz. House of Reps.*, No. 2022-008626 (Ariz. Super. Ct.) (Ex. 1), Nos. 19–21 & pg. 3.

1    The defendants then moved to designate Plaintiff a vexatious litigant under A.R.S.

2  § 12-3201.  *Potter*, 2024 WL 368095, at *2 ¶¶ 11–12; Minute Entry filed Feb. 27 2023,

3  *Potter v. Ariz. House of Reps.*, No. 2022-008626 (Ariz. Super. Ct.) (Ex. 2), at 1; Ex. 1,

4  Nos. 45–49.

5    Under A.R.S. § 12-3201, a court may declare a civil pro se litigant "vexatious" for,

6  among others, filing cases "solely or primarily" to harass others or without "substantial

7  justification," making "unreasonable, repetitive and excessive requests for information,"

8  or making "repeated filing[s] of documents or requests for relief that have been the subject

9  of previous rulings by the court in the same litigation."  A.R.S. § 12-3201(A), (E)(1).

10    The court held an evidentiary hearing on the vexatious litigant motion.  *Potter*,

11  2024 WL 368095, at *2 ¶ 14; Ex. 2, at 1; Ex. 1, Nos. 81–86.  The court considered, in

12  addition to his conduct in the case, Plaintiff's other "litigation activity," which "paint[ed]

13  a troubling picture."  Ex. 2, at 2.  The court found that Plaintiff "engaged in vexatious

14  conduct per A.R.S. § 12-3201 by: repeated filing of court actions without substantial

15  justification; and repeatedly filing documents or requests for relief that have been the

16  subject of previous rulings by the court in similar litigation."  *Potter*, 2024 WL 368095,

17  at *2 ¶ 14; Ex. 2, at 4.  Thus, the court barred Plaintiff from "fil[ing] any new pleading,

18  motion or other document in this case or any other pending civil action without prior leave

19  of the judge assigned to that case."  *Potter*, 2024 WL 368095, at *2 ¶ 14; Ex. 2, at 4.

20    Plaintiff appealed his vexatious litigant designation, raising three issues.  *Potter*,

21  2024 WL 368095, at *7–10 ¶¶ 44–59.  First, he argued that the vexatious litigant order

22  was not justified under A.R.S. § 12-3201.  *Id.* at *8 ¶¶ 47–48.  Second, he raised a

23  constitutional due process challenge.  *Id.* at *9 ¶¶ 51–55.  Third, he raised a First

24  Amendment challenge.  *Id.* ¶ 56.  The court of appeals affirmed.  *Id.* at *10 ¶ 61.

25  **II.    Plaintiff files a facial challenge in federal court.**

26    Undeterred, Plaintiff then filed a facial challenge in the District of Arizona against

27  AG Mayes and Judge Welty, the Chief Judge of the Maricopa County Superior Court

28  (who was never served).  *Potter v. Arizona*, No. 25-00016-PHX-KML (D. Ariz. filed Jan.

2

1   8, 2025).  He challenged A.R.S. §§ 12-3201 (vexatious litigants), 13-2921(E) (statutory

2   definition of harass), and 12-349(A)(2) (sanctions).   After Plaintiff amended his

3   complaint, AG Mayes moved to dismiss the case.  *Potter v. Arizona*, No. 25-00016-PHX-

4   KML, Dkt. 12 (Jan. 31, 2025), 18 (Feb. 14, 2025).

5   **III.   Plaintiff files the present federal court suit.**

6           Meanwhile, Plaintiff filed the Complaint in this case, which did not name AG

7   Mayes.  Complaint, *Potter v. Meza*, No. 25-00663-PHX-DWL (Feb. 27, 2025), Dkt. 1.

8           Plaintiff then voluntarily dismissed his first case and filed a First Amended

9   Complaint in this case naming AG Mayes and adding facial challenges to A.R.S. §§ 12-

10  3201 (vexatious litigants) and 13-2921 (harassment).   Notice of Dismissal, *Potter v.*

11  *Arizona*, No. 25-00016-PHX-KML (D. Ariz. May 12, 2025), Dkt. 24; FAC, *Potter v.*

12  *Meza*, No. 25-00663-PHX-DWL (May. 13, 2025), Dkt. 20.  Also pending in this case is

13  a motion for preliminary relief.  *See* Dkt. 23, 37.

14  **IV.   Plaintiff's ex-wife participates in Arizona's address confidentiality program.**

15          Plaintiff's ex-wife ("TD" per FAC at ¶ 43) participates in the address

16  confidentiality program established under A.R.S. § 41-161 *et seq*. and administered by

17  the Secretary of State.   FAC ¶¶ 92–94, 95.   Participation in the program requires

18  "[e]vidence that the applicant is a victim of domestic violence, a sexual offense or

19  stalking."  § 41-163(C)(3).   For purposes of the program, harassment under A.R.S. § 13-

20  2921 can qualify as "domestic violence" entitling a victim to address protections if certain

21  additional conditions are met, such as a marital or former marital relationship between

22  the defendant and the victim.   *See* A.R.S. § 41-161(5) (incorporating by reference

23  definition of "domestic violence" in A.R.S. § 13-3601); A.R.S. § 13-3601(A) (defining

24  "domestic violence").

25          Plaintiff alleges that his ex-wife presented his vexatious litigant designation as

26  evidence and was accepted into the program.   Therefore, he concludes, "the Arizona

27  Secretary of State now holds official records identifying Plaintiff as an A.R.S. § 13-3601

28  Domestic Violence perpetrator, although Plaintiff has never committed an act of domestic

3

1    violence." FAC ¶ 97. Various iterations of this assertion appear throughout his motion.

2    *See, e.g.*, Motion for Preliminary Relief (Mot.), Dkt. 23, at 8. ("[T]he State of Arizona

3    now deems Plaintiff to have violated A.R.S. § 12-3201, and thus to have perpetrated §§

4    13-3601/3602 Domestic Violence, for filing motion papers in well-founded lawsuits

5    absent leave of the court.").

6                                      **LEGAL STANDARD**

7        **Rule 12(b)(1).** Presumptively, "a cause lies outside [the Court's] limited

8    jurisdiction" until the "party asserting jurisdiction" establishes otherwise. *Kokkonen v.*

9    *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A party bringing a case in

10   federal court must demonstrate federal jurisdiction. *See Sw. Ctr. for Biological Diversity*

11   *v. FERC*, 967 F. Supp. 1166, 1172 (D. Ariz. 1997).

12       When ruling on a motion to dismiss for lack of subject-matter jurisdiction under

13   Fed. R. Civ. P. 12(b)(1), the court may take judicial notice of "matters of public record"

14   and other evidence "capable of accurate and ready determination by resort to sources

15   whose accuracy cannot be reasonably questioned." *In re White Elec. Designs Corp. Sec.*

16   *Lit.*, 416 F. Supp. 2d 754, 760 (D. Ariz. 2006).

17       **Standing.** "Article III standing is a necessary component of subject matter

18   jurisdiction." *In re Palmdale Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011). Article

19   III standing requires concrete, particularized injury that is actual or imminent, fairly

20   traceable to the challenged action, and redressable by a favorable ruling. *Clapper v.*

21   *Amnesty Int'l*, 568 U.S. 398, 409 (2013).

22       **Immunity.** Pursuant to the 11th Amendment, federal courts lack jurisdiction over

23   suits against states, unless Congress or the state waive immunity. *Green v. Mansour*, 474

24   U.S. 64, 68 (1985). However, state officers may be sued in their official capacities for

25   equitable relief addressing a constitutional violation. *Id.* ("[A] suit challenging the

26   constitutionality of a state official's action in enforcing state law is not one against the

27   State."); *see Ex Parte Young*, 209 U.S. 123, 159–60 (1908).

28

                                              4                                   ER-334

1    **Rule 12(b)(6).** When deciding a motion to dismiss for failure to state a claim

2    under Fed. R. Civ. P. 12(b)(6), "a court must take all allegations of material fact as true

3    and construe them in the light most favorable to the nonmoving party." *Kwan v.*

4    *SanMedica Int'l,* 854 F.3d 1088, 1096 (9th Cir. 2017) (cleaned up). But "conclusory

5    allegations of law and unwarranted inferences" will not spare a complaint from dismissal.

6    *Id.* A court may dismiss under this rule for either of "lack of a cognizable legal theory"

7    or "absence of sufficient facts alleged under a cognizable legal theory." *Johnson v.*

8    *Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008).

9                                    **ARGUMENT**

10    Plaintiff brings this facial challenge to Arizona's vexatious litigant statute, A.R.S.

11    § 12-3201; and the statutory definition of "harass" in A.R.S. § 13-2921(E). But the court

12    lacks jurisdiction, for two reasons. First, Plaintiff lacks standing as to AG Mayes because

13    Plaintiff cannot tie any of his claimed injuries to AG Mayes, nor can the relief he seeks

14    against AG Mayes redress them. Second, Plaintiff's challenge to the vexatious litigant

15    statute is a not proper *Ex Parte Young* action because AG Mayes lacks a sufficiently direct

16    connection to its enforcement scheme.

17    Even if the Court had jurisdiction, Plaintiff fails to state a claim. Because this is a

18    facial challenge, he must show each of these laws has no constitutional application

19    (except as to his overbreadth challenge, addressed below). He cannot. Ultimately, he

20    seeks constitutional protection for, first, filing vexatious papers, and second, continuing

21    to file them. There is no such constitutional protection. *Bill Johnson's Restaurants, Inc.*,

22    461 U.S. at 743 ("[B]aseless litigation is not immunized by the First Amendment right to

23    petition."); *accord Wolfe v. George*, 486 F.3d 1120, 1125 (9th Cir. 2007) (upholding

24    California prefiling requirement). The law Plaintiff challenges requires him to receive

25    preclearance before filing papers, so that the judge may allow proper papers as defined

26    by A.R.S. § 12-3201(E)(1). Only those proper filings are protected.

27  **I.    The Court lacks jurisdiction over this action as to AG Mayes.**

28    The Court lacks subject-matter jurisdiction for two reasons. First, Plaintiff lacks

1    standing for all his claims.  Second, AG Mayes is immune from Plaintiff's challenges to

2    the vexatious litigant statute.

### A. Standing

4    Article III standing is jurisdictional.  *In re Palmdale Hills Prop., LLC*, 654 F.3d at

5    873.  To establish standing, Plaintiff must demonstrate both (1) injury that fairly can be

6    traced to the challenged action of the defendant, not injury that results from the

7    independent action of some third party not before the court, *Bennett v. Spear*, 520 U.S.

8    154, 167 (1997), and (2) that "it is likely . . . that the injury will be redressed by a favorable

9    decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167,

10   181 (2000).  "[I]n cases with multiple defendants," a plaintiff must have "standing as

11   against each defendant." *Sullivan v. Ferguson*, 636 F. Supp. 3d 1276, 1283 (W.D. Wash.

12   2022).  Plaintiff does not reach this bar.

### 1. Plaintiff lacks standing to assert his challenge to the vexatious litigant statute (Count 1).

#### a. Plaintiff fails to allege a credible fear of prosecution.

16   Plaintiff relies heavily on perceived threats of prosecution, making a pre-

17   enforcement challenge.  A pre-enforcement challenge requires Plaintiff to allege "an

18   intention to engage in a course of conduct arguably affected with a constitutional interest,

19   but proscribed by a statute, and [that] there exists a credible threat of prosecution

20   thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014) (quoting

21   *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).  Crucially, the fear of prosecution

22   "must at least be 'credible.'" *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d

23   1134, 1140 (9th Cir. 2000) (citation omitted).  This he fails to do.

24   The credibility of a fear of prosecution rests on three factors: 1) a "concrete plan"

25   to violate the law; 2) "a specific warning or threat to initiate proceedings;" and 3) a

26   "history of past prosecution or enforcement under the challenged statute." *Libertarian

27   Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013).

28   Plaintiff alleges little to support these factors.  First, while Plaintiff generally

1    alleges his intent to file court papers without leave, he has not specified which papers he

2    plans to file.  FAC ¶ 98.  Second, not only is there no threat or warning, but also the

3    vexatious litigant statute is, by its terms, not a criminal statute.  Third, Plaintiff has not

4    pointed to a single such prosecution, directly or indirectly under A.R.S. § 13-2810.  *Cf.,*

5    *e.g.*, *McKee v. Lamore*, No. 21-0413, 2022 WL 517911, at *3 ¶ 12 (Ariz. App. Feb. 22,

6    2022) (sanctions, but no mention of criminal prosecution, after vexatious litigant filed

7    "more than a dozen documents without permission").  He alleges just the "existence of a

8    proscriptive statute," "insufficient to satisfy the 'case or controversy' requirement."

9    *Libertarian Party of Los Angeles Cnty.*, 709 F.3d at 871.

10        Plaintiff attempts to ground his fear in his ex-wife's participation in the address

11   confidentiality program described above.  *See* FAC ¶¶ 92–98.  From her participation he

12   concludes, for instance, in his motion for preliminary relief, that "the State of Arizona

13   now deems Plaintiff to have violated A.R.S. § 12-3201, and thus to have perpetrated

14   §§ 13-3601/3602 Domestic Violence, for filing motion papers in well-founded lawsuits

15   absent leave of the court."  Mot., Dkt. 23, at 8.

16        But this, too, fails.  The Secretary of State's acceptance of a vexatious litigant

17   designation as evidence is not a threat or warning of future enforcement because the

18   Secretary of State has no criminal enforcement powers, and can give no such warning.

19   *See* A.R.S. §§ 41-121, -121.02 (duties of Secretary of State and Department of State).

20   Nor has Plaintiff demonstrated any instance where a person was prosecuted for filing

21   papers without leave because of someone else's address confidentiality order.  *Cf.*

22   *Libertarian Party of Los Angeles Cnty*, 709 F.3d at 870 (requirements for credible fear).

23              **b.    Any injury cannot be fairly traced to AG Mayes, nor
24                      redressed by the relief sought against her.**

25        Plaintiff has not sufficiently alleged injury under the vexatious litigant statute.  In

26   any event, any injury he does allege fails to confer Article III standing as to AG Mayes

27   for two reasons.

28

7                                               ER-337

**First**, Plaintiff must show that "the injury [is] fairly traceable to the challenged action of [AG Mayes], and not the result of the independent action of some third party." *Bennett*, 520 U.S. at 167. When suing officers to challenge a statute, plaintiffs need "a reasonable expectation that the defendants might bring an enforcement action against them." *Ariz. Contractors Ass'n v. Napolitano*, Nos. 07-1355-PHX-NVW, 07-1684-PHX-NVW, 2007 WL 9723967, at *9 (Dec. 10, 2007).

A causal chain beginning with a challenged action can establish that harm is fairly traceable, even if there are "multiple links in the chain." *Skyline Wesleyan Church*, 968 F.3d at 748. But the chain must be "direct." *Id.*

Here, Plaintiff fails to provide any reason any enforcement would directly involve AG Mayes. AG Mayes has only such powers as are given in statute. Ariz. Const. art. V, § 9; *see also, e.g.*, A.R.S. §§ 21-422 (detailing powers relating to grand juries), 41-193 (detailing powers). And elected county attorneys, who prosecute the vast majority of criminal cases in Arizona's state courts, likewise have powers detailed in statute. *See, e.g.*, A.R.S. § 11-532. And those powers make clear that, in the unlikely event Plaintiff were prosecuted, it would be by a county attorney.

Plaintiff's consequence, a bar from "fil[ing] any new pleading, motion or other document . . . without prior leave of the judge assigned to that case," *Potter*, 2024 WL 368095, at *2 ¶ 14, is enforced by the court. At most, through an indirect chain of statutes, he alleges he could be prosecuted by someone. *See* FAC ¶ 103. But even that speculative belief is a far leap from tying the envisioned prosecution to AG Mayes. *Cf. Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 414 (2013) (mere "speculation about the decisions of independent actors" is insufficient for fair traceability).

AG Mayes's general supervisory power over county attorneys, in A.R.S. § 41-193(4–5), is not enough to bridge the gap. *See S. Pac. Transp. Co. v. Brown*, 651 F.2d 613, 614–15 (9th Cir. 1980) (feared prosecution not fairly traceable to attorney general who lacked power to prosecute challenged statute but would "advise and direct the district attorneys to prosecute"). Nor has Plaintiff shown that the Governor or AG Mayes is likely

1    to "deem[]" his case one where the Attorney General's involvement is "necessary."

2    A.R.S. § 41-193(2). In short, Plaintiff needs to allege why AG Mayes, specifically, might

3    reasonably be expected to prosecute him. He has not.

4        **Second**, relatedly, Plaintiff's asserted injury cannot be redressed by any relief he

5    seeks against AG Mayes. Standing requires that a favorable decision be likely to actually

6    redress the injury; mere speculation is not enough. *Lujan v. Defs. of Wildlife*, 504 U.S.

7    555, 561 (1992).

8        Here, an order enjoining AG Mayes from enforcing A.R.S. § 12-3201 would have

9    no practical effect because courts could still impose prefiling requirements on vexatious

10   litigants. As discussed, while prosecution is unlikely, any such prosecution would be

11   more likely to come from a county attorney than from AG Mayes. Thus, even setting all

12   the other problems with Plaintiff's arguments aside, his requested relief here would not

13   "likely" redress his problem because enjoining AG Mayes would not prevent a county

14   attorney from prosecuting him, nor the courts from enforcing their injunctions. *See*

15   *Friends of the Earth, Inc.*, 528 U.S. at 181.

16       **2.    Plaintiff also lacks standing to challenge the harassment statute**
17       **(Count 2).**

18       Nor does any asserted injury under A.R.S. § 13-2921, which he challenges as void

19   for vagueness, spell out standing for Plaintiff. That statute defines the crime of

20   harassment. Subsection (E) defines "harass" as "conduct that is directed at a specific

21   person and that would cause a reasonable person to be seriously alarmed, annoyed,

22   humiliated or mentally distressed and the conduct in fact seriously alarms, annoys,

23   humiliates or mentally distresses the person." But not everything defined by that

24   subsection is criminalized; subsection (A), instead, criminalizes a subset.

25       Plaintiff lacks standing here for three reasons. First, Plaintiff lacks any injury

26   connected to this statute. Although Plaintiff alleges that his ex-wife was able to have her

27   address deemed confidential as a result of his litigation being deemed "harassing," a third

28

1    party having their address treated as confidential is not an "invasion of a legally protected
2    interest" belonging *to Plaintiff. See Lujan*, 504 U.S. at 560.

3        Second and third, any injury would not be fairly traceable to AG Mayes and could
4    not be redressed by the relief sought. AG Mayes does not administer the program; any
5    harm resulting from the acceptance of an application has no connection to her. And, as
6    discussed earlier, because county attorneys carry out the vast majority of criminal
7    prosecutions in Arizona, enjoining AG Mayes would not "likely" redress any injury. *See*
8    *Friends of the Earth, Inc.*, 528 U.S. at 181. Additionally, AG Mayes does not enforce
9    § 41-161 *et seq.* The only colorable role of AG Mayes in the program appears at § 41-
10   165, which provides criminal penalties for intentionally or knowingly obtaining or
11   disclosing protected information. But that is unrelated to Plaintiff's supposed injury.
12   Consequently, an injunction against AG Mayes as relates to the definition of
13   "harassment" would not redress Plaintiff's alleged injury.

14       **B.    Plaintiff's challenge to the vexatious litigant statute is precluded by**
15       **sovereign immunity.**

16       In addition to Plaintiff's lacking standing, AG Mayes lacks a sufficiently direct
17   connection to the vexatious litigant statute's enforcement scheme, rendering Plaintiff's
18   challenge to that statute barred by sovereign immunity.

19       The vexatious litigant statute, A.R.S. § 12-3201, allows courts to limit filings from
20   litigants who behave in a vexatious manner, described earlier. Following a designation,
21   the litigant "may not file a new pleading, motion or other document without prior leave
22   of the court." *Id.* (B). As noted, the statute is enforced by the court, not AG Mayes.

23       A suit challenging the constitutionality of a state statute may seek prospective
24   injunctive relief against a state officer. *Green*, 474 U.S. at 68; *see Ex Parte Young*, 209
25   U.S. at 159–60. The suit must, though, be asserted against a state officer with "some
26   connection" to the law's enforcement. *Matsumoto v. Labrador*, 122 F.4th 787, 802 (9th
27   Cir. 2024) (quoting *Ex Parte Young*, 209 U.S. at 157). That connection must "go[] beyond
28   a generalized duty to enforce state law," *id.* (cleaned up), and "be fairly direct." *Coal. to*

1    *Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (quoting *L.A.*

2    *Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)).

3        AG Mayes lacks the requisite "fairly direct" connection here.  First, she had no

4    role in Plaintiff's designation, neither requesting a designation nor granting one.  Second,

5    she has no role in enforcing the statute or Plaintiff's order, for the reasons given earlier.

6    **II.    Plaintiff fails to state a claim for which he is entitled to relief.**

7        In deciding a 12(b)(6) motion, the Court must "take all allegations of material fact

8    as true and construe them in the light most favorable to the nonmoving party."  *Kwan*,

9    854 F.3d at 1096 (cleaned up).  But "conclusory allegations of law and unwarranted

10   inferences" do not receive this presumption of truth.  *Id.*  A court must dismiss once shown

11   either of the "lack of a cognizable legal theory" or the "absence of sufficient facts alleged

12   under a cognizable legal theory."  *Johnson*, 534 F.3d at 1121–22.

13       **A.    Plaintiff fails to state a claim in his challenge to the vexatious litigant**
14       **statute (Count 1).**

15           **1.    The statute is not overly broad.**

16   A.R.S. § 12-3201 also does not facially violate the First Amendment.  Ordinarily,

17   facial invalidation of a law requires that there be no constitutional applications.  *United*

18   *States v. Hansen*, 599 U.S. 762, 769 (2023).  But a special, narrow exception exists for

19   First Amendment overbreadth.  *Id.* at 770.  A law may be facially overbroad if it "prohibits

20   a substantial amount of protected speech relative to its plainly legitimate sweep."  *Id.*

21   (cleaned up).  The overbreadth doctrine is meant to prevent chilling effects.  *Comite de*

22   *Jornaleros v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011).

23       The doctrine is "strong medicine that is not to be casually employed."  *Hansen*,

24   599 U.S. at 770 (cleaned up).  "[T]here comes a point at which the chilling effect of an

25   overbroad law, significant though it may be, cannot justify prohibiting all enforcement of

26   that law—particularly a law that reflects legitimate state interests in maintaining

27   comprehensive controls over harmful, constitutionally unprotected conduct."  *Virginia v.*

28   *Hicks*, 539 U.S. 113, 119 (2003) (cleaned up).  To survive, therefore, a law needs only a

1    "plainly legitimate sweep" that is not "substantially outweigh[ed]" by its unconstitutional

2    applications.  *Moody v. NetChoice, LLC*, 603 U.S. 707, 723–24 (2024).  A law is also

3    "upheld if (1) it is not aimed at, and does not encompass constitutionally protected speech

4    or activities, and (2) it 'furthers an important or substantial government interest.'"

5    *Grundstein v. Ohio*, No. 06-2381, 2006 WL 3499990, at *5 (quoting *O'Brien v. United

6    States*, 391 U.S. 367, 377 (1968)).

7           Here, Plaintiff cannot make the required showing.  With its two judicial screening

8    steps, the vast majority of the law's applications will prevent filings not protected by the

9    First Amendment because "there is no constitutional right to file frivolous litigation."

10   *Wolfe*, 486 F.3d at 1125 (upholding California prefiling requirement for vexatious

11   litigants against overbreadth challenge).  Should the court mistakenly block a filing, the

12   litigant may seek special action review. *See* Ariz. R. Proc. Special Actions 11.  Therefore,

13   most of its applications are within the law's "plainly legitimate sweep" and are neither

14   aimed at, nor encompass, protected activity.

15          Put another way, the Court need only decide whether judges, in orders subject to

16   discretionary interlocutory review, are likely to prohibit substantially more protected

17   filings than unprotected.  To ask it is to answer.

18          Further, A.R.S. § 12-3201 is a poor fit for the overbreadth doctrine because it sits

19   outside the doctrine's purposes.  Only improper filings would be chilled by a limited

20   ability to engage in unprotected speech, an effect that is not cognizable. *See Hicks*, 539

21   U.S. at 124 ("doctrine's concern" is "with 'chilling' protected speech" (citation omitted)).

22          A.R.S. § 12-3201 regulates only unprotected activity by requiring prefiling review

23   to ensure a designated litigant files only proper papers, and is therefore not overbroad.

24                  a.     **The *Noerr-Pennington* doctrine does not save Plaintiff's**
25                         **overbreadth theory.**

26          Plaintiff alleges that the *Noerr-Pennington* doctrine supports his case by

27   demonstrating that there is no "plainly legitimate sweep" to the statute.  This

28   misconceives the doctrine, which stands for a generic "rule of statutory construction."

ER-342

1    *United States v. Koziol*, 993 F.3d 1160, 1171 (9th Cir. 2021).  It requires courts to

2    "construe federal statutes so as to avoid burdening conduct that implicates the protections

3    afforded by the Petition Clause unless the statute clearly provides otherwise."  *Sosa v.*

4    *DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006).  It is, in effect "a specific application

5    of the rule of statutory construction known as the canon of constitutional avoidance."  *Id.*

6    at 931 n.5.  It protects rights by interpreting statutes so as not to infringe on them, and

7    that is not the issue here.

8         The doctrine grew out of concerns about the use of one statute to deny individuals

9    rights guaranteed under other statutes or constitutional provisions.  Specifically, in

10   *Eastern Railroad Presidents Conference v. Noerr*, truck operators and their union sued a

11   group of railroads, their presidents, and a public relations firm, alleging a "conspir[acy]

12   to restrain trade" through a publicity campaign against truckers.  365 U.S. 127, 129

13   (1961).  The Supreme Court read the Sherman Act as not extending to this conduct.  A

14   broader reading would apply the Sherman Act to "political activity," which would "raise

15   important constitutional questions," an intent not "lightly impute[d] to Congress."  *Id.* at

16   138.  Similarly, the Sherman Act does not extend to "[j]oint efforts to influence public

17   officials."  *United Mine Workers of America v. Pennington*, 381 U.S. 657, 670 (1965).

18        Thus, federal statutes are generally interpreted in ways that do not infringe on the

19   Petition Clause.  But the doctrine does not extend to "sham litigation," which is litigation

20   that is "objectively baseless and the defendant's motive in bringing it was unlawful."

21   *Koziol*, 993 F.3d at 1171.

22        The doctrine does not do what Plaintiff needs it to here.  It is a rule for reading

23   statutes and is of no help to a plaintiff raising a facial challenge.  If Plaintiff were seeking

24   to *narrow* the scope of Arizona's law, *Noerr-Pennington* may of help to him.  But

25   narrowing the law hurts, not helps, his facial challenge.

26        **b.     Nor does *Ringgold-Lockhart* compel a different outcome.**

27        Plaintiff alleges that *Ringgold-Lockhart v. County of Los Angeles*, 761 F.3d 1057

28   (9th Cir. 2014) establishes the overbreadth of the statute, again by rendering it without

1   any legitimate sweep. FAC ¶ 140–44. He argues that *Ringgold-Lockhart* requires a court

2   to find both "serial objectively baseless litigation" *and* an "improper . . . motive of

3   harassment." FAC ¶ 141. And, he asserts, a recent Arizona Supreme Court case, *Arizona*

4   *Republican Party v. Richer*, 257 Ariz. 237 (2024), suggests that Arizona's vexatious

5   litigant statute does not require these dual findings and thus violates *Ringgold-Lockhart*.

6   *See* FAC ¶ 160.

7       But *Ringgold-Lockhart* does not say what Plaintiff claims it does. *Cf.* 761 F.3d at

8   1064 ("As an alternative to frivolousness, the district court may make an alternative

9   finding that the litigant's filings 'show a pattern of harassment.'") To the contrary,

10  *Ringgold-Lockhart* is explicit that "substantive findings of frivolousness or harassment"

11  is disjunctive. *Id*. at 1062. "[A] pattern of harassment" is an "alternative to

12  frivolousness." *Id.* at 1064. Thus, even taking as true Plaintiff's assertion that *Richer*

13  shows the vexatious litigant statute does not require finding *both* baseless litigation *and*

14  an improper motive, the statute does not violate *Ringgold-Lockhart*.

### 2. The statute comports with procedural due process.

15

16      A.R.S. § 12-3201 provides constitutionally sufficient procedural due process.

17  Under the Fourteenth Amendment's due process clause, states must provide "fair

18  procedure" when state action deprives a citizen of "a constitutionally protected interest in

19  'life, liberty, or property.'" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Once a

20  protected interest is at stake, "[p]arties whose rights are to be affected are entitled to be

21  heard; and in order that they may enjoy that right they must first be notified." *Wilkinson*

22  *v. Austin*, 545 U.S. 209, 226 (2005) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)).

23  Applying these requirements in the prefiling requirement context, the Ninth Circuit has

24  held that courts must provide notice and chance for a hearing, and must compile an

25  adequate record for review, before requiring prefiling review. *Molski v. Evergreen*

26  *Dynasty Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007) (citing *De Long v. Hennessey*, 912

27  F.2d 1144, 1147–48 (9th Cir. 1990)).

28

1    Arizona law requires the same process. "In the absence of convincing evidence

2    that the state supreme court would decide differently, a federal court is obligated to follow

3    the decisions of the state's intermediate courts." *Easyriders Freedom F.I.G.H.T. v.*

4    *Hannigan*, 92 F.3d 1486, 1494 n.4 (9th Cir. 1996) (cleaned up). Arizona's courts of

5    appeals interpret A.R.S. § 12-3201 as requiring the procedural steps the Ninth Circuit

6    imposes on prefiling requirements. *Madison v. Groseth*, 230 Ariz. 8, 14 ¶ 18 (App. 2012)

7    (Timmer, J.) ("We agree adherence to these principles is appropriate to ensure that a

8    litigant's access to courts is not inappropriately infringed upon, and we therefore adopt

9    them."); *see also, e.g.*, *Contreras v. Bourke*, 556 P.3d 291, 300 ¶ 28 (Ariz. App. 2024)

10   (stating it "necessarily follows that" *De Long*'s requirements "apply to pre-filing

11   restrictions entered under either § 12-3201 or the court's inherent authority"); *Potter*,

12   2024 WL 368095, at *7 ¶ 44 (applying *Madison* to A.R.S. § 12-3201 designation). Thus,

13   "the litigant must be afforded notice and an opportunity to oppose the order" and "the

14   court must create an adequate record" for appeal. *Madison*, 230 Ariz. at 14 ¶ 18 (quoting

15   *De Long*, 912 F.2d at 1147–48). Also, the order must be narrowly tailored. *Id.*

16   Additionally, the only consequence of a designation is a prefiling review

17   requirement. The court must still permit proper filings. *See Potter*, 2024 WL 368095, at

18   *9 ¶ 56 ("[T]he order will not bar Potter from filing pleadings made in good faith."). *Cf.*

19   *Wolfe*, 486 F.3d at 1126–27 (prefiling orders do "little more than require *sua sponte*

20   review of a [vexatious litigant's] complaint"). Therefore, the statute "does not regulate

21   conduct protected by the First Amendment." *Grundstein*, 2006 WL 3499990, at *4

22   (upholding Ohio prefiling requirement for vexatious litigants).

23   This is illustrated by Plaintiff's own case. He received due process, including

24   notice, briefing, and a hearing prior to his designation, based on substantive findings

25   required by law, on a record suitable for appeal. *See Potter*, 2024 WL 368095, at * 9

26   ¶ 51–53. His order was narrowly tailored, applying only to cases pending at the time it

27   was issued. *Id.* ¶ 54. Because these matters were actually litigated and essential to the

28   final judgment against Plaintiff, that determination has preclusive effect. *See Sharifi*

1    *Takieh v. Banner Health*, 515 F. Supp. 3d 1026, 1037 (D. Ariz. 2021) (discussing Arizona

2    issue preclusion rules as applied to Arizona judgments in federal court).

**3.      The statute is not void for vagueness.**

4    Nor is A.R.S. § 12-3201 void for vagueness.  The vagueness doctrine "guarantees

5    that ordinary people have fair notice of the conduct that a statute proscribes." *Sessions v.*

6    *Dimaya*, 584 U.S. 148, 155–56 (2018) (cleaned up).  The doctrine prevents government

7    from forcing citizens to "steer far wider of the unlawful zone than if the boundaries of the

8    forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109

9    (1972) (cleaned up).  "A law is void for vagueness if it is impermissibly vague in all of

10   its applications" and "cause[s] persons of common intelligence necessarily to guess at its

11   meaning and to differ as to its application." *United States v. Makowski*, 120 F.3d 1078,

12   1080 (9th Cir. 1997) (cleaned up).  But "a statute will not be ruled void for vagueness

13   when it is sufficient to give the particular defendant notice that his conduct is illegal."

14   *United States v. Goyette*, 458 F.2d 992, 993 (9th Cir. 1972).

15   Plaintiff can show no risk of an unclear requirement.  Whether or not a litigant

16   could quibble over how many harassing filings are "repeated," or if harassment always

17   means without "legitimate purpose," the vagueness doctrine is not about minute details,

18   but rather whether people, in total, know what they may and may not do.  *Human Life of*

19   *Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1019 (9th Cir. 2010) ("[P]erfect clarity is not

20   required even when a law regulates protected speech.").  After all, "we can never expect

21   mathematical certainty from our language." *Id.* (citation omitted).  Here, there is no real

22   confusion as to the core of what litigants may not do—they simply must avoid making

23   improper filings.  That is no new requirement.  It is required of them before a designation,

24   and enforced prospectively after.  As with the Ohio statute at issue in *Grundstein*, the

25   statute leaves no one to guess what may not be done.  2006 WL 3499990, at *4.

26   At bottom, "speculation about possible vagueness in hypothetical situations not

27   before the Court will not support a facial attack on a statute when it is surely valid in the

28   vast majority of its intended applications." *Tucson v. City of Seattle*, 91 F.4th 1318, 1330

1    (9th Cir. 2024) (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)) (alteration accepted).

2    And the Arizona court of appeals had no difficulty finding the law to clearly apply to

3    Plaintiff's own filings. *Cf. Goyette*, 458 F.2d at 993 (law not held vague when clearly

4    applicable to challenger's own case).

**B.    Plaintiff's harassment statute challenge fails to state a claim (Count 2).**

In his void for vagueness attack on A.R.S. § 13-2921, Plaintiff again fails to state

a claim. His claim rests on a misconception about what the law criminalizes. Subsection

(E) defines "harass." But A.R.S. § 13-2921 criminalizes only "knowingly and repeatedly

commit[ting] an act or acts that harass another person" and "knowing commit[ting] any

one of" specified acts, "in a manner that harasses." *Id.* (A). These "scienter

requirement[s]" may "mitigate [any] vagueness," *Makowski*, 120 F.3d at 1081, because

they "limit[] the discretion of law enforcement" and prevent prosecution of those who

lack notice. *United States v. Wyatt*, 408 F.3d 1257, 1261 (9th Cir. 2005); *see Village of

Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 503 n.21 (1982).

This dispels Plaintiff's idea that all litigation is, under the statutory definition,

harassment. FAC ¶¶ 210–12. *See State v. Brown*, 207 Ariz. 231, 237–38 ¶¶ 20–21 (Ariz.

App. 2004) (Pelander, J.) (intent requirements in (A) kept statute from criminalizing

various common interactions, such as "delivery of bad news," an interpretation that would

"exceed[] [the statute's] valid reach"); *see also State ex rel. Montgomery v. Harris*, 237

Ariz. 98, 101 ¶ 13 (2014) (in Arizona courts, laws are "construed sensibly").

Finally, even if subsection (A) could reach the act of filing a lawsuit without more

as Plaintiff alleges, that would not be Plaintiff's case. "[T]he summary of Plaintiff's

claims includes . . . plain attempts to harass parties and/or unnecessarily expand litigation

matters." *Potter*, 2024 WL 368095, at *8 ¶ 47; *se*e *Goyette*, 458 F.2d at 993.

**CONCLUSION**

Plaintiff neither establishes federal jurisdiction nor states a valid claim for relief.

Amendment would be futile as Plaintiff seeks constitutional protection for unprotected

conduct. The Court should dismiss the First Amended Complaint with prejudice.

ER-347

1

2      RESPECTFULLY SUBMITTED this 3rd day of June, 2025.

3                              **KRISTIN K. MAYES**
                              **ATTORNEY GENERAL**
4

5
                              By  /s/ *Joshua A. Katz*
6                                  Hayleigh S. Crawford
                                   *Deputy Solicitor General*
7                                  Joshua A. Katz
                                   *Assistant Attorney General*
8                                  Office of the Arizona Attorney General
                                   2005 N. Central Ave.
9                                  Phoenix, Arizona 85004
10

11                                 *Attorneys for Defendant Arizona Attorney*
                                   *General Kristin K. Mayes*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF CONFERRAL**

Pursuant to LRCiv. 12.1(c), undersigned counsel certifies that the parties have conferred to determine whether the issues identified in the motion to dismiss the First Amended Complaint as to Kristin K. Mayes, Arizona Attorney General, could be cured by a permissible amendment offered by the Plaintiff.

Counsel for AG Mayes conferred with self-represented Plaintiff via email on May 30 and June 2, 2025, to discuss the issues and arguments raised in the Motion to Dismiss the First Amended Complaint, namely that the Plaintiff has failed to state a claim on each of his counts and that subject-matter jurisdiction is lacking. Plaintiff did not propose any amendments to his complaint, and the parties were therefore unable to agree that Plaintiffs' complaint is curable in any part by a permissible amendment.

RESPECTFULLY SUBMITTED this 3rd day of June, 2025.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**


By /s/ *Joshua A. Katz*                        
    Hayleigh S. Crawford
    *Deputy Solicitor General*
    Joshua A. Katz
    *Assistant Attorney General*
    Office of the Arizona Attorney General
    2005 N. Central Ave.
    Phoenix, Arizona 85004

    *Attorneys for Defendant Arizona Attorney*
        *General Kristin K. Mayes*

**KRISTIN K. MAYES**
**Attorney General**
(Firm State Bar No. 14000)

Hayleigh S. Crawford (Bar No. 032326)
Joshua A. Katz (Bar No. 039449)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333
Hayleigh.Crawford@azag.gov
Joshua.Katz@azag.gov
ACL@azag.gov

*Attorneys for Defendant Arizona Attorney*
*General Kristin K. Mayes*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Philip Potter, individually and on behalf of all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>Robert Meza, et al.,<br><br>Defendants. | No. CV25-00663-PHX-DWL<br><br>**REPLY IN SUPPORT OF AG MAYES'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

1    After Plaintiff lost a public records case, the Maricopa County Superior Court
2    designated him a vexatious litigant under A.R.S. § 12-3201 and imposed a prefiling
3    requirement.  In addition to his conduct in that litigation, the court considered his broader
4    pattern of repetitive and meritless litigation.  On appeal, Plaintiff challenged both the
5    appropriateness of his designation under the law and the law's constitutionality.  The
6    Arizona court of appeals affirmed.  Undeterred, Plaintiff brought this sprawling case that
7    includes First and Fourteenth Amendment facial challenges to the vexatious litigant
8    statute and, derivatively, to A.R.S. § 13-2921, a statute criminalizing harassment.

9    But the First Amendment does not guarantee unrestricted access to courts,
10   particularly not for abusive filings.  *See Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S.
11   731, 743 (1983) ("[B]aseless litigation is not immunized by the First Amendment right to
12   petition.").  As a result, this case is without merit.  For that reason, and because Plaintiff
13   lacks standing and AG Mayes enjoys sovereign immunity, AG Mayes moved to dismiss
14   the First Amended Complaint as to her (Counts I and II).  Plaintiff's Response has only
15   confirmed that the Court should grant the motion.

16                          **ARGUMENT**

17   **I.    Plaintiff has not established the Court's subject-matter jurisdiction on
18          Counts I (vexatious litigant statute) or II (harassment statute).**

19   While the Court must treat the Complaint's factual allegations as true, its legal
20   allegations are not entitled to that treatment.  *Leite v. Crane Co.*, 749 F.3d 1117, 1121
21   (9th Cir. 2014) ("The district court resolves a facial attack as it would a motion to dismiss
22   under Rule 12(b)(6)"); *see Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017)
23   ("[c]onclusory allegations of law ... are insufficient to avoid dismissal" under Rule
24   12(b)(6) (cleaned up)).  Presumptively, "a cause lies outside [the Court's] limited
25   jurisdiction" until the "party asserting jurisdiction" establishes otherwise.  *Kokkonen v.
26   Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

27

28

                                  1

**A.    Plaintiff lacks Article III standing.**

"Article III standing is a necessary component of subject matter jurisdiction." *In re Palmdale Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011).  To meet his burden of establishing standing, Plaintiff must demonstrate a concrete, particularized injury that is actual or imminent, fairly traceable to the challenged action, and redressable by a favorable court decision.  *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013).  "[I]n cases with multiple defendants," a plaintiff must show "standing as against each defendant." *Sullivan v. Ferguson*, 636 F. Supp. 3d 1276, 1283 (W.D. Wash. 2022).  Plaintiff has not.

**1.    Plaintiff's Response still does not show an injury in fact.**

Plaintiff relies on a pre-enforcement theory to supply his injury in fact.  As the challenged statute is not a criminal law, he relies instead on other statutes, such as A.R.S. §§ 13-2810(A)(2) (interference with judicial proceedings) and 13-2921(A) (harassment) (hence, Count II challenging this statute).[1]  Pltf's Resp. to AG's Mot. to Dismiss, Dkt. 49, at 4.[2]  But none support his theory of standing.

To establish pre-enforcement standing, Plaintiff must show: (1) that "he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) "but proscribed by a statute"; and (3) that "there exists a credible threat of prosecution thereunder."  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014) (cleaned up); *see also Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022).  "[T]he threat of future enforcement must be substantial."  *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024) (cleaned up).

Expanding on the third prong, the Ninth Circuit has "developed a framework to evaluate whether a claimed threat of enforcement is genuine enough to confer standing." *Yellen*, 34 F.4th at 850.  Under that framework, courts consider: (1) whether the plaintiff has a "concrete plan" to violate the law, (2) whether the enforcement authority has issued

---

[1] Because Plaintiff's challenge to the harassment statute is derivative of his challenge to the vexatious litigant statute, the standing analysis is the same for both counts.

[2] Citations to court filings use the ECF pagination, not the document's internal pagination.

ER-352

1  a "specific warning or threat," and (3) whether there is a "history of past prosecution or

2  enforcement under the challenged statute." *Libertarian Party of Los Angeles Cnty. v.*

3  *Bowen*, 709 F.3d 867, 870 (9th Cir. 2013). Although the Court (Dkt. 47, at 10) found that

4  Plaintiff likely satisfies the first factor, his failure to satisfy the latter two is weightier.

5     This framework survived the Circuit's decision in *Peace Ranch* adopting the

6  *Driehaus* approach; both *Peace Ranch* and the later *Planned Parenthood Great Nw.,*

7  *Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 836 (9th Cir. 2024) cite *Yellen*'s use

8  of this third-prong framework. *See* 93 F.4th at 487; 122 F.4th at 836.

9                        **i.     Absence of a specific warning or threat of**
10                               **prosecution.**

11    The warning or threat factor concerns "whether the authorities in charge of

12  enforcing the challenged law have communicated a specific warning or threat to initiate

13  proceedings." *Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022) (citation and

14  quotation marks omitted). Plaintiff has not alleged that AG Mayes or any other authority

15  has actually threatened him with prosecution under A.R.S. §§ 13-2810 (interference with

16  judicial proceedings), 13-2921 (harassment), or 13-3601 (domestic violence).

17    Instead, Plaintiff (at 3–6) relies on the Secretary of State's acceptance of his ex-

18  wife into the Address Confidentiality Program to show a threat. But the Secretary has no

19  criminal enforcement powers. *See* A.R.S. §§ 41-121 to -121.02. The existence of

20  evidence against Plaintiff does not equate to a threat of prosecution.

21    Plaintiff suggests further (at 6) that standing is supported by AG Mayes's refusal

22  to disavow future enforcement. The Court has suggested he might be right as to A.R.S.

23  §§ 13-2810(A)(2) and 13-2921(A). Dkt. 47 at 11.

24    The case law does not yield that conclusion. For starters, the Ninth Circuit has

25  made clear that the absence of a disavowal, standing alone, does not establish jurisdiction.

26  *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) ("[W]e cannot go so far as to

27  say that a plaintiff has standing whenever the Government refuses to rule out use of the

28  challenged provision."). And "[i]t is well settled that evidence of past instances of

1    enforcement is important in a standing inquiry." *Id*.  Thus, the *absence* of past

2    enforcement must also be important.  *See San Diego Cnty. Gun Rights Comm. v. Reno*,

3    98 F.3d 1121, 1128 (9th Cir. 1996) ("absence of any past prosecutions … undercuts" a

4    "genuine threat of prosecution"), *overruled in part on other grounds*, *District of Columbia*

5    *v. Heller*, 554 U.S. 570 (2008).  And that absence is especially important where, as here,

6    statutes have been in place for many years.

7         Of course, "[i]n challenging a *new* law whose history of enforcement is *negligible*

8    *or nonexistent* ... a 'failure to disavow enforcement' is sufficient to establish a credible

9    threat of prosecution."  *Matsumoto v. Labrador*, 122 F.4th 787, 797 (9th Cir. 2024)

10   (emphases added) (quoting *Tingley*, 47 F.4th at 1068).  But that is nowhere near what we

11   have here.  Sections 13-2810, 12-3201, and 13-2921 have been on the books since 1977,

12   2014, and 1992, respectively.[3]  By contrast, the law at issue in *Matsumoto* was "less than

13   six months old."  122 F.4th at 798.  Enough time has lapsed to rely on history.

14                    **ii.    No history of comparable prosecutions.**

15        Relatedly, Plaintiff (at 3–6) also fails to establish a history of past enforcement

16   under the relevant, long-lived statutes for the conduct at issue—filing documents in

17   violation of a vexatious litigant order.  As the Court observed, "it is irrelevant that AG

18   Mayes may have, in general, pursued past prosecutions" under the relevant statutes;

19   Plaintiff must show prosecutions "where the underlying conduct ... was the unauthorized

20   filing of court documents in violation of a vexatious litigant order."  Dkt. 47 at 12.

21        The absence of both a specific threat of enforcement and a history of enforcement

22   outweigh Plaintiff's possession of a plan to violate his prefiling order.  Plaintiff has not

23   established a credible fear of prosecution and lacks pre-enforcement standing.

24                **2.    The Response fails to trace any injury to AG Mayes.**

25        Even if Plaintiff could establish injury in fact, he fails to show that any injury is

26   fairly traceable to AG Mayes.  Traceability requires a causal connection between the

27

28   _____

     [3] Section 13-2810 is unmodified.  Section 12-3201 was amended in 2015.  Section 13-
     2921 has been amended several times, the latest in 2022.

1    defendant's conduct and the plaintiff's injury, not the conduct of "some third party not

2    before the court." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).

3         But Plaintiff's filing restrictions were imposed by a court, not AG Mayes, who

4    played no role in Plaintiff's designation.  And, if he were to file papers in violation of the

5    order, it is the court that would enforce them in the first instance.  Plaintiff's opposition

6    confirms that he still cannot show "a reasonable expectation that [AG Mayes] might bring

7    an enforcement action against" him.  *Ariz. Contractors Ass'n v. Napolitano*, No. 07-1355-

8    PHX-NVW, 07-1684-PHX-NVW, 2007 WL 9723967, at *9 (Dec. 10, 2007).

9         Plaintiff (at 6–7) misapprehends his burden in pointing out that a chain of causation

10   may be long and need only be plausible.  The problem here is the lack of a "direct" chain

11   (and in fact, any chain at all) linking AG Mayes to any act or omission relevant to

12   Plaintiff.  *See Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d

13   738, 748 (9th Cir. 2020).  His proposed chain, instead, begins with his vexatious actions,

14   proceeds to a motion and decision by others, and may someday (he says) reach some sort

15   of enforcement action by someone.  *Cf. Clapper*, 568 U.S. at 414 ("speculation about the

16   decisions of independent actors" is insufficient).

17        As AG Mayes previously explained (MTD, Dkt. 38, at 9–10), all Plaintiff has to

18   go on to reach her is a general supervisory power over county attorneys and that AG

19   Mayes may generally take or assist in enforcement actions "at the direction of the

20   governor" or "if deemed necessary by" AG Mayes.  A.R.S. § 41-193(A)(2), (4), (5).  But

21   general supervisory power is insufficient.  *See S. Pac. Transp. Co. v. Brown*, 651 F.2d

22   613, 614–15 (9th Cir. 1980) ("The attorney general's power to direct and advise does not

23   make the alleged injury fairly traceable to his action.").  And Plaintiff makes no effort to

24   show that AG Mayes's involvement in such a prosecution would be "directed" or

25   "deemed necessary."

26        Plaintiff responds that it does not matter who would prosecute him, because

27   "standing is not short-circuited by the fact that there are multiple authorized enforcers of

28   the statute."  Dkt. 49, at 7 (quoting *Matsumoto*, 122 F.4th at 798).  The Court suggests he

1    may be right.  Dkt. 47, at 12 n.5.  But this fails for three reasons.  First, *Matsumoto* was

2    discussing injury in fact, not traceability.  Second, as discussed above, Plaintiff has failed

3    to show his chain terminates in *any* enforcer.  Third, *Matsumoto* involved multiple

4    officials with direct enforcement authority over a criminal statute; each was a "vessel[]

5    through which the statute's effects—by its own terms—flow[ed]."  122 F.4th at 799.  AG

6    Mayes is not such a vessel; the statute's "own terms" make no mention of her, and any

7    enforcement powers she may have would be indirect.  This case is thus more like *Clapper*,

8    where standing would have required the Court to speculate about decisions by

9    "independent actors," here the courts and county attorneys.  *See* 568 U.S. at 414.

10    Accordingly, Plaintiff has not shown that his alleged injury would be fairly

11    traceable to AG Mayes.

12          **3.    The Response fails to explain how an injunction against AG**
13                  **Mayes would redress any injury.**

14    Plaintiff also cannot show that any relief against AG Mayes would "likely" redress

15    his alleged injuries.  *See Lujan*, 504 U.S. at 561 ("It must be 'likely,' as opposed to merely

16    'speculative,' that the injury will be 'redressed by a favorable decision.'" (citations

17    omitted)).  Here, as explained in the motion to dismiss (at 9–10), enjoining AG Mayes

18    would not prevent courts from designating litigants vexatious or from refusing to receive

19    papers from vexatious litigants without leave, nor would it prevent any (unlikely)

20    prosecutions by county attorneys under either challenged statute.

21    Plaintiff's assertion (at 8) that AG Mayes "tacitly admits" her authority by calling

22    the prosecution "unlikely" misstates the issue.  The relevant question is not whether

23    prosecution is theoretically possible, but whether enjoining AG Mayes would likely

24    provide Plaintiff the relief he seeks.  It would not.

25          **B.    The Response does not resolve the sovereign immunity issues.**

26    As AG Mayes previously explained (MTD at 11–12), she is not a proper defendant

27    as to Count I under *Ex Parte Young*.  Sovereign immunity generally bars suits against a

28    state.  *See generally* U.S. Const. amend. 11.  A plaintiff may challenge the

1    constitutionality of a statute, though, by seeking injunctive relief against a state officer.

2    *Green v. Mansour*, 474 U.S. 64, 68 (1985); *see Ex Parte Young*, 209 U.S. 123, 159–60

3    (1908).   But that officer must have "some connection" to the law's enforcement.

4    *Matsumoto*, 122 F.4th at 802.  Plaintiff's only response (at 8–9) to AG Mayes's argument

5    that she lacks such a connection is to gesture at general prosecutorial and supervisory

6    powers, despite her powers being limited to those granted by statute.  *See* Ariz. Const.,

7    art. 5, § 9 ("The powers and duties of … attorney general … shall be as prescribed by

8    law.").  This fails, much as it does for standing.  *See Coal. to Defend Affirmative Action*

9    *v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) ("a generalized duty to enforce state law"

10   does not establish the requisite connection to enforcement).

11       Plaintiff's citation (at 9) to *Matsumoto* for the proposition that the Arizona

12   Attorney General "has the authority … to prosecute a person for a criminal violation of

13   this section" fares no better.   122 F.4th at 802.   *Matsumoto* involved a statute that

14   explicitly authorized the attorney general to initiate enforcement.  *Id.*  That is not the case

15   here.  Similarly, *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919–20

16   (9th Cir. 2004) dealt with an attorney general empowered to "do every act that the county

17   attorney can perform."  *Id.* at 920.  And the law in question explicitly provided for civil

18   and criminal penalties.  *See* Idaho Code § 18-605, *held unconstitutional on other grounds*,

19   *McCormack v. Hiedeman*, 900 F. Supp. 2d 1128 (D. Idaho 2015).  As noted, AG Mayes

20   has only those powers given her by statute, and the vexatious litigant statute does not

21   provide for any penalties beyond a prefiling requirement

22       Nor is Plaintiff's theory (at 9) that AG Mayes might theoretically prosecute him

23   under other statutes a "fairly direct" connection to § 12-3201's enforcement.  *See Coal.*

24   *to Defend Affirmative Action*, 674 F.3d at 1134 (citation omitted).

25   **II.    Plaintiff fails to state a claim for which he is entitled to relief.**

26       In deciding a Fed. R. Civ. P. 12(b)(6) motion, allegations of material fact are taken

27   as true and viewed favorably to the nonmoving party, while "conclusory allegations of

28   law and unwarranted inferences" are not.  *Kwan*, 854 F.3d at 1096 (cleaned up).  A court

1    must dismiss once shown either the "lack of a cognizable legal theory" or the "absence

2    of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside*

3    *Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008).

### A. Plaintiff's challenge to the vexatious litigant statute fails to state a claim.

6    Plaintiff fails to state a claim that A.R.S. § 12-3201 facially violates the First or

7    Fourteenth Amendments. The statute (1) does not infringe the First Amendment, (2) is

8    not void for vagueness, and (3) does not infringe procedural due process guarantees.

9    Plaintiff's response does not demonstrate he can establish otherwise.

### 1. Plaintiff cannot make out a case that the statute violates the First Amendment.

#### a. The Response confirms that the statute is not overbroad.

13    As discussed in the motion to dismiss (at 11), and by the Court (Dkt. 47, at 17), a

14    law survives an overbreadth challenge if it has a "plainly legitimate sweep" not

15    "substantially outweigh[ed]" by any unconstitutional applications. *Moody v. NetChoice,*

16    *LLC*, 603 U.S. 707, 723–24 (2024). Prefiling review allows a vexatious litigant to file

17    protected, but not unprotected, papers. *See Wolfe v. George*, 486 F.3d 1120, 1125 (9th

18    Cir. 2007) (noting "the courthouse doors are not closed" to a vexatious litigant). The

19    plainly legitimate sweep includes unprotected filings that are stopped on prefiling review.

20    *Id.* ("[T]here is no constitutional right to file frivolous litigation."). *Accord Grundstein*

21    *v. Ohio*, No. 06-2381, 2006 WL 3499990, at *4 (N.D. Ohio Dec. 5, 2006) (upholding

22    Ohio prefiling requirement because it "does not regulate conduct protected by the First

23    Amendment"). Only when a court mistakenly blocks a protected filing does the law

24    impact protected speech. Plaintiff gives no reason to think such mistakes will

25    "substantially" outweigh constitutional applications. Indeed, there is every reason to

26    think the vast majority of applications will be to block unprotected papers. And even

27    when such mistakes occur, a litigant may seek special action review, introducing yet a

28    third opportunity for judicial scrutiny.

ER-358

1    Plaintiff gives two responses (at 15–16), neither meritorious.  First, he argues that

2    any prefiling requirement is overbroad if it "is designed to prevent [a plaintiff] from filing

3    any complaint in any case without leave of court" (quoting *Moy v. United States*, 906 F.2d

4    467, 471 (9th Cir. 1990) (alteration in original)).  But *Moy* held only that where the litigant

5    had restricted his vexatious conduct to "facts and issues involved" in a particular case, the

6    injunction should have been so limited.  *Moy*, 906 F.2d at 470.  And other prefiling

7    requirements with the same effect have been upheld.  *See, e.g.*, *Wolfe*, 486 F.3d at 1124

8    (prefiling order "prohibits a vexatious litigant from filing any new litigation in the courts

9    of th[e] state in propria persona without first obtaining leave of the presiding judge").

10    Second, he posits every judge, trial and appellate, will get it wrong and prohibit

11    constitutionally protected filings by applying the statute's plain language.  But this puts

12    the cart before the horse by assuming what Plaintiff must prove.

### b.  Plaintiff continues to misread *Ringgold-Lockhart*.

14    Plaintiff (at 12–15) attempts to bolster his First Amendment case by looking to

15    *Ringgold-Lockhart v. County of Los Angeles*, 761 F.3d 1057 (9th Cir. 2014).  But he

16    continues to misread that case as imposing a heightened two-part standard for prefiling

17    orders.  As discussed in the motion to dismiss (at 13–14) and confirmed by the Court

18    (Dkt. 47, at 13), that case permits courts to impose prefiling restrictions based on either a

19    pattern of harassment or frivolousness, rather than demanding both.  *Id*. at 1062, 1064

20    ("As an alternative to frivolousness, the district court may make an alternative finding

21    that the litigant's filings 'show a pattern of harassment.'" (quoting *De Long v. Hennessey*,

22    912 F.3d 1144, 1148 (9th Cir. 1990)).

### c.  Plaintiff's reliance on the *Noerr-Pennington* doctrine remains misplaced.

25    Plaintiff also cannot rescue his claims by relying (at 11–15) on the *Noerr-*

26    *Pennington* doctrine.  As explained in the motion to dismiss (MTD at 13–14), the *Noerr-*

27    *Pennington* doctrine is a "rule of statutory construction," not a substantive constitutional

28    test.  *See United States v. Koziol*, 993 F.3d 1160, 1171 (9th Cir. 2021).  The doctrine

instructs courts to "construe federal statutes so as to avoid burdening" petitioning rights. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006). But in a facial challenge, a narrowing construction avoids, not creates, constitutional difficulties. *See id.* at 931 n.5 (doctrine is "a specific application of the rule of statutory construction known as the canon of constitutional avoidance"). Plaintiff's choice to launch a facial challenge has consequences. And that choice was his stated reason the case does not run afoul of *Rooker-Feldman*. Pltf's Resp. to OSC, Dkt. 27, at 2; *see also* Dkt. 47, at 7–8 & n.3.

### 2.    Plaintiff cannot establish his vagueness claim.

Plaintiff's facial vagueness challenge to A.R.S. § 12-3201 fails as a matter of law. "[P]erfect clarity is not required even when a law regulates protected speech." *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1019 (9th Cir. 2010). A law's language need not yield "mathematical certainty." *Id.* (citation omitted). Rather, it is enough that "ordinary people have fair notice of the conduct that a statute proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018) (cleaned up).

As the Court previously noted (Dkt. 47, at 18), the vexatious litigant statute is clear in the "vast majority of its intended applications." *Tucson v. City of Seattle*, 91 F.4th 1318, 1330 (9th Cir. 2024). This includes Plaintiff's case. *See United States v. Goyette*, 458 F.2d 992, 993 (9th Cir. 1972) ("[A] statute will not be ruled void for vagueness when it is sufficient to give the particular defendant notice that his conduct is illegal.").

Plaintiff responds (at 16) that A.R.S. § 12-3201(E) is facially invalid because it lacks an "objective standard"; specifically, a required number of prior filings. But he cites no authority for this hypothesized requirement.

### 3.    The lack of an express hearing requirement does not violate procedural due process.

AG Mayes previously demonstrated (MTD at 15–17), and the Court acknowledged (Dkt. 47, at 15–16), that the vexatious litigant statute meets procedural due process requirements to the degree a liberty interest is at stake. Arizona courts have adopted the procedural protections required by the Ninth Circuit. *See, e.g.*, *Contreras v. Bourke*, 556

ER-360

1    P.3d 291, 300 ¶ 28 (Ariz. App. 2024) (Ninth Circuit procedural requirements "apply to

2    pre-filing restrictions entered under either § 12-3201 or the court's inherent authority"

3    (citing *Madison v. Groseth*, 230 Ariz. 8, 14 ¶ 18 (App. 2012) (Timmer, J.)); *see also*

4    *Potter v. Ariz. House of Reps.*, No. 23-0213, 2024 WL 368095, at *7 ¶ 44 (Feb. 1, 2024).

5          Plaintiff responds in two ways, neither meritorious. Plaintiff first responds (at 15)

6    that the law lacks an express hearing provision. But it is the construction given by

7    Arizona courts, not Plaintiff, that the Court should heed. *See Easyriders Freedom*

8    *F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1494 n.4 (9th Cir. 1996).

9          Plaintiff next responds (at 16) that this is a disputed matter of law and so may not

10    be resolved on the pleadings. But that misstates the Rule 12(b)(6) standard, which calls

11    for dismissal when a complaint lacks a viable legal theory.

12        **B.**    **The Response's citation of a floor debate is not sufficient to show the**

13              **harassment statute vague.**

14          Plaintiff also fails to state a claim in his void for vagueness challenge to A.R.S.

15    § 13-2921, and his response (at 18) does not address the deficiencies identified in the

16    motion to dismiss (at 18). *See State v. Brown*, 207 Ariz. 231, 237–38 ¶¶ 20–21 (Ariz.

17    App. 2004) (Pelander, J.) (rejected vagueness challenge to harassment statute as satisfied

18    by scienter requirements in (A)).

19          Plaintiff's reliance (at 17) on floor statements by two Arizona legislators to show

20    that the statute was "controversial" does not change this result. As courts have repeatedly

21    held, individual legislators' views do not control the constitutional analysis. *See N.L.R.B.*

22    *v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017) (noting "floor statements by individual

23    legislators rank among the least illuminating forms of legislative history"). Two

24    lawmakers' comments are not evidence that § 13-2921 is unconstitutionally vague.

25                     **CONCLUSION**

26          Plaintiff fails to establish a basis for federal jurisdiction and does not state a claim

27    for which relief may be granted. The court should therefore dismiss the First Amended

28    Complaint with prejudice.

1    **RESPECTFULLY SUBMITTED** this 18th day of July, 2025.

2                                  **KRISTIN K. MAYES**
                                   **ATTORNEY GENERAL**
3

4
     By  /s/ *Joshua A. Katz*
5                *Hayleigh S. Crawford*
                 *Deputy Solicitor General*
6                Joshua A. Katz
                 *Assistant Attorney General*
7                Office of the Arizona Attorney General
                 2005 N. Central Ave.
8                Phoenix, Arizona 85004
9
                 *Attorneys for Defendant Arizona Attorney*
10                   *General Kristin K. Mayes*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Phillip Potter
    2301 N. 66th Street
2   Scottsdale, Arizona 85257
3   Phone: 480.459.0310
    E-Mail: phillip.t.potter@gmail.com
4   Plaintiff
    Pro Se
5

6               **IN THE UNITED STATES DISTRICT COURT**

7                 **FOR THE DISTRICT OF ARIZONA**

8

9

10  Phillip Potter,                          No. 2:25-cv-00663-PHX-DWL

11              Plaintiff,

12  v.                                       **FED. R. CIV. P.  65
                                             MOTION FOR TEMPORARY
13  Robert Meza, in his private              RESTRAINING ORDER AND
    capacity; Karrin Taylor Robson, in      PRELIMINARY INJUNCTION
14  her private capacity; Alane              RE: DEFENDANT MAYES
    Ortega; Kris Mayes, in her official      AND DEFENDANT WELTY**
15  capacity as Arizona Attorney
    General; Joseph Welty, in his
16  official administrative capacity as
    Presiding Judge of the Maricopa
17  County Superior Court; and Does
    1-60, inclusive,
18

19

20              Defendants.

21

22

23

24

25

26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

   This case presents a First Amendment facial challenge to Arizona's vexatious litigant statute, A.R.S. § 12-3201.  "[T]he right of access to the courts is a fundamental right protected by the Constitution."  *Delew v. Wagner*, 143 F.3d 1219, 1222 (9th Cir. 1998).  To safeguard that right of access, the Petition Clause guarantees litigation "may not be enjoined" unless the complaint is *both* "objectively baseless" in toto *and* filed for an "improper, malicious purpose".  *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-62, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (emphasis added); *BE & K Constr. Co. v. N.L.R.B.,* 536 U.S. 516, 531, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) (Litigation may be enjoined only if it is "both objectively baseless[1] *and* subjectively motivated by an unlawful purpose") (emphasis original); *Sosa v. DIRECTV, Inc*., 437 F.3d 923, 934 (9th Cir. 2006) (To forfeit or burden the Petition Clause's protections, "*both* objective baselessness and an improper motive" must be demonstrated) (emphasis original).  This two-prong conditional requirement echoes in the *Noerr-Pennington* doctrine which "stands for a generic rule of statutory construction, applicable to *any* statutory interpretation that could implicate the rights protected by the Petition Clause. ... [W]e must give adequate 'breathing space' to the right of petition.  ... [U]nder the breathing space principle, ... [only] 'sham litigation' [characterized by *both*] objective baselessness *and* an improper motive" may be enjoined.[2]  *Id* at 931-32 (emphasis added).

---

[1] Litigation is "objectively baseless" only if the underlying complaint contains no claim that arguably presents any "genuine issue of material fact ... or law" at filing.  *Pro. Real Est. Invs.*, 508 U.S. at 61.  Once a lawsuit has been decided and lost, "a court must 'resist the understandable temptation to engage in post hoc reasoning by concluding' that an ultimately unsuccessful 'action must have been unreasonable or without foundation.' ...We do not lightly conclude in any [] case that the litigation in question is objectively baseless".  *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) (internal citations omitted).
[2] Arizona courts and the Ninth Circuit treat vexatious litigant pre-filing restrictions as a species of injunction.  *Moy v. United States,* 906 F.2d 467, 470 (9th Cir. 1990); *Madison v. Groseth,* 230 Ariz. 8, 279 P.3d 633, 638-39 (App. 2012).

That said, enjoining a single lawsuit is fundamentally different from enjoining a *litigant* from filing *any* lawsuit absent leave of the court. The latter scenario implicates far greater threats to the Petition Clause. To stave off such threats, the Ninth Circuit established that courts must look to standards well beyond *Noerr-Pennington* when considering vexatious litigant injunctions. *See Ringgold-Lockhart v. County of Los Angeles,* 761 F.3d 1057, 1061 (9th Cir. 2014) (Any "pre-clearance requirement imposes a substantial burden on the free-access guarantee. ... Out of regard for the constitutional underpinnings of the right to court access ... [vexatious litigant injunctions may be issued] *only if* courts comply with certain procedural and substantive requirements") (emphasis added). Those heightened standards require not just that a single suit be evaluated for both objective baselessness and an improper motive, but that a comprehensive historical review of all lawsuits involving common parties and claims be conducted before courts may abridge a litigant's right of access to the courts. *Id* at 61-64; *see also* Ariz. Const. art. 2 § 5 ("The right of petition, ... shall never be abridged"). Built on the same line of precedent as *Noerr-Pennington*, the Ninth Circuit established that courts may find a pro se litigant vexatious *only if* there are heightened procedural and "substantive findings as to the frivolous or harassing nature of the litigant's actions." *Ringgold,* 761 F.3d at 1064. This "*Ringgold* Standard" requires trial judges to comprehensively review court records and evaluate all cases for *both* the presence of *serial* objectively baseless litigation *and* a demonstration of *serial* improper purposes in the form of (1) an "inordinate" number of "frivolous" suits, or (2) suits of a "harassing nature", meaning every case in a long series of cases must be found to be *both* objectively baseless *and* filed for an improper purpose, thus demonstrating a heightened "pattern of harassment" involving common defendants and claims. (Doc. 14 at 133-139.)

Enacted *after Ringgold*, the Arizona Legislature disregarded the U.S. Supreme Court's and the Ninth Circuit's guidance when it copied sanctions statute A.R.S. § 12-349 nearly verbatim to cobble together A.R.S. § 12-3201 (the "Statute") (Doc. 14 at 121, 122.) The Statute unlawfully attaches a § 12-3201(B) permanent blanket injunction to all litigation. (Doc. 14 at 188-192.) It also falls woefully short of *Noerr-Pennington* requirements and the *Ringgold* Standard. In fact, A.R.S. § 12-3201 is so vague and overbroad that Arizona courts are now finding self-represented *defendants* statutorily vexatious for filing unsuccessful motions in single cases, and forever denying those litigants their First Amendment rights in permanent blanket fashion. (Doc. 14 at 119.)

The Statute is also being weaponized. In this case state officials strategically used A.R.S. § 12-3201 as a litigation "sword" to obscure their misconduct. Beholden to the Statute, rather than to the Petition Clause, *Noerr-Pennington*, or *Ringgold*, a court found Plaintiff statutorily vexatious in public records litigation that confirmed a state legislator was trading his public office for private gain. (Doc. 14 at 1-79.)[3] Plaintiff is now prohibited from filing court papers in any suit absent prior leave of the court despite trial courts and appellate courts determining that Plaintiff prosecuted, and continues to prosecute, well-founded litigation. (Doc. 14 at 76-80, 240-243.) Compounding matters, Defendants Mayes and Welty now threaten Plaintiff with administrative[4], civil, and criminal enforcement of the facially unconstitutional Statute (Doc. 14 at 103-104.) which (1) cannot be squared with the *Noerr-Pennington* doctrine that "applies equally in all

---

[3] A "plaintiffs' facial challenge [i]s not 'inextricably intertwined' with the judicial decision of the local court [if] it [i]s a general challenge to the constitutionality of" a statute. *Noel v. Hall*, 341 F.3d 1148, 1157 (9th Cir. 2003). Therefore, this facial challenge to A.R.S. § 12-3201 is not subject to the *Rooker-Feldman* doctrine. *Id.*

[4] The Hon. John Welty is brought to suit in his official *administrative* capacity only, not his judicial capacity. (Doc. 14 at 104).

3

[statutory] contexts", *White,* 227 F.3d at 1231; (2) lacks a requisite hearing provision and thus violates procedural due process in every application (Doc. 14 at 193-194.); (3) contains the § 12-3201(B) provision mandating a permanent blanket injunction, and thus is unconstitutional in every application (Doc. 14 at 188-192.); and (4) contains A.R.S. § 12-3201(E)(1)(a)-(f) definitions of "vexatious conduct" that do not satisfy the heightened *Ringgold* Standard. (Doc. 14 at 123-187.)  In the end, A.R.S. § 12-3201 facially violates the First Amendment's Petition Clause due to vagueness and overbreadth.  *Grayned v. Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222, 227 (1972) ("[W]here a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'"); *Moody v. NetChoice, LLC,* 144 S. Ct. 2383, 2397 (2024) (A state law is overbroad if it "lacks a plainly legitimate sweep. ... [W]hen a facial suit is based on the First Amendment, ... [the law is also void if] 'a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'").  (Doc. 14 at 110, 123.)

Per Fed. R. Civ. P. ("Rule") 65, Plaintiff moves the Court to enjoin Defendants Mayes and Welty from enforcing the Statute in any manner.  *See Matsumoto v. Labrador*, 122 F.4th 787, 802 (9th Cir. 2024) ("*Ex parte Young* [] allows 'actions for prospective declaratory or injunctive relief against [S]tate [O]fficers in their official capacities for their alleged violations of federal law,' provided that the officer has 'some connection with the enforcement of the act'"); *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004) ("[A] mere scintilla of enforcement" connection is sufficient to invoke *Ex parte Young*).  Specifically, Plaintiff asks the Court to issue a Temporary Restraining Order ("TRO") and to schedule Preliminary Injunction ("PI") proceedings as he meets those requirements.  Plaintiff is likely to succeed on the merits.

Absent such relief, he will suffer irreparable harm in the form of ongoing fundamental rights deprivations and other imminently threatened deprivations. Both the balance of equities and the public interest also strongly favor granting the requested relief. Plaintiff satisfied Rule 65 notice requirements by serving Attorney General Mayes ("AG Mayes") on May 13, 2025, and he has arranged imminent personal service or waiver via Judge Welty's counsel. He will also promptly serve the other Defendants not subject to this Motion. Due to Plaintiff being imminently threatened with future irreparable injuries, no further notice should be required. *See* Rule 65(b)(1)(A), (B). Plaintiff also requests the Court waive any security requirement. *See* Rule 65(c). This Motion is based on the following Memorandum in Support, the First Amended Complaint, and its supporting documents and exhibits, and other evidence and arguments which may be presented.

**MEMORANDUM IN SUPPORT**

"[T]he right[] ... to petition for a redress of grievances [is] among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers of America v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). And "[t]he right of access to the courts is indeed but one aspect of the right of petition". *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) "Restricting access to the courts is ... a serious matter." *Ringgold,* 761 F.3d at 1061. "Out of regard for the constitutional underpinnings of the right to court access ... [vexatious litigant injunctions must] comply with certain procedural and substantive requirements". *Id* at 1061-62. The Statute fails those constitutional mandates.

I. BACKGROUND

   A. The Statute

      Effective January 1, 2015, A.R.S. § 12-3201 purportedly established a statutory

ER-368

authority that codified and complemented courts' inherent authority to administratively

manage their dockets in the government interest of judicial efficiency.  The Statute reads:

> A. In a noncriminal case, at the request of a party or on the court's own motion, the presiding judge of the superior court or a judge designated by the presiding judge of the superior court may designate a pro se litigant a vexatious litigant.
> B. A pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court.
> C. A pro se litigant is a vexatious litigant if the court finds the pro se litigant engaged in vexatious conduct.
> D. The requesting party may make an amended request at any time if the court either:
>    1. Determined that the party is not a vexatious litigant and the requesting party has new information or evidence that is relevant to the determination, even if there is not a pending case in the court.
>    2. Did not rule on the original request during the pendency of the action, even if there is not a pending case in the court.
> E. For the purposes of this section:
>    1. "Vexatious conduct" includes any of the following:
>       (a) Repeated filing of court actions solely or primarily for the purpose of harassment.
>       (b) Unreasonably expanding or delaying court proceedings.
>       (c) Court actions brought or defended without substantial justification.
>       (d) Engaging in abuse of discovery or conduct in discovery that has resulted in the imposition of sanctions against the pro se litigant.
>       (e) A pattern of making unreasonable, repetitive and excessive requests for information.
>       (f) Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation.
>    2. "Without substantial justification" has the same meaning prescribed in section 12-349.

### B. A.R.S. § 12-3201 Does Not Provide Procedural Or Substantive Due Process

As a matter of procedural due process, a self-represented litigant facing a possible

vexatious injunction must be afforded a fair opportunity to be heard during an evidentiary

hearing in opposition.  *Ringgold,* 761 F.3d at 1062-63.  But the Statute contains no

hearing provision on a matter affecting First Amendment rights, and thus violates the

1    U.S. Constitution in every application. (Doc. 14 at 193-194.)

2          Regarding substantive due process, the Ninth Circuit established that a vexatious

3    injunction can only be issued if certain standards are met even beyond the "objective

4    baselessness and an improper motive" *Noerr-Pennington* conditions. *See Ringgold,* 761

5    F.3d at 1062-66. (Doc. 14 at 133-187.)  Per that heightened *Ringgold* Standard, any suit

6    sparking a vexatious inquiry must be objectively baseless, but the pro se litigant also

7    must demonstrate a serial history of bringing objectively baseless suits, provided those

8    suits reached finality so judicial notice could be properly taken. *Id* at 1064; *In re*

9    *Powell,* 851 F.2d 427, 432 (D.C. Cir. 1988) (Courts "should be careful not to review

10   pending cases … complaints that predated the [motion for vexatious] injunction were still

11   pending at the time the injunction was imposed and, as such, could not have been

12   reviewed" for being baseless); *see also Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th

13   Cir. 2001).  If any of those heightened "baseless" conditions are not met, the examination

14   is complete, and the litigant cannot be found vexatious.  However, if those conditions are

15   all met, past and present baseless litigation may then be reviewed for evidence of serial

16   subjective "improper motives" in the form of either (1) an "inordinate" amount of

17   "frivolous" lawsuits, or (2) a "pattern of harassment" involving common parties and

18   claims.  Only then does the First Amendment permit a pro se plaintiff to be deemed

19   vexatious, so long as any resulting injunction is "narrowly tailored to the problem before

20   it". *Ringgold*, 761 F.3d at 1066.  Because no A.R.S. § 12-3201(E)(1)(a)-(f) provision

21   meets the U.S. Supreme Court's two-prong conditional requirement for enjoining a single

22   suit, or even approaches the Ninth Circuit's *Ringgold* Standard needed to abridge or

23   burden the fundamental right of access to the courts, the Statute violates substantive due

24   process in every application. (Doc. 14 at 124-187, 195-207.)

## C. A.R.S. § 12-3201 Was Intentionally Weaponized To Deprive Fundamental Rights

Weaponizing the Statute for the purpose of evading public scrutiny, the Arizona House of Representatives (the "House") and former State Representative Robert Meza moved for Plaintiff to be found an A.R.S. § 12-3201(C) "vexatious litigant" within the course of A.R.S. § 39-121, *et seq.* public records litigation which produced documents confirming Meza's pattern of using government resources, and acting under color of office, to trade his public office for private gain. (Doc. 14 at 1-42, 60-82.)[5]  At that point no other litigation involving Plaintiff had been finalized, much less found baseless.  To the contrary, prior lawsuits and concurrent lawsuits were deemed well-founded in other trial courts and appellate courts.  And neither the House nor Rep. Meza in his official capacity appeared as common defendants in any other litigation involving Plaintiff.

## D. A.R.S. § 12-3201 Is Being Criminalized to Threaten More Rights Deprivations

Arizona's Secretary of State has entered official documents asserting Plaintiff committed criminal acts traced directly to A.R.S. § 12-3201. (Doc. 14 at 92-98.)  In brief, the State of Arizona now deems Plaintiff to have violated A.R.S. § 12-3201, and thus to have perpetrated §§ 13-3601/3602 Domestic Violence, for filing motion papers in well-founded lawsuits absent leave of the court.  AG Mayes now threatens Plaintiff with criminal and civil prosecution for § 13-2810(A)(2) Interfering With Judicial Proceedings[6] and/or § 13-2921 Harassment violations – imminently threatened, and reasonably feared,

---

[5] *See Phoenix Newspapers, Inc. v. Keegan,* 201 Ariz. 344, 351 ¶ 33, 35 P.3d 105, 112 (App. 2001) ("The core purpose of the public records law is to allow the public access to official records and other government information so that the public may monitor the performance of government officials and their employees.").

[6] Per A.R.S. § 13-2810(A)(2), "[a] person commits interfering with judicial proceedings if such person knowingly: ... 2. Disobeys or resists the lawful order, process or other mandate of a court".  Filing motion papers absent leave of court allegedly "disobeys or resists" an A.R.S. § 12-3201 order, in supposed violation of A.R.S. § 13-2810(A)(2).

unlawful deprivations of liberty and of separation from his son per A.R.S. §§ 13-3601[7] and 13-3602[8]. (Doc. 14 at 98, 103.) And Judge Welty as "presiding judge ... may designate a pro se litigant a vexatious litigant" by administratively adding Plaintiff to a "Vexatious Litigant List" per A.R.S. § 12-3201(A).[9] Such administrative enforcement action further threatens Plaintiff's First Amendment petition rights. (Doc. 14 at 104, 111.)

## II. LAW AND DISCUSSION

A court may grant injunctive relief when the movant "establish[es] [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tip in his favor, and [4] that an injunction is in the public interest." *Aleman Gonzalez v. Barr*, 955 F.3d 762, 768 (9th Cir. 2020) quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Factors three and four "merge when the Government is the opposing party". *Nken v. Holder,* 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). Courts apply this approach to TRO and PI motions. *See e.g., Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, a TRO or PI "is appropriate when the [movant] demonstrates ... that serious questions going to the merits were raised and the balance of the hardships tips sharply in [his] favor, ... so long as [he] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id* at 1134-35. Every

---

[7] A.R.S. § 13-3601 triggers when a former spouse violates § 13-2810 or § 13-2921.
[8] A.R.S. § 13-3602(A) permits civil protective orders to be issued based on any A.R.S. § 13-3601 violation. The Attorney General "may seek any appropriate protective court order", including based on any A.R.S. § 13-3601 predicate, per A.R.S. § 13-4433(D).
[9] See https://tinyurl.com/2x4unmjx.

element is satisfied here.

A. Plaintiff Is Likely To Succeed On The Merits

To overcome First Amendment protections, the Statute would need to codify the *Ringgold* Standard. *See Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981) ("District courts are bound by the law of their own circuit."). But A.R.S. § 12-3201 patently violates *Ringgold* and violates the Petition Clause in every application.

1. The Statute Violates Procedural Due Process

Procedural due process requires fair notice and "the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 339-343 (1976). When "the private interest that will be affected by the official action" arises from the First Amendment and there is "the risk of an erroneous [permanent] deprivation of such interest", *Id*, due process demands a hearing. But the Statute has no provision requiring a hearing be conducted in opposition to an A.R.S. § 12-3201(A) motion, as it must per logic and the Ninth Circuit. *See Ringgold,* 761 F.3d at 1062-63. Accordingly, the Statute violates procedural due process in every application. (Doc. 14 at 193-194.)

2. The Statute Violates Substantive Due Process

a. A.R.S. § 12-3201(B) Violates the Overbreadth Doctrine

Per A.R.S. § 12-3201(B), "[a] pro se litigant who is designated a vexatious litigant may not file a new pleading, motion or other document without prior leave of the court". This permanent blanket injunction is facially designed to prevent a pro se litigant from filing any complaint in any case without leave of the court, and the Ninth Circuit has made it clear that a vexatious litigant injunction is unconstitutionally "overbroad [if] it is designed to prevent [a pro se litigant] from filing any complaint in any case without leave of court". *Moy,* 906 F.2d at 471. Consequently, A.R.S. § 12-3201(B) violates the

overbreadth doctrine in every application as that provision functions as a blanket injunction with no narrowly tailored solution to remedy any specific problem before the court (Doc. 14 at 188-191.).  *See De Long v. Hennessey,* 912 F.2d 1144, 1148 (9th Cir.1990) (Vexatious litigant injunctive orders "couched in overly broad terms, ... against future litigation [] block free access to the courts"); *Ringgold,* 761 F.3d at 1066 (An injunctive "order is too broad [if] it provides that the court 'will approve all filings'").

   b. A.R.S. § 12-3201(E)(1)(a)-(f) Are Unconstitutionally Vague and Overbroad

Per A.R.S. § 12-3201(C), "[a] pro se litigant is a vexatious litigant if the court finds the pro se litigant engaged in vexatious conduct" where § 12-3201(E)(1) defines "vexatious conduct" in the disjunctive as "any" conduct described at A.R.S. § 12-3201(E)(1)(a)-(f).  To reiterate, vexatious litigant injunctions can only be issued under heightened considerations which demonstrate *both* the threshold presence of *serial* objectively "baseless" litigation, *and* evidence of *serial* "improper motives" either in the form of an "inordinate" number of "frivolous suits" or a "pattern of harassment" against common defendants.  *See De Long,* 912 F.2d at 1147-48; *Ringgold,* 761 F.3d at 1062-66. With those considerations in mind, the Arizona Supreme Court recently interpreted the Statute's language through a Petition Clause lens.  *See Richer,* 257 Ariz., at 222, ¶ 44 (Penalizing those who bring suits "grounded in fact and law ... inflict[s] real damage to our republic by slamming the courthouse door on citizens ... legitimately seeking to vindicate rights").  That court dispositively found A.R.S. § 12-3201(E)(1)(c) "without substantial justification" language *only* considers the presence of objectively baseless litigation.  *Id* at 221, ¶¶ 34-37.  "[W]ithout substantial justification" means "groundless and not made in good faith", and cannot be "conflated" with the phrase, "groundless and made in bad faith".  *Id.*  "Bad faith" alone characterizes litigation motivated by an

"'improper' purpose". *Id*. Further, the language in each A.R.S. § 12-3201(E)(1)(a), (b), and (d) "subsection provides a separate bad faith" improper motive consideration, *Id* at ¶ 37, meaning each one of those provisions lacks a "baseless litigation" consideration. *Id*. Simply put, no A.R.S. § 12-3201(E)(1)(a)-(f) "subsection" can be read to codify, or even reach, *Noerr-Pennington* conditions to enjoin a single suit for *both* "objective baselessness" *and* an "improper motive", much less the heightened *Ringgold* Standard that the Ninth Circuit requires before courts may enjoin and abridge free access to the courts.[10] (Doc. 14 at 128-131.) The Statute (1) "abuts upon" and violates the Petition Clause in every application, *Grayned*; (2) "lacks a plainly legitimate sweep", *Moody*; and (3) is unconstitutional in "a substantial number of applications" if there is any "plainly legitimate sweep" at all. *Id*. (Doc. 14 at 124-187, 195-207.)

### 3. The State Threatens To Deploy A.R.S. § 12-3201 As A Criminal Predicate

In perhaps the ultimate Petition Clause violation, Plaintiff's current stance in the face of unconstitutional A.R.S. § 12-3201 orders and an unlawful A.R.S. § 12-3201(B) permanent blanket injunction has been bootstrapped into what the State now considers to be criminal violations of A.R.S. §§ 13-3601/3602. (Doc. 14 at 92-98.) Per official government records, the State has unlawfully accepted that filing papers in well-founded lawsuits absent prior leave of the court constitutes conduct ripe for the Attorney General to civilly and criminally prosecute Plaintiff for A.R.S. §§ 13-2921 and 2810(A)(2) violations (1) as § 13-3601 Domestic Violence criminal predicates; and (2) as the same criminal predicates to secure a § 13-3602 civil protective order. (Doc. 14 at 98, 103, 110.)

---

[10] A.R.S. § 12-3201(E)(1)(e) ("A pattern of making unreasonable, repetitive and excessive requests for information") and (f) ("Repeated filing of documents or requests for relief that have been the subject of previous rulings by the court in the same litigation") on their face include neither a "baseless litigation" nor an "improper purpose" component.

ER-375

1

2

**B. Plaintiff Faces Irreparable Injuries**

3

    1. "Concrete and Particularized"[11] Irreparable Injuries Are Readily Apparent

4

    Plaintiff faces "a likelihood of irreparable injury."  *All. for the Wild Rockies*, 632

5

F.3d at 1135.  Indeed, he is *currently* suffering *actual* irreparable injuries through the

6

*ongoing* deprivation of his First Amendment rights which, "by definition", constitutes

7

"an immediate and irreversible sanction" that cannot be sufficiently cured through

8

pecuniary damages.  *Nebraska Press Ass'n. v. Stuart*, 427 U.S. 539, 559 (1976);

9

*Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) quoting *Melendres v. Arpaio*,

10

695 F.3d 990, 1002 (9th Cir. 2012) (Any "deprivation of constitutional rights

11

'unquestionably constitutes irreparable injury.'"). (Doc. 14 at 76-79.)  Further supporting

12

the instant TRO Motion, Plaintiff now faces the imminent threat of even greater

13

irreparable injuries, including incarceration, absent the grant of injunctive relief.

14

    2. The Court Has Jurisdiction; Plaintiff Has Standing To Seek Injunctive Relief

15

    "Enjoining a statewide official under *Young* ... is appropriate when there is a

16

realistic possibility the official will take legal or administrative actions against the

17

plaintiff's interests."  *Doe v. DeWine,* 910 F.3d 842, 848-49 (6th Cir. 2018) citing *Ex*

18

*parte Young,* 209 U.S. 123 (1908).  Plaintiff faces the real threat that Judge Welty "will

19

take ... administrative actions" by administratively enforcing A.R.S. § 12-3201(A) and

20

adding Plaintiff's name to a Vexatious Litigant List.  (Doc. 14 at 104.)  He also faces the

21

real threat that AG Mayes "will take legal ... actions" by civilly and/or criminally

22

enforcing the Statute as an A.R.S. §§ 13-3601/3602 Domestic Violence predicate.  (Doc.

23

14 at 98, 103.)  To be clear, Plaintiff's former spouse cited an unlawful A.R.S. § 12-3201

24

entry in public records litigation to label Plaintiff an A.R.S. § 13-3601 perpetrator in

25

26

---

[11] *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-42 (2016).

official records held in the Arizona Secretary of State's office, and then to have that label entered into a family law case. (Doc. 14 at 92-97.) She did this to thwart discovery ordered on appellate remand, and special action, for the improper purpose of concealing evidence of criminal activities. That discovery involves financial documents which, in addition to being required to calculate child support per the Arizona Child Support Guidelines, risk providing direct evidence (1) of the former spouse's involvement in a Medicaid fraud scheme centered around Rep. Meza's actions in elected office; and (2) of her recurring efforts in concert with Meza to intimidate Plaintiff and to obstruct criminal investigations into the scheme (Doc. 14 at 83-97). As one result of those concerted efforts, the Secretary of State has now entered official records expressly asserting Plaintiff committed A.R.S. § 13-3601 Domestic Violence. The State of Arizona now considers Plaintiff's former spouse and young son to be victims of criminal domestic violence, with Plaintiff the perpetrator.

These circumstances invoke federal jurisdiction where State Officers Welty and Mayes are proper defendants for suit per *Ex parte Young*. Plaintiff also has standing to seek prospective relief. "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Defendants threaten to cause Plaintiff to suffer First, Fifth, and Fourteenth Amendment fundamental rights deprivations, creating "concrete, particularized, and ... imminent" injuries, by definition. *Nebraska Press Ass'n*; *Melendres*. "[T]he 'fairly traceable' and 'redressability' components for standing overlap and are 'two facets of a single causation requirement.'" *Washington Env't Council v. Bellon,* 732 F.3d 1131, 1146 (9th Cir. 2013). "Causation may be found even if there are multiple links in the

chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last [or first] link in the chain". *Mendia v. Garcia,* 768 F.3d 1009, 1012 (9th Cir. 2014). "What matters is not the 'length of the chain of causation, but rather the plausibility of the links that comprise the chain.'" *Nat'l. Audubon Soc'y., Inc. v. Davis,* 307 F.3d 835, 849 (9th Cir.2002). As a rather straightforward demonstration of traceability and redressability, if the Court enjoins Judge Welty from administratively enforcing A.R.S. § 12-3201(A), then Plaintiff will not suffer further denial of access to the courts by being placed on a Vexatious Litigant List. Standing confers. And if the Court enjoins AG Mayes from civilly and criminally enforcing non-adherence to A.R.S. § 12-3201 as any form of A.R.S. § 13-3601/3602 predicate then Plaintiff will not suffer additional irreparable injuries from indictment, prosecution, and incarceration, or separation from his son. Standing again confers.

C. The Balance Of Equities And The Public Interest Strongly Favor Plaintiff

Both "the balance of equities" and "the public interest" favor granting injunctive relief. *Aleman Gonzalez*, 955 F.3d at 768 quoting *Winter*, 555 U.S. at 20. "[I]t is always in the public interest," the Ninth Circuit has held, "to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002. And as Plaintiff established, A.R.S. § 12-3201 violates his fundamental rights under the Petition Clause. To be sure, "by establishing a likelihood that [the Statute] violates the U.S. Constitution, Plaintiff[] ha[s] also established that both the public interest and the balance of the equities favor [injunctive relief]." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Defendants, by comparison, "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). In that same vein, the U.S. Supreme Court held that promoting "well-founded" litigation

is always in the public interest. *Bill Johnson's Rests.,* 461 U.S. at 742-43. As such,

neither a TRO nor a PI cause the State to suffer any inequity or hardship, especially given

that Arizona courts would still be able to exercise inherent authority to control their

dockets and issue appropriate vexatious injunctions pursuant to that inherent authority

while any TRO or PI remains in effect. *See De Long,* 912 F.2d at 1147 (Courts possess

an "inherent power ... to regulate the activities of abusive litigants by imposing carefully

tailored restrictions under the appropriate circumstances ... [although] such orders should

'remain very much the exception to the general rule of free access to the courts'").

### D. Plaintiff Qualifies For A TRO And A PI

A TRO or a PI "is appropriate when the [movant] demonstrates ... that serious

questions going to the merits were raised and the balance of the hardships tips sharply in

the [movant]'s favor, ... so long as the [movant] also shows that there is a likelihood of

irreparable injury and that the injunction is in the public interest." *All. for the Wild

Rockies*, 632 F.3d at 1134-35. Plaintiff demonstrates that (1) "serious questions going to

the merits" have been raised; (2) the "balance of hardships" indeed "tips sharply in" his

favor since a TRO or a PI would not cause the State to suffer any hardship; (3) he now

suffers "irreparable injury" in the form of ongoing fundamental rights deprivations, and

"there is a likelihood" of future irreparable injuries, including in the form of indictment

and incarceration, absent a TRO or PI; and (4) a TRO and a PI are "in the public interest"

to protect fundamental rights under the Petition Clause.

III. CONCLUSION

Plaintiff filed court papers in the past, and will continue to file court papers in the

future, as part of an ongoing family law case and in a civil suit now set for trial. Those

actions fall squarely under the Petition Clause's broad protections. Yet, enforcement of

the Statute and associated orders subject Plaintiff to concrete and particularized, and actual (ongoing) and imminent (threatened) irreparable injuries at the hands of State Officers for prosecuting those well-founded lawsuits.  These threats loom over Plaintiff despite directly on-point U.S. Supreme Court precedent telling us that A.R.S. § 12-3201 cannot survive First Amendment facial challenges.  To be sure, because "the State's interest [is] 'in protecting the health and well-being of its citizens'" via "fact-finding" and the prosecution of "well-founded lawsuits", *Bill Johnson's Rests.,* 461 U.S. at 742-43, the State of Arizona has no compelling government interest in, and is expressly prohibited from, enjoining litigation that is not <u>*both*</u> objectively baseless <u>*and*</u> improperly motivated. *Pro. Real Est. Invs..*  In violation of those bedrock legal standards, A.R.S. § 12-3201 permits courts to permanently enjoin litigants from legitimately vindicating their rights in every application although the Petition Clause, the *Noerr-Pennington* doctrine, and the *Ringgold* Standard do not tolerate such tyrannical abridgments.  These heinous violations have caused Plaintiff and other pro so litigants to suffer ongoing fundamental rights deprivations, and to be imminently threatened with suffering additional irreparable injuries.  Due to the Statute being unconstitutional in every application, or at the very least in an unacceptably "substantial number of applications", Defendants Mayes and Welty should be prohibited from administratively, civilly, or criminally enforcing any A.R.S. § 12-3201 provision and any A.R.S. § 12-3201 order until the merits of this case are decided.  For the reasons stated herein, Plaintiff respectfully requests that the Court initiate Rule 65 proceedings, issue a Temporary Restraining Order pending further orders, and establish a discovery and briefing schedule on the issuance of a Preliminary Injunction pending final judgment on claims seeking declaratory and injunctive relief going to the Statute's First Amendment constitutionality.

17

1

2          DATED this 14th day of May 2025.

3

4                                    By: //s//

5                                         Phillip Potter
                                          Plaintiff
6                                         Pro Se

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ER-381

**KRISTIN K. MAYES**
**Attorney General**
(Firm State Bar No. 14000)

Hayleigh S. Crawford (Bar No. 032326)
Joshua A. Katz (Bar No. 039449)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333
Hayleigh.Crawford@azag.gov
Joshua.Katz@azag.gov
ACL@azag.gov

*Attorneys for Defendant Arizona Attorney*
*General Kristin K. Mayes*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Philip Potter, individually and on behalf of all others similarly situated<br><br>Plaintiffs,<br>v.<br><br>Robert Meza, et al.,<br><br>Defendants. | No.CV25-00663-PHX-DWL<br><br>**ARIZONA ATTORNEY GENERAL'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY RELIEF** |

1

**INTRODUCTION**

2    Plaintiff is subject to an order whereby Arizona courts preapprove his future court

3   filings in pending civil actions.  The order does not deprive Plaintiff of the right to file

4   legitimate, non-frivolous papers.  It only prevents him, in pending cases, from 1) filing

5   papers without leave of court and 2) filing improper papers, period.  Nonetheless, he seeks

6   to remedy this state of affairs, initially, by obtaining a temporary restraining order

7   ("TRO") and preliminary injunction ("PI") against Arizona Attorney General Kristin K.

8   Mayes ("AG Mayes").

9    The question presented is whether the Constitution entitles Plaintiff to the

10  extraordinary relief sought.  It does not.

11    As the Supreme Court has held, there is no constitutional right to make improper

12  filings.  *Bill Johnson's Rests.*, *Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983) ("[B]aseless

13  litigation is not immunized by the First Amendment right to petition.").  In any event, AG

14  Mayes is the wrong party against whom to seek this relief.  For both those reasons,

15  Plaintiff is unlikely to succeed on the merits.  He also shows no likely irreparable harm,

16  and the balance of the equities favors AG Mayes.  The Court should deny the motion for

17  preliminary relief.

18

**BACKGROUND**

19
**I.    Plaintiff sues in state court following a public records request and is
20          designated vexatious.**

21    This is Plaintiff's second trip to the District of Arizona following a public records

22  request and resulting state litigation.  *See* First Amended Complaint (FAC), Dkt. 14, ¶ 67.

23  Plaintiff sought documents from the Arizona House of Representatives, Representative

24  Robert Meza, and a private citizen.  *Id.*; *Potter v. Ariz. House of Reps.*, No. 23-0213, 2024

25  WL 368095, at *1 ¶ 4 (Ariz. App. Feb. 1, 2024).  Dissatisfied with their responses, he

26  filed a special action under A.R.S. § 39-121.02.  FAC ¶ 68; *Potter*, 2024 WL 368095, at

27  *1 ¶ 6.  The superior court granted a motion to dismiss.  *Potter*, 2024 WL 368095, at *2

28

ER-383

1    ¶¶ 9–10; Docket Sheet, *Potter v. Ariz. House of Reps.*, No. 2022-008626 (Ariz. Super.

2    Ct.) (Ex. 1), Nos. 19–21 & pg. 3.

3         Defendants then moved to designate Plaintiff a vexatious litigant. *Potter*, 2024

4    WL 368095, at *2 ¶¶ 11–12; Minute Entry filed Feb. 27 2023, *Potter v. Ariz. House of*

5    *Reps.*, No. 2022-008626 (Ariz. Super. Ct.) (Ex. 2), at 1; Ex. 1, Nos. 45–49.

6         Under A.R.S. § 12-3201, a court may declare a civil pro se litigant "vexatious" for,

7    as relevant here, filing cases "solely or primarily" to harass others or without "substantial

8    justification," making "unreasonable, repetitive and excessive requests for information,"

9    or making "repeated filings of documents or requests for relief that have been the subject

10   of previous rulings by the court in the same litigation." A.R.S. § 12-3201(A), (E)(1).

11        The court held an evidentiary hearing on the vexatious litigant motion. *Potter*,

12   2024 WL 368095, at *2 ¶ 14; Ex. 2, at 1; Ex. 1, Nos. 81–86. The court considered, in

13   addition to his conduct in the case, Plaintiff's other "litigation activity," which "paint[ed]

14   a troubling picture." Ex. 2, at 2. The court found that Plaintiff "engaged in vexatious

15   conduct per A.R.S. § 12-3201 by: repeated filing of court actions without substantial

16   justification; and repeatedly filing documents or requests for relief that have been the

17   subject of previous rulings by the court in similar litigation." *Potter*, 2024 WL 368095,

18   at *2 ¶ 14; Ex. 2, at 4. Thus, the court barred Plaintiff from "fil[ing] any new pleading,

19   motion or other document in this case or any other pending civil action without prior leave

20   of the judge assigned to that case." *Potter*, 2024 WL 368095, at *2 ¶ 14; Ex. 2, at 4.

21        Plaintiff appealed his vexatious litigant designation, raising three issues. *Potter*,

22   2024 WL 368095, at *7–10 ¶¶ 44–59. First, he argued that the vexatious litigant order

23   was not justified under A.R.S. § 12-3201. *Id.* at *8 ¶¶ 47–48. Second, he raised a

24   constitutional due process challenge. *Id.* at *9 ¶¶ 51–55. Third, he raised a First

25   Amendment challenge. *Id.* ¶ 56. The court of appeals affirmed. *Id.* at *10 ¶ 61.

26   **II.   Plaintiff files a facial challenge in federal court.**

27        Plaintiff then filed a facial challenge in the District of Arizona against AG Mayes

28   and Judge Welty, the Chief Judge of the Maricopa County Superior Court (who was never

1    served).  *Potter v. Arizona*, No. 25-00016-PHX-KML (D. Ariz. filed Jan. 8, 2025).  He

2    challenged A.R.S. §§ 13-3201 (vexatious litigants), 13-2921(E) (statutory definition of

3    harass), and 12-349(A)(2) (sanctions).  He sought declaratory and injunctive relief and

4    moved for a TRO and PI.  Motion for TRO, *id.* (D. Ariz. Jan. 8, 2025), Dkt. 2.  Judge

5    Lanham ordered Plaintiff to file a statement explaining jurisdiction and denied the TRO

6    without response, instructing Plaintiff to refile it only if she found jurisdiction and

7    established a briefing schedule.  Order, *id.* (Jan. 13, 2025), Dkt. 8.  After receiving his

8    statement, Judge Lanham ordered Plaintiff to file a First Amended Complaint, which he

9    did.  *Id.*, Dkt. 9 (Jan. 16, 2025), 10 (Jan. 22, 2025), 12 (Jan. 31, 2025).

10       AG Mayes filed a motion to dismiss, and once it was fully briefed, the parties held

11   a Rule 26(f) conference and filed their initial disclosures.  *Id.*, Dkt. 18 (Feb. 14, 2025), 20

12   (Feb. 25, 2025), 21 (Mar. 12, 2025), 22–23 (Apr. 29, 2025).

13   **III.    Plaintiff files the present federal court suit.**

14       Meanwhile, Plaintiff filed the Complaint in this case, which did not name AG

15   Mayes.  Complaint, *Potter v. Meza*, No. 25-00663-PHX-DWL (Feb. 27, 2025), Dkt. 1.

16       Then, before Judge Lanham ruled on the Motion to Dismiss, Plaintiff voluntarily

17   dismissed his first case and filed a First Amended Complaint in this case naming AG

18   Mayes and adding facial challenges to A.R.S. §§ 12-3201 (vexatious litigants) and 13-

19   2921 (harassment).  Notice of Dismissal, *Potter v. Arizona*, No. 25-00016-PHX-KML (D.

20   Ariz. May 12, 2025), Dkt. 24; First Amended Complaint (FAC), Potter v. Meza, No. 25-

21   00663-PHX-DWL (May. 13, 2025), Dkt. 20.  He subsequently filed this motion for a

22   TRO and PI.  Motion for Preliminary Relief (Mot.), *Potter v. Meza*, No. 25-00663-PHX-

23   DWL (May 14, 2025), Dkt. 23.  The motion seeks to enjoin enforcement of A.R.S. § 12-

24   3201 (vexatious litigants) only.

25       This Court issued a show cause order, to which Plaintiff responded.  Dkt. 26 (May

26   15, 2025), 27 (May 20, 2025).  While "not necessarily persuaded by Plaintiff's response

27   to the OSC," the Court "conclude[d] that the jurisdictional and other issues raised by

28   Plaintiff's FAC and motion for TRO are better resolved through the adversarial process."

1    Order, Doc. 29 (May 21, 2025), at 1–2.  It ordered AG Mayes to respond to the motion

2    by or on June 2, 2025.

3    **IV.    Plaintiff's ex-wife participates in Arizona's address confidentiality program.**

4          Plaintiff's ex-wife ("TD" per FAC at ¶ 43) participates in the address

5    confidentiality program established under A.R.S. § 41-161 *et seq.* and administered by

6    the Secretary of State.  FAC ¶¶ 92–94, 95.  Participation in the program requires

7    "[e]vidence that the applicant is a victim of domestic violence, a sexual offense or

8    stalking." § 41-163(C)(3).  For purposes of the program, harassment under A.R.S. § 13-

9    2921 can qualify as "domestic violence" entitling a victim to address protections if certain

10   additional conditions are met, such as a marital or former marital relationship between

11   the defendant and the victim. *See* A.R.S. § 41-161(5) (incorporating by reference

12   definition of "domestic violence" in A.R.S. § 13-3601); A.R.S. § 13-3601(A) (defining

13   "domestic violence").

14         Plaintiff alleges that his ex-wife presented his vexatious litigant designation as

15   evidence and was accepted into the program.  Therefore, he concludes, "the Arizona

16   Secretary of State now holds official records identifying Plaintiff as an A.R.S. § 13-3601

17   Domestic Violence perpetrator, although Plaintiff has never committed an act of domestic

18   violence." FAC ¶ 97.  Various iterations of this assertion appear throughout his motion.

19   *See, e.g.*, Mot. at 8 ("[T]he State of Arizona now deems Plaintiff to have violated A.R.S.

20   § 12-3201, and thus to have perpetrated §§ 13-3601/3602 Domestic Violence, for filing

21   motion papers in well-founded lawsuits absent leave of the court.").

22                              **LEGAL STANDARD**

23         Preliminary relief is "extraordinary and drastic" and "should not be granted unless

24   the movant, by a clear showing, carries the burden of persuasion." *Bowyer v. Ducey*, 506

25   F. Supp. 3d 699, 724 (D. Ariz. 2020) (cleaned up).  It is "never awarded as of right." *Id.*

26   (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

27         "The legal standards applicable to TROs and preliminary injunctions are

28   'substantially identical.'" *Barbaria v. Blinken*, 87 F.4th 963, 976 (9th Cir. 2023) (quoting

1   *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (per curiam)) (alteration

2   accepted).  Either requires "(1) a likelihood of success on the merits, (2) a likelihood of

3   irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors

4   the plaintiff, and (4) that an injunction is in the public interest." *Id.*  "The third and fourth

5   factors . . . merge into one inquiry when the government opposes" preliminary relief.

6   *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021).

7                                   **ARGUMENT**

8   **I.    Plaintiff is unlikely to succeed on the merits.**

9         Likelihood of success on the merits "is the most important" factor when seeking

10  preliminary relief.  *Barbaria*, 87 F.4th at 980 (citation omitted).  "[I]f a movant fails to

11  meet this 'threshold inquiry,' the court need not consider the other factors in the absence

12  of 'serious questions going to the merits.'" *Id.* (cleaned up).

13        Here, Plaintiff is unlikely to succeed on the merits.  First, the Court lacks

14  jurisdiction as to AG Mayes.  Second, none of Plaintiff's arguments succeeds in showing

15  the challenged provisions unconstitutional.

16        **A.    The Court lacks subject-matter jurisdiction.**

17        A lack of jurisdiction precludes the Court from "even reaching the merits" and

18  makes success on the merits impossible.  *See Munaf v. Green*, 553 U.S. 674, 690 (2008).

19  Even a "difficult question as to jurisdiction" makes "such success more unlikely." *Id.*

20  Therefore, to obtain preliminary relief, plaintiff is required to adequately establish that

21  there is at least a reasonable probability of ultimate success upon the question of

22  jurisdiction." *Zango, Inc. v. PC Tools Pty Ltd.*, 494 F. Supp. 2d 1189, 1194 (W.D. Wash.

23  2007) (quoting *Enterprise Int'l, Inc v. Corporacion Estatal Petrolera Ecuatoriana*, 762

24  F.2d 464, 471 (5th Cir. 1985)).

25        Here, the Court lacks subject-matter jurisdiction in this case as against AG Mayes

26  for two reasons.  First, Plaintiff lacks standing.  Second, AG Mayes is immune from

27  Plaintiff's challenges to the vexatious litigant statute and the sanctions statute.

28

**1.    Plaintiff lacks standing.**

"Article III standing is a necessary component of subject matter jurisdiction." *In re Palmdale Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011). Standing requires concrete, particularized injury that is actual or imminent, fairly traceable to the challenged act or omission of the defendant, and redressable by a favorable ruling. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013). "[I]n cases with multiple defendants," a plaintiff must have "standing as against each defendant." *Sullivan v. Ferguson*, 636 F. Supp. 3d 1276, 1283 (W.D. Wash. 2022).

Plaintiff has not established any injury, relying on a less than credible fear of prosecution. Nor has he shown that any injury is fairly traceable to AG Mayes. Finally, the declaratory and injunctive relief he seeks will not redress any conceivable injury.

**a.    Plaintiff lacks a credible fear of prosecution.**

Because he has not violated his injunction and has not been prosecuted, Plaintiff brings a pre-enforcement challenge. A pre-enforcement challenge requires Plaintiff to allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). Crucially, the fear of prosecution "must at least be 'credible.'" *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1140 (9th Cir. 2000) (citation omitted).

For all his references to prosecution, Plaintiff does not establish that his fear is credible. The credibility of a claimed fear of prosecution depends on three factors: 1) a "concrete plan" to violate the law; 2) "a specific warning or threat to initiate proceedings;" and 3) a "history of past prosecution or enforcement under the challenged statute." *Libertarian Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013).

Plaintiff alleges nothing to support these factors. First, while Plaintiff alleges his intent to file court papers without leave, he has not specified which papers he plans to file. FAC ¶ 98. Second, not only is there no threat or warning, but also the vexatious

ER-388

1    litigant statute is, by its terms, not a criminal statute.  Third, Plaintiff has not pointed to a

2    single such prosecution, directly or under A.R.S. § 13-2810.  *Cf., e.g.*, *McKee v. Lamore*,

3    No. 21-0413, 2022 WL 517911, at *3 ¶ 12 (Ariz. App. Feb. 22, 2022) (sanctions, but no

4    mention of criminal prosecution, after vexatious litigant filed "more than a dozen

5    documents without permission").  He alleges just the "existence of a proscriptive statute,"

6    "insufficient to satisfy the 'case or controversy' requirement."  *Libertarian Party of Los*

7    *Angeles Cnty.*, 709 F.3d at 871.[1]

8         Plaintiff attempts to ground his fear in his ex-wife's participation in the address

9    confidentiality program as discussed above.  From her participation he concludes "the

10   State of Arizona now deems Plaintiff to have violated A.R.S. § 12-3201, and thus to have

11   perpetrated §§ 13-3601/3602 Domestic Violence, for filing motion papers in well-

12   founded lawsuits absent leave of the court."  Mot. at 8.  He goes on to argue that he faces

13   prosecution for such crimes as interference with judicial proceedings and harassment.  He

14   argues this grounds a credible fear of prosecution.

15        But this, too, fails. The Secretary of State's acceptance of a vexatious litigant

16   designation as evidence is not a threat or warning of future enforcement because the

17   Secretary of State has no criminal enforcement powers, and can give no such warning.

18   *See* A.R.S. §§ 41-121, -121.02 (duties of Secretary of State and Department of State).

19   Nor has Plaintiff demonstrated any instance where a person was prosecuted for filing

20   papers without leave because of someone else's address confidentiality order.  *Cf.*

21   *Libertarian Party of Los Angeles Cnty*, 709 F.3d at 870 (requirements for credible fear).

22

23   _____

24   [1] Plaintiff alleged that "counsel for the Arizona Attorney General . . . raise[d] the specter
     of 'consequences' in email correspondence should Plaintiff file court papers."  Motion

25   for Service of Defendant Welty by Marshal, at 3–4, Potter v. Meza, No. 26-00663-PHX-
     DWL (May 16, 2026), Dkt. 25.  This is a mischaracterization.  Plaintiff discussed, in a

26   phone call, his concern that aspects of the now-operative complaint may interact with a
     state family court order.  He then raised the same issue in an email, adding as a third

27   element a criminal complaint he plans to file.  Undersigned counsel responded that the

28   Office does not provide hypothetical legal guidance, noting that he could not "comment
     on any consequences of filing."

                                    7

b.    **No injury is fairly traceable to AG Mayes.**

Assuming Plaintiff is injured by his designation, he fails to establish that such injury is fairly traceable to AG Mayes, who had no hand in his designation.

To carry his burden, Plaintiff must show that "the injury [is] fairly traceable to the challenged action of [AG Mayes], and not the result of the independent action of some third party." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). When suing officers to challenge a statute, plaintiffs need "a reasonable expectation that the defendants might bring an enforcement action against them." *Ariz. Contractors Ass'n v. Napolitano*, Nos. 07-1355-PHX-NVW, 07-1684-PHX-NVW, 2007 WL 9723967, at *9 (Dec. 10, 2007).

AG Mayes has only such powers as are given in statute. Ariz. Const. art. V, § 9; *see also, e.g.*, A.R.S. §§ 21-422 (detailing powers relating to grand juries), 41-193 (detailing powers). And county attorneys, who prosecute the vast majority of criminal cases in Arizona's state courts, likewise have powers detailed in statute. *See, e.g.*, A.R.S. § 11-532. And those powers make clear that, in the unlikely event Plaintiff were prosecuted, it would be by a county attorney.

AG Mayes's general supervisory power over county attorneys, in A.R.S. § 41-193(4–5), is not enough to trace any injury to her. *See S. Pac. Transp. Co. v. Brown*, 651 F.2d 613, 614–15 (9th Cir. 1980) (feared prosecution not fairly traceable to attorney general who lacked power to prosecute challenged statute but would "advise and direct the district attorneys to prosecute"). Nor has Plaintiff shown that the Governor or AG Mayes is likely to "deem[]" his case one where the Attorney General's involvement is "necessary." A.R.S. § 41-193(2). In short, Plaintiff needs to show why AG Mayes, specifically, might reasonably be expected to prosecute him. He has not.

c.    **Plaintiff's alleged injury cannot be redressed by the relief sought.**

Additionally, Plaintiffs' injury cannot be redressed by any injunction or declaratory judgment against AG Mayes. Standing requires that a favorable decision be

8

1    likely to actually redress the injury; mere speculation is not enough. *Lujan v. Defs. Of*
2    *Wildlife*, 504 U.S. 555, 561 (1992).

3        As discussed, while prosecution is unlikely, any such prosecution would be more
4    likely to come from a county attorney than from AG Mayes. Thus, even setting all the
5    other problems with Plaintiff's arguments aside, his requested relief here would not
6    "likely" redress his problem because enjoining AG Mayes would not prevent a county
7    attorney from prosecuting him, nor the courts from enforcing their injunctions. *See*
8    *Friends of the Earth, Inc. v. Laidlaw Env't Servs (TOC), Inc.*, 528 U.S. 167, 181 (2000).

9            **2.    The suit is barred by AG Mayes's sovereign immunity.**

10        Plaintiff raises various challenges to A.R.S. § 12-3201, the vexatious litigant
11    statute. That statute allows courts to more closely scrutinize filings from litigants who
12    behave in a vexatious manner, as defined in the law. Following such a designation, the
13    litigant "may not file a new pleading, motion or other document without prior leave of
14    the court." *Id.* (B).

15        A suit challenging the constitutionality of a state statute may seek prospective
16    injunctive relief against a state officer, notwithstanding state sovereign immunity. *Green*
17    *v. Mansour*, 474 U.S. 64, 68 (1985); *see Ex Parte Young*, 209 U.S. 123, 159–60 (1908).
18    But it may do so only if the suit is asserted against a state officer with "some connection"
19    to the law's enforcement. *Matsumoto v. Labrador*, 122 F.4th 787, 802 (9th Cir. 2024)
20    (quoting *Ex Parte Young*, 209 U.S. at 157). That connection must "go[] beyond a
21    generalized duty to enforce state law," *id.* (cleaned up), and "be fairly direct." *Coal. to*
22    *Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (quoting *L.A.*
23    *Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992). Failing these requirements,
24    sovereign immunity bars the suit.

25        AG Mayes lacks any connection to the vexatious litigant statute's enforcement
26    scheme, let alone a "fairly direct" one, for two reasons. *Coal. to Defend Affirmative*
27    *Action*, 674 F.3d at 1134. First, she had no role in Plaintiff's designation, neither
28    requesting a designation nor granting one. Second, she has no role in enforcing the statute

1    or Plaintiff's order. Primary enforcement of the vexatious litigant statute lies with the

2    courts and any secondary (indirect) enforcement would be by county attorneys.

3           As discussed, Plaintiff attempts to find a connection in a chain of events whereby

4    his ex-wife obtained confidentiality protection for her address, using his vexatious litigant

5    designation as evidence of harassment. *See* A.R.S. §§ 13-2921(A), (E) (defining

6    harassment), 41-161 (Secretary of State's address confidentiality program).

7           Even taking those allegations as true, Plaintiff still fails to establish that AG Mayes

8    has any role in enforcing the vexatious litigant statute, A.R.S. § 12-3201. He alleges no

9    exposure to criminal liability under statutes subject to enforcement by AG Mayes. And

10   the confidentiality program, § 41-161 *et seq.*, is administered by the Secretary of State,

11   not AG Mayes. *See* A.R.S. § 41-162(B) (the Secretary of State "shall establish" and carry

12   out the program). In sum, criminal statutes using similar terminology to the vexatious

13   litigant statute cannot connect AG Mayes to the latter's enforcement.

### B.   Plaintiff's claims are without merit.

#### 1.   Arizona's prefiling requirement comports with Ninth Circuit procedural requirements.

17          A.R.S. § 12-3201 provides constitutionally sufficient procedural due process.

18   Under the Fourteenth Amendment's due process clause, states must provide "fair

19   procedure" when state action deprives a citizen of "a constitutionally protected interest in

20   'life, liberty, or property.'" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Once a

21   protected interest is at stake, "[p]arties whose rights are to be affected are entitled to be

22   heard; and in order that they may enjoy that right they must first be notified." *Wilkinson*

23   *v. Austin*, 545 U.S. 209, 226 (2005) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)).

24   Applying this in the prefiling requirement context, the Ninth Circuit holds that courts

25   must provide notice and chance to be heard, and must compile an adequate record for

26   review, before requiring prefiling review. *Molski v. Evergreen Dynasty Corp.*, 500 F.3d

27   1047, 1057 (9th Cir. 2007) (citing *De Long v. Hennessey*, 912 F.2d 1144, 1147–48 (9th

28

ER-392

1    Cir. 1990)).  That understanding was not altered by *Ringgold-Lockhart v. County of Los*

2    *Angeles*, 761 F.3d 1057, 1061 (2014), which discusses and applies the *De Long* factors.

3        Here, the Arizona court of appeals determined Plaintiff received due process,

4    including notice, briefing, and a hearing prior to his designation and the record was

5    suitable for appeal, and that the order was narrowly tailored.  *See Potter*, 2024 WL

6    368095, at *9 ¶ 52–54.  The issue was actually litigated and essential to the final judgment

7    against Plaintiff, giving that determination preclusive effect.

8        Further, Arizona law requires due process.  "In the absence of convincing evidence

9    that the state supreme court would decide differently, a federal court is obligated to follow

10    the decisions of the state's intermediate courts."  *Easyriders Freedom F.I.G.H.T. v.*

11    *Hannigan*, 92 F.3d 1486, 1494 n.4 (9th Cir. 1996) (cleaned up).  Arizona's courts of

12    appeals interpret A.R.S. § 12-3201 as requiring the procedural steps the Ninth Circuit has

13    imposed on prefiling requirements.  *Madison v. Groseth*, 230 Ariz. 8, 14 ¶ 18 (App. 2012)

14    (Timmer, J.) ("We agree adherence to these principles is appropriate to ensure that a

15    litigant's access to courts is not inappropriately infringed upon, and we therefore adopt

16    them."); *see also, e.g.*, *Contreras v. Bourke*, 556 P.3d 291, 300 ¶ 28 (Ariz. App. 2024)

17    (stating it "necessarily follows that" *De Long*'s requirements "apply to pre-filing

18    restrictions entered under either § 12-3201 or the court's inherent authority"); *Potter*,

19    2024 WL 368095, at *7 ¶ 44 (applying *Madison* to A.R.S. § 12-3201 designation).  Thus,

20    under Arizona law, "the litigant must be afforded notice and an opportunity to oppose the

21    order" and "the court must create an adequate record" for appeal.  *Madison*, 230 Ariz. at

22    14 ¶ 18 (quoting *De Long*, 912 F.2d at 1147–48).

23        Additionally, the only consequence of a designation is a prefiling review

24    requirement, not inability to file.  The court must still permit proper filings.  *See Potter*,

25    2024 WL 368095, at *9 ¶ 56 ("[T]he order will not bar Potter from filing pleadings made

26    in good faith.").  *Cf. Wolfe v. George*, 486 F.3d 1120, 1126–27 (9th Cir. 2007) (prefiling

27    orders do "little more than require *sua sponte* review of a [vexatious litigant's]

28    complaint").  Therefore, the statute "does not regulate conduct protected by the First

1    Amendment." *Grundstein v. Ohio*, No. 06-2381, 2006 WL 3499990, at *4 (N.D. Ohio

2    Dec. 5, 2006) (upholding Ohio prefiling requirement for vexatious litigants). Should the

3    court fail to accept proper filings, the litigant may seek special action relief, providing a

4    procedural outlet in the rare case where a First Amendment interest exists. *See* Ariz.

5    Rules of Proc. for Special Actions, Rule 11.

6    　　　　　**2.　　Arizona law meets Ninth Circuit substantive requirements.**

7    　　　　　Turning to the substantive requirements for a prefiling requirements, Plaintiff

8    asserts that *Ringgold-Lockart* requires more than is required by Arizona law. But,

9    *Ringgold-Lockhart* does not say what Plaintiff claims it does. Plaintiff claims that this

10   authority requires "every case in a long series of cases must be found to be both

11   objectively baseless and filed for an improper purpose." Mot. at 2. On its face, it does

12   not. 761 F.3d at 1064 ("As an alternative to frivolousness, the district court may make an

13   alternative finding that the litigant's filings show a pattern of harassment.") Indeed,

14   *Ringgold-Lockhart* is explicit that "substantive findings of frivolousness or harassment"

15   is disjunctive. *Id*. at 1062. "[A] pattern of harassment" is an "alternative to

16   frivolousness." *Id.* at 1064.

17   　　　　　**3.　　The statute is not overbroad.**

18   　　　　　A.R.S. § 12-3201 does not facially violate the First Amendment. Ordinarily, facial

19   invalidation of a law requires that there be no constitutional applications. *United States*

20   *v. Hansen*, 599 U.S. 762, 769 (2023). But a special, narrow exception exists for First

21   Amendment overbreadth. *Id.* at 770. A law may be facially overbroad if it "prohibits a

22   substantial amount of protected speech relative to its plainly legitimate sweep." *Id.*

23   (cleaned up). To survive this scrutiny, a law need only have a "plainly legitimate sweep"

24   that is not "substantially outweigh[ed]" by its unconstitutional applications. *Moody v.*

25   *NetChoice, LLC*, 603 U.S. 707, 723–24 (2024). A law is also "upheld if (1) it is not aimed

26   at, and does not encompass constitutionally protected speech or activities, and (2) it

27   'furthers an important or substantial government interest.'" *Grundstein*, 2006 WL

28   3499990, at *5 (quoting *O'Brien v. United States*, 391 U.S. 367, 377 (1968)).

The overbreadth doctrine is meant to prevent chilling effects. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011). But "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law— particularly a law that reflects legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (cleaned up).

Under prefiling requirements, "the courthouse doors are not closed to" a vexatious litigant with "potentially meritorious claims not intended solely to harass or delay." *Wolfe*, 486 F.3d at 1125 (upholding prefiling requirement under California vexatious litigation statute). The "sweep" of a prefiling requirement, then, is those filings vexatious litigants wish to make, but cannot.

The "plainly legitimate" portion of that sweep consists of those prohibited filings that are unprotected under the First Amendment. "Just as false statements are not immunized by the First Amendment right to freedom of speech, . . . baseless litigation is not immunized by the First Amendment right to petition." *Bill Johnson's Rests., Inc.*, 461 U.S. at 743 (citations omitted); *see also Wolfe*, 486 F.3d at 1125 (California prefiling requirement for vexatious litigants "is not overbroad, because there is no constitutional right to file frivolous litigation."). The plainly legitimate portion of its sweep will be quite large in relation to the sweep as a whole because judges will allow protected filings.

The precedent on which Plaintiff relies is both inapt and incorrectly described. *Moy v. United States*, 906 F.2d 467, 471 (9th Cir. 1990) held that a particular plaintiff could not be prevented from filing complaints because there was "no evidence on this record [of] a general history of litigious filing," not that such restrictions are always overbroad. *Id.* *Cf.* Mot. at 10. Similarly, *Ringgold-Lockhart*, 761 F.3d at 1066 does not suggest that prefiling requirements are overly broad and unworkable. *Cf.* Mot. at 11. Instead, prefiling requirements cannot require merit, which cannot be determined "from pleadings alone." 761 F.3d at 1066. A.R.S. § 12-3201 contains no merit requirement.

ER-395

### 4. The statute is not void for vagueness.

Nor is A.R.S. § 12-3201 void for vagueness. The vagueness doctrine "guarantees that ordinary people have fair notice of the conduct that a statute proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018) (cleaned up). The doctrine prevents government from forcing citizens to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up). "A law is void for vagueness if it is impermissibly vague in all of its applications" and "cause[s] persons of common intelligence necessarily to guess at its meaning and to differ as to its application." *United States v. Makowski*, 120 F.3d 1078, 1080 (9th Cir. 1997) (cleaned up). "[A] statute will not be ruled void for vagueness when it is sufficient to give the particular defendant notice that his conduct is illegal." *United States v. Goyette*, 458 F.2d 992, 993 (9th Cir. 1972).

Plaintiff shows no risk of an unclear requirement. Whether or not a litigant could quibble over how many harassing filings are "repeated," or if harassment always means without "legitimate purpose," the vagueness doctrine is not about minute details, but rather whether people, in total, know what they may and may not do. *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1019 (9th Cir. 2010) ("[P]erfect clarity is not required even when a law regulates protected speech."). After all, "we can never expect mathematical certainty from our language." *Id.* (citation omitted). Here, there is no real confusion as to the core of what litigants may not do—they simply must avoid making improper filings. That is no new requirement. It is required of them before a designation, and enforced prospectively after. As with the Ohio statute at issue in *Grundstein*, the statute leaves no one to guess what may not be done. 2006 WL 3499990, at *4.

At bottom, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Tucson v. City of Seattle*, 91 F.4th 1318, 1330 (9th Cir. 2024) (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)) (alteration accepted). And the Arizona court of appeals had no difficulty finding the law to clearly apply to

ER-396

1   Plaintiff's own filings.  The Court must credit this finding.  *See Sharifi Takieh v. Banner*
2   *Health*, 515 F. Supp. 3d 1026, 1037 (D. Ariz. 2021) (discussing Arizona issue preclusion
3   rules as applied to Arizona judgments in federal court); *see also Goyette*, 458 F.2d at 993
4   (law not held vague when clearly applicable to challenger's own case).

5          **5.**    ***Noerr-Pennington* does not support Plaintiff's argument.**

6          Plaintiff argues that the *Noerr-Pennington* doctrine supports his case.  That
7   "doctrine stands for a generic rule of statutory construction."  *United States v. Koziol*, 993
8   F.3d 1160, 1171 (9th Cir. 2021).  In particular, it requires courts to "construe federal
9   statutes so as to avoid burdening conduct that implicates the protections afforded by the
10  Petition Clause unless the statute clearly provides otherwise."  *Sosa v. DIRECTV, Inc.*,
11  437 F.3d 923, 931 (9th Cir. 2006).  It is, in effect "a specific application of the rule of
12  statutory construction known as the canon of constitutional avoidance."  *Id.* at 931 n.5.
13  The doctrine grew out of concerns about the use of vexatious litigation to deny individuals
14  rights guaranteed under other statutes or constitutional provisions.

15         Specifically, in *Eastern Railroad Presidents Conference v. Noerr*, truck operators
16  and their union sued a group of railroads, their presidents, and a public relations firm,
17  alleging a "conspir[acy] to restrain trade" through a publicity campaign against truckers.
18  365 U.S. 127, 129 (1961).  The Supreme Court read the Sherman Act as not extending to
19  this conduct.  A broader reading would apply the Sherman Act to "political activity,"
20  which would "raise important constitutional questions," an intent not "lightly impute[d]
21  to Congress."  *Id.* at 138.

22         Citing *Noerr*, the Supreme Court then held in *United Mine Workers of America v.*
23  *Pennington* that the Sherman Act does not extend to "[j]oint efforts to influence public
24  officials."  381 U.S. 657, 670 (1965).  The doctrine has since been extended to "protect[]
25  access to judicial processes."  *Sosa*, 437 F.3d at 930.  Thus, federal statutes are generally
26  interpreted in ways that do not infringe on the Petition Clause.  But the doctrine does not
27  extend to "sham litigation," which is litigation that is "objectively baseless and the
28  defendant's motive in bringing it was unlawful."  *Koziol*, 993 F.3d at 1171.

1      In *Koziol*, for instance, the question was whether the defendant's threats of

2   litigation violated the Hobbs Act.  The Ninth Circuit held it need not read the Hobbs Act

3   as immunizing the specific activity at issue because it was "sham litigation." *Id.* at 1172.

4      And in *Bill Johnson's Restaurants*, the doctrine did not apply to prevent the NLRA

5   from prohibiting "baseless litigation" because it was "not immunized by the First

6   Amendment right to petition."  461 U.S. at 743.

7      The doctrine does not do what Plaintiff needs it to here.  It is a rule for reading

8   statutes and is of no help to a plaintiff raising a facial challenge.  If Plaintiff were seeking

9   to *narrow* the scope of Arizona's law, *Noerr-Pennington* may of help to him.  But

10  narrowing the law hurts, not helps, his facial challenge.  True, "[t]o say that one does not

11  have *Noerr-Pennington* immunity is to conclude that one's petitioning activity is

12  unprotected by the First Amendment." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000).

13  But only when the *Noerr-Pennington* question of the reach of a statute is present to begin

14  with.  To the extent that question is at issue in a facial challenge, it is a defense argument.

15  **II.     Plaintiff has not shown irreparable harm is likely to occur.**

16     "Plaintiffs seeking preliminary relief cannot rely on the mere possibility that

17  irreparable harm will occur but must instead show such harm is 'likely in the absence of

18  an injunction.'" *Ariz. Recovery Housing Ass'n v. Ariz. Dep't of Health Servs.*, 462 F.

19  Supp. 3d 990, 997 (D. Ariz. 2020) (quoting *Winter*, 555 U.S. at 22).  Plaintiff here has

20  shown nothing of the kind.

21     Plaintiff's designation does not prevent him from filing a single paper in Arizona

22  courts.  All it requires is that such filings receive prefiling clearance from the court.  That

23  clearance, in turn, will be given if the filing is proper.  Having papers checked to ensure

24  propriety is not irreparable harm. *See Wolfe*, 486 F.3d at 1125.

25     Unable to cite any concrete irreparable harms, Plaintiff instead generally claims

26  that the denial of constitutional rights is itself irreparable harm.  True.  But this renders

27  his irreparable harm argument entirely derivative of his likelihood of success arguments,

28  and they fail for the same reason.  Quite simply, a process that prevents only the filing of

ER-398

unprotected papers cannot violate the First Amendment in an immediate and irreparable manner. Nor may Plaintiff manufacture constitutional violations by failing to comply with the prefiling requirement. *See Diamond S.J. Enter., Inc. v. City of San Jose*, No., 2018 WL 11009362, at \*4 (Mar. 2, 2018) ("Courts have declined to issue TROs when the irreparable injury that would allegedly justify the issuance of a TRO has been self-created." (cleaned up)).

## III.    The balance of the equities and public interest incline against preliminary relief.

Plaintiff, similarly, frames his balance of the equities and public interest arguments as dependent on his merits arguments, maintaining that preventing the violation of constitutional rights is always in the public interest and that the government does not suffer harm from injunctions protecting rights. Again, this is so, but it means his argument here is entirely derivative of his arguments above. As those fail, so must this one.

As discussed above, none of Plaintiff's constitutional rights are violated, as all his designation prevents is the filing of papers the courts do not accept, i.e. improper filings. If the courts improperly reject papers, he can seek special action review. Plaintiff's real harm is having to go through an extra step to file those of his papers that are protected. Against this sits the court system's, and the public's, interest in a court system free of harassing behavior and vexatious filings. The balance of the equities and the public interest disfavor preliminary relief.

<div align="center">

**CONCLUSION**

</div>

Plaintiff is unlikely to succeed on the merits and has not shown he faces irreparable harm without relief. Both the balance of the equities and the public interest favor permitting the court system to enforce its rules preventing vexatious litigation through prefiling requirements. Therefore, the Court should deny Plaintiff's motion for preliminary relief.

ER-399

RESPECTFULLY SUBMITTED this 6th day of June, 2025.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**


By  /s/ *Joshua A. Katz*
     Hayleigh S. Crawford
     *Deputy Solicitor General*
     Joshua A. Katz
     *Assistant Attorney General*
     Office of the Arizona Attorney General
     2005 N. Central Ave.
     Phoenix, Arizona 85004

     *Attorneys for Defendant Arizona Attorney*
       *General Kristin K. Mayes*

ER-400

Phillip Potter
2301 N. 66th Street
Scottsdale, Arizona 85257
Phone: 480.459.0310
E-Mail: phillip.t.potter@gmail.com
Plaintiff
Pro Se

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Phillip Potter, | No. 2:25-cv-00663-PHX-DWL |
| Plaintiff, | |
| v. | **SECOND MOTION TO TAKE JUDICIAL NOTICE RE: ATTORNEY GENERAL MAYES' MOTION TO DISMISS** |
| Robert Meza, et al., | |
| Defendants. | |

INTRODUCTION

Pursuant to Fed. R. Evid. ("Rule") 201, Plaintiff asks the Court to take judicial notice of undisputed facts described below and attached as Exhibit 1 and Exhibit 2.

I. Legal Standard

"The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Lee v. City of L.A.,* 250 F.3d 668, 689 (9th Cir. 2001); Rule 201(b).  When notice is requested and the Court receives sufficient information, judicial notice is mandatory.  Rule 201(c)(2).  "The court may take judicial notice at any stage of the proceeding."  Rule 201(d).

II. The Court Should Take Judicial Notice

To evaluate the sufficiency of a complaint under Fed. R. Civ. P. 12(b)(1) and (6), courts look to "the complaint itself and its attached exhibits, documents incorporated by reference, and matters properly subject to judicial notice".  *In re NVIDIA Corp. Sec. Litig.,* 768 F.3d 1046, 1051 (9th Cir. 2014).  Attorney General Kris Mays filed a combined Fed. R. Civ. P. 12(b)(1) and (6) motion to dismiss (Doc. 38) wherein she posited that Plaintiff failed to state a claim because he had applied the wrong legal standard toward deciding whether the facially challenged statute, A.R.S. § 12-3201, violates the Petition Clause. (Doc. 14 at 125).  That motion is now fully briefed (Doc. 49; Doc. 53).  Plaintiff and the Attorney General dispute what legal standard properly determines the scope of the Petition Clause.  The proper standard, in turn, will be used to calculate whether "a substantial number of [the challenged statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v.*

*NetChoice, LLC,* 144 S. Ct. 2383, 2397 (2024). (Doc. 14 at 123).  "The overbreadth dispute boils down to what legal standard defines the right of access to the courts." (Doc. 49, p. 14).  Plaintiff asserted that, when deciding if instances of court petitioning lack First Amendment protection, both (1) objective baselessness and (2) a subjectively motivated improper purpose, in the conjunctive, must be demonstrated.  This is because the Supreme Court established that to give First Amendment "freedoms ... 'breathing space' essential to their fruitful exercise", the Petition Clause "*limited regulation* to suits that were *both* objectively baseless *and* subjectively motivated by an unlawful purpose", in conjunctive fashion.  *BE & K Constr. Co. v. NLRB,* 536 U.S. 516, 524, 531, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) (italics with underline emphasis added). (Doc. 14 at 125).

The Attorney General asked the Court to reject this conjunctive standard because "baseless litigation is not immunized by the First Amendment right to petition" (Doc 38, p. 1).  Citing *Ringgold-Lockhart v. County of Los Angeles,* 761 F.3d 1057, 1062 (9th Cir. 2014) as basis, she posited "'findings of frivolousness or harassment' is disjunctive. *Id*. at 1062. '[A] pattern of harassment" is an "alternative to frivolousness.' *Id*. at 1064." (Doc. 38, p. 14).  She continued to advocate for a "harassment" or "frivolousness"[1] disjunctive legal standard in her response, arguing the Petition Clause does not extend to lawsuits which show "either a pattern of harassment or frivolousness". (Doc. 53, p. 9).

Deciding a separate but related issue, the Court wrote "that *Ringgold-Lockhart* [i]s 'not applicable' because it 'addressed federal vexatious litigant [procedural] rules [under court's inherent authority] and expressly d[oes] not consider" statutory authorities (quoting *Sargent v. Cantil-Sakauye,* 812 F. App'x 682, 683 (9th Cir. 2020)). *See* Doc. 47,

---

[1] *See Moore v. Keegan Mgmt. Co. (In re Keegan Mgmt. Co., Sec. Litig.),* 78 F.3d 431, 434 (9th Cir. 1996) (Litigation is "frivolous" if it "is *both* baseless *and* made without a reasonable and competent inquiry.") (Emphasis original).

ER-403

n.7. However, the Court seemed willing to entertain the idea that "frivolous litigation" alone defines the outer edges of the Petition Clause, and that the Attorney General's understanding of substantive due process through *Ringgold* was accurate, such that her proposed disjunctive standard should be adopted (Doc. 47, p. 16-17). As justification, pointing to a case finding California state courts ruled California's vexatious litigant statute constitutional, this Court singled out the quote, "[j]ust as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition." (Doc. 47, p. 17).

Here, Plaintiff asks the Court to take judicial notice of facts based on, and in support of, the conjunctive legal standard. He reiterates the Supreme Court clarified the forementioned quote when explaining "that [a court] could enjoin baseless retaliatory [i.e., baseless *and* retaliatory] suits because they fell outside of the First Amendment and thus were analogous to 'false statements.' We concluded that '[j]ust as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition.' While this analogy is helpful, it does *not* suggest that the class of baseless litigation is *completely* unprotected: *At most*, it indicates such litigation should be unprotected 'just as' false statements are. And while false statements may be unprotected for their own sake, '[t]he First Amendment *requires* that we protect some falsehood in order to protect *speech that matters.*' ([N]oting the need to protect some falsehoods to ensure that 'the freedoms of speech and press [receive] that 'breathing space' essential to their fruitful exercise'). ... It is at least consistent with these 'breathing space' principles that we have *never* held that the *entire* class of objectively baseless litigation *may be enjoined or declared unlawful* even though such suits may advance no First Amendment interests of their own. Instead,

3

in cases like *Bill Johnson's* and *PREII,* our holdings <u>*limited regulation*</u> to suits that were <u>*both*</u> objectively baseless *and* subjectively motivated by an unlawful purpose", in conjunctive fashion. *BE & K,* 536 U.S. 516 at 531 (italics with underline emphasis added).[2] (Doc. 49, p. 11-12; Doc 14 at 213).

    *BE & K* is not the only binding precedent which confirms district courts in this circuit must apply the conjunctive legal standard on all matters implicating the Petition Clause. For example, the Ninth Circuit distinguishes "protected petitioning activity [from related litigation] activity which [also] must be protected to afford breathing space to the right of petition guaranteed by the First Amendment". *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933 (9th Cir. 2006). "Protected petitioning activity" – what one could think of as core petitioning – involves the filing of pleadings (i.e., a "complaint", petition, "answer", etc.) to seek redress vindicating <u>*substantive*</u> rights. *See* Fed. R. Civ. P. 7(a); Ariz. R. Civ. P. 7. While not considered core petitioning, "conduct incidental to a petition" encompasses all <u>*procedural*</u> conduct (i.e., motion practice, settlement communications, disclosure and discovery matters, etc.). *Sosa*, 437 F.3d at 935.

---

[2] The *BE & K* "entire class of objectively baseless litigation" consists of at least three "classes" of "objectively baseless" suits, including suits whose filing was (1) genuinely arguable under the filing circumstances; (2) not "subjectively motivated" by an "improper purpose"; and (3) "subjectively motivated by an improper purpose". Suits in the first "class" are not subject to sanction, much less injunction or other regulation of petitioning rights. The second "class" of objectively baseless suits are those negligently filed (i.e., <u>*objectively*</u> motivated) when viewed in the light of a reasonable person standard. *Townsend v. Holman Consulting Corp.,* 929 F.2d 1358, 1362 (9th Cir. 1990) (*en banc*) ("The standard governing both [baselessness and negligence] inquiries is objective"). This "class" may be subject to sanctions as a form of litigation-related misconduct per Fed. R. Civ. P. 11(c) if recklessly, knowingly or intentionally maintained after proper notice of unreasonableness. Finally, the last "class" of objectively baseless suits are <u>*subjectively*</u> motivated by an improper purpose. This "class" is not just sanctionable but also actionable because the petitioning falls outside the Petition Clause's conjunctive protections unlike the other "classes" of suits which fall within those protections.

4

"[T]hose who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct" whether that conduct be displayed by filing a petition (i.e., core "petitioning activity") or through prosecuting the petition (i.e., "conduct incidental to a petition"). *Id* at 929. This distinction between core petitioning and "incidental" conduct provides an avenue to manage litigation-related misconduct via procedural rules, and legislatures to enact laws which proscribe such misconduct. That said, the Petition Clause ensures such _procedural_ measures are not transformed into means, or used as pretext, to abridge _substantive_ petitioning.

The conjunctive standard establishes a bright line between permissible procedural sanctions and impermissible substantive infringement that manifests, for instance, in how courts interpret Fed. R. Civ. P. 11 to avoid sanctioning substantive petitioning unless the "complaint" is _both_ objectively baseless (i.e., frivolous) _and_ subjectively motivated by an improper purpose. *See e.g., Hudson v. Moore Business Forms, Inc.,* 836 F.2d 1156, 1159 (9th Cir.1987) ("a complaint that is found to be well-grounded in fact and law cannot be sanctioned as harassing, regardless of the attorney's subjective intent"); *CrossFit Inc. v. Martin*, No. 2:14-CV-02277-PHX-JJT, 2017 WL 4236968 * 8 (D. Ariz. Sept. 22, 2017) ("the [Fed. R. Civ. P. 11(b)(1)] 'improper purpose' inquiry subsumes the 'frivolousness inquiry' when applied to the filing of complaints. In other words, 'complaints are not filed for an improper purpose if they are non-frivolous.'"). (Doc. 49, p. 11).

Likewise, absent both conjunctive conditions, the Petition Clause guarantees legislators may not enact statutory burdens on substantive petitioning. But that is precisely what § 12-3201 does since no § 12-3201(E)(1)(a)-(f) "vexatious conduct" provision involves "both objectively baseless and subjectively motivated by an improper purpose" before petitioning is permanently enjoined. *See* A.R.S. § 12-3201(B) ("A pro

se litigant who is designated a vexatious litigant may not file a new *pleading*, motion or other document without prior leave of the court"). (Doc. 14 at 188-192). Such indiscriminate abridgement makes the statute unconstitutional. *See Sosa*, 437 F.3d at 936 (the "breathing space" requirement protects "petitioning activity" and "conduct incidental to a petition" under the First Amendment "unless the underlying petition itself fell outside" those conjunctive protections). To be sure, the Supreme Court has long held that state government officials have no authority to pass laws, enforce laws, or interpret laws (even the common law) in ways which serve to punish, chill or otherwise abridge First Amendment expression, most often in the form of speech[3], unless that expression is *both* objectively false *and* subjectively motivated by malice. *See e.g.*, *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). (Doc. 14 at 125-128).

Again, Attorney General Mayes misinterprets the *Ringgold* phrase "a pattern of harassment or frivolousness" in the "either ... or" disjunctive. (Doc. 38; Doc. 53). Her misinterpretation openly conflicts with *Sosa* and *BE & K* which "limited regulation to suits that were both objectively baseless and subjectively motivated by an unlawful purpose", in conjunctive fashion. Her misinterpretation would also impose the same disjunctive legal standard for substantively infringing on core petitioning that courts use to procedurally sanction litigation-related misconduct in a "written motion, or other paper". Fed. R. Civ. P. 11(b)(2) and (c). But a higher standard is required to sanction a "pleading" than a "motion" because of the Petition Clause. Indeed, as a basic matter of rules interpretation, courts apply the conjunctive standard, not the disjunctive, when considering sanctions for a "complaint". *CrossFit Inc,* WL 4236968 * 8 ("complaints are

---

[3] *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 393 (2011) ("The rights of speech and petition 'share substantial common ground'").

not filed for an improper purpose if they are non-frivolous.'").  If a disjunctive standard cannot form the basis to sanction core petitioning under a procedural authority, it surely cannot form the basis to infringe on those same petitioning rights under a statutory authority.  The disjunctive standard collapses under the weight of the conflicts it creates.

In contrast, reading the applicable legal standard in the conjunctive creates no conflicts.  U.S. Const. amends. I and XIV prohibit states from enacting or enforcing laws which abridge court petitioning unless the underlying suit is a "sham".  *Sosa*, 437 F.3d at 931-32.  The Ninth Circuit applies "a strict two-step analysis to assess whether a single action constitutes sham petitioning."  *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994).  Court petitioning is considered a "sham" only when *both* of two conditions are met: "where the lawsuit is objectively baseless and the [litig]ant's motive in bringing it was unlawful."  *Sosa*, 437 F.3d at 938.  "The two parts of the test operate in succession: Only if the suit is found to be objectively baseless does the court proceed to examine the litigant's subjective intent."  *USS-POSCO Indus.*, 31 F.3d at 810.  Given that the Supreme Court directly addressed this issue, the conjunctive standard must be used to differentiate "protected petitioning activity" from unprotected conduct in bright line fashion as "*BE & K* made ... explicit".  *Sosa*, 437 F.3d at 934.  This legal standard gives the Petition Clause "breathing space" and is otherwise known as the "sham litigation" test. *Id*. (Doc. 14 at 126, 230, n.38).

With that test in mind, the *Ringgold* reference to "harassment" (*see Ringgold*, 761 F.3d at 1064-65) traces to *In re Powell*, 851 F.2d 427 (D.C.Cir.1988) (per curiam) which made clear that in the vexatious litigant context, like all other contexts, cases reviewed for the "improper purpose" of "harassment" must also display "obvious lack of merit" as a precursor.  *Id* at 432.  Put another way, a meritorious (i.e., non-baseless) complaint

cannot give rise to a vexatious "harassment" consideration, much less an actual determination. *B&G Foods N. Am., Inc. v. Embry,* 29 F.4th 527, 538-39 (9th Cir. 2022) ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation"). The Attorney General's contention that *Ringgold* somehow permits a one-part legal standard to evaluate for the improper purpose of "harassment" absent objective baselessness cannot be reconciled with *BE & K*, *Sosa*, or any of their predecessor or progeny caselaw, but the conjunctive standard creates no such conflicts.

Furthermore, *Ringgold* never held that "frivolousness" in a single action, or even in a small number of actions, suffices as a stand-alone condition to deprive free access to the courts. The Ninth Circuit's legal standard for vexatious "frivolousness" expressed in *Ringgold* requires (1) an "inordinate" number of (2) frivolous suits. *Ringgold,* 761 F.3d at 1064 ("To determine whether the litigation is frivolous, district courts must 'look at <u>both</u> the number <u>and</u> content of the filings as indicia of the frivolousness of the litigant's claims. While we have not established a numerical definition for frivolousness, we have said that 'even if [a litigant's] <u>petition</u> is <u>frivolous</u>, the court [must] make a finding that the <u>number of complaints</u> was inordinate. Litigiousness alone is not enough. ... [T]wo cases is <u>far fewer</u> than what other courts have found 'inordinate.'") (internal citations omitted) (emphasis added). Taken together, the *Ringgold* vexatious "frivolousness" test for an "inordinate" number of what *Moore*, 78 F.3d at 434, defines as "baseless" suits filed "without a reasonable and competent inquiry" can alternatively be described as a test for "a series of lawsuits 'brought pursuant to a policy of starting legal proceedings without regard to the merits'". *Sosa*, 437 F.3d at 938. That alternative phrasing is what *Sosa* calls the "second sham litigation exception" test. *Id*. The "second" test complements the "first shame litigation exception" test which, again, is simply another name for the *BE*

*& K* conjunctive legal standard for <u>*both*</u> objective baselessness <u>*and*</u> a subjectively motivated improper purpose.  *Id*.  The Ninth Circuit reads the "first sham litigation exception" and the "second sham litigation exception" tests together "as applying to different situations" and thus consistent with *BE & K.  Relevant Grp., LLC v. Nourmand,* 116 F.4th 917, 929 (9th Cir. 2024). (Doc. 14 at 230, n.38). Although this circuit has "occasionally blurred the lines concerning which [sham exception] test should apply and when", the first exception test applies "when there is 'a single sham lawsuit (or *a small number of such suits*)" and the second exception test applies to a "series" of suits although there is no hard delineation between what constitutes a "small number" or a "series".[4] *Id* (emphasis original).  The "rarity" of case law addressing a "series" of suits is considered "a feature rather than a bug" of the second sham litigation exception test. *Id* at 931.  In other words, this circuit purposefully made the second sham test difficult to prove.  Critically, the unit of analysis for either sham litigation exception test is the "lawsuit" (i.e., the "civil action"), not filings within a suit.  *Id*.  And the Ninth Circuit does not consider "four actions" to be "inordinate" enough to constitute a "series".  *Id*; *Ringgold,* 761 F.3d at 1065 ("two cases is far fewer than what other courts have found 'inordinate'").  In the vexatious litigant context, the number of suits required to prove the second sham litigation exception test reaches into double digits where "thirty-five actions" is the minimum number affirmed.  *Id* at 1066.  *Ringgold* cites *BE & K* so the *Ringgold* circuit court was aware of the conjunctive legal standard made explicit therein. *Ringgold,* 761 F.3d at 1061. (Doc. 14 at 137-138).  The Attorney General's contention

---

[4] The "second sham litigation test" permits suits that are both objectively baseless and <u>*objectively*</u> motivated (i.e., negligently frivolous) to lose Petition Clause protection provided that the number of such suits is sufficiently "inordinate" to constitute a "series". The "series" concept serves as an alternative indicator that the litigant is actually "subjectively motived" to accomplish "an unlawful purpose".  *Sosa*, 437 F.3d *at* 938.

ER-410

that "baseless litigation [alone] is not immunized by the First Amendment right to petition" and her interpretation the Petition Clause permits a determination of "either" harassment "or" frivolousness as a disjunctive standard, cannot be reconciled with binding precedent or procedural rules.  The conjunctive legal standard harmonizes all.

In sum, when deciding whether litigation "conduct falls under the protection of the Petition Clause, we must give adequate 'breathing space' to the right of petition". *Sosa*, 437 F.3d at 931-32. (Doc. 14 at 126, 213).  The "breathing space" principle requires the Court evaluate A.R.S. § 12-3201 against the true scope of the Petition Clause defined by the *BE & K* conjunctive legal standard.  Attorney General Mayes asks the Court to apply a disjunctive legal standard based on misunderstood quotes taken out of context.  Providing clarity on those exact quotes, the U.S. Supreme Court made the conjunctive legal standard "explicit".  When applying that proper legal standard, the challenged statute is facially overbroad in violation of the First Amendment.  Federal rules interpretation, Ninth Circuit caselaw, and on-point Supreme Court precedent all support Plaintiff's position that the Court must apply the conjunctive legal standard to give the Petition Clause "breathing space essential to [its] fruitful exercise".  With the conjunctive standard in mind, Plaintiff asks the Court to grant judicial notice, as follows.

A. The Court Should Take Judicial Notice of California's Vexatious Litigant Statute

When deciding motions to dismiss, federal courts may take "judicial notice of ... statutes, ... not included in the plaintiff's complaint."  *Navajo Nation v. Dep't of the Interior,* 876 F.3d 1144, 1153 n.3 (9th Cir. 2017).

1. Calif. Code Civ. P. §§ 391-391.8 Is Relevant

The Court alluded to "California's vexatious litigant statute" (Calif. Code Civ. P. §§ 391-391.8) and associated caselaw in a preliminary ruling. (Doc. 47, p. 17).  It is well

known that California's statute has been challenged on First Amendment grounds in state courts up to the California Supreme Court which found that statute constitutional.  *See e.g.*, *Moran v. Murtaugh Miller Meyer & Nelson, LLP,* 40 Cal. 4th 780 (2007).  As such, federal courts must accept the state supreme court's construal and findings. *Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law, and [] we are bound by their constructions").  Only the U.S. Supreme Court remains in position to review and override the California Supreme Court.  U.S. Const., art. III, § 2; 28 U.S.C. § 1257.  That said, Arizona's supreme court has also spoken on how to construe its statute's language, and federal courts must also adopt that construal.  *See Ariz. Republican Party v. Richer*, 257 Ariz. 210 (2024). (Doc. 14 at 128-131).

The plain language of those two statutes differs considerably.  That said, the Court need not wrestle with any perceived discrepancies.  It can simply give nod to the California Supreme Court's findings while adopting the Arizona Supreme Court's *Richer* findings, apply the proper legal standard to decide what instances of petitioning the Petition Clause protects, and determine whether the challenged statute operates within, or infringes on, First Amendment protections.  To be clear though, the substantive language of California's statute holds that California state courts cannot find a litigant vexatious unless "after hearing evidence on the motion, the court determines that the litigation has no merit *and* has been filed for the purposes of harassment or delay".  Calif. Code Civ. P. § 391.3(b).  California's legislature expressly wrote the conjunctive legal standard into its statute to ensure applications do not run afoul of the Petition Clause.  Arizona's did not.

2. Exhibit 1: Calif. Code Civ. P. §§ 391-391.8

Plaintiff asks the Court to take judicial notice of Calif. Code Civ. P. § 391.3(b) plain language which says California courts may find a pro se litigant vexatious only

"[i]f, after hearing evidence on the motion, the court determines that the litigation has no merit *and* has been filed for the purposes of harassment or delay". This language can be found in Calif. Code Civ. P. §§ 391-391.8 (*see* Exhibit 1), which the Court can also review on the California Legislature's government website accessible online at https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?sectionNum=391.3.&nodeTreePath=5.4&lawCode=CCP.

### B. The Court Should Take Judicial Notice of Arizona's Vexatious Litigant List

Courts may take judicial notice of materials available on government websites. *Gustavson v. Wrigley Sales Co.*, 961 F. Supp. 2d 1100, 1113 n.1 (N.D. Cal. 2013). Courts also "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue". *Rancheria Citizens Council v. Borneo,* 971 F.2d 244, 248 (9th Cir. 1992)

### 1. Arizona's Vexatious Litigant List Is Relevant

The Arizona Supreme Court maintains an online list of litigants publicly designated vexatious per A.R.S. § 12-3201. The online list also links to case records, including judicial orders and administrative orders which allow the parties and the Court to ascertain facts from which can be used to calculate the number and ratio of case outcomes which violate the Petition Clause. Those calculations, in turn, reveal whether "a substantial number of applications are unconstitutional" to decide Count One.

On motion, § 12-3201 mandates state courts impose a blanket injunction on pro se litigants who demonstrates "any" evidence of "vexatious conduct". *See* A.R.S. §§ 12-3201(A), (B), (C), and (E)(1)(a)-(f). This includes a general prohibition on filing any future "pleading" absent "leave of court" per § 12-3201(B). However, the Ninth Circuit held that any vexatious injunction, like all injunctions implicating First Amendment

rights, "must be narrowly tailored to the vexatious litigant's wrongful behavior". *Molski v. Evergreen Dynasty Corp.,* 500 F.3d 1047, 1061 (9th Cir.2007) (per curiam). As explained in the operative complaint (Doc. 14 at 125) and Plaintiff's response (Doc. 49) to the Attorney General's motion to dismiss (Doc. 38), the Petition Clause "limit[s] regulation to suits that [a]re both objectively baseless *and* subjectively motivated by an unlawful purpose", in conjunctive fashion per *BE & K*. The question then becomes whether § 12-3201(E)(1)(a)-(f) proscribed conduct classifies as protected petitioning under the Petition Clause. If so, at least in "a substantial number of applications", then the statute violates the First Amendment. Consequently, the online list and facts contained therein are relevant to deciding Attorney General's motion to dismiss.

### 2. Exhibit 2: Records From Arizona's Vexatious Litigant List Website

Plaintiff asks the Court to take judicial notice of facts drawn from case records on Arizona's vexatious litigant list entered after January 1, 2015 (*see* Exhibit 2). The Court can also review these records on the Arizona Supreme Court website accessible online at https://www.azcourts.gov/Vexatious-Litigants/List-of-Vexatious-Litigants.

### 3. A Substantial Number of Applications Are Unconstitutional

As a matter of substantive due process, a vexatious litigant injunction must be narrowly tailored to fit a specific vice and can only regulate petitioning conduct which falls outside the Petition Clause's "breathing space" safeguards – i.e., "sham" litigation.

Of the seventeen (17) Maricopa County court records (Exhibit 1, pdf pp. 1-135), four (4) do not contain blanket language generally prohibiting the self-represented litigant from ever filing any new lawsuit (i.e., "court action") without leave of the court. Those cases are Administrative Order 2015-095 (pdf pp. 1-3, "Mr. Fishman may not file any new causes of action in any of the Maricopa County *Justice Courts* after the date of this

order"); Administrative Order 2017-028 (pdf pp. 4-6, "Mr. Ariav may not file any new causes of action against Barbara Dalicandro after the date of this order without leave of the Civil Presiding Judge"); Administrative Order 2022-053 (pdf pp. 101-103, "Mr. Meilleur may not file any new causes of action against Lisa Posada after the date of this order without leave of the Civil Presiding Judge"); and Administrative Order 2024-046 (pdf pp. 130-135, "Mr. Lewis may not file any new causes of action as a pro se litigant in any way related to his criminal arrest, prosecution, or conviction, including the issuance of any alleged bonds, after the date of this order without leave of the Civil Presiding Judge or his/her designee").  Of those four (4) cases, the litigant in question was found the have violated both § 12-3201(E)(1)(c) (i.e., objective baselessness) and (a) (i.e., the subjectively motivated improper purpose of harassment)[5] in three (3) cases; specifically, Administrative Order 2017-028 (pdf pp. 4-6, "the Court found Mr. Ariav brought his lawsuit without substantial justification; Mr. Ariav's intention was to harass, embarrass and intimidate the defendant"); Administrative Order 2022-053 (pdf pp. 101-103, "The Court finds that the lawsuits against Ms. Posada are brought without substantial justification and are intended primarily for the purpose of harassing her"), and Administrative Order 2024-046 (pdf pp. 130-135, "the Court finds that Mr. Lewis has engaged in vexatious conduct by the repeated filing of court actions solely or primarily for the purpose of harassment and brought actions without "substantial justification" as defined in A.R.S. § 12-349").

Of the thirty-eight (38) records on the list from other county courts (see Exhibit 1,

---

[5] The Arizona Supreme Court found § 12-3201(E)(1)(c) language only reaches objective baselessness while § 12-3201(a) only reaches the improper purpose of harassment.  This construal "extricates [Arizona] courts from the morass of attempting to discern the subjective motives of attorneys and parties in bringing a case and avoids conflating motive and the objective reasonableness of litigation".  *Richer*, 257 Ariz. 210 at ¶ 40.

pdf pp. 136 - 264), seventeen (17) cases do not include blanket language prohibiting the litigant from ever filing any new lawsuit (i.e., "court action") without leave of the court. Those cases are Yuma Administrative Order 2016-001 (pdf pp. 136-139, "Ordering the Riendeaus not file any new pleadings, motions or other documents in S1400CV201001521 *Riendeau v Thomas*, *Thomas and Markson P.C.* et al without prior leave of the court"); Yavapai case 1300DO201380058 (pdf pp. 149-150, "Petitioner shall also be required to obtain the Court's permission to file any future pleadings in this case"); Yavapai case S1300DO202480044 (pdf pp. 160-162)[6]; Yavapai case P1300DO20060917 (pdf pp. 163-167)[7]; Pima case SP20200416 (pdf pp. 168-175, "Cody Alan Castro, shall utilize the following procedure in order to obtain permission to file pleadings in this matter..."); Yavapai case V1300CV202180348 (pdf pp. 177-178, "he is precluded from filing any documents in this case without first obtaining leave of the Court"); Pima case C20174102 (pdf pp. 179-184, "Plaintiff shall be enjoined from filing any future lawsuits in Pina County against Defendant"); Pima case D20181014 (pdf pp. 191-197, "Respondent shall not file any more pleadings, motions or requests for relief in this divorce action"); Yavapai case V1300DO201580241 (pdf pp. 198-201, "Petitioner shall not file any pleadings in this case without first obtaining leave of the Judge"); Yavapai case P1300CV201800284 (pdf pp. 211-212, "before she is able to file another pleading against or involving Defendants she needs to file a motion for permission of the court"); Pima case SP2015-1002 (pdf pp. 213-215)[8]; Pima case D20201386 (pdf pp. 219-228, "Respondent shall not file any more pleadings, motions or requests for relief in this divorce action without a Court order accepting a proposed filing"); Pima case C20155817

---

[6] This Court issued no pre-filing restrictions but merely labeled the litigant vexatious.
[7] This Court issued no pre-filing restrictions but merely labeled the litigant vexatious.
[8] This Court issued no pre-filing restrictions but merely labeled the litigant vexatious.

ER-416

(pdf pp. 229-238, "Mel M. Marin is enjoined from filing any lawsuit, in which he is self-represented, in any Arizona Superior Court or any Justice Center against any Defendant in this action"); Pima case C20232864 (pdf pp. 239-247, "Plaintiff Mark W. McCune is enjoined from filing any pro se lawsuit in any Arizona Superior Court regarding the property located at 2131 N. Frannea Drive"); Pima case P1300DO201200632 (pdf pp. 248-249, "Respondent Deborah Sue Pomeroy is precluded from filing any document in this case without first obtaining leave of the Court"); Yavapai case P1300CV202100126 (pdf pp. 256-257, "Peter Strojnik is precluded from filing any documents in any of the following cases ... without first obtaining leave of the Court"; Yavapai case P1300PB201700254 (pdf pp. 258-259, "Respondent shall not file into the probate matter or any related civil matter without further order of the Superior Court").  Of those seventeen (17) cases, the litigant was found the have violated both § 12-3201(E)(1)(c) and (a) in five (5) cases; specifically, Yuma Administrative Order 2016-002 (pdf pp. 136-139, "Plaintiff's conduct in both lawsuits clearly evidences their intent to harass ... Plaintiff's entire conduct, the undersigned concludes is without any justification, not just 'without substantial justification'"); Pima case C20202169 (pdf pp. 151-159, "Accordingly, at least the Third and Fourth Lawsuit were brought without substantial justification. ... Given the totality of the conduct, the Court finds that the purpose of the conduct was to harass Defendant."); Pima case SP20200416 (pdf pp. 168-175, "Respondent's motions are frivolous and harassing")[9]; Pima case C20155817 (pdf pp. 229-238, "Plaintiff has filed frivolous and meritless cases against various parties throughout the country. ... Plaintiff's practice of filing repetitive lawsuits against these

---

[9] This court found motion practice was "frivolous and harassing", not the dissolution case. This record is included based primarily on its overall narrative rather than a specific §§ 12-3201(E)(1)(a) or (c) finding regarding a complaint or court action.

and other Defendants is abusive, harassing, and contrary to the interests of justice"); Pima case P1300DO201200632 (pdf pp. 248-249, "All of these pleadings are designed to harass and disparage ... The Petition to Modify Child Support, as well as many of the legal points in his "Notices" to the Court were brought without substantial justification").

<div align="center">CONCLUSION</div>

The Court should judicially notice facts from plain language in California's vexatious litigant statute. Those facts support the conjunctive legal standard. The Court should also judicially notice factual quotes from case records. Those facts show three (3) of seventeen (17) Maricopa County cases on the vexatious litigant list are constitutional, meaning just three (3) regulate "sham" litigation. As such, 82% of the challenged statute's applications in Maricopa County violate the Petition Clause. Elsewhere, only five (5) out of thirty-eight (38) cases on the list are constitutional. In other words, 87% of the challenged statute's applications outside of Maricopa County violate the Petition Clause. Altogether, when applying the proper conjunctive legal standard, of the fifty-five (55) total cases appearing on the state's vexatious litigant list, only eight (8) impose a narrowly tailored injunction which regulates sham petitioning. Consistent with the *Moody* analysis, 85% of vexatious litigant injunctions issued per A.R.S. § 12-3201 violate the Petition Clause, meaning "a substantial number of applications ... are unconstitutional" in relation to any legitimate sweep. The challenged statute is facially overbroad. The Court should permanently enjoin its operation and enforcement.

DATED this 16th day of October 2025.

By: //s//
Phillip Potter
Plaintiff
Pro Se



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**State of California**

**CODE OF CIVIL PROCEDURE**

**Section 391**

---

391. As used in this title, the following terms have the following meanings:

(a) "Litigation" means any civil action or proceeding, commenced, maintained or pending in any state or federal court.

(b) "Vexatious litigant" means a person who does any of the following:

(1) In the immediately preceding seven-year period has commenced, prosecuted, or maintained in propria persona at least five litigations other than in a small claims court that have been (i) finally determined adversely to the person or (ii) unjustifiably permitted to remain pending at least two years without having been brought to trial or hearing.

(2) After a litigation has been finally determined against the person, repeatedly relitigates or attempts to relitigate, in propria persona, either (i) the validity of the determination against the same defendant or defendants as to whom the litigation was finally determined or (ii) the cause of action, claim, controversy, or any of the issues of fact or law, determined or concluded by the final determination against the same defendant or defendants as to whom the litigation was finally determined.

(3) In any litigation while acting in propria persona, repeatedly files unmeritorious motions, pleadings, or other papers, conducts unnecessary discovery, or engages in other tactics that are frivolous or solely intended to cause unnecessary delay.

(4) Has previously been declared to be a vexatious litigant by any state or federal court of record in any action or proceeding based upon the same or substantially similar facts, transaction, or occurrence.

(5) After being restrained pursuant to a restraining order issued after a hearing pursuant to Chapter 1 (commencing with Section 6300) of Part 4 of Division 10 of the Family Code, and while the restraining order is still in place, they commenced, prosecuted, or maintained one or more litigations against a person protected by the restraining order in this or any other court or jurisdiction that are determined to be meritless and caused the person protected by the order to be harassed or intimidated.

(c) "Security" means an undertaking to assure payment, to the party for whose benefit the undertaking is required to be furnished, of the party's reasonable expenses, including attorney's fees and not limited to taxable costs, incurred in or in connection with a litigation instituted, caused to be instituted, or maintained or caused to be maintained by a vexatious litigant.

(d) "Plaintiff" means the person who commences, institutes or maintains a litigation or causes it to be commenced, instituted or maintained, including an attorney at law acting in propria persona.

   (e) "Defendant" means a person (including corporation, association, partnership and firm or governmental entity) against whom a litigation is brought or maintained or sought to be brought or maintained.

  (Amended by Stats. 2022, Ch. 84, Sec. 1. (AB 2391) Effective January 1, 2023.)



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**State of California**

**CODE OF CIVIL PROCEDURE**

**Section 391.1**

391.1.  (a)  In any litigation pending in any court of this state, at any time until final judgment is entered, a defendant may move the court, upon notice and hearing, for an order requiring the plaintiff to furnish security or for an order dismissing the litigation pursuant to subdivision (b) of Section 391.3. The motion for an order requiring the plaintiff to furnish security shall be based upon the ground, and supported by a showing, that the plaintiff is a vexatious litigant and that there is not a reasonable probability that they will prevail in the litigation against the moving defendant.

  (b)  A motion pursuant to subdivision (a) on the grounds that plaintiff is a vexatious litigant pursuant to paragraph (5) of subdivision (b) of Section 391 may be brought only by a person protected by the restraining order. A person filing a motion as described in this subdivision shall not be required to pay a filing fee.

  (Amended by Stats. 2022, Ch. 84, Sec. 2. (AB 2391) Effective January 1, 2023.)



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

State of California

CODE OF CIVIL PROCEDURE

Section 391.2

391.2. At the hearing upon the motion the court shall consider any evidence, written or oral, by witnesses or affidavit, as may be material to the ground of the motion. Except for an order dismissing the litigation pursuant to subdivision (b) of Section 391.3, no determination made by the court in determining or ruling upon the motion shall be or be deemed to be a determination of any issue in the litigation or of the merits thereof.

(Amended by Stats. 2012, Ch. 417, Sec. 2. (AB 2274) Effective January 1, 2013.)



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**State of California**

**CODE OF CIVIL PROCEDURE**

**Section  391.3**

---

391.3.  (a)  Except as provided in subdivision (b), if, after hearing the evidence upon the motion, the court determines that the plaintiff is a vexatious litigant and that there is no reasonable probability that the plaintiff will prevail in the litigation against the moving defendant, the court shall order the plaintiff to furnish, for the benefit of the moving defendant, security in such amount and within such time as the court shall fix.

(b)  If, after hearing evidence on the motion, the court determines that the litigation has no merit and has been filed for the purposes of harassment or delay, the court shall order the litigation dismissed. This subdivision shall only apply to litigation filed in a court of this state by a vexatious litigant subject to a prefiling order pursuant to Section 391.7 who was represented by counsel at the time the litigation was filed and who became in propria persona after the withdrawal of his or her attorney.

(c)  A defendant may make a motion for relief in the alternative under either subdivision (a) or (b) and shall combine all grounds for relief in one motion.

(Amended by Stats. 2012, Ch. 417, Sec. 3.  (AB 2274)  Effective January 1, 2013.)



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**State of California**

**CODE OF CIVIL PROCEDURE**

**Section 391.4**

391.4. When security that has been ordered furnished is not furnished as ordered, the litigation shall be dismissed as to the defendant for whose benefit it was ordered furnished.

(Added by Stats. 1963, Ch. 1471.)



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**State of California**

**CODE OF CIVIL PROCEDURE**

**Section  391.6**

391.6.  Except as provided in subdivision (b) of Section 391.3, when a motion pursuant to Section 391.1 is filed prior to trial the litigation is stayed, and the moving defendant need not plead, until 10 days after the motion shall have been denied, or if granted, until 10 days after the required security has been furnished and the moving defendant given written notice thereof. When a motion pursuant to Section 391.1 is made at any time thereafter, the litigation shall be stayed for such period after the denial of the motion or the furnishing of the required security as the court shall determine.

(Amended by Stats. 2012, Ch. 417, Sec. 4.  (AB 2274)  Effective January 1, 2013.)



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**State of California**

**CODE OF CIVIL PROCEDURE**

**Section 391.7**

---

391.7. (a) In addition to any other relief provided in this title, the court may, on its own motion or the motion of any party, enter a prefiling order which prohibits a vexatious litigant from filing any new litigation in the courts of this state in propria persona without first obtaining leave of the presiding justice or presiding judge of the court where the litigation is proposed to be filed. Disobedience of the order by a vexatious litigant may be punished as a contempt of court.

(b) The presiding justice or presiding judge shall permit the filing of that litigation only if it appears that the litigation has merit and has not been filed for the purposes of harassment or delay. The presiding justice or presiding judge may condition the filing of the litigation upon the furnishing of security for the benefit of the defendants as provided in Section 391.3.

(c) The clerk may not file any litigation presented by a vexatious litigant subject to a prefiling order unless the vexatious litigant first obtains an order from the presiding justice or presiding judge permitting the filing. If the clerk mistakenly files the litigation without the order, any party may file with the clerk and serve, or the presiding justice or presiding judge may direct the clerk to file and serve, on the plaintiff and other parties a notice stating that the plaintiff is a vexatious litigant subject to a prefiling order as set forth in subdivision (a). The filing of the notice shall automatically stay the litigation. The litigation shall be automatically dismissed unless the plaintiff within 10 days of the filing of that notice obtains an order from the presiding justice or presiding judge permitting the filing of the litigation as set forth in subdivision (b). If the presiding justice or presiding judge issues an order permitting the filing, the stay of the litigation shall remain in effect, and the defendants need not plead, until 10 days after the defendants are served with a copy of the order.

(d) For purposes of this section, "litigation" includes any petition, application, or motion other than a discovery motion, in a proceeding under the Family Code or Probate Code, for any order.

(e) The presiding justice or presiding judge of a court may designate a justice or judge of the same court to act on his or her behalf in exercising the authority and responsibilities provided under subdivisions (a) to (c), inclusive.

(f) The clerk of the court shall provide the Judicial Council a copy of any prefiling orders issued pursuant to subdivision (a). The Judicial Council shall maintain a record of vexatious litigants subject to those prefiling orders and shall annually disseminate a list of those persons to the clerks of the courts of this state.

(Amended by Stats. 2011, Ch. 49, Sec. 1. (SB 731) Effective January 1, 2012.)



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**State of California**

**CODE OF CIVIL PROCEDURE**

**Section 391.8**

---

391.8. (a) A vexatious litigant subject to a prefiling order under Section 391.7 may file an application to vacate the prefiling order and remove his or her name from the Judicial Council's list of vexatious litigants subject to prefiling orders. The application shall be filed in the court that entered the prefiling order, either in the action in which the prefiling order was entered or in conjunction with a request to the presiding justice or presiding judge to file new litigation under Section 391.7. The application shall be made before the justice or judge who entered the order, if that justice or judge is available. If that justice or judge who entered the order is not available, the application shall be made before the presiding justice or presiding judge, or his or her designee.

(b) A vexatious litigant whose application under subdivision (a) was denied shall not be permitted to file another application on or before 12 months has elapsed after the date of the denial of the previous application.

(c) A court may vacate a prefiling order and order removal of a vexatious litigant's name from the Judicial Council's list of vexatious litigants subject to prefiling orders upon a showing of a material change in the facts upon which the order was granted and that the ends of justice would be served by vacating the order.

(Added by Stats. 2011, Ch. 49, Sec. 2. (SB 731) Effective January 1, 2012.)